No.

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

AngioScore, Inc.,

*Plaintiff,*

v.

TriReme Medical, LLC (f/k/a TriReme Medical, Inc.), Eitan Konstantino, Quattro Vascular PTE Ltd. and QT Vascular Ltd. (f/k/a QT Vascular Pte. Ltd.),

*Defendants.*

_____

**United States District Court**
**Northern District of California, No. 4:12-cv-3393-YGR**
**The Honorable Yvonne Gonzalez Rogers**

_____

## TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD. AND QT VASCULAR LTD.'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL

### [NONCONFIDENTIAL]

_____

DAVID S. STEUER
STEVEN D. GUGGENHEIM
DYLAN J. LIDDIARD
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

*Attorneys for Applicants*
*TriReme Medical, LLC, Quattro Vascular PTE Ltd. and QT Vascular Ltd.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. III

CERTIFICATE OF INTEREST ............................................................ V

STATEMENT OF OPPOSITION .......................................................... VI

CONFIDENTIAL MATERIAL OMITTED ............................................. VII

ARGUMENT ....................................................................................... 1

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

II.   RELEVANT FACTUAL BACKGROUND .................................. 3

III.  THIS COURT SHOULD STAY EXECUTION OF THE
      JUDGMENT AND WAIVE ANY BOND REQUIREMENT ...................... 8

      A.   Corporate Defendants Raise Substantial Legal Questions And Are
           Likely To Succeed On The Merits Of Their Appeal .............................. 10

      B.   The Stay Will Not Substantially Injure AngioScore. .............................. 15

      C.   Corporate Defendants Will Suffer Irreparable Harm. ............................ 16

      D.   Corporate Defendants' Creditors Will Suffer Irreparable Harm. ............. 17

      E.   The Public Interest Strongly Supports Staying The Judgment. .............. 18

IV.   CONCLUSION ............................................................................ 20

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*Arban v. W. Publ'g Corp.,*
    345 F.3d 390 (6th Cir. 2003) ........................................................................9

*Arbaugh v. Y&H Corp.,*
    546 U.S. 500 (2006) ...................................................................................14

*Bass v. First Pac. Networks, Inc.,*
    219 F.3d 1052 (9th Cir. 2000) .....................................................................9

*Bd. of Trs. v. Roche Molecular Sys., Inc.,*
    131 S. Ct. 2188 (2011) ..............................................................................11

*Boyer v. Wilmington Materials, Inc.,*
    754 A.2d 881 (Del. Ch. 1999) ...................................................................13

*Broz v. Cellular Info. Sys., Inc.,*
    673 A.2d 148 (Del. 1996) ....................................................................11, 12

*Dillon v. City of Chi.,*
    866 F.2d 902 (7th Cir. 1988) .....................................................................17

*Dweck v. Nasser,*
    No. 1353-VCL, 2012 WL 161590 (Del. Ch. Jan. 18, 2012) .......................13

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,*
    835 F.2d 277 (Fed. Cir. 1987) ..................................................................10

*Equity Corp. v. Milton,*
    221 A.2d 494 (Del. 1966) ..........................................................................12

*Ethicon, Inc. v. U.S. Surgical Corp.,*
    135 F.3d 1456 (Fed. Cir. 1998) ................................................................12

*Fed. Prescription Serv. v. Am. Pharm. Ass'n,*
    636 F.2d 755 (D.C. Cir. 1980) ....................................................................9

*Guth v. Loft, Inc.,*
    5 A.2d 503 (Del. 1939) ..............................................................................11

*Int'l Telemeter, Corp. v. Hamlin Int'l Corp.,*
    754 F.2d 1492 (9th Cir. 1985) .....................................................................9

*Miami Int'l Realty Co. v. Paynter,*
    807 F.2d 871 (10th Cir. 1986) ...................................................................17

*N. Ind. Pub. Serv. Co. v. Carbon Cty. Coal Co.,*
    799 F.2d 265 (7th Cir. 1986) .......................................................................9

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.,*
    786 F.2d 794 (7th Cir. 1986) ................................................17, 18, 19

*Poplar Grove Planting & Ref. Co.,*
    600 F.2d 1189, 1190-91 (5th Cir. 1979) ........................................18

*Richard B. LeVine, Inc. v. Higashi,*
    131 Cal. App. 4th 566 (2005) ...........................................................12

*Sci. Accessories Corp. v. Summagraphics Corp.,*
    425 A.2d 957 (Del. 1980) ..................................................................12

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.,*
    897 F.2d 511 (Fed. Cir. 1990) .........................................................10

*Thorpe by Castleman v. CERBCO, Inc.,*
    676 A.2d 436 (1996) ....................................................................11, 13

*United Mine Workers of Am. v. Gibbs,*
    383 U.S. 715 (1966) ...........................................................................14

*U.S. v. All Assets of Statewide Auto Parts, Inc.,*
    971 F.2d 896 (2d Cir. 1992) ............................................................16

*Voda v. Cordis Corp.,*
    476 F.3d 887 (Fed. Cir. 2007) .....................................................14, 15

**STATUTES**

35 U.S.C. § 261 ......................................................................................12

35 U.S.C. § 262 ...................................................................................12,13

**RULES**

Fed. R. App. P. 8 .....................................................................................9

Fed. R. Civ. P. 62 .................................................................................1, 9

## CERTIFICATE OF INTEREST

Counsel for TriReme Medical, LLC, Quattro Vascular Pte Ltd., and QT Vascular Ltd. certifies the following:

1. The full names of every party represented by me: TriReme Medical, LLC, Quattro Vascular Pte Ltd. and QT Vascular Ltd.

2. The names of the real parties in interest represented by me: See response to item 1.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me: QT Vascular Ltd. discloses that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock. Quattro Vascular Pte Ltd. discloses that QT Vascular Ltd. owns 100% of its shares.

4. The names of all law firms, and the partners or associates, that appeared for the parties represented by me in the trial court or are expected to appear in this Court: Anne Aufhauser, Brian Danitz, Catherine Grealis, Steven D. Guggenheim, Joy Kim, Charlene Koski, Dylan J. Liddiard, Edmundo Marquez, Thomas J. Martin, Jasmine Owens, David S. Steuer, Cali Tran, Daniel Turbow, and Rebecca Wolitz of Wilson Sonsini Goodrich & Rosati, PC; Brandon Baum, David Caine, Thomas Carmack, Michael Nguyen, and James Otteson of Agility IP Law, LLP and Arnold & Porter LLP; William Gerard von Hoffman III, Joseph Re, Joshua Stowell, and Sheila Swaroop of Knobbe, Martens, Olson, Bear, LLP; John Claassen of Claassen Professional Corporation.

Dated:  October 26, 2015          Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ David S. Steuer
        DAVID S. STEUER

*Attorneys for Defendants-Applicants*
TriReme Medical LLC, Quattro Vascular Pte
Ltd., and QT Vascular Ltd

## STATEMENT OF OPPOSITION

Pursuant to Federal Circuit Rule 27(a)(5), counsel for Defendants-Applicants TriReme Medical, LLC, Quattro Vascular PTE Ltd. and QT Vascular Ltd. (collectively, "Corporate Defendants" or the "Companies") informed counsel for Plaintiff AngioScore, Inc. ("AngioScore") of Corporate Defendants' intent to file this motion and sought AngioScore's position. AngioScore indicated that it opposes the motion.

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rule 27(m), Corporate Defendants have prepared a public version of this motion that omits certain confidential information. Specifically, the material omitted on page 6 contains estimated interim unaudited financial information regarding QT Vascular Ltd. This information is sensitive Company information that is not publicly available which was filed under seal in the District Court. Corporate Defendants have attached a public version of an exhibit in support of this motion that omits the same information which was filed under seal in the District Court.

# ARGUMENT

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Pursuant to Rule 8 of the Federal Rules of Appellate Procedure, Corporate Defendants make this emergency motion for a stay of enforcement of a judgment pending appeal.  Corporate Defendants discussed the motion with opposing counsel, who indicated AngioScore opposes the motion.

On October 14, 2015, the day judgment was entered, Corporate Defendants moved in the District Court to stay execution of the judgment pending appeal and to waive the bond requirement.  Corporate Defendants also requested that the motion be heard on shortened time, prior to the expiration on October 28, 2015 of the automatic stay provided by Fed. R. Civ. P. 62(a).  On October 23, 2015, before an opposition was filed, the District Court denied the motion, finding Corporate Defendants' "proposals offered in lieu of a full bond . . . do not go far enough to ensure the status quo will be maintained throughout the appellate process— particularly in light of defendants' purported financial frailty."  *See* Ex. 1 at 3.[1]

As Corporate Defendants submitted to the District Court, because of their lack of collateral, the Companies cannot secure a supersedeas bond for the judgment amount without substantially impairing their ability to continue operations.  If this Court does not stay execution of the judgment and waive the

---

[1] "Ex._" refers to exhibits attached to the Declaration of Dylan J. Liddiard filed concurrently herewith.

bond requirement, the Companies will likely need to seek protection of the bankruptcy laws of the United States and their equivalent under the laws of the Republic of Singapore. In other words, executing on the judgment or collateralizing a bond for the full amount of the judgment would likely put the Companies out of business. This would harm the Companies, their public shareholders and multiple *bona fide* creditors. It would also risk harming the public interest by disrupting the availability of a life-saving medical device to doctors and patients. *See* Ex. 2 at 59 (District Court denying request for injunction that would "remove from the quiver of practicing physicians one arrow with which they might treat a patient").

In contrast, Plaintiff AngioScore cannot demonstrate any injury if the stay is granted. Indeed, driving Corporate Defendants into bankruptcy would only complicate and further delay any satisfaction of the money judgment.

Corporate Defendants will raise substantial legal questions on appeal which will require reversal of the judgment. In particular, the District Court erred in its holding that, in the absence of a written assignment agreement (and the termination of an earlier assignment agreement), an outside director must assign his own inventions made on his own time to a company – an unprecedented holding made as a matter of first impression under Delaware law which disregards the rights of inventors under superior federal law. The District Court also manifestly erred in

-2-

its failure to abide by the lawful assignment by the non-party/co-inventor of the Chocolate angioplasty balloon. As a result, Corporate Defendants had the right to sell Chocolate. AngioScore did not challenge that right, or establish an exclusive right to Chocolate, and could not establish proximate causation or damages, all of which expressly assumed an exclusive right to Chocolate. The judgment is also subject to reversal on the grounds that the Companies did not aid and abet the purported breach of fiduciary duty, QT Vascular is not subject to successor liability for the acts of its subsidiaries, the state law claims are time-barred, and the District Court acted without jurisdiction.

## II.    RELEVANT FACTUAL BACKGROUND

QT Vascular is a holding company that is publicly traded on the Singapore Stock Exchange. QT Vascular's subsidiaries, including TriReme Medical and Quattro Vascular, manufacture and sell Chocolate, a life-saving medical device used in the treatment of vascular disease. Ex. 2 at FF 30. Chocolate was invented by defendant Eitan Konstantino and non-party Tanhum Feld. *Id.* at FF 4, 7. Chocolate first became commercially available in 2011, and QT Vascular's subsidiaries continue to sell the device today. *Id.* at FF 216, 220.

AngioScore alleged that, in violation of Delaware state law, Konstantino developed Chocolate while serving as an outside director of AngioScore, and violated his fiduciary duties by failing to offer the rights to Chocolate to

-3-

AngioScore. *Id.* at 1. AngioScore further alleged that the Corporate Defendants are liable because they aided and abetted Konstantino's breach. *Id.* at 1-2.

Following a six-day bench trial on the state law claims, the Court entered its Findings of Fact and Conclusions of Law on July 1, 2015, awarding AngioScore past lost profits of $2.97 million and future lost profits of $17.064 million. *Id.* at 63.[2] The Court entered judgment on October 14, 2015. Ex. 3.

***QT Vascular's Failed Attempts To Obtain A Supersedeas Bond.*** QT Vascular has explored various avenues to obtain a supersedeas bond. It has attempted to raise cash in financing transactions, contacted an insurance broker with expertise in the bonding process, contacted its banker and an independent financial advisor. In each case, the result was the same: a supersedeas bond would need to be fully cash collateralized in the amount of the judgment, requiring the sequestering of cash that the Companies do not have.

In and around April 2015, QT Vascular initiated discussions with multiple lenders, including Silicon Valley Bank and Oxford Finance, LLC, to finance ongoing operations and the possible payment of damages in the event of an adverse judgment in this case. Ex. 4 ¶ 7. In light of the uncertainty of the litigation, these discussions were suspended by the lenders. *Id.* Ultimately, QT Vascular was only able to raise sufficient funds to support ongoing operations in the short term. *Id.*

---

[2] The jury entered its verdict in Defendants' favor on the patent claims on September 29, 2015, and the verdict form was duly recorded (Dkt. No. 790).

On August 26, 2015, anticipating the Court's entry of judgment, QT

Vascular sought to secure a supersedeas bond in the full amount of the expected

judgment by contacting ABD Insurance and Financial Services ("ABD"). Ex. 5 ¶

2. ABD is an insurance brokerage firm with expertise in the underwriting of surety

bonds and other financial guarantees. *Id*. In the course of investigating whether

the Corporate Defendants could secure a bond, ABD requested QT Vascular's

financial statements. *Id*. ¶ 3. ABD informed QT Vascular that, in light of the

Company's financial circumstances, a bond would require collateral "close to 100%

of the bond amount" in the form of cash or an irrevocable letter of credit. *Id*. ¶ 5;

*id*. at Exhibit 2.

The Company also contacted its bank, Silicon Valley Bank ("SVB"),

regarding obtaining a letter of credit to secure the supersedeas bond. *Id*. ¶ 4. On

September 1, 2015, QT Vascular learned that SVB would only extend the letter of

credit if it was fully cash collateralized (i.e., a dollar-for-dollar match between the

line of credit and the cash collateral). *Id*. ¶ 6; *id*. at Exhibit 3. QT Vascular also

contacted John Sailer, a venture-debt advisor, to explore alternative sources of the

letter of credit; however, this consultation resulted in the same conclusion, the

letter of credit would need to be fully cash collateralized. Ex. 4 ¶ 8.

On October 6, 2015, the Company again approached Oxford Finance, LLC

to discuss the possibility of a new financing. However, Oxford replied that it is

-5-

[This page contains confidential information that has been redacted]

"unable to fund into the financial uncertainty having to do with litigation." *Id.* ¶ 10.

Based on this investigation, QT Vascular determined that it cannot obtain a supersedeas bond without liquidating substantial operating assets and impairing the operation of the Company. *Id.* ¶ 11.

***QT Vascular's Financial Condition***. The Companies' unaudited and estimated assets as of October 9, 2015 total approximately ▮▮▮▮▮▮▮, comprising non-current assets of ▮▮▮▮▮▮ and current assets of ▮▮▮▮ ▮▮▮.[3] Ex. 4 ¶ 5. Approximately ▮▮▮▮▮▮ of these assets consist of cash or cash equivalents. *Id.* The Companies need this cash to fund ongoing operating expenses, including payroll and materials supporting the manufacture of Chocolate. *Id.* The remaining assets consist of non-liquid assets that are also needed to maintain the Companies' operations, including intellectual property, laboratory equipment, inventory and work-in-progress.[4] Ex. 4 ¶ 5.

Because the Companies do not maintain cash reserves in excess of short term operating requirements, and cannot readily sell-off other assets without impairing their ability to continue operations, Corporate Defendants do not have access to sufficient cash to satisfy the judgment or provide collateral for a bond for

---

[3] A non-current asset is an asset that is (1) not likely to turn to unrestricted cash within one year of the balance sheet date, or (2) not held primarily for "trading" (operational) purposes, *e.g.*, capitalized R&D. Ex. 4 at 1 n.1.

[4] Other assets, such as capitalized intangibles, are not convertible into cash without a change in control or major sale of operational assets, i.e., a "liquidity" event. Ex. 4 ¶ 5. As discussed below, the Corporate Defendants propose that in the event of such a liquidity event, QT Vascular will fund a supersedeas bond. *Id.*

the judgment. Any further depletion of the Companies' cash reserves would impair their ability to continue ordinary operations.[5] Ex. 4 ¶ 6.

Moreover, excluding the judgment amount in this case, as of October 9, 2015, the Companies have liabilities of approximately $22.635 million that they must pay to creditors. *Id.* ¶ 4. The total liabilities include approximately $13.425 million in convertible bond borrowings and financing costs, $4.952 million in accounts payable (including received invoices from product and service suppliers, SG&A expenses, and R&D and clinical expenses), $2.460 million in accrued liabilities (representing unreceived invoices), and $1.798 million in payroll and related liabilities. *Id.* The Companies' major creditors include MeKo Laserstrahl Materialbearbeitungen, Emerald Medical Services Pte. Ltd., InnoRa GmbH, CBSET Inc., SurModics Inc., and their convertible bond investors. *Id.*[6]

Because Corporate Defendants do not have sufficient cash to satisfy the judgment against it in the amount of $20.034 million (plus pre-judgment interest in

_____

[5] Corporate Defendants' inability to immediately satisfy the judgment is not surprising given that, as the District Court recognized, they are a "startup" (Ex. 2 at 29) and the majority of the judgment ($17.064 million of $20.034 million) is based on AngioScore's future lost profits due to future Chocolate sales.

[6] QT Vascular's unaudited June 30, 2015 consolidated financial statements reflect the Company's most recently reported financials. Ex. 5 ¶ 3. The statements reported total assets of $25.939 million, comprising non-current assets of $12.455 million and current assets of $13.484 million, $4.327 million of which are cash and cash equivalents. The Company reported total liabilities in the amount of $6.789 million. The total liabilities include $4.026 million in accounts payable; $1.439 million in accrued liabilities; and $1.324 million in payroll and related liabilities. *Id.* ¶¶ 8-10; *id.* at Exhibit 1, at 5.

-7-

the amount of $333,277), an immediate enforcement of the judgment would drive QT Vascular and its subsidiaries into insolvency. Ex. 4 ¶ 12. In the event of insolvency due to enforcement of the judgment, QT Vascular and its subsidiaries would likely be forced to seek the protection of the bankruptcy laws of the United States and their equivalent under the laws of the Republic of Singapore. In light of QT Vascular's inability to obtain a letter of credit, Corporate Defendants are unable to post a supersedeas bond at this time.

*Corporate Defendants' Request A Stay.* Following the entry of the judgment, Corporate Defendants requested that the District Court stay execution of the judgment pending appeal and waive the bond requirement. Dkt. No. 814. In lieu of a bond, Corporate Defendants requested that the following measures be taken to maintain the status quo during the pendency of the appeal and to ensure that a supersedeas bond will be posted as soon as practicable:

- A mutually-agreeable Monitor will be appointed to confirm that Corporate Defendants are maintaining the status quo during the pendency of the appeal;
- Corporate Defendants will refrain from transferring assets out of the United States except as required in the ordinary course of its existing business; and
- Corporate Defendants will post a supersedeas bond upon a major sale of operational assets or a change in control. *Id.* at 11.

On October 23, 2015, the District Court denied the motion to stay. Ex. 1.

## III.   THIS COURT SHOULD STAY EXECUTION OF THE JUDGMENT AND WAIVE ANY BOND REQUIREMENT.

Rule 8 of the Federal Rules of Appellate Procedure sets forth a procedure by which appellate courts may stay the execution of judgments entered by district courts. A party seeking a stay must ordinarily move first in the district court. Fed. R. App. P. 8(a)(1). If the district court denies the motion, a motion seeking a stay of the judgment may be made to the court of appeals. Fed. R. App. P. 8(a)(2). Here, the District Court denied the motion. Under Federal Rule of Civil Procedure 62(d), an appellant is entitled to a stay of execution of a judgment pending appeal as a matter of right after posting a supersedeas bond with the district court.[7] However, a bond is not mandatory and a stay may be granted where appropriate based on other considerations.[8] Indeed, Rule 62(g) of the Federal Rules of Civil Procedure provides: "This rule does not limit the power of the appellate court . . . to stay proceedings . . . while an appeal is pending ; or . . . to issue an order to preserve the status quo." Fed. R. Civ. P. 62(g). As the District Court recognized, this Court "is not limited by Rule 62." Ex.1 at 4. However, even if that standard applied, Corporate Defendants merit relief.

"In considering whether to grant a stay pending appeal, this court assesses movant's chances for success on appeal and weighs the equities as they affect the

---

[7] *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 409 (6th Cir. 2003); *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 (9th Cir. 2000); *Fed. Prescription Serv. v. Am. Pharm. Ass'n*, 636 F.2d 755, 760 (D.C. Cir. 1980) (court in its discretion may order partially secured or unsecured stays).

[8] *N. Ind. Pub. Serv. Co. v. Carbon Cty. Coal Co.*, 799 F.2d 265, 281 (7th Cir. 1986); *Int'l Telemeter, Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1495 (9th Cir. 1985); *Fed. Prescription Serv.*, 636 F.2d at 759.

parties and the public." *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 278 (Fed. Cir. 1987). Where there is a substantial legal question and the comparative harms favor a stay, the motion should be granted. *Id.* This Court considers four factors that guide its discretion to issue a stay pending appeal: (i) whether the appellant makes a showing that it is likely to succeed on the merits, (ii) whether the appellant will be irreparably harmed absent a stay, (iii) whether issuance of the stay will substantially injure the other parties interested in the proceeding, and (iv) where the public interest lies. *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). "[L]ikelihood of success in the appeal is not a rigid concept," when the harm to the applicant is great enough, a court will not require a strong showing that the applicant is likely to succeed on the merits. *Id.* at 512-13.

### A.    Corporate Defendants Raise Substantial Legal Questions And Are Likely To Succeed On The Merits Of Their Appeal

Corporate Defendants will raise substantial legal questions in their appeal which require reversal of the District Court's judgment.

***The District Court erred in its unprecedented holding that in the absence of a written assignment agreement an outside director must assign his outside inventions to the company.*** In holding that Eitan Konstantino breached his fiduciary duty, the District Court disregarded Konstantino's rights to his own invention. *See Bd. of Trs. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2192

-10-

(2011) ("rights in an invention belong to the inventor"). The District Court held as a matter of first impression that, in the absence of any assignment agreement, and, notwithstanding that AngioScore had affirmatively terminated an agreement requiring Konstantino to assign certain inventions to AngioScore, Delaware's corporate opportunity law required Konstantino to forfeit his interest in his own invention to AngioScore. However, Delaware has never applied its corporate opportunity doctrine to divest an outside director of his rights to his own invention by creating an implied obligation to assign those rights to the corporation.

Instead, the Delaware Supreme Court has consistently recognized that the corporate opportunity doctrine arises where the individual creates a conflict and competition by obtaining an asset or entering into a transaction with a third party.[9] The usurpation of a corporate opportunity is premised on "a business opportunity [that] comes to a corporate officer or director" in his "official capacity" which creates the conflict. *Guth*, 5 A.2d at 510. The corollary is that developing an opportunity of one's own making is outside the very paradigm of the corporate opportunity doctrine. *Equity Corp. v. Milton*, 221 A.2d 494 (Del. 1966).

The District Court's holding also abrogates the Delaware Supreme Court's

_____

[9] *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 443 (1996) ("Generally, the corporate opportunity doctrine is applied in circumstances where the director and the corporation compete against each other to buy something, whether it be a patent, license, or an entire business."); *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 150, 157 (Del. 1996); *Guth v. Loft, Inc.*, 5 A.2d 503, 512, 515 (Del. 1939).

recognition that directors may properly engage in their own business affairs, and may prepare to compete with the corporation during their tenure. *Broz*, 673 A.2d at 159; *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980). Because the District Court's decision is contrary to Delaware law and conflicts with federal law's recognition of the rights of an inventor, this Court is likely to reverse the judgment. Reversal of the judgment against Konstantino would require reversal of the judgment against the Corporate Defendants. *See, e.g.*, *Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 575 (2005) (no aiding and abetting liability without an underlying breach of fiduciary duty).

***The District Court erred in imposing damages that were not proximately caused by the breach***. In assessing Corporate Defendants' liability and awarding damages based on past and future lost profits, the District Court erroneously disregarded the fact that the Corporate Defendants had a lawful right to make and sell Chocolate that was independent of the alleged breach of fiduciary duty. As the co-inventor of Chocolate, Tanhum Feld – who is not a party to these proceedings – had an independent right to assign his undivided share in Chocolate to whomever he chose. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1465-66 (Fed. Cir. 1998); 35 U.S.C. §§ 261, 262. On June 1, 2010, Feld exercised that right by assigning all of his right, title and interest in Chocolate to Quattro Vascular. Ex. 2 at FF 187. Under Feld's assignment alone, Quattro Vascular was permitted to sell

-12-

Chocolate, and lawful sales of Chocolate in the marketplace resulted. All of the

Plaintiffs' damages computations and assumptions, however, disregarded the

lawful assignment from Feld and rested on the fundamentally unsound assumption

that AngioScore had an exclusive right in Chocolate due to Konstantino's

conduct. In other words, Plaintiffs' damages calculations all assumed that

AngioScore could have kept Chocolate off the market, which in turn would have

caused customers to make other choices, including AngioScore's balloon. Ex.

6. The disregard of the Companies' ability to sell Chocolate through Feld's

assignment, a claim that Plaintiff did not even allege much less champion, is fatally

inconsistent with 35 U.S.C. § 262. Given that Corporate Defendants had a legal

right to sell Chocolate independent of Konstantino, Konstantino's failure to

surrender his rights in Chocolate cannot be the proximate cause of any damage to

AngioScore. In the absence of proximate causation, the District Court's judgment

of money damages must be reversed.[10]

*The District Court lacked subject matter jurisdiction.* On March 11, 2015,

the defendants filed a Motion to Dismiss State Law Claims for Lack of Subject

---

[10] *Thorpe*, 676 A.2d at 444 (denying damages for usurped opportunity not
proximately caused by breach); *Dweck v. Nasser*, No. 1353-VCL, 2012 WL
161590, at *18 (Del. Ch. Jan. 18, 2012); *Boyer v. Wilmington Materials, Inc.*, 754
A.2d 881, 907 (Del. Ch. 1999).

Matter Jurisdiction. Dkt No. 557.[11] The District Court denied the motion.[12] Ex. 7.

The District Court erred in its analysis and should be reversed. In summary,

AngioScore sued defendants for patent infringement on June 29, 2012, alleging

that Chocolate infringes on the '119 patent. Dkt. No. 1. AngioScore added the

state claims nearly two years later. The '119 patent does not play any role in the

state claims. The bifurcated bench trial on the state claims and jury trial on the

patent claims vividly demonstrates that these distinctly different claims were not

expected to be tried in one proceeding,[13] and underscores the concern stated in

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (the claims should

"derive from a common nucleus of operative fact" and "are such that he would

ordinarily be expected to try them all in one judicial proceeding."); *Voda v. Cordis*

*Corp.*, 476 F.3d 887, 903 (Fed. Cir. 2007). In fact, not one word about the '119

patent appears in the District Court's 110 page decision following its bench trial.

    AngioScore admitted in certified materials in the Delaware Chancery Court

---

[11] Facing the commencement of trial, on March 23, 2015, Defendants filed a petition for writ of mandamus prior to the ruling on the motion to dismiss. Case No. 15-128. On April 2, 2015, the petition was denied, in part, because the Court found "whatever the merits of TriReme's § 1367 arguments, we cannot say, given the possibility the district court resolves the jurisdictional issues before trial and TriReme's ability to later seek review on appeal, that TriReme has established entitlement to mandamus relief." *Id.*, Dkt. No. 18 at 2.

[12] Defendants disputed the court's power over the state claims at the very outset. Even if they had not, "subject-matter jurisdiction may be raised . . . at any stage." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006) (citation omitted).

[13] The Court: "I will bifurcate this. That is, the patent *infringement claims are distinctly different* from the breach of fiduciary duty claims." Ex. 8 at 10:4-6 (emphasis added).

that the facts necessary for the patent case are not relevant to its state law case,

stating: "The factual issues regarding patent infringement are the structure of the

Chocolate device and the validity of the patent over the prior art, *none of which is*

*relevant to the breach of fiduciary duty case*," (Ex. 9 ¶ 9 (emphasis added)), and

> [The] alleged breach of fiduciary duty *is totally distinct from* [the] *alleged*
> *patent infringement*. The key time period for establishing the breach of
> fiduciary duty claim is mid-2009 through February 2010, when
> [Konstantino] resigned from the Board of Directors of AngioScore.
> However, the patent infringement did not occur until December 2011, when
> the commercialization of the Chocolate device began, long after the key
> facts for the breach of fiduciary duty claim.

*Id.* (emphasis added); *see also* Ex. 10 ¶ 8. The starkly different elements of the

fiduciary duty and patent claims and the evidence to prove them makes clear, as

AngioScore conceded, that they do not share a common nucleus of operative fact.

The District Court's observation that Chocolate is involved in both claims is

insufficient to meet the *Gibbs* test. Ex. 7 at 7-8; *see Voda*, 476 F.3d at 896-97.

The absence of supplemental jurisdiction requires that the judgment be vacated.

Reversal is also required by the District Court's erroneous findings that

TriReme Medical and Quattro Vascular aided and abetted Dr. Konstantino's

breach of fiduciary duty, that QT Vascular is liable for the acts of its subsidiaries,

and that the statute of limitations was tolled.

## B.    The Stay Will Not Substantially Injure AngioScore.

A stay of execution of judgment and a waiver of the posting of a bond

-15-

pending appeal are appropriate in this case. There is no foreseeable harm that can come to AngioScore if Corporate Defendants' motion for a stay pending appeal is granted. AngioScore does not face significant financial consequences if it does not receive the judgment amount immediately, and driving Corporate Defendants into bankruptcy would only complicate and further delay any satisfaction of the judgment. Moreover, as demonstrated by AngioScore's own projections and the District Court's damages award of $2.97 and $17.064 million in past and future lost profits, respectively, Corporate Defendants' sales are expected to increase over time. In addition, any concern regarding the disposition of assets during the pendency of the appeal is addressed by the Corporate Defendants' proposed measures, including the appointment of a mutually-agreeable Monitor and the requirement that a supersedeas bond for the full judgment be posted upon a major sale of operational assets or a change in control.

## C.   Corporate Defendants Will Suffer Irreparable Harm.

As set forth herein, execution on the judgment or requiring Corporate Defendants to post a bond in the amount of the judgment at this time will likely force the Corporate Defendants into bankruptcy. The result would be similar to enjoining the operation of Corporate Defendants' business. *See, e.g.*, *U.S. v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 901 (2d Cir. 1992) (seizure warrant and district court's refusal to vacate the seizure has the same effect as an

-16-

injunction).  In any event, the foreseeable loss of customers, goodwill and opportunities would not be readily remedied after appeal and a final judgment on the merits.  Corporate Defendants should not be required to go out of business to vindicate their rights on appeal.

## D.    Corporate Defendants' Creditors Will Suffer Irreparable Harm.

A stay is also warranted because allowing AngioScore to immediately enforce the judgment would "so interfere with [QT Vascular's] business or so jeopardize the collectability of other creditors' claims as to throw the company into bankruptcy." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 799 (7th Cir. 1986).  Under these circumstances, a stay of proceedings to enforce the judgment is appropriate. *See Dillon v. City of Chi.*, 866 F.2d 902, 904-05 (7th Cir. 1988) (citing *Olympia*, 786 F.2d at 796).  An alternative or reduced security is appropriate when, as here, the posting of a bond would financially strain the defendant to the point that it "would put the defendant's other creditors in undue jeopardy" and put the defendant into bankruptcy. *Olympia*, 786 F.2d at 796, 799. In similar situations, courts have granted motions to stay enforcement of the judgment without a full supersedeas bond.[14]  Courts do so in recognition of the bond requirement's underlying goal to "preserve the status quo while protecting

---

[14] *See, e.g., Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 874 (10th Cir. 1986) (affirming stay without a supersedeas bond in the full amount of the judgment where the defendant demonstrated that it "was financially unable to post a full bond and that execution on the judgment would place him in insolvency").

-17-

the non-appealing party's rights pending appeal." *Poplar Grove Planting & Ref. Co.*, 600 F.2d 1189, 1190-91 (5th Cir. 1979).

Here, requiring a bond in the amount of the judgment would go far beyond preserving the status quo.  Rather, allowing AngioScore to execute on the judgment and force QT Vascular into bankruptcy would not only place the claims of QT Vascular's other creditors in undue jeopardy, but also promote AngioScore's position dramatically by allowing it to tie up the Companies' assets. *See Olympia*, 786 F.2d at 798; *id.* at 800 (Easterbrook, J., concurring) ("The supersedeas bond is not supposed to elevate the judgment creditor over other creditors . . . .").  AngioScore's security would come at the cost of the Companies' numerous other creditors (whose claims arose prior to the judgment) who would then be forced to seek repayment in bankruptcy proceedings or the equivalent under Singapore law. *See* Ex. 4 ¶ 12.  Accordingly, modification of the bond requirement is appropriate to balance the interests of the Companies' existing creditors against AngioScore's contingent interest as a judgment creditor.

## E.   The Public Interest Strongly Supports Staying The Judgment.

Permitting AngioScore to immediately execute on the judgment or requiring Corporate Defendants to post a bond for the full judgment amount would also risk harming the public interest by disrupting Chocolate's availability to physicians and patients.  At trial, AngioScore proposed a number of alternative remedies,

-18-

including "an injunction on the sale of Chocolate." Ex. 2 at 57.  The District Court

denied AngioScore's request for an injunction, and instead awarded AngioScore

$20.034 million in past and future lost profits.  *Id.* at 59, 63, FF 220.

In declining to enjoin sales of Chocolate, the District Court acknowledged

that granting the request would erode the public's interest in the availability of

novel, effective medical devices.  *Id.* at 59 (denying AngioScore's request for an

injunction that would "remove from the quiver of practicing physicians one arrow

with which they might treat a patient").  But permitting AngioScore to immediately

enforce its judgment poses similar risks.  As noted above, immediate enforcement

would make QT Vascular insolvent, forcing it to file for bankruptcy and its

equivalent under Singapore law.[15]  While, under ideal circumstances, bankruptcy

proceedings would not affect QT Vascular's ability to continue to supply

Chocolate to physicians, the practical reality is that forcing QT Vascular into

bankruptcy is likely to disrupt the supply of Chocolate to doctors and patients.

Bankruptcy proceedings inflict deadweight losses on companies.  *See*

*Olympia*, 786 F.2d at 798-99.  Furthermore, filing for bankruptcy could affect the

Companies' relationships with their suppliers and vendors, affecting the supply and

distribution chains for Chocolate.  The net effect of these possible disruptions

---

[15] To the extent AngioScore seeks to use enforcement of the judgment to force QT Vascular completely out of the market, such a result would be in direct conflict with the Court's decision to award money damages rather than an injunction.

would go beyond the goals for the remedy: "the deprivation to the wrongdoer of benefits borne of the breach, and the goal of ensuring that a plaintiff will not continue to be harmed." Ex. 2 at 58. Instead, forcing QT Vascular and its subsidiaries into bankruptcy and potentially interfering with the availability of Chocolate for its "approved . . . medical use in treating complex disease" (*id.* at 59) would risk inflicting substantial harm on the public, particularly if physicians who have determined that Chocolate presents the optimal course of treatment are constrained in their ability to acquire the device for use on their patients. Thus, a modification of the bond requirement is warranted to preserve the public's interest in the continued availability of Chocolate to treat vascular disease.

## IV.    CONCLUSION

For the foregoing reasons, Corporate Defendants respectfully request that the Court stay enforcement of the judgment below without requiring a bond for the judgment amount and requiring that the following measures be taken by Corporate Defendants to preserve the status quo or grant such other relief as the Court may deem appropriate:

- A mutually-agreeable Monitor will be appointed to confirm that the Companies are maintaining the status quo during the pendency of the appeal;
- Corporate Defendants will refrain from transferring assets out of the United States except as required in the ordinary course of its existing business; and
- QT Vascular will post a supersedeas bond upon a major sale of operational assets or a change in control.

Respectfully submitted,

Dated: October 26, 2015

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ David S. Steuer
      DAVID S. STEUER
*Attorneys for Defendants-Applicants*
TriReme Medical LLC, Quattro Vascular Pte
Ltd., and QT Vascular Ltd

# EXHIBITS IN SUPPORT OF MOTION

## INDEX OF EXHIBITS

| Ex. | Description | Dkt. No.[1] | Date |
|---|---|---|---|
| | Declaration of Dylan J. Liddiard in Support of Appellants TriReme Medical, LLC, Quattro Vascular Pte Ltd. and QT Vascular Ltd.'s Emergency Motion to Stay Enforcement of Judgment Pending Appeal | | |
| 1 | Order Denying Defendants' Motions to Stay Enforcement of Judgment | 823 | 10/23/15 |
| 2 | Findings of Fact and Conclusions of Law | 665 | 07/01/15 |
| 3 | Judgment | 812 | 10/14/15 |
| 4 | Declaration of Randal Farwell in Support of Corporate Defendants TriReme Medical, LLC, Quattro Vascular Pte Ltd., and QT Vascular Ltd.'s Motion to Stay Enforcement of Judgment and Exhibit 1 thereto | 813-6 unredacted 815 redacted 815-1 | 10/14/15 |
| 5 | Declaration of Gina La in Support of Corporate Defendants TriReme Medical, LLC, Quattro Vascular Pte Ltd., and QT Vascular Ltd.'s Motion to Stay Enforcement of Judgment and Exhibits 1-3 thereto | 816 816-1 816-2 816-3 | 10/14/15 |
| 6 | Excerpts of Trial Transcript in *AngioScore, Inc. v. TriReme Medical, LLC et al.*, 4:12-cv-3393-YGR | | |
| 7 | Order on Defendants' Motion to Dismiss State Law Claims; Motions for Summary Judgment on State Law Claims; Motions in Limine re State Law Experts | 591 | 04/06/15 |
| 8 | Excerpts of Reporter's Transcript of Proceedings in *AngioScore, Inc. v. TriReme Medical, LLC et al.*, 4:12-cv-3393-YGR (N.D. Cal) | | 03/03/15 |
| 9 | Excerpts of Certified Response And Objections Of AngioScore, Inc. To Plaintiff's October 10, 2014 Demand For Advancement | | 10/20/15 |
| 10 | Certified Response And Objections Of AngioScore, Inc. To Plaintiff's February 10, 2015 Demand For Advancement | | 02/20/15 |

---

[1] "Dkt. No." refers to the docket in in *AngioScore, Inc. v. TriReme Medical, LLC et al.*, No. 4:12-cv-3393-YGR (N.D. Cal).

No.

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

AngioScore, Inc.,
*Plaintiff,*

v.

TriReme Medical, LLC (f/k/a TriReme Medical, Inc.), Eitan Konstantino, Quattro Vascular PTE Ltd. and QT Vascular Ltd. (f/k/a QT Vascular Pte. Ltd.),
*Defendants.*

---

**United States District Court**
**Northern District of California, No. 4:12-cv-3393-YGR**
**The Honorable Yvonne Gonzalez Rogers**

---

**DECLARATION OF DYLAN J. LIDDIARD IN SUPPORT OF TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD. AND QT VASCULAR LTD.'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL**

---

DAVID S. STEUER
STEVEN D. GUGGENHEIM
DYLAN J. LIDDIARD
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

*Attorneys for Applicants*
*TriReme Medical, LLC, Quattro Vascular PTE Ltd. and QT Vascular Ltd.*

I, Dylan J. Liddiard, declare and state as follows:

1.     I am an attorney admitted to the bar of this Court, and a member of the law firm Wilson Sonsini Goodrich & Rosati. I am one of the attorneys of record for TriReme Medical, LLC, Quattro Vascular PTE Ltd. and QT Vascular Ltd. (together, "Corporate Defendants"). I declare that the following statements are true to the best of my knowledge, information, and belief, formed after a thorough inquiry. If called upon to testify, I could and would testify competently thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Order Denying Defendants' Motions to Stay Enforcement of Judgment, filed on October 23, 2015 in *AngioScore, Inc. v. TriReme Medical, LLC et al.*, 4:12-cv-3393-YGR (N.D. Cal), docket number ("Dkt. No.") 823.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the Findings of Fact and Conclusions of Law, Dkt. No. 665, filed on July 1, 2015.

4.     Attached hereto as Exhibit 3 is a true and correct copy of the Judgment, Dkt. No. 812, filed on October 14, 2015.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Randal Farwell in Support of Corporate Defendants TriReme Medical, LLC, Quattro Vascular Pte Ltd., and QT Vascular Ltd.'s Motion to Stay Enforcement of Judgment, Dkt. Nos. 813-6 (unredacted) and 815 (redacted), and Exhibit 1 thereto, Dkt. No. 815-1, filed on October 14, 2015.

6.     Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of Gina La in Support of Corporate Defendants TriReme Medical, LLC, Quatto Vascular Pte Ltd., and QT Vascular Ltd.'s Motion to Stay Enforcement of Judgment, Dkt. No. 816, and Exhibits 1-3 thereto, Dkt. Nos. 816-1-3, filed on October 14, 2015.

7.     Attached hereto as Exhibit 6 is a true and correct copy of excerpts of the trial transcript in *AngioScore, Inc. v. TriReme Medical, LLC et al.*, 4:12-cv-3393-YGR (N.D. Cal).

8.     Attached hereto as Exhibit 7 is a true and correct copy of the Order on Defendants' Motion to Dismiss State Law Claims; Motions for Summary Judgment on State Law Claims; Motions in Limine re State Law Experts, Dkt. No. 591, filed on April 6, 2015.

9.     Attached hereto as Exhibit 8 is a true and correct copy of excerpts of the Reporter's Transcript of Proceedings in *AngioScore, Inc. v. TriReme Medical, LLC et al.*, 4:12-cv-3393-YGR (N.D. Cal), dated March 3, 2015.

10.     Attached hereto as Exhibit 9 is a true and correct copy of excerpts of the Certified Response And Objections Of AngioScore, Inc. To Plaintiff's October 10, 2014 Demand For Advancement, dated October 20, 2015.

11.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts of the Certified Response And Objections Of AngioScore, Inc. To Plaintiff's February 10, 2015 Demand For Advancement, dated February 20, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2015 in Palo Alto, California.

By: /s/ Dylan J. Liddiard
      Dylan J. Liddiard

No.

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

AngioScore, Inc.,

*Plaintiff,*

v.

TriReme Medical, LLC (f/k/a TriReme Medical, Inc.), Eitan Konstantino, Quattro Vascular PTE Ltd. and QT Vascular Ltd. (f/k/a QT Vascular Pte. Ltd.),

*Defendants.*

---

**United States District Court**
**Northern District of California, No. 4:12-cv-3393-YGR**
**The Honorable Yvonne Gonzalez Rogers**

---

**TRIREME MEDICAL, LLC., QUATTRO VASCULAR PET LTD, AND
QT VASCULAR LTD.'S EMERGENCY MOTION TO STAY
ENFORCEMENT OF JUDGMENT PENDING APPEAL**

**CERTIFICATE OF SERVICE**

---

DAVID S. STEUER
STEVEN D. GUGGENHEIM
DYLAN J. LIDDIARD
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

*Attorneys for Applicants*
*TriReme Medical, LLC, Quattro Vascular PTE Ltd. and QT Vascular Ltd.*

## CERTIFICATE OF SERVICE BY OVERNIGHT MAIL

I hereby certify that I am employed in Palo Alto, California. I am over the age of 18 years and not a party to the within action. My business address is Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304.

I further declare that I served a copy of:

> **TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD. AND QT FAXCULAR LTD.'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL (CONFIDENTIAL VERSION);**

> **TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD. AND QT FAXCULAR LTD.'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL (PUBLIC VERSION);**

> **DECLARATION OF DYLAN J. LIDDIARD IN SUPPORT OF TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD. AND QT VASCULAR LTD.'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL WITH EXHIBITS THERETO (CONFIDENTIAL VERSION);**

> **DECLARATION OF DYLAN J. LIDDIARD IN SUPPORT OF TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD. AND QT VASCULAR LTD.'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL WITH EXHIBITS THERETO (PUBLIC VERSION); AND**

> **CERTIFICATE OF SERVICE**

☒ **BY OVERNIGHT DELIVERY** By placing a true copy thereof enclosed in a sealed envelope and consigning the document(s) to an express mail service for guaranteed next business day delivery to the person(s) at the address(es) set forth below.

☒ **BY ELECTRONIC MAIL** By forwarding the document(s) by electronic transmission on this date to the Internet email address listed below.

I am readily familiar with Wilson Sonsini Goodrich & Rosati's practice for collection and processing of documents for overnight delivery according to instructions indicated above. In the ordinary course of business, documents would be handled accordingly.

### SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Palo Alto, California, this 26th day of October, 2015.

_____

Brian Danitz

## SERVICE LIST

| | |
|---|---|
| Diane M. Doolittle<br>Robert P. Feldman<br>Rachel Herrick Kassabian<br>Suong Nguyen<br>Kimball Parker<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>555 Twin Dolphin Drive, 5th Floor<br>Redwood Shores, CA 94065<br>Telephone: (650) 801-5000<br>Facsimile: (650) 801-5100 (fax)<br>dianedoolittle@quinnemanuel.com<br>bobfeldman@quinnemanuel.com<br>suongnguyen@quinnemanuel.com<br>kimballparker@quinnemanuel.com | ___ U.S. Mail<br>_X_ Overnight Delivery<br>___ Personal Delivery<br>_X_ Email |
| Peter J. Armenio<br>Laura Fairneny<br>Matthew Daniel Robson<br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>peterarmenio@quinnemanuel.com<br>laurafairneny@quinnemanuel.com<br>matthewrobson@quinnemanuel.com | ___ U.S. Mail<br>_X_ Overnight Delivery<br>___ Personal Delivery<br>_X_ Email |

| | |
|---|---|
| James Carl Otteson<br>David A. Caine<br>Michael Duy Khiem Nguyen<br>ARNOLD & PORTER<br>1801 Page Mill Road, Suite 110<br>Palo Alto, CA 94304<br>James.otteson@aporter.com<br>Michael.Nguyen@aporter.com<br>David.Caine@aporter.com | ____ U.S. Mail<br>__X__ Overnight Delivery<br>____ Personal Delivery<br>__X__ Email |
| Andrian Mary Pruetz<br>Mieke Katherine Malmberg<br>Richard William Buckner<br>GLASER WEILL FINK JACOBS<br>HOWARD ACVHEN & SHAPIRO LLP<br>10250 Constellation Blvd., 19th Floor<br>Los Angeles, CA 90067<br>apruetz@glaserweil.com<br>mmalmberg@glaserweil.com<br>rbuckner@glaserweil.com | ____ U.S. Mail<br>__X__ Overnight Delivery<br>____ Personal Delivery<br>__X__ Email |

# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANGIOSCORE, INC.,

Plaintiff,

v.

TRIREME MEDICAL, INC., ET AL.,

Defendants.

Case No.  12-cv-03393-YGR

**ORDER DENYING DEFENDANTS' MOTIONS
TO STAY ENFORCEMENT OF JUDGMENT**

Re: Dkt. Nos. 813-14, 817-19

Following a six-day bench trial, the Court issued its Findings of Fact and Conclusions of Law on July 1, 2015, detailing the history of this dispute and finding in favor of plaintiff on its state law claims for breach of fiduciary duty. (Dkt. No. 665.)  In September 2015, a jury trial was held on plaintiff's patent infringement claims, resulting in a verdict of non-infringement and invalidity as to all claims asserted. (Dkt. No. 790.)  Thereafter, defendants unsuccessfully moved to reopen the trial record in the state law portion of the case. (Dkt. No. 809.)  Judgment was entered on October 14, 2015, awarding plaintiff $2.97 million in past lost profits and $17.064 million in future lost profits (totaling $20.034) from all defendants and a royalty and other awards specific to defendant Konstantino, along with pre- and post-judgment interest. (Dkt. No. 812 at 2.)  Later that day and on the following day, defendants filed motions to stay enforcement of judgment pending appeal without the typical requirement of a supersedeas bond. (Dkt. No. 814, 818.)[1]  Defendants contend they have insufficient funds to offer a supersedeas bond directly or to obtain one from a lender.  They further claim they "will likely need to seek protection of the

---

[1] In connection with the corporate defendants' motion, they filed an administrative motion to seal certain corporate financial information. (Dkt. No. 813.)  Finding good cause therefor, the motion to seal is GRANTED. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   bankruptcy laws" if the instant motions are not granted.  Defendant QT Vascular offers three

2   conditions in lieu of a supersedeas bond: (1) appointment of a "Mutually-agreeable Monitor" to

3   ensure the status quo is maintained at the corporate defendants pending appeal; (2) no transferring

4   of corporate assets outside of the United States "except as required in the ordinary course of its

5   existing business"; and (3) the posting of a supersedeas bond upon a "major sale of operational

6   assets" or a change of control of the corporate defendants.  (Dkt. No. 814 at 11.)[2]  In light of the

7   representations of plaintiff and attached email communications between the parties, defendants

8   appear to have made little effort to meet and confer on this issue prior to bringing their motions,

9   even though the Findings of Fact issued nearly four months ago.

10          Pursuant to Federal Rule of Civil Procedure 62(a), in typical circumstances, a district

11   court's judgment is automatically stayed for 14 days following its entry—in this case, through

12   October 28, 2015.  Thereafter, the prevailing party may execute upon the judgment absent

13   imposition of a formal stay pending appeal, which an appellant is entitled to obtain from the trial

14   court by posting an adequate supersedeas bond pursuant to Rule 62(d).  *See Columbia Pictures*

15   *Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1197 & n.6 (9th Cir.

16   2001).  Such a stay takes effect upon the court's approval of the posted bond.  Fed. R. Civ. P.

17   62(d).  In the usual case, the supersedeas bond must be sufficient to fully satisfy the judgment,

18   including interest and costs.  *See Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1505 (9th Cir.

19   1987) ("The purpose of a supersedeas bond is to secure the appellees from a loss resulting from

20   the stay of execution and a full supersedeas bond should therefore be required."); *Cotton ex rel.*

21   *McClure v. City of Eureka*, 860 F. Supp. 2d 999, 1027 (N.D. Cal. 2012).  However, given the

22   purpose of the supersedeas bond is to preserve the status quo pending appeal, a district court

23   maintains "'inherent discretionary authority'" to set the amount of the bond, to allow alternative

24   forms of guarantee, or to waive the requirement entirely where appropriate.  *See Cotton*, 860 F.

25   Supp. 2d at 1027.  In the Ninth Circuit, district courts regularly consider five factors in

26

27          [2] Notably, defendant Konstantino does not offer any such guarantees as to his personal
     assets, merely noting that the corporate defendants' proposal will offer plaintiff "some security."
28   (Dkt. No. 818 at 2 n.1.)

2

1    determining whether to waive the bond requirement:

2                    (1) the complexity of the collection process; (2) the amount of time
                     required to obtain a judgment after it is affirmed on appeal; (3) the
3                    degree of confidence that the district court has in the availability of
                     funds to pay the judgment; (4) whether "the defendant's ability to
4                    pay the judgment is so plain that the cost of a bond would be a waste
                     of money"; and (5) whether the defendant is in such a precarious
5                    financial situation that the requirement to post a bond would place
                     other creditors of the defendant in an insecure position.
6

7    *Dillon v. City of Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988) (internal quotations and citations

8    omitted); *see also United States v. Moyer*, No. 07-CV-00510, 2008 WL 3478063, at *12 (N.D.

9    Cal. Aug. 12, 2008) (noting "Ninth Circuit courts regularly use these factors").

10          In the instant case, defendants present an argument solely under the fifth factor—whether

11   their financial condition is so precarious that the bond requirement would place other creditors in

12   an insecure position. *See Cotton*, 860 F. Supp. at 1028 (denying motion for stay and waiver of

13   supersedeas bond where defendants addressed only the fourth factor). The proposals offered in

14   lieu of a full bond do not include a partial bond, but rather limited safeguards that do not go far

15   enough to ensure the status quo will be maintained throughout the appellate process—particularly

16   in light of defendants' purported financial frailty. Moreover, the remaining factors are neutral or

17   cut against waiving the bond requirement in this case. Specifically, as to the first, third, and fourth

18   factors, defendants' representations—that they have limited cash on hand and inadequate assets to

19   serve as collateral for obtaining a supersedeas bond from a lender—suggest the collection process

20   may be arduous and the availability of sufficient funds in future years, in light of the other

21   creditors referenced, is questionable.

22          In the alternative, defendant Konstantino seeks a stay pursuant to Rule 62(b) pending the

23   resolution of his anticipated post-trial motions to amend the Court's Findings of Fact and for a

24   new trial. The rule provides as follows: "On appropriate terms for the opposing party's security,

25   the court may stay the execution of a judgment—or any proceedings to enforce it—pending

26   disposition of" certain post-trial motions. Fed. R. Civ. P. 62(b); *see Moyer*, 2008 WL 3478063, at

27   *6 (noting the decision of whether to grant a stay under Rule 62(b) is at the district court's

28   discretion and weighing factors such as movant's likelihood of success on the merits, the

United States District Court
Northern District of California

3

1  possibility of irreparable injury absent a stay, whether the stay will injure the non-movant, and the

2  public interest). Konstantino's limited briefing on this alternative request is insufficient to justify

3  the relief sought, particularly in the absence of any proposed terms to ensure the security of

4  plaintiff's judgment in the interim. *See Fredianelli v. Jenkins*, No. 11-CV-3232, 2013 WL

5  5934988, at *1 (N.D. Cal. Nov. 4, 2013) (noting a Rule 62(b) stay "'usually requires a bond'"

6  sufficient to fully satisfy the judgment and interest thereon).

7      Thus, having carefully considered the papers submitted and the record in this case, the

8  Court DENIES the motions.[3] Defendants may, of course, seek a stay from the Court of Appeals,

9  which is not limited by Rule 62. *See* Fed. R. Civ. P. 62(g).

10      This Order terminates Docket Numbers 813-14, 817-19.

11      IT IS SO ORDERED.

12  Dated: October 23, 2015

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

25      [3] Defendants filed motions for expedited hearing on their motions to stay enforcement of
26  judgment. (Dkt. Nos. 817, 819.) In light of the urgency of defendants' request, however, the
Court has proceeded directly to the merits, addressed herein, finding no need for a hearing to
27  resolve these issues. *See* Civ. L.R. 7-1(b); Fed. R. Civ. P. 78; *see also Lake at Las Vegas
Investors Group, Inc. v. Pacific Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991). Thus, the
28  motions for expedited hearing are DENIED as moot.

4

*United States District Court*
*Northern District of California*

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANGIOSCORE, INC.,** | Case No. 12-cv-03393-YGR |
| Plaintiff, | |
| v. | **FINDINGS OF FACT** |
| | **AND CONCLUSIONS OF LAW** |
| **TRIREME MEDICAL, INC., ET AL.,** | |
| Defendants. | |

## INTRODUCTION

This case staged a tension between the inveterate, established law of fiduciary duties held by corporate directors and breach of fiduciary duty claims that arise when directors of emerging companies are innovators in the technology themselves. In such an instance, plaintiff AngioScore would have innovation subverted to duty; defendants would have duty subverted to innovation. Neither party's position admits of any balance, and neither can be wholly right. As set forth in this Order, the Court finds that where transparency, loyalty, and good faith predominate, a director's fiduciary duties and his drive to innovate can co-exist, albeit with the duties to the corporation taking precedence.

AngioScore brings state law claims for breach of fiduciary duty against one of its founders and former directors, Eitan Konstantino, alleging that while he was a member of AngioScore's board, Konstantino developed a medical device directly competitive with AngioScore's flagship product. Rather than offer the opportunity to acquire the new device to AngioScore, AngioScore maintains that Konstantino instead took it for himself. AngioScore also claims that corporate defendants Quattro Vascular PTE Ltd. and TriReme Medical, Inc. aided and abetted Konstantino's

1    breach, and that liability for these entities' wrongdoing runs to QT Vascular Ltd. Defendants

2    disagree, arguing in part that the duty was not breached either because no opportunity existed, or

3    because AngioScore was not entitled to Konstantino's intellectual property as a matter of law.

4        Following a six-day bench trial on AngioScore's claims, the parties submitted proposed

5    findings of fact and conclusions of law. (Dkt. Nos. 643 (AngioScore's Opening Post-Trial Brief

6    ("AOB"), 645 (Defendants' Opening Post-Trial Brief ("DOB"), 649 (AngioScore's Post-Trial

7    Reply Brief ("ARB"), 650 (Defendants' Post-Trial Reply Brief ("DRB")).) Specifically, those

8    claims pertain to Konstantino's breach of fiduciary duty; that Quattro and TriReme aided and

9    abetted the same; QT Vascular is a successor in interest to Quattro and TriReme and therefore

10   liable for their aiding and abetting; and finally, that defendants have violated California's Unfair

11   Competition Law. Having reviewed the evidence of record, the arguments of the parties, and

12   relevant case law, for the reasons set forth in these findings of facts and conclusions of law, the

13   Court hereby FINDS for AngioScore in all material respects and AWARDS a remedy accordingly.

### FACTUAL BACKGROUND[1]

14

15   **I.    The Parties**

16       Since its founding in 2003, AngioScore has designed, manufactured, and marketed

17   specialty angioplasty balloon catheters that are used for the treatment of cardiovascular disease.

18   Its signature product line, sold under the brand name AngioSculpt, consists of an nylon balloon

19   surrounded by a nitinol structure. The AngioSculpt is sold in an array of dimensions and lengths

20   to meet varying patient needs, although the structure of the balloon and cage remain unchanged in

21   all material respects at each available sizing option. The purpose of the AngioSculpt is to treat

22   cardiovascular disease, whereby plaque deposits along a blood vessel's wall, forming what are

23   called lesions. The plaque deposits harden and block, or occlude, blood flow, with potentially

24   severe health risks. The AngioSculpt is used to open occluded or narrowed blood vessels at lesion

25   sites by inflating the balloon to compress the plaque deposits against a vessel wall. As the balloon

26

27       [1] Appended to the end of this order are the Court's detailed factual findings, setting forth
     citations to evidence of record. The following narrative factual discussion summarizes the events
28   giving rise to this case in a manner unencumbered by extensive record citations.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   inflates, the AngioSculpt's nitinol wire cage expands.  The expanded cage sits atop the balloon

2   and impresses upon plaque, "scoring it," in an effort designed to "crack" the plaque and open the

3   blood vessel, without injuring or puncturing the vessel wall.  It is to this scoring feature that

4   AngioScore owes its name.  After use, the device can then deflate, returning to its original form,

5   for removal from the patient's body.

6       Defendant Eitan Konstantino invented the AngioSculpt.  An engineer by training with a

7   doctorate in laser surface treatment, optical design, and materials science, Konstantino was a co-

8   founder, President, and Chief Scientist of AngioScore, Inc.  In this role, Konstantino sought to

9   develop and bring the AngioSculpt to market, which involved gaining approval both in Europe

10   and through the United States Food and Drug Administration ("FDA").  To accomplish these

11   goals, Konstantino sought funding from investors, who in turn acquired seats on AngioScore's

12   board of directors.  Among those directors were Tom Raffin, a partner with the venture capital

13   firm Telegraph Hill Partners, and Lisa Suennen, a partner at Psilos, another such firm.

14       In 2005, the board decided that Konstantino would be better suited to a role directed to

15   research and development.  Tom Trotter then became AngioScore's chief executive officer.  When

16   Trotter assumed the position, he and Konstantino discussed what role was most appropriate for

17   Konstantino moving forward.  In light of that conversation, Trotter offered Konstantino the role of

18   Executive Vice President of Research and Development and Chief Scientific Officer.

19       AngioScore wanted Konstantino to remain on the AngioScore team because of his central

20   role at the company as a co-founder, and his skill as an engineer.  Konstantino, however,

21   expressed a desire to leave and work full time as President and CEO of TriReme Medical, Inc., a

22   company he had founded for the purpose of developing bifurcation stents.  Accordingly, in the fall

23   of 2005, Trotter started to look for a replacement for Konstantino.  Both he and Konstantino

24   interviewed the candidates.  At the same time, Konstantino requested that he be given permission

25   to work on a developing technology with TriReme: endovascular bifurcation stents and delivery

26   systems for the same.  Although bifurcation stents are not competitive with specialty balloon

27   angioplasty catheters, AngioScore's board took this request seriously, ultimately adopting a

28

1  resolution that granted Konstantino permission to pursue this limited goal, and waived

2  AngioScore's interest in the bifurcation stent technology.

3          In late 2006, the role of AngioScore's Vice President of Research and Development

4  transitioned from Konstantino to Feridun Ozdil. While the details remain unclear, the relationship

5  between Konstantino and Ozdil soon became strained and culminated in a physical altercation.

6  Both Konstantino and Ozdil are intelligent scientists, but both are egotistical and authoritarian.

7  The "he said"/"he said" personality conflict was never resolved definitively.

8          In April 2007, Konstantino's employment with AngioScore terminated, although he

9  remained on its Board of Directors. In his capacity as a board member, he continued to attend

10  AngioScore's board meetings and received updates about AngioScore's financial well-being and

11  the status of its new product development up until he was asked to resign in February 2010.

12      II.     Chocolate, the Device at Issue

13          In the fall of 2009, Konstantino and his brother-like friend and colleague, Tanhum Feld,

14  conceived of what was to become "Chocolate" during a telephone "brainstorming" session. Feld

15  was discussing frame ideas for a balloon; Konstantino offered the notion of a balloon surface

16  defined by pillows and grooves. The concept was that a nitinol cage would surround a nylon

17  balloon. As the balloon inflated, it would protrude through the cage. The inflated balloon would

18  then display a pattern of pillows and grooves, exerting force against plaque lining a vessel wall.

19          With the concept for Chocolate established, Feld undertook to engineer the device,

20  directing and coordinating efforts of TriReme employees with Konstantino's approval. By

21  October 2009, Konstantino applied for a provisional patent application, naming himself and Feld

22  as co-inventors. Within just a few months, Chocolate had progressed from an intellectual concept

23  to physical prototypes. In January 2010, Konstantino and other TriReme employees attended

24  animal testing at Stanford for a Chocolate prototype.

25          Along with supervising and directing the employees at TriReme in their efforts to develop

26  Chocolate, Konstantino assumed the role of the businessman, conceptualizing the marketing of

27  Chocolate and pitching it to investors under the guise of a corporate entity called "Proteus."

28  During the second half of 2009, Konstantino met with twenty to thirty investors, offering them the

1    opportunity to invest in Chocolate. In these pitches, Konstantino represented that the Chocolate

2    was being developed by "Proteus," and that Chocolate's intellectual property, design, prototypes,

3    business model, team, and partnerships were all completed. With representations of this sort, he

4    secured a grant from the Singapore Economic Development Board and continued to solicit

5    additional investors.

6        The similarities between AngioSculpt and Chocolate are obvious. Both are specialty

7    angioplasty balloon catheters. Both are comprised of a nylon balloon surrounded by a nitinol

8    structure. Both are used to treat peripheral and coronary artery disease by inflating to open

9    occluded blood vessels. Neither leaves any metal behind in a blood vessel after use, unlike a stent.

10   Both are sold to the same customers and make overlapping marketing claims. Both are sold at

11   premium pricing with roughly identical list prices. Given the similarities between the devices,

12   Konstantino himself identified AngioScore as a partner for the Chocolate opportunity in investor

13   presentations in 2009 and 2010.

14       Konstantino knew that the devices would compete with one another and contemporaneous

15   documents show that not only did he so intend, but this information was used as part of his

16   investment pitch. In pricing Chocolate, Konstantino and employees at TriReme purposefully

17   priced Chocolate exactly $25 below the list prices for AngioSculpt and targeted the same

18   customers. Communications between Konstantino, Feld, and TriReme employees and officers

19   from late 2009 into 2010 confirm that all those involved with the development of Chocolate –

20   Konstantino, TriReme, and Quattro – were purposefully seeking to compete with the AngioSculpt

21   in the specialty balloon catheter market. This included touting Chocolate for all its competitive

22   advantages, including its potential as a drug-eluting balloon.

23       While he directed the development of Chocolate as both a medical device and business

24   opportunity, Konstantino nonetheless remained on AngioScore's board of directors. Pursuant

25   thereto, he was privy to all manner of confidential financial information, market information, and

26   competitive information regarding the performance of the AngioSculpt device and AngioScore's

27   highly sensitive risk assessments. (PX 220 (July 2009 Board Meeting presentation, including

28   strategic focus, discussions of business challenges).) He knew that AngioScore was having

5

1  difficulty developing a 100mm version of its AngioSculpt as of July 2009. (*Id.*) And, he knew

2  that the company was interested in pursuing a drug coated specialty balloon. (*See* PX 217

3  (February 21, 2009 email between board members discussing efforts to attain drug coated balloon

4  technology); PX 220 (July 2009 board presentation outlining future business strategy including

5  "extra long" devices of 100mm and a drug coated device).) In addition, Konstantino knew that the

6  financial status of AngioScore in late 2009 to early 2010 was relatively strong. AngioScore was in

7  a prime position to raise further capital, had considerable cash reserves, and was in the process of

8  dedicating resources to improving its presence in the specialty balloon catheter market, even

9  though it had just emerged from the expense of an unwarranted investigation. Indeed,

10  AngioScore's December 2009 Monthly Report, distributed for the board meeting, reflected that

11  cash on hand totaled $15.3 million. The report described this figure as an "[o]utstanding result."

12  (DX 1199.) That AngioScore could have exploited the Chocolate opportunity, had it been offered,

13  is not subject to reasonable dispute.

14          Notably, in December 2009, Konstantino had a conversation with AngioScore's CEO,

15  Trotter, regarding TriReme's development of a plain old balloon angioplasty ("POBA") device

16  called "Glider." At trial, both Trotter and Konstantino confirmed that this conversation took

17  place. Konstantino told Trotter that TriReme was too small to commercialize the Glider product,

18  and that he was in search of a funder. He offered the Glider to AngioScore for distribution

19  purposes. In his deposition, Konstantino explained that conversation as follows:

20          I share[d] with him the specifics of the product, the technical
            features of this product. I share[d] with him how do we think this
21          product may fit in the marketplace, what we view [are] the features
            or the advantages of this product. And I offered him to do some sort
22          of collaboration. Specifically we discussed -- or I offered two
            collaborations. I don't mean opportunities in a legal context. One was to distribute these. Told him, Tom, we are a
23          small company. We don't have commercial capabilities. You have
            that. This is not a product you put in the bag. We don't have
24          commercial capabilities. You do. This is another product you can
            put in the bag. You can reduce the overhead or the overhead
25          location on sale slips. There are many perceived benefits. And I
26          also talked with him about the what you call the fact, maybe, that
            AngioSculpt was not a highly deliverable product, at least this is in
27          the perception of physicians who are using the product.

28

6

United States District Court
Northern District of California

1   (*See* Trial Transcript ("Trial Tr."[2]) at 136:23-138:1 (reading Konstantino Dep. at 643:7-644:3).)

2   Trotter confirmed that when Konstantino revealed that TriReme had been working on the

3   Glider, he expressed concern that TriReme was venturing into angioplasty balloons at all.

4   Because Konstantino had presented TriReme's Glider as an ordinary POBA, however, the Glider

5   would not be acutely competitive with AngioSculpt. Notably absent from this conversation was

6   any mention of Chocolate, which had been in development for months, offered to others as a

7   corporate opportunity, and was about to undergo porcine testing.

8   After sitting through the February 3, 2010 AngioScore board meeting, Konstantino

9   approached Trotter and asked to meet privately. Referencing the December 2009 conversation in

10   which he had offered AngioScore the Glider POBA balloon, Konstantino told Trotter that

11   TriReme was "considering developing a specialty balloon catheter for peripheral indications," and

12   that TriReme had been actively working on "something for the future" in specialty balloon

13   catheters. To say that Konstantino "downplayed" the facts surrounding Chocolate would be an

14   understatement. Konstantino did not inform Trotter that the development of TriReme's specialty

15   balloon, which by that point had been called Chocolate for several months, was well underway.

16   He did not disclose his personal role in the development and conceptualization of the device, nor

17   did he disclose that a prototype had been created, a patent application and been submitted, animal

18   testing had occurred, or that he had already engaged potential investors and funding sources.

19   Trotter was nonetheless shocked by this news. Specialty balloons were AngioScore's focus. He

20   was of the belief that prior to that point, TriReme had been focusing on bifurcation stents and had

21   only recently started to consider POBA devices, and even then, only the Glider POBA. Trotter

22   informed Konstantino that he did not think further discussion was appropriate and asked him to

23   leave.

24   Immediately following that meeting, Trotter relayed the conversation with Konstantino to

25   members of AngioScore's board. The board expressed a universal belief that Konstantino should

26

27   _____

28   [2] References to "Trial Tr." refer to the consolidated transcript of trial, which appears in six, sequentially paginated volumes at Docket Entries 616, 617, 622, 623, 637, and 638.

United States District Court
Northern District of California

1    resign as soon as possible. If TriReme developed a specialty balloon, Konstantino would have

2    direct a conflict of interest. The board was concerned that TriReme was considering potentially

3    competing with AngioScore. At that point, no one at AngioScore knew that a competitive

4    specialty balloon device had been developed under Konstantino's direction and control.

5       The next day, Trotter sent Konstantino an email entitled "Board of Directors Position,"

6    copying AngioScore's attorney, John Sellers. In it, Trotter restated his concerns about TriReme

7    moving into the specialty balloon market, and stated that the board members with whom he had

8    spoken saw this as a "clear conflict of interest." The "consensus opinion" was that Konstantino

9    "need[ed] to resign from the Board immediately [and] probably should not have participated in

10   yesterday's Board Meeting." Trotter told Konstantino that Sellers would be in touch to make

11   arrangements for his resignation.

12      Konstantino's response was brief. Again, he did not disclose the existence, or

13   development status of the Chocolate device, nor did he disclose his intimate involvement with the

14   project. Rather, and importantly, he began his campaign of active misdirection. Thus, he

15   responded: "TriReme has not made any decision to make such [a] change and I was giving you

16   very early heads up to *something that may take place in the future, or may never happen*[.]"

17   (emphasis supplied).

18      On February 4, 2010, John Sellers responded to Konstantino in an email. Sellers informed

19   Konstantino that "e[]ven if you are just contemplating . . . you have important fiduciary duties

20   [and] ongoing confidentiality obligations." Later that day, the two men spoke on the telephone for

21   five to ten minutes. Sellers again emphasized Konstantino's fiduciary obligations to AngioScore

22   as a director, including that a conflict of interest would exist if TriReme developed a potentially

23   competing technology. They also discussed the logistics of Konstantino's resignation from the

24   Board.

25      The next day, February 5, 2010, Konstantino replied to Sellers, copying Trotter, Suennen,

26   and Raffin:

27          As we discussed, I'm surprised and disappointed that you and the
28          company jumped to the conclusion that I should resign from the

United States District Court
Northern District of California

United States District Court
Northern District of California

> board based on assumptions after receiving bits and pieces of
> information.  I am *keenly aware of my obligations* as a board
> member and this is precisely why I am coming to AngioScore
> [now]; *before any new project is started*.

(PX 107 (emphasis supplied).)  To investigate the issue further, Suennen reached out to former

AngioScore CEO, co-founder, and one of AngioScore's largest common stockholders, Ephraim

Heller, to discuss filling Konstantino's board seat and to find out whether Heller knew if

Konstantino was working on a new specialty balloon catheter at that time.  (*See* DX 1292.)

Although Konstantino had done work previously that Heller suspected may have conflicted with

his obligations to AngioScore, Konstantino had reassured him that all such activities had been

precleared with AngioScore.  Heller also stated that at that time, he believed that Konstantino was

working to bring a "competitive product" to market, although it was not clear whether such device

was the Glider, of which AngioScore was already aware, or whether it was a specialty balloon.

Suennen also spoke with Mike Lynn, a TriReme board member.  Lynn stated that he had no

knowledge or recollection that TriReme was working on a specialty balloon catheter.

Based on the above, the board decided to investigate whether Konstantino or TriReme had

in fact developed a competitive device.  To that end, they questioned Konstantino pointedly.  On

February 10, 2010, John Sellers sent a letter to Konstantino entitled "Obligations to AngioScore,

Inc." (PX 419.)  Knowing only of the Glider, AngioScore's board sought information relative to

whether Konstantino had been working on a device that built off of the Glider model, such as for

example adding a metal cage around the balloon structure.  The top paragraph on the second page

reads:

> Our current presumption is that you have handled these matters in a
> manner that *fully protects AngioScore and fully complies with your
> obligations to AngioScore*.

AngioScore acknowledged that as of the date of Konstantino's resignation, he and

TriReme had "every right going forward to develop products that may compete with AngioScore

as long as you do not use or disclose AngioScore['s] confidential information or intellectual

property." (*Id.*)  Nonetheless, Sellers requested that Konstantino confirm that no such activities

9

United States District Court
Northern District of California

took place while Konstantino was on AngioScore's board: "we respectfully request that you promptly provide the AngioScore Board of Directors further information regarding these activities in order to allow the Board to assess whether they are competitive to AngioScore." (*Id.*)

In response, Konstantino's counsel sent a letter on February 23, 2010 in which Konstantino disavowed any development of a specialty balloon by TriReme and affirmed that he had no role in the development of any such device. Specifically, Konstantino's counsel reiterated that prior to Konstantino's resignation on February 5, 2010, he was not "involved in *any development work* or licensing of angioplasty balloon technology for the coronary or periphery markets *that involves specialized features such as scoring, cutting, or drug eluting elements*." (PX 420 (emphasis supplied).) Likewise, Konstantino represented that he was not involved "in any development or licensing of angioplasty balloon technology for the coronary or periphery markets that makes similar claims to that of the AngioSculpt product." (*Id.*) Konstantino restated that TriReme was "*considering, in the future, the possibility* of entering the field of specialized balloons," but that before February 5, 2010, "TriReme *ha[d] not developed* any products . . . that compete[d] with AngioScore's products." (*Id.* (emphasis supplied).)

Although the board had no factual basis at the time for believing that such representations were false, Konstantino's letter was technically non-responsive to Sellers's original question and accordingly, AngioScore continued to pursue the matter.

In an email to the board, Trotter asked for opinions and feedback on Konstantino's response, and speculated that Konstantino may have been involved in developing a scoring version of Glider to compete with AngioScore in the future.[3] At that point, Trotter began to

---

[3] Two days later, Jim Andrews, AngioScore's Chief Financial Officer, forwarded Trotter a TriReme press release concerning its receipt of FDA 510K Clearance for the Glider PTA Balloon Catheter. (DX 1317.) Trotter forwarded the press release to the board of directors less than ten minutes later. Given that the Glider opportunity was first presented to Trotter in December of 2009, Trotter noted that "obviously this has been in the works for many months (testing, submission, approval, etc.) while Eitan was a member of our Board[.]" (*Id.*) He was concerned that Konstantino had developed the Glider PTA Balloon Catheter while he had possession of a "considerable amount of [AngioScore's] confidential Sales & Marketing, Product Development and Regulatory information." (DX 1317.) Although at that time Glider was a POBA and not a specialty balloon, Trotter was concerned that Konstantino "may be planning to add a scoring

10

1    prepare for potential legal action against Konstantino, should any "specialty balloon" come to

2    light. He asked AngioScore's patent counsel, Jim Heslin, to monitor new patent applications for

3    scoring/cutting balloons to see what, if anything, Konstantino might file. And he asked Andrews

4    to research whether AngioScore's insurance policy provided coverage for breaches of directors'

5    duties and obligations.

6         AngioScore continued to investigate its concerns regarding Konstantino's involvement

7    developing a competitive product with Konstantino directly. Sellers followed up with another

8    letter on March 5, 2010 directed to counsel for Konstantino, and the boards of both TriReme and

9    AngioScore. In it, Sellers remarked that previous representations by Konstantino had avoided

10   squarely addressing AngioScore's concern, namely, that during Konstantino's service as a board

11   member, he:

> obtained proprietary and confidential information about AngioScore,
> the peripheral market, and the role of specialty balloons in that
> market, while at the same time *developing and pursuing plans*
> within TriReme to *pursue those same markets with another device*.

(PX 421 (emphasis supplied).) Sellers further stated that AngioScore's board "specifically would

like to know whether prior to February 5, 2010, Mr. Konstantino and/or TriReme evaluated,

negotiated, or otherwise pursued the acquisition or licensing of any technology that competes with

AngioScore's products, and if so, why that opportunity was not provided to AngioScore in

accordance with Mr. Konstantino's duties as a Board member of AngioScore." (*Id.*)

     Again, counsel for Konstantino responded, unequivocally and unambiguously denying that

any such activity had taken place. Characterizing AngioScore's questioning as predicated on

---

element over time." Raffin speculated that the lead time on Konstantino's success for any such
scoring product would be three to five years out, and Trotter responded that while he agreed on the
likely timing of any such device, AngioScore "[n]eed[s] to watch him carefully." (*Id.*) Raffin and
Trotter both testified that at this time, they were concerned singularly on the Glider balloon, which
was not directly competitive with AngioSculpt, and Konstantino's possible appropriation of that
POBA platform to make a specialty balloon. Neither suspected that there was a separate specialty
balloon platform already underway. Due to the differences between POBAs and specialty
balloons like AngioSculpt, the Court finds that the fact of Glider's existence cannot be fairly said
to have put AngioScore on notice of Chocolate's existence.

11

United States District Court
Northern District of California

1    "unsubstantiated accusations" against Konstantino, counsel informed AngioScore that should such

2    accusations continue, Konstantino will "have no choice but to consider his legal options." (PX

3    423.)

4         With that, AngioScore considered its inquiry complete. Konstantino's representations had

5    sufficiently assuaged any and all concerns about whether he or TriReme had developed a specialty

6    balloon. AngioScore was satisfied that nothing of the sort had occurred. Based on the nature and

7    strength of Konstantino's representations, a reasonable person would have come to the same

8    conclusion.

9         AngioScore only learned that Chocolate existed a year and a half later, in the second half

10   of 2011, when a sales representative called the Washington Hospital Center and heard that a

11   presentation had been made on a new device called "Chocolate." However, it was only after

12   Feld's deposition in the spring of 2014, in connection with AngioScore's patent case, that

13   AngioScore discovered all of the facts referenced above evidencing that Chocolate had been

14   developed while Konstantino sat on AngioScore's board. That discovery yielded the claims

15   herein addressed.

16                                    CONCLUSIONS OF LAW

17   I.    As a member of AngioScore's board of directors, Konstantino breached his
           fiduciary duty to AngioScore and usurped a corporate opportunity when he
18         developed Chocolate for his own benefit and failed to offer the opportunity to
           AngioScore.
19

20         A. The Corporate Opportunity Doctrine Framework

21        The corporate opportunity doctrine "represents but one species of the broad fiduciary

22   duties assumed by a corporate director or officer." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148,

23   154 (Del. 1996). As a fiduciary of a corporation, directors agree to "place the interests of the

24   corporation before his or her own in appropriate circumstances." *Id.* "At the core of the fiduciary

25   duty is the notion of loyalty—the equitable requirement that, with respect to the property subject

26   to the duty, a fiduciary always must act in a good faith effort to advance the interests of his

27   beneficiary." *In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *21

28   (Del. Ch. Jan. 25, 2013) *reargument denied*, No. CIV.A. 5725-VCP, 2013 WL 1900997 (Del. Ch.

12

United States District Court
Northern District of California

May 8, 2013) (citing *Dweck v. Nasser*, 2012 WL 161590, at \*12 (Del. Ch. Jan. 18, 2012)).

Noting that corporate directors stand in fiduciary relationship to the corporations they

serve, the Delaware Supreme Court recognized in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939) that:

> public policy, existing through the years, and derived from a
> profound knowledge of human characteristics and motives, has
> established a rule that demands of a corporate officer or director,
> peremptorily and inexorably, the most scrupulous observance of his
> duty, not only affirmatively to protect the interests of the corporation
> committed to his charge, but also to refrain from doing anything that
> would work injury to the corporation, or to deprive it of profit or
> advantage which his skill and ability might properly bring to it, or to
> enable it to make in the reasonable and lawful exercise of its powers.
> The rule that requires an undivided and unselfish loyalty to the
> corporation demands that there shall be no conflict between duty
> and self-interest. The occasions for the determination of honesty,
> good faith and loyal conduct are many and varied, and no hard and
> fast rule can be formulated. The standard of loyalty is measured by
> no fixed scale.

*Id.* at 510. The corporate opportunity doctrine seeks to define the bounds of this duty where a

director may be inclined to take a business opportunity for him or herself. *See id.* The rule

enunciated in *Guth* is this:

> if there is presented to a corporate officer or director a business
> opportunity which the corporation is financially able to undertake,
> is, from its nature, in the line of the corporation's business and is of
> practical advantage to it, is one in which the corporation has an
> interest or a reasonable expectancy, and, by embracing the
> opportunity, the self-interest of the officer or director will be
> brought into conflict with that of [the] corporation, the law will not
> permit him to seize the opportunity for himself.

*Id.* at 510-11. Thus, under Delaware law, "[t]he elements of misappropriation of corporate

opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation

has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit

the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in

a position inimical to his duties to the corporation." *In re Mobilactive Media*, 2013 WL 297950,

at \*21. Once the plaintiff has shown the breach of the director's duty of loyalty, the burden

13

1    switches to the fiduciary to show that he or she did not seize a corporate opportunity "because

2    either the corporation was presented the opportunity and rejected it, or because the corporation

3    was not in a position to take the opportunity." *Grove v. Brown*, No. 6793-VCG, 2013 WL

4    4041495, at *8 (Del. Ch. Aug. 8, 2013). Delaware courts further recognize that "a director or

5    officer may take a corporate opportunity if: (1) the opportunity is presented to the director or

6    officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the

7    corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the

8    director or officer has not wrongfully employed the resources of the corporation in pursuing or

9    exploiting the opportunity." *Broz*, 673 A.2d at 155 (emphasis omitted).[4]

10    The rule set forth in the Delaware cases accords with economic and public policy, and

11    civic accountability. Put simply, men are not angels. We require structures to govern conduct.

12    *See* FEDERALIST NO. 51. The corporate structure necessarily requires a separation of ownership

13    and control, which produces a conflict: the shareholders are the principle bearers of risk, but the

14    board of directors are vested with the power to make managerial decisions. (*See* Trial Tr. at

15    646:7-21 (Testimony of Prof. Eric Talley).) Centralizing decisionmaking authority in a board of

16    directors presents efficiencies insofar as shareholders can diversify their interests, which, in turn,

17    has contributed to substantial economic growth and development. (*Id.* at 646:22-647:21.)

18    However, the concentration of decisionmaking power in individuals who do not necessarily bear

19    the risk creates a misalignment of interests. (*Id.* at 647:23-649-9.) The general purpose of

20

21        [4] The parties dispute the precise interplay between the test enunciated in *Guth*, and the
counter-test, or corollary test, enunciated in *Broz*. The first test sets forth the elements of

22    misappropriation of a corporate opportunity; the second test recognizes circumstances whereupon
a director or officer may take a corporate opportunity for himself. Although the tests appear at

23    variance, in substance, they are concordant. The fundamental question is whether a corporate
director, standing in fiduciary relation to a corporation he serves, has fallen short of "the most

24    scrupulous observance of his duty not only affirmatively to protect the interests of the corporation
committed to his charge, but also to refrain from doing anything that would work injury to the

25    corporation, or to deprive it of profit or advantage which his skill and ability might properly bring

26    to it, or to enable it to make in the reasonable and lawful exercise of its powers." *Guth*, 5 A.2d at
511. That these tests are concordant is evident from their overlap. Critically, both the *Guth* test

27    and the *Broz* corollary test turn on whether the corporation had an interest or expectancy in the
opportunity. Because the Court finds that AngioScore did have an interest or expectancy in the

28    Chocolate, under both tests, Konstantino has breached his duty of loyalty.

14

United States District Court
Northern District of California

1    corporate governance principles, specifically, the duties of care and loyalty, is to control for the

2    moral hazards that arise when directors either shirk their responsibilities or self-serve. (*Id.* at

3    649:10-650:25.) Without strong corporate governance principles, the trust that underpins a

4    shareholder's decision to invest will dissolve, with broader economic consequences to follow. (*Id.*

5    at 651:17-652:10.)

6         Whether a corporate opportunity has been usurped is "a factual question to be decided by

7    reasonable inferences from objective facts." *Guth*, 5 A.2d at 513.

8         **B. The Corporate Opportunity Doctrine applies to a director who is also an**

9              **inventor.**

10         Throughout this case, defendants have argued that the corporate opportunity doctrine

11    cannot apply where, as here, a director invents a technology, even where such technology is

12    directly competitive with that of the corporation he serves. Defendants maintain that because

13    Chocolate was intellectual property belonging to Konstantino and the product of his own

14    innovation, this necessarily obviates any fiduciary obligation to offer Chocolate to AngioScore.

15    (DOB at 2-3.) The Court disagrees.

16         The fact of inventorship does not absolve a director of his fiduciary obligations with

17    respect to inventions he may develop that compete with the corporation he serves. To hold

18    otherwise would work an absurdity. Directors of corporations would be free to invent and develop

19    competing technologies for their own benefit, concealing the same from the companies they serve,

20    even where elements of those inventions would likely benefit the companies. This scenario stands

21    in stark opposition to the foundational principles of corporate governance, which demand that

22    directors exalt the interests of the companies they serve above their own. *Guth*, 5 A.2d at 510

23    ("the rule . . . demands of a corporate officer or director, peremptorily and inexorably, the most

24    scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation

25    committed to his charge, but also to refrain from doing anything that would work injury to the

26    corporation, or to deprive it of profit or advantage which his skill and ability might properly bring

27    to it, or to enable it to make in the reasonable and lawful exercise of its powers."). Most seriously,

28    the extension of defendants' preferred rule would have directors entertain divided loyalty. The

position is untenable. *See id.* ("[t]he rule ... demands that there shall be no conflict between duty and self-interest"). The rule makes logical sense. A director can leave the corporation thereby dissolving the duties he owes. A corporation cannot and therefore relies on untarnished fidelity.

Defendants cite no case holding conclusively in their favor, but rather argue by analogy to *Equity Corp v. Milton*, 221 A.2d 494 (Del. 1966). That case is distinguishable. First, the facts of *Milton* counseled against a finding that the opportunity to that interest rightfully and in fairness belonged to the corporation. *Milton*, 221 A.2d 497; *see also Thorpe v. CERBCO, Inc.*, No. CIV.A. 11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993) ("While courts have considered a number of criteria in evaluating whether a director has usurped a corporate opportunity, the essence of this doctrine is 'that a director may not appropriate something for himself that in all fairness should belong to his corporation.'") (citing *Milton*, 221 A.2d at 497). Applying this standard, the *Milton* court determined that the claimed opportunity was not, in fairness, one belonging to the corporation – it was not of practical advantage to the corporation (*see id.* at 497), in keeping with the business of the corporation, nor did it fit into an established corporate policy (*see id.*). Having laid this foundation, the court stated, "if any doubt remains," the shares that had previously been controlled by Milton were later reacquired by him; simply put, the entire transaction from start to finish concerned Milton's property. Essentially, because there was nothing wrong with a corporate officer owning and controlling stock of his corporation, the court found that the duty of loyalty is not violated when a director shifts that ownership as he sees fit. (*Id.* at 498-99.) Thus, there was conclusively no corporate opportunity at issue in *Milton*.[5]

---

[5] Likewise, defendants' reliance on *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957 (Del. 1980) does not aid their position. The question presented in *Summagraphics* was exceedingly narrow: did the trial court's finding that no corporate opportunity existed (which finding was *not* appealed to the Delaware Supreme Court), leave room for a separate claim for breach of fiduciary duty? *Id.* at 962 ("The thrust of SAC's fiduciary breach of duty argument is that the trial court's conceded finding that Brenner's concept was not an opportunity available to SAC but one that defendants could take for themselves is not determinative of SAC's right to equitable relief by reason of defendants' breach of so-called "independent" fiduciary duties owed to SAC."). The Delaware Supreme Court thus considered the scope of fiduciary duty law and concluded that where no corporate opportunity is found to exist, as was the case in *Summagraphics*, that conclusion "finally determines the right of the corporate officer to treat the opportunity as his own." *Id.* at 964 (quotation omitted)). The fact that no corporate opportunity

16

United States District Court
Northern District of California

1    The logic enunciated in *Milton* does not compel a finding in defendants' favor here.  The

2    essential question is whether a director has appropriated something for himself that, in all fairness,

3    should belong to his corporation.  The determination of this question is always one of fact to be

4    determined from the objective facts and surrounding circumstances.  *Johnston v. Greene*, 121

5    A.2d 919, 923 (Del. 1956).  Here, the Court is confronted with facts establishing that Konstantino,

6    aware of AngioScore's competition-sensitive information, its then-existing financial condition,

7    design challenges, and business objectives, developed a competing device while on AngioScore's

8    board and took affirmative steps to exploit it himself while concealing it from AngioScore.  At the

9    same time, Konstantino was aware that he owed AngioScore fiduciary duties.  On these facts, that

10   Konstantino invented the competitive technology does not serve his argument that he should be

11   absolved of his fiduciary obligations to AngioScore.  Rather, it works the opposite effect:

12   Konstantino's failure to abide by his duty is plainly all the more offensive.  For these reasons, the

13   Court finds that it cannot indulge defendants' position and find that the corporate opportunity

14   doctrine does not apply.

15        At the same time, AngioScore's position is equally untenable.  AngioScore posits that by

16   virtue of Konstantino's position as a director, AngioScore had a right to the Chocolate outright,

17   and that therefore Konstantino was obligated to *give* the opportunity to AngioScore.  The logical

18   extension of this position demonstrates its implausibility.  Were this the case, Konstantino's

19   invention assignment agreement would have been superfluous in the first instance, and so, too,

20

21   existed in *Summagraphics* was critical to the court's reasoning, and essential to its holding.  *See id.* ("No case authority has been cited by appellant to support the proposition that key corporate
22   personnel are under a duty to disclose to their employer and not divert from him a business
     proposition that has been found not to be available and essential to the corporation.").
23   Furthermore, to the extent defendants argue that *Summagraphics* sanctions an employee's acts in
     anticipation of eventual competition, the limits of this freedom are well-defined: a fiduciary's
24   right to make such arrangements is "by no means absolute," particularly in instances where the
     fiduciary engages in "usurpation of [the] employer's business opportunity," and "the ultimate
25   determination of whether an employee has breached his fiduciary duties to his employer by
     preparing to engage in a competing enterprise must be grounded upon a thoroughgoing
26   examination of the facts and circumstances of the particular case."  *Id.* at 965 (citations, quotations
     omitted).  Here, the Court finds that Konstantino did usurp (indeed, created and then usurped) a
27   corporate opportunity, and that his machinations were not merely preparatory.
28

17

United States District Court
Northern District of California

1    would all invention assignment agreements between directors and the corporations they serve.

2    The Court cannot overlook the effect such a rule would work in the context of intellectual property

3    and emerging technologies.  Critically, holding that directors who are also innovators must

4    relinquish to the corporations they serve technologies falling within that corporation's line of

5    business, in which the corporation has an interest or expectancy, or which aligns with its business

6    purpose and objectives, would serve to undermine innovation.  Indeed, holding as AngioScore

7    requests would subvert fundamental principles of intellectual property respecting inventors' rights,

8    which are designed to encourage, not discourage, ingenuity and innovation.  The fact that this case

9    concerns a medical device, which is currently being used in medical procedures in this country,

10    only serves to underscore the public interest in innovation.

11         With these positions, the parties posit a tension:  do fiduciary duties extend so far as to

12    compromise, potentially fatally, innovation; or, by contrast, does a director's ingenuity and

13    innovation provide an escape route from his fiduciary duties?  Neither extreme prevails.  A court

14    must apply the principles of the law in such a way that balances the wise public policy behind the

15    *Guth* rule, with the public policy counseling in favor of innovation.  For this reason, the Court

16    finds that although AngioScore was owed fiduciary duties by Konstantino, those duties did not

17    entitle AngioScore to outright ownership of the Chocolate opportunity at any point in time.

18    Rather, what Konstantino's fiduciary duty demanded was that he offer AngioScore the *opportunity*

19    *to acquire* the rights to the Chocolate.  The Court need not venture as to specifics of such a

20    transaction, but having chosen to remain on AngioScore's board, the offering must occur to satisfy

21    both the law of fiduciary duties and the public interest in innovation.  Offering an opportunity to

22    AngioScore meets Delaware's demand that directors not undertake any activity that would work

23    harm to the corporation they serve and prioritize the interests of those corporations above their

24    own.  *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *21 ("At the core of the fiduciary

25    duty is the notion of loyalty . . . with respect to the property subject to the duty, a fiduciary always

26    must act in a good faith effort to advance the interests of his beneficiary.").  It also accords with

27    directors' duty not to "do anything" that would "deprive" the corporations they serve "of profit or

28    advantage which [their] skill and ability might properly bring to it."  *Guth*, 5 A.2d at 510.  And, it

18

1    remains faithful to the general principle that a director can establish conclusively no breach of his

2    fiduciary duty where, in keeping the interests of the corporation he serves first in mind, the

3    corporation is presented the opportunity and rejects it. *See Grove*, 2013 WL 4041495, at *8. By

4    ensuring that transparency and good faith predominate, the application of the rule in this manner

5    assures that any conflict will be resolvable.

### C. Application of the Corporate Opportunity Doctrine

#### 1. *Chocolate was an "opportunity" when Konstantino was on AngioScore's Board, and as such, falls under the Corporate Opportunity Doctrine.*

10   Longstanding law requires that certain "opportunities" be offered to the corporation. The

11   definition of an "opportunity" is "a favorable juncture of circumstances" or "a good chance for

12   advancement or progress." MERRIAM-WEBSTER, New Collegiate Dictionary (9th ed. 1988). The

13   evidence adduced in this case establishes conclusively that as of the date Konstantino resigned

14   from AngioScore's board of directors, Chocolate was a concrete business opportunity. By that

15   point, Chocolate had developed from a mere idea into a concrete opportunity. It had been in

16   development for approximately five months. The initial "brainstorming" discussions in the second

17   half of 2009 had resulted in the creation of many engineering design models, followed by physical

18   models and prototypes. By January of 2010, the Chocolate design was so complete that

19   prototypes were suitable for testing, and in fact, was the subject of a porcine study at Stanford,

20   which TriReme employees and Konstantino attended.

21   Not only was Chocolate sufficiently developed to enable testing, development of

22   Chocolate had advanced to the point that Konstantino felt it appropriate to market it as an

23   opportunity for investors. The fact that much development remained is no relevant to whether the

24   opportunity had already manifested. Defendants cannot escape that during the second half of

25   2009, Konstantino offered between twenty and thirty investors the opportunity to invest in

26   Chocolate. In preparation for investor meetings, Konstantino prepared slide presentations in

27   which he described the Chocolate technology, extolled its competitive, medical virtues, and

28   delineated the phases for potential investment. In a November 2009 presentation seeking funding

United States District Court
Northern District of California

1   from the Singapore Economic Development Board, Konstantino stated that the Chocolate "IP,

2   Concept design, Prototypes, business model, Team, [and] partnerships" were all "completed."  In

3   furtherance of his financial objectives, Konstantino corresponded with potential investors.  In such

4   communications, he represented that Chocolate's "initial design already works well and attracts a

5   lot of attention" and that Chocolate's product design was completed.

6          Such claims were not mere puffery designed to solicit investment.  In early 2010, design of

7   the Chocolate was essentially complete.  Indeed, Chocolate's 510K application in 2011 referenced

8   testing completed on Chocolate's nitinol cage designs created in January 2010.  Based on these

9   facts, that Chocolate had been developed to the point sufficient to render it a concrete business

10  opportunity prior to Konstantino's resignation from AngioScore's board of directors cannot be

11  reasonably disputed.  If the Chocolate opportunity was sufficiently concrete for twenty to thirty

12  investors, it was sufficiently developed to be offered to AngioScore.  The Court so finds.

13                    **2.  *Chocolate falls within AngioScore's line of business.***

14         An opportunity is within a corporation's line of business if it is "an activity as to which

15  [the corporation] has fundamental knowledge, practical experience and ability to pursue, which,

16  logically and naturally, is adaptable to its business having regard for its financial position, and is

17  one that is consonant with its reasonable needs and aspirations for expansion."  *In re Mobilactive*

18  *Media*, 2013 WL 297950, at *21 (citing *Guth*, 5 A.2d at 514).  This factor is to be broadly

19  construed.  *Id.* (citing *Dweck*, 2012 WL 161590, at *13).

20         The Court finds that Chocolate falls within AngioScore's line of business.  Since its

21  founding in 2003, AngioScore has designed, manufactured, and marketed angioplasty balloon

22  catheters surrounded by a nitinol structure that are used for the treatment of cardiovascular disease

23  and sold under the brand name AngioSculpt.  The evidence demonstrates conclusively that

24  AngioSculpt and Chocolate are similar in both purpose and function.  AngioSculpt and Chocolate

25  are both angioplasty balloon catheters consisting of a nitinol cage surrounding a semi-compliant

26  balloon.  Both are used to open occluded or narrowed blood vessels at lesion sites by inflating to

27  compress plaque deposits against the vessel wall and then deflating for removal from the patient's

28  body.  Both devices were cleared by the FDA with overlapping indications for use.  Indeed, there

United States District Court
Northern District of California

1    are no indications for which the peripheral Chocolate device is cleared that the peripheral

2    AngioScore device is not and the devices make similar marketing claims. Both specialty balloons

3    and as such, enjoy premium pricing over that of plain old balloon angioplasty (POBA) products.

4    In fact, Chocolate is priced at $25 per unit less than the AngioSculpt. Moreover, as set forth in

5    more detail below, Chocolate is a competitor to the AngioSculpt with a common customer base.

6        Under Delaware law, the "line of business" element is to be broadly construed. The Court

7    finds it met here. The similarities in terms of purpose and function establish that AngioScore had

8    "fundamental knowledge and practical experience" to pursue Chocolate. That AngioScore has

9    historically focused on products that "scored" plaque is of no moment, for the devices are

10   materially similar and their differences amount to variations on a common theme. For example,

11   both devices are comprised of nylon balloons encased in nitinol cages. No other specialty

12   balloons on the market use nitinol cage on a semi-compliant balloon – the Boston Scientific

13   Cutting Balloon uses surgical steel, and the Vascutrak uses stainless steel guide wires.[6] Further,

14   given the overlapping features and design, AngioScore's manufacturing and distribution process

15   could have easily been modified to accommodate Chocolate. All of Chocolate's component parts

16   were essentially the same as those of the AngioSculpt.

17       Based on the above findings, the conclusion is inescapable that Chocolate is "logically and

18   naturally . . . adapt[ed] to [AngioScore's] business." *See In re Mobilactive Media*, 2013 WL

19   297950, at *21 (citation omitted).

         **3.  *AngioScore had an interest or expectancy in Chocolate.***

21       "[F]or a corporation to have an expectant interest in any specific property, there must be

22   some tie between the property and the nature of the corporate business." *Grove*, 2013 WL

23   4041495, at *8 (internal quotes omitted). By requiring "a tie to the 'nature of the corporate

24   business,'" this factor "implicates many of the issues" discussed above concerning AngioScore's

25   line of business. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d

26   961, 973 (Del. Ch. 2003) (citing *Broz*, 673 A.2d at 156). Even if there is a "tie" between the line

_____

28       [6] Nonetheless, those devices also compete with AngioSculpt.

21

United States District Court
Northern District of California

1  of a corporation's business and the potential opportunity, however, the Court may decline to find

2  an interest or expectancy where facts establish that a corporation is shifting away from its

3  historical line of business, where it disavows such interest, and where it lacks the capacity to

4  capitalize on the interest.  In *Broz*, for example, the Delaware Supreme Court found that there was

5  no interest or expectancy where a corporation was divesting in the area of venture from which the

6  potential opportunity arose, and where its business plan did not contemplate any new acquisitions.

7  *Broz*, 673 A.2d at 156.  The inquiry requires a court to use its judgment to discern whether, given

8  the factual context of each particular case, the corporation had an interest, "*actual or in*

9  *expectancy*," or whether the acquisition of property for a director's own use "may hinder or defeat

10  the plans and purposes of the corporation in the carrying on or development of the legitimate

11  business for which it was created." *Johnston*, 121 A.2d at 924 (citations omitted) (emphasis in

12  original).

13        As detailed in the preceding discussion, the Court finds that "some tie" exists between

14  Chocolate and the nature of AngioScore's business.  The devices are both angioplasty balloon

15  catheters that serve similar purposes and are constructed from the same materials.  Well beyond

16  the loose connection that the "some tie" standard evokes, however, the Court finds that in 2009

17  and early 2010, AngioScore had an actual and expectancy interest in Chocolate by virtue of its

18  then-existing needs and business purposes, as well as Chocolate's unique features and potential

19  benefits to AngioScore.  The Court so finds for three main reasons:  (1) Chocolate's design

20  configuration could have proven helpful, and at a minimum, would have been seriously considered

21  in solving AngioScore's then-existing problem with creating AngioSculpt devices at 100mm

22  lengths; (2) Chocolate's potential as a drug-eluting specialty balloon technology was in keeping

23  with AngioScore's business goal to bring such a device to market; and (3) AngioScore had an

24  interest in keeping a direct competitor out of the relatively small specialty balloon market.

25  Collectively, these conclusions compel a finding that AngioScore had an interest and expectancy

26  in Chocolate as of, at the latest, the date Konstantino resigned from its board.  The Court

27  elaborates:

28

United States District Court
Northern District of California

First, in late 2009, AngioScore needed a balloon design amenable to longer length catheters. AngioScore was facing design challenges with its 100mm AngioSculpt. At the same time, drawings and prototypes of 100mm Chocolate balloons existed. Jeffrey Bleam, AngioScore's Vice President of Research and Development, explained the company's difficulty executing its 100mm AngioSculpt balloon. Part of the engineering challenge had to do with ensuring that the balloon would inflate uniformly while inside the nitinol cage. In the longer lengths, the balloon was less likely to inflate uniformly every time. The concern was that uneven inflation would result in an uneven distribution of force, jeopardizing the safety and effectiveness of the device. The company devoted significant resources to resolving this problem. Although research began in 2009, AngioScore did not release a 100mm balloon until 2011. Even as AngioScore finalized its first generation 100mm AngioSculpt, there remained issues with deployment. The company then devoted further engineering resources to design a second generation balloon. Ultimately, the engineering team discovered that by adding cross-lengths to the metal struts, they were able to ensure more even deployment of the balloon. The second generation 100mm balloon was released in 2013, presenting the critical cross-struts.

Had AngioScore known about the importance of the cross-struts back in 2009 and 2010, it likely never would have released the first generation 100mm AngioSculpt. To that end, the Chocolate's design would have been of considerable help. The cross-lengths added to the AngioSculpt 100mm resemble, at least conceptually, those which present as radial struts on the Chocolate device, and which had been a part of the Chocolate design since its early development in 2009. Bleam testified that had he gained access to the Chocolate, its unique elements could have benefitted the design of the 100mm AngioSculpt. He stated that the radial strut configuration was "pretty interesting, specifically," and its cross-application was relatively obvious. Accordingly, the Court finds it plausible that Chocolate's design would have aided AngioScore's pursuit of a 100mm balloon.

Second, the Court finds that Chocolate's avowed potential as a drug-eluting specialty balloon as of late 2009 accorded with AngioScore's business goal of bringing a drug-eluting balloon to market, and AngioScore would have therefore been interested in such technology. As a

23

1     member of AngioScore's board, Konstantino knew that AngioScore's strategy included bringing

2     drug-eluting balloon to market. In fact, the issue was discussed at AngioScore's 2010 board

3     meeting, which Konstantino attended. (*See* PX 246 (AngioScore February 2010 Board Meeting

4     presentation, giving overview of then-existing cash balance, notably above budget, research and

5     development items, including drug-coated devices).) The fact that Konstantino was soliciting

6     investments upon representations that Chocolate was an "ideal platform for drug delivery" (*see* PX

7     85) establishes conclusively that Chocolate would have aligned with AngioScore's stated business

8     objectives, long-term research and development plan, and business purpose. Moreover,

9     Konstantino's attendance at AngioScore's board meetings confirms that he both knew and

10    understood AngioScore's desire to enter this portion of the market.

11           Third, the Court finds that based on the evidence adduced at trial, AngioScore would have

12    been interested in Chocolate because *rejecting* the Chocolate opportunity carried financial

13    implications for the company: namely, the potential entry of a competitive device into the

14    specialty balloon catheter marketplace and a likely reduction in AngioScore's market share. In so

15    finding, the Court notes that AngioScore competes in a relatively small, specialty balloon catheter

16    market. In late 2009 and early 2010, there were only two general types of balloon catheters in the

17    specialty balloon market – those that scored or cut, as in the case of the Boston Scientific Cutting

18    Balloon and the AngioSculpt, and the Vascutrak, which possesses stainless steel guide wires. The

19    market was thus defined by the nature of the devices then available. Chocolate presented a

20    paradigm-shifting design: a cage designed to create pillows and grooves in such a way as to create

21    focal force on the balloon surface as it pushes through the openings in the cage. The entry of such

22    a device into a small, competitive marketplace previously limited to devices whose purpose was to

23    have metal come into contact with a vessel wall would have significant implications for revenues.

24    As a young company, revenue growth was a primary concern for AngioScore. (*See* Trial Tr. at

25    488:17-22; 489:15-490:4 (Raffin).) The business judgment revealed during the course of

26    testimony, in combination with common sense, leads the Court to conclude that AngioScore

27    would not have simply done nothing had Chocolate been offered in a timely fashion.

28

24

1     Defendants advance primarily three arguments in opposition to the interest and expectancy

2  element. (*See* DRB at 7-8.) The Court finds none persuasive based on the evidence in this case.

3  First, defendants argue that AngioScore would have rejected Chocolate because it was focused

4  singularly on developing the AngioSculpt line of scoring balloons. Second, defendants argue that

5  AngioScore disclaimed any interest in Chocolate when Konstantino's invention assignment

6  agreement terminated at the conclusion of his employment with AngioScore, and relatedly, that

7  the only entities with legally cognizable interests in Chocolate were Konstantino and Feld,

8  Chocolate's inventors. Third, defendants maintain that AngioScore would have passed on the

9  Chocolate opportunity due to personality conflicts with Konstantino. The Court addresses, and

10  rejects, each in turn.

11     As to the first argument, for the reasons set forth above, the Court is not convinced that

12  AngioScore would not have been interested in Chocolate. Put differently, the Court is not

13  persuaded that AngioScore would have refused the opportunity. The fact that Chocolate does not

14  engage in an identical mechanism of action to that of the AngioSculpt is not enough to overcome

15  the weight of evidence supporting the Court's finding that AngioScore would have been interested

16  in Chocolate.

17     Defendants argue that AngioScore's 2009 rejection of an unnamed scoring device

18  establishes that AngioScore would not have been interested in Chocolate. AngioScore's mid-2009

19  rejection of a new scoring balloon was based in part on Trotter's belief that there was no strong

20  need to add another scoring device to the market. (*See* DX 1099.) The Court is not convinced that

21  this decision bears on whether AngioScore had an interest or expectancy in Chocolate. The

22  opportunity presented in early 2009 related to another concrete product. AngioScore was

23  permitted to evaluate the design features. In light of this concrete opportunity, Trotter explained

24  that AngioScore declined to pursue the proposed technology because "there was nothing

25  particularly impressive about it." (Trial Tr. at 627:25-628:1 (Trotter direct).) He further added

26  that he "didn't see that there was any innovation there that would be valuable to AngioScore." (*Id.*

27  at 628:1-2.) The fact that Chocolate represented a new concept – focal force through the creation

28  of balloon pillows, rather than scoring – sets it apart from the opportunity AngioScore

United States District Court
Northern District of California

1    contemplated and rejected. Moreover, as set forth above, AngioScore would have been interested

2    in Chocolate for its presentation of longer lengths and for its potential as a drug-eluting device.

3         Defendants further rely on answers board members provided in response to a survey

4    conducted by a consultant, Sarah Lugaric. Board members were directed to answer the following

5    question: "Do you support acquiring another company, technology, or product line? (yes/no,

6    timing, description)." The board's responses fell onto a spectrum – some directors were open to it,

7    others less so. Three of the seven directors were opposed to acquiring another company,

8    technology, or product line; four indicated that they would be open to it with certain reservations.

9    Defendants seize on these answers to argue that the board never would have been interested in

10   Chocolate. The Court disagrees. First, the Lugaric question was hypothetical and abstract.

11   Second, the question related to members' inclination to acquire more than simply a new product –

12   it also concerned whether the members would be interested in the acquisition of another company.

13   The directors were not considering a concrete, potentially paradigm-changing technology. They

14   did not know that Chocolate existed. The answers to this survey thus cannot undermine the

15   Court's finding that AngioScore had an interest or expectancy in the Chocolate.

16        Defendants' second argument reduces to this: AngioScore did not renew Konstantino's

17   invention assignment agreement. Therefore, AngioScore had no interest in Konstantino's

18   inventions. Chocolate was one such invention. Therefore, AngioScore had no interest in

19   Chocolate. (DRB at 7.) Under the terms of an invention assignment agreement and as a matter of

20   contract law, this would appear to make sense. However, the rights and obligations to which

21   parties agree in the context of an employee/employer invention assignment agreement are

22   fundamentally different from the nature of the issue presented here: whether, in developing

23   Chocolate, and secreting it from the corporation he served for his own personal benefit,

24   Konstantino violated his duty of loyalty to AngioScore. Simply because AngioScore would no

25   longer automatically have property rights in anything Konstantino invented does not obviate

26   Konstantino's obligation to adhere scrupulously to his duty to place the interests of AngioScore

27   above his own financial gain. The lack of an invention assignment agreement does not absolve a

28   director of his fiduciary obligations with respect to inventions he may develop that compete with

United States District Court
Northern District of California

1   the corporation he serves. To hold otherwise would undermine the basic fabric upon which the

2   duty is based.

3          Last, defendants maintain that AngioScore would have passed on the Chocolate

4   opportunity due to personality conflicts between Konstantino and members of the AngioScore

5   board. Throughout the trial in this case, the defense returned to its theory that at some point

6   between 2006 and 2010, members of AngioScore's board had essentially blacklisted Konstantino.

7   While the Court agrees that personality conflicts may have existed, defendants' resort to

8   overstatement undermines their credibility and any relevance the true facts might have had. With

9   the exception of Ozdil, with whom Konstantino had previously had an altercation, and possibly

10  Tom Trotter, who was less than pleased to hear that in December 2009 Konstantino and TriReme

11  were embarking on building a POBA (the Glider), the Court finds that Konstantino was generally

12  well-regarded and respected by his other fellow board members in the time period leading up to

13  his resignation. No board members who testified stated that prior to the events giving rise to this

14  litigation, they had anything but amicable and professional interactions with Konstantino. None

15  witnessed any effort by any other board member to push Konstantino off the board, nor did any

16  board member witness any hostility between AngioScore and Konstantino. No evidence, besides

17  Konstantino's ruminations, supports any inference that board members possessed anti-Semitic

18  feelings toward Konstantino. Board members Raffin and Suennen testified credibly that no one

19  harbored such feelings and that they themselves are Jewish. Konstantino's claim that he was

20  ostracized at AngioScore is further undermined by evidence that AngioScore's CEO, Trotter, was

21  helping Konstantino further his non-AngioScore business pursuits, including fundraising for

22  TriReme, around the same time Konstantino and Feld were developing Chocolate. Specifically, in

23  August of 2009, Trotter emailed Ivan Pirzada in an attempt to get Konstantino funding. (PX 234.)

24  In December 2009, Trotter sent Konstantino a tip on potential funders for TriReme. (PX 241.)

25  The Court thus finds that there is no merit to Konstantino's claim that AngioScore would not have

26  worked with him on Chocolate. Furthermore, and to state the obvious, personality conflicts

27  between board members do not obviate their fiduciary duties to the companies they serve. The

28  law expects and demands that board members rise above such concerns.

United States District Court
Northern District of California

1    Accordingly, the Court finds that AngioScore had an interest and expectancy in the

2    Chocolate opportunity.

3                    **4. *AngioScore had the financial capacity to exploit the Chocolate***

4                          ***opportunity.***

5    The Court finds that AngioScore had the financial ability to exploit Chocolate. In so

6    finding, the Court is mindful that under Delaware law, this prong implicates broader policy

7    concerns more favorable to the corporation. Such concerns stem from the inherent conflict

8    between, on the one hand, a director who has control and responsibility for the financial security

9    of the corporation he serves, and on the other hand, the director's potential personal interest in

10    ensuring that the company not have secured financial footing so as to permit usurpation of what

11    otherwise might be a corporate opportunity. Thus, once the plaintiff has made such a *prima facie*

12    showing of financial ability, a fiduciary "faces a significant burden in establishing that a

13    corporation was financially unable to take advantage of a corporate opportunity." *Norman v.*

14    *Elkin*, 617 F. Supp. 2d 303, 312 (D. Del. 2009) (citing *Gen. Video Corp. v. Kertesz*, No. 1922-

15    VCL, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (finding financial inability must amount

16    to insolvency such that the company is practically defunct); *but see Yiannatsis v. Stephanis by*

17    *Sterianou*, 653 A.2d 275, 279 (Del. 1995) (declining to adopt "the 'insolvency-in-fact test'";

18    stating instead that courts should consider "a number of options and standards for determining

19    financial inability, including but not limited to, a balancing standard, temporary insolvency

20    standard, or practical insolvency standard")). Defendants have not established AngioScore's

21    inability to capitalize on the Chocolate opportunity. To the contrary, AngioScore has established

22    that it could have capitalized on Chocolate had Konstantino offered the opportunity.

23    Evidence regarding what it would have cost to develop Chocolate varies, but in all events,

24    reflects an initial amount that fell *below* the amount of cash AngioScore had on hand at the end of

25    2009 and beginning of 2010. According to an email from November 17, 2009, Konstantino

26    estimated capital requirement of approximately $3 million. (PX 70.) By May 2010, Konstantino

27    had secured sufficient capital to pursue the Chocolate "all the way to first commercial sale"; the

28    total raised to that point was $4.5 to 5 million. (PX 547; Belson dep., discussing Feb 2010

United States District Court
Northern District of California

Chocolate presentation that placed the cost of developing Chocolate at roughly $2 million USD beyond the Singaporean EDB grant, PX 78).)  Finally, with respect to the amount of money required to acquire an assignment of the intellectual property rights to Chocolate, the record places that value in the amount of $370,000 cash and a royalty of 5%.  (Trial Tr. at 237:8-18.)  In the event such right was acquired, however, there is nothing to suggest that AngioScore would have been obligated to develop Chocolate.

Based on the above figures, even assuming that Chocolate would have cost $5 million to develop, the Court finds that AngioScore was able to exploit this opportunity through several avenues.  First, AngioScore had approximately $17 million cash on hand in October 2009, and in excess of $15 million cash on hand at the end of 2009.  Second, as a going concern with existing relationships, AngioScore could have obtained funds from external investors, such as Oxford Finance, or other venture capital funds.  In December 2009, for example, Oxford Capital expressed a willingness to lend between $10 and $20 million to AngioScore.  Third, AngioScore could have redirected research and development money it was currently using to fix the design problems for its 100mm AngioSculpt product.  This financial position existed notwithstanding the downsizing and resources expended in response to a Department of Justice investigation.

The practicalities of new technology companies further support the Court's conclusion. Konstantino himself admitted that startup companies in Silicon Valley, such as AngioScore and TriReme, are frequently short on cash and face the prospect of running out of money.  He further stated that the fact that such a company is not "profitable" doesn't mean that the company is "not successful."  For example, TriReme was not able to sell its Antares product, a stent, in the United States, and Antares made only negligible sales abroad.  Despite TriReme's limited financial position, TriReme was able to develop Chocolate.

Based on the foregoing, the Court finds that AngioScore was able to exploit the Chocolate opportunity.  Despite having been privy to AngioScore's confidential financial documents as a member of AngioScore's board of directors (see e.g., PX 246, February 2010 board meeting presentation including proposed budget, discussion of cash on hand), Konstantino never broached the subject of Chocolate with AngioScore.

29

### 5. *By taking the Chocolate for himself, Konstantino placed himself in a position inimical to his fiduciary duties to AngioScore.*

The result of the above findings compels the conclusion that by taking the Chocolate opportunity for himself and companies he preferred, to the exclusion of AngioScore, Konstantino placed himself in a "position inimicable to his duties to the corporation." *Broz*, 673 A.2d at 155. In essence, he became a competitor to AngioScore. It is axiomatic that as such, absent some knowing waiver by AngioScore, Konstantino could never fulfill his duty of loyalty to AngioScore. Any financial gain Konstantino enjoyed stemmed from Chocolate's success in the limited specialty balloon market, in which AngioScore is a key player. Indeed, while sitting on AngioScore's board, Konstantino participated in a strategy where, by design, Chocolate would compete with AngioScore. Chocolate's price was explicitly tied to AngioSculpt pricing, *i.e.* *exactly* $25 less than AngioScore's products. That Chocolate was priced just below the AngioSculpt was intended to "drive rapid adoption" and "get faster uptick" in the specialty balloon catheter market. Moreover, Konstantino himself extolled the advantages of Chocolate compared to scoring balloons, including AngioScore's devices, as he sought to secure funding for Chocolate.

This factor is therefore met, as is each element of AngioScore's breach of fiduciary duty claim.

## II.     The Statute of Limitations does not bar AngioScore's claims.

"A claim for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland v. Sutherland*, No. CIV.A. 2399-VCN, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010); *see Pomeranz v. Museum Partners, L.P.*, No. CIV.A. 20211, 2005 WL 217039, at *8 (Del. Ch. Jan. 24, 2005). The parties agree as follows: (i) the relevant statute of limitations for breach of fiduciary duty claims is three years[7]; (ii) the acts giving rise to the instant claim occurred in 2009

---

[7] Under Delaware law, the doctrine of laches governs the timeliness of claims brought in equity. Courts sitting in equity will apply by analogy the statute of limitations for substantive claims in order to apply the doctrine of laches. *Pomeranz*, 2005 WL 217039, at *2. Here, three years is the relevant limitations period.

United States District Court
Northern District of California

1    and 2010; and (iii) more than three years elapsed between those acts and when plaintiff brought

2    its claim (here, June 27, 2014). The central issue is whether equitable tolling is available.

3    Plaintiff bears the burden of establishing that such tolling is warranted. *Pomeranz*, 2005 WL

4    217039, at *2. Defendants claim the statute has run because AngioScore was on notice by no later

5    than February 5, 2010, the date of Konstantino's resignation.

6        Three bases for tolling exist under Delaware law: (1) the inherently unknowable doctrine

7    (the "Discovery Rule"), (2) equitable tolling, and (3) fraudulent concealment. As set forth in

8    *Smith v. McGee*, No. CIV.A. 2101-S, 2006 WL 3000363, at *3-*4 (Del. Ch. Oct. 16, 2006), the

9    contours of each of these bases is as follows:

> A limitations period may be tolled under the inherently unknowable doctrine so long as "the discovery of the existence of a cause of action is a practical impossibility." Specifically, "there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury." Plaintiffs may establish "blameless ignorance" by showing justifiable reliance on a person whom they have "no ostensible reason to suspect of deception." Such proof tolls the limitations period until a plaintiff had "reason to know" of a wrong.
>
> Equitable tolling is appropriate "where a plaintiff reasonably relies on the competence and good faith of a fiduciary." Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." This doctrine also tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.
>
> Fraudulent concealment, unlike the doctrines of inherently unknowable injuries and equitable tolling, "requires an affirmative act of concealment by a defendant-an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." Nevertheless, "mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute." Like the previously mentioned doctrines, tolling exists only "until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence."

28    *Id.* (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456 (Del. Ch. July 17, 1998)). Under

31

*United States District Court*
*Northern District of California*

1    Delaware law, tolling is proper only until a plaintiff is properly put on inquiry notice. "When

2    plaintiffs are on inquiry notice, the statute of limitations begins to run. Inquiry notice does not

3    require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they

4    have sufficient knowledge to raise their suspicions to the point where persons of ordinary

5    intelligence and prudence would commence an investigation that, if pursued, would lead to the

6    discovery of the injury." *Pomeranz*, 2005 WL 217039, at *3 (citation omitted).

7        The Court finds tolling appropriate here based on the third of these theories: namely,

8    Konstantino's purposeful, fraudulent concealment, although much of the analysis would also

9    overlap with the first two approaches. Tolling is warranted because Konstantino "engaged in

10   fraudulent concealment of the facts necessary to put [AngioScore] on notice of the truth." *Albert*

11   *v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV.A. 762-N, 2005 WL 1594085, *19 (Del. Ch. June 29,

12   2005). Specifically, Konstantino's "affirmative act[s] of concealment" in early 2010, during the

13   time in which AngioScore sought information relating to whether he had developed a specialty

14   balloon, constitutes "an 'actual artifice'" that prevented AngioScore from gaining knowledge of

15   the facts. *In re Dean Witter*, 1998 WL 442456, at *5 (citation omitted). Having reviewed the

16   evidence of record and observed the testimony at trial, the conclusion is inescapable that letters

17   authored by Konstantino's counsel contained intentional misrepresentations that were intended to

18   put AngioScore "off the trail of inquiry." *Id.*

19       In Konstantino's February 3, 2010 meeting with Trotter, Konstantino told Trotter that

20   TriReme was "considering developing a specialty balloon catheter for peripheral indications," and

21   that TriReme had been actively working on "something for the future" in specialty balloon

22   catheters. (Trial Tr. at 574:8-12; 602:22-25 (Trotter); *see* PX 107.) This conversation itself was

23   deceptive in nature, for Konstantino did not in any way indicate that the development of

24   TriReme's specialty balloon, which by that point had been called Chocolate for several months,

25   was well underway. Nor did he disclose his personal role in the development and

26   conceptualization of the device, that a prototype had been created, that animal testing had

27   occurred, or that he had already engaged potential investors and funding sources.

28

United States District Court
Northern District of California

32

United States District Court
Northern District of California

1    Even lacking these details, the news of a possible specialty balloon at TriReme resulted in

2    an investigation led by AngioScore's lawyer.  Trotter sent Konstantino an email entitled "Board of

3    Directors Position," copying AngioScore's counsel, John Sellers. (PX 107.)  In it, Trotter restated

4    his concerns about TriReme moving into the specialty balloon market, and stated that the board

5    members with whom he had spoken saw this as a "clear conflict of interest."

6    Konstantino then engaged in a series of communications intentionally designed to assuage

7    AngioScore's concerns, disavowing that any such device existed or had been developed, much

8    less that he had any personal role in the development of a specialty balloon.  For example, in

9    response to Trotter's email, Konstantino stated that "TriReme has not made any decision to make

10    such a change and I was giving you very early heads up to *something that may take place in the*

11    *future, or may never happen*[.]"  He added, "there is *no reason to be trigger happy*." (PX 107

12    (emphasis supplied).)

13    Thereafter, Konstantino continued in his misdirection.  The next day, February 5, 2010,

14    Konstantino wrote an email to Sellers, cc'ing Trotter, Suennen, and Raffin.  (*Id.*)  In it, he stated:

15    
> As we discussed, I'm surprised and disappointed that you and the
> company jumped to the conclusion that I should resign from the
16    
> board based on assumptions after receiving bits and pieces of
> information.  I am *keenly aware of my obligations* as a board
17    
> member and this is precisely why I am coming to AngioScore now;
> *before any new project is started*.
18    

19    (*Id.* (emphasis supplied).)

20    The board nonetheless continued investigating whether Konstantino or TriReme had in fact

21    developed a competitive device.  At that point, Konstantino himself was the most authoritative

22    source of information regarding what activities, if any, he had actually undertaken with respect to

23    bringing a competitive product to market.  Thus, the board undertook to ask Konstantino whether

24    he had done so.

25    What followed were several letters from Konstantino, through counsel, in which

26    Konstantino unequivocally refuted any notion that he had worked on a specialty balloon catheter,

27    or that any such device had been developed, while he was on AngioScore's board.

28

1    In the first such letter, dated February 23, 2010. Konstantino's counsel specifically

2    reiterated that prior to Konstantino's resignation on February 5, 2010, he was not "involved in *any*

3    *development work* or licensing of angioplasty balloon technology for the coronary or periphery

4    markets *that involves specialized features such as scoring, cutting, or drug eluting elements*."

5    (PX 420 (emphasis supplied).)  Likewise, Konstantino represented that he was not involved "in

6    *any development* or licensing of angioplasty balloon technology for the coronary or periphery

7    markets that *makes similar claims* to that of the AngioSculpt product."  (*Id.* (emphasis supplied).)

8    Konstantino restated that TriReme was "*considering, in the future, the possibility* of entering the

9    field of specialized balloons for peripheral applications" but that before February 5, 2010,

10   TriReme "*ha[d] not developed* any products . . . that compete[] with AngioScore's products."  (*Id.*

11   (emphasis supplied).)

12   In response, AngioScore expressed concern that during Konstantino's service as a board

13   member, he:

> obtained proprietary and confidential information about AngioScore,
> the peripheral market, and the role of specialty balloons in that
> market, while at the same time **developing and pursuing plans**
> within TriReme to **pursue those same markets with another
> device.**

18   (PX 421 (emphasis supplied).)  Again, Konstantino unequivocally and unambiguously denied that

19   any such activity had taken place. (PX 423.)  Characterizing AngioScore's questioning as

20   predicated on "unsubstantiated accusations" against Konstantino, counsel informed AngioScore

21   that should such accusations continue, Konstantino will "have no choice but to consider his legal

22   options." (*Id.*)

23   At that point, Konstantino's representations had sufficiently assuaged any and all concerns

24   about whether he or TriReme had developed a specialty balloon.  AngioScore was satisfied that

25   nothing of the sort had occurred.  Given the nature and strength of Konstantino's representations, a

26   reasonable person would have come to the same conclusion.

27   "Equitable exceptions to statutes of limitations are narrow and designed to prevent

28   injustice." *Pomeranz*, 2005 WL 217039, at *13 (citations omitted).  The equitable exception to

34

United States District Court
Northern District of California

the normal rule is warranted here.  AngioScore acted diligently in its 2010 investigation.  That

Konstantino now disavows the intent of his obvious affirmative, misleading representations,

particularly those cloaked in formality as letters from his attorneys, is self-serving and bears on his

credibility for truthfulness.[8]  He cannot now hide behind the "actual artifice" he constructed to

prevent AngioScore from gaining knowledge of the facts.  AngioScore undertook an earnest,

broad-based inquiry into the nature of Konstantino's activities.  Instead of answering

AngioScore's queries in good faith and with candor, Konstantino's answers were designed to put

AngioScore "off the trail of inquiry" and disabuse AngioScore of the notion that any fiduciary

breach had occurred.  The truth was sharply at odds with Konstantino's representations.

Because Konstantino's artifice worked to his desired ends, the three-year statute of

limitations cannot now shield him from AngioScore's claim.  AngioScore was not on inquiry

notice until it learned, in connection with the discovery in its patent case, that Chocolate had been

developed before Konstantino left AngioScore's board.  It filed this claim mere months after that.

The claim is timely.

### III.  TriReme and Quattro aided and abetted Konstantino's breach of fiduciary duty.

#### A. The standard for aiding and abetting liability is met.

Under California law, "'[l]iability may . . . be imposed on one who aids and abets the

commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach

of duty and gives substantial assistance or encouragement to the other to so act or (b) gives

substantial assistance to the other in accomplishing a tortious result and the person's own conduct,

separately considered, constitutes a breach of duty to the third person.'"  *Casey v. U.S. Bank Nat'l*

---

[8] As a prime example of Konstantino's artifice, in 2009, while he was on AngioScore's board he filed a patent application for Chocolate.  In March 2010, after engaging in correspondence with AngioScore's lawyers, he switched patent counsel and filed a second provisional patent application.  The strategy underpinning Konstantino's second patent application decision is apparent.  By filing a second provisional patent application in March 2010, Konstantino sacrificed five months of patent priority.  However, by citing the March 2010 application instead of the earlier 2009 application in his March 2011 patent application, Konstantino was able to ensure that the patent application from 2009, which listed him as a co-inventor of Chocolate at a time when he was on AngioScore's board, would not become public.

1    *Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005) (citations omitted); *Neilson v. Union Bank of*

2    *California, N.A.*, 290 F. Supp. 2d 1101, 1133 (C.D. Cal. 2003) (noting that California courts cite

3    Restatement (Second) of Torts section 876 to hold that "liability may properly be imposed on one

4    who knows that another's conduct constitutes a breach of duty and substantially assists or

5    encourages the breach.") (citations omitted).  AngioScore must establish that defendant

6    corporations TriReme and Quattro actually knew of Konstantino's fiduciary duty breach.  *Casey*,

7    127 Cal. App. 4th at 1145 ("[E]ven 'ordinary business transactions' . . . can satisfy the substantial

8    assistance element of an aiding and abetting claim if the [defendant] actually knew those

9    transactions were assisting the [fiduciary] in committing a specific tort [breach of fiduciary duty].

10    Knowledge is the crucial element.").  Additionally, "causation is an essential element of an aiding

11    and abetting claim," and AngioScore must show that the aiders and abettors provided assistance

12    that was a substantial factor in causing AngioScore's harm.  *Neilson*, 290 F. Supp. 2d at 1135.

13        For corporations, "[i]t is the general rule that knowledge of an officer or director of a

14    corporation will be imputed to the corporation."  *See Brown v. Brewer*, No. CV 06-3731-GHK

15    (JTLx), 2008 WL 6170885, at *7 (C.D. Cal. July 14, 2008) (quoting *Teachers' Ret. Sys. of La. v.*

16    *Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006)).  California follows the well-established

17    principle that the acts and knowledge of an officer or agent can be attributed to a corporation or

18    principal.  *In re Cal. TD Inv. LLC*, 489 B.R. 124, 129 (Bankr. C.D. Cal. 2013).[9]

19

20

21

22

23

24

_____

25    [9] As was recognized in *In re Cal. TD Inv. LLC*, the attribution or imputation rule is subject
to the "adverse interest" exception, whereby an officer's acts adverse to a corporation will not
26    generally be imputed to the corporation, which is in turn subject to the "sole actor" exception,
where courts may impute the actions of officers even where adverse to the corporations if the
27    officer is the "sole person in control of [the corporation]."  489 B.R. at 129-30.  Defendants have
not argued that any such exception would apply in this case.

28

United States District Court
Northern District of California

1    **1. *TriReme knowingly provided substantial assistance.***

2        The Court finds that TriReme knew Konstantino's conduct constituted a breach of duty

3    and gave substantial assistance or encouragement for Konstantino to persist in his breach.

4    Accordingly, TriReme is liable for aiding and abetting Konstantino's breach of fiduciary duty.

5        First, the record is replete with evidence that TriReme employees provided substantial

6    assistance to Konstantino at every step of the design and modeling process for Chocolate. While

7    Konstantino remained on AngioScore's board of directors, TriReme engineers helped him develop

8    and build the Chocolate device. Such individuals included Feld[10]; Jayson Delos Santos, a senior

9    engineer; Maria Pizarro, TriReme's Director of Research and Development[11]; and Gary Binyamin,

10   TriReme's technology manager. These individuals were engaged in creating and fine-tuning the

11   engineering design of Chocolate. They created prototypes of Chocolate and undertook testing of

12   the devices. They attended the porcine study of the Chocolate device at Stanford in January 2010.

13   Not only did TriReme employees design and test the Chocolate idea prior to the time Konstantino

14   left AngioScore's board, they did so under his general supervision. Konstantino, as TriReme's

15

16        [10] The role of Feld with respect to TriReme at this time is unclear. On TriReme's

17   September 2009 board meeting, Feld is identified as TriReme's Vice President of Research and
     Development. However, in his testimony, Feld stated that around this time, he was a consultant

18   for TriReme. (Trial Tr. at 863:17-21.) The Court is wary of letting the distinction, however, exalt
     form over substance. Feld was a cofounder of TriReme. He testified that he speaks to

19   Konstantino at least weekly, if not more. Even as a consultant, he was paid by TriReme on a
     monthly basis, had access to all the TriReme employees who were working on Chocolate, and

20   used TriReme employees in the pursuit of Chocolate. (Trial Tr. at 863:17-864:20.)

21        [11] During trial, Pizarro persisted in her efforts to obfuscate the true nature of TriReme's

22   involvement in the Chocolate opportunity. During cross-examination, however, this quickly
     became apparent. For example, after acknowledging that she had been involved in a December

23   2009 presentation to MedTronic regarding the status of TriReme's projects, including Chocolate,
     Pizarro denied that "there was development work performed on Chocolate in 2009," disputing the

24   meaning of the word "development." (Trial. Tr. at 1069:2-1070:9.) The evidentiary record,

25   however, was starkly to the contrary – as Pizarro well knows. As early as October 2009, Pizarro
     was on emails concerning Chocolate prototypes, relaying engineering updates including such

26   information as: "we are building the 100mm balloons over as we speak." (PX 89.) Despite the
     obvious connection, Pizarro maintained that only "possibly" did such reference refer to Chocolate.

27   (Trial Tr. at 1071:23-25.) Similar attempts to equivocate and evade continued throughout her

28   testimony, compromising fatally any shred of credibility.

United States District Court
Northern District of California

1   CEO, was on emails contributing to the discussion. TriReme's HR and Marketing Manager

2   provided critical support to Konstantino's efforts by applying for funding for a grant from the

3   Singaporean government.

4        Second, the Court finds that based on the evidence of record, TriReme employees and

5   management knew that Konstantino was on AngioScore's board while such work was undertaken.

6   The conclusion is all but inescapable that they knew Konstantino's work on Chocolate constituted

7   a violation of his fiduciary duties as a board member. Throughout the later part of 2009 and early

8   into 2010, TriReme employees, as well as Konstantino, knew well – indeed, *intended* – that

9   Chocolate would compete with AngioScore, and that Konstantino remained on AngioScore's

10   board of directors. As TriReme's CEO, Konstantino knew he owed AngioScore fiduciary duties

11   solely by virtue of his board seat. (PX 101 (February 2009 letter Konstantino signed confirming

12   that he remained bound by fiduciary duties as a director).) Pizarro, a former AngioScore engineer,

13   knew AngioScore's line of business and knew that Konstantino was serving on AngioScore's

14   board of directors while Chocolate work was done at TriReme. (Trial Tr. at 1028:17-23; 1093:25-

15   1094:3.) Feld knew not only that Konstantino remained on AngioScore's board of directors and

16   remained subject to fiduciary duties, and that Chocolate competed with AngioSculpt, but also that

17   Konstantino had previously obtained a waiver from AngioScore for purposes of working on

18   bifurcated stents with TriReme. Ong, TriReme's HR Manager, also knew that Konstantino

19   remained on AngioScore's board while she helped him obtain financing for a product directly

20   competitive with AngioScore's products.

21             **2.  *Quattro/Proteus knowingly provided substantial assistance.***

22        The Court finds that during the development of Chocolate, Quattro existed as "Proteus," an

23   unincorporated association. In March of 2010, "Proteus" incorporated under the name Quattro.

24   For the reasons set forth below, the Court finds that Quattro/Proteus is liable for aiding and

25   abetting Konstantino's breach.

26        First, Proteus was an "unincorporated association" that predated Quattro and was capable

27   of being sued. Under California law, an "unincorporated association" is defined in California

28   Corporations Code section 18035. Subsection (a) of that provision provides that an

38

United States District Court
Northern District of California

1  "Unincorporated association" is an unincorporated group of two or more persons joined by mutual

2  consent for a common lawful purpose, whether organized for profit or not. Cal. Corp. Code §

3  18035 (West).

4       Although case law on this provision generally concerns entities like churches, political

5  parties, professional or trade associations, social clubs, and homeowners associations, the doctrine

6  and the breadth of what qualifies as an "unincorporated association" was explained in *Barr v.*

7  *United States Methodist Church*, 90 Cal. App. 3d 259 (1979). There, the court of appeals

8  explained that the trend in the state and nation was to "assure legal status where in fairness it is

9  appropriate" and included in such consideration the dictates of fairness where "persons dealing

10  with the association contend their legal rights have been violated." *Barr*, 90 Cal. App. 3d at 266-

11  67. An unincorporated association need not have the formalities of quasi-corporate organization.

12  "Courts have even assessed liability against a church association with no officers where there were

13  only nine persons whose sole business transaction (aside from small purchases of printed religious

14  material) was the purchase, by down payment, of a station wagon." *Id.* at 267 (citation omitted).

15  Likewise, criminal street gangs have been found to qualify as "unincorporated associations"

16  capable of being sued. *People ex rel. Totten v. Colonia Chiques*, 156 Cal. App. 4th 31, 41

17  (2007).[12]

18       Proteus easily satisfies the criteria under Section 18035. During the development of

19  Chocolate, Proteus was held out as if a corporation. It consisted of at least three members, James

20  Dreher, Konstantino, and Feld, and was formed for the lawful purpose of raising money and

21

22 ────────────

23       [12] In *Totten*, a criminal street gang was found to be an unincorporated association capable of being sued for injunctive relief. The court noted that "[s]tatutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical and that will lead to a wise policy rather than mischief or absurdity." *Id.* (citation omitted). Upon review of the purpose of California Corporations Code 18035, and in view of legislative history, the court of appeal found that "it would border on absurdity to conclude that, by the 2004 addition of Corporations Code section 18035, subdivision (a) [which included the element of "lawful purpose" in the definition of an unincorporated association], the Legislature intended to shield criminal street gangs from liability and injunctive relief by rendering them immune from civil suits. *Totten*, 156 Cal. App. 4th at 41.

24
25
26
27
28

39

United States District Court
Northern District of California

1   investor interest in the Chocolate technology. Investors were informed that "Proteus" was the

2   entity developing Chocolate and seeking funds therefor, and Konstantino represented himself as

3   Chairman of the entity. As Proteus's chairman, Konstantino signed a contract to raise funds for

4   Chocolate's development. Fairness would dictate that investors who gave money to Proteus

5   would have been able to seek recourse against Proteus. *Barr*, 90 Cal. App. 3d at 266-67.

6   Konstantino held himself out as a Chairman of Proteus, signed contracts as such, sought money

7   from individuals under the guise of this entity, and later, to investors, characterized Proteus's

8   transition to "Quattro" as merely a name change. Not only did Konstantino himself understand

9   that Quattro was "previously Proteus," but by characterizing the transition from Proteus to Quattro

10   as a simple change in name, he was able to retain for Quattro the benefits Proteus had obtained.

11   Indeed, the lack of distinction between Quattro and Proteus is so complete that on the basis that

12   the difference between these entities was merely one of nomenclature, contracts signed between

13   "Proteus" and third parties were amended to substitute the name "Quattro Vascular Pte Ltd" for

14   "Proteus Vascular Systems Pte Ltd." (PX 7.) The unfairness of immunizing Quattro is amplified

15   here, where defendants now offer a hypertechnical argument that because Quattro did not formally

16   exist as an incorporated entity at the time of Konstantino's breach, it cannot be liable for acts it

17   undertook when it was known as Proteus.[13] It is not lost on the Court that almost exactly one

18   month after Konstantino resigned from AngioScore's board, the name change occurred and

19   Quattro officially incorporated, with the agreement of Dreher, Konstantino, and Feld. Thereafter,

20   Quattro continued in Proteus's efforts. Defendants cannot hide posthumously behind the name

21   change.

22         Proteus/Quattro was inextricably involved in, and had actual knowledge of, Konstantino's

23   breach. Indeed, it was formed with the specific purpose of furthering that breach. Konstantino, as

24

25   ───────────────

26   [13] Even the term "Proteus" carries a meaning that pointedly undermines defendants'
     position. Proteus was a Greek sea god capable of assuming different forms. MERRIAM-WEBSTER,
     New Collegiate Dictionary (9th ed. 1988). An entity presenting "protean" qualities has the
27   "ability to assume different forms." *Id.* The Court finds that Proteus lived up to its name by later
     assuming the name "Quattro" while retaining its original essence.
28

1   Proteus's Chairman and Quattro's Director, formed the organization for purposes of raising funds

2   for Chocolate, which included seeking funding from the Singaporean government, and later, used

3   Quattro as the corporate entity to hold intellectual property rights in Chocolate. Dreher

4   implemented a business strategy for seeking early investors and funds. On this basis, the Court

5   finds that Proteus, as an unincorporated association, knowingly aided and abetted Konstantino's

6   breach of fiduciary duty. In March of 2010, when Proteus incorporated as Quattro, it maintained

7   its debts and liabilities. *See Sec.-First Nat. Bank of L.A. v. Cooper*, 145 P.2d 722, 731 (Cal. Ct.

8   App. 1944).

9    **IV.    QT Vascular is liable as a successor in interest to the liabilities of Quattro and
10             TriReme.**

11          The decision whether to impose successor liability involves broad equitable considerations.

12   *See Ray v. Alad Corp.*, 19 Cal.3d 22, 34 (Cal. 1977); *see also Rosales v. Thermex–Thermatron,*

13   *Inc.,* 67 Cal. App. 4th 187, 196 (Cal. Ct. App. 1998). Each case of successor liability must be

14   assessed on its own unique set of facts. *See CenterPoint Energy, Inc. v. Super. Ct.*, 157 Cal. App.

15   4th 1101, 1122 (Cal. Ct. App. 2007). Under California law, a corporation that purchases the assets

16   of another does not assume the liabilities of the selling corporation unless: "(1) there is an express

17   or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of

18   the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the

19   transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's

20   debts." *Ray*, 19 Cal.3d at 28.

21          As a preliminary matter, successor liability under California law requires an asset transfer,

22   not merely the purchase of stock. *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05 0553 MHP,

23   2007 WL 2462142, at *6 (N.D. Cal. Aug. 29, 2007); *Potlatch Corp. v. Superior Court,* 154 Cal.

24   App. 3d 1144, 1150-51 (Cal. Ct. App. 1984). The evidence on this point is admittedly limited.

25   However, in view of the evidentiary record, including its observation of the critical witness on this

26   issue, the Court finds that an asset transfer occurred. This conclusion is based on testimony from

27   defendants' 30(b)6 corporate designee, Momi Brosh, QT Vascular's Vice President of Business

28   Operations. Brosh was designated by defendants to testify on the relationship between QT

41

United States District Court
Northern District of California

1    Vascular, Quattro, and TriReme. He testified that QT Vascular assumed both the assets and

2    liabilities. (*See* Brosh Dep. at 277:19-281:15[14].) Specifically, Brosh testified that the shareholders

3    of Quattro and TriReme agreed to form QT Vascular. In exchange, the shareholders would

4    receive shares of QT Vascular stock, and QT Vascular would receive "100% of all existing stock,

5    shares, assets, and liabilities in each of Quattro, [and] TriReme." (*Id.*)

6          Persons designated as corporate representatives "[shall] testify as to matters known or

7    reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). A Rule 30(b)(6) deposition

8    notice serves a unique function: it is the sworn corporate admission that is binding on the

9    corporation. *Hardin v. Wal-Mart Stores, Inc.*, No. 08-CV-0617 AWI BAM, 2011 WL 11563217,

10   at *2 (E.D. Cal. Dec. 2, 2011) (citing *Gales v. Winco Foods*, 2011 WL 3794887 (N.D. Cal. 2011)

11   ("As a 30(b)(6) witness, her testimony is a sworn corporate admission binding on the

12   corporation."). If the notice of deposition or subpoena served on the entity sufficiently describes

13   the matters on which questions will be asked, the entity is under a duty to designate and produce

14   "one or more officers, directors, or managing agents, or designate other persons who consent to

15   testify on its behalf . . . ." Rule 30(b)(6); *Mitchell Eng'g v. City & Cnty. of S.F.*, 2010 WL

16   455290, at *1 (N.D. Cal. Feb. 2, 2010) ("A 30(b)(6) witness testifies as a representative of the

17   entity, his answers bind the entity and he is responsible for providing all the relevant information

18   known or reasonably available to the entity.") (quotation marks and citation omitted); *Great Am.*

19   *Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 541 (D. Nev. 2008). Still, other courts

20   hold that "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other

21   deposition testimony, can be contradicted and used for impeachment purposes[,]" and that such

22   testimony does not "bind" the designating entity "in the sense of [a] judicial admission." *A.I.*

23   *Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001). The Ninth Circuit has not yet

24

25

26          [14] Designated portions of Brosh's two-day video deposition testimony were played during
     trial (*see* Trial Tr. at 970) and the designated transcript for that testimony appears at the end of
27   Day Five of the trial transcript. (*See* Dkt. No. 637 (Trial Transcript Volume Five) at 205.)
     Citations to Brosh's deposition include only designated portions played during trial.

28

United States District Court
Northern District of California

decided the issue. *Coalition for a Sustainable Delta v. McCamman*, 725 F. Supp. 2d 1162, 1172 (E.D. Cal. 2010).

In the absence of specific direction from the Ninth Circuit, the Court joins those courts who have adopted a middle ground and holds that defendants cannot rebut the testimony of their Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and defendants have provided no adequate explanation for the rebuttal offered at trial. *See MKB Constructors v. Am. Zurich Ins. Co.*, 49 F. Supp. 3d 814, 829 n.11 (W.D. Wash. 2014); *Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000), *aff'd* 31 Fed. App'x. 151 (5th Cir. 2001) (per curiam) (unpublished); *State Farm Mut. Auto. Ins. Co. v. New Horizont*, 250 F.R.D. 203 (E.D. Pa. 2008) ("The better rule is that the testimony of a Rule 30(b)(6) representative, although admissible against the party that designates the representative, is not a judicial admission absolutely binding on that party," but the party still may not "retract prior testimony with impunity" and courts can disregard inconsistent testimony when the movant has relied on it); *Tex. Technical Inst. v. Silicon Valley, Inc.*, No. H–04–3349, 2006 WL 237027, at *5 (S.D. Tex. Jan. 31, 2006) (affidavit did not create an issue of material fact because it conflicted without explanation with Rule 30(b)(6) testimony).

With this in mind, the Court expounds on the basis for its finding. Brosh testified that he prepared for the deposition. He went over materials, spoke with the defendants' financial team, and with the research and development engineers. (Brosh Dep. at 33:11-19.) He provided specific names of individuals with whom he spoke. (Brosh Dep. at 34:06-35:24; 36:09-14.) He estimated that he spent approximately twenty hours preparing for the deposition, and that he met with counsel in preparation. (Brosh Dep. at 34:06-35:24; 62:08-19; 62:23-63:05.) He also spent time preparing on his own, including reading the QT Vascular IPO documents. (Brosh Dep. at 72:18-73:06.) Because Mr. Brosh is not a native English speaker, a translator was present for his deposition, as was his English-speaking counsel, and he was free to ask for translation assistance during the deposition. (*See* Brosh Dep. at 59:09-12.)

In addition, the pattern of questioning by AngioScore's counsel during the critical moments of Brosh's deposition permitted both sufficient review of the relevant documents, and

1  was sufficiently clear to provide Brosh an opportunity to understand what was being asked and

2  answer accordingly. Each question was constructed in the following format: counsel identified a

3  document and presented it to Brosh. She then read a brief sentence or phrase from the document

4  supporting a conclusion that certain factual events occurred. She would then ask if the relevant

5  sentence or phrase accurately set forth what actually happened. (*See* Brosh Dep. at 272:07-10;

6  273:19-21: 273:24-274:04; 277:19-277:22; 280:03-11; 281:02-15.) She did this no fewer than

7  four times. Brosh agreed every time. (*See id.*)

8       To the extent Brosh's answers were inaccurate or erroneous, he was free to submit errata

9  following the transmittal of his deposition transcript. He elected to do so. Indeed, Brosh

10 submitted fairly extensive errata, in two parts, wherein he amended his answers for purposes of

11 accuracy *fifty-five* times. (Dkt. Nos. 593-7, 593-8.) Tellingly, Brosh did not seek to amend or

12 correct the answers given with respect to QT Vascular's acquisition of assets from TriReme and

13 Quattro. To the extent defendants believed that his testimony remained in some way deficient,

14 they were free to offer another person for deposition as to these issues. They did not do so.

15      Moreover, Brosh's testimony that an asset transfer and liability assumption took place was

16 corroborated by contemporaneous documents reflecting that QT Vascular would be the product of

17 a merger between TriReme and Quattro. (PX 32; PX 43.) It is therefore not wholly controverted

18 by the evidence of record. At trial, defendants offered public statements of the corporate group

19 (comprising QT Vascular, TriReme US, TriReme Singapore, and Quattro), such as their initial

20 public offering documents and their 2013 annual report, to controvert Brosh's statements. Those

21 documents purport to demonstrate that by virtue of an arms'-length corporate reorganization, QT

22 Vascular acquired all stock in Quattro and TriReme, with only certain liabilities. In exchange

23 therefor, the shareholders in each of TriReme and Quattro received shares of QT Vascular's stock.

24 The Court is not convinced that these representations, standing alone, overcome the weight of

25 evidence to the contrary – Brosh's testimony, the manner in which the defendants' key players,

26 including Konstantino, Brosh, Haig, Pizarro, and Feld, conducted business affairs, and the fact that

27 the bulk of the management of these three defendant companies is entrusted to the same people.

28 Although some of these individuals simultaneously occupy different roles in the various defendant

United States District Court
Northern District of California

44

1    corporations, these roles do not appear to be distinct.  It also cannot be overlooked that Brosh, an

2    insider himself, reviewed the IPO document in preparation for his testimony and nonetheless

3    testified that QT Vascular acquired all assets and liabilities of TriReme and Quattro.

4        Based on the foregoing, the Court finds Brosh's answers to the questions most relevant to

5    whether QT Vascular assumed all of TriReme's and Quattro's assets and liabilities and that given

6    the sufficiency of their reliability, AngioScore appropriately relied upon his answers.  To the

7    extent that defendants seek to rely on contradictory testimony provided by Randall Farwell, QT

8    Vascular's CFO, who was never deposed, and was first disclosed as a witness on the eve of trial,

9    long after discovery had closed, they cannot do so.  Rule 30(b)(6) is a powerful and necessary

10   discovery tool, and AngioScore was entitled to rely upon Brosh's representations in developing its

11   case.  To the extent Brosh's testimony on this subject was inaccurate, there were multiple ways for

12   defendants to correct or clarify the evidentiary record and they have failed to provide any adequate

13   reason for why they did not do so, or why Brosh's testimony should be rebutted.  Their failure to

14   do so cannot be the basis for permitting an eleventh-hour witness to offer defendants' preferred

15   version of events.  To hold otherwise would be to permit a trial by ambush, which the federal

16   discovery rules are designed to avoid.

17       Having found that underlying the formation of QT Vascular was a transfer of assets and

18   liabilities from TriReme and Quattro, the Court now turns to whether QT Vascular is a successor

19   in interest to the liabilities of Quattro and TriReme.  Again, a corporation acquiring the assets of

20   another corporation will be found to have succeeded in interest to the acquired corporation's

21   liabilities if any one of the following applies: "(1) there is an express or implied agreement of

22   assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3)

23   the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the

24   purchaser is for the fraudulent purpose of escaping liability for the seller's debts."  *Ray*, 19 Cal.3d

25   at 28.

26       AngioScore argues that the first and second of the above theories apply here.  As to the

27   first – express or implied agreement to assume liabilities – as explained above, the Court finds that

28

United States District Court
Northern District of California

1    QT Vascular assumed the liabilities of Quattro and TriReme. Accordingly, imposing successor

2    liability is proper.

3          As to the second – whether the transaction amounted to a de facto merger – the Court also

4    finds that evidence supports a finding that this occurred. The *de facto* merger doctrine applies

5    under California law when "one corporation takes all of another's assets without providing any

6    consideration that could be made available to meet claims of the other's creditors" or when "the

7    consideration consists wholly of shares of the purchaser's stock which are promptly distributed to

8    the seller's shareholders in conjunction with the seller's liquidation." *Ray*, 136 Cal. Rptr. at 578.

9    To determine whether a transaction "cast in the form of an asset sale actually achieves the same

10   practical result" as a merger, the Court considers the following factors: "(1) was the consideration

11   paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the

12   same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the

13   purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to

14   carry on the business of the seller?" *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 846 (9th Cir. 1992)

15   (citing *Marks v. Minn. Mining and Mfg. Co.*, 187 Cal. App. 3d 1429, 1436 (Ct. Ct. App. 1986)).

16         Here, QT Vascular assumed the assets and liabilities of Quattro and TriReme, and in

17   consideration, gave QT Vascular stock to the former shareholders of Quattro and TriReme. The

18   purchasing company, QT Vascular, continued in the enterprise of Quattro and TriReme after its

19   formation: manufacturing and selling the Chocolate device. The shareholders of Quattro and

20   TriReme became shareholders of QT Vascular, and QT Vascular assumed the liabilities of each.

21   It cannot be said that under these facts, the transaction resulting in QT Vascular did not achieve

22   the same practical result as a merger. *See Marks*, 187 Cal. App. 3d at 1437-38 (finding a

23   "reorganization" between a parent and a subsidiary constituted a de facto merger).

24         For these reasons, the Court finds that QT Vascular is the successor in interest to the

25   liabilities of Quattro and TriReme.

26

27

28

*United States District Court*
*Northern District of California*

46

**V.     By usurping a corporate opportunity, defendants violated California's Unfair Competition Law.**

Under California Business and Professional Code section 17200, *et seq.*, "any unlawful, unfair or fraudulent business act or practice" is prohibited.  Cal. Bus. & Prof. Code § 17200 (West).  "Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent . . . ."  *Aleksick v. 7–Eleven, Inc.*, 205 Cal. App. 4th 1176, 1184 (Cal. Ct. App. 2012).  AngioScore argues that one of these three bases apply here:  that defendants' acts constitute "unlawful" predicate acts to establish liability under California's Unfair Competition Law ("UCL").[15]

A "violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong."  *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 610 (Cal. Ct. App. 2014) (citing *Berryman v. Merit Prop. Mgmt., Inc.*,152 Cal. App. 4th 1544, 1554 (Cal. Ct. App. 2007)).  "By proscribing any unlawful' business practice, [S]ection 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. Virtually any law—federal, state or local—can serve as a predicate for a [UCL] action."  *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 553 (2013) (quotations omitted); *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 195 (Kennard, J., concurring and dissenting)  (explaining that in 1963, the state legislature added "unlawful" business practices to the list of proscribed conduct and thereby "expanded the definition of unfair competition with respect to conduct violating statutory prohibitions, for now any business practice that violated an independent statutory duty was an instance of unfair competition that could be enjoined even if the underlying statute did not specifically authorize injunctive relief") (citation omitted).  Common law violations may suffice as predicate acts under the UCL.  *Yanting Zhang v. Superior Court*, 57 Cal. 4th 364, 380 (Cal. 2013).  Under the statute, "[p]revailing plaintiffs are

---

[15]  Although in prior briefing, AngioScore argued that defendants' actions qualify as "unfair" predicate acts for purposes of establishing UCL liability, the Court understands that AngioScore has essentially withdrawn that argument.  (Dkt. No. 658 ("AngioScore does not request that the Court find that Defendants' conduct also constitutes "unfair" acts and practices under the UCL.")).

United States District Court
Northern District of California

1    generally limited to injunctive relief and restitution." *Korea Supply Co. v. Lockheed Martin*

2    *Corp.*, 29 Cal.4th 1134, 1144 (Cal. 2003) (quoting *Cel-Tech Commc'ns, Inc.*, 20 Cal.4th at 179).

3    Accordingly, the Court addresses the issue below.

4          AngioScore seeks the extraordinary remedy of injunctive relief and asks that the Court

5    permanently enjoin defendants from continuing to sell Chocolate. In evaluating this request, the

6    Court has considered whether AngioScore has met its burden to establish that: (1) it has suffered

7    an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to

8    compensate for that injury; (3) considering the balance of hardships between the plaintiff and

9    defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a

10   permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006). Having

11   considered these factors, the Court declines to award AngioScore's requested injunction.

12         The Court possesses broad discretion in imposing equitable remedies upon finding a

13   violation of the UCL. *Yanting Zhang*, 57 Cal. 4th at 371 (citations omitted). Even when an unfair

14   business practice has been shown, the UCL does not require the imposition of equitable relief. *See*

15   *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 180 (Cal. 2000) ("The court's

16   discretion is very broad. Section 17203 does not mandate restitutionary or injunctive relief when

17   an unfair business practice has been shown."). Here, the Court is satisfied that the remedies set

18   forth below fully and fairly compensate AngioScore for its past and future harms, and adequately

19   addresses defendants' wrongdoing. AngioScore has conceded that the existence of such relief

20   obviates the need for an injunction. (Dkt. No. 658 at 5.) *See E.B.C. Trust Corp. v. JB Oxford*

21   *Holdings, Inc.*, 2005 WL 6214851, at *5 (C.D. Cal. Aug. 26, 2005) (injunctive relief "requires a

22   showing that other adequate relief is not available" and where "the plaintiff pursues other remedies

23   in addition to seeking relief under [UCL] the court may conclude that those other remedies obviate

24   the need for injunctive relief.") (citations omitted). Furthermore, as discussed more below, an

25   injunction is directly contrary to the public interest. Accordingly, the Court declines to award

26   AngioScore its requested injunction.

27

28

United States District Court
Northern District of California

48

REMEDY

I.    **Legal Framework**

The law abhors one who betrays his or her fiduciary duty. Thus, "[i]f an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit." *Guth*, 5 A.2d at 510. The bounds of this rule are considerable, for it rests upon the "broader foundation of a wise public policy that, for the purpose of *removing all temptation, extinguishes all possibility* of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty." *Id.* at 270 (emphasis supplied). Where a plaintiff has proved that its interests have been subverted by a disloyal fiduciary, "the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired." *Id.* at 273.

While it is true that damages flowing from a breach of fiduciary duty are to be liberally calculated, *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996) (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)), the Delaware Supreme Court has held that where certain claimed damages were not proximately caused by the breach, those damages were not recoverable. *Id.* Thus, causation remains a consideration for damages even in the context of fiduciary duty breaches. *Thorpe*, 676 A.2d at 444; *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 907 (Del. Ch. 1999) (noting lack of causal relationship; finding authority to award damages where the breach of duty caused economic harm to a corporation) (citing *Thorpe*, 676 A.2d at 445). So, too, does causation remain at issue in the case of aiding and abetting the commission of a tort. *See Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 352 (1966) ("It is clear from the evidence . . . that Bender was aware of or ratified Glen's breach of his fiduciary duties in all but a few respects, that he cooperated with Glen in the breach, and that he received the benefits of Glen's infidelity . . . . Under all the circumstances, Bender and

United States District Court
Northern District of California

49

1   Bender Co. must be held liable for their part in Glen's breach of his fiduciary duties. They

2   encouraged the sowing and reaped the benefit. They cannot now disclaim the burden.").

3   **II.    Defense of Causation**

4          Defendants have argued throughout this case that AngioScore has failed to prove that

5   defendants' behavior caused harm to AngioScore either because (i) the devices do not compete, or

6   (ii) Feld had an independent right to develop Chocolate. The Court is unpersuaded.

7          First, Chocolate and AngioSculpt compete. More than sufficient evidence exists in the

8   record to support a finding that Chocolate's presence in the market has harmed AngioScore. The

9   Court explains:

10          In the angioplasty balloon market, there are two basic categories of products. First are the

11   plain old balloon catheters, or POBAs, which come in three basic forms: compliant, semi-

12   compliant, and non-compliant. Within that field, POBAs come in different types (small, large,

13   standard, and high-pressure). (PX 294 at 251.) POBAs are priced between approximately $150 to

14   $200 per unit. (Trial Tr. at 412:7-9 (Viano direct).) Specialty balloons comprise a sub-market

15   within the broader angioplasty balloon market, and are priced as high as $1000, depending on

16   length. (*See id.*) Within that sub-market, there are relatively few players. (*Id.* at 249.) As of

17   2013, the specialty balloon catheter market was primarily occupied by four companies: Boston

18   Scientific, C.R. Bard, Abbott Laboratories, and AngioScore. The market share at that time reflects

19   that AngioScore was in close competition with Boston Scientific's flagship product, the Cutting

20   Balloon: AngioScore occupied 48.1% of the specialty balloon market and Boston Scientific

21   occupied 47.1%. C.R. Bard held only 3.3% of the market with its specialty balloon, the

22   Vascutrak. Abbott Laboratories held only 1.3%. (PX 294 at 249.)

23          The similarities between Chocolate and AngioSculpt from a competitive viewpoint are

24   overwhelming. Both are specialty balloons. Both contain balloons made with nylon elements.

25   Both have a nitinol cage surrounding the balloon. Neither device leaves anything behind in a

26   vessel after it has inflated; no stent remains, for example. The purposes for the devices are the

27   same: to open occluded blood vessels and enable more blood flow. The devices share the same

28   target customers, both of which are specialized: interventional cardiologists and vascular surgeons.

United States District Court
Northern District of California

50

1    (Trial Tr. at 407:20-408:3 (Viano).)    The fact that the two products do not use identical

2    mechanisms of action does not mean that they do not compete.

3        The obviousness of the competitive relationship between the devices becomes undeniable

4    upon a review of defendants' own pre-litigation communications regarding their goals for

5    Chocolate, then being developed and marketed.    Konstantino himself made multiple written

6    references that touted the competitive benefits of the Chocolate compared to the AngioSculpt.

7    (*See* PX 66 (November 2009 Chocolate presentation referencing that Chocolate would "reduce

8    dissections"; dissections would occur with a scoring balloon, *i.e.*, AngioSculpt); PX 124 (January

9    2010 email from Konstantino forwarding information memorandum outlining benefits of

10    Chocolate as Proteus's proprietary device; identifying AngioScore as one of "only a couple

11    companies" marketing specialty balloon products); PX 132 (October 2011 email from Vardit

12    Benjamin to Konstantino and Haig attaching "TriReme's Competitor Analysis" spreadsheet;

13    identifying the AngioSculpt as competitor); PX 127 (February 2011 email Konstantino forwarded

14    his wife for purposes of his patent application background discussion, identifying AngioSculpt as

15    an "alternative tool" to Chocolate).)    Chris Haig further confirmed the market similarities between

16    Chocolate and AngioSculpt.    As Chocolate was being developed, TriReme faced the question of

17    where to price its new specialty balloon catheter device.    In October 2011, an email from Steve

18    Dreaden entitled "AngioScore Competitive Information" relayed "competitive field intel on

19    AngioScore" in terms of their pricing.    (PX 130.)    The email itself and responses make clear that

20    TriReme priced Chocolate just $25 under AngioScore's prices.    (*See also* PX 135.)

21        Thus, for every size Chocolate was available, it was priced at exactly $25 below its

22    AngioScore counterpart.    Notably, Haig admitted that pricing for the Chocolate was keyed off

23    AngioSculpt, as opposed to Vascutrak, because AngioSculpt was "on the higher side" of the

24    pricing spectrum and had higher clinical value.    However, at that time they were first pricing

25    Chocolate, TriReme *lacked* clinical data on the value of Chocolate, further evidencing that

26    defendants believed AngioSculpt was the "closest competitor" to Chocolate.    (PX 143.)

27    Konstantino himself approved the pricing.

28

United States District Court
Northern District of California

51

1    Ample other evidence of record reveals that TriReme considered Chocolate competitive
2    with AngioSculpt. On December 30, 2011, following Chocolate's 510K approval, for example,
3    Haig forwarded a powerpoint deck to Konstantino extolling the virtues of Chocolate. (PX 137.)
4    Included was a slide entitled "Chocolate – pricing strategy" that stated that Chocolate was "price
5    competitive to other "specialty" catheters to drive rapid adoption" and noted specifically that
6    AngioSculpt was priced at $852. (*Id.*) Sales discussions at TriReme focused substantially on
7    distinguishing Chocolate from AngioSculpt in order to gain market share over the other
8    competitive specialty balloons. To that end, in December 2012, high level discussions occurred at
9    TriReme concerning such things as how to describe Chocolate's relative advantages compared to
10   the AngioScore and Vascutrak when communicating with potential customers. (PX 142.)
11   Although the devices are different in some ways, "all of these balloons fall under the "specialty
12   balloon" category." (*Id.*) The differences are finely tuned. In defendants' parlance, AngioScore
13   was described as a "focal force" balloon; Chocolate was described as a "distributed force" balloon.
14   Defendants maintain that Chocolate is "the opposite of a scoring balloon" because when inflated,
15   the balloon itself protrudes through the nitinol cage, forming crowns or pillows that impress upon
16   the plaque. This, they claim, contrasts with the AngioSculpt, which is designed such that the
17   nitinol element itself presses into the plaque. Again, the Court finds that these differences do not
18   do not demonstrate lack of competition. TriReme acknowledged as much when it was marketing
19   Chocolate. The differences, to the extent the parties' documents acknowledge them, were focused
20   on helping each side market its own product *as against* the other side's product – indeed, the
21   Court finds that such documents, on the whole, reaffirm that the devices were competing with one
22   another, *not* that they were so different that they did not compete.

23   Defendants' succeeded in their attempt to compete with the AngioSculpt. Frank Viano,
24   Eastern Area of VP of Sales for Spectranetics (which acquired AngioScore), testified on the
25   competitive relationship between Chocolate and AngioSculpt. With over 20 years of experience
26   in the area of selling cardiovascular angioplasty devices, including experience working with
27   AngioScore's other competitors such as Boston Scientific, Viano attested that he has personally
28   seen sales of AngioScore products affected by the advent of Chocolate. According to Viano,

52

United States District Court
Northern District of California

1   Chocolate is the closest competitor to AngioSculpt in the field of specialty balloons.  Viano also

2   confirmed that POBAs and stents are not competitors with AngioSculpt.

3          Loss of AngioSculpt sales have been directly attributed to Chocolate.  (Trial Tr. at 444:20-

4   445:21 (Viano, discussing losing five to ten units a month to Chocolate, including its sales to Dr.

5   Garcia, defendants' industry expert).)  Viano testified that he has been asked to reduce prices for

6   AngioSculpt approximately twenty-five to thirty times.  Corroborating that testimony, in March

7   2013, for example, Viano was asked via email by a sales and service representative in Maryland

8   and Rhode Island to reduce the AngioSculpt price because Chocolate had been offered at a lower

9   price.  (PX 152.)  He estimated that requests to reduce prices for AngioSculpt sales have occurred

10  at approximately ten to fifteen percent of the 200 or 250 hospitals falling under his jurisdiction.  In

11  response to the competition from Chocolate, Viano explained that he has directed his sales

12  representatives to provide more sales focus time on the AngioSculpt, to "sell our features, clinical

13  success, and track record to the hospitals in a much more robust fashion."  (Trial Tr. at 418:18-

14  419:5 (attesting to diversion of resources at AngioScore due to counter market threats by

15  Chocolate and including lowering prices for AngioSculpt).)

16         Defendants place much reliance on the fact that AngioScore initially disclaimed any

17  similarity between the devices when Chocolate was first released.  The Court finds such

18  arguments unpersuasive.  Initial reactions to Chocolate on behalf of AngioScore's marketing team

19  expressing skepticism that Chocolate could compete with AngioSculpt,[16] are not dispositive of the

20  question of whether, in fact, these devices compete.  As explained above, the fact that the devices

21  are different in design does not undermine their competitiveness with one another.  Based on

22  similar reasoning, the fact that in June 2014, Viano created a chart outlining the advantages of

23  AngioSculpt as compared to Chocolate for distribution to the AngioSculpt sales team does not

24  support a finding that the devices are not competing with one another.  If anything, it affirms it.

25

26         [16] Notwithstanding these assessments, which the Court finds reflected an optimistic
    viewpoint designed to motivate AngioScore's sales force, Viano confirmed that even at the
27  beginning he viewed Chocolate as a "competitive threat" to the AngioSculpt and instructed his
28  sales team to "knock it down right away."  (DX 1581.)

United States District Court
Northern District of California

1    (DX 1770.)  Viano testified that he and a colleague created the chart in response to TriReme's

2    recent acquisition of a 510(k) clearance for their Chocolate PTCA Balloon.  At that point, they

3    understood that the Chocolate device was an "immediate competitive threat."  Accordingly, the

4    chart was designed to identify all the ways in which AngioScore's device was superior.

5          Defendants' criticism that AngioScore's submission of sales documents do not

6    demonstrate a direct corroboration or one-to-one link between decrease in sales, and, in particular,

7    Chocolate as the source of the loss, is not dispositive.  The proffered evidence more than meets the

8    legal standard.  Leaving aside the weight of evidence confirming that AngioScore was forced to

9    lower its prices on its products due to pressure from Chocolate, and that defendants themselves

10   claimed that clinicians were replacing AngioScore devices with Chocolate (PX 164), defendants

11   argue that Chocolate did not impede AngioScore's market share because the two devices are

12   "complementary."  The only practitioner evidence directly supporting this notion is testimony

13   from Dr. Garcia, defendants' industry expert.  Defendants place more weight on this testimony

14   than it can bear.  Dr. Garcia, whose testimony is of marginal weight given his pre-existing

15   relationship with the defendants, testified that Chocolate and AngioSculpt are complementary, and

16   stated that Chocolate and AngioSculpt can be used "in concert, in the same patient."  (Trial Tr. at

17   911:16-25.)  But Dr. Garcia himself could not recall ever having used a Chocolate and

18   AngioSculpt in this manner.  Nor could he recall any medical studies recommending such

19   complementary usage.  Furthermore, he admitted that defendants' promotional materials did not

20   tout Chocolate as "complementary" to another product.  (Trial Tr. at 932:4-933:3.)  Indeed,

21   defendants' goal was to have physicians replace their use of AngioSculpt with Chocolate, and gain

22   market share.  (PX 164 (noting that clinicians are replacing the use of Scoring/Cutting

23   (AngioScore) devices with Chocolate).)

24         Defendants' second argument is that due to Feld's independent right to assign his interest

25   in Chocolate, defendants enjoyed an independent right to develop Chocolate.  Thus, they reason

26   that AngioScore cannot demonstrate that their actions caused AngioScore's harm, and that

27   AngioScore cannot establish that had the opportunity been offered by Konstantino, it would have

28

been able to acquire an exclusive right to Chocolate. The Court rejects this conclusion as contrary to the facts of record and reasonable inferences therefrom.

Defendants' position hinges on the notion that Feld would never have assigned his rights to AngioScore under any circumstances. The Court finds this argument implausible. Feld testified that while he was the engineering leader on the device, Konstantino was the one with the business acumen. Indeed, in deposition, Feld stated that he had no involvement with "the business side." (Trial Tr. at 862:21-863:1.) He had incomplete knowledge of who Chocolate's first investors were and was not involved in determining who could be a potential partner for Chocolate. (Trial Tr. at 863:10-14.) Konstantino was responsible for handling such things. Based on this and other of Feld's testimony, the Court finds that Feld would have assigned his interest wherever and to whomever Konstantino recommended. That Feld was subject to Konstantino's business decisions and did not exert any independent control over these decisions is further evidenced by the fact that despite Feld's critical role in designing the device, he was paid only $70,000 for his interest in Chocolate while Konstantino was paid $250,000. Feld's undeniable deference to Konstantino's independent business decisions is further underscored by the fact that Konstantino received a 2.85% royalty in Chocolate where Feld received only 2.15%. Had Konstantino offered the opportunity to AngioScore, the Court is steadfastly confident that based on Feld's lack of business acumen, allegiance to Konstantino, and fundamental character, he would have followed Konstantino's lead. For this reason, defendants' insistence that Feld's independent right somehow undermines AngioScore's harm does not persuade. Feld's claim he disliked AngioScore and would not have wanted Chocolate to belong to AngioScore, is belied by the objective facts and only raised conveniently in the context of ongoing litigation.

In sum, the Court finds that plaintiffs have offered sufficient evidence to establish that defendants' conduct – Konstantino's breach and defendants' aiding and abetting that breach – intentionally, and directly caused AngioScore harm.

III.    Remedy Awarded

A. Konstantino may retain no benefit he received as a result of his breach.

Under *Guth*, the remedies available in a breach of duty case are designed to "den[y] to the betrayer all benefit and profit." *Guth*, 5 A.2d at 510. AngioScore has proved that its interests have been subverted by a disloyal fiduciary, and may now "elect to claim all of the benefits of the transaction for itself." *Id.* at 273; *see also Thorpe*, 676 A.2d at 445 ("Once disloyalty has been established, the standards . . . require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct.").

Accordingly, Konstantino may retain no benefit of his breach. The result, while potentially viewed as harsh, is designed to deter such conduct from occurring in the first place. It differs from contractual remedies and does more than return AngioScore to the position that it would have been in had the breach never occurred. It serves to deter future transgressions. To wit, Konstantino's personal disgorgement shall include the $250,000 he received in agreeing to assign his intellectual property rights to Chocolate, as well as the 2.85% royalty on Chocolate sales. It also includes his shares in QT Vascular stock, which total roughly 15 million, and his existing stock options. Furthermore, Konstantino must disgorge any and all monies he collected in any sale of such stock, the monies he has received relative to his royalty share, and any monies he has made in connection with his monthly consulting retainer relative to Chocolate.

B. The Court awards AngioScore its past and future lost profits as the most appropriate equitable remedy.

In light of the fact that the underlying claim is equitable in nature, the Court has broad discretion to address inequity. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del. 2002) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983) (noting "the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate"); *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 439 (Del. 2000) (noting that this Court "defer[s] substantially to the discretion of the trial court in determining the proper remedy")). Beyond the disgorgement of benefits Konstantino personally received as a result of his breach, the Court finds it appropriate, given the totality of the circumstances, to fashion a remedy

United States District Court
Northern District of California

1    in order that defendants may be deterred from future breaches and to compensate AngioScore, as

2    "the beneficiary must not be harmed by such conduct." *Boyer*, 754 A.2d at 906.

3         As set forth above, AngioScore has proved that Chocolate's market presence has cost it

4    market share and resulted in lower profits; the causation element is satisfied. But it must be noted

5    that the harms resulting from defendants' wrongdoing are difficult to quantify, especially given the

6    industry and the infancy of Chocolate. The Court, "fortunately, has broad discretion to tailor

7    remedies to suit the situation as it exists." *Cantor Fitzgerald, L.P. v. Cantor*, No. CIV.A. 16297,

8    2001 WL 536911, at *3 (Del. Ch. May 11, 2001). Cognizant of this framework, AngioScore has

9    presented myriad alternative remedies that it believes would work to the same equitable ends. For

10   example, AngioScore has presented measurements of the following alternative remedies: (i)

11   disgorgement of defendants' past profits from Chocolate; (ii) an injunction on the sale of

12   Chocolate; (iii) awarding AngioScore its lost profits sustained to date, and a reasonable estimate

13   into the future; and (iv) awarding AngioScore the present value of Chocolate, which represents its

14   value into the future. The Court first explains why a lost profits award is, in its estimation, the

15   most appropriate for this case, and next explains why the other proposed remedies are wanting.

16        The Court finds that AngioScore's calculated lost profits, reflective of both its harm to this

17   point and into the future, is sufficiently well-established to remedy AngioScore's harm, and

18   represents an appropriate degree of opprobrium for defendants' wrongful behavior. Thus, the

19   Court awards AngioScore (i) its current lost profits of $2.97 million, representing the profits it

20   would have generated had business not been diverted to defendants, and (ii) its future lost profits

21   where, as here, the Court declines to issue an injunction and permits Chocolate to stay on the

22   market. That value is $17.064 million, representing AngioScore's lost profits on future sales from

23   2014 through the second quarter of 2019. (PX 383; Trial Tr. at 759:22-760:2.)

24        Defendants' dispute as to AngioScore's lost profits calculation centers on the definition of

25   the "market" in which AngioSculpt and Chocolate compete, and the corresponding market share

26   used to calculate AngioScore's lost sales.[17] For reasons explained extensively above and

27   _____

28        [17] As explained extensively above, although defendants maintain that Chocolate has not
caused AngioScore to suffer lost profits, the Court disagrees. The evidence demonstrates

57

incorporated by reference, the Court finds the specialty balloon market to be the relevant market

for purposes of analysis, not the whole angioplasty balloon catheter market. Of particular import

is that specialty balloons are priced significantly higher than POBAs and are designed to address

more complex medical problems where only four devices are employed: AngioSculpt, Chocolate,

Vascutrak, and Cutting Balloon. Defendants themselves have long recognized that Chocolate

would compete with AngioSculpt and priced their device accordingly. Thus, AngioScore's lost

profits model, which limits the relevant market to that of specialty balloons rather than POBAs,

provides an accurate estimation of losses AngioScore has suffered due to Chocolate's market

presence.[18] Having addressed this objection, the Court awards AngioScore $2.97 million,

representing its lost profits from December 2011, when Chocolate entered the market, to June

2014, when AngioScore filed its claim.

Next, AngioScore is awarded $17.064 million, which represents one measure to address

future harms, namely, AngioScore's calculation of its future lost profits through mid-2019.[19] In

declining to award AngioScore's estimated present values for Chocolate, which total either $46 or

$96 million, the Court weighed and balanced myriad considerations. The Court has endeavored to

remain faithful to the purposes of remedies for breach of fiduciary duty: the deprivation to the

wrongdoer of benefits borne of the breach, and the goal of ensuring that a plaintiff will not

continue to be harmed. The Court also finds that an award must be commensurate with the

---

conclusively that the devices do compete, and that defendants in fact intended that AngioScore
would experience lower profits due to Chocolate.

[18] Defendants' expert, Prowse, used an iData report in his competing calculation.
Although in their briefing, defendants do not dispute the suitability of the Millennium Research
Group Reports for the calculation AngioScore's relevant market share 2013 and 2014, and upon
which Gary Olsen, AngioScore's expert, relied in formulating his market share lost profits
analysis, the Court notes that both parties use the Millennium Research Group reports regularly in
the course of their business. Thus, the Court finds it the more reliable of the two for purposes of
this analysis.

[19] The end date certain is defined by the useful life of the AngioSculpt product with which
Chocolate has been shown to compete. (Trial Tr. at 761:19-762:2.) Notably, the time period here
reflects a conservative approach. (Trial Tr. at 763:3-8.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  highest degree of opprobrium for defendants' wrongful conduct, cognizant that here, had

2  Konstantino resigned from AngioScore's board before Chocolate became an opportunity, this

3  dispute would not exist.  AngioScore possessed no right to be offered the Chocolate opportunity

4  absent Konstantino's board membership.  Thus, the appropriate remedy is also one that does not

5  work to the destruction of new innovative technology.  This is critical, as there is a public benefit

6  derived from healthy advancement and competition in the marketplace, particularly in the area of

7  medical devices.  Put differently, the Court finds that equity demands that any remedy be

8  sufficient to repair and deter without being gratuitously extreme.

9       With these principles in mind, AngioScore's alternative remedies are less satisfying.  For

10  example, AngioScore's first proposed remedy – an injunction barring the sale of Chocolate – is

11  not appropriate here, where the parties concede that a monetary award will serve as an adequate

12  remedy.  Moreover, the Court cannot overlook the harm such an injunction would work on the

13  public interest.  That AngioScore asks the Court to remove from the quiver of practicing

14  physicians one arrow with which they might treat a patient is brazen, particularly where they also

15  seek monetary damages, albeit as an alternative.  The Court sees limited benefits in removing from

16  the avowedly limited field of specialty balloon catheters a device that has been approved for

17  medical use in treating complex disease.  An injunction is plainly inappropriate.

18       Next, given the infancy of Chocolate, calculating an award based on defendants' past

19  profits is less satisfying.[20]  Here, AngioScore contends that profits defendants have earned to date

20  due to Chocolate total $5,038,000.  (ARB at 21.)  Unsurprisingly, defendants dispute this amount.

21  The disagreement turns on the fact that Chocolate is a new product being developed in a start-up

22  environment.

23

24      [20] In cases concerning aiding and abetting a breach of fiduciary duty, disgorgement is one

25  available remedy.  *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1481 (2014), *as modified* (May 27, 2014); *see also Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,

26  No. CIV.A. 3290-VCP, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) *aff'd*, 988 A.2d 938 (Del. 2010) (finding that where defendants aided and abetted the breach of fiduciary duty, they are

27  jointly and severally liable for the damages imposed to remedy those breaches) (citing *Gotham Partners*, 817 A.2d at 173).

28

1    AngioScore's calculation centers on the delta between the sales price of the device less the

2    actual cost to manufacture, less a deduction for some marginal costs. Defendants, by contrast,

3    argue that all their research and development ("R&D") costs should be considered in determining

4    past and future lost profits. Both positions suffer from want of certainty, and were proffered to the

5    Court without any industry context or a fulsome record,[21] as R&D costs can be treated in various

6    ways from an accounting perspective.[22] Further, Defendants cannot dispute that the product has

7    been successful enough to generate revenues of approximately $11 million in 2014 and an

8    anticipated $20 million in 2015; and that optimism in the product is great, as evidenced by

9    defendants' ability to raise $40 million in an initial public offering and a market capitalization

10   estimated at $170 million. On the whole, this approach is not as compelling as a remedy based on

11   AngioScore's established record of profits.

12

13   [21] For example, AngioScore contends that the only evidence the Court should consider
     with respect to defendants' costs should be the testimony of defendants' 30(b)(6) witness. (Brosh
14   Dep. at 235:04-14.) The position does not persuade. Brosh was designated as a witness to answer
     questions relating to annual revenues and annual profits realized in connection with the
15   manufacture and sale of Chocolate devices in the United States and worldwide. (Dkt. No. 593-3 at
     4, Topic 5.) The topic, although connected conceptually to the notion of R&D costs, did not
16   expressly state that Brosh's testimony would concern the same. Importantly, counsel's questions
     of Brosh, which form the substance of his designated testimony, did not seek to elicit testimony
17   concerning the R&D costs associated with Chocolate. Rather, the designated portions of his
     deposition concern the costs to defendants of manufacturing each unit, the amount TriReme pays
18   Quattro for the manufactured units, and the profit margin realized upon market sale. (See Brosh
     Dep. at 228:01-05; 228:14-17; 229:06-14.) Thus, Brosh was not asked, nor did he testify to, costs
19   incurred as part of defendants' development of Chocolate. AngioScore cannot reasonably be
     heard to argue that it in any way understood Brosh's designated testimony to concern such costs,
20   nor that the testimony of Randall Farwell, QT Vascular's Chief Financial Officer, as to such costs,
     should be barred. Accordingly, the Court finds the Brosh testimony inconclusive and unhelpful in
21   the Court's endeavor to discern the most appropriate measure for assessing defendants' profits in
     this particular industry for this particular product. See Restatement Third of Restitution § 51, com.
22   h ("Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net
     gains, results in a punitive sanction that the law of restitution normally attempts to avoid.").
23

24   [22] Not only are R&D costs treated differently across industries, but at times they are sunk
     costs. Further, prior to Chocolate, defendants had never manufactured a specialty balloon. Thus,
25   they had to invest in some amount of infrastructure in order to develop Chocolate. It is not clear
     that such costs should not be considered sunk costs as well. Ultimately, defendants chose not to
26   be fully forthcoming with their financial information, with the result that they cannot now hide
     behind their own lack of disclosures and claim no profit.
27

28

United States District Court
Northern District of California

Next, the Court finds both of AngioScore's present value calculations lack adequate foundation. First, AngioScore relies upon terminal value for purposes of determining Chocolate's present value. Such calculations formed the basis for Gary Olsen's present value calculation. (*See* PX 381; PX 383.) The use of a terminal value is most commonly used to evaluate the value of a firm, rather than the future value of a discrete device or invention. (Trial Tr. at 1220:1-17.)[23] The application of a terminal value to a going concern company assumes that the company will continue beyond an explicit forecast period. Plaintiffs have failed to provide sufficient foundation showing that such a measurement is appropriate in the context of valuing a new device or product.

As an alternative to its terminal value calculation for Chocolate's present value, AngioScore contends in its post-trial briefing that the application of a multiple to current revenue in order to calculate Chocolate's present value is appropriate. Applying that multiple to AngioScore's 2014 revenue results in a total of $35 million, which AngioScore argues represents another measure of Chocolate's present value. The Court finds that this, too, lacks foundation. Olsen's testimony does not support a finding that this is a satisfactory method of calculating the value of a technology, as opposed to a going concern. As with the use of a terminal value, AngioScore's proof at trial concerning the appropriateness of using a revenue multiple effectively relied on the fact that this valuation technique was used in valuing QT Vascular as a going concern with a stabilized revenue stream, not the Chocolate as a new technology. (Trial Tr. at 777:5-13 (Olsen, testifying that use of a revenue multiple is a common way to value a company and noting that AngioScore and QT Vascular have been valued using a multiple applied to revenue); Trial Tr. at 780:2-7; *see also* Trial Tr. at 1246:18-1251:25 (Prowse, testifying that such measures are used to value companies).)

---

[23] Terminal value calculations play a part in appraisal proceedings which require valuation of a company. *See* Del. L. of Corp. and Bus. Org § 9.45 VALUATION IN A DELAWARE APPRAISAL PROCEEDING, 2006 WL 2454231 (noting that the discounted cash flow analysis utilizing a terminal value is a valid methodology for purposes of determining the value of appraised shares; "the value of a company is equal to the present value of its projected future cash flows"). AngioScore's cited case in support of applying a terminal value, *In re Orchard Enterprises, Inc.*, No. CIV.A. 5713-CS, 2012 WL 2923305 (Del. Ch. July 18, 2012), concerned an appraisal of stock values and did not apply a terminal value to a brand new technological device.

United States District Court
Northern District of California

In sum, the Court finds that equitable considerations counsel in favor of awarding AngioScore a remedy in the form of its past and future lost profits. Such a remedy repairs and deters without being punitive.

### C. Corporate defendants are liable for damages AngioScore has sustained.

As aiders and abettors of Konstantino's breach of fiduciary duty, defendants are jointly and severally liable. *See Casey*, 127 Cal. App. 4th at 1144; *Neilson*, 290 F. Supp. 2d at 1133 (noting that California courts cite Restatement (Second) of Torts section 876 to hold that "liability may properly be imposed on one who knows that another's conduct constitutes a breach of duty and substantially assists or encourages the breach.") (citations omitted); *see also Gotham Partners*, 817 A.2d at 160. Based upon the detailed discussion above, this liability should extend to the corporate defendants. *See Bancroft-Whitney*, 64 Cal.2d at 352 (finding that where defendant aiders and abettors were "aware of or ratified a director's breach of his fiduciary duties in all but a few respects, . . . cooperated with [the director] in the breach, and . . . received the benefits of [the director's] infidelity . . . . [they] must be held liable for their part in the director's breach of his fiduciary duties. They encouraged the sowing and reaped the benefit. They cannot now disclaim the burden.").

### CONCLUSION

In summary, the Court finds that Konstantino not only breached his fiduciary duties, he actively hid his transgressions to avoid detection. As a result, he exploited the Chocolate opportunity for his own gain rather than providing the opportunity to AngioScore, as he was duty bound to do. While such a duty would not have existed had he resigned before Chocolate became an opportunity, Konstantino's breach resulted in measurable harm to AngioScore.

A director's duty to the corporation he serves cannot be ignored under the mantra of innovation. Should a director walk that path, the innovation must be offered, the conduct transparent, and the fidelity to one's duty paramount. While conflicts between the desire to innovate and the obligations of board membership may arise, a director always has the option to resign. Here, Konstantino did neither, and thus, a remedy must be awarded to address the breach. The Court further finds that Quattro and TriReme aided and abetted the breach of fiduciary duty,

and that QT Vascular is liable for the acts of Quattro and TriReme.

Accordingly, the Court ORDERS the following measures of damages:

1. Konstantino shall disgorge the benefits he obtained by way of his breach; and

2. Defendants are liable for AngioScore's past and future lost profits, totaling $2.97 million and $17.064 million, respectively, for a total of $20.034 million.

No later than __July 13, 2015__, the parties shall submit a joint statement including language for a form of judgment, approved as to form, to be issued upon conclusion of the patent trial.

IT IS SO ORDERED.

Dated: July 1, 2015

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California

United States District Court
Northern District of California

FINDINGS OF FACT

| Findings of Fact | Supporting Evidence |
|---|---|
| 1.  Konstantino and Feld began development of Chocolate while Konstantino served on AngioScore's Board. Konstantino and Feld jointly conceived of the idea for Chocolate no later than the Fall of 2009. | Trial Tr. at 846:20-847:13, 850:3-25 (Feld direct), 1290:25-1293:6 (Konstantino 4/21/2015 direct); DX 1609. |
| 2.  Konstantino was a member of AngioScore's Board of Directors from March 2003 until February 5, 2010. | Trial Tr. at 133:7-11, 1275:21-23, 1288:25-1289:3. |
| 3.  Konstantino knew he owed fiduciary duties to AngioScore as a member of its Board of Directors. | Trial Tr. at 133:7-11; PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company.) |
| 4.  Konstantino and non-party Feld jointly conceived of the idea for Chocolate during a telephone call. While serving on AngioScore's Board, Konstantino conceived of an idea for an angioplasty balloon that had pillow and groove formations when inflated, and had a telephone call with Feld. The two men then "brainstormed" together. Konstantino conceived of the notion of a balloon with pillows and grooves; Feld suggested this could be achieved with a nitinol cage. This was the balloon catheter that later became known as Chocolate. | Trial Tr. at 1290:25-1291:21 (Konstantino 4/21/2015 direct stating that Feld was the first to suggest a nitinol cage to achieve pillows and grooves); 1292:22-1293:6; Trial Tr. at 846:20-847:13 (Feld direct, explaining that Konstantino and Feld were "brainstorming" and Feld was talking about using a frame or cage for what would eventually become Chocolate; later clarifying that he later thought that "it might be a good idea and that I should spend some time trying to create a model for this"); DX 1609; PX 109 at 0004. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **5.** While the precise extent of development of Chocolate as of February 5, 2010 is not certain, it was developed sufficiently to constitute a corporate opportunity as of that date. | Trial Tr. at 139:20-141:21 (Konstantino direct, "In 2009, and before I left the AngioScore board, I had an idea, one of three or four other ideas that I had at the same time. Around mid-January 2010, I made a decision to pursue this idea, and that's pretty much it."); 328:6-15 (Haig direct, noting that as of February 3, 2010, Chocolate was sufficiently developed such that it could be presented as part of the "scope of products that TriReme was working on"); *see also* PX 80. |
| **6.** In October 2009, TriReme's Board was notified of the Chocolate opportunity. | Trial Tr. at 1096:19-1097:11 (Pizarro cross-exam). *See also* Trial Tr. at 1291:22-1292:3 (Konstantino 4/21/2015 direct) (Konstantino stated that he met with "maybe 20 to 30" different investors in the second half of 2009). |
| **7.** On October 12, 2009, while serving on AngioScore's Board, Konstantino drafted and applied for a provisional patent application on the Chocolate technology, naming himself and Feld as co-inventors. | Trial Tr. at 200:15-201:10; PX 63; PX 64 (October 2009 patent application listing Feld as co-inventor). |
| **8.** While Konstantino was serving on AngioScore's Board, Feld and TriReme employees assisted with the Chocolate design, prepared engineering drawings on TriReme templates, built prototypes, and performed bench tests. | Trial Tr. at 152:5-153:4, 153:11-154:21, 155:3-156:25, 850:18-851:18, 863:17-864:3, 881:5-24, 1070:17-1073:1, 1078:11-1079:8; PX 65; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 109 at 0004; PX 618; PX 619; PX 620; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **9.** While Konstantino was serving on AngioScore's Board, a TriReme employee showed Chocolate to physicians. | PX 76 (January 2010 email between Ong, Pizarro, Haig re physician feedback; confirming Chocolate was shown to at least one physician); Trial Tr. at 364:13-365:15 (Haig direct). |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **10.** While Konstantino was serving on AngioScore's Board, he and seven other TriReme employees attended animal testing on Chocolate at Stanford sponsored by Quattro, then known as Proteus, in January 2010. | PX 11 (Report from Stanford study); PX 18 (recording attendees from TriReme at test); Trial Tr. at 172:13-173:6, 248:11-23. |
| **11.** While serving on AngioScore's Board, Konstantino sought to raise funds from third-party investors and the Singapore Economic Development Board in connection with Chocolate, with assistance from several TriReme employees. | Trial Tr. at 239:8-240:24, 243:19-244:3, 1292:1-3 (Konstantino direct); PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 3 (January 2010 engagement letter between Proteus and Maida Vale Associates signed by Konstantino referring to financial advisor arrangement for Proteus); PX 85 (December 2009 email between Konstantino, Ong, and Foo (Maida Vale) re Proteus's executive summary on Chocolate, requesting Foo sign a nondisclosure agreement); Ong Dep. at 16:3-9, 16:11-19, 16:23-17:8, 17:11, 21:4-10, 22:21-23:2, 29:22-30:17, 127:19-22, 128:4-10. |
| **12.** During the second half of 2009, Konstantino offered 20 to 30 investors the opportunity to invest in Chocolate. | Trial Tr. at 1292:1-3 (Konstantino direct); *see also* Trial Tr. at 878:15-21, 879:1-9 (Feld examination by Court, stating that Konstantino met with "dozens of investors" in the 2009 time frame). |
| **13.** In presentations seeking to raise funds for Chocolate, Konstantino described Chocolate as an "Investment Opportunity." | PX 2 at 0013 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 85 at 0014 December 2009 email between Konstantino, Ong, and Foo (Maida Vale) re Proteus's executive summary on Chocolate, requesting Foo sign a nondisclosure agreement). |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 14. | In a November 2009 presentation seeking funding from the Singapore Economic Development Board, Konstantino stated that the Chocolate "IP, Concept design, Prototypes, business model, Team, [and] partnerships" were all "completed." | PX 2 at 0010 (November 2009 presentation); Trial Tr. at 239:8-240:24; *see also* PX 85 at 0011 (email to Kah Foo transmitting November 2009 presentation); Trial Tr. at 162:12-19 (Konstantino direct). |
| 15. | In December 2009 correspondence with Dr. Kah Foo, with whom Konstantino was working to get financing for Chocolate, Konstantino represented that the "initial [Chocolate] design already works well and attracts a lot of attention." | PX 73 at 0001 (December 2009 email between Konstantino, Foo, and Ong); Trial Tr. at 160:23-25, 1319:17-1320:2 (Konstantino). |
| 16. | In January 2010, Konstantino sent Dr. Kah Foo, with whom Konstantino was working to get financing for Chocolate, a memorandum stating that the "Proof-of-Concept of the [Chocolate] design has been completed." | PX 124 at 0003 (January 2010 email wherein Konstantino transmits "Proteus Information memorandum" reflecting status of Chocolate development to that point); Trial Tr. at 144:9-13, 160:23-25. |
| 17. | Other presentations dated before Konstantino left AngioScore's Board stated that the Chocolate "product design" was "completed." | PX 585 at 0015 (October 2009 powerpoint re status of Chocolate, reflecting that "Front-end R&D: product design completed"); *see also* PX 78 at 0014 (February 2010 presentation re Chocolate). |
| 18. | The first Chocolate 510(k) was submitted on April 8, 2011. | PX 197 (510K notificaton for Chocolate PTA Balloon catheter); PX 201; Trial Tr. at 1009:14-1010:5. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| 19. The two kinds of testing on which the first Chocolate 510(k) relied to get FDA clearance—mechanical bench testing and pre-clinical animal testing—used samples of Chocolate products with constraining structure designs created before Konstantino left AngioScore's Board. | PX 11 at 0004; PX 197 at 0003, 0011 (510K notificaton for Chocolate PTA Balloon catheter); PX 599 at 0004 (Stanford report RPTA013-2, June 18, 2010, noting device used was RD 18.20); PX 618; PX 619; PX 620; Trial Tr. at 870:17-871:13, 1009:14-1011:7, 1089:20-1091:6, 1331:11-1332:22. |
| 20. The mechanical bench testing submitted to the FDA with the first Chocolate 510(k) used samples of design version RD_20, which was drawn on January 13, 2010. | PX 197 at 0003 (510K notificaton for Chocolate PTA Balloon catheter); PX 618; PX 619; PX 620; Trial Tr. at 870:17-871:13, 1089:20-1091:6. |
| 21. The pre-clinical animal testing submitted to the FDA with the first Chocolate 510(k) was performed on samples of design version RD_18.20, the same version used in the January 2010 animal testing. | PX 11 at 0004 (Stanford report reflecting RPTQ013-1); PX 197 at 0011 (510K notificaton for Chocolate PTA Balloon catheter noting in vivo study RPTQ-013-2); PX 599 at 0004 (Stanford report reflecting RPTA013-2, testing on RD 18.20); Trial Tr. at 1331:11-1332:22. |
| 22. Chocolate was a sufficiently concrete concept in October 2009 for Konstantino to so describe and define in an application to the U.S. Patent and Trademark Office. | Trial Tr. at 200:15-201:10; PX 63 (October 2009 email confirming filing of patent application); PX 64 (October 2009 patent application). |
| 23. Konstantino's filing of a provisional patent application for Chocolate evidences that Chocolate was a sufficiently concrete opportunity at that time such that an entity or individual could acquire rights. | Trial Tr. at 200:15-201:10, 201:21-23; 202:6-20 (Konstantino discussing his filing of patent applications for Chocolate); PX 64 (October 2009 patent application); PX 422; PX 427 (patent documents; applications). |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 24. | Konstantino's filing of a provisional patent application was specifically identified in his presentations to investors. | PX 2 at 0007, 0013 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 85 at 0008, 0014; PX 124 at 0003; Trial Tr. at 144:15-145:6, 242:12-17. |
| 25. | Since its founding in 2003, AngioScore has designed, manufactured, and sold specialty angioplasty balloon catheters under the brand name AngioSculpt. | Trial Tr. at 68:12-22. |
| 26. | Konstantino was the principal inventor of AngioSculpt and filed a patent application that described a drug-coated angioplasty balloon before AngioScore was founded and incorporated. | Trial Tr. at 841:1-22 (Feld direct), 1276:15-1277:12, 1277:19-1278:4 (Konstantino 4/21/2015 Direct); DX 1371; DX 1652 at 5; DX 2015 (Konstantino's resume). |
| 27. | AngioSculpt and Chocolate are both specialty angioplasty balloon catheters. | Trial Tr. at 159:7-16, 180:6-8, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 577:25-578:3, 924:5-17. |
| 28. | AngioSculpt and Chocolate both have a nitinol structure surrounding a nylon semi-compliant balloon. | Trial Tr. at 180:22-25, 410:5-21, 411:5-18, 579:13-21; PX 195 at 0002; PX 197 at 0005; PX 501. |
| 29. | No other specialty balloons on the market use nitinol cage on a semi-compliant balloon – the Boston Scientific Cutting Balloon uses surgical steel and the Vascutrak uses stainless steel guide wires. | Trial Tr. at 896: 16-23 (Garcia); 410:12-21 (Viano); Trial Tr. at 411:5-18 (Viano). |
| 30. | AngioSculpt and Chocolate are both used for the treatment of peripheral and coronary artery disease by opening occluded blood vessels | Trial Tr. at 181:1-10, 579:13-21; PX 189; PX 195; PX 201; PX 211. |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| | without leaving metal behind. | |
| 31. | AngioSculpt and Chocolate have both been cleared by the FDA with overlapping indications for use. | Trial Tr. at 420:12-20, 1015:12-16, 1016:8-11; PX 195; PX 201. |
| 32. | There are no indications for which the peripheral Chocolate device is cleared that the peripheral AngioScore device is not. | Trial Tr. at 1016:8-11; *see also* PX 195; PX 201. |
| 33. | AngioSculpt and Chocolate are sold to the same customers. | Trial Tr. at 181:11-20, 749:15-751:20; PX 152; PX 164. |
| 34. | AngioSculpt and Chocolate make overlapping marketing claims. | Trial Tr. at 422:11-428:5; PX 501; PX 531; PX 533. |
| 35. | AngioSculpt and Chocolate are both sold at premium pricing over plain old balloon angioplasty ("POBA") products. | Trial Tr. at 158:22-23, 159:2-3, 411:19-412:11, 746:8-749:2; PX 294 at 0219; PX 137 at 0014. |
| 36. | AngioSculpt and Chocolate have approximately the same list price. | Trial Tr. at 336:16-340:7; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); PX 137 at 0014. |
| 37. | While Chocolate is a specialty balloon catheter, it is not a "scoring device." Testing of Chocolate however confirms that the device bears into or impresses upon plaque before the balloon inflates to the point of protrusion beyond the nitinol cage. | Trial Tr. at 538:9-539:9; PX 452 (photograph of molding clay). Based on its classification of the Chocolate PTCA balloon as a Class II device, the FDA does not consider Chocolate to be a scoring balloon. Trial Tr. at 995:2-14, 1002:14-20, 1003:7-13 (Kuehn direct). |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **38.** To determine whether Chocolate scores, Jeffrey Bleam, an AngioScore engineer with over 20 years of experience in the medical device industry, performed an experiment in which he inflated the Chocolate device within a cylinder of modeling clay. Chocolate's nitinol struts left impressions in the modeling clay. | Trial Tr. at 538:9-539:9, 525:9-526:11; PX 452; PX 610. |
| **39.** There is no evidence of record that rebuts the findings from Bleam's test, nor any reason that the impressions in the modeling clay observed by Mr. Bleam were not reflective of how Chocolate would perform in a vessel. | *See* DX 1985; DX 1986 (noting diameter at various levels of pressure); Trial Tr. at 378:15-381:14-60, 382:5-22 (Haig testifying that Chocolate is not a scoring device). |
| **40.** A 2010 TriReme document states that Chocolate has a "[d]ual mechanism of action" whereby the first stage involves "[p]laque disruption by initial metal to plaque contact." At the second stage, when inflated, the balloon protrudes past the cage. | PX 78 at 0010; Trial Tr. at 1083:21-24, 1084:3-1085:18. |
| **41.** Defendants' FDA submissions state that Chocolate's nitinol constraining structure "provides for focal force transmission up to nominal pressure and multiple balloon pillows expanding beyond the CS at high pressure. Pillow dilatation is regional, providing for strain relief within the vascular wall and a gentle expansion mechanism." | PX 599 at 0003; Trial Tr. at 1331:11-13. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **42.** Defendants' FDA submissions state that "the inflation of the Chocolate Balloon closely resembles the commercially available VascuTrak balloon with the potential for increased focal force at low pressure." | PX 207 at 0004; Trial Tr. at 1087:2-1088:5. |
| **43.** Even if Chocolate did not score, AngioScore would still have been interested in the opportunity. | Trial Tr. at 91:22-92:6, 490:17-22, 540:9-14, 579:13-581:2; *see also* Trial Tr. at 208:24-209:7, 1295:19-1296:7; PX 2 at 0012; PX 78 at 0018; PX 85 at 0013. |
| **44.** Konstantino's actions demonstrate that he thought that AngioScore would have been interested in participating in the Chocolate opportunity. | Trial Tr. at 207:22-25, 208:24-209:7, 1295:19-1296:7. |
| **45.** Konstantino repeatedly referred to AngioScore as a potential partner in the Chocolate opportunity in presentations in 2009 and 2010. | PX 2 at 0012 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 78 at 0018; PX 85 at 0013; Trial Tr. at 207:22-25, 208:24-209:7. |
| **46.** On February 3, 2010, Konstantino approached Tom Trotter with the intent to present Chocolate as an investment opportunity because he thought AngioScore would be "interested in investing" in it. | Trial Tr. at 1295:19-1296:7; *see also* Trial Tr. at 207:22-25, 208:24-209:7. |
| **47.** In December 2009, Konstantino pitched Tom Trotter about AngioScore distributing the Glider product. | Trial Tr. at 136:4-138:6, 571:25-572:14; PX 423 at 0002. |
| **48.** Glider is a POBA, not a specialty balloon. | Trial Tr. at 138:7-21, 158:15-20, 571:25-572:14, 573:3-4; PX 423 at 0002. |

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **49.** | AngioSculpt is more similar to Chocolate than it is to Glider. | Trial Tr. at 138:13-21, 158:15-159:16, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 571:25-572:14, 573:3-4, 577:25-578:3, 924:5-17. |
| **50.** | Distributors of medical devices sometimes also invest in the company manufacturing the device. | Trial Tr. at 247:2-10. |
| **51.** | AngioScore could have found Chocolate's nitinol cage design useful in the 2009 to 2010 timeframe to address the challenge it faced in designing devices longer than 100mm. | Trial Tr. at 87:23-88:10, 91:1-16, 530:5-16 (Bleam direct), 532:7-536:5 (describing process of adding cross-struts to the AngioSculpt device to ensure even inflation, difficulties with 100mm length balloon)s, 539:15-25 (Bleam direct, explaining that Chocolate's radial struts could have assisted AngioScore's development of a 100mm device), 540:22-541:1 (Bleam direct, stating that he would have considered Chocolate for development despite its not being a "scoring balloon," describing modeling clay experiment, stating that it is "definitely a possibility" that AngioScore could have released a more ideal 100mm balloon sooner had it been aware of Chocolate), 541:12-20 (Bleam direct, stating that had someone shown him the Chocolate design while he was working on developing the 100mm AngioSculpt, that could have affected the money AngioScore spent developing these balloons), 564:1-23 (Trotter direct, discussing July 2009 board meeting presentation referring to AngioScore's difficulty with developing extra long catheters), 579:22-581:2 (Trotter direct, discussing same, stating that Chocolate opportunity could have saved AngioScore cost and development money for its longer length balloons). |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 52. | While Konstantino served on AngioScore's Board, drawings and prototypes of 100mm Chocolate devices existed. | PX 67 (November 2009 email between Feld and Delos Santos discussing performance of Chocolate prototypes, including a 100mm device); PX 89; PX 620; Trial Tr. at 871:10-13, 1070:17-1071:25, 1090:23-1091:6; Delos Santos Dep. at 76:23-77:7, 77:12-18, 77:21-25, 78:1. |
| 53. | The first Chocolate 510(k) submission sought FDA clearance for devices as long as 120mm. | PX 197 at 0002; Trial Tr. at 1012:4-25. |
| 54. | After the initial generation of its longer length product experienced design challenges, AngioScore introduced a new version of its 100mm AngioSculpt in 2013 with improvements. | Trial Tr. at 532:7-533:8, 534:1-535:24; PX 596; PX 622; DX 1706 at 20. |
| 55. | While Konstantino was on AngioScore's board, AngioScore was having difficulty designing a 100mm AngioSculpt, and Konstantino knew of the same. | Trial Tr. at 87:23-88:10, 91:1-16, 530:5-16; 532:7-536:5, 564:1-23, 579:22-581:2; PX 220 (July 2009 board meeting presentation discussing business challenges). |
| 56. | The Chocolate device possibly could have assisted in AngioScore's work to address the design problems associated with the 100mm AngioSculpt. | Trial Tr. at 91:1-16, 539:15-25, 540:22-541:1, 541:12-20, 579:22-581:2. |
| 57. | The Chocolate opportunity could have aided AngioScore's effort in developing longer-length specialty balloons. | Trial Tr. at 87:23-88:10, 91:1-16 (Andrews direct discussing difficulty designing 100mm AngioSculpt), 530:5-16 (Bleam direct re same), 532:7-536:5 ("the challenge for this particular device . . . [was ensuring] even deployment of the struts around the balloon" . . . "we added cross-links to the metal that goes over the balloon" to "help[] with even deployment"), 539:15-25 (testifying that knowledge of the Chocolate design could |

| Findings of Fact | Supporting Evidence |
|---|---|
| | have been of assistance in developing the 100mm device), 540:22-541:1, 541:12-20, 564:1-23, 579:22-581:2, 871:10-13, 1012:4-25, 1070:17-1071:25, 1090:23-1091:6; PX 67; PX 89; PX 197; PX 620. |
| 58.   AngioScore could have been interested in Chocolate in the 2009 to 2010 timeframe insofar as it presented long-term potential as a drug-eluting specialty balloon. | Trial Tr. at 490:5-16 (Raffin direct), 579:22-581:2, 697:7-698:2; PX 217 (February 2009 email between board members discussing effort to attain drug coated balloon technology; PX 220 (July 2009 board presentation outlining future business strategy including "extra long" devices of 100mm and drug coated device). |
| 59.   While Konstantino was on AngioScore's Board, AngioScore was working on developing drug-eluting specialty balloon technology. | Trial Tr. at 87:23-88:10, 164:14-165:17, 166:9-15, 214:15-215:6, 566:6-568:13, 579:22-581:2; PX 226; PX 246 (AngioScore February 2010 Board Meeting presentation, giving overview of then-existing cash balance, notably above budget (p.6), research and development items, including drug-coated devices (p.13)); DX 1199. |
| 60.   Konstantino did not disclose Chocolate or its potential as a drug-eluting specialty balloon to AngioScore.  Instead, in a letter to AngioScore's counsel dated February 23, 2010, he denied involvement in "any development work . . . of angioplasty balloon technology . . . that involves specialized features [. . .]." | PX 420 at 0004. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| 61.  While serving on AngioScore's Board, Konstantino was promoting Chocolate as an "ideal platform for drug delivery" in his efforts to obtain financing for his undisclosed project. | Trial Tr. at 160:20-162:4; PX 85 (November 2009 Proteus presentation) at 0008; *see also* PX 2 at 0007 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board). |
| 62.  Given the limited specialty balloon catheter market, AngioScore would not have simply done nothing had Chocolate been presented.  During the relevant time period, there were only two general types of balloon catheters in the specialty balloon market – those that scored or cut, as in the case of the Boston Scientific Cutting Balloon and the AngioSculpt, and Vascutrak, which had stainless steel guide wires.  Chocolate presented a paradigm-shifting design:  a cage designed to create pillows and grooves in such a way as to create focal force on the balloon surface as it pushes through the openings in the cage.  As a young company, revenue growth was a primary concern for AngioScore.  It would have, at a minimum, issued an offer to acquire rights to the technology. | Trial Tr. at 488:17-22; 489:15-490:4 (Raffin direct; 408:18-410:21 (Viano); 438:19-439:21. |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 63. | AngioScore's earlier rejection of an offer of a new scoring balloon does not establish that it had no interest or expectancy in Chocolate. The opportunity then presented related to another concrete product. AngioScore was permitted to evaluate the design features. In light of this concrete opportunity, Trotter explained AngioScore declined to pursue the proposed technology because "there was nothing particularly impressive about it." He further added that he "didn't see that there was any innovation there that would be valuable to AngioScore." The fact that Chocolate represented a new concept – focal force through the creation of balloon pillows, rather than scoring – sets it apart from the opportunity AngioScore contemplated and rejected. | *See* DX 1099; Trial Tr. 627:25-628:1 (Trotter direct); 628:1-2. |
| 64. | Personality conflict issues would not have prevented AngioScore from being interested in the Chocolate, nor would AngioScore have declined to exploit the Chocolate opportunity. On the whole, Konstantino was well-regarded by members of the board. | FF *supra* 51-61; PX 234 (August 2009 email in which Trotter emailed Ivan Pirzada in an attempt to get Konstantino funding); PX 241 (In December 2009, Trotter sent Konstantino a tip on potential funders for TriReme); Trial Tr. at 483:14-484-1 (Raffin); 692:16-21 (Suennen). |
| 65. | As a member of AngioScore's Board, Konstantino had long-standing exposure to, and access to, AngioScore's confidential information. Certain of this information was forwarded to others involved in the development of Chocolate. | PX 246 (February 2010 board meeting presentation); PX 444; PX 445; Trial Tr. at 174:7-15, 175:2-19, 176:4-11, 177:3-24, 213:7-15, 214:15-215:6. |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 66. | Konstantino used information obtained by virtue of his role on AngioScore's board when developing Chocolate. | PX 246 (AngioScore February 2010 Board Meeting presentation, giving overview of then-existing cash balance, notably above budget (p.6), research and development items, including drug-coated devices (p.13)); PX 444 (October 2009 email from Konstantino forwarding China Market information sent to AngioScore board); PX 445 (November 2009 email from Konstantino to Dreher forwarding Trotter's analysis of the VascuTrak device); Trial Tr. at 174:7-15, 175:2-19, 176:4-11, 177:3-24, 213:7-15, 214:15-215:6. That Konstantino and Feld jointly developed Chocolate does not undermine the fact that by virtue of his seat on AngioScore' board, Konstantino had access to information on the angioplasty balloon market, AngioScore's competitive standing in that market, and utilized such information in his pursuit of Chocolate. |
| 67. | Konstantino attended AngioScore's February 2010 Board meeting. | Trial Tr. at 138:22-139:4, 213:7-15. |
| 68. | At the same time Konstantino attended AngioScore's February 2010 Board meeting, TriReme's Vice President of Marketing & Business Development, Christopher Haig, traveled to Germany to meet with a drug coating technology company about Chocolate. | PX 222 (Feb. 5, 2010 email between Konstantino and Haig re meetings to discuss Chocolate); PX 223 (Feb. 9, 2010 emails re same); Trial Tr. at 163:5-164:2, 164:8-16, 331:3-333:6 (Konstantino direct discussing Haig's visit to Germany in February 2010). |
| 69. | AngioScore never disavowed an interest in Chocolate. | FF *infra* 70-85. |

| | | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|---|
| **70.** | | The survey of AngioScore Board members and management by Sarah Lugaric was directed to an abstract and hypothetical opportunity—*i.e.*, the acquisition of "another company technology or product line." | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 578:4-15, 696:7-13. |
| **71.** | | The Lugaric survey did not present either the specific Chocolate opportunity or a product resembling the Chocolate opportunity—*i.e.*, a specialty balloon with a nitinol structure surrounding the balloon that would leverage AngioScore's existing sales force and that had been developed by AngioScore's co-founder and co-creator of the AngioSculpt technology. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 68:14-16, 91:17-21, 131:6-21, 136:8-137:22, 159:7-16, 180:22-25, 181:11-20, 325:18-326:10, 326:20-22, 408:23-409:12, 410:5-21, 526:12-19, 577:25-578:3, 579:13-21; 924:5-17, 1276:15-17. |
| **72.** | | Several participants in the Lugaric survey testified that they interpreted the question about "acquiring another company, technology or product line" as referring to products outside of AngioScore's core business of specialty balloons. | Trial Tr. at 129:15-25, 578:16-579:21. |
| **73.** | | A majority of the Board members surveyed by Lugaric were receptive to the possibility of "acquiring another company, technology or product line." | PX 214 at 0002 (Lugaric survey responses summary). |
| **74.** | | Thomas Raffin responded to the Lugaric survey that he "[w]ould consider" "acquiring another company, technology or product line" and noted that this would "not [be] easy." Dr. Raffin would have considered Chocolate as such a possibility if it had been presented. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 488:7-22, 489:15-490:22. |

United States District Court
Northern District of California

79

| Findings of Fact | Supporting Evidence |
|---|---|
| **75.** Lisa Suennen responded to the Lugaric survey that she would have been "[p]otentially" interested in "acquiring another company, technology or product line," if that acquisition "is accretive or adds some significant strategic value." Ms. Suennen was open to having AngioScore incorporate new technology into its product lineup and would have considered pursuing Chocolate had that opportunity been presented. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 696:24-698:2. |
| **76.** Jeanette Welsh responded to the Lugaric survey that she would have been interested in "acquiring another company, technology or product line" "only if the acquisition leverages the very expensive Sales force AngioScore has." | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 131:6-21, 181:11-20. |
| **77.** Konstantino responded to the Lugaric survey that he would support "acquiring another company, technology or product line" "to leverage sales force," and that AngioScore "[c]an identify complementary or adjacent vascular technology" "[p]referably for the peripheral market" and "should be looking for product with premium pricing for distribution and[/]or acquisition." | PX 214 at 0002 (Lugaric survey responses summary). |

80

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| **78.** | Although Tom Trotter responded to the Lugaric survey by stating that he did not think "acquiring another company, technology or product line" was necessary to get AngioScore where it needed to go, he interpreted the question as referring to products outside the area of the balloon angioplasty and would have been interested in Chocolate had it been offered. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 578:4-581:2. |
| **79.** | AngioScore's Board—not its management—would have made the ultimate decision whether to accept or reject the Chocolate opportunity had it been offered. | Trial Tr. at 488:23-489:13. |
| **80.** | AngioScore did not consent to Konstantino's pursuit of the Chocolate opportunity, nor did it waive any interest or expectancy in that opportunity. | FF *infra* 81-85. |
| **81.** | Konstantino never disclosed Chocolate to AngioScore while serving on AngioScore's Board. | Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 280:1-25, 282:6-283:24, 486:2-487:10, 523:12-16, 571:25-573:4, 580:15-17, 633:7-14, 634:5-7, 693:6-11; PX 107 at 0001, 0003; PX 420 at 0004 (February 23, 2010 letter from Konstantino through counsel); PX 423 at 0006. |

81

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| 82. | AngioScore's Board took Konstantino's request to pursue "endovascular bifurcation stents and delivery systems for bifurcation stents" with TriReme very seriously and adopted a formal resolution that granted Konstantino permission to pursue this limited business opportunity and waived AngioScore's rights solely in that particular opportunity. | PX 98; Trial Tr. at 264:6-22. |
| 83. | AngioScore's original Board resolution dated July 26, 2005 only allowed Konstantino to provide advisory services to TriReme and specified that such services would be without compensation. | PX 98 at 0001. |
| 84. | AngioScore later gave Konstantino permission to pursue additional roles at TriReme but never waived its interest in anything other than bifurcation stents. | DX 1014; Trial Tr. at 561:24-562:4, 689:4-690:13, 721:13-722:2, 864:4-8. |
| 85. | Chocolate is not a bifurcation stent. | Trial Tr. at 1322:2-3, 1322:8-9, 1322:14-16. |
| 86. | Konstantino did not offer testimony that contradicted Lisa Suennen's testimony that he told her TriReme would not compete with AngioScore. | Trial Tr. at 689:4-690:13. |
| 87. | Konstantino's claim that he did not believe he needed AngioScore's consent to develop Chocolate is not credible. | PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company.) |

United States District Court
Northern District of California

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| **88.** | On February 10, 2009, Konstantino signed a letter confirming that "[a]s a member of the Company's Board of Directors," he was "of course also . . . subject to fiduciary duties to the Company under applicable law, like all directors." | PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company). |
| **89.** | Immediately before his resignation from AngioScore's Board, Konstantino told AngioScore that "precisely" because he was "keenly aware of [his] obligations as a board member," he approached AngioScore supposedly "before any new project is started." | PX 107 at 0001. |
| **90.** | In late 2006, Feridun Ozdil and Konstantino had an argument and their relationship soured. Despite the conflict of interest, Konstantino remained respected by other members of the board. | Trial Tr. at 1280:14-17; 1281:17-(Konstantino); DX 1993; Trial Tr. at 483:14-484-1 (Raffin); 692:16-21 (Suennen). |
| **91.** | AngioScore had the financial capacity to exploit the Chocolate opportunity. | DX 1199 (AngioScore's December 2009 Monthly Report noting $15.3 million cash on hand). |
| **92.** | Konstantino told potential investors that it would cost between $1.5 million and $5 million to commercialize Chocolate. | PX 547; Trial Tr. at 209:17-211:21; PX 258; PX 78 at 0017. |
| **93.** | Amir Belson, a TriReme Board Member, testified that that $3.5 million to $4 million would be sufficient to commercialize Chocolate and that he had "done things like this for less." | Belson Dep. at 238:12-16, 238:21-23, 239:04-10, 239:13-19; PX 78 at 0017. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| 94. Bleam, AngioScore's Vice President of R&D, testified it would cost AngioScore $1 million to $2 million to develop a "specialty balloon with nitinol over the balloon," with potentially more money needed for more complex versions. | Trial Tr. at 542:23-543:4. |
| 95. Given that AngioScore already had the infrastructure to produce a specialty angioplasty balloon using a nitinol exterior structure, the cost to exploit Chocolate would have been incremental. All the Chocolate's component parts were essentially the same as those of the AngioSculpt. | FF *supra* 27-28; *infra* 106. |
| 96. As of the date of its sale to Spectranetics, AngioScore had spent approximately $100 million developing different varieties of the AngioSculpt. | Trial Tr. at 582:6-15; 593:21-594:14. |
| 97. AngioScore had approximately $17 million cash on hand in October 2009, when Konstantino filed a provisional patent application on Chocolate. | Trial Tr. at 76:4-9; PX 63; PX 64 (October 2009 patent application). |
| 98. AngioScore had in excess of $15 million cash on hand at the end of 2009, just over a month before Konstantino resigned from AngioScore's Board. | PX 621; Trial Tr. at 74:4-75:21; *see also* PX 246 at 0016; Trial Tr. at 213:4-215:6; DX 1199. |
| 99. AngioScore could have exploited the Chocolate opportunity by borrowing the necessary funds. | PX 242 (December 2009 email from Trotter to AngioScore board detailing meeting with Oxford Financial and Oxford's willingness to lend up to $20 million); Trial Tr. at 76:13-79:16. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **100.** In December 2009, Oxford Finance stated a willingness to lend AngioScore up to $20 million, and even more if necessary. | PX 242 (December 2009 email from Trotter to AngioScore board detailing meeting with Oxford Financial and Oxford's willingness to lend up to $20 million). |
| **101.** AngioScore borrowed $10 million from Oxford in late 2010, and an additional $5 million in 2011. | Trial Tr. at 79:4-16. |
| **102.** AngioScore could have exploited the Chocolate opportunity through equity financing. | Trial Tr. at 79:18-80:3 (Andrews Direct), 696:14-697:11 (Suennen Direct). |
| **103.** AngioScore successfully raised "about $111 million" through six different equity rounds, including in 2011. | Trial Tr. at 79:18-80:3. |
| **104.** Psilos, an AngioScore investor with a Board seat, and others invested more money in AngioScore in 2011. | Trial Tr. at 696:14-697:11 (Suennen direct); PX 320 at 0050-0051. |
| **105.** AngioScore could have redirected R&D money it spent to develop the 100mm AngioSculpt in order to exploit the Chocolate opportunity. | Trial Tr. at 91:1-16, 539:15-25, 540:22-541:1, 541:12-20, 579:22-581:2. |
| **106.** AngioScore would not have needed to incur many of the post-commercialization costs that defendants attribute to Chocolate. | PX 214 at 0002; Trial Tr. at 131:6-21, 136:8-137:22, 1170:21-1172:15, 1174:12-1176:17; PX 388. |
| **107.** Several AngioScore Board members, including Konstantino, specifically called out AngioScore's excess sales capacity in responding to the Sarah Lugaric survey. | PX 214 at 0002; *see also* Trial Tr. at 136:8-137:22. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **108.** By taking the Chocolate opportunity for himself, Konstantino placed himself in a position inimical to his duties to AngioScore. | See e.g., FF *infra* 110-162; 200-220. |
| **109.** By taking the Chocolate opportunity for himself, Konstantino did not act in good faith or in the best interest of AngioScore. By taking the Chocolate opportunity for himself, Konstantino placed his own financial interest above AngioScore's. Konstantino did not reasonably believe he was acting in the best interest of AngioScore or in a way that was not adverse to AngioScore. | See e.g., FF *infra* 110-162; 200-220. |
| **110.** Konstantino viewed placing his own interests above AngioScore's interests as acceptable. | Trial Tr. at 133:23-134:1 ("'Q. Did you believe that you had a duty to place AngioScore's commercial interests above your own personal financial interests? A. No, I did not believe that.'"). |
| **111.** While sitting on AngioScore's Board of Directors, Konstantino knew that AngioScore "might be interested" in the Chocolate opportunity. | Trial Tr. at 91:1-16, 161:12-162:4, 164:14-165:17, 166:9-15, 208:24-209:7, 530:5-16, 564:17-565:5, 579:22-581:2, 1012:4-25, 1070:17-1071:25, 1295:19-1296:7; PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board identifying AngioScore as potential partner for Chocolate at p. 12); PX 69; PX 78 at 0018; PX 85; PX 89; PX 197; PX 226; PX 620. |
| **112.** Konstantino profited from taking the Chocolate opportunity for himself. | Trial Tr. 775:5-13; Brosh Dep. At 228:1-5, 14-17, 229:6-14; 235:4-5, 235:21-236:14; 254:25-255:12.; PX 383; PX 388. |

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 113. | AngioScore was harmed by Konstantino's decision to develop Chocolate, because it competes in the same specialty balloon market. | Trial Tr. at 139:20-141:23, 149:13-152:17, 159:7-16, 185:1-186:3, 186:7-189:4, 325:21-24; PX 15 at 0005; PX 66; PX 107; PX 419; PX 420. |
| 114. | While sitting on AngioScore's Board of Directors, Konstantino intended that Chocolate would compete with AngioSculpt. | PX 124 at 0007; PX 125 at 0009; Trial Tr. at 185:1-186:3 (Konstantino admitting that a December 13, 2009 presentation described Chocolate as "[a] step up from scoring," which "refer[s] to AngioScore"); id. at 186:7-189:4 (Konstantino admitting that a November 2009 TriReme presentation made the identical claim regarding reducing dissections that AngioScore makes). |
| 115. | Konstantino claimed that Chocolate was a "step up from scoring" balloons, such as AngioSculpt. | Trial Tr. at 185:1-186:3; PX 15 at 0005. |
| 116. | TriReme's sales force directly compared Chocolate to the AngioSculpt. | Trial Tr. at 343:19-344:7. |
| 117. | TriReme's sales force named AngioSculpt as Chocolate's "closest competitor." | Trial Tr. at 343:19-344:7; PX 127; PX 132 at 0002; PX 143; PX 154. |

United States District Court
Northern District of California

87

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 118. | TriReme used AngioSculpt to set the price of Chocolate, believing it would give Chocolate a competitive advantage. | Trial Tr. 335:9-336:15 (Haig admitting that TriReme targeted "AngioScore accounts" to "get a faster uptick on Chocolate" because these were accounts where "pricing had already been established for specialty balloons"); *id.* at 336:16-340:7 (TriReme setting Chocolate list price at launch in December 2011 to be exactly $25 below the price of AngioSculpt); *id.* at 348:10-349:4 (pricing Chocolate "competitive with other specialty catheters to drive rapid adoption," and listing AngioSculpt and two other balloons); PX 130; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); PX 137 at 0014; PX 143. |
| 119. | Konstantino never disclosed Chocolate to AngioScore, including during his December 2009 conversation with Trotter regarding Glider. | Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 280:1-25, 282:6-283:24, 486:2-487:10, 523:12-16, 571:25-573:4, 633:7-14, 634:5-7, 693:9-11; PX 107 at 0001, 0003; PX 420 at 0004; PX 423 at 0006.<br>Trial Tr. at 136:4-7, 138:7-12, 580:15-17. |
| 120. | While sitting on AngioScore's Board of Directors, Konstantino concealed the Chocolate opportunity from AngioScore. | PX 107 at 0001, 0003; Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 486:2-487:10, 575:19-24, 580:15-17, 633:7-14, 634:5-7, 693:6-11. |
| 121. | While serving on AngioScore's Board, Konstantino did not seek funding from any current AngioScore Board member. | Trial Tr. at 212:25-213:3 (Konstantino). |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **122.** Two days before Konstantino resigned from AngioScore's Board, Konstantino sat through an entire AngioScore Board meeting without disclosing Chocolate to AngioScore. | Trial Tr. at 138:22-139:4, 213:7-15 (Trotter). |
| **123.** After the February 3, 2010 AngioScore Board meeting, Konstantino had a brief discussion with Tom Trotter and told him that he and TriReme were considering pursuing a specialty balloon, and Trotter asked Konstantino to leave. | Trial Tr. at 574:1-19, 602:17-25 (Trotter). |
| **124.** During Konstantino's brief discussion with Trotter on February 3, 2010, Konstantino did not disclose Chocolate or defendants' ongoing development work on a specialty balloon. | Trial Tr. at 138:22-139:19 (Konstantino). |
| **125.** On February 4, 2010, Trotter emailed Konstantino relaying the board's unanimous belief that he should resign. Konstantino emailed AngioScore's Board on February 4, 2010 stating that AngioScore was being "trigger happy" by asking him to resign from AngioScore's Board of Directors. | PX 107; PX 108 at 0002-0003. |
| **126.** Konstantino's February 4, 2010 email to AngioScore's Board stating that AngioScore was being "trigger happy" by asking him to resign from AngioScore's Board was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21 (Konstantino direct, explaining that "around mid-January 2010, I made a decision to pursue this idea"), 152:5-153:4 (same, "Q. . . . [P]rior to . . . your February 5 resignation, you were involved in development work relative to Chocolate? A. Yes, I agree with you.", 153:11-154:21 (same, discussing TriReme employee involvement in Chocolate development); 155:3-156:25 (same), 171:5-172:6 (same, discussing Stanford porcine study), 172:13-173:6 (same), |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| | 883:8-23 (Feld cross, discussing development in fall 2009), 1070:17-1073:1 (Pizarro cross, discussing models), 1078:11-1079:8 (same); PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0002-0003; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **127.** Konstantino emailed AngioScore's Board on February 4, 2010 stating that "TriReme has not made any decision to make such a change and I was giving you very early heads up to something that may take place in the future, or may never happen." | PX 108 at 0002-0003. |
| **128.** Konstantino's February 4, 2010 email to AngioScore's Board stating "TriReme has not made any decision to make such a change and I was giving you very early heads up to something that may take place in the future, or may never happen" was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0002-0003; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **129.** Konstantino spoke to John Sellers on February 4, 2010 and did not disclose Chocolate or that defendants were already developing a specialty balloon. | Trial Tr. at 145:8-14, 271:14-272:4, 272:18-19, 318:18-19; PX 108 at 0001. |
| **130.** Konstantino emailed AngioScore's Board on February 5, 2010 stating that he was "keenly aware of my obligations as a board member and this is precisely why I am coming to Angio[S]core at this juncture; before any new project is started." | PX 108 at 0001-0002. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **131.** Konstantino's February 5, 2010 email to AngioScore's Board stating he was "keenly aware of my obligations as a board member and this is precisely why I am coming to Angio[S]core at this juncture; before any new project is started" was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0001-0002; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **132.** After Konstantino's resigned on February 5, 2010, AngioScore investigated whether Konstantino had done competitive work while on AngioScore's Board. | Trial Tr. at 693:12-694:12; DX 1292 (email from Suennen recounting conversations with Heller and Lynn); DX 1295; PX 419; PX 421; *see also;* DX 1329. |
| **133.** On February 10, 2010, AngioScore sent Konstantino a letter requesting "confirmation" that Konstantino and/or TriReme were not developing a specialty balloon prior to Konstantino's resignation from AngioScore's Board on February 5, 2010. | PX 419 at 0002. |
| **134.** Konstantino knowingly and intentionally misled his counsel and AngioScore in emails and letters in which he denied, among other things, that he or TriReme had engaged in any "development work" on balloons with "specialized features" or that "compete[] with" or "make[] similar claims" to AngioSculpt, and insisting that AngioScore was being "trigger happy." | PX 103 at 0001; PX 107 at 0001, 0003; PX 420 at 0004; PX 423 at 0006; Nguyen Dep. at 38:10-14; *see also* Trial Tr. at 150:11-24, 151:5-153:4, 153:11-154:21, 155:3-156:25, 158:6-159:14, 159:19-161:7, 161:14-162:4, 163:5-164:2, 164:8-13, 167:14-22, 168:6-169:2, 169:8-170:24, 171:5-172:6, 172:13-173:6. |
| **135.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that "TriReme is considering, in the future, the possibility of entering the field of specialized | PX 420 at 0004. |

United States District Court
Northern District of California

| Findings of Fact | | Supporting Evidence |
|---|---|---|
| | balloons." | |
| 136. | Konstantino's February 23, 2010 letter stating that "TriReme is considering, in the future, the possibility of entering the field of specialized balloons" was incorrect because Konstantino and TriReme had made the decision to enter the field of specialized balloons before Konstantino left AngioScore's Board. | Trial Tr. at 141:1-21, 328:6-15; PX 420 at 0004. |
| 137. | In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that "TriReme has not developed any products . . . that competes with AngioScore's products." | PX 420 at 0004. |
| 138. | Konstantino's February 23, 2010 letter stating that "TriReme has not developed any products . . . that competes with AngioScore's products" was incorrect because TriReme began developing Chocolate in 2009 and considered Chocolate a "[d]irect competitor[]" to AngioSculpt. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 185:1-186:6, 193:21-195:6, 883:3-23, 1070:17-1073:1, 1078:11-1079:8; PX 15 at 0005; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 124 at 0007; PX 125 at 0009; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| 139. | In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements." | PX 420 at 0004. |
| 140. | Konstantino's February 23, 2010 | Trial Tr. at 141:1-21, 152:5-15, 153:11- |

| Findings of Fact | Supporting Evidence |
|---|---|
| letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting, or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because Chocolate is a specialty balloon having a nitinol structure surrounding a semi-compliant nylon balloon. | 154:21, 155:3-156:25, 159:7-14, 171:5-172:6, 172:13-173:6, 180:20-25, 325:18-326:10, 326:20-22, 408:23-409:12, 410:5-21, 526:12-19, 575:25-578:3, 579:13-21, 883:8-23, 924:5-17, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| 141.   Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because Konstantino was promoting Chocolate in 2009 as an "ideal platform for drug delivery" in his efforts to obtain financing for his undisclosed project. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 160:20-162:4, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 85 at 0008; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| 142.   Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because TriReme's Vice President of Marketing & Business Development, | Trial Tr. at 163:5-164:2, 164:8-16, 331:3-333:6; PX 222; PX 223; PX 420 at 0004. |

United States District Court
Northern District of California

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| | Christopher Haig, traveled to Germany and met with a drug coating technology company about Chocolate on February 5, 2010. | |
| **143.** | Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because TriReme's contemporaneous documents state that Chocolate has a "[d]ual mechanism of action" whereby the first stage involves "[p]laque disruption by initial metal to plaque contact." | PX 78 at 0010; *see also* Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8, 1083:21-24, 1084:3-1085:18; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **144.** | In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product." | PX 420 at 0004. |
| **145.** | Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 181:1-10, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 189 at 0002; PX 195 at 0001; PX 201 at 0001; PX 211 at 0001; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |

94

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| | and because both AngioSculpt and Chocolate are used for the treatment of peripheral and coronary artery disease by opening occluded blood vessels without leaving metal behind. | |
| **146.** | Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because both AngioSculpt and Chocolate have been cleared by the FDA with overlapping indications for use. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 420:12-20, 883:8-23, 1015:12-16, 1016:8-11, 1070:17-1073:1, 1078:11-1079:8; PX 67 (November 2009 email between Feld and Delos Santos, discussing testing of Chocolate prototypes); PX 72 (December 2009 email discussing coating for Chocolate); PX 74 (December 2009 email between Feld and TriReme employees, including Konstantino, re findings from testing Chocolate prototypes); PX 87 (October 2009 email discussing same); PX 89 (October 2009 email re shorties of Chocolate); PX 90 (November 2009 email re Chocolate prototype production); PX 91 (email re Chocolate development); PX 92 (same); PX 93 (same, referring to "upcoming animal study"); PX 195 at 0001 (AngioScore 510K Summary for AngioSculpt Scoring Balloon Catheter); PX 201 at 0001 (TriReme 510K Summary for Chocolate PTA Balloon Catheter); PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **147.** | Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 422:20-428:5, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; PX 501 (QT Vascular website describing Chocolate product); PX 531 at 0005-0006 (AngioSculpt marketing materials); PX 533 at 0004 (AngioSculpt XL marketing materials); Delos Santos Dep. at |

| Findings of Fact | Supporting Evidence |
|---|---|
| and because both AngioSculpt and Chocolate make similar marketing claims. | 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **148.** Konstantino provided the information for, and approved the contents of, the February 23, 2010 letter to AngioScore's counsel. | Trial Tr. at 150:11-24, 151:5-16; Nguyen Dep. at 38:10-14. |
| **149.** On March 5, 2010, AngioScore sent Konstantino a second letter inquiring whether "Konstantino and/or TriReme evaluated, negotiated, or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" prior to Konstantino's resignation from AngioScore's Board on February 5, 2010. | PX 421 at 0002. |
| **150.** In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products." | PX 423 at 0006. |
| **151.** Konstantino's March 21, 2010 letter stating that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" was intentionally misleading because defendants, particularly TriReme, were evaluating Chocolate prior to February 5, 2010. | Trial Tr. at 168:9-18, 169:8-170:13, 171:5-173:6; PX 18; PX 70; PX 93; PX 423 at 0006. |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **152.** | Konstantino's March 21, 2010 letter stating that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" was intentionally misleading because defendants thought Chocolate was a "[d]irect competitor[]" to AngioSculpt. | PX 125 at 0009; *see also* Trial Tr. at 185:1-186:6, 193:21-195:6; PX 15 at 0005; PX 124 at 0007; PX 423 at 0006. |
| **153.** | In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated AngioScore made "unsubstantiated accusations" that Konstantino "somehow breached his duties as a Board member of AngioScore." | PX 423 at 0006. |
| **154.** | In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that "AngioScore has provided no details to support [] an accusation" that Konstantino has "somehow breached his duties as a Board member of AngioScore." | PX 423 at 0006. |
| **155.** | In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that AngioScore should "refrain from making these unsubstantiated accusations" or "Mr. Konstantino will have no choice but to consider his legal options." | PX 423 at 0006. |
| **156.** | AngioScore sent the February 10, 2010 and March 5, 2010 letters to Konstantino to investigate the "specific details" of Konstantino's development activities prior to his resignation from AngioScore's Board | Trial Tr. at 275:19-276:4, 282:6-283:2, 283:10-24; PX 419; PX 421. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| on February 5, 2010. | |
| **157.** Konstantino's repeated misrepresentations, misdirection, and threats of legal action prevented AngioScore from becoming aware of when defendants began developing Chocolate. | Trial Tr. at 280:1-25, 283:21-24, 522:1-523:16, 633:7-14, 634:5-7. |
| **158.** AngioScore did not file a claim in 2010 because AngioScore did not know that "Chocolate existed at that point" and was intentionally led to believe that no specialty balloon existed. | Trial Tr. at 634:5-7; *see also* Trial Tr. at 271:14-272:4, 272:18-19, 486:5-487:10; 693:9-11. |
| **159.** While serving on AngioScore's Board, Konstantino filed a provisional patent application for Chocolate in October 2009. | Trial Tr. at 200:15-201:10; PX 63; PX 64 (October 2009 patent application). |
| **160.** After receiving two letters from AngioScore's counsel, Konstantino switched patent counsel and filed a second provisional patent application sometime in March 2010 without informing either of his patent lawyers of the substantially similar application from five months earlier. | Trial Tr. at 203:19-206:18; Heslin Dep. at 88:9-18; Shay Dep. at 39:14-19; PX 64 (October 2009 patent application); PX 419; PX 421; PX 422. |
| **161.** By filing a second provisional patent application in March 2010, Konstantino lost five months of patent priority. However, by citing to the second provisional patent application from March 2010 instead of the first provisional patent application from October 2009 in his March 2011 utility patent application, Konstantino ensured that the first provisional patent application from October 2009 | Trial Tr. at 201:15-203:13, 205:2-4; PX 64 (October 2009 patent application); PX 422; PX 427. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| would not become public. | |
| 162. Konstantino's actions with respect to the patent application demonstrate an intent to deceive. | *See* FF *supra* 159-161. |
| 163. TriReme provided substantial assistance to Konstantino's breach of fiduciary duty. | PFF 146-159. |
| 164. Before Konstantino left AngioScore's Board of Directors, TriReme engineers helped develop and build the Chocolate device. Tanhum Feld, in his various roles at TriReme, worked with several TriReme employees to develop Chocolate, including Jayson Delos Santos, a TriReme Senior R&D Engineer, Maria Pizarro, TriReme's Director of R&D, and Gary Binyamin, TriReme's Technology Manager. | PX 109 at 0004 (September 2009 TriReme board meeting presentation containing organizational chart); PX 92 (December 2009 email between TriReme employees and Konstantino relating to design and prototype development for Chocolate); PX 87 (October 2009 email between Feld, Delos Santos, and Konstantino re same); PX 90 (November 2009 email between Feld and Delos Santos re same); Trial Tr. at 850:18-851:5, 863:17-864:15. |
| 165. Konstantino and the TriReme employees who worked on Chocolate referred to themselves as the "Team." | PX 92; Trial Tr. at 156:4-25. |
| 166. The TriReme Chocolate team created prototypes, solved technical issues such as bonding the nitinol cage to the balloon, and tested the device. | PX 87; PX 92; Trial Tr. at 328:23-329:14; 851:16-852:4. |
| 167. Eight TriReme employees attended the January 15, 2010 testing of the Chocolate device at Stanford. | PX 18 at 0002 (recorded attendance at Stanford study, Konstantino included). |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **168.** | In February 2010, Trireme's Vice President of Marketing and Business Development traveled to Germany to meet with a company specializing in drug coating technology about a partnership involving Chocolate. | PX 222; PX 223; Trial Tr. at 331:7-22. |
| **169.** | TriReme repeatedly listed Chocolate as a TriReme product in its presentations in late 2009 and early 2010. | PX 15 at 0005; PX 17 at 0004. |
| **170.** | By February 3, 2010 TriReme had already decided "that Chocolate was going to be brought into the scope of products that TriReme was working on." | Trial Tr. at 328:6-15; PX 80. |
| **171.** | The TriReme Chocolate team worked on Chocolate during TriReme's business hours, via TriReme's email system, using TriReme's engineering templates. | Trial Tr. at 879:17-880:6, 881:5-8, 22-24, 882:14-20; PX 65. |
| **172.** | TriReme had the requisite knowledge for aiding and abetting. | FF *infra* 173-176. |
| **173.** | Konstantino was TriReme's CEO in 2009 and 2010. | PX 109; Trial Tr. at 134:6-8. |

100

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| **174.** | As a co-creator of AngioSculpt and a co-founder of AngioScore, Feld knew AngioScore's line of business, knew that Konstantino was serving on AngioScore's Board, knew that Konstantino owed AngioScore fiduciary duties, knew AngioScore had only granted Konstantino a waiver to pursue bifurcated stents with TriReme, and knew that Chocolate and AngioScore were alternative tools—all while helping Konstantino develop the Chocolate device. | Trial Tr. at 840:25-843:3, 864:4-8 (Feld direct, confirming Feld's knowledge that Konstantino had been granted a waiver from AngioScore for his work with TriReme on Glider), 882:10-13 (confirming Feld's knowledge that Konstantino was on AngioScore's board while developing Chocolate), 879:13-16 (confirming that Feld knew that in such capacity, Konstantino had fiduciary duties to AngioScore); PX 127. |
| **175.** | As a former employee of AngioScore who had worked on AngioSculpt, Maria Pizarro knew AngioScore's line of business, and knew that Konstantino was serving on AngioScore's Board. | Trial Tr. at 1028:12-14, 1028:25-1029:7; 1093:25-1094:3; PX 442. |
| **176.** | GimMoey Ong, TriReme's HR and Marketing Manager, knew Konstantino was on AngioScore's Board, and knew that Chocolate would compete with AngioSculpt. | Trial Tr. at 969:10-21; Ong Dep. at 46:1-7; PX 124 at 0001, 0007; PX 125 at 0001, 0009. |
| **177.** | Proteus Vascular Systems was an unincorporated association founded in 2009 that sought to develop and market the Chocolate device. | PX 124; PX 2 at 0002-0014; Trial Tr. at 241:7-20. |
| **178.** | Proteus consisted of at least three individuals: James Dreher, Konstantino, and Feld. Dreher "led" Proteus, while Konstantino was the Chairman of the Board. | PX 124 at 0002; PX 445. |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 179. | As part of his entrepreneurial practice, Dreher would quickly form a company and raise early money, and sell the company soon thereafter. He applied this model to Chocolate and helped attract potential acquirers. | Trial Tr. at 175:17-19; 1324:8-22; PX 70 at 0001; PX 124. |
| 180. | Konstantino recruited employees, presented Chocolate to the Economic Development Board of Singapore, and sought funds for Proteus. | PX 70; PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 124; Trial Tr. at 239:8-241:1; PX 3. |
| 181. | On January 1, 2010, Konstantino signed a contract as Proteus' Chairman to help raise funds for the Chocolate project. | PX 3; Trial Tr. 242:18-244:11. |
| 182. | Konstantino represented that Quattro was "previously Proteus." | PX 6 at 0002; Trial Tr. at 246:3-9; PX 7. |
| 183. | According to an addendum to the January 10, 2010 fundraising contract Konstantino had signed as Chairman of Proteus, a few months later, [t]he name Proteus Vascular Systems Pte Ltd was changed to Quattro Vascular Pte Ltd." The addendum noted this name change and "Quattro" assumed the role previously held by "Proteus," with its rights and obligations. | PX 7; Trial Tr. at 247:15-248:4. |
| 184. | While still serving on AngioScore's Board, Konstantino held himself out as the Chairman of Proteus and later as a Director at Quattro. | PX 3; Trial Tr. 242:18-244:11; PX 7. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **185.** On January 15, 2010, the company (apparently still known as Proteus at that time) sponsored a study at Stanford involving the Chocolate device. Later that year, the report from the study was released reflecting that "Quattro Vascular Pte Ltd" had sponsored the study. | PX 11; Trial Tr. at 248:5-23. |
| **186.** Quattro formally incorporated in March 2010. James Dreher, Konstantino, and others involved in the organization all agreed to the incorporation. | PX 1 at 0004. |
| **187.** Konstantino and Feld assigned their rights to the Chocolate device to Quattro for a 5% royalty and a cash payment. | Trial Tr. at 237:8-13. |
| **188.** Konstantino and Feld were founders and shareholders of Quattro when they transferred their rights to Chocolate. | PX 1 at 0004-0005. |
| **189.** QT Vascular is the product of a merger between TriReme and Quattro. | PX 43; Trial Tr. at 256:7-21 (Konstantino discussing representation he made on behalf of QT Vascular wherein he stated that "QTV is a result of a merger between Quattro Vascular and TriReme Medical"). |
| **190.** QT Vascular assumed the assets and liabilities of TriReme or Quattro wholesale in the final transaction. | PX 32; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **191.** Momi Brosh, QT Vascular's corporate designee on the relationship among TriReme, Quattro, QT Vascular, stated that QT Vascular took on Quattro's and TriReme's assets and liabilities. | Trial Tr. at 969:22-970:2; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15; PX 32. |
| **192.** While defendants significantly changed the answers of Brosh's 30(b)(6) testimony after the fact, they did not dispute his answers on the above facts, and did not seek to amend his answers on the same. | *See* Dkt. Nos. 593-7; 593-8. Trial Tr. at 1126:6-12, 1127:22-1128:8 (Farwell direct); DX 1746 at 82-83; DX 1652 at 43-45. |
| **193.** Documents describing the terms for the QT Vascular transaction refer to it as a merger. | PX 32 at 0001 (Summary of terms for proposed merger, signed November 5, 2012); Trial Tr. at 252:13-254:23. |
| **194.** The TriReme Board minutes say that TriReme will merge with Quattro. | PX 30 at 0001-0002; Trial Tr. at 251:11-252:12. |
| **195.** Quattro wrote to its shareholders that it will merge with TriReme. | PX 33 (letter to Quattro shareholders dated November 6, 2012, explaining decision to merge, need for merger between TriReme and Quattro, "a merged entity would provide a complete platform for an IPO and a far more compelling story for a potential acquirer"); Trial Tr. 254:24-255:13. |
| **196.** Konstantino described the transaction to form QT Vascular as a merger. | PX 40; Trial Tr. at 255:19-256:6. |
| **197.** QT Vascular presentations state that QT Vascular "is a result of a merger between Quattro Vascular and TriReme Medical." | PX 43 at 0002; Trial Tr. at 256:7-21. |

United States District Court
Northern District of California

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| **198.** | Along with the assets and liabilities of Quattro and TriReme, QT Vascular "acquired 100% of the issued and outstanding capital stock" of Quattro and TriReme and that the "purchase consideration for the acquisition" was "satisfied by the allotment and issuance" of QT Vascular shares, "credited as fully paid." | Trial Tr. at 1328:3-17; PX 45 at 0080; Trial Tr. at 1125:16-23; 1128:5-8; PX 32 at 0001; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15. |
| **199.** | The shareholders of TriReme and Quattro became the shareholders of QT Vascular. | Trial Tr. at 1328:3-17; *see also* PX 45 at 0073. |
| **200.** | AngioScore has experienced financial losses due to Chocolate's entry into the marketplace. | PX 152; PX 164; PX 130; Trial Tr. at 1235:1-1239:20. |
| **201.** | AngioSculpt and Chocolate compete. As a result of defendants' competition and targeted pricing strategy, AngioScore lost share in the specialty balloon market. | PX 15 at 0005; PX 124 at 0007 (Proteus investor document noting AngioScore as potential competitor); PX 127 (February 2011 email between Feld and Konstantino noting AngioSculpt as competitor to Chocolate); PX 130 (October 2011 email between Dreaden, Konstantino, Haig, Benjamin re competitive information on AngioScore's pricing, discussing Chocolate pricing strategy); PX 132 at 0002 (TriReme competitor analysis spreadsheet noting AngioSculpt PTA and PTCA devices compete with Chocolate); PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioScore); PX 137 (December 2011 email re Chocolate noting pricing strategy keyed off of other balloons including AngioSculpt); PX 143 (December 2012 email between Haig and Borrell reflecting Chocolate pricing $25 less per unit than AngioSculpt); PX 154 (March 2013 sales email noting that "the closest |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Findings of Fact | Supporting Evidence |
|---|---|
| | comparable product [to Chocolate] is the AngioSculpt"); PX 164 (June 2013 email between TriReme sales to customer noting that "most clinicians are replacing the use of Scoring/Cutting (AngioScore) devices with Chocolate"); PX 264 at 0163 (Millennium Research Group Report table noting that AngioScore had 12.5% of specialty balloon catheter market share in 2009); PX 294 at 0251 (Millennium Research Group Report table noting that AngioScore had 48.1% of the specialty balloon market share in 2013); Trial Tr. at 159:7-16 (Konstantino direct, noting that "specialty balloon" is a balloon that costs more than an average POBA), 520:3-13 (noting field of competitive specialty balloons consists of AngioSculpt, Chocolate, Vascutrak, and the Cutting Balloon), 185:1-186:3 (Konstantino direct, establishing that Konstantino considered Chocolate competitive ("a step up") with respect to AngioSculpt), 218:6-21 (Konstantino confirming that he utilizes Millennium Research Group reports), 335:9-340:17 (Konstantino direct, re competition between Chocolate and AngioSculpt), 343:19-344:7 (Haig direct, with respect to pricing), 348:10-349:4 (same), 353:18-25 (same, discussing Millennium Research Group report), 355:25-357:1 (Haig, discussing competitive products in specialty balloon market), 571:6-11 (same, discussing metal impressing upon plaque in the case of scoring or cutting balloons), 741:10-17 (Olsen direct, discussing lost profits from the end of 2011 to the end of 2Q14 for AngioScore), 1235:1-1239:20 (Prowse cross, discussing AngioSculpt and Chocolate as competitors occupying the same market). |

106

| | **Findings of Fact** | **Supporting Evidence** |
|---|---|---|
| 202. | The parties' damages experts generally agree on the methodology to calculate AngioScore's lost profits, and used the same numerical values for AngioScore's lost revenue, profit margin, and the applicable discount rate. | Trial Tr. at 1228:5-1229:25 (defendants' expert, Prowse, testifying that the material change in his calculation was with respect to market share percentages; revenue, profits, profit margin, gross profit margin remain the same). |
| 203. | Chocolate and the AngioSculpt products are specialty balloons. | Trial Tr. at 159:7-16, 180:6-8, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 577:25-578:3, 924:5-17; PX 142. |
| 204. | The Chocolate and AngioSculpt products compete with each other in the specialty balloon market. Within the specialty balloon sub-market, there are relatively few players. As of 2013, the Millennium Research Group found the specialty balloon catheter market was primarily occupied by four companies: Boston Scientific, C.R. Bard, Abbott Laboratories, and AngioScore. The market share reflects that AngioScore was in close competition with Boston Scientific and its product, the Cutting Balloon: AngioScore occupied 48.1% of the specialty balloon market and Boston Scientific occupied 47.1%. C.R. Bard held 3.3% of the market with its specialty balloon, the Vascutrak. Abbott Laboratories held only 1.3%. | FF *supra* 200-201; *infra* 205-220. PX 294 at 249-51; PX 142. |
| 205. | Once a doctor decides "to use a specialty balloon for a particular procedure," the competition narrows to just four devices: "the AngioSculpt, the Chocolate, the Vascutrak, and the Cutting Balloon" and a drug-coated balloon, which recently entered the specialty balloon market. | Trial Tr. at 520:3-13; Trial Tr. at 922:11-19, 923:11-18 (Garcia direct). |

United States District Court
Northern District of California

107

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **206.** | AngioScore has lost sales due to Chocolate's entry into the specialty balloon catheter marketplace. | Trial Tr. at 418:18-419:5 (attesting to diversion of resources at AngioScore due to threat from Chocolate); 444:20-445:21 (Viano discussing losing five to ten units a month to Chocolate, including losing sales to Dr. Garcia, defendants' industry expert); PX 152; PX 164 (defendants' email reflecting observation that clinicians were replacing AngioScore devices with Chocolate). |
| **207.** | TriReme used specialty balloons to set their initial prices for Chocolate. | PX 137 at 0014; Trial Tr. at 336:11-15, 339:19-340:7, 340:10-17, 341:16-24, 348:10-349:4. |
| **208.** | TriReme's sales force targeted doctors who used specialty balloons. | PX 164; PX 124 at 0007; PX 130; PX 132 at 0002; PX 137 at 0014; PX 152; PX 154; Trial Tr. at 336:11-15. |
| **209.** | Documents show that TriReme employees stated that AngioScore was Chocolate's "closest competitor." | PX 143; PX 154; PX 132 at 0002; PX 127; Trial Tr. at 343:19-344:7. |
| **210.** | TriReme employees gathered pricing information on AngioScore, and strategically priced Chocolate $25 below AngioSculpt to "get faster uptick" in AngioScore accounts. | PX 130; PX 143; PX 137 at 0014; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); Trial Tr. at 335:14-336:15. |
| **211.** | TriReme's Vice President of Marketing & Business Development regarded AngioScore accounts as "an opportunity for TriReme" because premium "pricing had already been established for specialty balloons." | Trial Tr. 336:11-15. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| 212. POBAs are priced around $150 to $200 per unit. Specialty balloons are priced much higher than that, up to $1000 per unit, depending on length. | Trial Tr. at 412:7-9 (Viano direct). |
| 213. AngioScore and defendants use the Millennium Research Report in the course of their businesses. | Trial Tr. at 218:6-21; 353:18-25; 571:6-18. |
| 214. No trial evidence established that either party used the iData Research Report, nor did Dr. Prowse offer any reason to use the iData Research Report to determine AngioScore's market share. | Trial Tr. at 571:19-23. |
| 215. According to the Millennium Research Reports, AngioScore had between a 39% and 48% of the specialty balloon catheter market between 2011 and 2014. | PX 264 at 163; PX 294 at 251; Trial Tr. at 218:6-21; 353:18-25; 571:6-11. |
| 216. Chocolate made $11,269,00 in revenue from 2011 to 2014. | PX 388; Trial Tr. 742:1-742:7; PX 381 at 0028. |
| 217. Applying AngioScore's market share to Chocolate's revenue, AngioScore lost $5,335,000 in revenue to Chocolate. | Trial Tr. at 757:9-17; PX 264 at 163; PX 294 at 251; Trial Tr. at 218:6-21; 353:18-25; 571:6-11; PX 381 at 0028. |
| 218. AngioScore had profit margins between 55% and 58%. | Trial Tr. at 758:5-760:2; PX 351; PX 369-372; PX 381 at 0028. |
| 219. Applying AngioScore lost revenue shows that AngioScore lost $2.97 million to Chocolate from 2011 to 2014. | Trial Tr. at 741:10-24; PX 381 at 0028. *See also* Trial Tr. at 444:20-445:21 (Viano cross, discussing losing five to ten units a month to Chocolate, including losing sales to Dr. Garcia, defendants' industry expert). |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| 220. | If Chocolate remains on the market through 2019, AngioScore will suffer $17.064 million in lost profits. | Trial Tr. at 759:22-760:2, 772:21-25. |
| 221. | Konstantino received $250,000 by agreeing to an invention assignment agreement of Chocolate. | DX 1435 at 0003. |
| 222. | Konstantino receives a 2.85% royalty on Chocolate sales. | Trial Tr. at 1342:13-22. |
| 223. | Konstantino has 15 million shares of QT Vascular stock. | Trial Tr. at 1336:23-1338:4. |
| 224. | Konstantino has stock options in QT Vascular. | Trial Tr. at 1336:23-25. |

110

# EXHIBIT 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ANGIOSCORE, INC., | Case No. 4:12-CV-3393-YGR |
| Plaintiff, | [PROPOSED] JUDGMENT |
| v. | *AS MODIFIED BY THE COURT* |
| TRIREME MEDICAL, LLC (f/k/a TRIREME MEDICAL, INC.), EITAN KONSTANTINO, QUATTRO VASCULAR PTE LTD., and QT VASCULAR LTD. (f/k/a QT VASCULAR PTE. LTD.), | Trial Date(s): April 13, 2015 September 14, 2015 |
| Defendants. | Hon. Yvonne Gonzalez Rogers |

1    Trial without a jury on the Third Cause of Action for Breach of Fiduciary Duty Under

2    Delaware Law, the Fourth Cause of Action for Aiding and Abetting a Breach of Fiduciary Duty,

3    and the Fifth Cause of Action for Unfair Competition Under California Business and Professions

4    Code § 17200 alleged in the Fourth Amended Complaint (Dkt. No. 244) commenced in this matter

5    on April 13, 2015 and concluded on April 21, 2015.  The Court entered its Findings of Fact and

6    Conclusions of Law on July 1, 2015 (Dkt. No. 665), finding in Plaintiff AngioScore, Inc.'s favor

7    on the Third, Fourth, and Fifth Causes of Action of the Fourth Amended Complaint.  On March 3,

8    2015, the Court granted Plaintiff AngioScore, Inc.'s unopposed oral motion to voluntarily dismiss

9    the Second Cause of Action of the Fourth Amended Complaint.

10    A jury trial on the First Cause of Action alleging Patent Infringement in the Fourth

11    Amended Complaint (Dkt. No. 244) commenced in this matter on September 9, 2015, with jury

12    selection, and on September 14, 2015, with opening statements and evidence.  The jury entered its

13    verdict in Defendants' favor on the First Cause of Action of the Fourth Amended Complaint on

14    September 29, 2015, and the verdict form was duly recorded (Dkt. No. 790).

15    Based on the jury's verdict (Dkt. No. 790), JUDGMENT is hereby ENTERED in favor of

16    Defendants Eitan Konstantino, TriReme Medical, LLC, Quattro Vascular Pte Ltd., and QT

17    Vascular Ltd. on the First Cause of Action in the Fourth Amended Complaint.  Based on the

18    Court's Findings of Fact and Conclusions of Law (Dkt. No. 665), JUDGMENT is hereby

19    ENTERED in favor of Plaintiff AngioScore, Inc. on the Third, Fourth, and Fifth Causes of Action

20    in the Fourth Amended Complaint.

21    It is further ORDERED that:

22    (1)  AngioScore's First Cause of Action is DISMISSED WITH PREJUDICE with respect

23    to claims 4, 5, 6 and 7 of United States Patent No. 7,691,119 (the "'119 patent").

24    (2)  Based on the jury's verdict, Claims 1, 2, 3, 8 and 9 of the '119 patent are not infringed

25    by the accused Chocolate PTA Balloon Catheter products and are invalid.  Accordingly, Plaintiff

26    AngioScore, Inc. is to recover nothing with respect to the First Cause of Action in the Fourth

27    Amended Complaint.

28

1       (3)  Plaintiff AngioScore, Inc. recovers from Defendants Eitan Konstantino, TriReme

2   Medical, LLC, Quattro Vascular Pte Ltd., and QT Vascular Ltd. the amount of $2.97 million in

3   past lost profits and $17.064 million in future lost profits, for a total of $20.034 million, plus pre-

4   judgment interest in the amount of $333,277 calculated by applying the legal rate of interest set

5   forth in 6 Del. C. § 2301(a) compounded monthly to the $2.97 million in past lost profits, plus

6   post-judgment interest at the rate of 0.31% per annum as set forth at 28 U.S.C. § 1961.

7       (4)  Plaintiff AngioScore, Inc. further recovers from Defendant Eitan Konstantino the

8   $250,000 he received pursuant to his Intellectual Property Assignment with Quattro Vascular Pte.

9   Ltd. dated June 1, 2010, the 2.85% royalty on past and future Chocolate sales as set forth in his

10   Intellectual Property Assignment with Quattro Vascular Pte. Ltd. dated June 1, 2010, his shares in

11   QT Vascular stock, his QT Vascular stock options, any and all monies he has collected from sales

12   of QT Vascular stock, any and all monies he has received relative to his royalty share, and any and

13   all monies he has made in connection with his monthly consulting retainer relative to Chocolate,

14   plus pre-judgment interest in the amount of $121,992 calculated by applying the legal rate of

15   interest set forth in 6 Del. C. § 2301(a) compounded monthly to the amounts Defendant Eitan

16   Konstantino received pursuant to his Intellectual Property Assignment with Quattro Vascular Pte.

17   Ltd. through June 30, 2014, plus post-judgment interest at the rate of 0.31% per annum.

18       (5)  Plaintiff AngioScore, Inc. has prevailed in establishing that Defendant Eitan

19   Konstantino breached his fiduciary duties to Plaintiff AngioScore, Inc., that Defendants TriReme

20   Medical, LLC and Quattro Vascular Pte Ltd. aided and abetted that breach, and that Defendant QT

21   Vascular Ltd. is liable for the acts of Defendants TriReme Medical, LLC and Quattro Vascular Pte

22   Ltd.  As the prevailing party on the Third, Fourth, and Fifth causes of action, Plaintiff AngioScore,

23   Inc. is awarded its costs in an amount to be determined in accordance with the procedures set forth

24   in Northern District of California Local Rule 54 to the extent that it can show the costs are related

25   to those causes of action.  Defendants QT Vascular Ltd., Eitan Konstantino, TriReme Medical,

26   LLC, and Quattro Vascular Pte Ltd., have prevailed with respect to the First Cause of Action for

27   Patent Infringement.  As such, the Defendants are awarded costs in an amount to be determined in

28

1  accordance with the procedures set forth in Northern District of California Local Rule 54 to the

2  extent that they can show the costs are related to that cause of action.

3     IT IS SO ORDERED.

4  Dated: October 14, 2015

5                                    Hon. Yvonne Gonzalez Rogers
                                     United States District Judge

# EXHIBIT 4
# NONCONFIDENTIAL

1 | DAVID S. STEUER, State Bar No. 127059
dsteuer@wsgr.com
2 | STEVEN D. GUGGENHEIM, State Bar No. 201386
guggenheim@wsgr.com
3 | DYLAN J. LIDDIARD, State Bar No. 203055
dliddiard@wsgr.com
4 | THOMAS J. MARTIN, State Bar No. 150039
tmartin@wsgr.com
5 | BRIAN DANITZ, State Bar No. 247403
bdanitz@wsgr.com
6 |
WILSON SONSINI GOODRICH & ROSATI
7 | Professional Corporation
650 Page Mill Road
8 | Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
9 | Facsimile: (650) 565-5100

10 | Attorneys for Defendants
TRIREME MEDICAL, LLC,
11 | QUATTRO VASCULAR PTE LTD,
and QT VASCULAR LTD.
12 |

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA

15 | OAKLAND DIVISION

| | |
|---|---|
| 16   ANGIOSCORE, INC., | CASE NO.: 4:12-cv-3393-YGR |
| 17      Plaintiff, | DECLARATION OF RANDAL FARWELL IN SUPPORT OF |
| 18      v. | CORPORATE DEFENDANTS TRIREME MEDICAL, LLC, QUATTRO |
| 19   TRIREME MEDICAL, LLC (f/k/a TRIREME MEDICAL, INC.), EITAN | VASCULAR PTE LTD, AND QT VASCULAR LTD.'S MOTION TO STAY |
| 20   KONSTANTINO, QUATTRO VASCULAR PTE LTD. and QT VASCULAR LTD. (f/k/a | ENFORCEMENT OF JUDGMENT [FED. R. CIV. PROC. 62] |
| 21   QT VASCULAR PTE. LTD.), | Date: November 24, 2015 |
| 22      Defendants. | Time: 2:00 p.m. Hon. Yvonne Gonzalez Rogers |
| 23 | |

24 | REDACTED VERSION OF THE DOCUMENT SOUGHT TO BE SEALED

25 | [NONCONFIDENTIAL]

26

27

28

**[This page contains confidential information that has been redacted]**

1     I, Randal Farwell, declare:

2     1.     I am Chief Financial Officer at QT Vascular Ltd. My duties as Chief Financial
3  Officer include reviewing and drafting the consolidated financial statements of QT Vascular Ltd.,
4  and its subsidiaries, including TriReme Medical, LLC and Quattro Vascular Pte. Ltd. (collectively,
5  the "Company").

6     2.     QT Vascular Ltd. is a venture-backed company that has received periodic funding
7  sufficient to meet the Company's ongoing operating expenses.

8     3.     The Company does not maintain significant cash reserves. The Company's on-
9  hand cash is used to fund its operating expenses, including payroll and materials supporting the
10  manufacture of Chocolate.

11    4.     Excluding the judgment amount in this case, I estimate that the Company's
12  liabilities as of October 9, 2015 total approximately $22.635 million, which include approximately
13  $13.425 million in convertible bond borrowings and financing costs, $4.952 million in accounts
14  payable (including received invoices from product and service suppliers, SG&A expenses, and
15  R&D and clinical expenses), $2.460 million in accrued liabilities (representing unreceived
16  invoices), and $1.798 million in payroll and related liabilities. The Company's creditors include
17  MeKo Laserstrahl Materialbearbeitungen, Emerald Medical Services Pte. Ltd., InnoRa GmbH,
18  CBSET Inc., SurModics Inc., and the Company's convertible bond investors.

19    5.     I estimate that the Company's total unaudited assets as of October 9, 2015 total
20  approximately              , comprising non-current assets of              and current
21  assets of              [1]  Approximately              of these assets consist of cash or cash
22  equivalents. The Company needs this cash to fund ongoing operating expenses, including payroll
23  and materials supporting the manufacture of Chocolate. The Company's remaining assets include
24  non-liquid assets that are also needed to maintain the Company's operations, including intellectual

25  _____

26    [1] A non-current asset is an asset that is either (1) not likely to turn to unrestricted cash
   within one year of the balance sheet date, or (2) not held primarily for "trading" (operational)
27  purposes; e.g., capitalized R&D.

28                                          1

1 ‖ property, laboratory equipment, inventory and work-in-progress. Other assets, such as capitalized
2 ‖ intangibles, are not convertible into cash without a change in control or major sale of operational
3 ‖ assets, i.e., a "liquidity" event.

4 ‖     6.    Because the Company does not maintain cash reserves in excess of short term
5 ‖ operating requirements, and cannot readily sell-off its other assets without impairing its ability to
6 ‖ continue operations, the Company does not have access to sufficient cash to satisfy the judgment or
7 ‖ provide collateral for a bond for the judgment. Any further depletion of the Company's cash
8 ‖ reserves would substantially impair the Company's ability to continue ordinary operations.

9 ‖     7.    In and around April 2015, the Company initiated discussions with multiple lenders,
10 ‖ including Silicon Valley Bank and Oxford Finance, LLC, to finance ongoing operations and the
11 ‖ possible payment of damages in the event of an adverse judgment in this case. In light of the
12 ‖ uncertainty of the litigation, these discussions were suspended by the lenders. Ultimately, the
13 ‖ Company was only able to raise sufficient funds to support ongoing operations in the short term.

14 ‖     8.    I also contacted John Sailer, an independent venture-debt advisor with no pre-
15 ‖ existing relationship with QT Vascular, to explore forms of collateral other than cash to secure a
16 ‖ letter of credit to support the appeal bond, and I learned that a letter of credit would need to be cash
17 ‖ collateralized.

18 ‖     9.    In August and September 2015, Gina La, Director of Finance at TriReme Medical,
19 ‖ LLC, contacted ABD Insurance and Financial Services and Silicon Valley Bank.

20 ‖     10.    On October 6, 2015, I contacted Oxford Finance, LLC to discuss the possibility of a
21 ‖ new financing for the Company. Oxford replied that it is "unable to fund into the financial
22 ‖ uncertainty having to do with litigation." Attached hereto as Exhibit 1 is a true and correct copy of
23 ‖ my e-mail exchange with Killu Sanborn of Oxford Finance, LLC.

24 ‖     11.    Based on this investigation, I determined that to obtain a supersedeas bond, the
25 ‖ Company would need to deposit cash collateral totaling the full amount of the bond. As a result,
26 ‖ the Company cannot feasibly obtain a supersedeas bond in the amount of the judgment without
27 ‖ liquidating substantial assets and impairing the ongoing operations of the Company.

28 ‖                                                                2

1       12.     Because the Company does not have sufficient cash to satisfy the judgment against

2 it in the amount of $20.034 million, an immediate enforcement of the judgment would drive QT

3 Vascular and its subsidiaries into insolvency. In the event of insolvency due to enforcement of the

4 judgment, QT Vascular and its subsidiaries would likely be forced to seek protection of the

5 bankruptcy laws of the United States and their equivalent under the laws of the Republic of

6 Singapore.

7       13.     In light of the Company's inability to obtain a letter of credit, the Company has

8 determined that the following proposed steps may be taken to preserve the status quo during the

9 pendency of the appeal and to post a supersedeas bond as soon as it is practicable:

10           •    A mutually-agreeable Monitor will be appointed to confirm that the Company is

11              maintaining the status quo during the pendency of the appeal;

12           •    The Company will refrain from transferring assets out of the United States except as

13              required in the ordinary course of its existing business; and

14           •    The Company will post a supersedeas bond upon a major sale of operational assets

15              or a change in control of the Company.

16     I declare under penalty of perjury that the foregoing is true and correct.

17     Executed on October 14, 2015 at Pleasanton, California.

18

19

20                              Randal Farwell

21

22

23

24

25

26

27

28                                  3

# EXHIBIT 1

**From:**     Killu Sanborn <KSanborn@oxfordfinance.com>
**Sent:**     Wednesday, October 07, 2015 11:23 AM
**To:**       Randal Farwell
**Subject:**  RE: Quick update from Oxford

Randy,

Thank you for the update. As we discussed on the phone, we have been following the company for a long time, and although we continue to like what we have seen for technology, operationally, and the management caliber, we are unable to fund into the financial uncertainty having to do with litigation. We hope that once you have the litigation completely resolved and behind you, we can resume our financing conversations.

Good luck and kind regards,

Killu

Killu Sanborn, Ph.D.
Oxford Finance, LLC
858 699 8730 c
858 997 1434 o


-------- Original message --------
From: Randal Farwell <rfarwell@trirememedical.com>
Date: 10/06/2015 11:35 AM (GMT-08:00)
To: Killu Sanborn <KSanborn@oxfordfinance.com>
Cc: Eitan Konstantino-Comcast <konsta@comcast.net>
Subject: RE: Quick update from Oxford

Killu,

Would it be possible to connect with you regarding a new financing need that our Company has?

Please feel free to call me (cell # is below) or Eitan.

Thanks,

Randy

Randal H. Farwell
**Chief Financial Officer**
**QT Vascular Ltd**
US Cell: +1 818 281 8323
Tel: +1 925-931-1300
Email: rfarwell@trirememedical.com

**From:** Kirk Andrews [mailto:kandrews@oxfordfinance.com]
**Sent:** Monday, June 01, 2015 3:42 PM
**To:** Eitan Konstantino-Comcast; Eitan Konstantino; Randal Farwell
**Cc:** Killu Sanborn; Garrett Henn
**Subject:** RE: Quick update from Oxford

Eitan and Randal,

Thanks for providing the revised forecast last week. While our review of the debt financing opportunity is substantially complete, I did have a short list remaining topics/questions I wanted to cover further, including:

- Status of litigation with AngioScore
    o Has this concluded or does it remain ongoing?
- Clarify product differentiation vs. AngioScore
    o Pricing/marketing, catheter design/performance (maneuverability, kinking, etc.). It would be helpful to get a little more color here.
- Chocolate Touch for coronary use First in Man trial
    o How many total patients will be enrolled?
    o By when is full enrollment estimated?
    o How long will the follow-up period be and when do you estimate final data?

Perhaps it would be most appropriate to share a follow-up call to discuss these. I can be available anytime tomorrow (Tue), after 1:30p Wed, and anytime Thu. Please let me know when you might have ~20-30 minutes of availability.

Thanks,
Kirk

Kirk Andrews
Director, Credit & Portfolio Mgmt.
Oxford Finance LLC
650 473 3901

---

**From:** Eitan Konstantino [mailto:konsta@Comcast.net]
**Sent:** Wednesday, May 20, 2015 11:39 PM
**To:** Killu Sanborn; Eitan Konstantino; Randal Farwell (rfarwell@trirememedical.com)
**Cc:** Kirk Andrews; Garrett Henn
**Subject:** RE: Quick update from Oxford

Sounds good,
Thx, Eitan

-------- Original message --------
From: Killu Sanborn <KSanborn@oxfordfinance.com>
Date: 2015/05/20 23:08 (GMT-08:00)
To: Eitan Konstantino <ekonstantino@trirememedical.com>, "Randal Farwell (rfarwell@trirememedical.com)" <rfarwell@trirememedical.com>
Cc: Kirk Andrews <kandrews@oxfordfinance.com>, Garrett Henn <ghenn@oxfordfinance.com>
Subject: Quick update from Oxford

Gentlemen,

Just a note with a quick update – we are making good progress in our credit review, and will likely reach out with a few questions. We are aiming to get to the next steps of framing out a potential financing proposal early next week. We hope that works with your timing. Let us know also if there have been any substantive updates since we last spoke so we can include them, if any.

Kind regards,
Killu

Killu Sanborn, Ph.D.
Oxford Finance, LLC
858-699-8730 cell
858-997-1434 office

IMPORTANT: The information contained in this e-mail message is confidential and is intended only for the named addressee(s). If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution, copying, re-use or dissemination of this transmittal is prohibited and may be unlawful. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you have received this transmittal in error, please reply to the sender that you have received the message in error and then delete it. This e-mail and all other electronic communications from Oxford Finance or any of its affiliates and their respective representatives are for informational purposes only, and no such communication is intended by the sender to constitute an electronic signature, electronic record or any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise explicitly indicated.

IMPORTANT  The information contained in this e-mail message is confidential and is intended only for the named addressee(s). If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution, copying, re-use or dissemination of this transmittal is prohibited and may be unlawful  It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you have received this transmittal in error, please reply to the sender that you have received the message in error and then delete it. This e-mail and all other electronic communications from Oxford Finance or any of its affiliates and their respective representatives are for informational purposes only, and no such communication is intended by the sender to constitute an electronic signature, electronic record or any agreement by the sender to conduct a transaction by electronic means  Any such intention or agreement is hereby expressly disclaimed unless otherwise explicitly indicated.

IMPORTANT  The information contained in this e-mail message is confidential and is intended only for the named addressee(s). If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution, copying, re-use or dissemination of this transmittal is prohibited and may be unlawful  It constitutes non-public information intended to be conveyed only to the designated recipient(s)  If you have received this transmittal in error, please reply to the sender that you have received the message in error and then delete it. This e-mail and all other electronic communications from Oxford Finance or any of its affiliates and their respective representatives are for informational purposes only, and no such communication is intended by the sender to constitute an electronic signature, electronic record or any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise explicitly indicated.

# EXHIBIT 5

1  DAVID S. STEUER, State Bar No. 127059
   dsteuer@wsgr.com
2  STEVEN D. GUGGENHEIM, State Bar No. 201386
   guggenheim@wsgr.com
3  DYLAN J. LIDDIARD, State Bar No. 203055
   dliddiard@wsgr.com
4  THOMAS J. MARTIN, State Bar No. 150039
   tmartin@wsgr.com
5  BRIAN DANITZ, State Bar No. 247403
   bdanitz@wsgr.com
6
   WILSON SONSINI GOODRICH & ROSATI
7  Professional Corporation
   650 Page Mill Road
8  Palo Alto, CA 94304-1050
   Telephone:  (650) 493-9300
9  Facsimile:  (650) 565-5100

10 Attorneys for Defendants
   TRIREME MEDICAL, LLC,
11 QUATTRO VASCULAR PTE LTD,
   and QT VASCULAR LTD.

12

13              **UNITED STATES DISTRICT COURT**

14              **NORTHERN DISTRICT OF CALIFORNIA**

15                    **OAKLAND DIVISION**

16 ANGIOSCORE, INC.,                    )   CASE NO.: 4:12-cv-3393-YGR
                                        )
17         Plaintiff,                   )   **DECLARATION OF GINA LA IN**
                                        )   **SUPPORT OF CORPORATE**
18     v.                               )   **DEFENDANTS TRIREME MEDICAL,**
                                        )   **LLC, QUATTRO VASCULAR PTE LTD,**
19 TRIREME MEDICAL, LLC (f/k/a          )   **AND QT VASCULAR LTD.'S MOTION**
   TRIREME MEDICAL, INC.), EITAN        )   **TO STAY ENFORCEMENT OF**
20 KONSTANTINO, QUATTRO VASCULAR        )   **JUDGMENT [FED. R. CIV. PROC. 62]**
   PTE LTD. and QT VASCULAR LTD. (f/k/a )
21 QT VASCULAR PTE. LTD.),              )      **Date:  November 24, 2015**
                                        )      **Time: 2:00 p.m.**
22         Defendants.                  )      **Hon. Yvonne Gonzalez Rogers**
                                        )

23

24

25

26

27

28

I, Gina La, declare:

1.      I am Director of Finance at TriReme Medical, LLC.  My duties as Director of Finance include drafting and reviewing the consolidated financial statements of QT Vascular Ltd., and its subsidiaries, including TriReme Medical LLC and Quattro Vascular Pte. Ltd. (collectively, the "Company").

2.      On or about August 26, 2015, I contacted ABD Insurance and Financial Services ("ABD") to initiate the process of securing a bond for the anticipated appeal by QT Vascular Ltd., Quattro Vascular Pte. Ltd., and TriReme Medical, LLC in this case for the full amount of the expected judgment of $20.034 million plus anticipated interest and costs.  ABD is an insurance brokerage firm with expertise in the underwriting of surety bonds and other financial guarantees.

3.      In the course of investigating whether the Company could secure a bond, ABD requested QT Vascular's financial statements.  On August 27, 2015, I provided ABD with a copy of QT Vascular's unaudited consolidated financial statements for the three and six months ended June 30, 2015 which reflected the Company's most recently reported financial results (the "Q2 Financial Statements").  Attached hereto as Exhibit 1 is a true and correct copy of the Q2 Financial Statements.

4.      On August 27, 2015, I also contacted Silicon Valley Bank ("SVB"), the Company's bank, regarding obtaining an irrevocable letter of credit to secure the bond.

5.      On August 31, 2015, Bryan D. Martin, ABD's Surety Practice Leader, informed me that, based on the size of the bond need relative to the remaining capital and liquidity in the company, in order for ABD to provide an appeal bond of approximately $30,000,000 for the adverse judgement of approximately $20,000,000, ABD "would need substantial collateral that would be close to 100% of the bond amount" and that this "collateral would be in the form of cash or an irrevocable letter of credit from a bank acceptable to the Surety and in a format acceptable to the Surety."  Attached hereto as Exhibit 2 is a true and correct copy of my e-mail exchange with Bryan D. Martin.

1

DECL. OF GINA LA ISO CORP. DEFS.'
MOTION TO STAY ENFORCEMENT OF JUDGMENT
CASE NO.: 4:12-CV-3393-YGR

1    6.    On September 1, 2015, I was informed that SVB would not provide a loan to
2 collateralize the letter of credit and that SVB would only extend the letter of credit if it was fully
3 cash collateralized.

4    7.    On October 1, 2015, SVB confirmed that the letter of credit would need to be
5 secured by cash deposited in a collateral account.  Attached hereto as Exhibit 3 is a true and
6 correct copy of my e-mail exchange with Li Song and Kevin Longo of SVB.

7    8.    The Q2 Financial Statements reported total assets in the amount of $25.939 million,
8 which include non-current assets of $12.455 million and current assets of $13.484 million.

9    9.    The Q2 Financial Statements reported total liabilities in the amount of $6.789
10 million, which include $4.026 million in accounts payable (including received invoices from
11 product and service suppliers, SG&A expenses, and R&D and clinical expenses); $1.439 million in
12 accrued liabilities (representing unreceived invoices); and $1.324 million in payroll and related
13 liabilities.

14    10.    The Q2 Financial Statements reported a total of $4.327 million in cash and cash
15 equivalents.

16    1 declare under penalty of perjury that the foregoing is true and correct.

17    Executed on October 14, 2015 at Pleasanton, California.

18
19
20                                    Gina La

21
22
23
24
25
26
27
28
                                    2

# EXHIBIT 1

**QT Vascular Ltd. and its subsidiaries**

**Unaudited Financial Statements Announcement for the second quarter/three months ended 30/6/2015**

*QT Vascular Ltd. (the "Company") was listed on Catalist of the Singapore Exchange Securities Trading Limited (the "SGX-ST") on 29 April 2014. The initial public offering of the Company was sponsored by PrimePartners Corporate Finance Pte. Ltd. ("PPCF" or the "Sponsor").*

*This announcement has been prepared by the Company and its contents have been reviewed by the Sponsor for compliance with the SGX-ST Listing Manual Section B: Rules of Catalist. The Sponsor has not verified the contents of this announcement.*

*This announcement has not been examined or approved by the SGX-ST. The Sponsor and the SGX-ST assume no responsibility for the contents of this announcement, including the accuracy, completeness or correctness of any of the information, statements or opinions made or reports contained in this announcement.*

*The contact person for the Sponsor is Ms. Gillian Goh, Director, Head of Continuing Sponsorship, at 16 Collyer Quay, #10-00 Income at Raffles, Singapore 049318, telephone +65 6229 8088.*

**Background**

The Company was incorporated in the Republic of Singapore on 6 March 2013 under the Companies Act (Chapter 50) of Singapore as a private company limited by shares under the name of "QT Vascular Pte. Ltd."

The Company was admitted to Catalist Board of the SGX-ST ("Catalist") on 29 April 2014.

1

**PART I INFORMATION REQUIRED FOR QUARTERLY (1Q, 2Q & 3Q), HALF-YEAR (HY) AND FULL YEAR ANNOUNCEMENTS**

**1(a)(i) CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME**

Consolidated statement of comprehensive income (for the group) together with a comparative statement for the corresponding period of the immediately preceding financial year.

| | Group 3 months ended | | |
| --- | --- | --- | --- |
| | 30/6/2015 US$'000 | 30/6/2014 US$'000 | Change |
| Revenue | 3,312 | 3,226 | 2.7% |
| Cost of sales | (2,881) | (3,045) | (5.4)% |
| **Gross profit** | 431 | 181 | 138.1% |
| | | | |
| Sales and marketing | (2,487) | (1,966) | 26.5% |
| Administrative expenses | (2,018) | (2,766) | (27.0)% |
| Research and development expenses | (1,700) | (1,872) | (9.2)% |
| Other income | 4 | – | NM |
| Other expenses | – | (52) | NM |
| **Results from operating activities** | (5,770) | (6,475) | (10.9)% |
| | | | |
| Finance income | 1 | 6 | (83.3)% |
| Finance costs | (605) | (7,025) | (91.4)% |
| **Net finance costs** | (604) | (7,019) | (91.4)% |
| | | | |
| **Loss before tax** | (6,374) | (13,494) | (52.8)% |
| Tax expense | (1) | – | NM |
| **Loss for the period** | (6,375) | (13,494) | (52.8)% |
| | | | |
| **Other comprehensive loss** | | | |
| Item that is or may be reclassified subsequently to profit or loss: | | | |
| Foreign currency translation differences | 792 | 245 | 223.3% |
| **Total comprehensive loss for the period** | (5,583) | (13,249) | (57.9)% |
| | | | |
| **Loss attributable to:** | | | |
| Owners of the Company | (6,375) | (13,494) | (52.8)% |
| **Loss for the period** | (6,375) | (13,494) | (52.8)% |
| | | | |
| **Total comprehensive loss attributable to:** | | | |
| Owners of the Company | (5,583) | (13,249) | (57.9)% |
| **Total comprehensive loss for the period** | (5,583) | (13,249) | (57.9)% |

NM denotes not meaningful

**1(a)(i)  CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME (CONT'D)**

| | Group 6 months ended | | |
|---|---|---|---|
| | 30/6/2015 US$'000 | 30/6/2014 US$'000 | Change |
| Revenue | 6,610 | 6,067 | 8.9% |
| Cost of sales | (4,472) | (5,546) | (19.4)% |
| **Gross profit** | 2,138 | 521 | 310.4% |
| | | | |
| Sales and marketing | (5,707) | (4,169) | 36.9% |
| Administrative expenses | (4,697) | (6,130) | (23.4)% |
| Research and development expenses | (4,132) | (2,815) | 46.8% |
| Other income | 12 | – | NM |
| Other expenses | – | (87) | NM |
| **Results from operating activities** | (12,386) | (12,680) | (2.3)% |
| | | | |
| Finance income | 412 | 7 | NM |
| Finance costs | (1) | (9,994) | (99.9)% |
| **Net finance income/(costs)** | 411 | (9,987) | NM |
| | | | |
| **Loss before tax** | (11,975) | (22,667) | (47.2)% |
| Tax expense | (2) | (1) | NM |
| **Loss for the period** | (11,977) | (22,668) | (47.2)% |
| | | | |
| **Other comprehensive loss** | | | |
| Item that is or may be reclassified subsequently to profit or loss: | | | |
| Foreign currency translation differences | (750) | 216 | NM |
| **Total comprehensive loss for the period** | (12,727) | (22,452) | (43.3)% |
| | | | |
| **Loss attributable to:** | | | |
| Owners of the Company | (11,977) | (22,668) | (47.2)% |
| **Loss for the period** | (11,977) | (22,668) | (47.2)% |
| | | | |
| **Total comprehensive loss attributable to:** | | | |
| Owners of the Company | (12,727) | (22,452) | (43.3)% |
| **Total comprehensive loss for the period** | (12,727) | (22,452) | (43.3)% |

3

**1(a)(ii) Notes to the consolidated statement of comprehensive income**

|  | Group (Second Quarter) | | | Group (Year-To-Date) | | |
|---|---|---|---|---|---|---|
|  | 3 months ended | | | 6 months ended | | |
|  | 30/6/2015 US$'000 | 30/6/2014 US$'000 | % change | 30/6/2015 US$'000 | 30/6/2014 US$'000 | % change |
| Depreciation of property, plant and equipment | (49) | (84) | (41.7)% | (113) | (214) | (47.2)% |
| Gain on disposal of property, plant and equipment | – | 3 | NM | – | 3 | NM |
| Amortization of intangible assets | (173) | (80) | 116.3% | (345) | (159) | 117.0% |
| Exchange (loss)/gain | (605) | (297) | 103.7% | 408 | (452) | NM |
| Equity-settled share based payment transactions | – | (154) | (100.0)% | (36) | (347) | (89.6)% |
| Interest income | 1 | 6 | (83.3)% | 4 | 7 | (42.9)% |
| Interest expense | – | (4,033) | NM | (1) | (4,497) | (99.9)% |

4

## 1(b)(i)  CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

Consolidated statements of financial position (for the issuer and group), together with a comparative statement as at the end of the immediately preceding financial year.

| | Group | | Company | |
|---|---|---|---|---|
| | 30/6/2015 US$'000 | 31/12/2014 US$'000 | 30/6/2015 US$'000 | 31/12/2014 US$'000 |
| **Assets:** | | | | |
| Property, plant and equipment | 910 | 827 | – | – |
| Intangible assets | 11,393 | 9,235 | 39 | 40 |
| Investment in subsidiaries | – | – | 80,047 | 73,232 |
| Other non-current assets | 152 | 201 | – | – |
| **Non-current assets** | 12,455 | 10,263 | 80,086 | 73,272 |
| | | | | |
| Inventories | 6,208 | 6,174 | – | – |
| Trade and other receivables | 2,949 | 3,474 | 2 | 14 |
| Cash and cash equivalents | 4,327 | 20,152 | 2,914 | 11,516 |
| **Current assets** | 13,484 | 29,800 | 2,916 | 11,530 |
| **Total assets** | 25,939 | 40,063 | 83,002 | 84,802 |
| | | | | |
| **Equity:** | | | | |
| Share capital | 133,410 | 133,263 | 133,410 | 133,263 |
| Reserves | (1,536) | (821) | (34,946) | (33,287) |
| Accumulated losses | (112,724) | (100,747) | (16,290) | (15,929) |
| **Total equity** | 19,150 | 31,695 | 82,174 | 84,047 |
| | | | | |
| **Liabilities:** | | | | |
| Loans and borrowings | 7 | 12 | – | – |
| Trade and other payables, including derivatives | 175 | 175 | – | – |
| **Non-current liabilities** | 182 | 187 | – | – |
| | | | | |
| Loans and borrowings | 3 | 1 | – | – |
| Trade and other payables, including derivatives | 6,604 | 8,180 | 828 | 755 |
| **Current liabilities** | 6,607 | 8,181 | 828 | 755 |
| **Total liabilities** | 6,789 | 8,368 | 828 | 755 |
| **Total equity and liabilities** | 25,939 | 40,063 | 83,002 | 84,802 |

5

**1(b)(ii) Aggregate amount of group's borrowings.**

| | Secured | | Unsecured | |
|---|---|---|---|---|
| | 30 June 2015 US$'000 | 31 December 2014 US$'000 | 30 June 2015 US$'000 | 31 December 2014 US$'000 |
| Amount repayable within one year or less or on demand: | | | | |
| Loans and borrowings | 3 | 1 | – | – |
| | 3 | 1 | – | – |

| | Secured | | Unsecured | |
|---|---|---|---|---|
| | 30 June 2015 US$'000 | 31 December 2014 US$'000 | 30 June 2015 US$'000 | 31 December 2014 US$'000 |
| Amount repayable after one year: | | | | |
| Loans and borrowings | 7 | 12 | – | – |
| | 7 | 12 | – | – |

**Details of any collateral**

The loans and borrowings are secured by an office equipment acquired via hire purchase.

6

## 1(c)  CONSOLIDATED STATEMENT OF CASH FLOWS

Consolidated statement of cash flows (for the group), together with a comparative statement for the corresponding period of the immediately preceding financial year.

|  | Note | Group 3 months ended 30/6/2015 US$'000 | 30/6/2014 US$'000 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net loss | | (6,375) | (13,494) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation of property, plant and equipment | | 49 | 84 |
| Amortisation of intangible assets | | 173 | 80 |
| Interest income | | (1) | (6) |
| Interest expense | | – | 4,033 |
| Gain on disposal of property, plant and equipment | | – | (3) |
| Exchange loss | | 605 | 297 |
| Equity-settled share-based payment transactions | | – | 154 |
| Change in fair value of financial instruments | | – | 2,695 |
| | | (5,549) | (6,160) |
| Changes in working capital: | | | |
| - Trade and other receivables | | 386 | 914 |
| - Inventories | | 1,187 | (255) |
| - Other assets | | 21 | (16) |
| - Trade and other payables, including derivatives | | 315 | 447 |
| - Deferred income | | – | (2,488) |
| **Net cash used in operating activities** | | (3,640) | (7,558) |
| **Cash flows from investing activities** | | | |
| Purchase of property, plant and equipment | | (61) | (80) |
| Additions to intangible assets | | (1,726) | (789) |
| **Net cash used in investing activities** | | (1,787) | (869) |
| **Cash flows from financing activities** | | | |
| Repayment of hire purchase creditor | | (1) | – |
| Proceeds from issuance of ordinary shares, net of transactions costs | | – | 40,768 |
| Proceeds from exercise of share options | | – | 2 |
| Proceeds from exercise of warrants | | – | 3,487 |
| **Net cash (used in)/from financing activities** | | (1) | 44,257 |
| Net (decrease)/increase in cash and cash equivalents | | (5,428) | 35,830 |
| Effect of exchange rate changes on cash and cash equivalents | | 50 | – |
| Cash and cash equivalents at beginning of period | | 9,705 | 3,068 |
| **Cash and cash equivalents at end of period** | 1 | 4,327 | 38,898 |

7

**1(c)   CONSOLIDATED STATEMENT OF CASH FLOWS (CONT'D)**

| | Note | Group 6 months ended 30/6/2015 US$'000 | 30/6/2014 US$'000 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net loss | | (11,977) | (22,668) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation of property, plant and equipment | | 113 | 214 |
| Amortisation of intangible assets | | 345 | 159 |
| Interest income | | (4) | (7) |
| Interest expense | | 1 | 4,497 |
| Gain on disposal of property, plant and equipment | | – | (3) |
| Exchange (gain)/loss | | (408) | 452 |
| Equity-settled share-based payment transactions | | 36 | 347 |
| Change in fair value of financial instruments | | – | 5,045 |
| | | (11,894) | (11,964) |
| Changes in working capital: | | | |
| -  Trade and other receivables | | 530 | 198 |
| -  Inventories | | (34) | (1,144) |
| -  Other assets | | 48 | (20) |
| -  Trade and other payables, including derivatives | | (1,142) | 1,754 |
| -  Deferred income | | – | (129) |
| **Net cash used in operating activities** | | (12,492) | (11,305) |
| | | | |
| **Cash flows from investing activities** | | | |
| Purchase of property, plant and equipment | | (208) | (173) |
| Additions to intangible assets | | (2,755) | (1,578) |
| **Net cash used in investing activities** | | (2,963) | (1,751) |
| | | | |
| **Cash flows from financing activities** | | | |
| Repayment of hire purchase creditor | | (2) | – |
| Proceeds from issuance of ordinary shares, net of transactions costs | | – | 40,768 |
| Proceeds from issuance of convertible note, net of transaction costs | | – | 2,500 |
| Proceeds from exercise of share options | | 147 | 2 |
| Proceeds from exercise of warrants | | – | 3,487 |
| **Net cash from financing activities** | | 145 | 46,757 |
| | | | |
| **Net (decrease)/increase in cash and cash equivalents** | | (15,310) | 33,701 |
| Effect of exchange rate changes on cash and cash equivalents | | (515) | – |
| Cash and cash equivalents at beginning of period | | 20,152 | 5,197 |
| **Cash and cash equivalents at end of period** | 1 | 4,327 | 38,898 |

8

**I(e)**     **CONSOLIDATED STATEMENT OF CASH FLOWS (CONT'D)**

Note:

(1)     Cash and cash equivalents are derived from:

|  | Group | |
|---|---|---|
|  | 30 June 2015 US$'000 | 30 June 2014 US$'000 |
| Bank balances | 4,282 | 38,850 |
| Deposits pledged | 45 | 48 |
| Total cash and cash equivalents | 4,327 | 38,898 |

## 1(d)(i) CONSOLIDATED STATEMENT OF CHANGES IN EQUITY

**A statement (for the issuer and group) showing either (i) all changes in equity or (ii) changes in equity other than those arising from capitalization issues and distributions to shareholders, together with a comparative statement for the corresponding period of the immediately preceding financial year.**

| | Attributable to owners of the Company | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Ordinary shares US$'000 | Convertible preference shares US$'000 | Other reserve US$'000 | Reserve for own shares US$'000 | Translation reserve US$'000 | Share-based payment reserve US$'000 | Accumulated losses US$'000 | Total equity US$'000 |
| **Group** | | | | | | | | |
| At 1 April 2014 | 5,529 | 47,404 | (1,368) | (77) | 327 | 3,149 | (75,747) | (20,783) |
| | | | | | | | | |
| **Total comprehensive loss for the period** | | | | | | | | |
| Loss for the period | – | – | – | – | – | – | (13,494) | (13,494) |
| | | | | | | | | |
| Other comprehensive income | – | | | | | | | |
| Foreign currency translation differences | | – | – | – | 245 | – | – | 245 |
| Total comprehensive loss for the period | – | – | – | – | 245 | – | (13,494) | (13,249) |
| | | | | | | | | |
| **Contributions by and distributions to owners** | | | | | | | | |
| Preference shares issued pursuant to exercise of warrants | – | 3,487 | – | – | – | – | – | 3,487 |
| Shares issued pursuant to conversion of preference shares | 50,891 | (50,891) | – | – | – | – | – | – |
| Shares issued pursuant to the initial public offering | 43,775 | – | – | – | – | – | – | 43,775 |
| Shares issued in satisfaction of professional fees | 1,684 | – | – | – | – | – | – | 1,684 |
| Transaction costs pursuant to the initial public offering | (4,691) | – | – | – | – | – | – | (4,691) |
| Shares issued pursuant to conversion of convertible notes | 35,911 | – | – | – | – | – | – | 35,911 |
| Share options exercised | 2 | – | – | – | – | (2) | – | – |
| Share-based payment transactions | – | – | (17) | – | – | 188 | – | 171 |
| Total contributions by and distributions to owners | 127,572 | (47,404) | (17) | – | – | 186 | – | 80,337 |
| At 30 June 2014 | 133,101 | – | (1,385) | (77) | 572 | 3,335 | (89,241) | 46,305 |

## 1(d)(i)  CONSOLIDATED STATEMENT OF CHANGES IN EQUITY (CONT'D)

| | Attributable to owners of the Company | | | | | | |
| | Ordinary shares US$'000 | Other reserve US$'000 | Reserve for own shares US$'000 | Translation reserve US$'000 | Share-based payment reserve US$'000 | Accumulated losses US$'000 | Total equity US$'000 |
|---|---|---|---|---|---|---|---|
| **Group** | | | | | | | |
| **At 1 April 2015** | 133,410 | (1,385) | (77) | (4,399) | 3,534 | (106,349) | 24,734 |
| **Total comprehensive loss for the period** | | | | | | | |
| Loss for the period | – | – | – | – | – | (6,375) | (6,375) |
| **Other comprehensive income** | | | | | | | |
| Foreign currency translation differences | – | – | – | 792 | – | – | 792 |
| **Total comprehensive loss for the period** | – | – | – | 792 | – | (6,375) | (5,583) |
| **Contribution by and distribution to owners** | | | | | | | |
| Share-based payment transactions | – | – | – | – | (1) | – | (1) |
| **Total contribution by and distribution to owners** | – | – | – | – | (1) | – | (1) |
| **At 30 June 2015** | 133,410 | (1,385) | (77) | (3,607) | 3,533 | (112,724) | 19,150 |

## 1(d)(i)  CONSOLIDATED STATEMENT OF CHANGES IN EQUITY (CONT'D)

| Company | Ordinary shares US$'000 | Convertible preference shares US$'000 | Other reserve US$'000 | Reserve for own shares US$'000 | Translation reserve US$'000 | Share-based payment reserve US$'000 | Accumulated losses US$'000 | Total Equity US$'000 |
|---|---|---|---|---|---|---|---|---|
| At 1 April 2014 | 5,529 | 47,404 | (32,373) | (77) | (4) | 2,956 | (8,686) | 14,749 |
| **Total comprehensive loss for the period** | | | | | | | | |
| Loss for the period | – | – | – | – | – | – | (7,652) | (7,652) |
| **Other comprehensive income** | | | | | | | | |
| Foreign currency translation differences | – | – | – | – | 587 | – | – | 587 |
| Total comprehensive loss for the period | – | – | – | – | 587 | – | (7,652) | (7,065) |
| **Contributions by and distributions to owners** | | | | | | | | |
| Preference shares issued pursuant to exercise of warrants | – | 3,487 | – | – | – | – | – | 3,487 |
| Shares issued pursuant to conversion of preference shares | 50,891 | (50,891) | – | – | – | – | – | – |
| Shares issued pursuant to the initial public offering | 43,775 | – | – | – | – | – | – | 43,775 |
| Shares issued in satisfaction of professional fees | 1,684 | – | – | – | – | – | – | 1,684 |
| Transaction costs pursuant to the initial public offering | (4,691) | – | – | – | – | – | – | (4,691) |
| Shares issued pursuant to conversion of convertible notes | 35,911 | – | – | – | – | – | – | 35,911 |
| Share options exercised | 2 | – | – | – | – | (2) | – | – |
| Share-based payment transactions | – | – | (17) | – | – | 35 | – | 18 |
| Total contributions by and distributions to owners | 127,572 | (47,404) | (17) | – | – | 33 | – | 80,184 |
| At 30 June 2014 | 133,101 | – | (32,390) | (77) | 583 | 2,989 | (16,338) | 87,868 |
| At 1 April 2015 | 133,410 | – | (32,390) | (77) | (7,429) | 3,534 | (15,144) | 81,904 |
| **Total comprehensive loss for the period** | | | | | | | | |
| Loss for the period | – | – | – | – | – | – | (1,146) | (1,146) |
| **Other comprehensive income** | | | | | | | | |
| Foreign currency translation differences | – | – | – | – | 1,417 | – | – | 1,417 |
| Total comprehensive loss for the period | – | – | – | – | 1,417 | – | (1,146) | 271 |
| **Contribution by and distribution to owners** | | | | | | | | |
| Share-based payment transactions | – | – | – | – | – | (1) | – | (1) |
| Total contribution by and distribution to owners | – | – | – | – | – | (1) | – | (1) |
| At 30 June 2015 | 133,410 | – | (32,390) | (77) | (6,012) | 3,533 | (16,290) | 82,174 |

(Header spanning: Attributable to owners of the Company)

**1(d)(ii) CHANGES IN COMPANY'S SHARE CAPITAL**

**Details of any changes in the company's share capital arising from rights issue, bonus issue, share buybacks, exercise of share options or warrants, conversion of other issues of equity securities, issue of shares for cash or as consideration for acquisition or for any other purpose since the end of the previous period reported on. State also the number of shares that may be issued on conversion of all the outstanding convertibles as well as the number of shares held as treasury shares, if any, against the total number of issued shares excluding treasury shares of the issuer, as at the end of the current financial period reported on and as at the end of the corresponding period of the immediately preceding financial year.**

Ordinary Share Capital

Since the last financial period ended 31 March 2015, there has been no change in the issued and paid-up share capital of the Company (766,306,009 shares) up to 30 June 2015.

Outstanding Options

The Group was formed following the restructuring exercise pursuant to which TriReme Medical LLC ("TriReme US") and Quattro Vascular Pte. Ltd. ("Quattro") became wholly owned subsidiaries of the Group (the "Restructuring Exercise").

Prior to the Restructuring Exercise, TriReme US had in 2005, adopted the 2005 Stock Plan to allow TriReme US to grant options to purchase shares in TriReme US to its employees, directors and consultants (each, as defined under the 2005 Stock Plan) and Quattro had in 2010, adopted the 2010 Equity Incentive Plan to allow Quattro to grant options to purchase shares in Quattro to its employees, directors and consultants (each, as defined under the 2010 Equity Incentive Plan). Subsequently, the Company had in 2013, adopted the QTV 2013 Share Plan to allow the Company to grant options to purchase shares in the Company to employees, directors and consultants (each, as defined under the QTV 2013 Share Plan).

Pursuant to the Restructuring Exercise, the Company had on 9 April 2014, assumed the options under the 2005 Stock Plan and 2010 Equity Incentive Plan. Following the close of placement of shares in relation to the IPO on 25 April 2014, the Company had ceased the issuance of options under the 2005 Stock Plan, 2010 Equity Incentive Plan and QTV 2013 Share Plan (collectively, the "Three Share Plans").

The Company also had on 9 April 2014, adopted the 2014 QTV Employee Share Option Scheme and has not issued any options under this scheme as at the date of this announcement.

On 9 April 2014, the Company undertook a subdivision of 1 ordinary share into 16 ordinary shares.

For the three months ended 30 June 2015, no ordinary shares were issued in respect of the options under the Three Share Plans as there were no exercise of share options during the period.

A reconciliation of outstanding share options from 1 April 2015 to 30 June 2015 is as follows:

| Outstanding Options | Number of Options |
|---|---|
| At 1 April 2015 | 104,401,030 |
| Forfeited during the period | (1,546,244) |
| Exercised during the period | − |
| Granted during the period | − |
| At 30 June 2015 | 102,854,786 |

As of 30 June 2015, there are 102,854,786 outstanding options convertible into 102,854,786 ordinary shares, representing approximately 13.4% of the existing ordinary share capital as at 30 June 2015 (30 June 2014: 116,690,586 (15.4% of the ordinary shares as at 30 June 2014).

For further details on the Three Share Plans, please refer to the Company's offer document dated 16 April 2014.

The Company also had on 30 April 2015, adopted the QT Vascular Restricted Share Plan 2015 and has not issued any awards under this plan as at the date of this announcement.

**Treasury Shares**

The Company held no treasury shares as at 30 June 2015 and as at 30 June 2014.

Save as disclosed above, there were no other outstanding convertibles or treasury shares held by the Company as at 30 June 2015 and as at 30 June 2014.

1(d)(iii)  NUMBER OF ISSUED SHARES

**To show the total number of issued shares excluding treasury shares as at the end of the current financial period and as at the end of the immediately preceding year.**

The total number of issued ordinary shares was 766,306,009 as at 30 June 2015 and 760,128,260 as at 31 December 2014.

The Company held no treasury shares as at 30 June 2015 and 31 December 2014.

1(d)(iv) TREASURY SHARES

**A statement showing all sales, transfers, disposal, cancellation and/or use of treasury shares as at the end of the current financial period reported on.**

Not applicable. There were no sales, transfers, disposals, cancellation and/or use of treasury shares during and as at the end of the current financial period reported on.

2.  **Whether the figures have been audited or reviewed in accordance with which auditing standard or practice.**

The figures have not been audited or reviewed by the Company's auditors.

3. **Where the figures have been audited or reviewed, the auditors' report (including any qualifications or emphasis of a matter).**

Not applicable.

4. **Whether the same accounting policies and methods of computation as in the issuer's most recently audited annual financial statements have been applied.**

Save as disclosed in Paragraph 5 below, the Group has applied the same accounting policies and methods of computation in the financial statements for the current reporting period as compared to those used in the most recently audited annual financial statements for the financial year ended 31 December 2014.

5. **If there are any changes in the accounting policies and methods of computation, including any required by an accounting standard, what has changed, as well as the reasons for and the effect of, the change.**

The Group has applied the same accounting policies and methods of computation in the preparation of financial statements for the current financial period compared with the most recently audited financial statements for the financial year ended 31 December 2014, except for the adoption of the Financial Reporting Standards ("FRSs") and Interpretation of FRS ("INT FRS") that are mandatory for financial years beginning on or after 1 January 2015. The adoption of these new FRS and INT FRS has no material impact to the results of the Group and of the Company for the current period reported on.

6. **EARNINGS PER SHARE**

Earnings per ordinary share of the group for the current financial period reported on and the corresponding period of the immediately preceding financial year, after deducting any provision for preference dividends.

| Group | 3 months ended 30/6/2015 Basic and diluted [1] | 3 months ended 30/6/2014 Basic and diluted [1] |
|---|---|---|
| Loss for the period attributable to owners of the Company (US$'000) | (6,375) | (13,494) |
| Weighted average number of ordinary shares used to compute loss per share ('000) | 766,307 | 656,477 |
| Loss per share (US$) | (0.01) | (0.02) |

Note:

(1)    The basic and diluted loss per share were the same as the potential ordinary shares are anti-dilutive as the effect of the share conversions would be to decrease the loss per share.

7.    NET ASSET VALUE FOR ISSUER AND GROUP

Net asset value (for the issuer and group) per ordinary share based on the total number of issued shares excluding treasury shares of the issuer at the end of the:

(a)    current financial period reported on; and
(b)    immediately preceding financial year.

| | Group | | Company | |
|---|---|---|---|---|
| | 30/6/2015 US$ | 31/12/2014 US$ | 30/6/2015 US$ | 31/12/2014 US$ |
| Net asset value per ordinary share [1],[2] | 0.03 | 0.04 | 0.11 | 0.11 |

Notes:

(1)    The net asset value per ordinary share of the Group is calculated based on net assets of US$19.2 million as at 30 June 2015 (31 December 2014: US$31.7 million). The net asset value per ordinary share of the Company is calculated based on net assets of US$82.2 million as at 30 June 2015 (31 December 2014: US$84.0 million).

(2)    For both the Group and the Company, the net asset value per ordinary share were calculated based on 766,306,009 ordinary shares in issue as at 30 June 2015 and 760,128,260 as at 31 December 2014.

8.    REVIEW OF PERFORMANCE OF THE GROUP

A review of the performance of the group, to the extent necessary for a reasonable understanding of the group's business. It must include a discussion of the following:

(a)    any significant factors that affected the turnover, costs, and earnings of the group for the current financial period reported on, including (where applicable) seasonal or cyclical factors; and

(b)    any material factors that affected the cash flow, working capital, assets or liabilities of the group during the current financial period reported on.

CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

*Three months ended 30 June 2015 compared to the three months ended 30 June 2014*

The breakdown of our revenue derived from the sale of our products to the various geographical regions and by the number of units sold for the three months ended 30 June 2015 ("2Q2015") and for the three months ended 30 June 2014 ("2Q2014") are presented below:

| | Three Months Ended 2Q2015 | | Three Months Ended 2Q2014 | |
|---|---|---|---|---|
| | US$'000 | % | US$'000 | % |
| United States | 2,894 | 87.4 | 3,096 | 96.0 |
| Europe | 93 | 2.8 | 82 | 2.5 |
| Asia | 325 | 9.8 | 48 | 1.5 |
| | 3,312 | 100 | 3,226 | 100 |

| | Three Months Ended 2Q2015 | Three Months Ended 2Q2014 |
|---|---|---|
| Units sold | 7,513 | 8,321 |

Our revenue increased by US$0.1 million, or 2.7%, from US$3.2 million in 2Q2014 to US$3.3 million in 2Q2015. The increase was mainly due to an increase in sales to our Asia distributors for our Chocolate® PTA Balloon Catheter ("Chocolate PTA") and Glider PTCA Balloon Catheter ("Glider PTCA") products as well as by our direct sales team for our Chocolate® PTCA Balloon Catheter ("Chocolate PTCA") and Glider PTCA following a 241.1% increase in average sales per sales representative of US$31,761 in 2Q2015 as compared to US$9,311 in 2Q2014.

The increase is partially offset by the decrease in sales to Cordis in 2Q2015 as Cordis had made a larger purchase of Chocolate PTA in 2Q2014 as they were building up their inventory following the commencement of sales of Chocolate PTA by Cordis in 2Q2014.

Cost of sales decreased by approximately US$0.1 million, or 5.4%, from US$3.0 million in 2Q2014 to US$2.9 million in 2Q2015 mainly due to lower sales to Cordis in 2Q2015.

As a result of the above, our Group recorded a gross profit of US$0.4 million or 13.0% of revenue in 2Q2015 as compared to a gross profit of US$0.2 million or 5.6% of revenue in 2Q2014.

Our loss before taxation decreased by US$7.1 million or 52.8%, from US$13.5 million 2Q2014 to US$6.4 million in 2Q2015. The analysis of the loss before taxation are as follows:

- Our sales and marketing expenses increased by US$0.5 million, or 26.5% from US$2.0 million in 2Q2014 to US$2.5 million in 2Q2015 mainly due to an increase in cost of our direct sales personnel in 2Q2015 following the increase in number of sales personnel at the end of 4Q2014.

- Our administrative expenses decreased by approximately US$0.8 million, or 27.0%, from US$2.8 million in 2Q2014 to US$2.0 million in 2Q2015 is mainly attributable to the absence of IPO costs in 2Q2015. The decrease is partially offset by the increase in legal fees for 2Q2015.

- Our research and development expenses decreased by approximately US$0.2 million from US$1.9 million in 2Q2014 to US$1.7 million in 2Q2015. The decrease is due to US$3.4 million of research and development expenses incurred in 2Q2015, offset by the capitalization of development expenses of US$1.7 million in 2Q2015. The Group capitalized a lower amount of US$0.8 million of development expenses in 2Q2014 to intangible assets.

- We were in a net finance cost position of US$0.6 million for 2Q2015, as compared to a net finance cost position of US$7.0 million in 2Q2014 which was mainly due to the fair value loss on financial instruments of US$2.7 million and interest expenses on the accretion expense incurred on our convertible notes of US$4.0 million in 2Q2014. There were no such fair value loss recorded in 2Q2015 as the financial instruments have been converted to ordinary shares following the Company's IPO in 2Q2014. The fair value loss or gain on financial instruments are non-cash in nature, and were recorded at fair value through profit or loss as required in accordance with FRS. In

2Q2015, the Group recorded a foreign exchange loss of US$0.6 million as compared to a foreign exchange loss of US$0.3 million in 2Q2014 pursuant to exchange rate changes between the Singapore dollar and United States dollar.

- Amortisation of intangible assets increased by US$93,000, or 116.3% from US$80,000 in 2Q2014 to US$173,000 in 2Q2015 mainly due to the amortisation of Chocolate PTA and Chocolate PTCA capitalised costs.

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

|  | As at 30 June 2015 US$'000 | As at 31 December 2014 US$'000 | Change % |
|---|---|---|---|
| Non-current assets | 12,455 | 10,263 | 21.4% |
| Current assets | 13,484 | 29,800 | (54.8)% |
| Total assets | 25,939 | 40,063 | (35.3)% |
| Total equity | 19,150 | 31,695 | (39.6)% |
| Non-current liabilities | 182 | 187 | (2.7)% |
| Current liabilities | 6,607 | 8,181 | (19.3)% |
| Total liabilities | 6,789 | 8,368 | (18.9)% |

The Group had working capital of US$6.9 million and US$21.6 million as at 30 June 2015 and 31 December 2014 respectively. The decrease in working capital is mainly due to utilisation of Group's cash for general working capital purposes and professional fees incurred relating to the litigation with AngioScore as well as for the research and development of new products.

Our non-current assets increased by US$2.2 million from US$10.3 million as at 31 December 2014 to US$12.5 million as at 30 June 2015 was mainly due to the increase in intangible assets of US$2.2 million. The increase in intangible assets was due to the capitalization of research and development expenses.

Our current assets decreased by US$16.3 million from US$29.8 million as at 31 December 2014 to US$13.5 million as at 30 June 2015 mainly due to the decrease in cash and cash equivalents of US$15.8 million following the increase in research and development expenses and general working capital requirements such payments to our suppliers, professional fees relating to the litigation with AngioScore and staff costs as well as the decrease in trade and other receivables of US$0.5 million due to reduction in prepayments.

Our current liabilities decreased by US$1.6 million from US$8.2 million as at 31 December 2014 to US$6.6 million as at 30 June 2015 mainly due to settlement of balances due to suppliers of US$1.6 million.

CONSOLIDATED STATEMENT OF CASH FLOWS

*Cash Flow Analysis 2Q2015*

The Group recorded cash outflows from operating activities of US$3.6 million for 2Q2015 which was a result of an operating loss before working capital changes of US$5.5 million and a decrease in working capital changes of US$1.9 million. The decrease in working capital changes was mainly due to the decrease in inventories of US$1.2 million and, trade and other receivables of US$0.4 million as well as an increase in trade and other payables, including derivatives of US$0.3 million.

Cash used in investing activities for 2Q2015 was US$1.8 million which was mainly due to additions to property, plant and equipment of approximately US$0.1 million and intangible assets pertaining to developed technology of approximately US$1.7 million.

In 2Q2015, there were no significant net cash inflow or outflow items from financing activities.

*Cash Flow Analysis 2Q2014*

The Group recorded cash outflows from operating activities of US$7.6 million for 2Q2014 which was a result of an operating loss before working capital changes of US$6.2 million and an increase in working capital changes of US$1.4 million. The increase in working capital changes was mainly due to a decrease in deferred income of US$2.5 million following the fulfilment of our obligations under the distribution agreement with Cordis and increase in inventories of US$0.3 million. The decrease was partially offset by a US$0.9 million decrease in trade and other receivables due to an improvement in collection from trade debtors and US$0.4 million in trade and other payables (including derivatives).

Cash used in investing activities for 2Q2014 was US$0.9 million which was mainly due to additions to intangible assets pertaining to developed technology of approximately US$0.8 million.

In 2Q2014, net cash inflow derived from financing activities was US$44.3 million which was mainly due to net proceeds received from the exercise of warrants and the issue of share capital pursuant to the Company's IPO.

9.    **FORECAST AND PROSPECT STATEMENT**

**Where a forecast, or a prospect statement, has been previously disclosed to shareholders, any variance between it and the actual results.**

Not applicable. No forecast or prospect statement had been issued for the current financial reporting period.

10.    **SIGNIFICANT TRENDS AND COMPETITIVE CONDITIONS OF THE INDUSTRY**

**A commentary at the date of the announcement of the significant trends and competitive conditions of the industry in which the group operates and any known factors or events that may affect the group in the next reporting period and the next 12 months.**

The rapid adoption of drug-coated balloons ("DCBs") continues, especially in the United States, where two products in this category have been approved by the FDA since late last year. This adoption is supported by strong clinical data from multi-center clinical trials and has

now been recognized by the granting of supplemental reimbursement by the US governmental insurance program known as Medicare. While the detailed impact on the overall market is still coming into focus, some early trends are emerging. CR Bard, manufacturer of the Lutonix drug-coated balloon, recently announced in an analysts' call that its peripheral balloon product line sales were up 45%, primarily due to the impact of Lutonix. This also reflected in their recently announced partnership with Boston Scientific Corporation for distribution of the Lutonix DCB. In the United States alone, some analysts are now estimating that DCBs are already reaching US$140 million to US$160 million on an annualized basis. Conversely, other existing product lines have experienced a flattening of growth or actual sales decline due to the introduction of DCBs. In the same recent analysts' call, CR Bard announced that their peripheral stent business declined 3%. Similarly, Spectranetics announced that sales of its specialty balloon, Angiosculpt, are flat in the United States. We expect other peripheral stent makers and specialty balloons to reflect similar market trends. As such, the Group may experience some softening of Chocolate PTA sales through its US distributor, Cordis. While this may slow down overall sales growth for the Group in the near-term, this is expected to be counterbalanced by expected approval of the Group's peripheral DCB, Chocolate Touch, in Europe and Chocolate PTA in Japan later this year. In the longer-term, the continued growth of the DCB market increases the potential held by Chocolate Touch as it progresses toward United States' FDA approval.

<u>AngioScore Inc. ("AngioScore") litigation</u>

In relation to the State Law Claims (pertaining to the breach of fiduciary duty), the trial court had on 1 July 2015 awarded damages of US$20.034 million jointly and severally against Dr. Eitan Konstantino, the CEO of the Group, Quattro Vascular Pte Ltd ("Quattro Vascular"), TriReme Medical, LLC ("TriReme") and the Company (collectively the "Defendants").

The other litigation filed by AngioScore, i.e. the Patent Trial, is currently estimated to commence in September 2015. Only after a decision on the Patent Trial is reached can the judgement relating to both the State Law Claims and Patent Trial be entered by the Court.

The Defendants have been advised by their US counsel that they have multiple grounds for appeal against the trial court decision on the State Law Claims and such appeal will be made to the appeal court after judgement is entered by the Court as mentioned above. AngioScore is currently not able to commence the claim process until 14 days after the US$20.034 million judgement is entered by the Court. Pending the conclusion of the appeal and final resolution of the State Law Claims, the Defendants will not be making any payments to AngioScore.

Based on the facts above, management is unable to reliably estimate the amount of obligation owed to AngioScore in the respective financial statements of Quattro Vascular, TriReme and the Company for the period ended 30 June 2015. Accordingly, no provision on the damages has been made to the financial statements of the Group for the period ended 30 June 2015.

11.   **IF A DECISION REGARDING DIVIDEND HAS BEEN MADE:**

   **(a) Whether an interim (final) ordinary dividend has been declared (recommended); and**

   No dividends have been declared or recommended for the current reporting period.
   **(b) (i) Amount per share (cents)**

   Not applicable.

(b) (ii) Previous corresponding period (cents)

    Not applicable

(c) **Whether the dividend is before tax, net of tax or tax exempt. If before tax or net of tax, state the tax rate and the country where the dividend is derived. (If the dividend is not taxable in the hands of the shareholders, this must be stated).**

    Not applicable.

(d) **The date the dividend is payable**

    Not applicable.

(e) **Books closure date**

    Not applicable.

**12. IF NO DIVIDEND HAS BEEN DECLARED/RECOMMENDED, A STATEMENT TO THAT EFFECT**

    No dividends have been declared or recommended for the current reporting period.

**13. INTERESTED PERSONS TRANSACTIONS**

**If the Group has obtained a general mandate from shareholders for the IPTs, the aggregate value of such transactions as required under Rule 920(1)(a)(ii). If no IPT mandate has been obtained, a statement to that effect.**

There was no interested persons transactions which are S$100,000 or more entered into during the current financial period reported on.  The Group does not have a general mandate for recurrent interested persons transactions.

**14. USE OF PROCEEDS**

<u>Initial Public Offering ("IPO")</u>

Pursuant to the IPO, the Company received gross proceeds of S$55,000,000 ("IPO Proceeds"). As at the date of this announcement, the IPO proceeds has been utilized as follows:

| | Amount allocated S$'000 | Amount utilised S$'000 | Balance S$'000 |
|---|---|---|---|
| Commercial expansion [(1)] | 5,000 | 5,000 | – |
| Development of new products and product enhancements | 15,000 | 15,000 | – |
| General working capital purposes [(2)] | 30,282 | 30,282 | – |
| Listing expenses | 4,718 | 4,718 | – |
| Total | 55,000 | 55,000 | – |

21

Notes:

(1)  Commercial expansion includes marketing activities, expenses incurred in entering into further supplier and distributorship agreements, market expansion activities and costs of our sales force.

(2)  A breakdown on the proceeds utilized for general working capital purposes is as follows:

|  | S$'000 |
|---|---|
| Payment of salaries and wages | 10,978 |
| Payment to suppliers | 9,778 |
| Payment of professional fees | 9,526 |
| Total | 30,282 |

The above utilizations are in accordance with the intended use of IPO proceeds, as stated in the Offer Document.

Convertible Bonds

The Company has announced a proposed issue of convertible bonds of up to US$13.14 million (the "Bonds") on 24 July 2015. On 6 August 2015, the Company announced the completion of the subscription of the first tranche of the Bonds amounting to US$5.475 million.

No proceeds arising from the first tranche of the Bond have been utilised as at the date of this announcement.

**15.  NEGATIVE CONFIRMATION PURSUANT TO RULE 705(5) OF LISTING MANUAL**

The Board of Directors of the Company ("Board") confirms that to the best of their knowledge, nothing has come to the attention of the Board which may render the unaudited interim financial results for the 3 months and 6 months ended 30 June 2015 to be false or misleading in any material aspect.


**BY ORDER OF THE BOARD**
**Eitan Konstantino**
**Chief Executive Officer**
12 August 2015

22

# EXHIBIT 2

**From:**          Bryan Martin <bryanm@theabdteam.com>
**Sent:**          Monday, August 31, 2015 4:40 PM
**To:**            Gina Huynh
**Subject:**       RE: Surety Bond  for $20M +

Gina,

Per our conversation, in order for us to provide an Appeal bond of approximately $30,000,000 for the adverse judgement of approximately $20,000,000, we would need substantial collateral that would be close to 100% of the bond amount.  This collateral would be in the form of cash or an irrevocable letter of credit from a bank acceptable to the Surety and in a format acceptable to the Surety.  If the collateral were to be in cash form, the cash would earn interest on your behalf unless it was needed to pay the ultimate judgement.  Whatever amount of collateral that was not used to pay the judgement would be returned in a timely manner.

This underwriting determination is based on the size of the bond need, relative to the remaining capital and liquidity in the company.  If there are other sources of equity and liquidity that can bolster the financials, that could reduce the required collateral amount and potential premium for the bond.

Please let me know if you have any questions.  I will continue to make efforts on your behalf, but I did not want to delay in providing you with feedback.  Thank you.

Bryan D. Martin, MBA, CFA, CRIS
Surety Practice Leader, SVP
ABD Insurance and Financial Services
3 Waters Park Drive, Bulding 3, Suite 100
San Mateo, CA  94403
415-302-4309 (work/cell)
650-488-8566 (fax)
BryanM@theabdteam.com



No coverage is bound until confirmed in writing by the issuing insurer or an authorized ABD Insurance and Financial Services representative. This communication, including attachments, is for the exclusive use of the intended recipient. If you are not the intended recipient, please notify the sender immediately, delete this communication, and destroy all copies. Thank you!

**From:** Gina Huynh [mailto:ghuynh@trirememedical.com]
**Sent:** Thursday, August 27, 2015 10:41 AM
**To:** Bryan Martin <bryanm@theabdteam.com>
**Subject:** RE: Surety Bond for $20M +

Hi Bryan,
Sorry I didn't forward the information yesterday.

Please find attached the "Proposed Form of Judgment" and Q2'15 Financial Results.  For additional financial information, please go to www.sgx.com and the symbol for QT Vascular Ltd is 5I0 (#5 and letter I and a zero).  I also attached the link below:

http://www.sgx.com/wps/portal/sgxweb/home/company_disclosure/stockfacts?code=5I0

Thanks for the quick response.

Gina La Huynh
Director of Finance
Trireme Medical
925-931-1300 x 285

---

**From:** Bryan Martin [mailto:bryanm@theabdteam.com]
**Sent:** Thursday, August 27, 2015 10:01 AM
**To:** Gina Huynh
**Subject:** RE: Surety Bond for $20M +

Gina,

Thank you very much for reaching out, and thank you for your time on the phone yesterday. Per our conversation, please provide a copy of the judgement. Also, please provide a 6/30/2015 financial statement. Thanks again.

Bryan D. Martin
Construction & Surety Leader, SVP
ABD Insurance and Financial Services
3 Waters Park Drive, Bulding 3, Suite 100
San Mateo, CA  94403
415-302-4309 (work/cell)
650-488-8566 (fax)
BryanM@theabdteam.com



No coverage is bound until confirmed in writing by the issuing insurer or an authorized ABD Insurance and Financial Services representative. This communication, including attachments, is for the exclusive use of the intended recipient. If you are not the intended recipient, please notify the sender immediately, delete this communication, and destroy all copies. Thank you!

---

**From:** Gina Huynh [mailto:ghuynh@trirememedical.com]
**Sent:** Wednesday, August 26, 2015 3:43 PM
**To:** Bryan Martin <bryanm@theabdteam.com>
**Subject:** Surety Bond for $20M +

Hi Bryan,
As per my voice message, I got your contact thru Steven Guggemheim from WSGR.
I am not sure whether Steven has a chance to brief you on our situation. We just recently got the judgment for $20M. We are in the process of filing the appeal. In the meantime, we would like to get a surety bond. Steven thought that you might be able to help us.

I would greatly appreciate your reply. My contact information is below. Looking forward to hearing from you.

Sincerely,

Gina La Huynh
Director of Finance

Trireme Medical
925-931-1300 x 285

# EXHIBIT 3

| | |
|---|---|
| **From:** | Kevin Longo <KLongo@svb.com> |
| **Sent:** | Thursday, October 01, 2015 3:43 PM |
| **To:** | Gina Huynh; Li Song |
| **Cc:** | Michelle Lai |
| **Subject:** | RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit |

Hi Gina,

No worries on the delayed response. I'm sure you are really busy over there.

Unfortunately cash secured means cash put in a collateral account that secures the loan. So trade AR would not be considered secured cash. Feel free to give us a call with any other questions. Thanks.

Kevin

---

**From:** Gina Huynh [mailto:ghuynh@triremedical.com]
**Sent:** Thursday, October 01, 2015 3:42 PM
**To:** Kevin Longo; Li Song
**Cc:** Michelle Lai
**Subject:** RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit

Hi Kevin,

Sorry, this email got lost....

Based on your comment highlighted below, whatever amount of cash secured will be the amount of the LC?  Do you consider Trade AR as secured cash?

Thanks.

Gina

---

**From:** Kevin Longo [mailto:KLongo@svb.com]
**Sent:** Wednesday, September 23, 2015 7:57 PM
**To:** Gina Huynh; Li Song
**Cc:** Michelle Lai
**Subject:** RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit

Hi Gina,

Apologies for the delayed response. I was traveling. We can do an LC as large as you need provided that it is cash secured. Will any additional equity or other capital be coming into the company in the next 6 months? We may be able to do a small amount of the LC on an unsecured basis but that would need to dig into projections and have a company update. I also don't think that the unsecured amount would be anywhere near the meaningful amount that you are looking for.

Still happy to discuss and try to help in any way that we can but want to set the right expectations. Thanks.

Kevin

**From:** Gina Huynh [mailto:ghuynh@trirememedical.com]
**Sent:** Tuesday, September 22, 2015 2:50 PM
**To:** Li Song; Kevin Longo
**Subject:** RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit

Hi Li and Kevin,
Hope you two are doing well.

According to our previous conversations, since it is not possible for us to get an LC of $20M+, then would you please let me know what amount of LC that we can get based on the latest financial information attached? Can you make a quick assessment and let me know what additional information you need so we can move this along?

Greatly appreciate your assistance.

Thanks.

Gina La Huynh
Director of Finance
Trireme Medical
925-931-1300 x 285


**From:** Li Song [mailto:lsong@svb.com]
**Sent:** Tuesday, September 01, 2015 4:24 PM
**To:** Gina Huynh; Kevin Longo
**Subject:** RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit

Hi Gina,

I got your message. Kevin will be on vacation starting tomorrow so I will reply here. Generally the most common collateral for our clients' LC is to fully cash collateralize them. The LCs with a loan to secure them are the minority.

For an LC of $25M-30M, it's too large for the lending team (Kevin's team) to get comfortable with using a loan to secure it as of now, after he looked into some high level datapoints.

Hope this helps and please let me know for any further questions.

Best,
Li
650-400-8640

**From:** Gina Huynh [mailto:ghuynh@trirememedical.com]
**Sent:** Friday, August 28, 2015 4:09 PM
**To:** Kevin Longo; Li Song
**Cc:** Shawn Parry; Roberto Rosas
**Subject:** RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit

Thank you, Li.

And Kevin, thank you for a quick connection.

3:30 on Monday sounds good.

My contact is below.  Looking forward to working with you on this.

Enjoy the weekend!

Gina La Huynh
Director of Finance
Trireme Medical
Office: 925-931-1300 x 285
Cell: 925-487-3678

---

**From:** Kevin Longo [mailto:KLongo@svb.com]
**Sent:** Friday, August 28, 2015 3:46 PM
**To:** Li Song; Gina Huynh
**Cc:** Shawn Parry; Roberto Rosas
**Subject:** RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit

Thanks Li.

Hi Gina,

Are you available on Monday at 3:30 to catch up on this? Thanks and have a great weekend.

Kevin

---

**From:** Li Song
**Sent:** Friday, August 28, 2015 3:44 PM
**To:** Kevin Longo; ghuynh@trirememedical.com
**Subject:** RE: TRIREME MEDICAL INC - RE: Irrevocable Letter of Credit

Kevin, I spoke with Gina this morning. She does need an LC, $25M-30M range as a surety bond of a law suit, by the end of September. SVB has issued similar LCs before.

But Gina's situation is that the company doesn't have enough cash to collateralize the LC. She is inquiring if we can consider a line for them to house the LC under it.

I will let you connect with her from here for the due diligence/credit review part. I will jump back in when it's time.

Hi Gina, Kevin Longo manages the banking team covering your company. His # s 650-320-1146. Hope this helps.

Best,
Li

3

650-400-8640

**From:** Gina Huynh [mailto:ghuynh@trirememedical.com]
**Sent:** Thursday, August 27, 2015 6:01 PM
**To:** Diana Rivera
**Cc:** Gina Huynh
**Subject:** Irrevocable Letter of Credit
**Importance:** High

Hi Diana,
Please advise who I should talk to about a Letter of Credit?

Greatly appreciate your prompt attention and support.

Sincerely,

Gina La Huynh
Director of Finance
Trireme Medical
925-931-1300 x 285

**If you recently applied for credit**: *Important disclosures for Equal Credit Opportunity Act and USA PATRIOT Act, please click here.*
**If you recently applied for credit**: *Important disclosures for Equal Credit Opportunity Act and USA PATRIOT Act, please click here.*
**If you recently applied for credit**: *Important disclosures for Equal Credit Opportunity Act and USA PATRIOT Act, please click here.*
**If you recently applied for credit**: *Important disclosures for Equal Credit Opportunity Act and USA PATRIOT Act, please click here.*

# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| | | |
|---|---|---|
| ANGIOSCORE, INC., | ) | **COURT TRIAL** |
| | ) | |
| PLAINTIFF, | ) | **VOLUME 4** |
| | ) | |
| VS. | ) | NO. C 12-03393 YGR |
| | ) | |
| TRIREME MEDICAL, INC., | ) | |
| EITAN KONSTANTINO AND | ) | **PAGES 671 - 955** |
| QUATTRO VASCULAR PTE. LTD. | ) | |
| | ) | |
| DEFENDANT. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | THURSDAY, APRIL 16, 2015 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:            QUINN, EMANUEL, URQUHART & SULLIVAN
                          55 TWIN DOLPHIN DRIVE, SUITE 560
                          REDWOOD SHORES, CALIFORNIA  94065
                  BY:  SKY ADAMS,
                       MARGARET CARUSO,
                       DIANE M. DOOLITTLE,
                       LAURA FAIRNENY,
                       ROBERT P. FELDMAN,
                       KIMBALL D. PARKER,
                       CATE SAAD,
                       MARGARET H.S. SHYR,
                       NATHAN SUN, ATTORNEYS AT LAW

(APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:         RAYNEE H. MERCADO, CSR NO. 8258

     PROCEEDINGS REPORTED BY ELECTRONIC RECORDING DEVICE;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

1    THOSE TRANSLATED ONTO MY EXHIBIT.

2    Q.  DID YOU ADD THEM UP AND PUT THEM ON EXHIBIT 4A BASICALLY?

3    A.  RIGHT.  TOOK THEM STRAIGHT FROM THIS EXHIBIT AND PUT THEM

4    ON MY EXHIBIT.

5    Q.  YOU HAVE TO SPEAK UP AND SPEAK SLOWLY.

6    A.  YOU'RE CORRECT.  I PUT -- YOU KNOW, THESE FOUR NUMBERS I

7    ADDED UP AND PUT ONTO MY EXHIBIT.

8    Q.  DID YOU TAKE INTO ACCOUNT ON EXHIBIT 4A ANY REVENUE FROM

9    CHOCOLATE MADE OUTSIDE OF THE UNITED STATES?

10   A.  NO, I DID NOT.

11   Q.  WHY NOT?

12   A.  ALTHOUGH ANGIOSCORE ALSO SOLD PRODUCTS IN NON-U.S.

13   MARKETS, IT'S -- I FELT I NEEDED MORE INFORMATION IN TERMS OF

14   MARKET SHARE AND -- AND CUSTOMER INFORMATION IN ORDER TO

15   JUSTIFY INCLUDING THOSE REVENUES, AND ABSENT THAT INFORMATION,

16   I CHOSE TO EXCLUDE THEM.

17   Q.  THANK YOU.

18        AFTER DETERMINING THE REVENUE, WHAT IS THE NEXT

19   CALCULATION THAT YOU NEED TO MAKE AS REFLECTED ON EXHIBIT 4A?

20   A.  THE NEXT STEP WOULD BE TO DETERMINE HOW MUCH OF THAT

21   REVENUE WOULD HAVE BEEN MADE BY ANGIOSCORE IF CHOCOLATE WERE

22   NOT ON THE MARKET.

23   Q.  AND DID YOU CONSULT VARIOUS SOURCES TO MAKE THAT

24   DETERMINATION?

25   A.  I DID.

1   Q.   IN GENERAL TERMS, HOW -- WHAT WAS THE NATURE OF YOUR

2   INQUIRY, THAT IS TO SAY, WHAT DID YOU CONCLUDE ABOUT WHAT

3   OTHER SPECIALTY BALLOON CATHETERS WERE THE CLOSEST COMPETITIVE

4   PRODUCT TO CHOCOLATE?

5   A.   BASED ON THE EVIDENCE AND THE INFORMATION I REVIEWED, I

6   CONCLUDED THAT ANOTHER SPECIALTY BALLOON WOULD BE THE MOST

7   LIKELY REPLACEMENT FOR CHOCOLATE.

8   Q.   WAS ONE OF THE SOURCES OF YOUR OPINION ABOUT THAT

9   STATEMENTS MADE BY THE DEFENDANTS BOTH IN TESTIMONY AND IN

10  CONTEMPORANEOUS DOCUMENTATION?

11          MR. GUGGENHEIM:  OBJECTION, LEADING.

12          THE COURT:  SUSTAINED.

13          MR. FELDMAN:  I -- YOUR HONOR, MAY I MAKE A COMMENT?

14      I WOULD -- IS YOUR HONOR'S PRACTICE THAT LEADING QUESTIONS

15  MAY NOT BE ASKED OF EXPERTS?  I KNOW IT'S NOT EFFECTIVE, BUT

16  IS IT YOUR RULE THAT LEADING QUESTIONS MAY NOT BE ASKED OF

17  EXPERTS?  BECAUSE MANY JUDGES PERMIT IT AND SOME JUDGES DON'T.

18          THE COURT:  IT WOULD GO FASTER.  THERE AREN'T THE

19  SAME KIND OF ISSUES.

20          MR. FELDMAN:  RIGHT.

21          THE COURT:  BUT HE MADE AN OBJECTION, AND IT WAS AN

22  APPROPRIATE OBJECTION.

23          MR. GUGGENHEIM:  AND, YOUR HONOR, I WILL JUST SAY FOR

24  THE RECORD, I ASSUME YOU ALLOWED MR. FELDMAN TO LEAD IN ALL

25  THE PRELIMINARY MATTERS FOR PRECISELY THAT REASON, BUT I THINK

1   A.   THIS IS THE MARKET RESEARCH REPORT PRODUCED OR PUBLISHED

2   BY MILLENNIUM RESEARCH GROUP IN 2014.

3   Q.   WE'VE ALREADY EXAMINED THIS THIS MORNING?

4   A.   YES.

5   Q.   CAN I DIRECT YOUR ATTENTION TO PAGE 249 OF EXHIBIT 294.

6              (EXHIBIT PUBLISHED.)

7        THE WITNESS:   I SEE IT ON THE SCREEN.

8   BY MR. FELDMAN:

9   Q.   AND DOES ANYTHING ON THIS PAGE -- WAS ANYTHING ON THIS

10  PAGE CONSIDERED BY YOU IN COMING TO YOUR CONCLUSION?

11  A.   YES.   ONE IS THE FACT THAT MILLENNIUM HAS HIGHLIGHTED THE

12  FACT THAT THERE IS A SEPARATE AND DISTINCT SPECIALTY BALLOON

13  MARKET.   AND THEY GO ON TO SAY WHAT -- WHO ARE THE PLAYERS IN

14  THAT MARKET, WHICH INCLUDE BOSTON SCIENTIFIC AND ANGIOSCORE

15  AMONGST THE PRINCIPAL PLAYERS.

16  Q.   AND HOW DID THIS REPORT ENTER INTO YOUR OPINION?

17  A.   IT AGAIN CORROBORATED THAT THERE IS A DISTINCT SPECIALTY

18  BALLOON MARKET THAT'S SEPARATE FROM OTHER SEGMENTS OF THE

19  PERIPHERAL MARKET IN WHICH HIGH-END BALLOONS AND HIGH-PRICED

20  BALLOONS OPERATE.

21  Q.   SO HAVING CONSIDERED STATEMENTS BY THE DEFENDANT, WHICH WE

22  DID NOT TROUBLE THE RECORD WITH, HAVING CONSIDERED PRICING

23  INFORMATION, HAVING CONSIDERED THE MILLENNIUM REPORT, AND

24  HAVING CONSIDERED THE CUSTOMER OVERLAP, HAVE YOU REACHED A

25  CONCLUSION ABOUT -- EXCUSE ME -- HAVE YOU REACHED A CONCLUSION

```
1    ABOUT WHAT WOULD HAPPEN IF CHOCOLATE WERE NOT IN THE MARKET

2    WITH RESPECT TO WHAT OTHER COMPANIES MIGHT GET THEIR SALES?

3    A.   I HAVE.

4    Q.   WHAT IS THAT CONCLUSION?

5    A.   THAT ABSENT CHOCOLATE ON THE MARKET, THE MOST LIKELY

6    REPLACEMENT FOR THAT BALLOON WOULD BE ANOTHER SPECIALTY

7    BALLOON, PRIMARILY THE -- EITHER THE ANGIOSCORE'S ANGIOSCULPT

8    BALLOON OR THE CUTTING BALLOON FROM BOSTON SCIENTIFIC.

9              MR. FELDMAN:   OKAY.   THANK YOU, YOUR HONOR.

10             THE COURT:   OKAY.   WE'LL GO AHEAD AND TAKE OUR

11   15-MINUTE BREAK.

12        (RECESS TAKEN AT 10:06 A.M.; PROCEEDINGS RESUMED AT

13   10:20 A.M.)

14             THE COURT:   OKAY.   WE'RE BACK ON THE RECORD.

15        YOU MAY PROCEED.

16   BY MR. FELDMAN:

17   Q.   AFTER DETERMINING THAT SPECIALTY BALLOONS WERE THE LIKELY

18   REPLACEMENTS FOR CHOCOLATE IF IT WERE NOT ON THE MARKET, DID

19   YOU DETERMINE WHAT PERCENTAGE OF CHOCOLATE SALES ANGIOSCORE

20   WOULD LIKELY GET?

21   A.   YES, I DID.

22   Q.   AND IS THAT REFLECTED ON EXHIBIT 4A?

23                      (EXHIBIT PUBLISHED.)

24             THE WITNESS:   YES, THAT'S REFLECTED ON THE SECOND ROW

25   OF EXHIBIT 4A.
```

1   MARKET INCREASE.

2   Q.   AND DID YOU --

3   A.   TO BE CONSERVATIVE.

4   Q.   DID YOU REGARD THAT AS CONSERVATIVE OR AGGRESSIVE?

5   A.   I FELT THAT WAS VERY CONSERVATIVE, GIVEN THAT WITH THIS

6   BEING A RECENT PRODUCED INTRODUCTION, IT'S LIKELY TO GROW IN

7   EXCESS OF INDUSTRY FOR A WHILE.

8                   (EXHIBIT PUBLISHED.)

9   BY MR. FELDMAN:

10  Q.   AM I CORRECT THAT THE NUMBERS FOR THE YEARS 2015, 2016,

11  2017, 2018, AND THE FIRST HALF OF 2019 ARE REFLECTED ON THE

12  SECOND LINE OF EXHIBIT 7C?

13                  (EXHIBIT PUBLISHED.)

14          THE WITNESS:   THAT IS CORRECT.

15  BY MR. FELDMAN:

16  Q.   THANK YOU.

17      AFTER ESTIMATING CHOCOLATE'S FUTURE REVENUE, WHAT WAS THE

18  NEXT STEP -- EXCUSE ME -- WITH RESPECT TO BOTH PERIPHERAL AND

19  CORONARY COMBINED?

20  A.   SIMILAR TO THE PAST LOST PROFITS CALCULATION, THE NEXT

21  STEP IS TO APPLY THE MARKET SHARE FOR ANGIOSCORE THAT IT WOULD

22  OBTAIN OF THE CHOCOLATE SALES IF CHOCOLATE WERE NOT AVAILABLE.

23  Q.   AND CAN YOU, IN BRIEF, DESCRIBE HOW YOU DID THAT, PLEASE?

24  A.   IT WAS THE SAME PROCESS AS WITH PAST LOST PROFITS.   I

25  LOOKED TO THE MILLENNIUM RESEARCH REPORT FOR THE PERIPHERAL

1  REPORT.

2  Q.  OKAY.  BUT WE LOOKED AT ONE.  WE'LL GET TO THAT.

3     SO LET'S TALK ABOUT LOST PROFITS FIRST.

4     YOU'VE CALCULATED ANGIOSCORE'S LOST PROFITS, I BELIEVE YOU

5  SAID, FOR TWO SEPARATE PERIODS OF TIME, RIGHT, SIR?

6  A.  CORRECT.

7  Q.  AND THE FIRST RAN FROM DECEMBER 2011 TO Q2 2014 --

8  A.  CORRECT.

9  Q.  -- CORRECT?

10    AND YOU STARTED IT IN DECEMBER 2011 BECAUSE THAT'S WHEN

11 CHOCOLATE WAS FIRST BEING SOLD IN THE UNITED STATES, RIGHT,

12 SIR?

13 A.  THAT IS RIGHT.

14 Q.  AND YOUR CALCULATION OF LOST PROFITS FROM DECEMBER 2011 TO

15 Q2 2014 IS BASED UPON THE SALES OF ANGIOSCULPT THAT YOU

16 BELIEVE ANGIOSCORE WOULD HAVE MADE IF CHOCOLATE HAD NOT BEEN

17 ON THE MARKET, RIGHT?

18 A.  THAT RIGHT.

19 Q.  RIGHT.  SO IT'S AS IF CHOCOLATE HAD NEVER BEEN DEVELOPED

20 AND SOLD, CORRECT?

21 A.  THAT IS CORRECT.

22 Q.  OKAY.  AND THEN THE SECOND PERIOD OF TIME RUNS FROM Q3

23 2014 TO Q2 2019, AND THAT'S ANGIOSCORE'S FUTURE LOST PROFITS,

24 RIGHT?

25 A.  THAT'S RIGHT.

1    Q.  AND AGAIN, THIS CALCULATION ASSUMES THAT CHOCOLATE IS NOT

2    BEING SOLD DURING THAT PERIOD, RIGHT, SIR?

3    A.  THAT IS RIGHT.

4    Q.  AND YOUR LOST PROFITS MODEL ASSUMES THAT THE PRESENCE OF

5    CHOCOLATE ON THE MARKET ACTUALLY CAUSED ANGIOSCORE TO LOSE

6    SALES, RIGHT?

7    A.  OR ANOTHER WAY TO SAY THAT IS IF THOSE SALES HAVE NEVER

8    HAPPENED, WHERE WOULD THEY HAVE GONE?

9    Q.  WELL, YOUR UNDERLYING ASSUMPTION IS THAT ABSENT CHOCOLATE

10   THE SALES WOULD HAVE BEEN HIGHER, RIGHT?

11   A.  THAT IS AN UNDERLYING ASSUMPTION.

12   Q.  AND DID YOU BELIEVE THAT YOU HAD EVIDENCE OF CAUSATION, IN

13   OTHER WORDS, THAT THE PRESENCE OF CHOCOLATE HAD ACTUALLY

14   CAUSED ANGIOSCORE TO LOSE SALES?

15   A.  BASED ON THE EVIDENCE I REVIEWED, I BELIEVE THESE ARE

16   DIRECT COMPETITORS.

17   Q.  AND YOU BELIEVE THAT THEY -- THE PRESENCE OF CHOCOLATE

18   ACTUALLY CAUSED ANGIOSCORE TO LOSE SALES, RIGHT, SIR?

19   A.  RIGHT.  ABSENT THAT PRODUCT, I BELIEVE ANGIOSCORE'S SALES

20   WOULD HAVE BEEN HIGHER.

21   Q.  ALL RIGHT.  AND IN FORMULATING YOUR OPINION, YOU RELIED IN

22   PART ON CONVERSATIONS WITH MR. TROTTER, RIGHT, ABOUT LOST

23   SALES?

24   A.  IN PART.

25   Q.  AND YOU NOTED IN YOUR REPORT MR. TROTTER HAD SAID THAT THE

1   RESPECT TO SETON UNIVERSITY -- SORRY -- ST. LOUIS UNIVERSITY

2   HOSPITAL?  THAT'S CUSTOMER NO. 52.

3   A.  RIGHT.  MY SAME ANSWER WOULD APPLY.

4   Q.  SO IN FACT IF I TOLD YOU THAT ST. LOUIS UNIVERSITY

5   ACTUALLY HAD PURCHASED ZERO ANGIOSCORE CATHETERS BEFORE THEY

6   BOUGHT CHOCOLATE AND THEN BOUGHT THREE AFTER THAT POINT, YOU

7   DON'T KNOW, RIGHT?

8   A.  RIGHT.  I BELIEVE IT'S THE RELEVANT QUESTION IS IF THEY

9   COULDN'T HAVE BOUGHT THOSE CHOCOLATE UNITS, WOULD THEY HAVE

10  BOUGHT AN ANGIOSCULPT.

11  Q.  AND WITH RESPECT TO MOUNT SINAI MEDICAL CENTER, IF I TOLD

12  YOU THAT ANGIOSCORE HAD SOLD NO PTA CATHETERS TO MOUNT SINAI

13  BEFORE MOUNT SINAI FIRST PURCHASED CHOCOLATE AND THEN TWC

14  THEREAFTER, YOU DON'T KNOW THAT, RIGHT?

15  A.  I DON'T HAVE THE DATA IN FRONT OF ME.

16  Q.  OKAY.

17  A.  RIGHT.

18  Q.  NOW, WE TALKED -- OR YOU TALKED ON YOUR DIRECT ABOUT

19  ANGIOSCORE'S MARKET SHARE.

20       MR. GUGGENHEIM:  AND CAN WE PULL UP EXHIBIT 4A TO

21  PLAINTIFF'S EXHIBIT 381.

22              (EXHIBIT PUBLISHED.)

23  BY MR. GUGGENHEIM:

24  Q.  ALL RIGHT.  AND YOU -- AND YOU MULTIPLIED THE -- THE

25  CHOCOLATE REVENUES BY 48.1 PERCENT MARKET SHARE TO GET

```
 1    CHOCOLATE WOULD BE; DID YOU EVER DO THAT CALCULATION?
 2    A.   SO IF I IGNORE ALL FUTURE PROFITS ASSOCIATED WITH
 3    CHOCOLATE BEYOND 2018?
 4    Q.   UM-HMM.
 5    A.   THAT WOULD BE AROUND $4 MILLION.
 6    Q.   OKAY.
 7         SO IT WOULD DROP FROM 50 MILLION TO 4 MILLION; IS THAT
 8    RIGHT?
 9    A.   AGAIN, ONLY IF YOU IGNORE EVERYTHING AFTER 2018.
10    Q.   ALL RIGHT.
11         NOW, NONE OF YOUR DAMAGES ESTIMATES THAT WE'VE TALKED
12    ABOUT TODAY ATTEMPT TO ESTIMATE DAMAGES WHERE BOTH TRIREME AND
13    ANGIOSCORE ARE SELLING A CHOCOLATE-TYPE PRODUCT AT THE SAME
14    TIME, CORRECT?
15              THE COURT:  I DON'T UNDERSTAND THAT QUESTION.
16              MR. GUGGENHEIM:  OKAY.  WELL, I'LL BREAK IT INTO
17    PIECES, JUDGE.
18    Q.   YOUR LOST PROFITS DAMAGES ANALYSIS ASSUMES CHOCOLATE IS
19    NOT ON THE MARKET AT ALL, RIGHT?
20    A.   THAT'S RIGHT.
21    Q.   AND YOUR DISGORGEMENT ANALYSIS ASSUMES THAT TRIREME
22    DISGORGES ALL OF ITS PROFITS, RIGHT?
23    A.   THAT'S RIGHT.
24    Q.   SO IN THAT DISGORGEMENT ANALYSIS, IT ASSUMES THAT TRIREME
25    ISN'T SOMEHOW INDEPENDENTLY ABLE TO LICENSE AND MAKE THE
```

1     CHOCOLATE PRODUCT, RIGHT?

2     A.   I DON'T BELIEVE IT CONTEMPLATES A LICENSE.

3     Q.   OKAY.

4          AND YOUR PRESENT VALUE CALCULATION IS BASED ON A SITUATION

5     RIGHT NOW WHERE THE DEFENDANTS ARE THE ONLY ONES IN THE MARKET

6     SELLING THE CHOCOLATE DEVICE, CORRECT?

7     A.   YEAH.  IT ASSUMES THEY'RE THE OWNERS OF THIS ASSET.

8     Q.   AND IN ALL OF YOUR DAMAGES ESTIMATES THAT WE'VE TALKED

9     ABOUT TODAY, YOU'VE ASSUMED THAT DR. KONSTANTINO WOULD BE

10    COMPELLED TO GIVE HIS INTELLECTUAL PROPERTY TO ANGIOSCORE FOR

11    NO MONEY, CORRECT?

12    A.   I HAVEN'T DONE ANY WORK TO APPORTION THESE DAMAGES AMONGST

13    THE DIFFERENT DEFENDANTS.

14    Q.   UH-HUH.  YOU DIDN'T CONSIDER AS A COST IN ANY OF YOUR

15    CALCULATIONS THE COST OF, FOR EXAMPLE, ANGIOSCORE LICENSING

16    THAT IP; IS THAT CORRECT?

17    A.   I'M JUST TRYING TO THINK OF WHY ANGIOSCORE WOULD NEED A

18    LICENSE FOR DEFENDANT -- HOLDING THAT -- I'M NOT SURE I

19    UNDERSTAND THE QUESTION.

20         MR. GUGGENHEIM:  OKAY.  I HAVE NOTHING FURTHER AT

21    THIS TIME, YOUR HONOR.

22         THE COURT:  REDIRECT.

23         MR. FELDMAN:  YES, YOUR HONOR.

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4

5          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7     I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,

8     NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS

9     HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR

10    OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

11

12                _____

13            RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

14                    FRIDAY, APRIL 17, 2015

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANGIOSCORE, INC.,

         Plaintiff,

    v.

TRIREME MEDICAL, INC., ET AL.,

         Defendants.

Case No.  12-cv-03393-YGR

ORDER ON DEFENDANTS' MOTION TO
DISMISS STATE LAW CLAIMS; MOTIONS
FOR SUMMARY JUDGMENT ON STATE LAW
CLAIMS; MOTIONS IN LIMINE RE STATE
LAW EXPERTS

Now before the Court are three categories of motions:  (1) defendants' motion to dismiss the state law claims in this action for lack of subject matter jurisdiction;  (2) the parties' cross-motions for summary judgment on state law claims;  and (3) the parties' motions in limine relating to the admissibility of certain expert testimony.  (Dkt. Nos. 555 ("MTD"); 468 ("Defts. MSJ"); 478 ("Pltf. MSJ"); 462 ("Talley Mot."); 463 ("Olsen Mot. re State Law"); 466 ("Lewin Mot."), respectively.)

On March 3, 2015, the Court held a hearing at which the parties were provided an opportunity to present argument on the summary judgment and in limine motions.  At that same hearing, the Court provided tentative rulings and noted that an order memorializing said rulings would follow.  With one exception, those ruling remain in place.

On March 11, 2015, defendants filed their motion to dismiss the state law claims on the basis of subject matter jurisdiction.  Plaintiff opposed in the normal course.  Defendants declined the Court's invitation to expedite a reply and filed the same in the normal course. Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion suitable for expedited resolution without oral argument, and issues the rulings herein.

1    For the reasons set forth below, the Court DENIES defendants' motion to dismiss, GRANTS

2    in part and DENIES in part plaintiff's motion for summary judgment, GRANTS in part and DENIES

3    in part defendants' motion for summary judgment, DENIES defendants' motion to preclude the

4    testimony of Eric Talley, AngioScore's corporate governance expert, GRANTS AngioScore's

5    motion to preclude the testimony of defendants' rebuttal expert David Lewin, and DENIES

6    WITHOUT PREJUDICE defendants' motion to preclude certain opinions of AngioScore's state law

7    damages expert, Gary Olsen.

### FACTUAL BACKGROUND AND PROCEDURAL POSTURE

9    The facts of this case are well-known to the parties and the Court. References to specific

10    facts are set forth herein as necessary for the Court's ultimate rulings and to provide a brief factual

11    background. The Court notes that while it grants summary judgment as to portions of the claims

12    stated herein, trial on the balance is set to begin in less than a week, and a final resolution of the

13    claims in their entirety will result in a more fulsome order setting forth findings of fact that

14    support its ruling at the conclusion of trial. The Court is mindful that "the tests enunciated in *Guth*

15    and subsequent cases provide guidelines to be considered by a reviewing court in balancing the

16    equities of an individual case." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).

17    Importantly, "[n]o one factor is dispositive and all factors must be taken into account insofar as

18    they are applicable." *Id.* The summary judgment rulings herein are intended to promote an

19    efficient use of public resources as the parties prepare for trial. The final order in this case will

20    expound on the application of each factor of the corporate opportunity doctrine to the facts of this

21    unique case, including those discussed in this order, and whether defendant Dr. Eitan Konstantino

22    "appropriated for himself something that in fairness should belong to [AngioScore]." *Id.*

23    As a basic factual primer, the Court provides the following context. In its Fourth Amended

24    Complaint ("4AC"), Plaintiff AngioScore names as defendants one natural person and three

25    business entities: (1) Dr. Eitan Konstantino ("Konstantino"); (2) TriReme Medical, LLC (f/k/a

26    TriReme Medical, Inc.) ("TriReme"); (3) Quattro Vascular Pte Ltd. (f/k/a Proteus Vascular

27    Systems) ("Quattro"); and (4) QT Vascular Ltd. (f/k/a QT Vascular Pte. Ltd.) ("QT"). (Dkt. No.

28    244.) Konstantino founded TriReme in 2005. (Dkt. No. 512-2 (Pltf. Resp. to Defts. Stmt. of

United States District Court
Northern District of California

Undisputed Facts) at Fact 9.) Quattro and QT Vascular are both incorporated in Singapore;

Quattro as of March 25, 2010, QT Vascular as of March 6, 2013. (*Id.* at Fact 80, 81.) The

defendants sell an angioplasty balloon catheter sold under the name "Chocolate," which plaintiff

contends competes with AngioScore's angioplasty balloon catheter, the "AngioSculpt."

Konstantino was a founder of AngioScore, and he remained on AngioScore's board of directors

until February 5, 2010. (*Id.* at Fact 44.)

The 4AC alleges both claims for patent infringement, and violations of state law stemming

generally from plaintiff's contention that while on AngioScore's board of directors, Konstantino

developed a device that was competitive to AngioScore's flagship product, the AngioSculpt, a

specialty balloon catheter. (*Id.* at ¶¶ 49–79.) Chocolate is also a specialty balloon catheter with a

non-deployable metallic structure made of nitinol, which sits atop a balloon. (Dkt. No. 478 at 2.)

The Chocolate device treats blood vessel disease by applying focal forces to plaque deposits.

(*See, e.g., id.* at 6-7; Dkt. No. 481 ("Parker Decl."[1]) Exs. 24, 25, 27, Garcia Dep. at 11:8-12:18;

27:5-28:4).)

After the Chocolate was released to the market, AngioScore analyzed Chocolate's design

and initiated this action in 2012, alleging only patent infringement claims. (Dkt. No. 1.)

Discovery commenced and revealed that Chocolate may have been developed while Konstantino

was on AngioScore's board. AngioScore asked for further information relating to Chocolate's

development, which requests were met with resistance, necessitating motions to compel. (*See,*

*e.g.*, Dkt. Nos. 88, 89, Parker Decl. Ex. 16.) Once defendants did produce this information,

Angioscore discovered that Konstantino had participated in the development of Chocolate while

still serving on its board of directors. Specifically, documents produced late in discovery evince

that prior to his departure from AngioScore, in the fall of 2009, Konstantino collaborated with his

fellow TriReme co-founder, Tanhum Feld, to develop the Chocolate. Such development included

---

[1] "Parker Decl." refers to the declaration of Kimball Dean Parker (Dkt. No. 479) and exhibits submitted in conjunction with AngioScore's motion for partial summary judgment, which documents appear at entries numbered 479 through 485. "Parker Opp. Decl." refers to the Parker declaration and exhibits submitted in support of AngioScore's opposition to defendants' motion for summary judgment, which appear at docket entries 516, 520, and 521.

3

designing the Chocolate, submitting a provisional patent application, and undertaking porcine testing of the Chocolate. Around the same time, Konstantino also prepared presentation materials in order to secure investors for Chocolate. (*See* Parker Decl. Exs. 12, 16, 17, 19, 62.)

After receiving this discovery, on May 6, 2014, AngioScore sought leave to amend its then-operative complaint to add the state law claims of breach of fiduciary duty, aiding and abetting the same, and unfair competition. (Dkt. No. 202.) Defendants opposed amendment, arguing that the Court lacked subject matter jurisdiction over AngioScore's new claim, on the basis that these new claims "relate to facts and theories of liability that are not at issue in the patent case" and that even if supplemental jurisdiction existed, the Court should decline to exercise it to the extent it raises novel questions of state law that would predominate over the federal claim. (Dkt. No. 209-3 at 1-2; 17-18.) The Court rejected these arguments and permitted AngioScore leave to amend. (Dkt. No. 219.)

AngioScore brings these claims on the basis that Konstantino did not offer the Chocolate to AngioScore, nor did he apprise AngioScore of the extent of his work on the Chocolate or its development. (Dkt. No. 478 at 5.) Rather, in February 2010, Konstantino notified AngioScore's CEO that TriReme was "contemplating" moving into the specialty balloon market. (Parker Decl. Ex. 11, Email from Konstantino to Sellers (Feb. 5, 2010).) When AngioScore noted that this would present a conflict of interest because Konstantino was a board member of AngioScore and any specialty balloon catheter device would likely compete with the AngioSculpt, Konstantino represented that TriReme had not decided for certain that it would enter that market, and that Konstantino had approached Angioscore "before any new project [was] started." *Id.* AngioScore nonetheless asked Konstantino to resign from the board, and Konstantino did so on February 5, 2010. (Parker Decl. Ex. 7.)

After Konstantino left the board, he further reassured AngioScore that he had not violated his fiduciary obligations to the company with respect to the development of a specialty balloon catheter for TriReme. In a letter prepared by his counsel, Konstantino stated that "prior to February 5, 2010, TriReme has not developed any products, nor acquired or licensed any technology that competes with AngioScore's products," and that he "was not involved in any

4

1   development work or licensing of angioplasty balloon technology for the coronary or periphery

2   markets that involves specialized features such as scoring, cutting, or drug eluting elements."

3   (Parker Decl. Ex. 22, Letter from Nguyen to Sellers (Feb. 23, 2010).)

4        At a three-hour hearing on March 3, 2015, the Court, having reviewed the evidence of

5   record, relevant case law, and the parties' briefing, tentatively granted in part AngioScore's

6   motion for summary judgment and offered further tentative rulings on other outstanding motions

7   to assist the parties with trial preparation. At the hearing, and upon questioning from the Court,

8   the parties advised the Court that the state law claims are equitable in nature and thus not

9   amenable to resolution by a jury. (*See* Dkt. No. 582, Hrg. Tr. 8:14-9:2.) Accordingly, the Court

10  bifurcated the trial.[2]

11       Neither party objected to bifurcation, but defendants did urge the Court that the patent trial

12  should proceed first, given that the patent claim was the first filed. Finding that trial as to the state

13  claims would better facilitate resolution of the patent claims without imposing additional burden

14  on the citizenry, the Court deemed bifurcation warranted and confirmed that trial on the state law

15  claims alone would commence as originally scheduled on April 13, 2015.

16              MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

17       On March 11, 2015, defendants filed the instant motion to dismiss for lack of jurisdiction.

18  (Dkt. No. 555.) It is apparent to the Court that by way of the instant motion, defendants seek to

19  avoid the bench trial on the state law claims over which the Court has presided for approximately

20  nine months, all discovery related thereto has concluded, and for which summary judgment and

21  evidentiary rulings have been tentatively announced, many of which were not in defendants'

22  favor. Nonetheless, mindful that jurisdictional issues are foundational and that it is duty-bound to

23  ensure that jurisdiction is proper, the Court addresses this motion first.[3]

24  _____

25  [2] Defendants noted that one claim for breach of fiduciary duty was not equitable in nature
    and carried a jury right. (Dkt. No. 582, Hrg. Tr. at 14:8-20.) At that point, AngioScore moved
26  orally to dismiss that claim. The oral motion was unopposed by defendants and granted. (*Id.* at
    15:10-22.) Had that claim not been dismissed, bifurcation would not have been warranted.
27

28  [3] It is not lost on the Court that the arguments advanced in defendants' motion to dismiss
    were raised previously in connection with AngioScore's motion for leave to amend. (*See* Dkt. No.

United States District Court
Northern District of California

1    **I.    LEGAL STANDARD**

2    "Federal courts are courts of limited jurisdiction. They possess only that power authorized

3    by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v.*

4    *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). Relevant to the

5    instant motion, the supplemental jurisdiction statute, 28 U.S.C. § 1367, provides, in relevant part:

6
          [I]n any civil action in which the district courts have original
7          jurisdiction, the district courts shall have supplemental jurisdiction
           over all other claims that are so related to claims in the action within
8          such original jurisdiction that they form part of the same case or
           controversy under Article III of the United States Constitution.
9

10   28 U.S.C. § 1367(a). In construing the bounds of the federal courts' reach, a state law claim is

11   understood as part of the same case or controversy when it shares a "common nucleus of operative

12   fact" with the federal claims and the state and federal claims would normally be tried together.

13   *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004).

14        Even if supplemental jurisdiction is proper under Section 1367(a), the Court has discretion

15   to decline such jurisdiction if, after undertaking a case-specific analysis, it finds that declining

16

17   209-3.) Although in its order granting that motion the Court did not specifically address these
18   arguments, in resolving the motion it did consider whether amendment was proper in full view of
     all arguments made, including defendants' jurisdictional argument. The Court notes that
19   following its order granting leave to amend, defendants did not move for clarification of that
     order, or for reconsideration on any basis, including on the question of whether supplemental
20   jurisdiction is proper. Neither did defendants move to dismiss the as-amended complaint for lack
     of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). In substance, then, defendants'
21   motion to dismiss is a motion for reconsideration of the Court's prior ruling.

22        In this District, motions for reconsideration must adhere to the Local Rule and the instant
23   motion does not. (Civil. L. R. 7-9.) First, the motion was not diligently made. The claims with
     which defendants now take issue have been part and parcel of this case since amendment was
24   permitted. Discovery has concluded; expert opinions have been rendered. The argument
     concerning subject matter jurisdiction could have, and indeed *was*, presented in mid-2014, yet
25   defendants filed the instant motion in March of 2015. Defendants have fallen far short of the
26   reasonable diligence standard. Second, the local rules require that any motion for reconsideration
     be accompanied by a motion for leave to so file; defendants have also failed to comply with this
27   requirement. (Civil L. R. 7-9(a).) Third, motions for reconsideration are limited to specific
     substantive instances: where, for example, there is an error of law or a material change in fact or
28   law. (Civil L. R. 7-9(b).) Defendants have not demonstrated that such is the case here.

6

*United States District Court*
*Northern District of California*

1  supplemental jurisdiction "comports with the underlying objective of most sensibly

2  accommodat[ing] the values of economy, convenience, fairness and comity." *Executive Software*

3  *N. Am., Inc. v. United States Dist. Court,* 24 F.3d 1545, 1557–58 (9th Cir. 1994) (alteration in

4  original) (internal quotations and citations omitted) (overruled on other grounds, *Cal. Dept. of*

5  *Water Resources v. Powerex Corp.*, 533 F.3d 1087, 1093 (9th Cir. 2008)). Section 1367(c) states

6  that a court may decline to exercise jurisdiction over a supplemental state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims
> over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has
> original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons
> for declining jurisdiction.

11  28 U.S.C. § 1367(c).

12  II.    ANALYSIS

13      The Court finds that the federal and state law claims are sufficiently, and indeed

14  substantially, connected and therefore that the exercise of supplemental jurisdiction is proper.

15      At the heart of this case is the Chocolate specialty balloon catheter, which AngioScore

16  claims was developed by a former member of its board, Konstantino, in contravention of his

17  fiduciary duties, and infringes AngioScore's patent. Once the Chocolate came to market in 2011,

18  AngioScore analyzed it and initiated this action, alleging patent infringement. In the course of

19  discovery relative to that claim, AngioScore sought documents relating to the conception and

20  development of the Chocolate device. After considerable use of judicial resources to compel the

21  production of relevant discovery, AngioScore learned that Konstantino and other defendants had

22  developed Chocolate while Konstantino was still on AngioScore's board. After obtaining

23  requested discovery, AngioScore sought leave to amend its complaint to add the state law claims

24  now at issue. (Dkt. No. 202.)

25      Against this backdrop, defendants now argue that the infringement and fiduciary duty

26  claims are not sufficiently related such that this Court may exercise jurisdiction over the state law

27  claims. The position strains credulity. As a practical matter, the Court finds that there is a

28  substantial overlap of evidence between the federal and state claims and therefore a common

7

1    nucleus of operative fact.  As stated above, the core of this case concerns the Chocolate device –

2    whether it infringes an AngioScore patent, and whether Konstantino's development of the device

3    was a violation of his duties to AngioScore.  Critically, Konstantino's role and relationship to

4    AngioScore will be at issue in both the patent and state law claims.  Viewing the issue holistically,

5    the overlap is obvious:  AngioScore is alleging that the patent infringement is willful and that

6    Konstantino both developed the infringing device and took it for himself and his own benefit.

7    Defendants' attempt to parse the claims down to their elements myopically to isolate the legal

8    differences between the patent and state law claims cannot undermine the coherence of the factual

9    narrative from which all of AngioScore's claims flow.

10           The nuances of AngioScore's affirmative case further reveals the extent of this overlap.

11   One example of this is in the damages calculation context.  The extent, if any, to which Chocolate

12   competes with the AngioSculpt remains relevant in terms of calculating both patent and state law

13   damages.  The same experts who calculated patent damages also opined on damages relating to the

14   state law corporate opportunity doctrine claim.  In addition, the witnesses and documents used to

15   support the claims substantially overlap.  Tellingly, an abundance of the documents underpinning

16   the state law summary judgment claims were produced in the context of patent discovery (see Dkt.

17   No. 579 ("Caruso Decl.") ¶¶ 22, 23), because again, both claims flow from the development of the

18   allegedly infringing device.  Witnesses also overlap, as evidenced by the fact that witnesses set to

19   be called in the imminent bench trial on state law issues were deposed while the case was purely a

20   patent case.

21           The fundamentally related nature of the federal and state law claims cannot be ignored.

22   Both turn on proof concerning exactly what the Chocolate is, how it was developed, and its import

23   relative to AngioScore both in terms of lost profits if found to be infringing, or its value as a

24   potential corporate opportunity.  Defendants cannot escape the logical proposition that AngioScore

25   "would ordinarily be expected to try [ . . . ] all [such claims] in one judicial proceeding." *United*

26   *Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also BLT Rest. Grp. LLC v.*

27   *Tourondel*, 855 F. Supp. 2d 4, 11 (S.D.N.Y. 2012) (in assessing the propriety of supplemental

28   jurisdiction, "the court should look to whether the evidence likely to be used in the specific case in

United States District Court
Northern District of California

8

addressing the federal claim is likely to substantially overlap that used to address the state-law claims. Indeed, it is only by such an assessment that one can fairly determine whether a plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.'" (citing *Lyndonville Sav. Bank*, 211 F.3d at 704 (quoting *Gibbs*, 383 U.S. at 725) (further internal citations omitted))).

Defendants' reliance on (i) the Court's decision to bifurcate trial on these claims, and (ii) any representations the parties have made in the Delaware court, does not compel a different result.

With respect to bifurcation, the record reflects, and the Court reaffirms here, that its decision to bifurcate was influenced by a host of factors. First, the Court was prepared to try all the claims in this case together before a jury, when, at the March 3, 2015 hearing, AngioScore acknowledged that all but one of its state law claims was equitable in nature, and dismissed the lone jury claim: breach of fiduciary duty under California law. (March 3, 2015 Hrg. Tr. at 15:2-22.) The dismissal of AngioScore's California fiduciary duty claim rendered a bench trial possible on the remaining equitable claims. The Court further considered AngioScore's representation that resolution of the state law issues would potentially facilitate out-of-court resolution of the patent claims. The Court did not understand AngioScore to be representing that it was, *in any way*, declining to further pursue its patent claim or conceding that its patent claim was not valid, but rather, that there was a potential efficiency in trying the state law claims separately first. Second, the Court noted that its calendar is exceedingly heavy with trials, and that the trial date set in this case could not be altered. Third, the Court noted that the state claims are of an equitable nature and therefore not suitable for a jury to decide, and that the elements of these claims differ from the question of patent infringement. The Court understands that jury service presents a burden on ordinary citizens, and seeks to respect their time by ensuring that, where possible, jurors not be subject to unnecessary inconvenience. That these considerations weighed in favor of bifurcation does not undermine the fact that there is substantial overlap between these claims such that they would ordinarily be tried together. Moreover, defendants' delay in bringing the instant motion for the nine-month period wherein all parties operated under the assumption that the claims would be tried together undermines their present position that these claims ever should have been

9

1    considered as part of the same case to begin with. (*See* Dkt. No. 555 at 3 n.2.)

2        Next, with respect to certain representations made to the Delaware Court during the course

3    of Konstantino's action seeking advancement of legal fees, defendants' argument is unavailing.

4    There, the relevant inquiry was whether under an indemnification agreement, certain fees should

5    be advanced by AngioScore for Konstantino's legal defense. Arguments related thereto did not

6    address the standard for determining whether supplemental jurisdiction is proper, but rather related

7    to determining the separability of fees. (*See* Dkt. No. 579-12, 579-13; 557-1.) Defendants'

8    position that AngioScore in some way conceded the jurisdictional question – assuming that such a

9    statement could be dispositive of the issue –does not persuade.

10        In defendants' final argument, they maintain that even if supplemental jurisdiction exists,

11    this Court should nonetheless decline to exercise it in this case. The Court disagrees. As set forth

12    above, 28 U.S.C. section 1367(c) provides that a federal district court may decline to exercise

13    jurisdiction over a supplemental state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

        The Court does not find that any of these four factors justifies dismissing AngioScore's

state law claims.[4] As to the first factor, the Court finds substantial guidance from Delaware case

law, which sets forth a multi-factor test to be applied in corporate opportunity cases, and which

contemplates that the application of these factors is intensely fact-specific. The facts of the instant

case do not, in and of themselves, present such a departure from what the Delaware courts have

articulated that this Court is left without guidance as to how to apply Delaware law. Indeed,

defendants themselves sought summary judgment in this forum based on the application of that

body of law to the facts of this case.

---

[4] Further discussion of the novelty of this case, and why the Court finds that it may apply the relevant Delaware principles of law to the facts presented here, is set forth in Section III(B)(1), *infra*.

10

Second, the Court finds that the state law claims are not substantially predominating this case. The patent claim is being litigated fully by plaintiff and was the subject of its own summary judgment and claim construction motions practice. That AngioScore may want to proceed first with the state claim in the final chapter of this hard-fought, years-long case does not mean that the patent claim has been substantially predominated by the state law claims. In fact, the patent claim was the first claim brought, and it was through patent discovery that AngioScore uncovered documents that led it to seek leave to bring these state law claims.

The third factor does not apply. The federal patent claim is still a part of this case. The most that can be understood from AngioScore's representation at the March 3, 2015 hearing is that AngioScore would be inclined to seek an out-of-court resolution of the patent claim following trial on the state law claims. By definition, such a resolution would be mutual and does not negate the existence of the federal claim.

Finally, the Court can discern no exceptional circumstances that justify declining jurisdiction in this case. Defendants' position that judicial economy will not be served by retaining jurisdiction is nonsensical. For one thing, substantial party resources have been expended in litigating these claims. In point of fact, *defendants themselves* filed briefs seeking summary judgment in their favor on the very claims for which they now seek dismissal. So, too, has the court expended substantial judicial resources in order to assist the parties resolve these claims, both in terms of resolving motions, discovery disputes, and aiding in mediation.

For these reasons, the Court finds that it may properly exercise supplemental jurisdiction over the state law claims, and that no reasonable basis for declining such jurisdiction exists.[5] The motion is DENIED.

---

[5] Because it finds conclusively that it may properly exercise supplemental jurisdiction over the state law claims, the Court does not consider separately AngioScore's alternative argument that the Court also has original jurisdiction under 28 U.S.C. section 1338, which "'is a jurisdictional statute, giving the district court jurisdiction to hear certain state or [other non-] federal unfair competition claims' when joined with a substantial and related claim under the patent laws." *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1372 (Fed. Cir. 1994) (citing *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988), *cert. denied*, 488 U.S. 968 (1988)). The Court notes, however, defendants' concession that the test for whether the state claims and the patent claim "form part of the same case or controversy" is the same under

11

United States District Court
Northern District of California

## MOTIONS FOR SUMMARY JUDGMENT ON STATE LAW CLAIMS

Plaintiff contends summary judgment in its favor is appropriate on three of four elements of the corporate opportunity doctrine. Defendants cross-move that the corporate opportunity doctrine cannot, as a matter of law, apply to the facts of this case, and that alternatively, plaintiff's claims are untimely. In addition, defendants seek summary judgment as to plaintiff's remaining claims: successor liability, aiding and abetting, and alter ego liability.

### I.    LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

Federal Rule of Civil Procedure 56(a) states that "[a] party may move for summary judgment, identifying each claim or defense—or the *part* of each claim or defense—on which summary judgment is sought." (Emphasis supplied.) Under this plain language "summary adjudication on individual parts of claims brought against a party" is allowed. *Bushnell v. Vis Corp.*, No. C-95-04256 MHP, 1996 WL 506914, at *11 (N.D. Cal. Aug. 29, 1996).

### II.    THE CORPORATE OPPORTUNITY DOCTRINE

The corporate opportunity doctrine "represents but one species of the broad fiduciary duties assumed by a corporate director or officer." *Broz*, 673 A.2d at 154. As a fiduciary of a corporation, directors agree to "place the interests of the corporation before his or her own in appropriate circumstances." *Id.* "At the core of the fiduciary duty is the notion of loyalty—the

---

either Section 1338 or Section 1367. (Dkt. No. 585 at 8.) As discussed at length above, the Court finds this requirement met.

1    equitable requirement that, with respect to the property subject to the duty, a fiduciary always

2    must act in a good faith effort to advance the interests of his beneficiary." *In re Mobilactive*

3    *Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013)

4    *reargument denied*, No. CIV.A. 5725-VCP, 2013 WL 1900997 (Del. Ch. May 8, 2013) (citing

5    *Dweck v. Nasser*, at *12).

6          Noting that corporate directors stand in fiduciary relationship to the corporations they

7    serve, the Delaware Supreme Court recognized in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. Sup. Ct.

8    1939) that:

9                   public policy, existing through the years, and derived from a
                    profound knowledge of human characteristics and motives, has
10                  established a rule that demands of a corporate officer or director,
                    peremptorily and inexorably, the most scrupulous observance of his
11                  duty, not only affirmatively to protect the interests of the corporation
                    committed to his charge, but also to refrain from doing anything that
12                  would work injury to the corporation, or to deprive it of profit or
                    advantage which his skill and ability might properly bring to it, or to
13                  enable it to make in the reasonable and lawful exercise of its powers.
                    The rule that requires an undivided and unselfish loyalty to the
14                  corporation demands that there shall be no conflict between duty
                    and self-interest. The occasions for the determination of honesty,
15                  good faith and loyal conduct are many and varied, and no hard and
                    fast rule can be formulated. The standard of loyalty is measured by
16                  no fixed scale.
17

18   *Id.* at 511. The corporate opportunity doctrine seeks to define the bounds of this duty where a

19   director may be inclined to take a business opportunity for him or herself. *See id.* The rule

20   enunciated in *Guth* is this:

21                  if there is presented to a corporate officer or director a business
22                  opportunity which the corporation is financially able to undertake,
                    is, from its nature, in the line of the corporation's business and is of
23                  practical advantage to it, is one in which the corporation has an
                    interest or a reasonable expectancy, and, by embracing the
24                  opportunity, the self-interest of the officer or director will be
                    brought into conflict with that of the corporation, the law will not
25                  permit him to seize the opportunity for himself.
26

27   *Id.* at 510-11. Thus, under Delaware law, "[t]he elements of misappropriation of corporate

28   opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation

13

has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation." *In re Mobilactive Media*, No. 5725-VCP, 2013 WL 297950, *21 (Del. Ch. Jan. 25, 2013). Once the plaintiff has shown the breach of the director's duty of loyalty, the burden switches to the fiduciary to show that he or she did not seize a corporate opportunity "because either the corporation was presented the opportunity and rejected it, or because the corporation was not in a position to take the opportunity." *Grove v. Brown*, No. 6793-VCG, 2013 WL 4041495, at *8 (Del. Ch. Aug. 8, 2013).

Delaware courts further recognize that "a director or officer may take a corporate opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity." *Broz*, 673 A.2d at 155.

### III.    JUDGMENT ON ELEMENTS OF THE CORPORATE OPPORTUNITY DOCTRINE

Plaintiff moves for summary judgment on three of the four factors listed above; each is discussed in turn below. On cross-motion for summary judgment, defendants contend that Konstantino has established each of the four elements proving as a matter of law that he did not usurp a corporate opportunity. Having considered the arguments and evidence presented, the Court **GRANTS** in part plaintiff's motion, and **DENIES** defendants' cross-motion.

#### A. Plaintiff's Motion

##### *1. Line of business*

An opportunity is within a corporation's line of business if it is "an activity as to which [the corporation] has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion." *In re Mobilactive Media*, 2013 WL 297950, at *21 (citing *Guth*, 5 A.2d at 514). This factor is to be broadly construed. *Id.* (citing *Dweck v. Nasser*, 2012 WL 161590, at *13 (Del. Jan. 18, 2012).

14

1    Plaintiff argues that the following undisputed evidence entitles it to judgment on this

2    element: Since its founding in 2003, AngioScore has designed, manufactured, and marketed

3    angioplasty balloon catheters surrounded by a nitinol structure that are used for the treatment of

4    cardiovascular disease and sold under the brand name AngioSculpt. AngioSculpt and Chocolate,

5    TriReme's device, are both angioplasty balloon catheters used to open occluded or narrowed blood

6    vessels at lesion sites by inflating to compress plaque deposits against the vessel wall and then

7    deflating for removal from the patient's body. Both devices were cleared by the FDA for identical

8    clinical indications: both are "intended for balloon dilatation of lesions in the peripheral

9    vasculature, including the iliac, femoral, ilio-femoral, popliteal, infra-popliteal, and renal arteries.

10   NOT for use in the coronary or cerebral vasculature." (Parker Decl. Ex. 25, Chocolate PTA

11   510(k) Summary (Dec. 14, 2011); Parker Decl. Ex. 24, AngioSculpt PTA 510(k) Summary (Mar.

12   22, 2010).) In addition, plaintiff argues that defendants' own documents recognize the Chocolate

13   as a competitor to the AngioSculpt, and that a portion of TriReme's Chocolate customers are or

14   were AngioScore's customers. (*See, e.g.*, Parker Decl. Ex. 36, Email from Haig (Dec. 15, 2012) at

15   TR 0838519.) The evidence demonstrates that the devices are similar in both purpose and

16   function.

17   By contrast, defendants argue the technical differences between the devices to conclude

18   that they do not fall within the same line of business. For example, defendants argue that

19   AngioSculpt scores accumulated plaque, whereas Chocolate does not, and that Chocolate has

20   "pillows" that impress upon the plaque, which the AngioSculpt lacks. (Defts. Opp. to Pltf. MSJ at

21   4-5.) Defendants also place much emphasis on the fact that AngioScore was a purportedly self-

22   avowed "single technology company," with a fixed focus on "scoring" balloons to the exclusion of

23   other types of balloon angioplasty catheters. (*See id.* at Ex. 16 at AS0700230.) Finally,

24   defendants contend that the FDA indications for use are not dispositive of whether the Chocolate

25   falls within AngioScore's line of business, because a broad array of balloon catheters, including

26   plain old balloon angioplasty ("POBA") devices, would also fall within that scope.

27   The Court finds defendants' arguments unavailing. Under Delaware law, the "line of

28   business" element is to be broadly construed. The undisputed similarities in terms of purpose and

United States District Court
Northern District of California

15

1    function establish that AngioScore has "fundamental knowledge and practical experience" to

2    pursue the Chocolate under the broad notions underpinning the "line of business" element.

3    Moreover, that AngioScore has historically focused on products that "scored" rather than

4    impressed on plaque relates more to the interest or expectancy element below. Here, the evidence

5    not reasonably subject to dispute establishes that the Chocolate is "logically and naturally ...

6    adapted to [AngioScore's] business" based on AngioScore's experience in the specialty balloon

7    catheter market. *See In re Mobilactive Media*, 2013 WL 297950, at *21 (citation omitted). The

8    fact that the devices may differ technically does not create a triable issue of material fact as to this

9    element. Even defendants' presentations from 2009 and 2010 list AngioScore as a *potential*

10    *partner* for the Chocolate, and defendants' documents have recognized Chocolate as a competitor

11    to AngioSculpt. (*See e.g.*, Parker Decl. Ex. 21, Singapore-SV Chocolate Presentation (Dec. 30,

12    2009), at TR1044052; Parker Decl. Ex. 32, Chocolate Presentation (Feb. 2010), at TR0027514;

13    Parker Decl. Ex. 37, Email from Crater (Mar. 27, 2013), at TR0845859; Parker Decl. Ex. 38,

14    Email from Benjamin (Oct. 25, 2011).)

15         In light of the evidence presented, and Delaware's broad notions of the "line of business"

16    factor, the Court finds that no material dispute of fact exists to be tried. Accordingly, the Court

17    GRANTS plaintiff's motion summary judgment on this factor.

18                    *2.    Interest or Expectancy*

19         "[F]or the corporation to have an expectant interest in any specific property, there must be

20    some tie between that property and the nature of the corporate business." *Grove*, 2013 WL

21    4041495, at *8 (internal quotes omitted). By requiring "a tie to the 'nature of the corporate

22    business,'" this factor "implicates many of the issues" discussed above concerning AngioScore's

23    line of business. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d

24    961, 973 (Del. Ch. 2003) (citing *Broz*, 673 A.2d at 156). Even if there is a "tie" between the line

25    of a corporation's business and the potential opportunity, however, the Court may decline to find

26    an interest or expectancy where facts establish that a corporation is shifting away from its

27    historical line of business, where it disavows such interest, and where it lacks the capacity to

28    capitalize on the interest. In *Broz*, for example, the Delaware Supreme Court found that there was

United States District Court
Northern District of California

1    no interest or expectancy where a corporation was divesting in the area of venture from which the

2    potential opportunity arose, and where its business plan did not contemplate any new acquisitions.

3    *Broz*, 673 A.2d at 156.

4         Defendants argue vociferously that AngioScore had no interest in developing the

5    Chocolate. (Defts. Opp. to Pltf. MSJ at 12-19.) In support of this position, defendants advance

6    three arguments. First, defendants argue that during 2009 and 2010, AngioScore was focused on

7    developing the AngioSculpt. Based thereon, defendants urge that AngioScore's interest at that

8    time was to the exclusion of all other devices including the Chocolate. Second, defendants argue

9    that AngioScore granted Konstantino "broad consent" to work on projects like Chocolate with

10   TriReme and that AngioScore arguably knew and approved of Konstantino's work with TriReme

11   on devices like Chocolate. Third, defendants argue that AngioScore was focused singularly on the

12   AngioSculpt and that in December 2009, the board of AngioScore was not interested in acquiring

13   a new company, technology, or product line.

14        As demonstrated in the previous section, the Court finds that there is undoubtedly "some

15   tie" between the Chocolate and the nature of AngioScore's business. The devices are both

16   angioplasty balloon catheters that serve similar purposes. Indeed, defendants acknowledged as

17   much as far back as 2009 when they identified AngioScore as a potential partner for the

18   Chocolate.

19        However, at this juncture the Court finds that material questions of fact persist as to

20   whether AngioScore had an interest or expectancy in the Chocolate. Evidence adduced to date

21   raises questions as to whether AngioScore was focused singularly on its own product,

22   AngioSculpt, and relatedly, whether AngioScore's board of directors would have favored

23   capitalizing on the Chocolate opportunity. (*See, e.g.*, Dkt. No. 512-2 (Pltf. Resp. to Defts. Stmt. of

24   Undisputed Facts) at Issue 1, Fact 7 and evidence cited therein.) In *Broz*, despite a finding that the

25   subject opportunity fell within a plaintiff corporation's line of business, the Delaware Supreme

26   Court nonetheless determined that the corporation did not have an interest or expectancy in that

27   opportunity. In so finding, the court considered evidence such as board members' testimony

28   relating to whether the Michigan-2 license would have been of interest to the CIS board even

United States District Court
Northern District of California

absent certain financial impediments to acquisition, and CIS's articulated business plan, which did not contemplate any new acquisitions.

Here, the Court notes that the parties dispute strongly what conclusions may be drawn from the evidence presented thus far. In the December 2009 AngioScore board meeting, members may have evinced disinclination to even consider an opportunity such as Chocolate. Defendants argue that the members' responses to the question "Do you support acquiring another company, technology[,] or product line?" conclusively establish that the consensus was that AngioScore was not interested and had no expectancy in a new opportunity such as the Chocolate. Plaintiff, in opposition, contends that the responses to the question were not so conclusive, and furthermore, points out that defendants have offered misleading characterizations of this evidence.

Based on its own analysis of the evidence, the Court finds that AngioScore's actual, then-existing disposition on the question of acquiring another opportunity and the Board's degree of preference for developing the AngioSculpt solely, are in dispute. Furthermore, as explained below, questions linger concerning AngioScore's financial capacity to exploit the Chocolate. Accordingly, the Court declines to rule that either party may obtain summary judgment on this factor. The parties' motions for summary judgment on this element are therefore DENIED.

### 3.   *Financial Ability*

The third prong of the corporate opportunity analysis focuses on whether AngioScore had the financial ability to take the Chocolate opportunity. "If the directors are uncertain whether the corporation can make the necessary outlays, they need not embark it upon the venture; if they do, they may not substitute themselves for the corporation any place along the line and divert possible benefits into their own pockets." *Irving Trust Co. v. Deutsch*, 73 F.2d 121, 124 (2d Cir. 1934) (recognizing "the wisdom of a rigid rule forbidding directors of a solvent corporation to contract on the plea of the corporation's financial inability to perform").

Under Delaware law, this prong implicates broader policy concerns more favorable to the corporation. Such concerns stem from the inherent conflict between, on the one hand, a director who has control and responsibility for the financial security of the corporation he serves, and on the other hand, the director's potential personal interest in ensuring that the company not have

18

secure financial footing so as to permit usurpation of what otherwise might be a corporate opportunity. Thus, once the plaintiff has made such a *prima facie* showing of financial ability, a fiduciary "faces a significant burden in establishing that a corporation was financially unable to take advantage of a corporate opportunity." *Norman v. Elkin*, 617 F. Supp. 2d 303, 312 (D. Del. 2009) (citing *Gen. Video Corp. v. Kertesz*, No. 1922-VCL, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (finding financial inability must amount to insolvency such that the company is practically defunct); *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279 (Del. 1995) (stopping short of adopting "the 'insolvency-in-fact test' "; stating instead that courts should consider "a number of options and standards for determining financial inability, including but not limited to, a balancing standard, temporary insolvency standard, or practical insolvency standard")).

Here, the Court finds that disputes as to material fact remain as to whether AngioScore was in a position to exploit the Chocolate opportunity, and that such disputes preclude a finding in AngioScore's favor at this time. Of material concern is the ongoing dispute regarding the amount of capital required to exploit Chocolate. Without this initial figure, the Court cannot ascertain whether AngioScore would have been able to take advantage of the Chocolate opportunity. (*Compare* Parker Decl. Ex. 32, Chocolate Presentation (Feb. 2010) at TR0027513 (noting that Chocolate could have been developed for $3.5-4 million); Parker Decl. Ex. 45, Belson Dep. (Nov. 21, 2014) at 238:12-239:19 *with* Dkt. No. 504-16 ("Danitz Opp. Decl."[6]) Ex. 45, Konstantino Dep. 618:3-15 (noting that it took "tens of millions of dollars" to bring Chocolate to market), Danitz Opp. Decl. Ex. 129.) Accordingly, summary judgment is not warranted given the current state of the record.

_____

[6] "Danitz Opp. Decl." refers to the declaration of Brian Danitz (Dkt. No. 500) and exhibits submitted in conjunction with defendants' opposition to AngioScore's motion for partial summary judgment, which documents appear at entries numbered 500, 502, 504, 507-509. "Danitz Decl." refers to the declaration of Brian Danitz submitted in support of defendants' motion for summary judgment, which appears at docket entries numbered 469, 472-477.

**B. Defendants' Cross Motion and Counter-Arguments**

Defendants move for cross-summary judgment on the four counter-prongs to the corporate opportunity doctrine, discussed above, and two arguments of a more overarching nature, namely, that (i) the corporate opportunity doctrine does not apply to the circumstances of this case, and (ii) the statute of limitations bars AngioScore's claims. All of defendants' arguments are unpersuasive. The Court first addresses the broader arguments, and then addresses the remaining counter-prongs.

*1. Applicability of the Corporate Opportunity Doctrine*

Defendants contend that Chocolate was not a corporate opportunity for AngioScore because Konstantino and co-inventor Tanhum Feld conceived of the idea for Chocolate on their own. They thus assert that Chocolate was solely the inventors' opportunity and not AngioScore's. (Defts. MSJ at 16-17.) The Court is unpersuaded based on the record before it.

As an initial matter, the Court acknowledges the broad bedrock principles espoused in *Guth*. The corporate opportunity doctrine stems from "the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents." *Guth*, 5 A.2d at 510. However, the rule to be applied in determining whether such a violation has occurred, as enunciated in *Guth*, is fact-intensive in its application. Each prong of the multi-step test demands a nuanced understanding of the facts unique to each case. All factors must be considered; no single factor is dispositive. *See Broz*, 673 A.2d at 157 (weighing the "totality of the circumstances" in light of "the situation only as it existed when the opportunity was presented"). Given that the analysis is so fact-intensive, the standard understandably proves amenable to a variety of circumstances.

Defendants rely principally on *Equity Corp. v. Milton*, 221 A.2d 494 (Del. 1966) for their position that an opportunity of a director's own making is not an opportunity owed to the corporation. *Equity* does not persuade. There, the corporate opportunity doctrine was used to challenge a fiduciary's owning part of the corporation's outstanding stock. In finding no breach, the court states that "there is nothing wrong in a corporate officer owning or controlling stock of his corporation." *Id.* at 499. This is not an inherently controversial proposition. But ultimately,

20

United States District Court
Northern District of California

United States District Court
Northern District of California

*Equity* does not offer guidance on the question presented here: whether a director who invents a product falling within a corporation's line of business and works with other companies to develop it is unencumbered by, or absolved of, his duty of loyalty to the corporation he serves.

In any event, given the lack of direct authority to support defendants' contention, and the lack of a full factual record, the Court does not find a basis for ruling on the issue as a matter of law.[7] Furthermore, the case law suggests that the doctrine could apply to such circumstances. Thus, in *Guth*, the Delaware Supreme Court noted that the duty of loyalty:

> demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to ***deprive it of profit or advantage which his skill and ability might properly bring to it***, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

*Guth*, 5 A.2d at 510 (emphasis supplied). The rule contemplates that directors owe the companies they serve the benefit of their skills and expertise and is not suggestive of the exception defendants espouse. To permit otherwise does not just conflict with this rule – it subverts it.

Accordingly, defendants' motion for summary judgment on this ground is DENIED.[8]

---

[7] Defendants allude to the fact that Konstantino was an "outside director" of AngioScore, but cite no case for the proposition that the fiduciary duties attendant to such a role differ in any way from those of any other sort of director. (*See* Dkt. No. 535 ("Defts. MSJ Reply") at 7.) Moreover, even if co-inventor Tanhum Feld did not want AngioScore to partner on Chocolate, the Court is not convinced given the factual record to this point, that this would obviate Konstatino's fiduciary obligations. Plaintiff has raised a triable issue of fact on this point.

[8] Defendants present two other theories supporting their contention that the corporate opportunity doctrine does not apply in this case: first, that the opportunity was presented to Konstantino in his individual capacity because he invented it, and second, that he was merely planning to compete. Neither persuade.

As noted above, the Court finds that the doctrine may be applied to this case. Moreover, the Court finds that plaintiff has raised a material disputed question as to whether the Chocolate opportunity "was [. . .] 'presented' to Konstantino in his 'individual . . . capacity'" rather than in his corporate capacity. Defendants' contention that because Konstantino invented the Chocolate he avoided his fiduciary obligations to AngioScore thus does not warrant summary judgment in their favor. (Defts. MSJ at 19.) Moreover, the record contains facts sufficient to raise a

1

## 2. *Statute of Limitations and Laches*

2    "A claim for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland*

3    *v. Sutherland*, No. 2399-VCN, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010); *see Pomeranz v.*

4    *Museum Partners, L.P.*, No. CIV. A. 20211, 2005 WL 217039, at *8 (Del. Ch. Jan. 24, 2005).

5    The parties agree as follows: (i) the relevant statute of limitations for breach of fiduciary duty

6    claims is three years[9]; (ii) the acts giving rise to the instant claim occurred in 2009 and 2010; and

7    (iii) more than three years elapsed between those acts and when plaintiff brought its claim (here,

8    June 27, 2014). The central issue is whether equitable tolling is available. Plaintiff bears the

9    burden to show that such tolling is warranted. *Pomeranz*, 2005 WL 217039, at *2. Defendants

10    claim the statute has run because AngioScore was on notice by no later than February 5, 2010.

11    Three bases for tolling exist under Delaware law -- (1) the inherently unknowable doctrine

12    (the "Discovery Rule"), (2) equitable tolling, and (3) fraudulent concealment. Because it finds

13    that the last most strongly supports tolling in this case, the Court considers the fraudulent

14    concealment test first. Pursuant thereto, tolling is warranted "if a defendant engaged in fraudulent

15    concealment of the facts necessary to put a plaintiff on notice of the truth." *Albert v. Alex. Brown.*

16    *Mgmt. Servs., Inc.*, No. CIV. A. 762-N, 2005 WL 1594085, *19 (Del. Ch. June 29, 2005). Tolling

17    is justified if there is "an affirmative act of concealment by a defendant, an 'actual artifice' that

18

19    reasonable inference that Konstantino developed Chocolate in his corporate capacity as a board
    member of AngioScore, by, for example, sharing AngioScore's market data with TriReme and

20    possibly using his knowledge of the AngioSculpt to inform his innovation and development of the
    Chocolate. Accordingly, defendants' request for summary judgment on this prong is DENIED.

21

22    Likewise, the record does not conclusively establish that Konstantino was merely
    "planning to compete" and that therefore his actions are immunized from the scope of the

23    corporate opportunity doctrine. Rather, a disputed question exists over whether Konstantino was
    actively taking steps to develop, fund, test, and prepare the Chocolate for market, while at the

24    same time concealing Chocolate from AngioScore. At this juncture, a finding that Konstantino
    was preparing to compete with AngioScore is not without dispute. Defendants' request for

25    summary judgment on this point is therefore DENIED.

26    [9] Under Delaware law, the doctrine of laches governs the timeliness of claims brought in
    equity. Courts sitting in equity will apply by analogy the statute of limitations for substantive

27    claims in order to apply the doctrine of laches. *Pomeranz*, 2005 WL 217039, at *2. Here, three
    years is the relevant limitations period.

28

United States District Court
Northern District of California

1    prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended

2    to put a plaintiff off the trail of inquiry." *Id.* (citation omitted).

3            Under Delaware law, tolling is proper only until a plaintiff is properly put on inquiry

4    notice. "When plaintiffs are on inquiry notice, the statute of limitations begins to run. Inquiry

5    notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice

6    when they have sufficient knowledge to raise their suspicions to the point where persons of

7    ordinary intelligence and prudence would commence an investigation that, if pursued would lead

8    to the discovery of the injury." *Pomeranz*, 2005 WL 217039, at *3 (citation omitted).

9            Plaintiff posits that the statute was tolled until 2014 when they learned of Konstantino's

10   development activities.  Prior to 2014, plaintiff claims Konstantino's repeatedly and expressly

11   represented that no basis existed for any suspicion that a breach of his duty had occurred.  In

12   support thereof, plaintiff identifies a series of communications between representatives of

13   AngioScore and Konstantino in February 2010.  These are some of the same emails that

14   defendants claim should have put AngioScore on notice.

15           First, in a February 2010 email to Tom Trotter, Konstantino wrote that "TriReme *has not*

16   *made any decision* to make such a change [ i.e., to enter the specialty balloon catheter market] and

17   I was giving you very early heads up to something that may take place *in the future, or may never*

18   *happen*" and that there was "no reason to be trigger happy" in reference to Trotter's asking

19   Konstantino to resign.  (Parker Decl. Ex. 11 at AS0796033 (emphases supplied).)  In response, on

20   February 4, 2010, AngioScore's counsel, John Sellers, explained to Konstantino that even if he or

21   TriReme were "just contemplating this decision [he has] important fiduciary duties."  (*Id.* at

22   AS0796032.)  The next day, Konstantino replied that "I am keenly aware of my obligations as a

23   board member and this is precisely why I am coming to Angio[S]core at this juncture; before any

24   new project is started." (*Id.* at AS0796031 (emphasis supplied).)

25           After Konstantino resigned on February 5, 2010, John Sellers requested confirmation that

26   Konstantino was "not involved with any development efforts, or acquisition or licensing

27   negotiations, involving product applications that would be competitive to AngioScore's products."

28   (Dkt. No. 516 ("Parker Opp. Decl.") Ex. 7, Sellers Decl. ¶ 5.)  Sellers further asked about

23

United States District Court
Northern District of California

1   Konstantino and TriReme's development activities relating to "angioplasty balloon

2   technology…that involves specialized features such as scoring, cutting or drug-eluting element, or

3   is designed to make similar claims to that of the AngioSculpt." (*Id.* at ¶ 6.)

4       Konstantino's final response to this request was unambiguous and unequivocal. On

5   February 23, 2010, through counsel, he represented that "TriReme is considering in the future the

6   possibility of entering the field of specialized balloons," but that before February 5, 2010

7   "TriReme ha[d] **not developed any products . . . that compete[] with AngioScore's products.**"

8   (Parker Decl. Ex. 22, Letter from Nguyen to Sellers (Feb. 23, 2010) (emphasis supplied).)  In that

9   same letter, he maintained that he **"was not involved in any development work . . .** for the

10  coronary or periphery markets that involves specialized features such as scoring, cutting, or drug

11  eluting elements." (*Id.*)  On March 21, 2010, again through counsel, he affirmed that that **"neither**

12  **Mr. Konstantino nor TriReme evaluated,** negotiated, **or otherwise pursued** the acquisition or

13  licensing of **any technology that competes with AngioScore's products.**" (Parker Opp. Decl.

14  Ex. 9, Letter from Nguyen to Sellers (March 21, 2010) (emphasis supplied).)

15      Plaintiff further argues that Konstantino's response to AngioScore's stated concerns not

16  only affirmatively disavowed any breach, but conveyed unflinching confidence in his own ability

17  to adhere to his duties.  The Court agrees that the communications create disputed questions over

18  defendants' contention that plaintiff was (1) on inquiry notice as of, at the latest, February 5, 2010,

19  and (2) that tolling is not warranted here.

20      First, as to inquiry notice, questions persist as to whether plaintiff had "sufficient

21  knowledge" before 2014 to "raise [its] suspicions to the point where persons of ordinary

22  intelligence and prudence would commence an investigation that, if pursued would lead to the

23  discovery of the injury" of which it now complains, and if so, when. *Pomerantz*, 2005 WL

24  217039 at *3 (citations omitted).  A factfinder could determine it was reasonable that AngioScore

25  did not bring the instant claim earlier.  Despite mention of a potential second balloon in 2010, and

26  even possible suspicions, it was not at all clear to AngioScore that Konstantino *himself* had taken

27  significant steps to develop that balloon while he was a board member.  The statements upon

28  which defendants' rely do not disclose Konstantino's involvement in the development of the

United States District Court
Northern District of California

24

1    second balloon, or any features of that balloon; many appear to concern TriReme's business

2    strategy in general terms. (*See* Defts. MSJ Reply at 2-3 (listing statements).) Moreover, some of

3    the evidence defendants argue establishes that AngioScore was on notice of Chocolate appears to

4    pertain to a different product entirely, the Glider catheter, which is not a specialty balloon and

5    which AngioScore was not interested in pursuing. But critically, even at their combined greatest

6    weight, a reasonable factfinder could determine that these facts do not overcome the strength of

7    Konstantino's affirmative, and arguably misleading, representations.

8    Second, on the question of whether tolling is warranted here, the Court finds that

9    substantial questions remain. As stated above, three bases exist for tolling statutes of limitations

10   under Delaware law. Pursuant to the "fraudulent concealment" test, tolling is warranted "if a

11   defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of

12   the truth." *Albert v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV. A. 762-N, 2005 WL 1594085, *19

13   (Del. Ch. June 29, 2005). Tolling is justified if there is "an affirmative act of concealment by a

14   defendant— an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or

15   some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *In re Dean*

16   *Witter P'ship Litig.*, No. CIV. A. 14816, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998) (citation

17   omitted).

18   As stated above, a reasonable factfinder could determine that Konstantino's several

19   intentional statements to AngioScore obfuscated the true nature of his activities while he was a

20   board member, and affirmatively misrepresented the facts of both the Chocolate and his

21   involvement with the Chocolate. To the extent Konstantino concealed operative facts that

22   prevented AngioScore's discovery of Konstantino's wrongful conduct relative to the Chocolate,

23   tolling would be permissible. Specifically, by the time Konstantino resigned from AngioScore's

24   board, Chocolate's development was underway and Konstantino had been a knowing participant

25   in that development. In response to questions concerning the same, Konstantino's responses

26   suggest a disavowal of any such activities.

27   Defendants counter that Konstantino was asked to resign from AngioScore's board

28   apparently due to the "serious conflict of interest" created by TriReme's possible bringing to

market a device that would compete with AngioScore and argue that therefore AngioScore knew

of this cause of action at the time of Konstantino's resignation.  (Danitz Decl. Ex. 24, Email from

Trotter to Konstantino (Feb. 4, 2010).)  But the intent behind Trotter's email, and his

understanding of the facts relative to Chocolate or any other competitive device at that time, and

likewise whether plaintiff had actual knowledge sufficient to put it on notice, remains the subject

of dispute.

For the reasons stated above, the defendants' motion for summary judgment on their

statute of limitations and laches defenses is **DENIED**.[10]

### 3.  *Counter-Prongs of the Corporate Opportunity Doctrine*

Last, defendants argue that Konstantino did not usurp a corporate opportunity under the

counter-test enunciated in *Broz.*  673 A.2d at 155.  To refresh, that case stated that:

> a director or officer may take a corporate opportunity if: (1) the
> opportunity is presented to the director or officer in his individual
> and not his corporate capacity; (2) the opportunity is not essential to
> the corporation; (3) the corporation holds no interest or expectancy
> in the opportunity; and (4) the director or officer has not wrongfully
> employed the resources of the corporation in pursuing or exploiting
> the opportunity.

*Id.*  As stated above, the Court finds that defendants have not met their burden as to the first prong,

and finds no basis to grant either party's summary judgment on the third "interest or expectancy"

prong.

As to the two remaining counter-prongs, the Court finds that defendants have not met their

burden to compel summary judgment in their favor.  First, with respect to whether the Chocolate

was "essential" or "desirable" to AngioScore, the facts discussed above concerning AngioScore's

interest or expectancy in the Chocolate overlap with the issue of whether the Chocolate was

essential or desirable to Angioscore.  With all reasonable inferences drawn in AngioScore's favor,

---

[10] As the parties conceded at argument, defendants' motion for summary judgment on plaintiff's unfair competition law claim is contingent upon the Court's finding that the fiduciary duty claim is barred by either laches or the relevant statute of limitations.  Because the Court does not so find, it also finds the unfair competition claim is not appropriate for resolution on summary judgment.  Defendants' motion as to this cause of action is therefore **DENIED**.

United States District Court
Northern District of California

1    the Court finds that at minimum, factual questions remain.

2        Similarly, with respect to the final prong – whether Konstantino did or did not wrongfully

3    employ the resources of AngioScore in pursuing or exploiting the Chocolate opportunity –

4    numerous factual questions remain. For example, AngioScore disputes that Konstantino did not

5    use its proprietary information to develop and market the Chocolate device, and emails suggest

6    that Konstantino may have shared AngioScore's information, specifically China market data, with

7    TriReme during the time he was developing Chocolate. (*See* Parker Opp. Decl. Exs. 23, 24.)

8    Moreover, Konstantino was on AngioScore's board of directors while he was developing

9    Chocolate. This fact raises a reasonable inference that he was exposed to information proprietary

10   and confidential to AngioScore, and that he undertook to develop and market Chocolate with that

11   knowledge. Such facts counsel against a summary judgment finding for defendants on this issue.

12       Accordingly, defendants' motion for summary judgment on these bases is DENIED.

13               **C. Defendants' Summary Judgment Arguments on Remaining State Law Claims**

14                       *1. Successor Liability*

15       Defendants contend that the evidence is insufficient to establish that QT Vascular is the

16   successor in interest to the liabilities of Quattro and TriReme. The Ninth Circuit recognizes such

17   liability where a corporation that purchases the assets of another if (1) the purchasing corporation

18   expressly or impliedly agrees to assume the liability; (2) the transaction amounts to a "de-facto"

19   consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling

20   corporation; or (4) the transaction was fraudulently entered to escape liability. *Atchison, Topeka*

21   *& Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1998). Evidence

22   adduced to date creates a genuine dispute as to at least one of these factors. For example, the

23   Summary of Terms for Proposed Merger reflects that the parties contemplated potentially that QT

24   Vascular would receive all the liability of Quattro and TriReme, and that the parties understood

25   the transaction to constitute a merger. (*See* Parker Opp. Decl. Ex. 31 at TR1181405.) Defendants

26   contend that the final agreement contained no transfer of liabilities, but this does not avoid the

27   suggestion that the transaction amounted to a merger. Furthermore, defendants' corporate

28   representative Momi Brosh, in a deposition stated that QT Vascular received all of the existing

United States District Court
Northern District of California

27

stock, shares, assets, and liabilities in each of Quattro and TriReme. (*See id.* Ex. 32, Brosh Dep. at 279:18-281:15.) In sum, the Court finds that questions remain. Defendants' motion for summary judgment on this issue is therefore **DENIED**.

### 2. *Aiding and Abetting*

Aiding and abetting a breach of fiduciary duty occurs when the defendant "knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act . . . ." *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (Cal. App. 4th Dist. 2005); *see also In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1050 (N.D. Cal. 2009) (citing *Casey*, 127 Cal. App. 4th at 1144). Defendants contend that Quattro cannot be held to have aided and abetted Konstantino in breaching his fiduciary duties.

At this juncture, the Court finds that questions of material fact exist that preclude granting summary judgment on this issue. For example, Quattro, or its predecessor, may have sponsored a January 2010 study of the Chocolate, and evidence suggests that Quattro's predecessor company, through Konstantino, apparently solicited money from the Singapore government for Chocolate development. Facts adduced to date support a reasonable inference that Quattro, or its predecessor, was aware that Konstantino was a director of AngioScore with fiduciary obligations to that company that conflicted with his undertaking to create a specialty angioplasty balloon catheter. Accordingly, summary judgment on this issue is **DENIED**.

### 3. *Alter Ego*

The relevant legal principles underlying the doctrine of alter ego liability, which permits a plaintiff to pierce the corporate veil between a parent corporation and a subsidiary, are set forth in *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000).

Alter ego liability is an "extreme remedy, sparingly used." *Id.* at 539 (citation omitted). Such relief is appropriate where there has been an abuse of the corporate privilege so severe that it justifies holding the equitable ownership of a corporation liable for the actions of the corporation. *Roman Catholic Archbishop v. Superior Court*, 15 Cal. App. 3d 405, 411 (1971). For example, when the corporate form is "used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the

28

1  corporation's acts to be those of the persons or organizations actually controlling the corporation,

2  in most instances the equitable owners." *Sonora*, 83 Cal. App. 4th at 538 (citations omitted).

3  In order to pierce the corporate veil, a plaintiff must establish two things. First, that there

4  is such a unity of interest and ownership between the corporation and its equitable owner that the

5  separate personalities of the corporation and the shareholder do not in reality exist. Second, there

6  must be an inequitable result if the acts in question are treated as those of the corporation alone.

7  *Id.* (citations omitted). Factors to be considered in applying the doctrine include:

8
9              commingling of funds and other assets of the two entities, the
               holding out by one entity that it is liable for the debts of the other,
10             identical equitable ownership in the two entities, use of the same
               offices and employees, and use of one as a mere shell or conduit for
11             the affairs of the other.

12  *Id.* at 538-539 (quotation and citations omitted). In addition, courts look to whether there has been

13  "inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate

14  records, and identical directors and officers." *Id.* at 539 (listing cases). Importantly, "[n]o one

15  characteristic governs, but the courts must look at all the circumstances to determine whether the

16  doctrine should be applied." *Id.* (citations omitted). The question of "[w]hether to hold a parent

17  liable for acts of its subsidiary is a highly fact-specific inquiry." *Bowoto v. Chevron Texaco*

18  *Corp.*, 312 F. Supp. 2d 1229, 1235 (N.D. Cal. 2004).

19  The Court notes first that plaintiff has advanced a theory for alter ego liability that was

20  presented neither in its 4AC, nor in its briefing relative to the motion to dismiss that pleading.

21  There, plaintiff appeared to plead that Konstantino had manipulated the corporate form for his

22  own purposes and that Quattro, TriReme, and QT Vascular were his alter egos. In its current

23  briefing, plaintiff argues that the corporations were alter egos of each other and seeks to pierce the

24  corporate veil between them.

25  The Court finds that alter ego liability is not available here. Plaintiff does not advance any

26  colorable argument that defendants engaged in fraud in the corporate restructuring of the corporate

27  defendants. In addition, AngioScore fails to present a material issue of disputed fact regarding its

28  alter ego theory of liability. Of primary concern is plaintiff's contention that in the absence of

29

United States District Court
Northern District of California

1   corporate veil-piercing, injustice would result because AngioScore could not recover all the
2   proceeds of the sales of Chocolate. (Pltf. Opp. to Defts. MSJ at 25.) That is not a sufficient basis
3   for piercing the veil. "The inability of plaintiffs to recover for their losses is not a sufficient
4   inequity to justify overlooking the corporate form." *Bowoto*, 312 F. Supp. 2d at 1247; *see, e.g.,*
5   *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1113 ("Lastly, we see no injustice in
6   the effect of the trial court's findings. While it is true that the trustees apparently have a judgment
7   for several thousand dollars against an insolvent defendant, their inability to collect does not, by
8   itself, constitute an inequitable result."). The Court finds that there is not sufficient evidence to
9   support a finding that incorporation was undertaken in bad faith or that observing the corporate
10   form would produce an inequitable result.

11      Plaintiff's reliance on *In re Hydroxycut*, 810 F. Supp. 2d 1100, 1124 (S.D. Cal. 2011) does
12   not compel a different result. There, in considering whether plaintiff had made a *prima facie*
13   showing for its claim on a motion to dismiss for lack of personal jurisdiction, the court noted that
14   the defendant had "made a conscious decision to attempt to hide behind its corporate form to avoid
15   liability." *Id.* In so holding, the court likened the facts of *Hydroxycut* to those in *Craigslist, Inc. v.*
16   *Mesiab*, No. C 08-05064 CW (MEJ), 2010 WL 5300883, at \*7 (N.D. Cal. Nov. 15, 2010), where
17   the defendants emailed about their strategy to avoid litigation by manipulating the corporate form.

18      The facts marshaled by AngioScore in support of its alter ego theory do not rise to this
19   level. Indeed, although it remains disputed, AngioScore argues that QT Vascular agreed to, and
20   did, assume the liabilities of both Quattro and TriReme. (Pltf. Opp. to Defts. MSJ at 23; Ex. 31;
21   Ex. 32, 279:18-281:15.) Thus, evidence upon which AngioScore relies for its successor liability
22   argument suggests that the defendants here did not attempt to manipulate the corporate form in
23   order to avoid liability.

24      AngioScore has not presented a sufficient basis for a reasonable factfinder to disregard the
25   corporate form and hold QT Vascular liable for the acts of its subsidiaries. Defendants' motion
26   for summary judgment on this basis is GRANTED.

27

28

30

1

## MOTIONS IN LIMINE

2          The Court now turns to the motions relating to the admissibility of expert witness

3   testimony on the question of state law damages.[11]  (Dkt. Nos. 462 ("Talley Motion"); 463 ("Olsen

4   State Law Motion"); 466 ("Lewin Motion").)

5   **I.     LEGAL STANDARD**

6          Rule 702 provides that "scientific, technical, or other specialized knowledge" by a

7   qualified expert is admissible if it will "help the trier of fact to understand the evidence or to

8   determine a fact in issue."  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

9   U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137(1999), "require that the judge

10  apply his gatekeeping role . . . to all forms of expert testimony, not just scientific testimony."

11  *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002).

12         However, "far from requiring trial judges to mechanically apply the *Daubert* factors—or

13  something like them—to both scientific and non-scientific testimony, *Kumho Tire* heavily

14  emphasizes that judges are entitled to broad discretion when discharging their gatekeeping

15  function."  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  Indeed, the Ninth

16  Circuit has determined that a "trial court not only has broad latitude in determining whether an

17  expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability."

18  *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (citing *Hankey*, 203

19  F.3d at 1167) (emphasis in original), *overruled on other grounds, Estate of Barabin v.*

20  *AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th Cir.) *cert. denied*, 135 S. Ct. 55 (2014).

21         Concerning the reliability of non-scientific testimony, the "*Daubert* factors (peer review,

22  publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose

23  reliability depends heavily on the knowledge and experience of the expert, rather than the

24

25         _____

26  [11] Given that the trial in this case is bifurcated and that proceedings on the state law claims
    will proceed first, this Order addresses only the motions in limine that pertain to the state law
    claims.  The motions relative to the patent claims will be addressed only after the case on
27  plaintiff's state law claims resolve.  (Dkt. Nos. 464 ("Sheehan Motion"); 471 ("Olsen Patent
    Damages Motion").)
28

*United States District Court*
*Northern District of California*

31

methodology or theory behind it." *Hankey*, 203 F.3d at 1169; *see also Kumho Tire*, 526 U.S. at 150 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. . . . In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.").

As many courts have recognized, however, "the *Daubert* gatekeeping obligation is less pressing in connection with a bench trial" where "the 'gatekeeper' and the trier of fact [are] one and the same." *Volk v. United States*, 57 F. Supp. 2d 888, 896 n. 5 (N.D. Cal. 1999); *see also Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 596 n. 10 (D. N.J. 2002) ("[W]here the Court itself acts as the ultimate trier of fact at a bench trial, the Court's role as a gatekeeper pursuant to *Daubert* is arguably less essential."); *Fierro v. Gomez*, 865 F. Supp. 1387, 1395 n. 7 (N.D. Cal. 1994), *aff'd* 77 F.3d 301 (9th Cir. 1996), *vacated and remanded on other grounds*, 519 U.S. 918 (1996), *modified on other grounds on remand*, 147 F.3d 1158 (9th Cir. 1998) (concluding that the better approach under *Daubert* in a bench trial is to permit the contested expert testimony and "allow 'vigorous cross-examination, presentation of contrary evidence' and careful weighing of the burden of proof to test 'shaky but admissible evidence'") (quoting *Daubert*, 509 U.S. 579).

## II.    TALLEY MOTION

Defendants argue that the opinions and proposed testimony of Professor Eric L. Talley concerning "sound corporate governance" are inadmissible and beyond his expertise under the Federal Rules of Evidence and *Daubert*. (Dkt. No. 462.)

Courts have admitted expert testimony on corporate governance in breach of fiduciary duty actions insofar as such testimony is used to inform the jury about the standard of care and the scope of duties. *See, e.g., In re Homestore.com, Inc.*, No. CV 01-11115 RSWL (CWx), 2011 WL 291176, at *10 (C.D. Cal. Jan. 25, 2011) (admitting expert testimony "on the appropriate standard of behavior a CEO owes its company and shareholders" but noting that no legal conclusions could be offered); *Wattel v. Browne*, No. 02-CV-2256 PHX-PGR, 2006 WL 1211186 (D. Ariz. May 3, 2006) (admitting expert testimony on corporate governance standards in breach of fiduciary case involving directors and officers of corporation); *see also FDIC v. Jackson*, 133 F.3d 694, 700 (9th

*United States District Court*
*Northern District of California*

32

1    Cir. 1998) (referencing expert testimony submitted on summary judgment related to determination

2    of whether a corporate director has properly discharged his duties).  The ultimate question of

3    whether Konstantino breached these duties, however, is to be decided by the factfinder.

4        In light of the foregoing, the Court finds that Talley may not testify on the ultimate issue of

5    fact in this case, specifically, whether Konstantino did or did not breach his duties.  Talley may,

6    however, present an expert opinion on governance practices generally applied in the corporate

7    context to control for potential conflicts of interest.  To the extent that defendants take issue with

8    the remainder of Talley's report, those issues can come out in the crucible of cross-examination.

9    The motion is DENIED.

10    **III.    LEWIN MOTION**

11        Plaintiff argues that the proposed expert testimony of Professor David Lewin should be

12    precluded in its entirety because such testimony will not help the trier of fact to understand the

13    evidence or to determine a fact in issue and is unreliable.  (Dkt. No. 466.)  The gravamen of

14    Lewin's "expert opinion" is based merely upon anecdotal, self-selected examples, which

15    defendants argue stand for the proposition that the principles of sound corporate governance

16    practices are not consonant with real-world practices, and that Talley's opinions are "profoundly

17    anti-competitive."  (Lewin Rpt., Dkt. No. 467-2 at 7-8.)

18        Ultimately, expert opinions must have a sufficient factual and foundational basis in order

19    to be helpful.[12]  Lewin's testimony does not meet this standard.  With respect to Lewin's opinions

20    on generally accepted principles of corporate governance, the Court finds that Lewin has failed to

21    establish that his opinions are sufficiently rooted in factual knowledge such that they are reliable

22    and relevant.  These opinions are not based on any methodology or analysis.  As such, Lewin's

23

24    _____

25        [12] Defendants seek to admit Lewin's testimony insofar as Lewin rebuts Talley's testimony.
      As set forth above, Talley's testimony is limited to the generally accepted corporate governance
26    principles that govern directors' fiduciary obligations and which are directed to prevent conflicts
      of interest.  Accordingly, the Court need only address the substance of Lewin's opinion rebutting
27    those opinions; Lewin's remaining opinions, addressing the excluded portions of Talley's
28    testimony, are likewise precluded.

United States District Court
Northern District of California

33

1    opinions lack any foundation such that they may be assistance to the trier of fact. The motion is
2    GRANTED.

3    **IV.    OLSEN MOTION**

4          Defendants seek to preclude two of three damages theories offered by expert Gary Olsen
5    concerning the valuation of damages on plaintiff's state law claims. (Dkt. No. 463.) Specifically,
6    defendants question whether Olsen may provide testimony on his first theory of damages for
7    plaintiff's corporate opportunity claim based on the amount of revenues AngioScore purportedly
8    would have achieved had AngioScore "shelved" Chocolate and had Chocolate never been
9    developed and brought to the market. (*Id.* at 1.) Defendants also challenge whether Olsen may
10   provide testimony on his third theory of damages for the same claim based on a present value of
11   purported profits on sales of Chocolate after June 30, 2014. (*Id.*) Defendants contend that this
12   theory was not included in Olsen's prior reports and improperly fails to include any costs to
13   develop or bring the Chocolate to market prior to that date. (*Id.*)

14         At this juncture, the Court DENIES the motion without prejudice. Olsen will be permitted
15   to testify. The Court will consider the arguments made in this motion, and any other issues that
16   arise with respect to Olsen's state law damages calculations, either in the context of the bench trial
17   or in its ultimate findings of fact and conclusions of law.

18                                          CONCLUSION

19         For the reasons set forth above, the Court rules as follows:

20             1.  Defendants' motion to dismiss is DENIED;

21             2.  Plaintiff's motion for summary judgment is GRANTED as to the line of business

22                 factor, and DENIED as to the balance;

23             3.  Defendants' motion for summary judgment is GRANTED as to the alter ego theory,

24                 and DENIED as to the balance;

25             4.  Defendants' motion to preclude the testimony of Eric Talley is DENIED;

26             5.  Plaintiff's motion to preclude the testimony of David Lewin is GRANTED; and

27             6.  Defendants' motion to preclude certain opinions of AngioScore's state law

28                 damages expert, Gary Olsen is DENIED WITHOUT PREJUDICE.

34

1    In addition, on April 2, 2014, the Federal Circuit denied defendants' petition for writ of

2   mandamus and emergency motion for a stay of the proceedings in this Court. (Dkt. No. 587-1.)

3   Accordingly, defendants' motion to stay this action pending resolution of their petition is DENIED

4   as moot, as is their motion to shorten time on to that motion to stay.

5    This Order terminates Docket Nos. 462, 463, 466, 468, 478, 555, 575, and 576.

6

7    IT IS SO ORDERED.

8   Dated: April 6, 2015

9

10                          YVONNE GONZALEZ ROGERS
                            UNITED STATES DISTRICT COURT JUDGE

# EXHIBIT 8

UNITED STATES DISTRICT COURT **CERTIFIED COPY**

NORTHERN DISTRICT OF CALIFORNIA


BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| | | |
|---|---|---|
| ANGIOSCORE, INC., | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 12-03393 YGR |
| | ) | |
| TRIREME MEDICAL, INC., | ) | |
| EITAN KONSTANTINO AND | ) | PAGES 1 - 130 |
| QUATTRO VASCULAR PTE. LTD. | ) | |
| | ) | |
| DEFENDANT. | ) | OAKLAND, CALIFORNIA |
| | ) | TUESDAY, MARCH 3, 2015 |


## REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          QUINN, EMANUEL, URQUHART & SULLIVAN
                        55 TWIN DOLPHIN DRIVE, SUITE 560
                        REDWOOD SHORES, CALIFORNIA  94065
                   BY:  DIANE M. DOOLITTLE,
                        LAURA FAIRNENY,
                        ROBERT P. FELDMAN,
                        KIMBALL D. PARKER,
                        CATE SAAD, ATTORNEYS AT LAW


                 (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:           RAYNEE H. MERCADO, CSR NO. 8258

    PROCEEDINGS REPORTED BY ELECTRONIC RECORDING DEVICE;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

```
 1            MR. LIDDIARD:  WELL, YOUR HONOR, MY -- MY VIEW IS

 2    THAT THE MOVING PARTY WOULD HAVE THE BURDEN OF PROOF.

 3            THE COURT:  WELL, I DISAGREE WITH YOU.  THAT IS, I

 4    BELIEVE THAT --

 5       WELL, WHO'S GOING TO ARGUE THIS ONE, MR. FELDMAN?

 6            MR. FELDMAN:  I WILL.

 7            THE COURT:  OKAY.  LET'S TALK ABOUT --

 8                     (SIMULTANEOUS COLLOQUY.)

 9            MR. FELDMAN:  YOU'RE A HUNDRED PERCENT CORRECT WITH

10    RESPECT TO THE FOUR ELEMENTS AND THE BURDEN.  AND WHAT WE'RE

11    SEEKING.

12            THE COURT:  MR. LIDDIARD, YOU CAN ARGUE WHY THOSE

13    ELEMENTS DO NOT CONTROL.

14            MR. LIDDIARD:  WELL, YOUR HONOR, I'M NOT ARGUING THAT

15    THEY DON'T CONTROL.  WHAT I'M SAYING IS THAT THE COURT,

16    SITTING IN EQUITY HERE -- AND THIS IS AN EQUITABLE CLAIM --

17    WOULD HAVE TO TAKE ALL OF THESE FACTORS IN -- INTO

18    CONSIDERATION IN THEIR TOTALITY.  AND THE BROZ DECISION FROM

19    THE DELAWARE SUPREME COURT ARTICULATES ANOTHER TEST, YOUR

20    HONOR, AND IF I -- I MAY READ IT.

21            THE COURT:  SO ARE YOU ARGUING THAT THIS DOES NOT GO

22    TO THE JURY?

23            MR. LIDDIARD:  I THINK MR. FELDMAN AND I ARE IN

24    AGREEMENT THAT THE BREACH OF FIDUCIARY DUTY CLAIM IS NOT A

25    JURY ISSUE, YOUR HONOR.
```

1          **THE COURT:** AGREED, MR. FELDMAN?

2              **MR. FELDMAN:** IT WOULD SO APPEAR, YOUR HONOR.

3                  (PAUSE IN THE PROCEEDINGS.)

4          **THE COURT:** SO THE ONLY THING THAT'S GOING TO THE

5    JURY, THEN, IS THE PATENT INFRINGEMENT CLAIM, YOUR FIRST CAUSE

6    OF ACTION?

7       MR. FELDMAN?

8              **MR. FELDMAN:** IT WOULD SO APPEAR. I -- I'M SAYING IT

9    THE WAY I'M SAYING IT BECAUSE THAT WOULD BE MY UNDERSTANDING.

10   THERE ARE -- WITH RESPECT TO SOME ASPECTS OF THE FIDUCIARY

11   DUTY CLAIM, THERE MAY BE SOME DOUBT ABOUT THAT SO THAT IF

12   THERE WERE A DISPUTE, I WOULD SUGGEST THAT WE RETURN TO YOUR

13   HONOR TO BRIEF IT.

14      I'VE ATTEMPTED TO FIND OUT WHETHER THIS IS A DISPUTE.  I

15   HAVEN'T BEEN SUCCESSFUL IN FINDING THAT OUT, SO IT WOULD BE

16   OUR POSITION THAT THE ENTIRE FIDUCIARY DUTY ASPECT OF THE CASE

17   IS FOR THE COURT.  I CAN'T REPRESENT TO YOU THAT I KNOW THAT

18   EVERY SINGLE ASPECT OF IT IS, BUT THAT IS MY BELIEF.

19             **THE COURT:** AND THAT'S YOUR BELIEF.

20             **MR. LIDDIARD:** YOUR HONOR, RIGHT NOW, IT'S UNCLEAR ON

21   THE AIDING AND ABETTING CLAIM, WHICH IS BROUGHT UNDER

22   CALIFORNIA LAW, CALIFORNIA TORT, WHETHER OR NOT THAT WOULD BE

23   TRIABLE TO A JURY OR NOT.  WE'RE ENDEAVORING TO DO SOME

24   RESEARCH ON THAT PARTICULAR ISSUE.  BUT IN LIGHT OF THE FACT

25   THAT THERE'S A PATENT CLAIM AND THERE'S A JURY TRIAL ANYHOW,

1    WE HAVEN'T GOT TO THE POINT OF COMPLETING OUR RESEARCH ON THAT

2    PARTICULAR POINT.

3        AND TO MY KNOWLEDGE --

4            **THE COURT:**  WELL, I'M GOING TO -- BECAUSE I WILL

5    BIFURCATE THIS.  THAT IS, THE PATENT INFRINGEMENT CLAIMS ARE

6    DISTINCTLY DIFFERENT FROM THE BREACH OF FIDUCIARY DUTY CLAIMS.

7    AND THE AMOUNT OF TIME THAT HAS TO GO INTO ONE IS

8    SIGNIFICANTLY DIFFERENT THAN THE OTHER.  SO --

9            **MR. LIDDIARD:**  WELL --

10           **MR. FELDMAN:**  MAY I -- MAY I BE HEARD ON THAT, YOUR

11   HONOR?

12           **THE COURT:**  YOU MAY.

13           **MR. FELDMAN:**  LET ME ADDRESS THE LEGAL ISSUE, WHICH,

14   AS I SAID, I'VE ATTEMPTED TO GET SOME TRACTION ON AND HAVEN'T

15   BEEN ABLE TO.

16       WITH RESPECT TO THE LEGAL -- WITH RESPECT TO THE -- I

17   DON'T MEAN LEGAL VERSUS EQUITABLE, BUT WITH RESPECT TO THE

18   LEGAL QUESTION THAT YOU ASKED, HERE'S WHAT I BELIEVE THE STATE

19   OF THE LAW TO BE.  I BELIEVE THE STATE OF THE LAW TO BE THAT

20   WITH RESPECT TO THE FIDUCIARY DUTY CLAIM, THAT IS FOR YOUR

21   HONOR, BOTH WITH RESPECT TO LIABILITY AND REMEDY.

22       I BELIEVE IT'S EQUITABLE.  I BELIEVE IT'S FOR YOU TO

23   DECIDE THE FACTS WITH RESPECT TO LIABILITY AND FOR YOU TO

24   ORDER A REMEDY.  AND I SUBMIT THAT I HOPE YOU WILL.

25       WITH RESPECT TO THE AIDING AND ABETTING CLAIM, HERE'S WHAT

1  I KNOW TODAY:  BREYER HAS WRITTEN THAT IN CONNECTION WITH A

2  BREACH OF FIDUCIARY DUTY CLAIM, AIDING AND ABETTING IS DECIDED

3  UNDER CALIFORNIA LAW, EVEN WHERE THE AIDING AND ABETTING IS OF

4  A BREACH OF DUTY UNDER DELAWARE LAW.

5      HE DECIDED THAT IN THE *IN RE: BROCADE* CASE.  I BELIEVE

6  IT'S IN THE FOOTNOTE.  I DON'T REMEMBER THE FOOTNOTE NUMBER,

7  BUT IT'S IN THE *IN RE: BROCADE* CASE.  HE DID NOT CITE ANY

8  AUTHORITY, BUT I BELIEVE HE'S CORRECT, AND I'M NOT AWARE OF

9  ANY CONTRARY AUTHORITY.

10     WITH RESPECT TO WHETHER THE AIDING -- AIDING -- AND AS I

11 SAID, I'VE ATTEMPTED TO GET TRANSACTION ON THIS.  WITH RESPECT

12 TO WHETHER THE AIDING AND ABETTING CLAIM -- AIDING AND

13 ABETTING BREACH OF FIDUCIARY DUTY CLAIM BRINGS WITH IT A JURY

14 TRIAL, I BELIEVE THE ANSWER IS NO.  I BELIEVE THERE'S NO CASE

15 THAT ADDRESSES THAT.

16     I BELIEVE THIS IS THE -- THE FOLLOWING IS THE CORRECT

17 ANALYSIS:  UNDER CALIFORNIA LAW, WHICH I BELIEVE WOULD CONTROL

18 HERE BUT I'M NOT POSITIVE, I BELIEVE THAT YOUR HONOR WOULD

19 CONCLUDE THAT THE CORRECT TEST IS WHETHER THE GIST -- THAT'S

20 SPELLED G-I-S-T -- IS -- IS AN EQUITABLE OR LEGAL CLAIM.

21     IF IT IS AN EQUITABLE CLAIM, I BELIEVE YOUR HONOR DECIDES.

22 IF IT IS A LEGAL CLAIM, THEN I BELIEVE A JURY WOULD BE

23 IMPANELED.

24     I -- WE HAVE NOT FOUND TO DATE ANY CASE THAT ADDRESSES

25 WHETHER THE GIST OF A AIDING AND ABETTING OF BREACH OF

1    FIDUCIARY DUTY IS LEGAL OR EQUITABLE.  SO -- AND WE HAVEN'T --

2    YES, WE HAVEN'T FOUND THAT.  WE ACTUALLY HAVE NOT FOUND ANY

3    CASE THAT ADDRESSES THE MORE GENERAL -- SLIGHTLY MORE GENERAL

4    QUESTION OF WHETHER AIDING AND ABETTING A BREACH OF AN

5    EQUITABLE TORT IS JURY OR JUDGE.

6        I BELIEVE -- IT WOULD -- AND WE WOULD SUBMIT AND REQUEST

7    THAT THAT GO TO YOUR HONOR; THAT IS, THE AIDING AND ABETTING,

8    IN MY VIEW, IS A -- IS A CALIFORNIA TORT AND WOULD -- THE GIST

9    OF IT, SINCE IT'S AIDING AND ABETTING AND EQUITABLE TORT,

10   WOULD BE ITSELF A EQUITABLE CLAIM, AND THAT WOULD GO TO YOUR

11   HONOR.

12       WITH RESPECT TO THE ISSUES OF SUCCESSOR LIABILITY, ALTER

13   EGO, AND THOSE, IF YOU WILL, SECONDARY LIABILITY CLAIMS,

14   THOSE -- THOSE ARE -- AND, TO THE BEST OF MY UNDERSTANDING AND

15   RESEARCH, THOSE ARE EQUITABLE AS WELL.

16       SO THERE'S, TO MY WAY OF THINKING, LITTLE TO NO DOUBT

17   ABOUT ANY OF THIS EXCEPT FOR THE AIDING AND ABETTING.  AND

18   WITH RESPECT TO AIDING AND ABETTING, IF YOUR HONOR WERE

19   INCLINED TO FOLLOW JUDGE BREYER AND WHAT I THINK IS RELATED

20   CALIFORNIA LAW, YOU WOULD CONCLUDE THAT YOUR HONOR HAS THE

21   OBLIGATION TO -- TO ADDRESS THOSE ISSUES AS WELL.

22       THIS IS NOT THE FIRST TIME -- SINCE COUNSEL SAID WHAT HE

23   AND I HAVE DISCUSSED, I'VE TRIED TO GET AN ANSWER TO THIS

24   BEFORE SO THAT WHEN WE CAME TO YOU AND YOU ASKED US THESE

25   QUESTIONS, WE EITHER HAD AN AGREEMENT OR A DISAGREEMENT.

1    YOU.

2          **THE COURT:**  OKAY.  I WAS GOING TO SAY HAVE A GOOD

3    WEEKEND, BUT IT'S ONLY TUESDAY.

4          **MR. LIDDIARD:**  FEELS LIKE A FRIDAY.

5          **THE COURT:**  I HEAR YOU ALREADY.  THANK YOU.

6    WE'RE OFF THE RECORD.

7          (PROCEEDINGS WERE CONCLUDED AT 12:16 P.M.)

8                        --oOo--

9

10

11                **CERTIFICATE OF REPORTER**

12

13          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

14    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

15    I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,

16    NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS

17    HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR

18    OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

19

20    _____

21          RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

22              SUNDAY, MARCH 15, 2015

23

24

25

# EXHIBIT 9

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| EITAN KONSTANTINO, | ) |
| | ) |
| Plaintiff/Counterclaim | ) |
| Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| ANGIOSCORE, INC. | ) C.A. No. 9681-CB |
| | ) |
| Defendant/Counterclaim | ) |
| Plaintiff/Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| QUATTRO VASCULAR PTE LTD., | ) |
| QT VASCULAR LTD., and TRIREME | ) |
| MEDICAL, LLC | ) |
| | ) |
| Third-Party Defendants. | ) |

**CERTIFIED RESPONSE AND OBJECTIONS OF ANGIOSCORE, INC. TO PLAINTIFF'S OCTOBER 10, 2014 DEMAND FOR ADVANCEMENT**

Defendant AngioScore, Inc. ("AngioScore"), by and through the undersigned counsel, and pursuant to the Court's Order of August 15, 2014 and the Court's corrected Order of September 22, 2014, collectively the "Order," hereby submits its response and objections (the "Response") to the October 10, 2014 demand for advancement submitted by plaintiff Eitan Konstantino ("Plaintiff").

1.    The Order awarded advancement of fees and expenses incurred by Plaintiff in prosecuting Counts I and II of the Verified Complaint for Advancement

(the "Complaint") and for defending against (a) the second, third, and fifth causes of action in litigation pending in the U.S. District Court for the Northern District of California, captioned *AngioScore, Inc. v. TriReme Medical, LLC, et al.*, Case No. 4:12-cv-3393-YGV (the "Federal Action"), (b) claims asserted in an action pending in Alameda County Superior Court captioned *AngioScore, Inc. v. Konstantino*, Case No. RG14725578 (the "California Action"), and (c) the counterclaim asserted against Plaintiff in the above-captioned action (collectively, the "Covered Claims").

2.      The Order also required Plaintiff to submit to AngioScore a demand, compliant with the form set forth in Paragraph 4 of the Order, by October 10, 2014, for time and expenses incurred through September 30, 2014.  Plaintiff's counsel, Wilson Sonsini Goodrich and Rosati, P.C. ("WSGR"), submitted such a demand on October 10, 2014 (the "Demand").

3.      The Demand attached three invoices (collectively, the "Invoices") for work done by WSGR between September 1, 2014 and September 30, 2014.

4.      AngioScore objects to and disputes certain amounts, identified in the schedule attached hereto as Exhibit A, sought by the Demand as unnecessary, unsupported, or otherwise outside of the scope of the advancement or payment right.

5.     The undisputed amounts set forth in the Invoices total $312,463.71. The disputed amounts set forth in the Invoices total $486,044.51. Below, Table 1 summarizes the Invoices. Table 1 also contains total and invoice-specific disputed and undisputed amounts demanded.

| | Date Range of Entries | Actions | Total Amount | Undisputed Amount | Disputed Amount |
|---|---|---|---|---|---|
| **Grand Totals** | 9/1/2014 to 9/30/2014 | All | **$798,508.24** | **$312,463.73** | **$486,044.51** |

| Invoice No. | Invoice Date | Action | Total Amount | Undisputed Amount | Disputed Amount |
|---|---|---|---|---|---|
| 1584211 | 10 Oct. 2014 | Federal | **$732,312.23** | **$250,150.86** | **$482,161.38** |
| 1584212 | 10 Oct. 2014 | California | **$41,007.94** | **$39,597.94** | **$1,410.00** |
| 1584210 | 10 Oct. 2014 | Delaware | **$25,188.05** | **$22,714.93** | **$2,473.13** |

**Table 1**

6.     The bases upon which AngioScore relies in objecting to and disputing the amounts reflected in Exhibit A are as follows:

7.     ***Failure to Apportion Fees Between Patent Litigation Tasks (non-Covered Claims) and Covered Claims in the Federal Action.*** The Invoices include $732,312.23 incurred in only *one month* (September 2014) in the Federal Action. The scope of WSGR's representation of the Plaintiff in the Federal Action is narrow - WSGR represents only Plaintiff (one of four defendants in the action)

on only certain claims (the second, third, and fifth causes of action). The Federal

Action was initially filed by AngioScore on October 17, 2012 and, until May 2014,

AngioScore asserted only causes of action against Plaintiff related to patent

infringement.

8.      Plaintiff has taken the position that the amended causes of action for

breach of fiduciary duty added an entirely different set of claims that were distinct

from the claims for patent infringement. Indeed, Ms. Montgomery-Reeves

explained in Plaintiff's Certified Reply to the Certified Response and Objections of

AngioScore to Plaintiff's September 5, 2014 Demand for Advancement (the

"September 24, 2015 WSGR Reply"): "Konstantino opposed the motion for leave

to add the state law claims against him, and part of that opposition argued that the

patent claim and the alleged breach of fiduciary duty claims were sufficiently

distinct and unrelated, such that the Federal court should not exercise discretion

over these unrelated, supplemental, claims." (Para. 28, at page 19).

9.      Plaintiff's alleged breach of fiduciary duty is totally distinct from

Plaintiff's alleged patent infringement. The key time period for establishing the

breach of fiduciary duty claim is mid-2009 through February 2010, when Plaintiff

resigned from the Board of Directors of AngioScore. However, the patent

infringement did not occur until December 2011, when the commercialization of

the Chocolate device began, long after the key facts for the breach of fiduciary

duty claim.   Moreover, the factual bases for demonstrating that a breach of

fiduciary duty occurred are different from those necessary to prove patent

infringement: for example, the alleged failure of Plaintiff to inform the Board of

AngioScore about his early work on the Chocolate device would constitute a

breach of fiduciary duty regardless of whether or not the Chocolate device

infringed a patent.  The factual issues regarding patent infringement are the

structure of the Chocolate device and the validity of the patent over the prior art,

none of which is relevant to the breach of fiduciary duty case.

      10.     The Federal Action started as a patent infringement action and after

the operative pleading was amended to include claims for breach of fiduciary duty,

the patent infringement claims continued to be litigated.   To the extent work

needed to be performed for the patent infringement aspect of the Action, that work

is not subject to advancement, as it would have had to be done regardless of

whether the breach of fiduciary duty claims had been added.  Despite the fact that

WSGR states the scope of its representation of Plaintiff does not include his

defense with regard to the patent claims and despite the fact that Agility IP has

been designated as the law firm that represents Plaintiff with regard to patent

claims, WSGR is in fact performing tasks that relate only to the defense of the

patent claims and improperly including the fees associated with that work in the

Demand.  Moreover, to the extent WSGR worked on general case management

OF COUNSEL:
James W. Geriak
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
650 Town Center Drive
Fourth Floor
Costa Mesa, CA 92626
(714) 513-5100

William L. Respess
Elizabeth S. Balfour
SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
12275 El Camino Real
Suite 200
San Diego, CA 92130
(858) 720-8900

Dated: October 20, 2014

YOUNG CONAWAY STARGATT
    & TAYLOR LLP

*/s/ William D. Johnston*
William D. Johnston (No. 2123)
Kathaleen St. J. McCormick (No. 4579)
Elisabeth S. Bradley (No. 5459)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

*Attorneys for AngioScore, Inc.*


## CERTIFICATION

I, William D. Johnston, certify that the foregoing Response is true and correct, that I personally reviewed the Demand and the Invoices, and, in my professional judgment, in consultation with counsel for AngioScore, Inc., in the underlying proceedings, the disputed fees and expenses identified in Exhibit A to the Response are not reasonable or otherwise fall outside of the scope of Plaintiff's advancement of payment right.

*/s/ William D. Johnston*
William D. Johnston (No. 2123)

# EXHIBIT 10

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EITAN KONSTANTINO,                                    )
                                                      )
            Plaintiff/Counterclaim                    )
            Defendant,                                )
                                                      )
      v.                                              )
                                                      )
ANGIOSCORE, INC.,                                     )
                                                      )
            Defendant/Counterclaim                    )
            Plaintiff/Third-Party                     )
            Plaintiff,                                )
                                                      )  C.A. No. 9681-CB
      v.                                              )
QUATTRO VASCULAR PTE LTD.,                            )
QT VASCULAR LTD., TRIREME                             )
MEDICAL, LLC, TRIREME                                 )
MEDICAL (SINGAPORE) PTE. LTD., and                   )
the GROUP, a *de facto* partnership                  )
comprised of TRIREME MEDICAL, LLC,                   )
QT VASCULAR LTD., QUATTRO                             )
VASCULAR PTE LTD., and TRIREME                        )
MEDICAL (SINGAPORE) PTE LTD.,                         )
                                                      )
            Third-Party Defendants.                   )

## CERTIFIED RESPONSE AND OBJECTIONS OF ANGIOSCORE, INC. TO PLAINTIFF'S FEBRUARY 10, 2015 DEMAND FOR ADVANCEMENT

Defendant AngioScore, Inc. ("AngioScore"), by and through the undersigned counsel, and pursuant to the Court's Order of August 15, 2014 and the Court's corrected Order of September 22, 2014, collectively the "Order," hereby submits its response and objections (the "Response") to the February 10, 2015 demand for advancement submitted by plaintiff Eitan Konstantino ("Plaintiff").

1.      This Response incorporates as if fully set forth herein the factual background set forth in paragraphs 1 and 2 of the Certified Response and Objections of AngioScore, Inc. to Plaintiff's January 22, 2015 Demand for Advancement (the "January Response"). All defined terms used in this Response have the same meaning set forth in the January Response unless otherwise indicated.

2.      Plaintiff's counsel, Wilson Sonsini Goodrich and Rosati, P.C. ("WSGR"), submitted a demand for advancement on February 10, 2014 (the "Demand"). The Demand attached six invoices (collectively, the "Invoices"). Two of the invoices pertained to work done by WSGR between January 1, 2015 and January 31, 2015, two of the invoices pertained to work done by FTI Consulting between January 1, 2015 and January 31, 2015, one of the invoices pertained to work done by Exponent between January 1, 2015 and January 31, 2015, and the final invoice pertained to work done by St. Elizabeth's Medical Center between January 1, 2015 and January 31, 2015.

3.    The amounts set forth in the Invoices total $1,046,135.17.  Below,

Table 1 summarizes the Invoices.

|  | Date Range of Entries | Actions | Total Amount |
|---|---|---|---|
| Grand Totals | Febuary 10, 2015 | Delaware and Federal | $1,046,135.17 |

| Invoice No. | Invoice Date | Action | Total Amount |
|---|---|---|---|
| 7369644 | February 5, 2015 | Breach of Fiduciary Duty | $5,565.00 |
| 1612202 | February 10, 2015 | Federal Action | $1,007,089.63 |
| 7369597 | January 31, 2015 | FTI Corporate Governance | $3,600.00 |
| January 2015 | January 2015 | Lawrence Garcia | $3,875.00 |
| 1612201 | February 10, 2015 | Delaware Action | $24,273.54 |
| 269383 | February 4, 2015 | Exponent | $1,732.00 |

**Table 1**

4.    AngioScore intends to pay the total amount sought in the February

Demand, $1,046,135.17, in the next monthly transfer presently scheduled for

March 2, 2015, in light of the Court's February 16, 2015 bench ruling granting

Plaintiff Eitan Konstantino's Motion for Advancement of Fees and Expenses

Pursuant to Rule 88, and the February 20, 2015 implementing order.

5.    AngioScore's payment of such amounts is without waiver of any

objection AngioScore could assert to Plaintiff's advancement demands at any later

stage, including any "clawback" proceeding or any proceeding concerning

Plaintiff's lack of entitlement to indemnification.  AngioScore's payment of such

amount is also without waiver of any arguments AngioScore may make on any

potential appeal in this action, including but not limited arguments challenging the

February 16, 2015 bench ruling and February 20, 2015 implementing order. Likewise, nothing herein shall be construed as a waiver of any arguments AngioScore may pursue in connection with its counterclaims and Third-Party Claims in this action.

6.      To remove any doubt as to whether AngioScore has adequately preserved objections it could make in this Response, AngioScore includes its general objections below:

7.      ***Failure to Apportion Fees Between Patent Litigation Tasks (non-Covered Claims) and Covered Claims in the Federal Action.***      The scope of WSGR's representation of the Plaintiff in the Federal Action is narrow—WSGR represents only Plaintiff (one of four defendants in the action) on only certain claims (the second, third, and fifth causes of action).      The Federal Action was initially filed by AngioScore on October 17, 2012 and, until May 2014, AngioScore asserted only causes of action against Plaintiff related to patent infringement.

8.      Plaintiff's alleged breach of fiduciary duty is distinct from Plaintiff's alleged patent infringement.  The key time period for establishing the breach of fiduciary duty claim is mid-2009 through February 2010, when Plaintiff resigned from the Board of Directors of AngioScore.  However, the patent infringement did not occur until December 2011, when the commercialization of the Chocolate

-4-

device began, long after the key facts underlying the breach of fiduciary duty claim.    Moreover, the factual bases for demonstrating that a breach of fiduciary duty occurred are different from those necessary to prove patent infringement: for example, the alleged failure of Plaintiff to inform the Board of AngioScore about his early work on the Chocolate device would constitute a breach of fiduciary duty regardless of whether or not the Chocolate device infringed a patent.    The factual issues regarding patent infringement are the structure of the Chocolate device and the validity of the patent over the prior art, none of which is relevant to the breach of fiduciary duty case.

    9.    Despite the fact that WSGR states the scope of its representation of Plaintiff does not include his defense of the patent claims, and despite the fact that Agility IP has been designated as the law firm that represents Plaintiff with regard to the patent claims, it appears from the January invoice that WSGR is in fact performing tasks that relate only to the defense of the patent claims and improperly including the fees associated with that work in the Demand.    It is unclear whether WSGR has, in fact, removed from the invoice submitted for advancement claim time spent on the defense of Plaintiff with regard to patent claims.    WSGR cannot be permitted to simply lump all work performed for Plaintiff into the advancement invoice based on the bald assertion that this work was in fact performed in relation to the breach-of-fiduciary-duty claims.

10.    *Failure to Apportion Fees Between Work Performed for Plaintiff and Work Performed for the Corporate Defendants in the Federal Action.* It also appears that WSGR has improperly included the fees associated with performing work for the other three defendants which are not entitled to any fee advancement: TriReme, QT, and Quattro, despite the fact that only Plaintiff has a right to advancement.

11.    *"Block Billing" and Vague Entries.* "Block billing" entries and vague descriptions prevent AngioScore from making a determination regarding whether, on the face of the submitted entry, the work performed is subject to advancement.    Some block-billed entries, for example, do not make clear how much time was spent on work for Plaintiff in connection with the Covered Claims versus the non-covered, patent, claims.  Other block-billed entries, for example, do not make clear how much time was spent on work related to the defense of Plaintiff, as opposed to work related to the defense of the Corporate Defendants in the Federal Action.

OF COUNSEL:
James W. Geriak
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
650 Town Center Drive
Fourth Floor
Costa Mesa, CA 92626
(714) 513-5100

William L. Respess
Elizabeth S. Balfour
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
12275 El Camino Real
Suite 200
San Diego, CA 92130
(858) 720-8900

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

*/s/ Kathaleen S. McCormick*
William D. Johnston (No. 2123)
Kathaleen S. McCormick (No. 4579)
Elisabeth S. Bradley (No. 5459)
Matthew C. Bloom (No. 5867)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

*Counsel for Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff AngioScore, Inc.*

Dated: February 20, 2015

## CERTIFICATION

I, Kathaleen S. McCormick, certify that the foregoing Response is true and correct, that I personally reviewed the Demand and the Invoices, and, in my professional judgment, in consultation with counsel for AngioScore, Inc. in the underlying proceedings, certain of the fees and expenses sought in the Demand and Invoices are not reasonable or otherwise fall outside of the scope of Plaintiff's advancement of payment right.

*/s/ Kathaleen S. McCormick*
Kathaleen S. McCormick (No. 4579)

-7-