No. 2016-1126, -1142

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————————

### ANGIOSCORE, INC.,

*Plaintiff-Appellee,*

v.

### TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD., QT VASCULAR LTD., AND EITAN KONSTANTINO,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the Northern District of California
No. 4:12-cv-3393 (Hon. Yvonne Gonzalez Rogers)

———————————————

**BRIEF OF DEFENDANTS-APPELLANTS TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD., AND QT VASCULAR LTD.**

———————————————

David A. Caine
ARNOLD & PORTER LLP
1801 Page Mill Road, Suite 110
Palo Alto, CA 94304
Tel:  (650) 798-2920
Fax: (650) 798-2999
david.caine@aporter.com

Lisa S. Blatt
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel:  (202) 942-5000
Fax: (202) 942-5999
lisa.blatt@aporter.com

*Counsel for Defendants-Appellants*
*TriReme Medical, LLC, Quattro Vascular PTE Ltd., and QT Vascular Ltd.*

[additional counsel listed on inside cover]

David S. Steuer
Steven D. Guggenheim
Dylan J. Liddiard
WILSON SONSINI GOODRICH &
  ROSATI
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300
dsteuer@wsgr.com

*Counsel for Defendants-Appellants*
*TriReme Medical, LLC, Quattro Vascular PTE Ltd., and QT Vascular Ltd.*

# CERTIFICATE OF INTEREST

Counsel for appellants TriReme Medical, LLC, Quattro Vascular PTE Ltd., and QT Vascular Ltd. certifies the following:

1.    The full names of every party represented by me:

TriReme Medical, LLC, Quattro Vascular PTE Ltd., and QT Vascular Ltd.

2.    The names of the real parties in interest represented by me:

See response to item 1.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me:

QT Vascular Ltd. discloses that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock. Quattro Vascular PTE Ltd. discloses that QT Vascular Ltd. owns 100% of its shares.

4.    The names of all law firms, and the partners or associates, that appeared for the parties represented by me in the trial court or are expected to appear in this Court:

Lisa S. Blatt and David A. Caine of Arnold & Porter LLP; Anne Aufhauser, Brian Danitz, Catherine Grealis, Cheryl W. Foung, Steven D. Guggenheim, Joy Kim, Charlene Koski, Dylan J. Liddiard, Edmundo Marquez, Thomas J. Martin, Jasmine Owens, David S. Steuer, Cali Tran, Daniel Turbow, and Rebecca Wolitz of Wilson Sonsini Goodrich & Rosati, PC; Brandon Baum, David Caine, Thomas Carmack, Michael Nguyen, and James Otteson of Agility IP Law, LLP and Arnold & Porter LLP; William Gerard von Hoffman III, Joseph Re, Joshua Stowell, and Sheila Swaroop of Knobbe, Martens, Olson, Bear, LLP; John Claassen of Claassen Professional Corporation.


Dated:  February 16, 2016                    /s/  Lisa S. Blatt_____
                                             Lisa S. Blatt

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ...................................................................2

INTRODUCTION ................................................................................3

STATEMENT OF THE CASE ..............................................................5

STATEMENT OF FACTS ....................................................................9

SUMMARY OF ARGUMENT ............................................................16

STANDARD OF REVIEW .................................................................18

ARGUMENT .....................................................................................20

I.    THE DISTRICT COURT LACKED SUBJECT MATTER JURISDICTION
      OVER THE STATE-LAW CLAIMS ............................................20

      A.    The State and Federal Claims Did Not Derive From a Common
            Nucleus of Operative Facts ................................................21

      B.    Alternatively, the Court Should Have Dismissed the State-Law
            Claims Under Section 1367(c) ...........................................26

      C.    The District Court Lacked Jurisdiction Over the Unfair
            Competition Claim Under 28 U.S.C. § 1338(b) ...................29

II.   THE CHOCOLATE INVENTION WAS NOT A "CORPORATE
      OPPORTUNITY" UNDER DELAWARE LAW ...............................30

      A.    A Director's Own Invention Is Not a Corporate Opportunity ...............31

      B.    The District Court's Decision Bypassed Settled Delaware Law
            Governing a Fiduciary's Right to Prepare to Compete ..........36

III.   FEDERAL LAW WOULD PREEMPT ANY STATE LAW TREATING CHOCOLATE AS A "CORPORATE OPPORTUNITY" ...............................39

    A.   Federal Law Preempts Any State Law That Diminishes an Inventor's Rights in His Invention.............................................................39

    B.   Federal Law Preempts Any State Law Providing Patent-Like Protection for an Unpatented Article .......................................42

IV.   FELD'S ASSIGNMENT OF HIS INTEREST IN THE CHOCOLATE PATENT APPLICATIONS PRECLUDES ANY FINDING OF HARM........44

    A.   Feld's Rights Permitted Defendants to Make and Sell Chocolate..........45

    B.   The District Court Erred in Assuming That Feld Would Have Relinquished His Rights to AngioScore .................................47

V.   THE "LOST PROFITS" AWARD IS REVERISIBLE ERROR .....................49

    A.   The Lost Profits Award Is Contrary to Public Policy ............................50

    B.   The District Court Failed to Deduct the Costs AngioScore Would Have Incurred in Acquiring Chocolate ......................................52

VI.   THE DISTRICT COURT ERRED IN DENYING ATTORNEYS' FEES FOR ANGIOSCORE'S FRIVOLOUS PATENT CLAIM ..............................53

    A.   The District Court Denied Summary Judgment on AngioScore's Theory of Infringement Under the Doctrine of Equivalents...................54

    B.   The Doctrine of Equivalents Did Not Apply As a Matter of Law..........57

CONCLUSION ......................................................................................................60

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

CASES                                                                         **Page(s)**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
   805 F.3d 1368 (Fed. Cir. 2015) .......................................................47

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
   2016 WL 363443 (Fed. Cir. 2016) ...............................55, 57, 58, 59

*Asyst Techs., Inc. v. Emtrak, Inc.*,
   402 F.3d 1188 (Fed. Cir. 2005) ...............................................58, 59

*Augme Techs., Inc. v. Yahoo! Inc.*,
   755 F.3d 1326 (Fed. Cir. 2014) ...............................................58, 59

*Axel Johnson, Inc. v. Carroll Carolina Oil Co.*,
   145 F.3d 660 (4th Cir. 1998) ............................................................24

*Bd. of Trs. v. Roche Molecular Sys., Inc.*,
   131 S. Ct. 2188 (2011).....................................................39, 40, 41

*Biotechnology Indus. Org. v. District of Columbia*,
   496 F.3d 1362 (Fed. Cir. 2007) .......................................................42

*Black v. Hollinger Int'l, Inc.*,
   872 A.2d 559 (Del. 2005).................................................................34

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989)..........................................................................42

*Broz v. Cellular Info. Sys, Inc.*,
   673 A.2d 148 (Del. 1996) .................................................................31

*Carlson v. Hallinan*,
   925 A.2d 506 (Del. Ch. 2006) .........................................................33

*Carnegie-Mellon Univ. v. Cohill*,
   484 U.S. 343 (1988)..........................................................................28

*Clark v. B.H. Holland Co.*,
   86 F.3d 1178 (Fed. Cir. 1996) (unpublished)........................21, 22, 23

*Compco Corp. v. Day-Brite Lighting, Inc.*,
  376 U.S. 234 (1964)..................................................................................42

*David J. Greene & Co. v. Dunhill Int'l, Inc.*,
  249 A.2d 427 (Del. Ch. 1968) ...............................................................34

*Dubroff v. Wren Holdings, LLC*,
  2011 WL 5137175 (Del. Ch. Oct. 28, 2011) .........................................53

*Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*,
  2007 WL 1991179 (Del. Super. Ct. June 19, 2007)...............................52

*Equity Corp. v. Milton*,
  221 A.2d 494 (Del. 1966)...................................................................34, 35

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998) .......................................................39, 41

*Guth v. Loft, Inc.*,
  5 A.2d 503 (Del. 1939)...............................................................31, 32, 35

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  134 S. Ct. 1744 (2014)......................................................................19, 57

*Highway Equip. Co. v. FECO, Ltd.*,
  469 F.3d 1027 (Fed. Cir. 2006) ...................................................20, 21, 22

*Honeywell, Inc. v. S.F. Hous. Auth.*,
  164 F. Supp. 2d 1130 (N.D. Cal. 2001), *aff'd in part, rev'd in part
  and remanded*, 72 F. App'x 609 (9th Cir. 2003)...................................50

*Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*,
  858 A.2d 392 (Del. Ch. 2004), *rev'd in part on other grounds*, 872
  A.2d 944 (Del. 2005) ..............................................................................52

*Impreglon, Inc. v. Newco Enterprises, Inc.*,
  508 F. Supp. 2d 1222 (N.D. Ga. 2007)..................................................38

*Kohls v. Duthie*,
  791 A.2d 772 (Del. Ch. 2000) ...............................................................34

*Lekoff v. Gen. Motors Corp.*,
  No. 92-7138, 1993 WL 193367 (E.D. Pa. June 8, 1993) .....................25

v

*Levin v. Commerce Energy, Inc.*,
    560 U.S. 413 (2010)........................................................................28

*Life Techs. Inc. v. Clontech Labs., Inc.*,
    224 F.3d 1320 (Fed. Cir. 2000) ....................................................48

*Mars, Inc. v. Kabushiki-Kaisha Nippon Conlux*,
    24 F.3d 1368 (Fed. Cir. 1994) ......................................................21

*Moore U.S.A., Inc. v. Standard Register Co.*,
    229 F.3d 1091 (Fed. Cir. 2000) .........................................57, 58, 59

*Nordock, Inc. v. Sys., Inc.*,
    803 F.3d 1344 (Fed. Cir. 2015) ....................................................52

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014)...................................................................54

*Rite-Hite Corp. v. Kellen Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) ......................................................19

*Schering Corp. v. Roussel-UCLAF SA*,
    104 F.3d 341 (Fed. Cir. 1997) ......................................................46

*Science Accessories Corp. v. Summagraphics Corp.*,
    425 A.2d 957 (Del. 1980) .............................................................37

*Sears, Roebuck & Co. v. Stiffel Co.*,
    376 U.S. 225 (1964).......................................................................42

*Source Servs. Corp. v. Bogdan*,
    47 F.3d 1165 (4th Cir. 1995) (unpublished).................................38

*Tavory v. NTP, Inc.*,
    297 F. App'x 976 (Fed. Cir. 2008) ..............................42, 48, 49, 50

*Thorpe by Castleman v. CERBCO, Inc.*,
    676 A.2d 436 (Del. 1996)........................................................33, 34

*U.S. Valves, Inc. v. Dray*,
    212 F.3d 1368 (Fed. Cir. 2000) ....................................................19

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
411 F.3d 1369 (Fed. Cir. 2005) .......................................................19, 39, 42, 43

*United Aircraft Corp. v. Boreen*,
413 F.2d 694 (3d Cir. 1969) ................................................................38

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966)................................................................26, 28

*United States v. Dubilier Condenser Corp.*,
289 U.S. 178 (1933)................................................................40

*Voda v. Cordis Corp.*,
476 F.3d 887 (Fed. Cir. 2007) .......................................18, 19, 20, 21, 26, 27, 29

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)................................................................50

*Wisconsin Alumni Research Found. v. Xenon Pharm., Inc.*,
591 F.3d 876 (7th Cir. 2010) ................................................................45

*Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*,
206 F.3d 1408 (Fed. Cir. 2000) .......................................................54, 55, 56, 59

**STATUTES AND RULES**

28 U.S.C. § 1295(a)(1)................................................................2

28 U.S.C. § 1331................................................................1

28 U.S.C. § 1338(a) ................................................................1

28 U.S.C. § 1338(b) ................................................................1, 2, 29, 30

28 U.S.C. § 1367................................................1, 2, 3, 6, 7, 16, 19, 20, 25, 29

28 U.S.C. § 1367(a) ................................................................18, 24, 26, 30

28 U.S.C. § 1367(c) ................................................................21, 26, 27

28 U.S.C. § 1367(c)(1)................................................................27

28 U.S.C. § 1367(c)(2)................................................................28

vii

35 U.S.C. § 261 ................................................................. 39, 41

35 U.S.C. § 262 ............................................................. 41, 45, 49

35 U.S.C. § 285 ............................................................ 2, 8, 19, 54

Bayh-Dole Act, 35 U.S.C. §§ 200–212 ................................. 40

Cal. Bus. & Prof. Code § 17208 ......................................... 53

Fed. R. App. P. 28(i) ......................................................... 44

## OTHER AUTHORITIES

13 Charles Alan Wright et al., *Federal Practice and Procedure*
§ 3582 (3d ed. 2015) ..................................................... 30

15 James Wm. Moore et al., *Moore's Federal Practice* § 104.44
(3d ed. 2015) ............................................................... 29

16 James Wm. Moore et al., *Moore's Federal Practice* § 106.24
(3d ed. 2015) ............................................................... 26

1 Paul Goldstein, *Goldstein on Copyright* § 15.2.2
(rev. 3d ed. Supp. 2016) ................................................ 29

Restatement (Third) of Agency § 8.04 ................................. 37

William Lynch Schaller, *Corporate Opportunities and Corporate
Competition in Illinois: A Comparative Discussion of Fiduciary
Duties*, 46 J. Marshall L. Rev. 1 (2012) ............................ 33

## STATEMENT OF RELATED CASES

Counsel is unaware of any case pending in this or any other court that will affect or be affected by the decision in this appeal.  This appeal on behalf of Defendants-Appellants TriReme Medical, LLC, Quattro Vascular PTE Ltd., and QT Vascular Ltd. (collectively, the "Corporate Defendants") is consolidated with No. 2016-1142, the appeal on behalf of Defendant-Appellant Eitan Konstantino ("Konstantino").  This Court previously denied Defendants-Appellants' petition for a writ of mandamus.  No. 2015-128.  No other appeal from the same proceedings in the district court was or is before this or any other appellate court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff-Appellee AngioScore, Inc.'s patent infringement claim under 28 U.S.C. § 1331 and § 1338(a).  AngioScore also asserted state-law claims for breach of fiduciary duty, aiding and abetting, and unfair competition, invoking jurisdiction under 28 U.S.C. § 1367 and § 1338(b).  On October 14, 2015, after separate trials on the patent and state-law claims, the district court entered final judgment for the Corporate Defendants and Konstantino on the patent claim and for AngioScore on the state-law claims.  A19–22.

On October 26, 2015, the Corporate Defendants moved this Court to stay execution of the judgment pending appeal.  Konstantino filed a similar motion on October 28, 2015.  This Court treated the motions as notices of appeal,

consolidated the appeals, and stayed execution of the judgment. Doc. 4, 5, 33.

Thereafter, the district court denied Appellants' motion for attorneys' fees on the

patent claim (A179–82) and Konstantino's motion to alter or amend the judgment

with respect to the state-law claims (A183–85). The Corporate Defendants and

Konstantino then filed timely amended notices of appeal on January 21, 2016.

A18734; A18737. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.      Whether the district court lacked subject matter jurisdiction over

AngioScore's state-law claims under 28 U.S.C. § 1367 and § 1338(b).

2.      Whether an outside corporate director's own invention is a "corporate

opportunity" that Delaware law requires the director to offer to the corporation.

3.      Whether federal patent law preempts state-law claims that (a) give a

corporation an implied right in its fiduciary's invention, and (b) provide the

corporation with patent-like protection for an unpatented invention.

4.      Whether a corporation suffers harm when its fiduciary fails to assign

to the corporation his co-inventorship rights to an invention, where the other co-

inventor has no duty to assign, and does not assign, his rights to the corporation.

5.      Whether the court erred in awarding "lost profits" to AngioScore.

6.      Whether the court abused its discretion in denying attorneys' fees for

AngioScore's failed patent claim under 35 U.S.C. § 285.

# INTRODUCTION

This case began as a meritless patent infringement lawsuit, and that is where it should have ended. Instead, the case morphed into an unprecedented foray into novel theories of Delaware state law that conflict with more than 200 years of federal patent jurisprudence. A jury roundly rejected AngioScore's claim that a life-saving new medical device called "Chocolate," which Defendant Eitan Konstantino co-invented in 2009, infringed an AngioScore patent. But before the jury trial on that ill-fated patent claim, the district court allowed AngioScore to add state-law claims for breach of fiduciary duty, aiding and abetting, and unfair competition against Konstantino and the Corporate Defendants.

Those state-law claims presented the novel and untenable theory that under Delaware's "corporate opportunity" doctrine, Konstantino—as an unpaid outside director of AngioScore—had a fiduciary duty to "offer" AngioScore his rights in the Chocolate invention. A82. The district court, purporting to balance a "tension" between Delaware fiduciary law and federal patent policy, found the theory viable. A65. After a bench trial on only the state-law claims, the court awarded AngioScore more than $20 million in lost profits. A121. That award presumed that, had Konstantino offered AngioScore his rights, AngioScore would have bought those rights, shelved the invention, and thus increased sales of AngioScore's own purportedly competing medical device, called "AngioSculpt."

AngioScore's state-law claims had no business in federal court. The district court lacked supplemental jurisdiction under 28 U.S.C. § 1367 because AngioScore's state-law claims and federal patent claim did not derive from a common nucleus of operative fact. The two sets of claims involved wholly different facts, including different alleged wrongdoing at different times. AngioScore's state-law claims, moreover, turned on novel questions of state law. These are exactly the types of claims that should be left to state courts.

The district court also adopted an unprecedented and erroneously expansive interpretation of Delaware law—namely, that an outside director's rights to his own invention, conceived and reduced to practice on his personal time, is a "corporate opportunity" that the director must offer to the corporation. That holding defies nearly 80 years of Delaware jurisprudence. Delaware law applies the corporate opportunity doctrine only when a fiduciary diverts to himself a business opportunity presented by a *third party*. The decision below also placed Delaware fiduciary duty law in conflict with centuries-old federal patent law, and is therefore barred by federal preemption.

Further, Konstantino's co-inventor, Tanhum Feld, indisputably had no obligation to assign his own rights in the Chocolate invention to AngioScore. Feld, rather, lawfully assigned his interest in the Chocolate patent applications to a Corporate Defendant. The court thus should have held that Defendants had an

unfettered right to make and sell the device, even had Konstantino offered his rights to AngioScore.  Konstantino's failure to do so thus caused AngioScore no harm.  And the court's "lost profits" award—which presumed that AngioScore would have purchased rights in a life-saving new medical device only to keep it off the market—was against public policy.  The court then compounded that error by awarding "lost profits" without deducting the costs AngioScore would have had to pay Konstantino and Feld to purchase their rights in the invention.

This Court should vacate the judgment on the state-law claims and remand with instructions to dismiss for lack of subject matter jurisdiction.  But if the Court reaches the merits, it should reverse the district court's erroneous decision.  This Court further should reverse the district court's separate order denying Defendants the attorneys' fees they incurred defending AngioScore's costly and exceptionally meritless patent infringement claim.

## STATEMENT OF THE CASE

### A.    AngioScore's Patent Infringement and State-Law Claims

On June 29, 2012, AngioScore brought this action against Defendants in the United States District Court for the Northern District of California.  The complaint alleged that the Chocolate device infringed United States Patent No. 7,691,119 (the "'119 patent"), which AngioScore had purchased and never practiced.  A321–28; *see also* A367–74 (First Am. Compl. filed Aug. 16, 2012).  Konstantino co-

5

invented Chocolate in 2009 and assigned his rights in the invention to a Corporate Defendant, Quattro Vascular PTE Ltd., in 2010.  A128; A50235–37.

On May 6, 2014, two years after filing this patent lawsuit, AngioScore sought leave to add state-law claims.  A666–86.  Separate and apart from the alleged patent infringement, those claims asserted that Konstantino violated Delaware's corporate opportunity doctrine by "fail[ing] to disclose and offer to AngioScore the business opportunity relating to the Chocolate device."  A2540; *accord* A697–98.  AngioScore also asserted that the Corporate Defendants aided and abetted Konstantino's alleged breach of fiduciary duty, and that those violations constituted unfair competition under California law.  A698–99.  On June 25, 2014, the district court granted leave to amend.  A23–29.  AngioScore filed the operative Fourth Amended Complaint on July 15, 2014.  A2529–47.

On March 3, 2015, the district court bifurcated AngioScore's federal patent claim and state-law claims, and set a separate trial for each: a bench trial on the state-law claims, and a later jury trial on the patent claim.  A11808.  On March 11, 2015, Defendants moved to dismiss the state-law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367, asserting that the state-law claims and patent infringement claim did not derive from a common nucleus of operative fact.  A11809–25.  On March 23, 2015, facing the start of trial on the state-law claims, Defendants petitioned this Court for a writ of mandamus on the jurisdictional issue.

No. 2015-128.  On April 2, 2015, this Court denied the petition, stating that the district court still could resolve the question of jurisdiction before trial and Defendants could seek review in a later appeal.  A12618–20.

On April 6, 2015, the district court ruled that it had jurisdiction under § 1367 because both the federal and state-law claims "flow from the development of the allegedly infringing device," *i.e.*, Chocolate.  A37 (published at 87 F. Supp. 3d 986).  The court recognized, however, that "the elements of these [state-law] claims differ from the question of patent infringement," and that the alleged breach of fiduciary duty occurred in 2009, nearly two years before the alleged patent infringement in 2011.  A32–33, 38.

### B.    The Separate Trials on AngioScore's State and Federal Claims

On July 1, 2015, following a bench trial on only the state-law claims, the district court issued Findings of Fact and Conclusions of Law, ruling in favor of AngioScore.  A65–66.  The court held that the Chocolate invention was a "corporate opportunity" that Konstantino had a fiduciary duty to offer to AngioScore.  A82–84.  The court recognized that AngioScore's claim created "tension" between Delaware fiduciary law and the "public policy counseling in favor of innovation," but found that Delaware law "tak[es] precedence" over federal patent policy.  A65, 82.  The court awarded AngioScore $20,034,000 in "lost profits."  A120–23.  The award presumed that AngioScore would have

7

acquired all rights in the Chocolate invention but never put the invention to any use, thereby increasing sales of AngioScore's own allegedly competing product, AngioSculpt.

In September 2015, the district court held a separate jury trial on AngioScore's federal patent infringement claim. In contrast to the state-law trial, the patent trial centered on whether Chocolate infringed the '119 patent, and whether any of AngioScore's asserted claims were valid. The jury trial did not address issues that predominated at the state-law trial, such as whether Konstantino had a fiduciary obligation to offer rights in the Chocolate invention to AngioScore, and, if so, whether AngioScore would have had the interest and ability to acquire Konstantino's rights.

On September 29, 2015, the jury rendered a verdict in Defendants' favor, finding that Chocolate did not infringe any asserted claim of the '119 patent and that all of AngioScore's asserted claims were invalid. A17163–69.

On October 14, 2015, the district court entered judgment for Defendants on the patent claim and for AngioScore on the state-law claims. A19–22. The court then denied Defendants' request for attorneys' fees under 35 U.S.C. § 285 as the prevailing parties on the patent claim. A179–82 (available at 2015 WL 8293455).

Defendants timely appealed the judgment for AngioScore on the state-law claims, and the denial of attorneys' fees on the failed patent claim. A18734–36;

8

A18737–39.  On November 25, 2015, this Court stayed execution of the judgment on the state-law claims pending resolution of this appeal.  Doc. 33.

## STATEMENT OF FACTS

### A.    Dr. Konstantino's Tenure at AngioScore

Dr. Eitan Konstantino is a successful engineer and innovator who has obtained patents on two dozen inventions, including multiple life-saving and life-enhancing medical devices.  Konstantino attended the prestigious Israel Institute of Technology, earning undergraduate and master's degrees in mechanical engineering in 1994 and 1996, and a Ph.D. in laser surface treatment, optical design, and materials science in 2000.  A51320–21; A67.

In March 2003, Konstantino, his colleague Tanhum Feld, and three others co-founded AngioScore to develop and market a new angioplasty balloon catheter they had co-invented, now known as the "AngioSculpt."  Physicians use AngioSculpt to open arterial blockages in patients with cardiovascular disease.  Doctors insert the balloon catheter into the blocked blood vessel and extend it to the site of the blockage.  The balloon then inflates, causing a metal scoring spiral on its surface to press into plaque within the vessel wall causing a blockage.  This results in the "scoring" (or cutting) of the vessel wall, allowing it to expand and blood flow to increase.  A66–67.

Konstantino initially served as AngioScore's President and sat on its Board of Directors.  As a condition of his employment, Konstantino and AngioScore in March 2003 entered into a Confidential Information and Invention Assignment Agreement (the "Invention Assignment Agreement").  A61142–53.  Subject to a narrow carve-out for certain inventions unrelated to endovascular therapy, Konstantino agreed to "disclos[e]" and "assign" to AngioScore his "right, title and interest . . . in and to any and all inventions, original works of authorship, developments, concepts, knowhow, improvements or trade secrets . . . which [Konstantino] may solely or jointly conceive or develop or reduce to practice . . . during the period of [his employment] with the Company."  A61143–44. Konstantino further agreed to "assist AngioScore" in securing rights in any such inventions and "any . . . intellectual property rights relating thereto."  A61144.

As President, Konstantino led AngioScore in obtaining regulatory approval to market AngioSculpt, and attracted outside funding from venture capitalists. Those outside investors, in turn, obtained seats on AngioScore's board of directors. A67.  Over time, the directors substantially diminished and ultimately terminated Konstantino's professional responsibilities and invention assignment obligations at AngioScore.  A51325–28.

In November 2005, AngioScore's board demoted Konstantino from President to Executive Vice President and Chief Scientific Officer, and named a

10

new CEO, Tom Trotter.  A80071; A51325–26; A67.  In October 2006, as part of a new "transition plan," AngioScore again demoted Konstantino to a "part-time temporary employee, without an official title and without specific duties and responsibilities."  A80078.  AngioScore told Konstantino that his "status as a temporary employee will end no later than March 31, 2007."  *Id.*  During Konstantino's five months as a "part-time temporary employee," AngioScore directed Konstantino to "report to . . . the Company's new Vice President of Research and Development," and to "work on projects assigned to [him] by [the new Vice President]."  *Id.*; *see also* A51326–30; A68.

As of April 1, 2007, AngioScore terminated Konstantino's employment and did not retain him as a consultant.  A80081; A51330.  Konstantino remained only as an outside board member to represent certain minority investors, just as the venture capital-sponsored directors expressly represented the shareholding interests of their investors.  A51330.  Konstantino received no compensation, in contrast to other outside directors who received stock option grants.  *Id.*; A50293.

## B.    Konstantino's Work With TriReme

Throughout the time that AngioScore was diminishing his role, Konstantino, with AngioScore's blessing, increased his involvement with TriReme Medical, Inc., another company Konstantino co-founded.

11

In July 2005, Konstantino informed AngioScore's board of a "proposed business opportunity he would like to pursue with TriReme, which would involve endovascular bifurcation stents and delivery systems for bifurcation stents." A80062.  AngioScore's board advised that it had "no interest" in this business opportunity and "no objection" to Konstantino pursuing it with TriReme.  *Id.*  The board consented to Konstantino pursuing the opportunity and providing advisory services to TriReme, limited to endovascular bifurcation stents and delivery systems, so long as he did so on his own time "without using [AngioScore's] facilities, equipment or intellectual property."  A80062–63; *see also* A51330–32.

Several months later, when AngioScore demoted Konstantino in November 2005, Konstantino told the company that if it was "not interested in . . . [his] ideas, other people may, and [he] requested to be able to provide additional services to TriReme."  A51332.  AngioScore was amenable, and agreed that Konstantino may "join the board of directors of TriReme" and "provide other services to TriReme," no longer limiting his work to endovascular bifurcation stents and delivery systems.  A80071.  AngioScore further "waive[d] any rights it may have had . . . to participate in TriReme's first round of equity financing."  *Id.*; *see also* A51332–33.

Then, in terminating Konstantino's employment altogether as of April 1, 2007, AngioScore agreed that the parties' earlier agreements no longer limited his role at TriReme.  A51333–34.  AngioScore and Konstantino executed an

amendment providing that their earlier agreements were "no longer required for Mr. Konstantino to be involved with TriReme." A80081.

In addition to eliminating restrictions on Konstantino's work at TriReme, AngioScore also narrowed and then terminated his Invention Assignment Agreement. In demoting Konstantino to "part-time temporary employee" in October 2006, AngioScore agreed that, when he was no longer an employee or consultant of the company, "any obligation" under the Assignment Agreement would terminate. A80079. Konstantino's Assignment Agreement thus expired when AngioScore terminated his part-time employment as of April 1, 2007. A80081. From then on, Konstantino had no contractual obligation whatsoever to assign any invention to AngioScore. He remained at AngioScore only as an unpaid outside board member, and otherwise focused on his work at TriReme. A51330.

### C.    Dr. Konstantino's Co-Invention of the Chocolate Device

In the fall of 2009, more than two years after AngioScore terminated Konstantino's employment and his Invention Assignment Agreement, Konstantino and Feld jointly conceived of the idea for a new angioplasty balloon catheter, called Chocolate. A128. Konstantino developed Chocolate on his own time and without using any AngioScore facilities, equipment, resources, trade secrets, or other confidential information. A50860, 50868–69, 51353–54.

Doctors use Chocolate to unblock occluded vessels while minimizing dissection (or tears) to the artery that can result in restenosis, *i.e.*, a recurrence of arterial narrowing.  The device employs a "paradigm-shifting design":  as the balloon inflates, the struts of Chocolate's constraining structure move in opposite longitudinal directions to form a pattern of pillows on the balloon, which make contact with the vessel.  A88; A50370–72; A50926; A51001; A80582.  Thus, unlike the AngioSculpt device, Chocolate "is not a scoring device."  A134.

On October 12, 2009, Konstantino and Feld filed a provisional patent application, naming both as co-inventors.  A129; A61036; A61037–51.  On June 1, 2010, Konstantino assigned his rights in the Chocolate patent applications to TriReme's corporate affiliate, Quattro, in exchange for a cash payment of $250,000 and a 2.85% royalty on sales of Chocolate.  A80492–95.  Feld also assigned his rights in the Chocolate patent applications to Quattro in exchange for a cash payment of $70,000 and a 2.15% royalty.  A80496–99.  Feld worked to develop the Chocolate device, while Konstantino sought funding from outside investors to bring the device to market.  A51337–51339.

Konstantino, then a former employee who remained as an unpaid member of AngioScore's board, repeatedly attempted to discuss his outside work with AngioScore's CEO, Tom Trotter.  In December 2009, Konstantino told Trotter that TriReme was developing a plain old balloon angioplasty device, or "POBA,"

14

called "Glider." A70. Konstantino asked if AngioScore would be interested in collaborating with Konstantino and TriReme on the Glider device. A70–71. In rejecting the offer, Trotter was "very dismissive" and stressed that "AngioScore['s] focus is on the benefits of scoring." A51341; *see also* A50599.

On February 3, 2010, following a board meeting, Konstantino again approached Trotter, informing him that TriReme was "moving into specialty balloon[s]." A51342. Konstantino asked if AngioScore would "be interested in investing even a small amount of money" to "anchor the investment." A51342–43. Trotter rejected the idea and directed Konstantino to leave the building. A51342; *see also* A50602. The next day, Trotter sent an email to Konstantino, copying AngioScore's lawyer, demanding that Konstantino immediately resign from AngioScore's board. A51343–44; A80356–57.

Nearly two years later, in December 2011, Defendants obtained regulatory approval and began selling Chocolate in the United States. A122. In June 2012, AngioScore filed this action, initially asserting only that Chocolate infringed AngioScore's '119 patent, which AngioScore had purchased and never practiced. A321. Two years later in May 2014, AngioScore moved to amend its complaint to assert state-law claims.

15

## SUMMARY OF ARGUMENT

The district court's judgment on AngioScore's state-law claims should be reversed for multiple reasons.

*First*, the district court lacked supplemental jurisdiction under 28 U.S.C. § 1367 because AngioScore's state-law claims and federal patent claim did not derive from a common nucleus of operative fact, and one would not ordinarily expect the claims to be tried together. The claims involved different alleged wrongdoing during different periods of time. And the court in fact bifurcated the state and federal claims and held separate trials in part because the claims were "distinctly different" and "involve different and distinct issues." A11970, 11973. This Court repeatedly has reversed when district courts improperly expanded supplemental jurisdiction in patent litigation. The Court should do the same here.

*Second*, the district court adopted an unprecedented and overbroad interpretation of Delaware law. The court held that Chocolate was a "corporate opportunity" that Konstantino had a fiduciary duty to offer to AngioScore. For nearly 80 years, however, Delaware courts have applied the corporate opportunity doctrine only when a director diverts to himself a business opportunity that a *third party* presents to the director in his corporate capacity. The doctrine has never been applied, and indeed makes no sense, when the purported opportunity is the director's *own* invention. The district court nevertheless adopted AngioScore's

16

novel theory, bypassing established Delaware jurisprudence that governs when a corporate fiduciary may prepare to compete with the corporation.

*Third*, the district court's decision places Delaware fiduciary law in conflict with centuries-old federal patent law.  Under federal law, inventors own the rights in their inventions absent a written assignment agreement.  Yet under the decision below, Delaware law required Konstantino to forfeit his rights in his own invention to AngioScore, even though his Invention Assignment Agreement had terminated years earlier.  Further, under federal law, anyone can make and sell an unpatented invention.  Under the decision below, however, Delaware law gave AngioScore a patent-like right to preclude Defendants from selling Chocolate even before any patent had issued.  On both issues, the court's interpretation of Delaware law conflicts with federal patent law and is therefore preempted.

*Fourth*, Konstantino's failure to offer his rights in the Chocolate patent applications to AngioScore did not cause AngioScore any harm.  Even with Konstantino's rights, AngioScore would have been no better off because Konstantino's co-inventor lawfully assigned his own rights in the Chocolate patent applications to a Corporate Defendant, Quattro.  AngioScore thus could not have prevented the Corporate Defendants from making and selling Chocolate, which was the linchpin of AngioScore's theory of harm.

*Fifth*, the district court erred in awarding "lost profits."  Equitable remedies cannot violate public policy.  The district court thus denied an injunction preventing Defendants from selling Chocolate as "directly contrary to the public interest."  A112.  But the same is true of the lost profits award.  That award presumed that—had Konstantino offered his rights in the Chocolate invention to AngioScore—AngioScore would have prevented Defendants from selling Chocolate.  The court independently erred by failing to deduct the costs AngioScore would have had to pay Konstantino and Feld for their rights.

*Finally*, the district court erred as a matter of law in denying attorneys' fees for AngioScore's frivolous patent infringement claim under 35 U.S.C. § 285.  The court determined that the claim, while "not particularly strong," was not "exceptionally weak" because it had survived summary judgment.  A181.  But the court's denial of summary judgment was based on an erroneous view of the law concerning infringement under the doctrine of equivalents.  This legal error is an invalid basis for denying attorneys' fees for AngioScore's meritless patent claim.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's exercise of supplemental jurisdiction over non-federal claims under 28 U.S.C. § 1367(a).  *Voda v. Cordis Corp.*, 476 F.3d 887, 892 (Fed. Cir. 2007).  A district court's decision "not to

decline supplemental jurisdiction under 28 U.S.C. § 1367(c)" is reviewed under an abuse of discretion standard.  *Id*. at 897–98.

This Court "reviews factual findings of any district court bench trial for clear error and its conclusions of law *de novo*."  *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372–73 (Fed. Cir. 2000) (citations omitted).

"Preemption is a question of law reviewed *de novo*."  *Ultra-Precision Mfg., Ltd. v. Ford Motor Co*., 411 F.3d 1369, 1376 (Fed. Cir. 2005).

"In order to prevail on appeal on an issue of damages, an appellant must convince [this Court] that the determination was based on an erroneous conclusion of law, clearly erroneous factual findings, or a clear error of judgment amounting to an abuse of discretion."  *Rite-Hite Corp. v. Kellen Co.*, 56 F.3d 1538, 1543 (Fed. Cir. 1995).

This Court reviews a district court's denial of attorneys' fee under 35 U.S.C. § 285 for abuse of discretion.  When legal error invades the analysis under § 285, a "district court would necessarily abuse its discretion."  *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014).

**ARGUMENT**

## I.   THE DISTRICT COURT LACKED SUBJECT MATTER JURISDICTION OVER THE STATE-LAW CLAIMS

The district court should have dismissed AngioScore's state-law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367.

Section 1367 "authorizes supplemental jurisdiction only over claims that are 'so related to claims in the action with . . . original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" *Voda v. Cordis Corp.*, 476 F.3d 887, 894 (Fed. Cir. 2007) (quoting § 1367(a)). "For this relatedness requirement to be satisfied, 'the state and federal claims must derive from a common nucleus of operative fact' such that they would ordinarily be expected to be tried in one proceeding." *Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027, 1038 (Fed. Cir. 2006) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

The operative facts of AngioScore's state and federal claims fundamentally differed, and it would have made no sense to try the claims in one proceeding. The proof is in the pudding: the district court held separate trials for the state-law and federal patent claims, reasoning in part that "the patent infringement claims are distinctly different from the breach of fiduciary duty claims." A11970. Bifurcating the claims made sense, the court explained, because "a patent case and a breach of fiduciary duty case . . . involve different and distinct issues." A11973.

Indeed, in its 110-page decision on the state-law claims (A65–174), the district court never once mentioned the '119 patent. This Court, as it has done repeatedly when district courts have improperly expanded supplemental jurisdiction in patent litigation, should vacate the judgment and remand with instructions to dismiss for lack of jurisdiction.[1]

## A.     The State and Federal Claims Did Not Derive From a Common Nucleus of Operative Facts

In determining whether federal and non-federal claims derive from a "common nucleus of operative fact," this Court has been faithful to the "fundamental precept that federal courts are courts of limited jurisdiction, empowered to act only within the bounds of Article III." *Highway Equip.*, 469 F.3d at 1032 (quotation source and marks omitted); *accord, e.g.*, *Mars, Inc.*, 24 F.3d at 1375 ("Federal courts may not assume jurisdiction where none exists").

The common nucleus test requires not some loose or generalized overlap, but a close connection between the issues and facts in the federal and non-federal claims. In *Highway Equipment*, for example, this Court rejected the district court's exercise of supplemental jurisdiction over state-law contract claims in a patent

---

[1]    *E.g.*, *Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027 (Fed. Cir. 2006) (reversing district court's exercise of supplemental jurisdiction over non-federal claims in patent infringement case); *Clark v. B.H. Holland Co.*, 86 F.3d 1178, at *2-3 (Fed. Cir. 1996) (unpublished) (same); *Mars, Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1375 n.4 (Fed. Cir. 1994) (same); *Voda v. Cordis Corp.*, 476 F.3d 887, 904 (Fed. Cir. 2007) (same under § 1367(c)).

infringement suit.  469 F.3d at 1037.  There, the plaintiff, a manufacturer of agricultural products, brought a patent infringement action against one of its former dealers, and the defendant asserted a state-law counterclaim for wrongful termination of the parties' dealer agreement.  This Court held that the district court lacked supplemental jurisdiction because "[t]he facts alleged in the federal counts involved not a contract, but a patent that issued . . . months after the dealership agreement was terminated.  Furthermore, the facts alleged in the [state-law] count involved the distribution of [plaintiff's] products, whereas the facts alleged in the federal counts involved a product manufactured by [defendant] subsequent to the termination of the dealership agreement."  *Id.*

Similarly, in *Clark v. B.H. Holland Co.*, this Court *sua sponte* held that the district court in a patent inventorship dispute erred in exercising supplemental jurisdiction over state-law claims asserting that the defendant also engaged in corporate mismanagement.  86 F.3d at *3.  "The corporate activities at issue took place sometime after the patent application was filed and the . . . patent issued," and the plaintiff "only argued in generalities that the facts and issues were interrelated."  *Id.*

Here, neither the issues to be tried nor the alleged wrongdoing in AngioScore's state-law and patent infringement claims were sufficiently related to confer supplemental jurisdiction.  The state-law claims concerned the relationship

between AngioScore and its former director Konstantino—a relationship that ended in February 2010. A68–76, 83. As the court observed, "the acts giving rise to the instant [state-law] claim occurred in 2009 and 2010." A94–95. The patent claim, by contrast, centered exclusively on the relationship between AngioScore's '119 patent and the Chocolate device, which was not sold in the United States until December 2011, and thus could not even be accused of infringement before then. *See* A122.

AngioScore itself recognized the overwhelming differences between its state-law and federal patent claims. In a related state-court proceeding in which Konstantino sought legal fees from AngioScore to defend this case under an indemnification agreement, AngioScore submitted a sworn response, stating: "[Konstantino's] alleged breach of fiduciary duty is *totally distinct* from [his] alleged patent infringement." A11840 (emphasis added). AngioScore explained that "the factual bases for demonstrating that a breach of fiduciary duty occurred are different from those necessary to prove patent infringement: for example, the alleged failure of [Konstantino] to inform the Board of AngioScore about his early work on the Chocolate device would constitute a breach of fiduciary duty regardless of whether or not the Chocolate device infringed a patent." A11841. Similarly, AngioScore represented, "[t]he factual issues regarding patent infringement are the structure of the Chocolate device and the validity of the patent

over the prior art, none of which is relevant to the breach of fiduciary duty case." *Id.*

AngioScore also noted that "[t]he key time period for establishing the breach of fiduciary duty claim is mid-2009 through February 2010, when [Konstantino] resigned from the Board of Directors of AngioScore. However, the patent infringement did not occur until December 2011, when the commercialization of the Chocolate device began, long after the key facts for the breach of fiduciary claim." A11840–41. In another filing in the same state-court case, AngioScore reiterated: "The parties agree that the breach-of-fiduciary-duty and patent-infringement claims are distinct. . . . The two claims are distinct as to both the pertinent facts and the relevant time period." A11898–99. These admissions by AngioScore alone warrant dismissal for lack of supplemental jurisdiction. *See Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660, 662 (4th Cir. 1998) (*sua sponte* finding no supplemental jurisdiction because plaintiff itself characterized state and federal claims as separate and distinct).

The district court held that it had supplemental jurisdiction because "the core of this case concerns the Chocolate device—whether it infringes an AngioScore patent, and whether Konstantino's development of the device was a violation of his duties to AngioScore." A36–37. But just because federal and state claims involve the same product does not mean the claims "are so related . . . that they form part

of the same case or controversy." 28 U.S.C. § 1367(a). That rationale would expand supplemental jurisdiction beyond what Congress could have intended. Under the district court's "same device" theory, a patent infringement claim involving Chocolate could confer supplemental jurisdiction over a state-law medical malpractice claim involving Chocolate, a product liability claim concerning Chocolate's warning label, or a breach of contract claim concerning the distribution of Chocolate. A patent suit concerning a particular make of automobile could share a common nucleus of operative fact with a personal injury action concerning a car accident in the same make of car.[2] That is not the law.

The district court treated the common nucleus standard as a "but-for" test. The court posited that AngioScore's patent and state-law claims shared a common nucleus of operative fact because "both claims flow from the development of the allegedly infringing device." A37. But under § 1367 "it is insufficient to establish that 'but for' one event, the other would have not happened, if there is otherwise no factual commonality between the two claims." 16 James Wm. Moore et al., *Moore's Federal Practice* § 106.24 (3d ed. 2015).

---

[2]    *Cf. Lekoff v. Gen. Motors Corp.*, No. 92-7138, 1993 WL 193367, at *4 (E.D. Pa. June 8, 1993) ("The claims of the Lekoffs derive from GM's failure to correct an alleged defect in their new automobile under warranty after several attempts. Heather O'Connor's claims arise from her accident, which was allegedly caused by the same defect. While there is some overlap of evidence in the two cases, the transactions or occurrences out of which the claims arose . . . are sufficiently different that they do not form part of the same case or controversy . . . .").

AngioScore's state-law claims should never have been heard in federal court, and this Court should vacate the judgment and remand with instructions to dismiss for lack of subject matter jurisdiction under § 1367(a).

**B.    Alternatively, the Court Should Have Dismissed the State-Law Claims Under Section 1367(c)**

Under § 1367(c), even if federal and state-law claims share a common nucleus of operative fact, a district court "may decline to exercise supplemental jurisdiction over" the state-law claims.  Supplemental jurisdiction "need not be exercised in every case in which it is found to exist."  *Gibbs*, 383 U.S. at 726. Where other considerations diminish the efficiency of hearing related federal and state claims in one action, "a federal court should hesitate to exercise jurisdiction over state claims."  *Id.*  Although the decision whether to decline supplemental jurisdiction is discretionary, this Court has held that "[a] district court's discretion . . . is not unfettered."  *Voda*, 476 F.3d at 897.

This Court in *Voda* held that, even if the federal and non-federal patent claims at issue were sufficiently related, the district court abused its discretion in exercising supplemental jurisdiction over the non-federal claims.  *Id.* at 897–98. "[C]onsiderations of comity, judicial economy, fairness, and other exceptional circumstances constitute[d] compelling reasons to decline jurisdiction."  *Id.* at 898. In this case, too, the considerations specified in § 1367(c) mandate dismissal.

*First*, AngioScore's breach of fiduciary duty claims turned on "novel and complex" issues of state law, 28 U.S.C. § 1367(c)(1), the resolution of which was the province of Delaware courts.  The district court recognized that it was charting newfound territory—namely, "a tension between the inveterate, established law of fiduciary duties held by corporate directors and breach of fiduciary duty claims that arise when directors of emerging companies are innovators in the technologies themselves."  A65.  The court ultimately concluded that corporate duties "tak[e] precedence" over innovation, *id.*, finding support in the Federalist Papers, Merriam-Webster's Dictionary, "foundational principles of corporate governance," and "wise public policy."  A78–79, 82.  As explained below, *see infra* Part II, the court fundamentally misconstrued Delaware law, but it should never have considered creating a new state-law duty in the first instance.  The court, rather, should have left AngioScore's novel interpretation of Delaware fiduciary law to the Delaware courts.

*Second*, this Court has recognized that a core consideration under § 1367(c) is "judicial economy," including whether the state and federal claims "could result in separate trials."  *Voda*, 476 F.3d at 903.  Here, once the district court determined that bifurcation was warranted, it should have reconsidered the propriety of exercising supplemental jurisdiction.  "Under *Gibbs*, a federal court should consider and weigh in each case, and *at every stage of the litigation*, the values of

27

judicial economy, convenience, fairness, and comity in order to decide whether to

exercise jurisdiction over a case brought in that court involving pendent state-law

claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (emphasis

added).

*Third*, AngioScore's state-law claims "substantially predominate[d]" over

the patent infringement claim.  28 U.S.C. § 1367(c)(2).  Where "the state issues

substantially predominate, whether in terms of proof, of the scope of the issues

raised, or of the comprehensiveness of the remedy sought, the state claims may be

dismissed without prejudice and left for resolution to state tribunals." *Gibbs*, 383

U.S. at 726.  "[P]retrial procedures or even the trial itself may reveal a substantial

hegemony of state law claims" that could not have been foreseen at an earlier

phase.  *Id.*  Here, the federal patent claim should have never been brought, as

evidenced by the jury's verdict against AngioScore.

*Finally*, any perceived benefits to litigating the state and federal claims in

the same forum were far outweighed by the important "comity" interest in

allowing state courts to adjudicate issues of state law.  "Needless decisions of state

law should be avoided both as a matter of comity and to promote justice between

the parties, by procuring for them a surer-footed reading of applicable law."

*Gibbs*, 383 U.S. at 726–27; *see also Levin v. Commerce Energy, Inc.*, 560 U.S.

413, 421 (2010) ("The comity doctrine counsels lower federal courts to resist

engagement in certain cases falling within their jurisdiction."); *Voda*, 476 F.3d at 903 (finding district court abused discretion in failing to dismiss supplemental foreign patent claims in part based on comity principles).

### C.    The District Court Lacked Jurisdiction Over the Unfair Competition Claim Under 28 U.S.C. § 1338(b)

Though the assertion appears nowhere in its five complaints, A321, 367, 581, 1543, 2529, AngioScore argued below that the district court had jurisdiction over its state-law unfair competition claim under 28 U.S.C. § 1338(b).  This argument too lacks merit.

Section 1338(b) grants jurisdiction over state-law unfair competition claims that are "joined with a substantial and related" federal patent claim.  To determine whether a state-law unfair competition claim is sufficiently "related" to a patent claim, courts apply the same "common nucleus" standard applied under § 1367. "[T]he test for whether the two claims form part of the same case or controversy is the same common-nucleus test used under Section 1338(b).  Therefore, the key to whether there is jurisdiction over the claim is whether the common-nucleus test is met, not whether the claim is one for 'unfair competition.'"  15 James Wm. Moore et al., *Moore's Federal Practice* § 104.44 (3d ed. 2015); *accord* 1 Paul Goldstein, *Goldstein on Copyright* § 15.2.2 (rev. 3d ed. Supp. 2016) ("Although *Gibbs* involved pendent jurisdiction outside the framework of section 1338(b), courts have followed its approach in interpreting section 1338(b).") (citing cases); 13

Charles Alan Wright et al., *Federal Practice and Procedure* § 3582 (3d ed. 2015) (similar); A40–41 n.5 (similar).

The district court recognized that AngioScore's unfair competition claim was inextricably intertwined with its breach of fiduciary duty claims; indeed, the alleged breach of fiduciary duty served as the predicate for the unfair competition claim. A111. Thus, the district court lacked subject matter jurisdiction under § 1338(b) for the same reasons the court lacked supplemental jurisdiction under § 1367(a). The state-law and federal patent infringement claims were fundamentally different and distinct.

Finally, even if § 1338(b) conferred jurisdiction over the lone unfair competition claim, the result would be the same. The district court did not grant any remedy for the alleged violation of California unfair competition law, finding that AngioScore's request for an injunction barring the sale of the Chocolate device was "directly contrary to the public interest." A112–13, 124.

## II.    THE CHOCOLATE INVENTION WAS NOT A "CORPORATE OPPORTUNITY" UNDER DELAWARE LAW

The district court created an unprecedented and erroneously expansive duty under Delaware law. The court held that Konstantino's rights in the Chocolate invention were a "corporate opportunity" that Konstantino had a fiduciary duty to "offer" to AngioScore. A83–84. The court further held that the Corporate

Defendants aided and abetted Konstantino's purported breach of that duty, and that those violations constituted unfair competition under California law.  A99–112.

Delaware law forecloses these holdings.  For nearly 80 years, Delaware courts have applied the corporate opportunity doctrine to prohibit a corporate director from diverting to himself a business opportunity that a *third party* presents to the director in his corporate capacity.  The doctrine requires the director to pass along such an opportunity to the corporation; he cannot divert it away from the corporation to himself.  No court—not one—has held that a director's *own* invention, which the director conceived on his *personal* time, is a corporate opportunity that the director must offer to the corporation.  The district court's decision, moreover, bypassed established Delaware jurisprudence that directly governs a corporation's claim that its director or officer improperly prepared to compete with the corporation.

## A.    A Director's Own Invention Is Not a Corporate Opportunity

Under Delaware law, the corporate opportunity doctrine "represents but one species of the broad fiduciary duties assumed by a corporate director or officer." *Broz v. Cellular Info. Sys, Inc.*, 673 A.2d 148, 154 (Del. 1996).  The Delaware Supreme Court set forth the "classic statement of the doctrine" in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939):

> [I]f there is presented to a corporate officer or director a
> business opportunity which the corporation is financially able

>to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

*Broz*, 673 A.2d at 154 (quoting *Guth*, 5 A.2d at 511). When such a business opportunity "comes to a corporate officer or director in . . . his official capacity," the officer or director must pass along the opportunity to the corporation; he cannot divert the opportunity away from the corporation to himself. *Id.* at 510; *see also* A78 & n.4.

To our knowledge, until the decision below, no court had held that a corporate director's *own* invention, which the director *personally* conceived, is a corporate opportunity. The cases, rather, all fit a well-worn pattern: a third party presents some business opportunity to an officer or director in his corporate capacity, and the officer or director—rather than pass along the opportunity to the corporation—diverts it to himself. The common feature of all the cases, notably absent from this case, is that some third party presented the opportunity to the fiduciary.

The doctrine is premised on a business opportunity that is "*presented to* a corporate officer or director." *Guth*, 5 A.2d at 511 (emphasis added). The doctrine thus applies when "a business opportunity [that] *comes to* a corporate officer or

32

director" in his "official capacity." *Id.* (emphasis added). In the "particular and narrow fact pattern" that characterizes corporate opportunity claims, "a third party presents an identifiable, concrete deal relating to the corporate employer's business." William Lynch Schaller, *Corporate Opportunities and Corporate Competition in Illinois: A Comparative Discussion of Fiduciary Duties*, 46 J. Marshall L. Rev. 1, 18 (2012).

The essence of the corporate opportunity doctrine, therefore, is a competition between the fiduciary and the corporation for some external opportunity. "Generally, the corporate opportunity doctrine is applied in circumstances where the director and the corporation compete against each other to buy something, whether it be a patent, license, or an entire business." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 443 (Del. 1996). "In the typical corporate opportunity case, only one entity may take advantage of the opportunity, *i.e.*, if A buys the property or merges with C then B cannot buy the property or merge with C." *Carlson v. Hallinan*, 925 A.2d 506, 538 (Del. Ch. 2006).

Corporate opportunity cases uniformly involve business opportunities that were "presented to" the fiduciary from an external source. In *Thorpe*, for instance, a third party approached a director of a holding company to inquire about purchasing one the holding company's operating subsidiaries. 676 A.2d at 438. The court held that the director usurped this corporate opportunity when, rather

33

than inform the holding company's board of the third party's inquiry, the director attempted to sell the third party his own controlling interest in the holding company. *Id.* at 438–40. Similarly, in *Black v. Hollinger International, Inc.*, 872 A.2d 559 (Del. 2005), the court held that a director had unlawfully diverted to himself an opportunity to sell the company to two buyers who had approached him in his corporate capacity. *Id.* at 562, 566–68; *see also, e.g.*, *David J. Greene & Co. v. Dunhill Int'l, Inc.*, 249 A.2d 427, 435 (Del. Ch. 1968) (plaintiffs stated a corporate opportunity claim where majority shareholder diverted to itself the opportunity to acquire another company); *Kohls v. Duthie*, 791 A.2d 772, 783–86 (Del. Ch. 2000) (plaintiff stated a corporate opportunity claim where directors failed to offer the corporation the opportunity to repurchase a large block of its stock for a nominal price, instead purchasing the shares themselves).

By contrast, developing an opportunity of one's own making is outside the scope of the corporate opportunity doctrine. In *Equity Corp. v. Milton*, 221 A.2d 494 (Del. 1966), the defendant CEO held stock options in the plaintiff corporation, and, for tax reasons, the CEO transferred the options to a different corporation that he controlled. Later, the CEO reacquired the options, and the corporation claimed that such reacquisition was a corporate opportunity, and thus the CEO should have offered the corporation the opportunity to purchase the options for itself. The Delaware Supreme Court disagreed, explaining that "[t]he opportunity, . . . if

indeed it can be called an opportunity, which came to Milton *was of his own making*, and was in reality nothing more than the reacquisition directly of property over which he formerly had exercised control indirectly." *Id.* at 499. The case thus involved "a situation entirely inconsistent with the usual concept of corporate business opportunity." *Id.*

This case, too, fundamentally differs from every other case applying the corporate opportunity doctrine. In the district court's view, the alleged "corporate opportunity" was Konstantino's invention of Chocolate. But a corporate director's own invention, which the director personally conceives, is not "presented to" the director at all, much less by a third party. *Guth*, 5 A.2d at 511. The invention did not "come[] to" Konstantino in his official capacity as a director of AngioScore. *Id.* Konstantino, rather, conceived of Chocolate on his own time, using his own labor, skills, and imagination, and without using any AngioScore resources or confidential information. *See id.* at 510–11 ("[T]he corporation has no interest in [the opportunity] . . . if the officer or director has not wrongfully embarked the corporation's resources therein."). As in *Milton*, Konstantino's invention "was of his own making." 221 A.2d at 499. No case has applied the corporate opportunity doctrine in any remotely similar circumstance. To hold that Konstantino's own invention was an opportunity "presented to" Konstantino in his capacity as a

corporate director accordingly would mark an unprecedented expansion of Delaware law.

Relying on a dictionary definition of the word "opportunity," the district court reasoned that the rights to the Chocolate invention were a "corporate opportunity" because they presented "'a favorable juncture of circumstances' or 'a good chance for advancement or progress.'"  A83 (quoting Merriam-Webster, New Collegiate Dictionary (9th ed. 1988)).  But that dictionary definition is not only out of context, it defines only *one* of the words in a specialized legal term of art.  That overbroad definition cannot be reconciled with decades of Delaware precedent applying the doctrine only where a third party presents an opportunity to a director. And the definition runs headlong into *Milton*.  There, the acquisition of the CEO's stock options would have been "a favorable juncture of circumstances" or "a good chance for advancement or progress" for the corporation.  But while the acquisition may have been an "opportunity" under Merriam-Webster's definition, it was not a "*corporate* opportunity" under settled Delaware law.

### B.    The District Court's Decision Bypassed Settled Delaware Law Governing a Fiduciary's Right to Prepare to Compete

The district court acknowledged that Chocolate was "the product of [Konstantino's] own innovation," but found that the corporate opportunity doctrine nonetheless applied because Chocolate would "compete" with AngioSculpt, and such competition supposedly breached Konstantino's fiduciary duty of loyalty.

36

A79.  Relying on "foundational principles of corporate governance," the court

asserted that a director must "leave the corporation" before preparing to compete

with it.  A79–80.  But settled Delaware law allows directors to prepare to compete

with the corporation before leaving.

The Delaware Supreme Court has held that fiduciaries retain the right to

prepare to compete with the corporation.  *Science Accessories Corp. v.

Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980).  "[The] policy in favor of

free competition has prompted the recognition of a privilege in favor of employees

which enables them to prepare or make arrangements to compete with their

employers prior to leaving the employ of their prospective rivals without fear of

incurring liability for breach of their fiduciary duty of loyalty."  *Id.* at 964–65

(citation omitted).  Absent a contractual agreement to the contrary, fiduciaries are

"free to make reasonable preparations to compete," and need not divulge to their

principal their plans to do so.  *Id.* at 965.  Thus, in *Science Accessories*, the state

high court held that the fiduciary duty of loyalty did not forbid employees from

building a working model of a competing product on their own time, without using

company materials, facilities, or confidential information.  *Id.*

The Restatement of Agency similarly recognizes that "an agent may take

action, not otherwise wrongful, to prepare for competition following termination of

the agency relationship."  Restatement (Third) of Agency § 8.04.  Accordingly,

applying Maryland law, the Fourth Circuit held that the duty of loyalty did not prohibit an employee from preparing to compete by establishing a rival firm, because he had not used any of the employer's "more sophisticated or confidential information." *Source Servs. Corp. v. Bogdan*, 47 F.3d 1165, at *5 (4th Cir. 1995) (unpublished); *see also United Aircraft Corp. v. Boreen*, 413 F.2d 694, 700 (3d Cir. 1969) (similar under Pennsylvania law).  Even "extensive negotiations with [a new employer] regarding . . . employment, . . . incorporation of [a new business] and discussion of potential lease options, and . . . contributions of equipment and other resources to [a new employer]" are "mere preparation for competition" and "do not rise to the level of a breach of fiduciary duty."  *Impreglon, Inc. v. Newco Enterprises, Inc.*, 508 F. Supp. 2d 1222, 1230 (N.D. Ga. 2007).

Given this baseline legal principle, corporations typically enter into written agreements with fiduciaries if they wish to impose more restrictions than fiduciary law provides.  But here, no contractual agreement barred Konstantino from preparing to compete with AngioScore.  To the contrary, AngioScore repeatedly agreed to Konstantino's work at TriReme and even his service on TriReme's board of directors, while he remained both an employee and director of AngioScore.  *See supra* pp. 11–13.  In addition, while the Invention Assignment Agreement initially assigned any invention by Konstantino to AngioScore, that Agreement expired in April 2007—more than two years before Konstantino conceived of the idea for

Chocolate.  *See supra* p. 13.  Thus, neither any contractual obligation nor any common-law fiduciary duty barred Konstantino from developing Chocolate on his own time without disclosing his invention to AngioScore.

## III.   FEDERAL LAW WOULD PREEMPT ANY STATE LAW TREATING CHOCOLATE AS A "CORPORATE OPPORTUNITY"

The district court's reading of Delaware law would squarely conflict with centuries-old federal patent law, and thus is preempted and "without effect" under the Supremacy Clause.  *Ultra-Precision Mfg., Ltd. v. Ford Motor Co*., 411 F.3d 1369, 1377 (Fed. Cir. 2005).

### A.   Federal Law Preempts Any State Law That Diminishes an Inventor's Rights in His Invention

"Since 1790, the patent law has operated on the premise that rights in an invention belong to the inventor."  *Bd. of Trs. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2192 (2011).  Thus, "inventors have the right to patent their inventions." *Id.* at 2194; *accord Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1465 (Fed. Cir. 1998).  "[A]n inventor can assign his rights in an invention to a third party," but the Patent Act requires that such assignments be in writing.  *Roche*, 131 S. Ct. at 2195; *see also* 35 U.S.C. § 261.  Absent "an agreement to the contrary, an employer does not have rights in an invention 'which is the original conception of the employee alone.'"  *Roche*, 131 S. Ct. at 2195 (citing *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 189 (1933)).

In *Roche*, the Supreme Court held that the Bayh-Dole Act, 35 U.S.C.

§§ 200–212, could not be read to "reorder[] the normal priority of rights in an

invention . . . by vesting title to federally funded inventions in the inventor's

employer." *Id.* Such a reading would "supplant one of the fundamental precepts

of patent law and deprive inventors of rights in their own inventions" *Id.* at 2198–

99. Doing so would mark a "sea change in intellectual property rights." *Id.* at

2199. If Congress wished to do such "violence to the basic principle of patent law

that inventors own their inventions," Congress must "sa[y] so clearly." *Id.*

*Dubilier*, a 1933 decision cited extensively by *Roche*, confirms the "basic

principle" that the inventor owns a patented invention. In that case, two federal

employees conceived of and reduced to practice an invention for operating a radio

receiver. 289 U.S. at 185. Though they conducted their work in the agency's

laboratory, the agency had neither suggested nor assigned the work. *Id.* at 184–85.

*Dubilier* rejected the notion that the inventors were obliged to assign the patents

they obtained on their invention to the United States. The Court explained that "[a]

patent is property, and title to it can pass only by assignment." *Id.* at 187.

Accordingly, because the inventors had not agreed to assign their inventions to

their employer, the United States had no right to their patents. *Id.* at 187–88, 193–

96. "The circumstances preclude the implication of any agreement [by the

inventors] to assign their inventions or patents." *Id.* at 196.

Here, as co-inventors of the Chocolate device, Konstantino and Feld each owned a pro rata, undivided interest in the Chocolate patent applications. *See Ethicon*, 135 F.3d at 1465; 35 U.S.C. § 262. Each co-inventor had an independent right to assign his interest in those patent applications. *Ethicon*, 135 F.3d at 1465; 35 U.S.C. §§ 261, 262. Neither Konstantino nor Feld conceived of Chocolate nor reduced it to practice while working for or with AngioScore or using AngioScore's equipment, supplies, facilities, trade secrets, or other confidential information. A50856–60, 50868–69, 51353. AngioScore was not paying either of them. A50716–17, 50583–87. Neither was employed by AngioScore at the time of their conception or reduction to practice. *Id.* Neither had any assignment agreement with AngioScore at the time. *Id.* In fact, both Konstantino and Feld's assignment agreements had terminated years earlier. *Id.*

Yet, under the district court's decision, Konstantino had a state-law obligation to offer his interest in the Chocolate patent applications to AngioScore. But even if that were a correct interpretation of Delaware law—and it is not—state law would conflict with "the basic principle of patent law that inventors own their inventions." *Roche*, 131 S. Ct. at 2199. Delaware law thus would be "preempted by federal patent law [because] it conflicts with 'the accomplishment and execution of the full purposes and objectives of Congress.'" *Tavory v. NTP, Inc.*,

297 F. App'x 976, 982 (Fed. Cir. 2008) (quoting *Ultra-Precision*, 411 F.3d at

1377).

**B.    Federal Law Preempts Any State Law Providing Patent-Like Protection for an Unpatented Article**

Just as the "right to exclude" is based on the issuance of a patent, *see*

*Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir.

2007), the corollary also is true: the public is free to make, use, offer, and sell

unpatented ideas and articles.  *See Ultra-Precision*, 411 F.3d at 1377–78.

Accordingly, "[f]ederal law preempts state law that offers 'patent-like protection'

to discoveries unprotected under federal patent law." *Id.*

The Supreme Court repeatedly has held that federal patent law preempts

state-law claims that conferred patent-like protection for unpatented articles.  "Just

as a State cannot encroach upon the federal patent laws directly, it cannot, under

some other law, such as that forbidding unfair competition, give protection of a

kind that clashes with the objectives of the federal patent laws." *Sears, Roebuck &*

*Co. v. Stiffel Co.*, 376 U.S. 225, 230–33 (1964).  "[S]tate regulation of intellectual

property must yield to the extent that it clashes with the balance struck by

Congress in our patent laws." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489

U.S. 141, 152–57 (1989); *see also Compco Corp. v. Day-Brite Lighting, Inc.*, 376

U.S. 234, 237–38 (1964) ("To forbid copying would interfere with the federal

policy . . . of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain.").

This Court in *Ultra-Precision* likewise held that the Patent Act preempted a state-law unjust enrichment claim seeking damages for the defendant's manufacture, use, and sale of an automotive air conditioner compressor designed to reduce noise, even though the design was not covered by the plaintiff's patents. 411 F.3d at 1378. The Court explained that "federal patent law generally precludes a plaintiff from recovering a royalty-like award premised on defendant's making, using, offering to sell, or selling an unpatented discovery after plaintiff makes the discovery available to the public." *Id.* at 1380 (citation omitted).

Likewise here, under the district court's decision, Delaware law gave patent-like protection to AngioScore, even though the Chocolate device was still unpatented at the time of judgment. *See* A19364. The district court awarded lost profits premised on AngioScore's ability to prevent Defendants from making and selling Chocolate. AngioScore's damages expert admitted that his "lost profits damages analyses assumes Chocolate is not on the market at all." A50841. The expert further conceded that his "calculation of lost profits . . . is based upon the sales of AngioSculpt that [he] believe[d] AngioScore would have made if Chocolate had not been on the market." A50803–84. The district court accepted AngioScore's theory, concluding that, under Delaware law, "AngioScore has

43

proved that Chocolate's market presence has cost it market share and resulted in lower profits." A121–23.  Because Chocolate was unpatented, however, no one—including AngioScore—could preclude anyone else from making or selling the device under the guise of Delaware or any other state law.

By awarding AngioScore lost profits premised on a state-law right to exclude Defendants from making and selling an unpatented article, the district court impermissibly brought Delaware law into conflict with federal patent law. For this independent reason, the judgment must be reversed.[3]

## IV.  FELD'S ASSIGNMENT OF HIS INTEREST IN THE CHOCOLATE PATENT APPLICATIONS PRECLUDES ANY FINDING OF HARM

Even if Delaware law required Konstantino to "offer" his rights in the Chocolate invention to AngioScore—and it did not—Konstantino's failure to do so did not cause AngioScore any harm.

As the district court noted, "the Delaware Supreme Court has held that where certain claimed damages were not proximately caused by the breach, those damages were not recoverable." A113 (citing *Thorpe*, 676 A.2d at 444).  Here, even had Konstantino assigned his interest in the Chocolate patent applications to AngioScore, AngioScore would have been no better off because Konstantino's co-inventor, Tanhum Feld, lawfully assigned his interest in those patent applications

---

[3]   To avoid repetition, the Corporate Defendants adopt and incorporate the additional preemption and related arguments set forth in Argument V.C. of Konstantino's opening brief.  *See* Fed. R. App. P. 28(i).

to a Corporate Defendant, Quattro.  AngioScore thus could not have prevented

Defendants or anyone else from making and selling Chocolate.

### A.    Feld's Rights Permitted Defendants to Make and Sell Chocolate

Under federal patent law, co-inventors hold equal and undivided rights in

their joint invention.  "In the absence of any agreement to the contrary, each of the

joint owners of a patent may make, use, offer to sell, or sell the patented invention

within the United States, or import the patented invention into the United States,

without the consent of and without accounting to the other owners."  35 U.S.C.

§ 262.  Thus, "joint patent owners . . . have control over the entire property, and

each co-owner may freely use the patented technology without regard to the other."

*Wisconsin Alumni Research Found. v. Xenon Pharm., Inc.*, 591 F.3d 876, 882 (7th

Cir. 2010).

Under this "statutory default rule," absent an agreement to the contrary,

"each co-owner is at the mercy of the other in that the right of each to license

independently may, for all practical purposes, destroy the monopoly and so amount

to an appropriation of the whole value of the patent."  *Id.* (quotation source and

marks omitted).  "Thus, unless the co-owner has given up these rights through 'an

agreement to the contrary,' 35 U.S.C. § 262, the co-owner may not be prohibited

from exploiting its rights in the patent, including the right to grant licenses to third

45

parties on whatever conditions the co-owner chooses." *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 344 (Fed. Cir. 1997).

Accordingly, as a co-inventor, Feld owned an undivided interest in the Chocolate patent applications that was equal to Konstantino's interest. Feld had an independent, unfettered right to assign his interest in those patent applications to anyone he wished, including Quattro. Any interest that AngioScore might have acquired from Konstantino therefore could not have prevented Defendants or anyone else from making and selling a device covered by the patent applications.

Nevertheless, AngioScore's lost profits model, which the district court accepted, assumed that but for Konstantino's breach, AngioScore would have had the ability keep Chocolate off the market. A50841–42. But as co-owners of the patent applications, Konstantino and Feld each had the independent right to authorize the manufacture and sale of Chocolate through license or assignment of their respective interests in the patent applications. Neither co-inventor needed the other's consent. Without an assignment or participation from Feld, then, any breach by Konstantino could not have caused AngioScore any harm. Acquiring Konstantino's rights would have allowed AngioScore to make and sell Chocolate, but those rights would not have allowed AngioScore to block Defendants from doing the same. AngioScore's theory of harm thus fails as a matter of law.

**B.     The District Court Erred in Assuming That Feld Would Have Relinquished His Rights to AngioScore**

The district court surmised that "[h]ad Konstantino offered the opportunity to AngioScore, . . . [Feld] would have followed Konstantino's lead.  For this reason, defendants' insistence that Feld's independent right somehow undermines AngioScore's harm does not persuade."  A119.  This rationale is not only counterfactual, but such speculation is also insufficient as a matter of law to find causation and harm.  "The amount of lost profits . . . cannot be left simply to speculation."  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1381 (Fed. Cir. 2015).

No one testified that Feld would have "followed Konstantino's lead" even if it meant assigning Feld's interest in the Chocolate patent applications to AngioScore.  To the contrary, Feld unequivocally testified that he would not have assigned his rights to AngioScore because he disliked the company's management:

> Q.  Did you consider assigning your rights as an inventor in Chocolate to AngioScore?
>
> A.  No, I did not.
>
> Q.  Why not?
>
> A.  First of all, it was never relevant, it was never on the table.  But if it was, I would not have assigned it.
>
> Q.  Why not?
>
> A.  Because I did not like the management of AngioScore.

Q. Anyone in particular?

A.  Particular the CEO, Tom Trotter.

Q.  Can you think of any circumstances that you would have assigned your inventorship rights to Chocolate to AngioScore and Mr. Trotter?

A. No, I do not.

A50864–65.  The district court clearly erred in disregarding this testimony based on hindsight and speculation.  *See Life Techs. Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000) (finding clear error based on "impermissible use of hindsight" and misapprehension of the underlying legal standard).

In any event, what a third party might have done if a party had itself engaged in some hypothetical offer is too speculative to support causation of harm.  The district court assumed that one co-inventor of a multi-million-dollar invention would blindly follow the other co-inventor by making the same assignment.  And the court made this assumption without any concept of the terms for this supposed assignment, including the amount AngioScore would have offered to pay Feld.

More problematic, the district court's speculation about Feld again placed Delaware law in conflict with federal patent law and is preempted.  This Court's decision in *Tavory v. NTP, Inc.*, 297 F. App'x 976, is closely analogous.  There, one co-inventor (Campana) assigned his rights in an invention to the defendant (NTP), which then successfully sued a third party for infringement and recovered damages.  The plaintiff, claiming to be a co-inventor, sued NTP for unjust

48

enrichment under state law, seeking a portion of those damages.  This Court held

that federal patent law preempted that state-law claim because, under § 262, NTP

was the "legitimate assignee of Campana's interests in the patents-in-suit."  *Id.* at

983.  As the Court explained, the plaintiff "cannot sidestep § 262 through a state

law unjust enrichment claim; such a claim is preempted because it 'stands as an

obstacle to the accomplishment and execution of the full purposes and objectives

of Congress' in enacting § 262."  *Id.* (citation omitted).

The same is true here.  AngioScore, relying on a purported right to

Konstantino's interest in the Chocolate patent applications, attempts to use

Delaware law to sidestep Feld's separate and independent ability to assign his

interest in those patent applications under § 262.  Just as in *Tavory*, the state-law

claim is preempted because Quattro was a "legitimate assignee of [Feld's] interests

in" Chocolate.  *Id.*

## V.    THE "LOST PROFITS" AWARD IS REVERISIBLE ERROR

The district court correctly denied AngioScore's request for "an injunction

barring the sale of Chocolate" because of the "harm such an injunction would work

on the public interest."  A123.  AngioScore's requested injunction would

"remov[e] from the avowedly limited field of specialty balloon catheters a device

that has been approved for medical use in treating complex disease."  *Id.*  The court

found AngioScore's request "brazen" and "plainly inappropriate" because it would

"remove from the quiver of practicing physicians one arrow with which they might treat a patient." *Id.*

Nevertheless, the court paradoxically awarded AngioScore more than $20 million in "lost profits" on the theory that, but for Konstantino's alleged breach of fiduciary duty, AngioScore would have acquired Konstantino and Feld's interests and then precluded Defendants from selling Chocolate, so that AngioScore would sell more of its own purportedly competing device, AngioSculpt. Like an injunction barring the sale of Chocolate, this lost profits award—premised on denying physicians and patients access to Chocolate, a life-saving new device—is contrary to the public interest and should be reversed. At a minimum, this Court should remand because the district court, in calculating lost profits, ignored the costs AngioScore would have incurred to acquire Konstantino and Feld's rights.

## A.    The Lost Profits Award Is Contrary to Public Policy

Courts may not issue an injunction that would be contrary to the public interest. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). Likewise, courts should award equitable monetary relief only "where such action involves no violation or frustration of law or public policy." *Honeywell, Inc. v.*

*S.F. Hous. Auth.*, 164 F. Supp. 2d 1130, 1136 (N.D. Cal. 2001), *aff'd in part, rev'd in part and remanded*, 72 F. App'x 609 (9th Cir. 2003).

Contrary to this basic principle of equity, the district court awarded lost profits based on AngioScore's supposed right to keep the Chocolate device *off the market* and out of the hands of physicians and patients who benefit from it. The court found that "Chocolate's *market presence* has cost [AngioScore] market share and resulted in lower profits." A121 (emphasis added); *see also* A50753, 50767. In other words, the court awarded profits that AngioScore supposedly "would have generated had business not been diverted to defendants." A121.

The district court's award is squarely at odds with important public policies, each of which the court itself recognized. *First*, the award runs counter to the policy favoring innovation. The district court recognized that "an appropriate award is . . . one that does not work to the destruction of innovative technology." A123. Yet the award here presumed that AngioScore could and would have kept Chocolate, an innovative new device, off the market. *Second*, the award undermines the policy favoring the availability of life-saving and life-enhancing medical products. As the district court acknowledged, the interest in promoting public health disfavors any remedy that would "remove from the quiver of practicing physicians one arrow with which they might treat a patient." *Id.*

Because the district court's lost profits award assumed that AngioScore

could and would have prevented Defendants and anyone else from selling

Chocolate, the award is contrary to public policy and should be reversed.

### B.    The District Court Failed to Deduct the Costs AngioScore Would Have Incurred in Acquiring Chocolate

"Profits are based on gross revenue after deducting certain allowable

expenses." *Nordock, Inc. v. Sys., Inc.*, 803 F.3d 1344, 1354 (Fed. Cir. 2015). "It is

axiomatic that a claim for lost profits requires evidence of lost revenues, *minus* the

costs associated with generating those revenues." *Empire Fin. Servs., Inc. v. Bank*

*of N.Y. (Del.)*, 2007 WL 1991179, at *4 (Del. Super. Ct. June 19, 2007) (emphasis

added). Such costs "are required to be subtracted from lost revenues in

determining lost profits." *Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 858

A.2d 392, 425 (Del. Ch. 2004), *rev'd in part on other grounds*, 872 A.2d 944 (Del.

2005). Yet the district court awarded AngioScore lost profits from the purported

sales AngioScore would have generated had it acquired Konstantino and Feld's

interests, without deducting the costs AngioScore would have had to pay

Konstantino and Feld to obtain their interests.

The district court rejected as "untenable" AngioScore's argument that

"AngioScore had a right to the Chocolate outright, and that therefore Konstantino

was obligated to *give* the opportunity to AngioScore." A81. "[W]hat

Konstantino's fiduciary duty demanded was that he offer AngioScore the

*opportunity to acquire* the rights to the Chocolate." A82. While finding that

AngioScore would have had to pay Konstantino to acquire his rights, the district

court declined to "venture as to specifics of such a transaction." *Id.* But to

properly calculate lost profits, Delaware law and common sense required the court

to venture as to the specifics of such a transaction. The district court's admitted

failure to do so at a minimum requires a remand to determine the costs AngioScore

would have incurred to acquire both Konstantino and his co-inventor Feld's

interests, and any other properly deductible expenses.[4]

## VI.    THE DISTRICT COURT ERRED IN DENYING ATTORNEYS' FEES FOR ANGIOSCORE'S FRIVOLOUS PATENT CLAIM

After the jury rendered a verdict of noninfringement and invalidity of all of

AngioScore's asserted claims, Defendants moved for attorneys' fees under 35

U.S.C. § 285. A17665. Section 285 provides for fee-shifting in "exceptional

cases." A case is "exceptional" under § 285 when the plaintiff asserts

"exceptionally meritless claims." *Octane Fitness, LLC v. ICON Health & Fitness,*

*Inc.*, 134 S. Ct. 1749, 1757 (2014).

---

[4]    The Corporate Defendants adopt and incorporate the additional lost profits and related arguments set forth in Argument V.D of Konstantino's opening brief. The Corporate Defendants also adopt and incorporate the statute of limitations arguments set forth in Argument V.B of Konstantino's opening brief. Under the three-year statute of limitations for the breach of fiduciary duty and aiding and abetting claims or a four-year limitations period for the unfair competition claims, AngioScore's claims are time-barred. *Dubroff v. Wren Holdings, LLC*, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011) ("Under Delaware law, claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unjust enrichment . . . are generally addressed with reference to a three-year statute of limitations."); Cal. Bus. & Prof. Code § 17208.

The district court found that AngioScore's patent claim "was not particularly strong," but did not find the claim "exceptionally weak," primarily because AngioScore's theory of infringement under the doctrine of equivalents ("DOE") had "surviv[ed]" summary judgment." A181.  But the court's denial of summary judgment was premised on an incorrect view of DOE law.  A legal error in denying summary judgment, allowing a plainly erroneous theory of infringement to proceed to trial, provides no basis to deny fees under § 285.  This Court should reverse.

### A.    The District Court Denied Summary Judgment on AngioScore's Theory of Infringement Under the Doctrine of Equivalents

"To establish whether an accused device infringes a patent, this court performs a two-step analysis.  First, the claims must be correctly construed to determine the scope of the claims.  Second, the claims must be compared to the accused device." *Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1413 (Fed. Cir. 2000) (quotation marks omitted)  "Literal infringement exists when every limitation recited in the claim is found in the accused device." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 2016 WL 363443, at *5 (Fed. Cir. 2016) (quotation marks omitted).  "Absent any limitation of a patent claim, an accused device cannot be held to literally infringe the claim." *Zodiac Pool Care*, 206 F.3d at 1415.

"[A] device that does not infringe a patent claim literally may still infringe the very same claim under the DOE if every limitation of the claim is literally or

equivalently present in the accused device. For a claim limitation to be 'equivalently present' in an accused device, there must be only 'insubstantial differences' between the missing claim limitation and corresponding aspects of the accused device." *Id.*

Here, in denying attorneys' fees, the district court focused on a single limitation—the "'end' limitation." A181. The "end" limitation is set forth in AngioScore's independent claim 1, on which all of AngioScore's other asserted claims depend. Independent claim 1 claims an angioplasty balloon catheter including, among other things, "a non-deployable radially expansible stent comprising a hypo tube disposed over the balloon and comprising a proximal end; a distal end; and at least three longitudinally aligned, radially-spaced struts, *wherein each strut extends from the proximal end to the distal end . . . .*" A345 (emphasizing the "end" limitation). Figure 1 shows the balloon (1) with stent (2) disposed over it, including struts (5) with proximal end (3) and distal end (4):



FIG. 1

55

The district court granted summary judgment to Defendants on AngioScore's theory of literal infringement with respect to the "end" limitation. A1533. AngioScore had argued that the metal "constraining structure" in Chocolate met the '119 patent's "end" limitation based on a claim construction that broadened the word "end" to encompass an "end region." A1515–18. The court correctly rejected that construction as contrary to the intrinsic evidence. *Id.* The court then found no literal infringement because Chocolate's constraining structure indisputably does not have longitudinal members extending from the proximal end to the distal end. *Id.* The annotated engineering drawing shows how the "struts" in Chocolate extend to the end of the constraining structure on only one side or the other, in alternating order; not one strut extends from end to end:



Defendants also sought summary judgment of no infringement under the DOE with respect to the "end" limitation. As Defendants explained, a structure in which *no* strut extends from "the proximal end to the distal end" cannot be equivalent to a structure in which *every* strut "extends from the proximal end to the distal end." Dkt. 447 at 3. The district court, however, allowed AngioScore to

proceed with its DOE theory at trial.  As described below, that ruling was based on

an erroneous view of DOE law.  And when legal error invades the exceptional case

analysis, a "district court would necessarily abuse its discretion."  *Highmark Inc. v.*

*Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014).

## B.    The Doctrine of Equivalents Did Not Apply As a Matter of Law

"[A]ll claim limitations are not entitled to an equal scope of equivalents.'"

*Akzo*, 2016 WL 363443, at *6 (quotation marks omitted).  "[M]any limitations

warrant little, if any, range of equivalents" because of "the All Limitations

Rule . . . or the inherent narrowness of the claim language."  *Moore U.S.A., Inc. v.*

*Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000).  Under the All

Limitations Rule, "the doctrine of equivalents does not apply if applying the

doctrine would vitiate an entire claim limitation."  *Asyst Techs., Inc. v. Emtrak,*

*Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005).  "[S]aying that a claim element would

be vitiated is akin to saying that there is *no equivalent* to the claim element in the

accused device . . . ."  *Akzo*, 2016 WL 363443, at *7.  "Under the doctrine of

equivalents, an infringement theory thus fails if it renders a claim limitation

inconsequential or ineffective."  *Id.*

Likewise, "the concept of equivalency cannot embrace a structure that is

specifically excluded from the scope of the claims."  *Augme Techs., Inc. v. Yahoo!*

*Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014) (citation omitted).  This specific

exclusion principle applies "where the patentee seeks to encompass a structural feature that is the opposite of, or inconsistent with, the recited limitation." *Id.*

For instance, in *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091 (Fed. Cir. 2000), this Court held that, under the DOE, a claim calling for strips of adhesive that extend "the *majority* of the lengths" of the longitudinal margins of a form was not equivalent to strips that extended a *minority* of that length. *Id*. at 1106. "First, to allow what is undisputedly a minority (*i.e.*, 47.8%) to be equivalent to a majority would vitiate the ['majority of the lengths' limitation]." *Id*. at 1106. "If a minority could be equivalent to a majority, this limitation would hardly be necessary . . . ." *Id.* "Second, it would defy logic to conclude that a minority—the very antithesis of a majority—could be insubstantially different from a claim limitation requiring a majority." *Id.*[5]

Likewise here, the DOE does not apply to the end limitation in AngioScore's '119 patent. To allow a structure in which *no* strut extends end-to-end to be equivalent to a structure in which *every* strut extends end-to-end "would vitiate the [end] limitation." *Moore*, 229 F.3d at 1106. If zero end-to-end struts could be

---

[5]    *See also, e.g., Azko*, 2016 WL 363443, at *7 (finding that an accused system that did not generate back pressure could not be equivalent to a claim requiring back pressure); *Augme*, 755 F.3d at 1335 (Because "embedded and linked code are opposites, . . . they 'cannot possess only insubstantial differences.'"); *Asyst*, 402 F.3d at 1194–95 ("[T]he 'mounted on' limitation is binary in nature . . . . To hold that 'unmounted' is equivalent to 'mounted' would effectively read the 'mounted on' limitation out of the patent."); *Zodiac Pool Care*, 206 F.3d at 1416 (finding that "a stop which extends to the peripheral edge of a disk" is not equivalent to "one that is 'substantially inward' of the very same disk").

equivalent to all end-to-end struts, the end limitation "would hardly be necessary"—indeed, the limitation would be meaningless. *Id.* Moreover, "it would defy logic to conclude that [no end-to-end struts]—the very antithesis of [all end-to-end struts]—could be insubstantially different from [the end] limitation." *Id.* A structure with no end-to-end struts is "the opposite of, or inconsistent with," a structure requiring all end-to-end struts. *Augme*, 755 F.3d at 1335.

Because legal error invaded the district court's evaluation of whether AngioScore's patent infringement claim was "exceptionally meritless" under § 285, this Court should reverse the district court's denial of attorneys' fees.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment in favor of AngioScore on the state-law claims, and also the court's order denying Defendants' motion for attorneys' fees on the patent infringement claim.

Dated: February 16, 2016                    Respectfully submitted,

 

                                         /s/  Lisa S. Blatt
David S. Steuer                            Lisa S. Blatt
Steven G. Guggenheim                       ARNOLD & PORTER LLP
Dylan J. Liddiard                          601 Massachusetts Ave., NW
WILSON SONSINI GOODRICH &                  Washington, DC 20001
  ROSATI                             (202) 942-5000
650 Page Mill Road                         lisa.blatt@aporter.com
Palo Alto, CA 94304
(650) 493-9300                             David A. Caine
dsteuer@wsgr.com                           ARNOLD & PORTER LLP
                                           1801 Page Mill Road, Suite 110
                                           Palo Alto, CA 94304
                                           Tel:  (650) 798-2920
                                           Fax: (650) 798-2999
                                           david.caine@aporter.com

*Counsel for Defendants-Appellants*
*TriReme Medical, LLC, Quattro Vascular PTE Ltd., and QT Vascular Ltd.*

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

Judgment filed Oct. 14, 2014 (Dkt. No. 812) ..................................................... A19

Order on Defendant's Motion to Dismiss State Law Claims;
Motions for Summary Judgment on State Law Claims;
Motions in Limine re State Law Experts
filed Apr. 6, 2014 (Dkt. No. 591) ..................................................................... A30

Findings of Fact and Conclusions of Law
filed July 1, 2015 (Dkt. No. 665) ...................................................................... A65

Order Denying Defendants' Motion for Attorney's Fees
filed Dec. 9, 2015 (Dkt. No. 841) ................................................................... A179

U.S. Patent No. 7,691,119 .............................................................................. A331

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ANGIOSCORE, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>TRIREME MEDICAL, LLC (f/k/a TRIREME MEDICAL, INC.), EITAN KONSTANTINO, QUATTRO VASCULAR PTE LTD., and QT VASCULAR LTD. (f/k/a QT VASCULAR PTE. LTD.),<br><br>          Defendants. | Case No. 4:12-CV-3393-YGR<br><br>[PROPOSED] JUDGMENT<br><br>*AS MODIFIED BY THE COURT*<br><br>Trial Date(s):  April 13, 2015<br>                      September 14, 2015<br><br>Hon. Yvonne Gonzalez Rogers |

1    Trial without a jury on the Third Cause of Action for Breach of Fiduciary Duty Under

2    Delaware Law, the Fourth Cause of Action for Aiding and Abetting a Breach of Fiduciary Duty,

3    and the Fifth Cause of Action for Unfair Competition Under California Business and Professions

4    Code § 17200 alleged in the Fourth Amended Complaint (Dkt. No. 244) commenced in this matter

5    on April 13, 2015 and concluded on April 21, 2015.  The Court entered its Findings of Fact and

6    Conclusions of Law on July 1, 2015 (Dkt. No. 665), finding in Plaintiff AngioScore, Inc.'s favor

7    on the Third, Fourth, and Fifth Causes of Action of the Fourth Amended Complaint.  On March 3,

8    2015, the Court granted Plaintiff AngioScore, Inc.'s unopposed oral motion to voluntarily dismiss

9    the Second Cause of Action of the Fourth Amended Complaint.

10    A jury trial on the First Cause of Action alleging Patent Infringement in the Fourth

11    Amended Complaint (Dkt. No. 244) commenced in this matter on September 9, 2015, with jury

12    selection, and on September 14, 2015, with opening statements and evidence.  The jury entered its

13    verdict in Defendants' favor on the First Cause of Action of the Fourth Amended Complaint on

14    September 29, 2015, and the verdict form was duly recorded (Dkt. No. 790).

15    Based on the jury's verdict (Dkt. No. 790), JUDGMENT is hereby ENTERED in favor of

16    Defendants Eitan Konstantino, TriReme Medical, LLC, Quattro Vascular Pte Ltd., and QT

17    Vascular Ltd. on the First Cause of Action in the Fourth Amended Complaint.  Based on the

18    Court's Findings of Fact and Conclusions of Law (Dkt. No. 665), JUDGMENT is hereby

19    ENTERED in favor of Plaintiff AngioScore, Inc. on the Third, Fourth, and Fifth Causes of Action

20    in the Fourth Amended Complaint.

21    It is further ORDERED that:

22    (1)  AngioScore's First Cause of Action is DISMISSED WITH PREJUDICE with respect

23    to claims 4, 5, 6 and 7 of United States Patent No. 7,691,119 (the "'119 patent").

24    (2)  Based on the jury's verdict, Claims 1, 2, 3, 8 and 9 of the '119 patent are not infringed

25    by the accused Chocolate PTA Balloon Catheter products and are invalid.  Accordingly, Plaintiff

26    AngioScore, Inc. is to recover nothing with respect to the First Cause of Action in the Fourth

27    Amended Complaint.

28

-1-                          Case No. 4:12-CV-3393-YGR

[PROPOSED] JUDGMENT

1    (3)  Plaintiff AngioScore, Inc. recovers from Defendants Eitan Konstantino, TriReme

2  Medical, LLC, Quattro Vascular Pte Ltd., and QT Vascular Ltd. the amount of $2.97 million in

3  past lost profits and $17.064 million in future lost profits, for a total of $20.034 million, plus pre-

4  judgment interest in the amount of $333,277 calculated by applying the legal rate of interest set

5  forth in 6 Del. C. § 2301(a) compounded monthly to the $2.97 million in past lost profits, plus

6  post-judgment interest at the rate of 0.31% per annum as set forth at 28 U.S.C. § 1961.

7    (4)  Plaintiff AngioScore, Inc. further recovers from Defendant Eitan Konstantino the

8  $250,000 he received pursuant to his Intellectual Property Assignment with Quattro Vascular Pte.

9  Ltd. dated June 1, 2010, the 2.85% royalty on past and future Chocolate sales as set forth in his

10  Intellectual Property Assignment with Quattro Vascular Pte. Ltd. dated June 1, 2010, his shares in

11  QT Vascular stock, his QT Vascular stock options, any and all monies he has collected from sales

12  of QT Vascular stock, any and all monies he has received relative to his royalty share, and any and

13  all monies he has made in connection with his monthly consulting retainer relative to Chocolate,

14  plus pre-judgment interest in the amount of $121,992 calculated by applying the legal rate of

15  interest set forth in 6 Del. C. § 2301(a) compounded monthly to the amounts Defendant Eitan

16  Konstantino received pursuant to his Intellectual Property Assignment with Quattro Vascular Pte.

17  Ltd. through June 30, 2014, plus post-judgment interest at the rate of 0.31% per annum.

18    (5)  Plaintiff AngioScore, Inc. has prevailed in establishing that Defendant Eitan

19  Konstantino breached his fiduciary duties to Plaintiff AngioScore, Inc., that Defendants TriReme

20  Medical, LLC and Quattro Vascular Pte Ltd. aided and abetted that breach, and that Defendant QT

21  Vascular Ltd. is liable for the acts of Defendants TriReme Medical, LLC and Quattro Vascular Pte

22  Ltd.  As the prevailing party on the Third, Fourth, and Fifth causes of action, Plaintiff AngioScore,

23  Inc. is awarded its costs in an amount to be determined in accordance with the procedures set forth

24  in Northern District of California Local Rule 54 to the extent that it can show the costs are related

25  to those causes of action.  Defendants QT Vascular Ltd., Eitan Konstantino, TriReme Medical,

26  LLC, and Quattro Vascular Pte Ltd., have prevailed with respect to the First Cause of Action for

27  Patent Infringement.  As such, the Defendants are awarded costs in an amount to be determined in

28

-2-                    Case No. 4:12-CV-3393-YGR
                       [PROPOSED] JUDGMENT

1 | accordance with the procedures set forth in Northern District of California Local Rule 54 to the

2 | extent that they can show the costs are related to that cause of action.

3 |      **IT IS SO ORDERED.**

4 | Dated: October 14, 2015

5 |            Hon. Yvonne Gonzalez Rogers
           United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 4:12-CV-3393-YGR
~~[PROPOSED]~~ JUDGMENT

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANGIOSCORE, INC.,

    Plaintiff,

    v.

TRIREME MEDICAL, INC., ET AL.,

    Defendants.

Case No.  12-cv-03393-YGR

**ORDER ON DEFENDANTS' MOTION TO DISMISS STATE LAW CLAIMS; MOTIONS FOR SUMMARY JUDGMENT ON STATE LAW CLAIMS; MOTIONS IN LIMINE re STATE LAW EXPERTS**

Now before the Court are three categories of motions:  (1) defendants' motion to dismiss the state law claims in this action for lack of subject matter jurisdiction;  (2) the parties' cross-motions for summary judgment on state law claims;  and (3) the parties' motions in limine relating to the admissibility of certain expert testimony.  (Dkt. Nos. 555 ("MTD"); 468 ("Defts. MSJ"); 478 ("Pltf. MSJ"); 462 ("Talley Mot."); 463 ("Olsen Mot. re State Law"); 466 ("Lewin Mot."), respectively.)

On March 3, 2015, the Court held a hearing at which the parties were provided an opportunity to present argument on the summary judgment and in limine motions.  At that same hearing, the Court provided tentative rulings and noted that an order memorializing said rulings would follow.  With one exception, those ruling remain in place.

On March 11, 2015, defendants filed their motion to dismiss the state law claims on the basis of subject matter jurisdiction.  Plaintiff opposed in the normal course.  Defendants declined the Court's invitation to expedite a reply and filed the same in the normal course. Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion suitable for expedited resolution without oral argument, and issues the rulings herein.

1    For the reasons set forth below, the Court **DENIES** defendants' motion to dismiss, **GRANTS**

2    in part and **DENIES** in part plaintiff's motion for summary judgment, **GRANTS** in part and **DENIES**

3    in part defendants' motion for summary judgment, **DENIES** defendants' motion to preclude the

4    testimony of Eric Talley, AngioScore's corporate governance expert, **GRANTS** AngioScore's

5    motion to preclude the testimony of defendants' rebuttal expert David Lewin, and **DENIES**

6    **WITHOUT PREJUDICE** defendants' motion to preclude certain opinions of AngioScore's state law

7    damages expert, Gary Olsen.

8                      **FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

9    The facts of this case are well-known to the parties and the Court.  References to specific

10    facts are set forth herein as necessary for the Court's ultimate rulings and to provide a brief factual

11    background.  The Court notes that while it grants summary judgment as to portions of the claims

12    stated herein, trial on the balance is set to begin in less than a week, and a final resolution of the

13    claims in their entirety will result in a more fulsome order setting forth findings of fact that

14    support its ruling at the conclusion of trial.  The Court is mindful that "the tests enunciated in *Guth*

15    and subsequent cases provide guidelines to be considered by a reviewing court in balancing the

16    equities of an individual case." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).

17    Importantly, "[n]o one factor is dispositive and all factors must be taken into account insofar as

18    they are applicable." *Id*.  The summary judgment rulings herein are intended to promote an

19    efficient use of public resources as the parties prepare for trial.  The final order in this case will

20    expound on the application of each factor of the corporate opportunity doctrine to the facts of this

21    unique case, including those discussed in this order, and whether defendant Dr. Eitan Konstantino

22    "appropriated for himself something that in fairness should belong to [AngioScore]." *Id*.

23    As a basic factual primer, the Court provides the following context.  In its Fourth Amended

24    Complaint ("4AC"), Plaintiff AngioScore names as defendants one natural person and three

25    business entities: (1) Dr. Eitan Konstantino ("Konstantino"); (2) TriReme Medical, LLC (f/k/a

26    TriReme Medical, Inc.) ("TriReme"); (3) Quattro Vascular Pte Ltd. (f/k/a Proteus Vascular

27    Systems) ("Quattro"); and (4) QT Vascular Ltd. (f/k/a QT Vascular Pte. Ltd.) ("QT").  (Dkt. No.

28    244.)  Konstantino founded TriReme in 2005.  (Dkt. No. 512-2 (Pltf. Resp. to Defts. Stmt. of

United States District Court
Northern District of California

2

**A000031**

United States District Court
Northern District of California

1   Undisputed Facts) at Fact 9.)  Quattro and QT Vascular are both incorporated in Singapore;

2   Quattro as of March 25, 2010, QT Vascular as of March 6, 2013.  (*Id*. at Fact 80, 81.)  The

3   defendants sell an angioplasty balloon catheter sold under the name "Chocolate," which plaintiff

4   contends competes with AngioScore's angioplasty balloon catheter, the "AngioSculpt."

5   Konstantino was a founder of AngioScore, and he remained on AngioScore's board of directors

6   until February 5, 2010.  (*Id*. at Fact 44.)

7        The 4AC alleges both claims for patent infringement, and violations of state law stemming

8   generally from plaintiff's contention that while on AngioScore's board of directors, Konstantino

9   developed a device that was competitive to AngioScore's flagship product, the AngioSculpt, a

10  specialty balloon catheter.  (*Id*. at ¶¶ 49–79.)  Chocolate is also a specialty balloon catheter with a

11  non-deployable metallic structure made of nitinol, which sits atop a balloon.  (Dkt. No. 478 at 2.)

12  The Chocolate device treats blood vessel disease by applying focal forces to plaque deposits.

13  (*See, e.g.*, *id*. at 6-7; Dkt. No. 481 ("Parker Decl."[1]) Exs. 24, 25, 27, Garcia Dep. at 11:8-12:18;

14  27:5-28:4).)

15       After the Chocolate was released to the market, AngioScore analyzed Chocolate's design

16  and initiated this action in 2012, alleging only patent infringement claims.  (Dkt. No. 1.)

17  Discovery commenced and revealed that Chocolate may have been developed while Konstantino

18  was on AngioScore's board.  AngioScore asked for further information relating to Chocolate's

19  development, which requests were met with resistance, necessitating motions to compel.  (*See,*

20  *e.g.*, Dkt. Nos. 88, 89, Parker Decl. Ex. 16.)  Once defendants did produce this information,

21  Angioscore discovered that Konstantino had participated in the development of Chocolate while

22  still serving on its board of directors.  Specifically, documents produced late in discovery evince

23  that prior to his departure from AngioScore, in the fall of 2009, Konstantino collaborated with his

24  fellow TriReme co-founder, Tanhum Feld, to develop the Chocolate.  Such development included

25

26       [1] "Parker Decl." refers to the declaration of Kimball Dean Parker (Dkt. No. 479) and
    exhibits submitted in conjunction with AngioScore's motion for partial summary judgment, which
27  documents appear at entries numbered 479 through 485.  "Parker Opp. Decl." refers to the Parker
    declaration and exhibits submitted in support of AngioScore's opposition to defendants' motion
28  for summary judgment, which appear at docket entries 516, 520, and 521.

3

1    designing the Chocolate, submitting a provisional patent application, and undertaking porcine

2    testing of the Chocolate.  Around the same time, Konstantino also prepared presentation materials

3    in order to secure investors for Chocolate.  (*See* Parker Decl. Exs. 12, 16, 17, 19, 62.)

4            After receiving this discovery, on May 6, 2014, AngioScore sought leave to amend its

5    then-operative complaint to add the state law claims of breach of fiduciary duty, aiding and

6    abetting the same, and unfair competition.  (Dkt. No. 202.)  Defendants opposed amendment,

7    arguing that the Court lacked subject matter jurisdiction over AngioScore's new claim, on the

8    basis that these new claims "relate to facts and theories of liability that are not at issue in the

9    patent case" and that even if supplemental jurisdiction existed, the Court should decline to

10   exercise it to the extent it raises novel questions of state law that would predominate over the

11   federal claim.  (Dkt. No. 209-3 at 1-2; 17-18.)  The Court rejected these arguments and permitted

12   AngioScore leave to amend.  (Dkt. No. 219.)

13           AngioScore brings these claims on the basis that Konstantino did not offer the Chocolate

14   to AngioScore, nor did he apprise AngioScore of the extent of his work on the Chocolate or its

15   development.  (Dkt. No. 478 at 5.)  Rather, in February 2010, Konstantino notified AngioScore's

16   CEO that TriReme was "contemplating" moving into the specialty balloon market.  (Parker Decl.

17   Ex. 11, Email from Konstantino to Sellers (Feb. 5, 2010).)  When AngioScore noted that this

18   would present a conflict of interest because Konstantino was a board member of AngioScore and

19   any specialty balloon catheter device would likely compete with the AngioSculpt, Konstantino

20   represented that TriReme had not decided for certain that it would enter that market, and that

21   Konstantino had approached Angioscore "before any new project [was] started."  *Id.*  AngioScore

22   nonetheless asked Konstantino to resign from the board, and Konstantino did so on February 5,

23   2010.  (Parker Decl. Ex. 7.)

24           After Konstantino left the board, he further reassured AngioScore that he had not violated

25   his fiduciary obligations to the company with respect to the development of a specialty balloon

26   catheter for TriReme.  In a letter prepared by his counsel, Konstantino stated that "prior to

27   February 5, 2010, TriReme has not developed any products, nor acquired or licensed any

28   technology that competes with AngioScore's products," and that he "was not involved in any

United States District Court
Northern District of California

4

1    development work or licensing of angioplasty balloon technology for the coronary or periphery

2    markets that involves specialized features such as scoring, cutting, or drug eluting elements."

3    (Parker Decl. Ex. 22, Letter from Nguyen to Sellers (Feb. 23, 2010).)

4          At a three-hour hearing on March 3, 2015, the Court, having reviewed the evidence of

5    record, relevant case law, and the parties' briefing, tentatively granted in part AngioScore's

6    motion for summary judgment and offered further tentative rulings on other outstanding motions

7    to assist the parties with trial preparation.  At the hearing, and upon questioning from the Court,

8    the parties advised the Court that the state law claims are equitable in nature and thus not

9    amenable to resolution by a jury.  (*See* Dkt. No. 582, Hrg. Tr. 8:14-9:2.)  Accordingly, the Court

10   bifurcated the trial.[2]

11         Neither party objected to bifurcation, but defendants did urge the Court that the patent trial

12   should proceed first, given that the patent claim was the first filed.  Finding that trial as to the state

13   claims would better facilitate resolution of the patent claims without imposing additional burden

14   on the citizenry, the Court deemed bifurcation warranted and confirmed that trial on the state law

15   claims alone would commence as originally scheduled on April 13, 2015.

16                     MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

17         On March 11, 2015, defendants filed the instant motion to dismiss for lack of jurisdiction.

18   (Dkt. No. 555.)  It is apparent to the Court that by way of the instant motion, defendants seek to

19   avoid the bench trial on the state law claims over which the Court has presided for approximately

20   nine months, all discovery related thereto has concluded, and for which summary judgment and

21   evidentiary rulings have been tentatively announced, many of which were not in defendants'

22   favor.  Nonetheless, mindful that jurisdictional issues are foundational and that it is duty-bound to

23   ensure that jurisdiction is proper, the Court addresses this motion first.[3]

24   _____

25         [2] Defendants noted that one claim for breach of fiduciary duty was not equitable in nature
     and carried a jury right.  (Dkt. No. 582, Hrg. Tr. at 14:8-20.)  At that point, AngioScore moved

26   orally to dismiss that claim.  The oral motion was unopposed by defendants and granted.  (*Id*. at
     15:10-22.)  Had that claim not been dismissed, bifurcation would not have been warranted.

27

28         [3] It is not lost on the Court that the arguments advanced in defendants' motion to dismiss
     were raised previously in connection with AngioScore's motion for leave to amend.  (*See* Dkt. No.

                                                     5

**A000034**

**I.    LEGAL STANDARD**

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  Relevant to the instant motion, the supplemental jurisdiction statute, 28 U.S.C. § 1367, provides, in relevant part:

> [I]n any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  In construing the bounds of the federal courts' reach, a state law claim is understood as part of the same case or controversy when it shares a "common nucleus of operative fact" with the federal claims and the state and federal claims would normally be tried together.  *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004).

Even if supplemental jurisdiction is proper under Section 1367(a), the Court has discretion to decline such jurisdiction if, after undertaking a case-specific analysis, it finds that declining

---

209-3.)  Although in its order granting that motion the Court did not specifically address these arguments, in resolving the motion it did consider whether amendment was proper in full view of all arguments made, including defendants' jurisdictional argument.  The Court notes that following its order granting leave to amend, defendants did not move for clarification of that order, or for reconsideration on any basis, including on the question of whether supplemental jurisdiction is proper.  Neither did defendants move to dismiss the as-amended complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  In substance, then, defendants' motion to dismiss is a motion for reconsideration of the Court's prior ruling.

In this District, motions for reconsideration must adhere to the Local Rule and the instant motion does not.  (Civil. L. R. 7-9.)  First, the motion was not diligently made.  The claims with which defendants now take issue have been part and parcel of this case since amendment was permitted.  Discovery has concluded; expert opinions have been rendered.  The argument concerning subject matter jurisdiction could have, and indeed *was*, presented in mid-2014, yet defendants filed the instant motion in March of 2015.  Defendants have fallen far short of the reasonable diligence standard.  Second, the local rules require that any motion for reconsideration be accompanied by a motion for leave to so file; defendants have also failed to comply with this requirement.  (Civil L. R. 7-9(a).)  Third, motions for reconsideration are limited to specific substantive instances:  where, for example, there is an error of law or a material change in fact or law.  (Civil L. R. 7-9(b).)  Defendants have not demonstrated that such is the case here.

6

supplemental jurisdiction "comports with the underlying objective of most sensibly

accommodat[ing] the values of economy, convenience, fairness and comity." *Executive Software*

*N. Am., Inc. v. United States Dist. Court,* 24 F.3d 1545, 1557–58 (9th Cir. 1994) (alteration in

original) (internal quotations and citations omitted) (overruled on other grounds, *Cal. Dept. of*

*Water Resources v. Powerex Corp.*, 533 F.3d 1087, 1093 (9th Cir. 2008)).  Section 1367(c) states

that a court may decline to exercise jurisdiction over a supplemental state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

## II.    ANALYSIS

The Court finds that the federal and state law claims are sufficiently, and indeed

substantially, connected and therefore that the exercise of supplemental jurisdiction is proper.

At the heart of this case is the Chocolate specialty balloon catheter, which AngioScore

claims was developed by a former member of its board, Konstantino, in contravention of his

fiduciary duties, and infringes AngioScore's patent.  Once the Chocolate came to market in 2011,

AngioScore analyzed it and initiated this action, alleging patent infringement.  In the course of

discovery relative to that claim, AngioScore sought documents relating to the conception and

development of the Chocolate device.  After considerable use of judicial resources to compel the

production of relevant discovery, AngioScore learned that Konstantino and other defendants had

developed Chocolate while Konstantino was still on AngioScore's board.  After obtaining

requested discovery, AngioScore sought leave to amend its complaint to add the state law claims

now at issue.  (Dkt. No. 202.)

Against this backdrop, defendants now argue that the infringement and fiduciary duty

claims are not sufficiently related such that this Court may exercise jurisdiction over the state law

claims.  The position strains credulity.  As a practical matter, the Court finds that there is a

substantial overlap of evidence between the federal and state claims and therefore a common

United States District Court
Northern District of California

7

1    nucleus of operative fact.  As stated above, the core of this case concerns the Chocolate device –

2    whether it infringes an AngioScore patent, and whether Konstantino's development of the device

3    was a violation of his duties to AngioScore.  Critically, Konstantino's role and relationship to

4    AngioScore will be at issue in both the patent and state law claims.  Viewing the issue holistically,

5    the overlap is obvious:  AngioScore is alleging that the patent infringement is willful and that

6    Konstantino both developed the infringing device and took it for himself and his own benefit.

7    Defendants' attempt to parse the claims down to their elements myopically to isolate the legal

8    differences between the patent and state law claims cannot undermine the coherence of the factual

9    narrative from which all of AngioScore's claims flow.

10        The nuances of AngioScore's affirmative case further reveals the extent of this overlap.

11   One example of this is in the damages calculation context.  The extent, if any, to which Chocolate

12   competes with the AngioSculpt remains relevant in terms of calculating both patent and state law

13   damages.  The same experts who calculated patent damages also opined on damages relating to the

14   state law corporate opportunity doctrine claim.  In addition, the witnesses and documents used to

15   support the claims substantially overlap.  Tellingly, an abundance of the documents underpinning

16   the state law summary judgment claims were produced in the context of patent discovery (*see* Dkt.

17   No. 579 ("Caruso Decl.") ¶¶ 22, 23), because again, both claims flow from the development of the

18   allegedly infringing device.  Witnesses also overlap, as evidenced by the fact that witnesses set to

19   be called in the imminent bench trial on state law issues were deposed while the case was purely a

20   patent case.

21        The fundamentally related nature of the federal and state law claims cannot be ignored.

22   Both turn on proof concerning exactly what the Chocolate is, how it was developed, and its import

23   relative to AngioScore both in terms of lost profits if found to be infringing, or its value as a

24   potential corporate opportunity.  Defendants cannot escape the logical proposition that AngioScore

25   "would ordinarily be expected to try [ . . . ] all [such claims] in one judicial proceeding." *United*

26   *Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also BLT Rest. Grp. LLC v.*

27   *Tourondel*, 855 F. Supp. 2d 4, 11 (S.D.N.Y. 2012) (in assessing the propriety of supplemental

28   jurisdiction, "the court should look to whether the evidence likely to be used in the specific case in

United States District Court
Northern District of California

United States District Court
Northern District of California

1    addressing the federal claim is likely to substantially overlap that used to address the state-law

2    claims. Indeed, it is only by such an assessment that one can fairly determine whether a plaintiff

3    'would ordinarily be expected to try them all in one judicial proceeding.'" (citing *Lyndonville Sav.*

4    *Bank*, 211 F.3d at 704 (quoting *Gibbs*, 383 U.S. at 725) (further internal citations omitted))).

5           Defendants' reliance on (i) the Court's decision to bifurcate trial on these claims, and (ii)

6    any representations the parties have made in the Delaware court, does not compel a different

7    result.

8           With respect to bifurcation, the record reflects, and the Court reaffirms here, that its

9    decision to bifurcate was influenced by a host of factors. First, the Court was prepared to try all

10   the claims in this case together before a jury, when, at the March 3, 2015 hearing, AngioScore

11   acknowledged that all but one of its state law claims was equitable in nature, and dismissed the

12   lone jury claim: breach of fiduciary duty under California law. (March 3, 2015 Hrg. Tr. at 15:2-

13   22.) The dismissal of AngioScore's California fiduciary duty claim rendered a bench trial possible

14   on the remaining equitable claims. The Court further considered AngioScore's representation that

15   resolution of the state law issues would potentially facilitate out-of-court resolution of the patent

16   claims. The Court did not understand AngioScore to be representing that it was, *in any way*,

17   declining to further pursue its patent claim or conceding that its patent claim was not valid, but

18   rather, that there was a potential efficiency in trying the state law claims separately first. Second,

19   the Court noted that its calendar is exceedingly heavy with trials, and that the trial date set in this

20   case could not be altered. Third, the Court noted that the state claims are of an equitable nature

21   and therefore not suitable for a jury to decide, and that the elements of these claims differ from the

22   question of patent infringement. The Court understands that jury service presents a burden on

23   ordinary citizens, and seeks to respect their time by ensuring that, where possible, jurors not be

24   subject to unnecessary inconvenience. That these considerations weighed in favor of bifurcation

25   does not undermine the fact that there is substantial overlap between these claims such that they

26   would ordinarily be tried together. Moreover, defendants' delay in bringing the instant motion for

27   the nine-month period wherein all parties operated under the assumption that the claims would be

28   tried together undermines their present position that these claims ever should have been

9

**A000038**

considered as part of the same case to begin with.  (*See* Dkt. No. 555 at 3 n.2.)

Next, with respect to certain representations made to the Delaware Court during the course of Konstantino's action seeking advancement of legal fees, defendants' argument is unavailing. There, the relevant inquiry was whether under an indemnification agreement, certain fees should be advanced by AngioScore for Konstantino's legal defense.  Arguments related thereto did not address the standard for determining whether supplemental jurisdiction is proper, but rather related to determining the separability of fees.  (*See* Dkt. No. 579-12, 579-13; 557-1.)  Defendants' position that AngioScore in some way conceded the jurisdictional question – assuming that such a statement could be dispositive of the issue –does not persuade.

In defendants' final argument, they maintain that even if supplemental jurisdiction exists, this Court should nonetheless decline to exercise it in this case.  The Court disagrees.  As set forth above, 28 U.S.C. section 1367(c) provides that a federal district court may decline to exercise jurisdiction over a supplemental state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The Court does not find that any of these four factors justifies dismissing AngioScore's state law claims.[4]  As to the first factor, the Court finds substantial guidance from Delaware case law, which sets forth a multi-factor test to be applied in corporate opportunity cases, and which contemplates that the application of these factors is intensely fact-specific.  The facts of the instant case do not, in and of themselves, present such a departure from what the Delaware courts have articulated that this Court is left without guidance as to how to apply Delaware law.  Indeed, defendants themselves sought summary judgment in this forum based on the application of that body of law to the facts of this case.

---

[4] Further discussion of the novelty of this case, and why the Court finds that it may apply the relevant Delaware principles of law to the facts presented here, is set forth in Section III(B)(1), *infra*.

United States District Court
Northern District of California

1    Second, the Court finds that the state law claims are not substantially predominating this

2    case.  The patent claim is being litigated fully by plaintiff and was the subject of its own summary

3    judgment and claim construction motions practice.  That AngioScore may want to proceed first

4    with the state claim in the final chapter of this hard-fought, years-long case does not mean that the

5    patent claim has been substantially predominated by the state law claims.  In fact, the patent claim

6    was the first claim brought, and it was through patent discovery that AngioScore uncovered

7    documents that led it to seek leave to bring these state law claims.

8        The third factor does not apply.  The federal patent claim is still a part of this case.  The

9    most that can be understood from AngioScore's representation at the March 3, 2015 hearing is that

10   AngioScore would be inclined to seek an out-of-court resolution of the patent claim following trial

11   on the state law claims.  By definition, such a resolution would be mutual and does not negate the

12   existence of the federal claim.

13       Finally, the Court can discern no exceptional circumstances that justify declining

14   jurisdiction in this case.  Defendants' position that judicial economy will not be served by

15   retaining jurisdiction is nonsensical.  For one thing, substantial party resources have been

16   expended in litigating these claims.  In point of fact, *defendants themselves* filed briefs seeking

17   summary judgment in their favor on the very claims for which they now seek dismissal.  So, too,

18   has the court expended substantial judicial resources in order to assist the parties resolve these

19   claims, both in terms of resolving motions, discovery disputes, and aiding in mediation.

20       For these reasons, the Court finds that it may properly exercise supplemental jurisdiction

21   over the state law claims, and that no reasonable basis for declining such jurisdiction exists.[5]  The

22   motion is **DENIED**.

23   _____

24       [5] Because it finds conclusively that it may properly exercise supplemental jurisdiction over
     the state law claims, the Court does not consider separately AngioScore's alternative argument

25   that the Court also has original jurisdiction under 28 U.S.C. section 1338, which "'is a
     jurisdictional statute, giving the district court jurisdiction to hear certain state or [other non-]

26   federal unfair competition claims' when joined with a substantial and related claim under the
     patent laws."  *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1372 (Fed. Cir. 1994)

27   (citing *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988), *cert. denied*,
     488 U.S. 968 (1988)).  The Court notes, however, defendants' concession that the test for whether

28   the state claims and the patent claim "form part of the same case or controversy" is the same under

United States District Court
Northern District of California

United States District Court
Northern District of California

### MOTIONS FOR SUMMARY JUDGMENT ON STATE LAW CLAIMS

Plaintiff contends summary judgment in its favor is appropriate on three of four elements of the corporate opportunity doctrine. Defendants cross-move that the corporate opportunity doctrine cannot, as a matter of law, apply to the facts of this case, and that alternatively, plaintiff's claims are untimely. In addition, defendants seek summary judgment as to plaintiff's remaining claims: successor liability, aiding and abetting, and alter ego liability.

### I.    LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

Federal Rule of Civil Procedure 56(a) states that "[a] party may move for summary judgment, identifying each claim or defense—or the *part* of each claim or defense—on which summary judgment is sought." (Emphasis supplied.) Under this plain language "summary adjudication on individual parts of claims brought against a party" is allowed. *Bushnell v. Vis Corp.*, No. C-95-04256 MHP, 1996 WL 506914, at *11 (N.D. Cal. Aug. 29, 1996).

### II.    THE CORPORATE OPPORTUNITY DOCTRINE

The corporate opportunity doctrine "represents but one species of the broad fiduciary duties assumed by a corporate director or officer." *Broz*, 673 A.2d at 154. As a fiduciary of a corporation, directors agree to "place the interests of the corporation before his or her own in appropriate circumstances." *Id.* "At the core of the fiduciary duty is the notion of loyalty—the

either Section 1338 or Section 1367. (Dkt. No. 585 at 8.) As discussed at length above, the Court finds this requirement met.

A000041

1    equitable requirement that, with respect to the property subject to the duty, a fiduciary always

2    must act in a good faith effort to advance the interests of his beneficiary." *In re Mobilactive*

3    *Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013)

4    *reargument denied*, No. CIV.A. 5725-VCP, 2013 WL 1900997 (Del. Ch. May 8, 2013) (citing

5    *Dweck v. Nasser*, at *12).

6         Noting that corporate directors stand in fiduciary relationship to the corporations they

7    serve, the Delaware Supreme Court recognized in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. Sup. Ct.

8    1939) that:

> public policy, existing through the years, and derived from a
> profound knowledge of human characteristics and motives,
> has established a rule that demands of a corporate officer or director,
> peremptorily and inexorably, the most scrupulous observance of his
> duty, not only affirmatively to protect the interests of the corporation
> committed to his charge, but also to refrain from doing anything that
> would work injury to the corporation, or to deprive it of profit or
> advantage which his skill and ability might properly bring to it, or to
> enable it to make in the reasonable and lawful exercise of its powers.
> The rule that requires an undivided and unselfish loyalty to the
> corporation demands that there shall be no conflict between duty
> and self-interest. The occasions for the determination of honesty,
> good faith and loyal conduct are many and varied, and no hard and
> fast rule can be formulated. The standard of loyalty is measured by
> no fixed scale.

18   *Id.* at 511.  The corporate opportunity doctrine seeks to define the bounds of this duty where a

19   director may be inclined to take a business opportunity for him or herself.  *See id.*  The rule

20   enunciated in *Guth* is this:

> if there is presented to a corporate officer or director a business
> opportunity which the corporation is financially able to undertake,
> is, from its nature, in the line of the corporation's business and is of
> practical advantage to it, is one in which the corporation has an
> interest or a reasonable expectancy, and, by embracing the
> opportunity, the self-interest of the officer or director will be
> brought into conflict with that of the corporation, the law will not
> permit him to seize the opportunity for himself.

27   *Id.* at 510-11.  Thus, under Delaware law, "[t]he elements of misappropriation of corporate

28   opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation

United States District Court
Northern District of California

United States District Court
Northern District of California

has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation." *In re Mobilactive Media*, No. 5725-VCP, 2013 WL 297950, *21 (Del. Ch. Jan. 25, 2013).  Once the plaintiff has shown the breach of the director's duty of loyalty, the burden switches to the fiduciary to show that he or she did not seize a corporate opportunity "because either the corporation was presented the opportunity and rejected it, or because the corporation was not in a position to take the opportunity." *Grove v. Brown*, No. 6793-VCG, 2013 WL 4041495, at *8 (Del. Ch. Aug. 8, 2013).

Delaware courts further recognize that "a director or officer may take a corporate opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity." *Broz*, 673 A.2d at 155.

### III.    JUDGMENT ON ELEMENTS OF THE CORPORATE OPPORTUNITY DOCTRINE

Plaintiff moves for summary judgment on three of the four factors listed above; each is discussed in turn below.  On cross-motion for summary judgment, defendants contend that Konstantino has established each of the four elements proving as a matter of law that he did not usurp a corporate opportunity.  Having considered the arguments and evidence presented, the Court **GRANTS** in part plaintiff's motion, and **DENIES** defendants' cross-motion.

#### A.  Plaintiff's Motion

##### 1.  Line of business

An opportunity is within a corporation's line of business if it is "an activity as to which [the corporation] has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion." *In re Mobilactive Media*, 2013 WL 297950, at *21 (citing *Guth*, 5 A.2d at 514).  This factor is to be broadly construed.  *Id*. (citing *Dweck v. Nasser*, 2012 WL 161590, at *13 (Del. Ch. Jan. 18, 2012).

14

United States District Court
Northern District of California

1    Plaintiff argues that the following undisputed evidence entitles it to judgment on this

2    element:  Since its founding in 2003, AngioScore has designed, manufactured, and marketed

3    angioplasty balloon catheters surrounded by a nitinol structure that are used for the treatment of

4    cardiovascular disease and sold under the brand name AngioSculpt.  AngioSculpt and Chocolate,

5    TriReme's device, are both angioplasty balloon catheters used to open occluded or narrowed blood

6    vessels at lesion sites by inflating to compress plaque deposits against the vessel wall and then

7    deflating for removal from the patient's body.  Both devices were cleared by the FDA for identical

8    clinical indications:  both are "intended for balloon dilatation of lesions in the peripheral

9    vasculature, including the iliac, femoral, ilio-femoral, popliteal, infra-popliteal, and renal arteries.

10   NOT for use in the coronary or cerebral vasculature." (Parker Decl. Ex. 25, Chocolate PTA

11   510(k) Summary (Dec. 14, 2011); Parker Decl. Ex. 24, AngioSculpt PTA 510(k) Summary (Mar.

12   22, 2010).)  In addition, plaintiff argues that defendants' own documents recognize the Chocolate

13   as a competitor to the AngioSculpt, and that a portion of TriReme's Chocolate customers are or

14   were AngioScore's customers.  (*See, e.g.*, Parker Decl. Ex. 36, Email from Haig (Dec. 15, 2012) at

15   TR 0838519.)  The evidence demonstrates that the devices are similar in both purpose and

16   function.

17        By contrast, defendants argue the technical differences between the devices to conclude

18   that they do not fall within the same line of business.  For example, defendants argue that

19   AngioSculpt scores accumulated plaque, whereas Chocolate does not, and that Chocolate has

20   "pillows" that impress upon the plaque, which the AngioSculpt lacks.  (Defts. Opp. to Pltf. MSJ at

21   4-5.)  Defendants also place much emphasis on the fact that AngioScore was a purportedly self-

22   avowed "single technology company," with a fixed focus on "scoring" balloons to the exclusion of

23   other types of balloon angioplasty catheters.  (*See id*. at Ex. 16 at AS0700230.)  Finally,

24   defendants contend that the FDA indications for use are not dispositive of whether the Chocolate

25   falls within AngioScore's line of business, because a broad array of balloon catheters, including

26   plain old balloon angioplasty ("POBA") devices, would also fall within that scope.

27        The Court finds defendants' arguments unavailing.  Under Delaware law, the "line of

28   business" element is to be broadly construed.  The undisputed similarities in terms of purpose and

15

1   function establish that AngioScore has "fundamental knowledge and practical experience" to

2   pursue the Chocolate under the broad notions underpinning the "line of business" element.

3   Moreover, that AngioScore has historically focused on products that "scored" rather than

4   impressed on plaque relates more to the interest or expectancy element below.  Here, the evidence

5   not reasonably subject to dispute establishes that the Chocolate is "logically and naturally ...

6   adapted to [AngioScore's] business" based on AngioScore's experience in the specialty balloon

7   catheter market.  *See In re Mobilactive Media*, 2013 WL 297950, at *21 (citation omitted).  The

8   fact that the devices may differ technically does not create a triable issue of material fact as to this

9   element.  Even defendants' presentations from 2009 and 2010 list AngioScore as a *potential*

10  *partner* for the Chocolate, and defendants' documents have recognized Chocolate as a competitor

11  to AngioSculpt.  (*See e.g.*, Parker Decl. Ex. 21, Singapore-SV Chocolate Presentation (Dec. 30,

12  2009), at TR1044052; Parker Decl. Ex. 32, Chocolate Presentation (Feb. 2010), at TR0027514;

13  Parker Decl. Ex. 37, Email from Crater (Mar. 27, 2013), at TR0845859; Parker Decl. Ex. 38,

14  Email from Benjamin (Oct. 25, 2011).)

15      In light of the evidence presented, and Delaware's broad notions of the "line of business"

16  factor, the Court finds that no material dispute of fact exists to be tried.  Accordingly, the Court

17  **GRANTS** plaintiff's motion summary judgment on this factor.

### *2.    Interest or Expectancy*

19      "[F]or the corporation to have an expectant interest in any specific property, there must be

20  some tie between that property and the nature of the corporate business."  *Grove*, 2013 WL

21  4041495, at *8 (internal quotes omitted).  By requiring "a tie to the 'nature of the corporate

22  business,'" this factor "implicates many of the issues" discussed above concerning AngioScore's

23  line of business.  *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d

24  961, 973 (Del. Ch. 2003) (citing *Broz*, 673 A.2d at 156).  Even if there is a "tie" between the line

25  of a corporation's business and the potential opportunity, however, the Court may decline to find

26  an interest or expectancy where facts establish that a corporation is shifting away from its

27  historical line of business, where it disavows such interest, and where it lacks the capacity to

28  capitalize on the interest.  In *Broz*, for example, the Delaware Supreme Court found that there was

United States District Court
Northern District of California

16

1    no interest or expectancy where a corporation was divesting in the area of venture from which the

2    potential opportunity arose, and where its business plan did not contemplate any new acquisitions.

3    *Broz*, 673 A.2d at 156.

4          Defendants argue vociferously that AngioScore had no interest in developing the

5    Chocolate.  (Defts. Opp. to Pltf. MSJ at 12-19.)  In support of this position, defendants advance

6    three arguments.  First, defendants argue that during 2009 and 2010, AngioScore was focused on

7    developing the AngioSculpt.  Based thereon, defendants urge that AngioScore's interest at that

8    time was to the exclusion of all other devices including the Chocolate.  Second, defendants argue

9    that AngioScore granted Konstantino "broad consent" to work on projects like Chocolate with

10   TriReme and that AngioScore arguably knew and approved of Konstantino's work with TriReme

11   on devices like Chocolate.  Third, defendants argue that AngioScore was focused singularly on the

12   AngioSculpt and that in December 2009, the board of AngioScore was not interested in acquiring

13   a new company, technology, or product line.

14         As demonstrated in the previous section, the Court finds that there is undoubtedly "some

15   tie" between the Chocolate and the nature of AngioScore's business.  The devices are both

16   angioplasty balloon catheters that serve similar purposes.  Indeed, defendants acknowledged as

17   much as far back as 2009 when they identified AngioScore as a potential partner for the

18   Chocolate.

19         However, at this juncture the Court finds that material questions of fact persist as to

20   whether AngioScore had an interest or expectancy in the Chocolate.  Evidence adduced to date

21   raises questions as to whether AngioScore was focused singularly on its own product,

22   AngioSculpt, and relatedly, whether AngioScore's board of directors would have favored

23   capitalizing on the Chocolate opportunity.  (*See, e.g*., Dkt. No. 512-2 (Pltf. Resp. to Defts. Stmt. of

24   Undisputed Facts) at Issue 1, Fact 7 and evidence cited therein.)  In *Broz*, despite a finding that the

25   subject opportunity fell within a plaintiff corporation's line of business, the Delaware Supreme

26   Court nonetheless determined that the corporation did not have an interest or expectancy in that

27   opportunity.  In so finding, the court considered evidence such as board members' testimony

28   relating to whether the Michigan-2 license would have been of interest to the CIS board even

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1  absent certain financial impediments to acquisition, and CIS's articulated business plan, which did

2  not contemplate any new acquisitions.

3      Here, the Court notes that the parties dispute strongly what conclusions may be drawn

4  from the evidence presented thus far.  In the December 2009 AngioScore board meeting, members

5  may have evinced disinclination to even consider an opportunity such as Chocolate.  Defendants

6  argue that the members' responses to the question "Do you support acquiring another company,

7  technology[,] or product line?" conclusively establish that the consensus was that AngioScore was

8  not interested and had no expectancy in a new opportunity such as the Chocolate.  Plaintiff, in

9  opposition, contends that the responses to the question were not so conclusive, and furthermore,

10  points out that defendants have offered misleading characterizations of this evidence.

11      Based on its own analysis of the evidence, the Court finds that AngioScore's actual, then-

12  existing disposition on the question of acquiring another opportunity and the Board's degree of

13  preference for developing the AngioSculpt solely, are in dispute.  Furthermore, as explained

14  below, questions linger concerning AngioScore's financial capacity to exploit the Chocolate.

15  Accordingly, the Court declines to rule that either party may obtain summary judgment on this

16  factor.  The parties' motions for summary judgment on this element are therefore **DENIED**.

17              ***3.  Financial Ability***

18      The third prong of the corporate opportunity analysis focuses on whether AngioScore had

19  the financial ability to take the Chocolate opportunity.  "If the directors are uncertain whether the

20  corporation can make the necessary outlays, they need not embark it upon the venture; if they do,

21  they may not substitute themselves for the corporation any place along the line and divert possible

22  benefits into their own pockets."  *Irving Trust Co. v. Deutsch*, 73 F.2d 121, 124 (2d Cir. 1934)

23  (recognizing "the wisdom of a rigid rule forbidding directors of a solvent corporation to contract

24  on the plea of the corporation's financial inability to perform").

25      Under Delaware law, this prong implicates broader policy concerns more favorable to the

26  corporation.  Such concerns stem from the inherent conflict between, on the one hand, a director

27  who has control and responsibility for the financial security of the corporation he serves, and on

28  the other hand, the director's potential personal interest in ensuring that the company not have

18

**A000047**

United States District Court
Northern District of California

1  secure financial footing so as to permit usurpation of what otherwise might be a corporate

2  opportunity.  Thus, once the plaintiff has made such a *prima facie* showing of financial ability, a

3  fiduciary "faces a significant burden in establishing that a corporation was financially unable to

4  take advantage of a corporate opportunity."  *Norman v. Elkin*, 617 F. Supp. 2d 303, 312 (D. Del.

5  2009) (citing *Gen. Video Corp. v. Kertesz*, No. 1922-VCL, 2008 WL 5247120, at *19 (Del. Ch.

6  Dec. 17, 2008) (finding financial inability must amount to insolvency such that the company is

7  practically defunct); *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279 (Del. 1995)

8  (stopping short of adopting "the 'insolvency-in-fact test' "; stating instead that courts should

9  consider "a number of options and standards for determining financial inability, including but not

10  limited to, a balancing standard, temporary insolvency standard, or practical insolvency

11  standard")).

12      Here, the Court finds that disputes as to material fact remain as to whether AngioScore was

13  in a position to exploit the Chocolate opportunity, and that such disputes preclude a finding in

14  AngioScore's favor at this time.  Of material concern is the ongoing dispute regarding the amount

15  of capital required to exploit Chocolate.  Without this initial figure, the Court cannot ascertain

16  whether AngioScore would have been able to take advantage of the Chocolate opportunity.

17  (*Compare* Parker Decl. Ex. 32, Chocolate Presentation (Feb. 2010) at TR0027513 (noting that

18  Chocolate could have been developed for $3.5-4 million); Parker Decl. Ex. 45, Belson Dep. (Nov.

19  21, 2014) at 238:12-239:19 *with* Dkt. No. 504-16 ("Danitz Opp. Decl."[6]) Ex. 45, Konstantino Dep.

20  618:3-15 (noting that it took "tens of millions of dollars" to bring Chocolate to market), Danitz

21  Opp. Decl. Ex. 129.)  Accordingly, summary judgment is not warranted given the current state of

22  the record.

23

24

25

26      [6] "Danitz Opp. Decl." refers to the declaration of Brian Danitz (Dkt. No. 500) and exhibits
submitted in conjunction with defendants' opposition to AngioScore's motion for partial summary

27  judgment, which documents appear at entries numbered 500, 502, 504, 507-509.  "Danitz Decl."
refers to the declaration of Brian Danitz submitted in support of defendants' motion for summary

28  judgment, which appears at docket entries numbered 469, 472-477.

United States District Court
Northern District of California

### B. Defendants' Cross Motion and Counter-Arguments

Defendants move for cross-summary judgment on the four counter-prongs to the corporate opportunity doctrine, discussed above, and two arguments of a more overarching nature, namely, that (i) the corporate opportunity doctrine does not apply to the circumstances of this case, and (ii) the statute of limitations bars AngioScore's claims. All of defendants' arguments are unpersuasive. The Court first addresses the broader arguments, and then addresses the remaining counter-prongs.

#### 1. Applicability of the Corporate Opportunity Doctrine

Defendants contend that Chocolate was not a corporate opportunity for AngioScore because Konstantino and co-inventor Tanhum Feld conceived of the idea for Chocolate on their own. They thus assert that Chocolate was solely the inventors' opportunity and not AngioScore's. (Defts. MSJ at 16-17.) The Court is unpersuaded based on the record before it.

As an initial matter, the Court acknowledges the broad bedrock principles espoused in *Guth*. The corporate opportunity doctrine stems from "the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents." *Guth*, 5 A.2d at 510. However, the rule to be applied in determining whether such a violation has occurred, as enunciated in *Guth*, is fact-intensive in its application. Each prong of the multi-step test demands a nuanced understanding of the facts unique to each case. All factors must be considered; no single factor is dispositive. *See Broz*, 673 A.2d at 157 (weighing the "totality of the circumstances" in light of "the situation only as it existed when the opportunity was presented"). Given that the analysis is so fact-intensive, the standard understandably proves amenable to a variety of circumstances.

Defendants rely principally on *Equity Corp. v. Milton*, 221 A.2d 494 (Del. 1966) for their position that an opportunity of a director's own making is not an opportunity owed to the corporation. *Equity* does not persuade. There, the corporate opportunity doctrine was used to challenge a fiduciary's owning part of the corporation's outstanding stock. In finding no breach, the court states that "there is nothing wrong in a corporate officer owning or controlling stock of his corporation." *Id.* at 499. This is not an inherently controversial proposition. But ultimately,

20

*Equity* does not offer guidance on the question presented here:  whether a director who invents a product falling within a corporation's line of business and works with other companies to develop it is unencumbered by, or absolved of, his duty of loyalty to the corporation he serves.

In any event, given the lack of direct authority to support defendants' contention, and the lack of a full factual record, the Court does not find a basis for ruling on the issue as a matter of law.[7]  Furthermore, the case law suggests that the doctrine could apply to such circumstances. Thus, in *Guth*, the Delaware Supreme Court noted that the duty of loyalty:

> demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to ***deprive it of profit or advantage which his skill and ability might properly bring to it***, or to enable it to make in the reasonable and lawful exercise of its powers.  The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

*Guth*, 5 A.2d at 510 (emphasis supplied).  The rule contemplates that directors owe the companies they serve the benefit of their skills and expertise and is not suggestive of the exception defendants espouse.  To permit otherwise does not just conflict with this rule – it subverts it.

Accordingly, defendants' motion for summary judgment on this ground is **DENIED**.[8]

_____

[7] Defendants allude to the fact that Konstantino was an "outside director" of AngioScore, but cite no case for the proposition that the fiduciary duties attendant to such a role differ in any way from those of any other sort of director.  (*See* Dkt. No. 535 ("Defts. MSJ Reply") at 7.)  Moreover, even if co-inventor Tanhum Feld did not want AngioScore to partner on Chocolate, the Court is not convinced given the factual record to this point, that this would obviate Konstatino's fiduciary obligations.  Plaintiff has raised a triable issue of fact on this point.

[8] Defendants present two other theories supporting their contention that the corporate opportunity doctrine does not apply in this case:  first, that the opportunity was presented to Konstantino in his individual capacity because he invented it, and second, that he was merely planning to compete.  Neither persuade.

As noted above, the Court finds that the doctrine may be applied to this case.  Moreover, the Court finds that plaintiff has raised a material disputed question as to whether the Chocolate opportunity "was [. . .] 'presented' to Konstantino in his 'individual . . . capacity'" rather than in his corporate capacity.  Defendants' contention that because Konstantino invented the Chocolate he avoided his fiduciary obligations to AngioScore thus does not warrant summary judgment in their favor.  (Defts. MSJ at 19.)  Moreover, the record contains facts sufficient to raise a

21

United States District Court
Northern District of California

### 2.  *Statute of Limitations and Laches*

"A claim for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland v. Sutherland*, No. 2399-VCN, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010); *see Pomeranz v. Museum Partners, L.P.*, No. CIV. A. 20211, 2005 WL 217039, at *8 (Del. Ch. Jan. 24, 2005). The parties agree as follows:  (i) the relevant statute of limitations for breach of fiduciary duty claims is three years[9];  (ii) the acts giving rise to the instant claim occurred in 2009 and 2010; and (iii)  more than three years elapsed between those acts and when plaintiff brought its claim (here, June 27, 2014).  The central issue is whether equitable tolling is available.  Plaintiff bears the burden to show that such tolling is warranted.  *Pomeranz*, 2005 WL 217039, at *2.  Defendants claim the statute has run because AngioScore was on notice by no later than February 5, 2010.

Three bases for tolling exist under Delaware law -- (1) the inherently unknowable doctrine (the "Discovery Rule"), (2) equitable tolling, and (3) fraudulent concealment.  Because it finds that the last most strongly supports tolling in this case, the Court considers the fraudulent concealment test first.  Pursuant thereto, tolling is warranted "if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth."  *Albert v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV. A. 762-N, 2005 WL 1594085, *19 (Del. Ch. June 29, 2005).  Tolling is justified if there is "an affirmative act of concealment by a defendant, an 'actual artifice' that

reasonable inference that Konstantino developed Chocolate in his corporate capacity as a board member of AngioScore, by, for example, sharing AngioScore's market data with TriReme and possibly using his knowledge of the AngioSculpt to inform his innovation and development of the Chocolate.  Accordingly, defendants' request for summary judgment on this prong is **DENIED**.

Likewise, the record does not conclusively establish that Konstantino was merely "planning to compete" and that therefore his actions are immunized from the scope of the corporate opportunity doctrine.  Rather, a disputed question exists over whether Konstantino was actively taking steps to develop, fund, test, and prepare the Chocolate for market, while at the same time concealing Chocolate from AngioScore.  At this juncture, a finding that Konstantino was preparing to compete with AngioScore is not without dispute.  Defendants' request for summary judgment on this point is therefore **DENIED**.

[9]  Under Delaware law, the doctrine of laches governs the timeliness of claims brought in equity.  Courts sitting in equity will apply by analogy the statute of limitations for substantive claims in order to apply the doctrine of laches.  *Pomeranz*, 2005 WL 217039, at *2.  Here, three years is the relevant limitations period.

22

United States District Court
Northern District of California

United States District Court
Northern District of California

1  prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended

2  to put a plaintiff off the trail of inquiry." *Id*. (citation omitted).

3      Under Delaware law, tolling is proper only until a plaintiff is properly put on inquiry

4  notice.  "When plaintiffs are on inquiry notice, the statute of limitations begins to run.  Inquiry

5  notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice

6  when they have sufficient knowledge to raise their suspicions to the point where persons of

7  ordinary intelligence and prudence would commence an investigation that, if pursued would lead

8  to the discovery of the injury."  *Pomeranz*, 2005 WL 217039, at *3 (citation omitted).

9      Plaintiff posits that the statute was tolled until 2014 when they learned of Konstantino's

10  development activities.  Prior to 2014, plaintiff claims Konstantino's repeatedly and expressly

11  represented that no basis existed for any suspicion that a breach of his duty had occurred.  In

12  support thereof, plaintiff identifies a series of communications between representatives of

13  AngioScore and Konstantino in February 2010.  These are some of the same emails that

14  defendants claim should have put AngioScore on notice.

15      First, in a February 2010 email to Tom Trotter, Konstantino wrote that "TriReme ***has not***

16  ***made any decision*** to make such a change [ i.e., to enter the specialty balloon catheter market] and

17  I was giving you very early heads up to something that may take place ***in the future***, ***or may never***

18  ***happen***" and that there was "no reason to be trigger happy" in reference to Trotter's asking

19  Konstantino to resign.  (Parker Decl. Ex. 11 at AS0796033 (emphases supplied).)  In response, on

20  February 4, 2010, AngioScore's counsel, John Sellers, explained to Konstantino that even if he or

21  TriReme were "just contemplating this decision [he has] important fiduciary duties."  (*Id.* at

22  AS0796032.)  The next day, Konstantino replied that "I am **keenly aware** of my obligations as a

23  board member and this is precisely why I am coming to Angio[S]core at this juncture; **before any**

24  **new project is started**." (*Id.* at AS0796031 (emphasis supplied).)

25      After Konstantino resigned on February 5, 2010, John Sellers requested confirmation that

26  Konstantino was "not involved with any development efforts, or acquisition or licensing

27  negotiations, involving product applications that would be competitive to AngioScore's products."

28  (Dkt. No. 516 ("Parker Opp. Decl.") Ex. 7, Sellers Decl. ¶ 5.)  Sellers further asked about

23

1   Konstantino and TriReme's development activities relating to "angioplasty balloon

2   technology…that involves specialized features such as scoring, cutting or drug-eluting element, or

3   is designed to make similar claims to that of the AngioSculpt." (*Id.* at ¶ 6.)

4        Konstantino's final response to this request was unambiguous and unequivocal. On

5   February 23, 2010, through counsel, he represented that "TriReme is considering in the future the

6   possibility of entering the field of specialized balloons," but that before February 5, 2010

7   "TriReme ha[d] **not developed any products . . . that compete[] with AngioScore's products**."

8   (Parker Decl. Ex. 22, Letter from Nguyen to Sellers (Feb. 23, 2010) (emphasis supplied).) In that

9   same letter, he maintained that he "**was not involved in any development work . . .** for the

10  coronary or periphery markets that involves specialized features such as scoring, cutting, or drug

11  eluting elements." (*Id.*) On March 21, 2010, again through counsel, he affirmed that that "**neither**

12  Mr. Konstantino nor TriReme **evaluated**, negotiated, **or otherwise pursued** the acquisition or

13  licensing of **any technology that competes with AngioScore's products.**" (Parker Opp. Decl.

14  Ex. 9, Letter from Nguyen to Sellers (March 21, 2010) (emphasis supplied).)

15       Plaintiff further argues that Konstantino's response to AngioScore's stated concerns not

16  only affirmatively disavowed any breach, but conveyed unflinching confidence in his own ability

17  to adhere to his duties. The Court agrees that the communications create disputed questions over

18  defendants' contention that plaintiff was (1) on inquiry notice as of, at the latest, February 5, 2010,

19  and (2) that tolling is not warranted here.

20       First, as to inquiry notice, questions persist as to whether plaintiff had "sufficient

21  knowledge" before 2014 to "raise [its] suspicions to the point where persons of ordinary

22  intelligence and prudence would commence an investigation that, if pursued would lead to the

23  discovery of the injury" of which it now complains, and if so, when. *Pomerantz*, 2005 WL

24  217039 at *3 (citations omitted). A factfinder could determine it was reasonable that AngioScore

25  did not bring the instant claim earlier. Despite mention of a potential second balloon in 2010, and

26  even possible suspicions, it was not at all clear to AngioScore that Konstantino *himself* had taken

27  significant steps to develop that balloon while he was a board member. The statements upon

28  which defendants' rely do not disclose Konstantino's involvement in the development of the

United States District Court
Northern District of California

24

**A000053**

1    second balloon, or any features of that balloon; many appear to concern TriReme's business

2    strategy in general terms.  (*See* Defts. MSJ Reply at 2-3 (listing statements).)  Moreover, some of

3    the evidence defendants argue establishes that AngioScore was on notice of Chocolate appears to

4    pertain to a different product entirely, the Glider catheter, which is not a specialty balloon and

5    which AngioScore was not interested in pursuing.  But critically, even at their combined greatest

6    weight, a reasonable factfinder could determine that these facts do not overcome the strength of

7    Konstantino's affirmative, and arguably misleading, representations.

8        Second, on the question of whether tolling is warranted here, the Court finds that

9    substantial questions remain.  As stated above, three bases exist for tolling statutes of limitations

10   under Delaware law.  Pursuant to the "fraudulent concealment" test, tolling is warranted "if a

11   defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of

12   the truth."  *Albert v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV. A. 762-N, 2005 WL 1594085, *19

13   (Del. Ch. June 29, 2005).  Tolling is justified if there is "an affirmative act of concealment by a

14   defendant— an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or

15   some misrepresentation that is intended to put a plaintiff off the trail of inquiry."  *In re Dean*

16   *Witter P'ship Litig.*, No. CIV. A. 14816, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998) (citation

17   omitted).

18       As stated above, a reasonable factfinder could determine that Konstantino's several

19   intentional statements to AngioScore obfuscated the true nature of his activities while he was a

20   board member, and affirmatively misrepresented the facts of both the Chocolate and his

21   involvement with the Chocolate.  To the extent Konstantino concealed operative facts that

22   prevented AngioScore's discovery of Konstantino's wrongful conduct relative to the Chocolate,

23   tolling would be permissible.  Specifically, by the time Konstantino resigned from AngioScore's

24   board, Chocolate's development was underway and Konstantino had been a knowing participant

25   in that development.  In response to questions concerning the same, Konstantino's responses

26   suggest a disavowal of any such activities.

27       Defendants counter that Konstantino was asked to resign from AngioScore's board

28   apparently due to the "serious conflict of interest" created by TriReme's possible bringing to

United States District Court
Northern District of California

25

**A000054**

1   market a device that would compete with AngioScore and argue that therefore AngioScore knew

2   of this cause of action at the time of Konstantino's resignation.  (Danitz Decl. Ex. 24, Email from

3   Trotter to Konstantino (Feb. 4, 2010).)  But the intent behind Trotter's email, and his

4   understanding of the facts relative to Chocolate or any other competitive device at that time, and

5   likewise whether plaintiff had actual knowledge sufficient to put it on notice, remains the subject

6   of dispute.

7       For the reasons stated above, the defendants' motion for summary judgment on their

8   statute of limitations and laches defenses is **DENIED**.[10]

9   ### *3.  Counter-Prongs of the Corporate Opportunity Doctrine*

10      Last, defendants argue that Konstantino did not usurp a corporate opportunity under the

11  counter-test enunciated in *Broz.*  673 A.2d at 155.  To refresh, that case stated that:

12
13          a director or officer may take a corporate opportunity if: (1) the
            opportunity is presented to the director or officer in his individual
            and not his corporate capacity; (2) the opportunity is not essential to
14          the corporation; (3) the corporation holds no interest or expectancy
            in the opportunity; and (4) the director or officer has not wrongfully
15          employed the resources of the corporation in pursuing or exploiting
            the opportunity.
16

17  *Id.*  As stated above, the Court finds that defendants have not met their burden as to the first prong,

18  and finds no basis to grant either party's summary judgment on the third "interest or expectancy"

19  prong.

20      As to the two remaining counter-prongs, the Court finds that defendants have not met their

21  burden to compel summary judgment in their favor.  First, with respect to whether the Chocolate

22  was "essential" or "desirable" to AngioScore, the facts discussed above concerning AngioScore's

23  interest or expectancy in the Chocolate overlap with the issue of whether the Chocolate was

24  essential or desirable to Angioscore.  With all reasonable inferences drawn in AngioScore's favor,

25

26          [10] As the parties conceded at argument, defendants' motion for summary judgment on
    plaintiff's unfair competition law claim is contingent upon the Court's finding that the fiduciary
27  duty claim is barred by either laches or the relevant statute of limitations.  Because the Court does
    not so find, it also finds the unfair competition claim is not appropriate for resolution on summary
28  judgment.  Defendants' motion as to this cause of action is therefore **DENIED**.

26

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the Court finds that at minimum, factual questions remain.

2    Similarly, with respect to the final prong – whether Konstantino did or did not wrongfully

3    employ the resources of AngioScore in pursuing or exploiting the Chocolate opportunity –

4    numerous factual questions remain.  For example, AngioScore disputes that Konstantino did not

5    use its proprietary information to develop and market the Chocolate device, and emails suggest

6    that Konstantino may have shared AngioScore's information, specifically China market data, with

7    TriReme during the time he was developing Chocolate.  (*See* Parker Opp. Decl. Exs. 23, 24.)

8    Moreover, Konstantino was on AngioScore's board of directors while he was developing

9    Chocolate.  This fact raises a reasonable inference that he was exposed to information proprietary

10   and confidential to AngioScore, and that he undertook to develop and market Chocolate with that

11   knowledge.  Such facts counsel against a summary judgment finding for defendants on this issue.

12   Accordingly, defendants' motion for summary judgment on these bases is **DENIED**.

13   ### C.  Defendants' Summary Judgment Arguments on Remaining State Law Claims

14   #### 1.    *Successor Liability*

15   Defendants contend that the evidence is insufficient to establish that QT Vascular is the

16   successor in interest to the liabilities of Quattro and TriReme.  The Ninth Circuit recognizes such

17   liability where a corporation that purchases the assets of another if (1) the purchasing corporation

18   expressly or impliedly agrees to assume the liability; (2) the transaction amounts to a "de-facto"

19   consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling

20   corporation; or (4) the transaction was fraudulently entered to escape liability.  *Atchison, Topeka*

21   *& Santa Fe Ry. Co. v. Brown & Bryant, Inc*., 159 F.3d 358, 361 (9th Cir. 1998).  Evidence

22   adduced to date creates a genuine dispute as to at least one of these factors.  For example, the

23   Summary of Terms for Proposed Merger reflects that the parties contemplated potentially that QT

24   Vascular would receive all the liability of Quattro and TriReme, and that the parties understood

25   the transaction to constitute a merger.  (*See* Parker Opp. Decl. Ex. 31 at TR1181405.)  Defendants

26   contend that the final agreement contained no transfer of liabilities, but this does not avoid the

27   suggestion that the transaction amounted to a merger.  Furthermore, defendants' corporate

28   representative Momi Brosh, in a deposition stated that QT Vascular received all of the existing

27

1  stock, shares, assets, and liabilities in each of Quattro and TriReme.  (*See id.* Ex. 32, Brosh Dep. at

2  279:18-281:15.)  In sum, the Court finds that questions remain.  Defendants' motion for summary

3  judgment on this issue is therefore **DENIED**.

### 2.  *Aiding and Abetting*

5  Aiding and abetting a breach of fiduciary duty occurs when the defendant "knows the

6  other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to

7  the other to so act . . . ."  *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (Cal. App.

8  4th Dist. 2005); *see also In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d

9  1018, 1050 (N.D. Cal. 2009) (citing *Casey*, 127 Cal. App. 4th at 1144).  Defendants contend that

10  Quattro cannot be held to have aided and abetted Konstantino in breaching his fiduciary duties.

11  At this juncture, the Court finds that questions of material fact exist that preclude granting

12  summary judgment on this issue.  For example, Quattro, or its predecessor, may have sponsored a

13  January 2010 study of the Chocolate, and evidence suggests that Quattro's predecessor company,

14  through Konstantino, apparently solicited money from the Singapore government for Chocolate

15  development.  Facts adduced to date support a reasonable inference that Quattro, or its

16  predecessor, was aware that Konstantino was a director of AngioScore with fiduciary obligations

17  to that company that conflicted with his undertaking to create a specialty angioplasty balloon

18  catheter.  Accordingly, summary judgment on this issue is **DENIED**.

### 3.  *Alter Ego*

20  The relevant legal principles underlying the doctrine of alter ego liability, which permits a

21  plaintiff to pierce the corporate veil between a parent corporation and a subsidiary, are set forth in

22  *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000).

23  Alter ego liability is an "extreme remedy, sparingly used."  *Id.* at 539 (citation omitted).

24  Such relief is appropriate where there has been an abuse of the corporate privilege so severe that it

25  justifies holding the equitable ownership of a corporation liable for the actions of the corporation.

26  *Roman Catholic Archbishop v. Superior Court*, 15 Cal. App. 3d 405, 411 (1971).  For example,

27  when the corporate form is "used to perpetrate a fraud, circumvent a statute, or accomplish some

28  other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the

United States District Court
Northern District of California

28

corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." *Sonora*, 83 Cal. App. 4th at 538 (citations omitted).

In order to pierce the corporate veil, a plaintiff must establish two things. First, that there is such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. *Id.* (citations omitted). Factors to be considered in applying the doctrine include:

> commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other.

*Id*. at 538-539 (quotation and citations omitted). In addition, courts look to whether there has been "inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Id.* at 539 (listing cases). Importantly, "[n]o one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Id.* (citations omitted). The question of "[w]hether to hold a parent liable for acts of its subsidiary is a highly fact-specific inquiry." *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1235 (N.D. Cal. 2004).

The Court notes first that plaintiff has advanced a theory for alter ego liability that was presented neither in its 4AC, nor in its briefing relative to the motion to dismiss that pleading. There, plaintiff appeared to plead that Konstantino had manipulated the corporate form for his own purposes and that Quattro, TriReme, and QT Vascular were his alter egos. In its current briefing, plaintiff argues that the corporations were alter egos of each other and seeks to pierce the corporate veil between them.

The Court finds that alter ego liability is not available here. Plaintiff does not advance any colorable argument that defendants engaged in fraud in the corporate restructuring of the corporate defendants. In addition, AngioScore fails to present a material issue of disputed fact regarding its alter ego theory of liability. Of primary concern is plaintiff's contention that in the absence of

United States District Court
Northern District of California

corporate veil-piercing, injustice would result because AngioScore could not recover all the

proceeds of the sales of Chocolate.  (Pltf. Opp. to Defts. MSJ at 25.)  That is not a sufficient basis

for piercing the veil.  "The inability of plaintiffs to recover for their losses is not a sufficient

inequity to justify overlooking the corporate form." *Bowoto*, 312 F. Supp. 2d at 1247; *see, e.g.*,

*Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1113 ("Lastly, we see no injustice in

the effect of the trial court's findings.  While it is true that the trustees apparently have a judgment

for several thousand dollars against an insolvent defendant, their inability to collect does not, by

itself, constitute an inequitable result.").  The Court finds that there is not sufficient evidence to

support a finding that incorporation was undertaken in bad faith or that observing the corporate

form would produce an inequitable result.

Plaintiff's reliance on *In re Hydroxycut*, 810 F. Supp. 2d 1100, 1124 (S.D. Cal. 2011) does

not compel a different result.  There, in considering whether plaintiff had made a *prima facie*

showing for its claim on a motion to dismiss for lack of personal jurisdiction, the court noted that

the defendant had "made a conscious decision to attempt to hide behind its corporate form to avoid

liability." *Id*.  In so holding, the court likened the facts of *Hydroxycut* to those in *Craigslist, Inc. v.*

*Mesiab*, No. C 08-05064 CW (MEJ), 2010 WL 5300883, at *7 (N.D. Cal. Nov. 15, 2010), where

the defendants emailed about their strategy to avoid litigation by manipulating the corporate form.

The facts marshaled by AngioScore in support of its alter ego theory do not rise to this

level.  Indeed, although it remains disputed, AngioScore argues that QT Vascular agreed to, and

did, assume the liabilities of both Quattro and TriReme.  (Pltf. Opp. to Defts. MSJ at 23; Ex. 31;

Ex. 32, 279:18-281:15.)  Thus, evidence upon which AngioScore relies for its successor liability

argument suggests that the defendants here did not attempt to manipulate the corporate form in

order to avoid liability.

AngioScore has not presented a sufficient basis for a reasonable factfinder to disregard the

corporate form and hold QT Vascular liable for the acts of its subsidiaries.  Defendants' motion

for summary judgment on this basis is **GRANTED**.

30

United States District Court
Northern District of California

**MOTIONS IN LIMINE**

1

2      The Court now turns to the motions relating to the admissibility of expert witness

3   testimony on the question of state law damages.[11]  (Dkt. Nos. 462 ("Talley Motion"); 463 ("Olsen

4   State Law Motion"); 466 ("Lewin Motion").)

5   **I.    LEGAL STANDARD**

6      Rule 702 provides that "scientific, technical, or other specialized knowledge" by a

7   qualified expert is admissible if it will "help the trier of fact to understand the evidence or to

8   determine a fact in issue."  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509

9   U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137(1999), "require that the judge

10   apply his gatekeeping role . . . to all forms of expert testimony, not just scientific testimony."

11   *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th Cir. 2002).

12      However, "far from requiring trial judges to mechanically apply the *Daubert* factors—or

13   something like them—to both scientific and non-scientific testimony, *Kumho Tire* heavily

14   emphasizes that judges are entitled to broad discretion when discharging their gatekeeping

15   function."  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  Indeed, the Ninth

16   Circuit has determined that a "trial court not only has broad latitude in determining whether an

17   expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability."

18   *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (citing *Hankey*, 203

19   F.3d at 1167) (emphasis in original), *overruled on other grounds, Estate of Barabin v.*

20   *AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th Cir.) *cert. denied*, 135 S. Ct. 55 (2014).

21      Concerning the reliability of non-scientific testimony, the "*Daubert* factors (peer review,

22   publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose

23   reliability depends heavily on the knowledge and experience of the expert, rather than the

24

25      _____

26      [11] Given that the trial in this case is bifurcated and that proceedings on the state law claims
     will proceed first, this Order addresses only the motions in limine that pertain to the state law
27   claims.  The motions relative to the patent claims will be addressed only after the case on
     plaintiff's state law claims resolve.  (Dkt. Nos. 464 ("Sheehan Motion"); 471 ("Olsen Patent
28   Damages Motion").)

1    methodology or theory behind it." *Hankey*, 203 F.3d at 1169; *see also Kumho Tire*, 526 U.S. at

2    150 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at

3    issue in some cases. . . .  In other cases, the relevant reliability concerns may focus upon personal

4    knowledge or experience.").

5        As many courts have recognized, however, "the *Daubert* gatekeeping obligation is less

6    pressing in connection with a bench trial" where "the 'gatekeeper' and the trier of fact [are] one

7    and the same." *Volk v. United States*, 57 F. Supp. 2d 888, 896 n. 5 (N.D. Cal. 1999); *see also*

8    *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 596 n. 10 (D. N.J. 2002)

9    ("[W]here the Court itself acts as the ultimate trier of fact at a bench trial, the Court's role as a

10    gatekeeper pursuant to *Daubert* is arguably less essential."); *Fierro v. Gomez*, 865 F. Supp. 1387,

11    1395 n. 7 (N.D. Cal. 1994), *aff'd* 77 F.3d 301 (9th Cir. 1996), *vacated and remanded on other*

12    *grounds*, 519 U.S. 918 (1996), *modified on other grounds on remand*, 147 F.3d 1158 (9th Cir.

13    1998) (concluding that the better approach under *Daubert* in a bench trial is to permit the

14    contested expert testimony and "allow 'vigorous cross-examination, presentation of contrary

15    evidence' and careful weighing of the burden of proof to test 'shaky but admissible evidence'")

16    (quoting *Daubert*, 509 U.S. 579).

17    **II.    TALLEY MOTION**

18        Defendants argue that the opinions and proposed testimony of Professor Eric L. Talley

19    concerning "sound corporate governance" are inadmissible and beyond his expertise under the

20    Federal Rules of Evidence and *Daubert*.  (Dkt. No. 462.)

21        Courts have admitted expert testimony on corporate governance in breach of fiduciary duty

22    actions insofar as such testimony is used to inform the jury about the standard of care and the

23    scope of duties.  *See, e.g., In re Homestore.com, Inc.*, No. CV 01-11115 RSWL (CWx), 2011 WL

24    291176, at *10 (C.D. Cal. Jan. 25, 2011) (admitting expert testimony "on the appropriate standard

25    of behavior a CEO owes its company and shareholders" but noting that no legal conclusions could

26    be offered); *Wattel v. Browne*, No. 02-CV-2256 PHX-PGR, 2006 WL 1211186 (D. Ariz. May 3,

27    2006) (admitting expert testimony on corporate governance standards in breach of fiduciary case

28    involving directors and officers of corporation); *see also FDIC v. Jackson*, 133 F.3d 694, 700 (9th

United States District Court
Northern District of California

32

Cir. 1998) (referencing expert testimony submitted on summary judgment related to determination of whether a corporate director has properly discharged his duties).  The ultimate question of whether Konstantino breached these duties, however, is to be decided by the factfinder.

In light of the foregoing, the Court finds that Talley may not testify on the ultimate issue of fact in this case, specifically, whether Konstantino did or did not breach his duties.  Talley may, however, present an expert opinion on governance practices generally applied in the corporate context to control for potential conflicts of interest.  To the extent that defendants take issue with the remainder of Talley's report, those issues can come out in the crucible of cross-examination. The motion is **DENIED**.

**III.    LEWIN MOTION**

Plaintiff argues that the proposed expert testimony of Professor David Lewin should be precluded in its entirety because such testimony will not help the trier of fact to understand the evidence or to determine a fact in issue and is unreliable.  (Dkt. No. 466.)  The gravamen of Lewin's "expert opinion" is based merely upon anecdotal, self-selected examples, which defendants argue stand for the proposition that the principles of sound corporate governance practices are not consonant with real-world practices, and that Talley's opinions are "profoundly anti-competitive."  (Lewin Rpt., Dkt. No. 467-2 at 7-8.)

Ultimately, expert opinions must have a sufficient factual and foundational basis in order to be helpful.[12]  Lewin's testimony does not meet this standard.  With respect to Lewin's opinions on generally accepted principles of corporate governance, the Court finds that Lewin has failed to establish that his opinions are sufficiently rooted in factual knowledge such that they are reliable and relevant.  These opinions are not based on any methodology or analysis.  As such, Lewin's

---

[12] Defendants seek to admit Lewin's testimony insofar as Lewin rebuts Talley's testimony. As set forth above, Talley's testimony is limited to the generally accepted corporate governance principles that govern directors' fiduciary obligations and which are directed to prevent conflicts of interest.  Accordingly, the Court need only address the substance of Lewin's opinion rebutting those opinions; Lewin's remaining opinions, addressing the excluded portions of Talley's testimony, are likewise precluded.

United States District Court
Northern District of California

1  opinions lack any foundation such that they may be assistance to the trier of fact.  The motion is

2  **GRANTED**.

3  **IV.    OLSEN MOTION**

4      Defendants seek to preclude two of three damages theories offered by expert Gary Olsen

5  concerning the valuation of damages on plaintiff's state law claims.  (Dkt. No. 463.)  Specifically,

6  defendants question whether Olsen may provide testimony on his first theory of damages for

7  plaintiff's corporate opportunity claim based on the amount of revenues AngioScore purportedly

8  would have achieved had AngioScore "shelved" Chocolate and had Chocolate never been

9  developed and brought to the market.  (*Id*. at 1.)  Defendants also challenge whether Olsen may

10  provide testimony on his third theory of damages for the same claim based on a present value of

11  purported profits on sales of Chocolate after June 30, 2014.  (*Id*.)  Defendants contend that this

12  theory was not included in Olsen's prior reports and improperly fails to include any costs to

13  develop or bring the Chocolate to market prior to that date.  (*Id*.)

14      At this juncture, the Court **DENIES** the motion without prejudice.  Olsen will be permitted

15  to testify.  The Court will consider the arguments made in this motion, and any other issues that

16  arise with respect to Olsen's state law damages calculations, either in the context of the bench trial

17  or in its ultimate findings of fact and conclusions of law.

18  **CONCLUSION**

19      For the reasons set forth above, the Court rules as follows:

20      1.  Defendants' motion to dismiss is **DENIED**;

21      2.  Plaintiff's motion for summary judgment is **GRANTED** as to the line of business

22          factor, and **DENIED** as to the balance;

23      3.  Defendants' motion for summary judgment is **GRANTED** as to the alter ego theory,

24          and **DENIED** as to the balance;

25      4.  Defendants' motion to preclude the testimony of Eric Talley is **DENIED**;

26      5.  Plaintiff's motion to preclude the testimony of David Lewin is **GRANTED**; and

27      6.  Defendants' motion to preclude certain opinions of AngioScore's state law

28          damages expert, Gary Olsen is **DENIED WITHOUT PREJUDICE.**

34

United States District Court
Northern District of California

1    In addition, on April 2, 2014, the Federal Circuit denied defendants' petition for writ of

2    mandamus and emergency motion for a stay of the proceedings in this Court.  (Dkt. No. 587-1.)

3    Accordingly, defendants' motion to stay this action pending resolution of their petition is **DENIED**

4    as moot, as is their motion to shorten time on to that motion to stay.

5    This Order terminates Docket Nos. 462, 463, 466, 468, 478, 555, 575, and 576.

6

7    **IT IS SO ORDERED.**

8    Dated:  April 6, 2015

9

10    YVONNE GONZALEZ ROGERS
      **UNITED STATES DISTRICT COURT JUDGE**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

35

**A000064**

1
2
3
4
5
6                UNITED STATES DISTRICT COURT
7             NORTHERN DISTRICT OF CALIFORNIA
8

| | |
|---|---|
| **ANGIOSCORE, INC.,** | Case No. 12-cv-03393-YGR |
| Plaintiff, | |
| v. | **FINDINGS OF FACT** |
| **TRIREME MEDICAL, INC., ET AL.,** | **AND CONCLUSIONS OF LAW** |
| Defendants. | |

14                     **INTRODUCTION**

This case staged a tension between the inveterate, established law of fiduciary duties held by corporate directors and breach of fiduciary duty claims that arise when directors of emerging companies are innovators in the technology themselves. In such an instance, plaintiff AngioScore would have innovation subverted to duty; defendants would have duty subverted to innovation. Neither party's position admits of any balance, and neither can be wholly right. As set forth in this Order, the Court finds that where transparency, loyalty, and good faith predominate, a director's fiduciary duties and his drive to innovate can co-exist, albeit with the duties to the corporation taking precedence.

AngioScore brings state law claims for breach of fiduciary duty against one of its founders and former directors, Eitan Konstantino, alleging that while he was a member of AngioScore's board, Konstantino developed a medical device directly competitive with AngioScore's flagship product. Rather than offer the opportunity to acquire the new device to AngioScore, AngioScore maintains that Konstantino instead took it for himself. AngioScore also claims that corporate defendants Quattro Vascular PTE Ltd. and TriReme Medical, Inc. aided and abetted Konstantino's

*Left margin (vertical text):* United States District Court / Northern District of California

United States District Court
Northern District of California

1    breach, and that liability for these entities' wrongdoing runs to QT Vascular Ltd.  Defendants

2    disagree, arguing in part that the duty was not breached either because no opportunity existed, or

3    because AngioScore was not entitled to Konstantino's intellectual property as a matter of law.

4         Following a six-day bench trial on AngioScore's claims, the parties submitted proposed

5    findings of fact and conclusions of law.  (Dkt. Nos. 643 (AngioScore's Opening Post-Trial Brief

6    ("AOB"), 645 (Defendants' Opening Post-Trial Brief ("DOB"), 649 (AngioScore's Post-Trial

7    Reply Brief ("ARB"), 650 (Defendants' Post-Trial Reply Brief ("DRB")).)  Specifically, those

8    claims pertain to Konstantino's breach of fiduciary duty; that Quattro and TriReme aided and

9    abetted the same; QT Vascular is a successor in interest to Quattro and TriReme and therefore

10   liable for their aiding and abetting; and finally, that defendants have violated California's Unfair

11   Competition Law.  Having reviewed the evidence of record, the arguments of the parties, and

12   relevant case law, for the reasons set forth in these findings of facts and conclusions of law, the

13   Court hereby FINDS for AngioScore in all material respects and AWARDS a remedy accordingly.

14                              FACTUAL BACKGROUND[1]

15   I.       The Parties

16        Since its founding in 2003, AngioScore has designed, manufactured, and marketed

17   specialty angioplasty balloon catheters that are used for the treatment of cardiovascular disease.

18   Its signature product line, sold under the brand name AngioSculpt, consists of an nylon balloon

19   surrounded by a nitinol structure.  The AngioSculpt is sold in an array of dimensions and lengths

20   to meet varying patient needs, although the structure of the balloon and cage remain unchanged in

21   all material respects at each available sizing option.  The purpose of the AngioSculpt is to treat

22   cardiovascular disease, whereby plaque deposits along a blood vessel's wall, forming what are

23   called lesions.  The plaque deposits harden and block, or occlude, blood flow, with potentially

24   severe health risks.  The AngioSculpt is used to open occluded or narrowed blood vessels at lesion

25   sites by inflating the balloon to compress the plaque deposits against a vessel wall.  As the balloon

26

27   ──────────────

28        [1] Appended to the end of this order are the Court's detailed factual findings, setting forth citations to evidence of record.  The following narrative factual discussion summarizes the events giving rise to this case in a manner unencumbered by extensive record citations.

1   inflates, the AngioSculpt's nitinol wire cage expands.  The expanded cage sits atop the balloon

2   and impresses upon plaque, "scoring it," in an effort designed to "crack" the plaque and open the

3   blood vessel, without injuring or puncturing the vessel wall.  It is to this scoring feature that

4   AngioScore owes its name.  After use, the device can then deflate, returning to its original form,

5   for removal from the patient's body.

6        Defendant Eitan Konstantino invented the AngioSculpt.  An engineer by training with a

7   doctorate in laser surface treatment, optical design, and materials science, Konstantino was a co-

8   founder, President, and Chief Scientist of AngioScore, Inc.  In this role, Konstantino sought to

9   develop and bring the AngioSculpt to market, which involved gaining approval both in Europe

10  and through the United States Food and Drug Administration ("FDA").  To accomplish these

11  goals, Konstantino sought funding from investors, who in turn acquired seats on AngioScore's

12  board of directors.  Among those directors were Tom Raffin, a partner with the venture capital

13  firm Telegraph Hill Partners, and Lisa Suennen, a partner at Psilos, another such firm.

14       In 2005, the board decided that Konstantino would be better suited to a role directed to

15  research and development.  Tom Trotter then became AngioScore's chief executive officer.  When

16  Trotter assumed the position, he and Konstantino discussed what role was most appropriate for

17  Konstantino moving forward.  In light of that conversation, Trotter offered Konstantino the role of

18  Executive Vice President of Research and Development and Chief Scientific Officer.

19       AngioScore wanted Konstantino to remain on the AngioScore team because of his central

20  role at the company as a co-founder, and his skill as an engineer.  Konstantino, however,

21  expressed a desire to leave and work full time as President and CEO of TriReme Medical, Inc., a

22  company he had founded for the purpose of developing bifurcation stents.  Accordingly, in the fall

23  of 2005, Trotter started to look for a replacement for Konstantino.  Both he and Konstantino

24  interviewed the candidates.  At the same time, Konstantino requested that he be given permission

25  to work on a developing technology with TriReme:  endovascular bifurcation stents and delivery

26  systems for the same.  Although bifurcation stents are not competitive with specialty balloon

27  angioplasty catheters, AngioScore's board took this request seriously, ultimately adopting a

28

United States District Court
Northern District of California

3

**A000067**

United States District Court
Northern District of California

1  resolution that granted Konstantino permission to pursue this limited goal, and waived

2  AngioScore's interest in the bifurcation stent technology.

3       In late 2006, the role of AngioScore's Vice President of Research and Development

4  transitioned from Konstantino to Feridun Ozdil.  While the details remain unclear, the relationship

5  between Konstantino and Ozdil soon became strained and culminated in a physical altercation.

6  Both Konstantino and Ozdil are intelligent scientists, but both are egotistical and authoritarian.

7  The "he said"/"he said" personality conflict was never resolved definitively.

8       In April 2007, Konstantino's employment with AngioScore terminated, although he

9  remained on its Board of Directors.  In his capacity as a board member, he continued to attend

10  AngioScore's board meetings and received updates about AngioScore's financial well-being and

11  the status of its new product development up until he was asked to resign in February 2010.

12  **II.    Chocolate, the Device at Issue**

13       In the fall of 2009, Konstantino and his brother-like friend and colleague, Tanhum Feld,

14  conceived of what was to become "Chocolate" during a telephone "brainstorming" session.  Feld

15  was discussing frame ideas for a balloon; Konstantino offered the notion of a balloon surface

16  defined by pillows and grooves.  The concept was that a nitinol cage would surround a nylon

17  balloon.  As the balloon inflated, it would protrude through the cage.  The inflated balloon would

18  then display a pattern of pillows and grooves, exerting force against plaque lining a vessel wall.

19       With the concept for Chocolate established, Feld undertook to engineer the device,

20  directing and coordinating efforts of TriReme employees with Konstantino's approval.  By

21  October 2009, Konstantino applied for a provisional patent application, naming himself and Feld

22  as co-inventors.  Within just a few months, Chocolate had progressed from an intellectual concept

23  to physical prototypes.  In January 2010, Konstantino and other TriReme employees attended

24  animal testing at Stanford for a Chocolate prototype.

25       Along with supervising and directing the employees at TriReme in their efforts to develop

26  Chocolate, Konstantino assumed the role of the businessman, conceptualizing the marketing of

27  Chocolate and pitching it to investors under the guise of a corporate entity called "Proteus."

28  During the second half of 2009, Konstantino met with twenty to thirty investors, offering them the

United States District Court
Northern District of California

opportunity to invest in Chocolate.  In these pitches, Konstantino represented that the Chocolate was being developed by "Proteus," and that Chocolate's intellectual property, design, prototypes, business model, team, and partnerships were all completed.  With representations of this sort, he secured a grant from the Singapore Economic Development Board and continued to solicit additional investors.

The similarities between AngioSculpt and Chocolate are obvious.  Both are specialty angioplasty balloon catheters.  Both are comprised of a nylon balloon surrounded by a nitinol structure.  Both are used to treat peripheral and coronary artery disease by inflating to open occluded blood vessels.  Neither leaves any metal behind in a blood vessel after use, unlike a stent.  Both are sold to the same customers and make overlapping marketing claims.  Both are sold at premium pricing with roughly identical list prices.  Given the similarities between the devices, Konstantino himself identified AngioScore as a partner for the Chocolate opportunity in investor presentations in 2009 and 2010.

Konstantino knew that the devices would compete with one another and contemporaneous documents show that not only did he so intend, but this information was used as part of his investment pitch.  In pricing Chocolate, Konstantino and employees at TriReme purposefully priced Chocolate exactly $25 below the list prices for AngioSculpt and targeted the same customers.  Communications between Konstantino, Feld, and TriReme employees and officers from late 2009 into 2010 confirm that all those involved with the development of Chocolate – Konstantino, TriReme, and Quattro – were purposefully seeking to compete with the AngioSculpt in the specialty balloon catheter market.  This included touting Chocolate for all its competitive advantages, including its potential as a drug-eluting balloon.

While he directed the development of Chocolate as both a medical device and business opportunity, Konstantino nonetheless remained on AngioScore's board of directors.  Pursuant thereto, he was privy to all manner of confidential financial information, market information, and competitive information regarding the performance of the AngioSculpt device and AngioScore's highly sensitive risk assessments.  (PX 220 (July 2009 Board Meeting presentation, including strategic focus, discussions of business challenges).)  He knew that AngioScore was having

5

A000069

United States District Court
Northern District of California

1  difficulty developing a 100mm version of its AngioSculpt as of July 2009.  (*Id.*)  And, he knew

2  that the company was interested in pursuing a drug coated specialty balloon.  (*See* PX 217

3  (February 21, 2009 email between board members discussing efforts to attain drug coated balloon

4  technology); PX 220 (July 2009 board presentation outlining future business strategy including

5  "extra long" devices of 100mm and a drug coated device).)  In addition, Konstantino knew that the

6  financial status of AngioScore in late 2009 to early 2010 was relatively strong.  AngioScore was in

7  a prime position to raise further capital, had considerable cash reserves, and was in the process of

8  dedicating resources to improving its presence in the specialty balloon catheter market, even

9  though it had just emerged from the expense of an unwarranted investigation.  Indeed,

10  AngioScore's December 2009 Monthly Report, distributed for the board meeting, reflected that

11  cash on hand totaled $15.3 million. The report described this figure as an "[o]utstanding result."

12  (DX 1199.)  That AngioScore could have exploited the Chocolate opportunity, had it been offered,

13  is not subject to reasonable dispute.

14      Notably, in December 2009, Konstantino had a conversation with AngioScore's CEO,

15  Trotter, regarding TriReme's development of a plain old balloon angioplasty ("POBA") device

16  called "Glider."  At trial, both Trotter and Konstantino confirmed that this conversation took

17  place.  Konstantino told Trotter that TriReme was too small to commercialize the Glider product,

18  and that he was in search of a funder.  He offered the Glider to AngioScore for distribution

19  purposes.  In his deposition, Konstantino explained that conversation as follows:

20          I share[d] with him the specifics of the product, the technical
21          features of this product.  I share[d] with him how do we think this
            product may fit in the marketplace, what we view [are] the features
22          or the advantages of this product.  And I offered him to do some sort
            of collaboration.  Specifically we discussed -- or I offered two
23          collaborations or two opportunities.  I don't mean opportunities in a
            legal context. One was to distribute these. Told him, Tom, we are a
24          small company.  We don't have commercial capabilities.  You have
            that.  This is not a product you put in the bag.  We don't have
25          commercial capabilities.  You do.  This is another product you can
            put in the bag.  You can reduce the overhead or the overhead
26          location on sale slips.  There are many perceived benefits.  And I
            also talked with him about the what you call the fact, maybe, that
27          AngioSculpt was not a highly deliverable product, at least this is in
            the perception of physicians who are using the product.
28

6

**A000070**

1    (*See* Trial Transcript ("Trial Tr."[2]) at 136:23-138:1 (reading Konstantino Dep. at 643:7-644:3).)

2    Trotter confirmed that when Konstantino revealed that TriReme had been working on the

3    Glider, he expressed concern that TriReme was venturing into angioplasty balloons at all.

4    Because Konstantino had presented TriReme's Glider as an ordinary POBA, however, the Glider

5    would not be acutely competitive with AngioSculpt.  Notably absent from this conversation was

6    any mention of Chocolate, which had been in development for months, offered to others as a

7    corporate opportunity, and was about to undergo porcine testing.

8    After sitting through the February 3, 2010 AngioScore board meeting, Konstantino

9    approached Trotter and asked to meet privately.  Referencing the December 2009 conversation in

10    which he had offered AngioScore the Glider POBA balloon, Konstantino told Trotter that

11    TriReme was "considering developing a specialty balloon catheter for peripheral indications," and

12    that TriReme had been actively working on "something for the future" in specialty balloon

13    catheters.  To say that Konstantino "downplayed" the facts surrounding Chocolate would be an

14    understatement.  Konstantino did not inform Trotter that the development of TriReme's specialty

15    balloon, which by that point had been called Chocolate for several months, was well underway.

16    He did not disclose his personal role in the development and conceptualization of the device, nor

17    did he disclose that a prototype had been created, a patent application and been submitted, animal

18    testing had occurred, or that he had already engaged potential investors and funding sources.

19    Trotter was nonetheless shocked by this news.  Specialty balloons were AngioScore's focus.  He

20    was of the belief that prior to that point, TriReme had been focusing on bifurcation stents and had

21    only recently started to consider POBA devices, and even then, only the Glider POBA.  Trotter

22    informed Konstantino that he did not think further discussion was appropriate and asked him to

23    leave.

24    Immediately following that meeting, Trotter relayed the conversation with Konstantino to

25    members of AngioScore's board.  The board expressed a universal belief that Konstantino should

26

27    _____

    [2] References to "Trial Tr." refer to the consolidated transcript of trial, which appears in six,

28    sequentially paginated volumes at Docket Entries 616, 617, 622, 623, 637, and 638.

A000071

United States District Court
Northern District of California

United States District Court
Northern District of California

1   resign as soon as possible.  If TriReme developed a specialty balloon, Konstantino would have

2   direct a conflict of interest.  The board was concerned that TriReme was considering potentially

3   competing with AngioScore.  At that point, no one at AngioScore knew that a competitive

4   specialty balloon device had been developed under Konstantino's direction and control.

5       The next day, Trotter sent Konstantino an email entitled "Board of Directors Position,"

6   copying AngioScore's attorney, John Sellers.  In it, Trotter restated his concerns about TriReme

7   moving into the specialty balloon market, and stated that the board members with whom he had

8   spoken saw this as a "clear conflict of interest."  The "consensus opinion" was that Konstantino

9   "need[ed] to resign from the Board immediately [and] probably should not have participated in

10  yesterday's Board Meeting."  Trotter told Konstantino that Sellers would be in touch to make

11  arrangements for his resignation.

12      Konstantino's response was brief.  Again, he did not disclose the existence, or

13  development status of the Chocolate device, nor did he disclose his intimate involvement with the

14  project.  Rather, and importantly, he began his campaign of active misdirection.  Thus, he

15  responded:  "TriReme has not made any decision to make such [a] change and I was giving you

16  very early heads up to *something that may take place in the future, or may never happen*[.]"

17  (emphasis supplied).

18      On February 4, 2010, John Sellers responded to Konstantino in an email.  Sellers informed

19  Konstantino that "e[]ven if you are just contemplating . . . you have important fiduciary duties

20  [and] ongoing confidentiality obligations."  Later that day, the two men spoke on the telephone for

21  five to ten minutes.  Sellers again emphasized Konstantino's fiduciary obligations to AngioScore

22  as a director, including that a conflict of interest would exist if TriReme developed a potentially

23  competing technology.  They also discussed the logistics of Konstantino's resignation from the

24  Board.

25      The next day, February 5, 2010, Konstantino replied to Sellers, copying Trotter, Suennen,

26  and Raffin:

27          As we discussed, I'm surprised and disappointed that you and the
            company jumped to the conclusion that I should resign from the
28

8

**A000072**

United States District Court
Northern District of California

1
2
3

board based on assumptions after receiving bits and pieces of information. I am ***keenly aware of my obligations*** as a board member and this is precisely why I am coming to AngioScore [now]; ***before any new project is started***.

4    (PX 107 (emphasis supplied).) To investigate the issue further, Suennen reached out to former

5    AngioScore CEO, co-founder, and one of AngioScore's largest common stockholders, Ephraim

6    Heller, to discuss filling Konstantino's board seat and to find out whether Heller knew if

7    Konstantino was working on a new specialty balloon catheter at that time. (*See* DX 1292.)

8    Although Konstantino had done work previously that Heller suspected may have conflicted with

9    his obligations to AngioScore, Konstantino had reassured him that all such activities had been

10    precleared with AngioScore. Heller also stated that at that time, he believed that Konstantino was

11    working to bring a "competitive product" to market, although it was not clear whether such device

12    was the Glider, of which AngioScore was already aware, or whether it was a specialty balloon.

13    Suennen also spoke with Mike Lynn, a TriReme board member. Lynn stated that he had no

14    knowledge or recollection that TriReme was working on a specialty balloon catheter.

15    Based on the above, the board decided to investigate whether Konstantino or TriReme had

16    in fact developed a competitive device. To that end, they questioned Konstantino pointedly. On

17    February 10, 2010, John Sellers sent a letter to Konstantino entitled "Obligations to AngioScore,

18    Inc." (PX 419.) Knowing only of the Glider, AngioScore's board sought information relative to

19    whether Konstantino had been working on a device that built off of the Glider model, such as for

20    example adding a metal cage around the balloon structure. The top paragraph on the second page

21    reads:

22
23

Our current presumption is that you have handled these matters in a manner that fully protects AngioScore and fully complies with your obligations to AngioScore.

24

25    AngioScore acknowledged that as of the date of Konstantino's resignation, he and

26    TriReme had "every right going forward to develop products that may compete with AngioScore

27    as long as you do not use or disclose AngioScore['s] confidential information or intellectual

28    property." (*Id.*) Nonetheless, Sellers requested that Konstantino confirm that no such activities

9

United States District Court
Northern District of California

1    took place while Konstantino was on AngioScore's board: "we respectfully request that you

2    promptly provide the AngioScore Board of Directors further information regarding these activities

3    in order to allow the Board to assess whether they are competitive to AngioScore." (*Id.*)

4        In response, Konstantino's counsel sent a letter on February 23, 2010 in which Konstantino

5    disavowed any development of a specialty balloon by TriReme and affirmed that he had no role in

6    the development of any such device. Specifically, Konstantino's counsel reiterated that prior to

7    Konstantino's resignation on February 5, 2010, he was not "involved in *any development work* or

8    licensing of angioplasty balloon technology for the coronary or periphery markets *that involves*

9    *specialized features such as scoring, cutting, or drug eluting elements*." (PX 420 (emphasis

10   supplied).) Likewise, Konstantino represented that he was not involved "in any development or

11   licensing of angioplasty balloon technology for the coronary or periphery markets that makes

12   similar claims to that of the AngioSculpt product." (*Id.*) Konstantino restated that TriReme was

13   "*considering, in the future, the possibility* of entering the field of specialized balloons," but that

14   before February 5, 2010, "TriReme *ha[d] not developed* any products . . . that compete[d] with

15   AngioScore's products." (*Id.* (emphasis supplied).)

16       Although the board had no factual basis at the time for believing that such representations

17   were false, Konstantino's letter was technically non-responsive to Sellers's original question and

18   accordingly, AngioScore continued to pursue the matter.

19       In an email to the board, Trotter asked for opinions and feedback on Konstantino's

20   response, and speculated that Konstantino may have been involved in developing a scoring

21   version of Glider to compete with AngioScore in the future.[3] At that point, Trotter began to

22

23       [3] Two days later, Jim Andrews, AngioScore's Chief Financial Officer, forwarded Trotter a
     TriReme press release concerning its receipt of FDA 510K Clearance for the Glider PTA Balloon
24   Catheter. (DX 1317.) Trotter forwarded the press release to the board of directors less than ten
     minutes later. Given that the Glider opportunity was first presented to Trotter in December of
25   2009, Trotter noted that "obviously this has been in the works for many months (testing,
     submission, approval, etc.) while Eitan was a member of our Board[.]" (*Id.*) He was concerned
26   that Konstantino had developed the Glider PTA Balloon Catheter while he had possession of a
     "considerable amount of [AngioScore's] confidential Sales & Marketing, Product Development
27   and Regulatory information." (DX 1317.) Although at that time Glider was a POBA and not a
     specialty balloon, Trotter was concerned that Konstantino "may be planning to add a scoring

28

10

United States District Court
Northern District of California

prepare for potential legal action against Konstantino, should any "specialty balloon" come to light. He asked AngioScore's patent counsel, Jim Heslin, to monitor new patent applications for scoring/cutting balloons to see what, if anything, Konstantino might file. And he asked Andrews to research whether AngioScore's insurance policy provided coverage for breaches of directors' duties and obligations.

AngioScore continued to investigate its concerns regarding Konstantino's involvement developing a competitive product with Konstantino directly. Sellers followed up with another letter on March 5, 2010 directed to counsel for Konstantino, and the boards of both TriReme and AngioScore. In it, Sellers remarked that previous representations by Konstantino had avoided squarely addressing AngioScore's concern, namely, that during Konstantino's service as a board member, he:

> obtained proprietary and confidential information about AngioScore, the peripheral market, and the role of specialty balloons in that market, while at the same time ***developing and pursuing plans*** within TriReme to ***pursue those same markets with another device***.

(PX 421 (emphasis supplied).) Sellers further stated that AngioScore's board "specifically would like to know whether prior to February 5, 2010, Mr. Konstantino and/or TriReme evaluated, negotiated, or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products, and if so, why that opportunity was not provided to AngioScore in accordance with Mr. Konstantino's duties as a Board member of AngioScore." (*Id.*)

Again, counsel for Konstantino responded, unequivocally and unambiguously denying that any such activity had taken place. Characterizing AngioScore's questioning as predicated on

---

element over time." Raffin speculated that the lead time on Konstantino's success for any such scoring product would be three to five years out, and Trotter responded that while he agreed on the likely timing of any such device, AngioScore "[n]eed[s] to watch him carefully." (*Id.*) Raffin and Trotter both testified that at this time, they were concerned singularly on the Glider balloon, which was not directly competitive with AngioSculpt, and Konstantino's possible appropriation of that POBA platform to make a specialty balloon. Neither suspected that there was a separate specialty balloon platform already underway. Due to the differences between POBAs and specialty balloons like AngioSculpt, the Court finds that the fact of Glider's existence cannot be fairly said to have put AngioScore on notice of Chocolate's existence.

11

United States District Court
Northern District of California

1    "unsubstantiated accusations" against Konstantino, counsel informed AngioScore that should such

2    accusations continue, Konstantino will "have no choice but to consider his legal options."  (PX

3    423.)

4         With that, AngioScore considered its inquiry complete.  Konstantino's representations had

5    sufficiently assuaged any and all concerns about whether he or TriReme had developed a specialty

6    balloon.  AngioScore was satisfied that nothing of the sort had occurred.  Based on the nature and

7    strength of Konstantino's representations, a reasonable person would have come to the same

8    conclusion.

9         AngioScore only learned that Chocolate existed a year and a half later, in the second half

10   of 2011, when a sales representative called the Washington Hospital Center and heard that a

11   presentation had been made on a new device called "Chocolate."  However, it was only after

12   Feld's deposition in the spring of 2014, in connection with AngioScore's patent case, that

13   AngioScore discovered all of the facts referenced above evidencing that Chocolate had been

14   developed while Konstantino sat on AngioScore's board.  That discovery yielded the claims

15   herein addressed.

16                              CONCLUSIONS OF LAW

17   **I.    As a member of AngioScore's board of directors, Konstantino breached his**
         **fiduciary duty to AngioScore and usurped a corporate opportunity when he**
18       **developed Chocolate for his own benefit and failed to offer the opportunity to**
         **AngioScore.**
19

20              **A.  The Corporate Opportunity Doctrine Framework**

21        The corporate opportunity doctrine "represents but one species of the broad fiduciary

22   duties assumed by a corporate director or officer."  *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148,

23   154 (Del. 1996).  As a fiduciary of a corporation, directors agree to "place the interests of the

24   corporation before his or her own in appropriate circumstances."  *Id.*  "At the core of the fiduciary

25   duty is the notion of loyalty—the equitable requirement that, with respect to the property subject

26   to the duty, a fiduciary always must act in a good faith effort to advance the interests of his

27   beneficiary."  *In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *21

28   (Del. Ch. Jan. 25, 2013) *reargument denied*, No. CIV.A. 5725-VCP, 2013 WL 1900997 (Del. Ch.

                                        12

1    May 8, 2013) (citing *Dweck v. Nasser*, 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012)).

2        Noting that corporate directors stand in fiduciary relationship to the corporations they

3    serve, the Delaware Supreme Court recognized in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939) that:

> public policy, existing through the years, and derived from a
> profound knowledge of human characteristics and motives, has
> established a rule that demands of a corporate officer or director,
> peremptorily and inexorably, the most scrupulous observance of his
> duty, not only affirmatively to protect the interests of the corporation
> committed to his charge, but also to refrain from doing anything that
> would work injury to the corporation, or to deprive it of profit or
> advantage which his skill and ability might properly bring to it, or to
> enable it to make in the reasonable and lawful exercise of its powers.
> The rule that requires an undivided and unselfish loyalty to the
> corporation demands that there shall be no conflict between duty
> and self-interest. The occasions for the determination of honesty,
> good faith and loyal conduct are many and varied, and no hard and
> fast rule can be formulated. The standard of loyalty is measured by
> no fixed scale.

*Id.* at 510.  The corporate opportunity doctrine seeks to define the bounds of this duty where a

director may be inclined to take a business opportunity for him or herself.  *See id.*  The rule

enunciated in *Guth* is this:

> if there is presented to a corporate officer or director a business
> opportunity which the corporation is financially able to undertake,
> is, from its nature, in the line of the corporation's business and is of
> practical advantage to it, is one in which the corporation has an
> interest or a reasonable expectancy, and, by embracing the
> opportunity, the self-interest of the officer or director will be
> brought into conflict with that of [the] corporation, the law will not
> permit him to seize the opportunity for himself.

*Id.* at 510-11.  Thus, under Delaware law, "[t]he elements of misappropriation of corporate

opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation

has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit

the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in

a position inimical to his duties to the corporation."  *In re Mobilactive Media*, 2013 WL 297950,

at *21.  Once the plaintiff has shown the breach of the director's duty of loyalty, the burden

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1  switches to the fiduciary to show that he or she did not seize a corporate opportunity "because

2  either the corporation was presented the opportunity and rejected it, or because the corporation

3  was not in a position to take the opportunity." *Grove v. Brown*, No. 6793-VCG, 2013 WL

4  4041495, at *8 (Del. Ch. Aug. 8, 2013). Delaware courts further recognize that "a director or

5  officer may take a corporate opportunity if: (1) the opportunity is presented to the director or

6  officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the

7  corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the

8  director or officer has not wrongfully employed the resources of the corporation in pursuing or

9  exploiting the opportunity." *Broz*, 673 A.2d at 155 (emphasis omitted).[4]

10     The rule set forth in the Delaware cases accords with economic and public policy, and

11  civic accountability. Put simply, men are not angels. We require structures to govern conduct.

12  *See* FEDERALIST NO. 51. The corporate structure necessarily requires a separation of ownership

13  and control, which produces a conflict: the shareholders are the principle bearers of risk, but the

14  board of directors are vested with the power to make managerial decisions. (*See* Trial Tr. at

15  646:7-21 (Testimony of Prof. Eric Talley).) Centralizing decisionmaking authority in a board of

16  directors presents efficiencies insofar as shareholders can diversify their interests, which, in turn,

17  has contributed to substantial economic growth and development. (*Id*. at 646:22-647:21.)

18  However, the concentration of decisionmaking power in individuals who do not necessarily bear

19  the risk creates a misalignment of interests. (*Id*. at 647:23-649-9.) The general purpose of

20  _____

21     [4] The parties dispute the precise interplay between the test enunciated in *Guth*, and the
counter-test, or corollary test, enunciated in *Broz*. The first test sets forth the elements of

22  misappropriation of a corporate opportunity; the second test recognizes circumstances whereupon
a director or officer may take a corporate opportunity for himself. Although the tests appear at

23  variance, in substance, they are concordant. The fundamental question is whether a corporate
director, standing in fiduciary relation to a corporation he serves, has fallen short of "the most

24  scrupulous observance of his duty not only affirmatively to protect the interests of the corporation
committed to his charge, but also to refrain from doing anything that would work injury to the

25  corporation, or to deprive it of profit or advantage which his skill and ability might properly bring
to it, or to enable it to make in the reasonable and lawful exercise of its powers." *Guth*, 5 A.2d at

26  511. That these tests are concordant is evident from their overlap. Critically, both the *Guth* test
and the *Broz* corollary test turn on whether the corporation had an interest or expectancy in the

27  opportunity. Because the Court finds that AngioScore did have an interest or expectancy in the
Chocolate, under both tests, Konstantino has breached his duty of loyalty.

28

14

**A000078**

corporate governance principles, specifically, the duties of care and loyalty, is to control for the moral hazards that arise when directors either shirk their responsibilities or self-serve. (*Id*. at 649:10-650:25.) Without strong corporate governance principles, the trust that underpins a shareholder's decision to invest will dissolve, with broader economic consequences to follow. (*Id*. at 651:17-652:10.)

Whether a corporate opportunity has been usurped is "a factual question to be decided by reasonable inferences from objective facts." *Guth*, 5 A.2d at 513.

### B. The Corporate Opportunity Doctrine applies to a director who is also an inventor.

Throughout this case, defendants have argued that the corporate opportunity doctrine cannot apply where, as here, a director invents a technology, even where such technology is directly competitive with that of the corporation he serves. Defendants maintain that because Chocolate was intellectual property belonging to Konstantino and the product of his own innovation, this necessarily obviates any fiduciary obligation to offer Chocolate to AngioScore. (DOB at 2-3.) The Court disagrees.

The fact of inventorship does not absolve a director of his fiduciary obligations with respect to inventions he may develop that compete with the corporation he serves. To hold otherwise would work an absurdity. Directors of corporations would be free to invent and develop competing technologies for their own benefit, concealing the same from the companies they serve, even where elements of those inventions would likely benefit the companies. This scenario stands in stark opposition to the foundational principles of corporate governance, which demand that directors exalt the interests of the companies they serve above their own. *Guth*, 5 A.2d at 510 ("the rule . . . demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers."). Most seriously, the extension of defendants' preferred rule would have directors entertain divided loyalty. The

United States District Court
Northern District of California

United States District Court
Northern District of California

1    position is untenable. *See id.* ("[t]he rule ... demands that there shall be no conflict between duty

2    and self-interest"). The rule makes logical sense. A director can leave the corporation thereby

3    dissolving the duties he owes. A corporation cannot and therefore relies on untarnished fidelity.

4              Defendants cite no case holding conclusively in their favor, but rather argue by analogy to

5    *Equity Corp v. Milton*, 221 A.2d 494 (Del. 1966). That case is distinguishable. First, the facts of

6    *Milton* counseled against a finding that the opportunity to that interest rightfully and in fairness

7    belonged to the corporation. *Milton*, 221 A.2d 497; *see also Thorpe v. CERBCO, Inc.*, No. CIV.A.

8    11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993) ("While courts have considered a number of

9    criteria in evaluating whether a director has usurped a corporate opportunity, the essence of this

10   doctrine is 'that a director may not appropriate something for himself that in all fairness should

11   belong to his corporation.'") (citing *Milton*, 221 A.2d at 497). Applying this standard, the *Milton*

12   court determined that the claimed opportunity was not, in fairness, one belonging to the

13   corporation – it was not of practical advantage to the corporation (*see id*. at 497), in keeping with

14   the business of the corporation, nor did it fit into an established corporate policy (*see id*.). Having

15   laid this foundation, the court stated, "if any doubt remains," the shares that had previously been

16   controlled by Milton were later reacquired by him; simply put, the entire transaction from start to

17   finish concerned Milton's property. Essentially, because there was nothing wrong with a

18   corporate officer owning and controlling stock of his corporation, the court found that the duty of

19   loyalty is not violated when a director shifts that ownership as he sees fit. (*Id*. at 498-99.) Thus,

20   there was conclusively no corporate opportunity at issue in *Milton*.[5]

21

22           [5] Likewise, defendants' reliance on *Science Accessories Corp. v. Summagraphics Corp.*,

23   425 A.2d 957 (Del. 1980) does not aid their position. The question presented in *Summagraphics* was exceedingly narrow: did the trial court's finding that no corporate opportunity existed (which

24   finding was *not* appealed to the Delaware Supreme Court), leave room for a separate claim for breach of fiduciary duty? *Id*. at 962 ("The thrust of SAC's fiduciary breach of duty argument is

25   that the trial court's conceded finding that Brenner's concept was not an opportunity available to SAC but one that defendants could take for themselves is not determinative of SAC's right to

26   equitable relief by reason of defendants' breach of so-called "independent" fiduciary duties owed to SAC."). The Delaware Supreme Court thus considered the scope of fiduciary duty law and

27   concluded that where no corporate opportunity is found to exist, as was the case in *Summagraphics*, that conclusion "finally determines the right of the corporate officer to treat the

28   opportunity as his own." *Id*. at 964 (quotation omitted)). The fact that no corporate opportunity

<center>16</center>

<center>**A000080**</center>

1    The logic enunciated in *Milton* does not compel a finding in defendants' favor here.  The

2    essential question is whether a director has appropriated something for himself that, in all fairness,

3    should belong to his corporation.  The determination of this question is always one of fact to be

4    determined from the objective facts and surrounding circumstances.  *Johnston v. Greene*, 121

5    A.2d 919, 923 (Del. 1956).  Here, the Court is confronted with facts establishing that Konstantino,

6    aware of AngioScore's competition-sensitive information, its then-existing financial condition,

7    design challenges, and business objectives, developed a competing device while on AngioScore's

8    board and took affirmative steps to exploit it himself while concealing it from AngioScore.  At the

9    same time, Konstantino was aware that he owed AngioScore fiduciary duties.  On these facts, that

10   Konstantino invented the competitive technology does not serve his argument that he should be

11   absolved of his fiduciary obligations to AngioScore.  Rather, it works the opposite effect:

12   Konstantino's failure to abide by his duty is plainly all the more offensive.  For these reasons, the

13   Court finds that it cannot indulge defendants' position and find that the corporate opportunity

14   doctrine does not apply.

15         At the same time, AngioScore's position is equally untenable.  AngioScore posits that by

16   virtue of Konstantino's position as a director, AngioScore had a right to the Chocolate outright,

17   and that therefore Konstantino was obligated to *give* the opportunity to AngioScore.  The logical

18   extension of this position demonstrates its implausibility.  Were this the case, Konstantino's

19   invention assignment agreement would have been superfluous in the first instance, and so, too,

20

21   existed in *Summagraphics* was critical to the court's reasoning, and essential to its holding.  *See
     id*. ("No case authority has been cited by appellant to support the proposition that key corporate
22   personnel are under a duty to disclose to their employer and not divert from him a business
     proposition that has been found not to be available and essential to the corporation.").
23   Furthermore, to the extent defendants argue that *Summagraphics* sanctions an employee's acts in
     anticipation of eventual competition, the limits of this freedom are well-defined:  a fiduciary's
24   right to make such arrangements is "by no means absolute," particularly in instances where the
     fiduciary engages in "usurpation of [the] employer's business opportunity," and "the ultimate
25   determination of whether an employee has breached his fiduciary duties to his employer by
     preparing to engage in a competing enterprise must be grounded upon a thoroughgoing
26   examination of the facts and circumstances of the particular case."  *Id*. at 965 (citations, quotations
     omitted).  Here, the Court finds that Konstantino did usurp (indeed, created and then usurped) a
27   corporate opportunity, and that his machinations were not merely preparatory.

28

United States District Court
Northern District of California

17

**A000081**

1    would all invention assignment agreements between directors and the corporations they serve.

2    The Court cannot overlook the effect such a rule would work in the context of intellectual property

3    and emerging technologies.  Critically, holding that directors who are also innovators must

4    relinquish to the corporations they serve technologies falling within that corporation's line of

5    business, in which the corporation has an interest or expectancy, or which aligns with its business

6    purpose and objectives, would serve to undermine innovation.  Indeed, holding as AngioScore

7    requests would subvert fundamental principles of intellectual property respecting inventors' rights,

8    which are designed to encourage, not discourage, ingenuity and innovation.  The fact that this case

9    concerns a medical device, which is currently being used in medical procedures in this country,

10   only serves to underscore the public interest in innovation.

11          With these positions, the parties posit a tension:  do fiduciary duties extend so far as to

12   compromise, potentially fatally, innovation; or, by contrast, does a director's ingenuity and

13   innovation provide an escape route from his fiduciary duties?  Neither extreme prevails.  A court

14   must apply the principles of the law in such a way that balances the wise public policy behind the

15   *Guth* rule, with the public policy counseling in favor of innovation.  For this reason, the Court

16   finds that although AngioScore was owed fiduciary duties by Konstantino, those duties did not

17   entitle AngioScore to outright ownership of the Chocolate opportunity at any point in time.

18   Rather, what Konstantino's fiduciary duty demanded was that he offer AngioScore the *opportunity*

19   *to acquire* the rights to the Chocolate.  The Court need not venture as to specifics of such a

20   transaction, but having chosen to remain on AngioScore's board, the offering must occur to satisfy

21   both the law of fiduciary duties and the public interest in innovation.  Offering an opportunity to

22   AngioScore meets Delaware's demand that directors not undertake any activity that would work

23   harm to the corporation they serve and prioritize the interests of those corporations above their

24   own.  *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *21 ("At the core of the fiduciary

25   duty is the notion of loyalty . . . with respect to the property subject to the duty, a fiduciary always

26   must act in a good faith effort to advance the interests of his beneficiary.").  It also accords with

27   directors' duty not to "do anything" that would "deprive" the corporations they serve "of profit or

28   advantage which [their] skill and ability might properly bring to it."  *Guth*, 5 A.2d at 510.  And, it

United States District Court
Northern District of California

18

**A000082**

1  remains faithful to the general principle that a director can establish conclusively no breach of his

2  fiduciary duty where, in keeping the interests of the corporation he serves first in mind, the

3  corporation is presented the opportunity and rejects it.  *See Grove*, 2013 WL 4041495, at *8.  By

4  ensuring that transparency and good faith predominate, the application of the rule in this manner

5  assures that any conflict will be resolvable.

### C.  Application of the Corporate Opportunity Doctrine

#### 1.  *Chocolate was an "opportunity" when Konstantino was on AngioScore's Board, and as such, falls under the Corporate Opportunity Doctrine.*

10  Longstanding law requires that certain "opportunities" be offered to the corporation.  The

11  definition of an "opportunity" is "a favorable juncture of circumstances" or "a good chance for

12  advancement or progress."  MERRIAM-WEBSTER, New Collegiate Dictionary (9th ed. 1988).  The

13  evidence adduced in this case establishes conclusively that as of the date Konstantino resigned

14  from AngioScore's board of directors, Chocolate was a concrete business opportunity.   By that

15  point, Chocolate had developed from a mere idea into a concrete opportunity.  It had been in

16  development for approximately five months.  The initial "brainstorming" discussions in the second

17  half of 2009 had resulted in the creation of many engineering design models, followed by physical

18  models and prototypes.  By January of 2010, the Chocolate design was so complete that

19  prototypes were suitable for testing, and in fact, was the subject of a porcine study at Stanford,

20  which TriReme employees and Konstantino attended.

21  Not only was Chocolate sufficiently developed to enable testing, development of

22  Chocolate had advanced to the point that Konstantino felt it appropriate to market it as an

23  opportunity for investors.  The fact that much development remained is no relevant to whether the

24  opportunity had already manifested.  Defendants cannot escape that during the second half of

25  2009, Konstantino offered between twenty and thirty investors the opportunity to invest in

26  Chocolate.  In preparation for investor meetings, Konstantino prepared slide presentations in

27  which he described the Chocolate technology, extolled its competitive, medical virtues, and

28  delineated the phases for potential investment.  In a November 2009 presentation seeking funding

United States District Court
Northern District of California

United States District Court
Northern District of California

1  from the Singapore Economic Development Board, Konstantino stated that the Chocolate "IP,

2  Concept design, Prototypes, business model, Team, [and] partnerships" were all "completed."  In

3  furtherance of his financial objectives, Konstantino corresponded with potential investors.  In such

4  communications, he represented that Chocolate's "initial design already works well and attracts a

5  lot of attention" and that Chocolate's product design was completed.

6      Such claims were not mere puffery designed to solicit investment.  In early 2010, design of

7  the Chocolate was essentially complete.  Indeed, Chocolate's 510K application in 2011 referenced

8  testing completed on Chocolate's nitinol cage designs created in January 2010.  Based on these

9  facts, that Chocolate had been developed to the point sufficient to render it a concrete business

10  opportunity prior to Konstantino's resignation from AngioScore's board of directors cannot be

11  reasonably disputed.  If the Chocolate opportunity was sufficiently concrete for twenty to thirty

12  investors, it was sufficiently developed to be offered to AngioScore.  The Court so finds.

13                  **2.  *Chocolate falls within AngioScore's line of business.***

14      An opportunity is within a corporation's line of business if it is "an activity as to which

15  [the corporation] has fundamental knowledge, practical experience and ability to pursue, which,

16  logically and naturally, is adaptable to its business having regard for its financial position, and is

17  one that is consonant with its reasonable needs and aspirations for expansion."  *In re Mobilactive*

18  *Media*, 2013 WL 297950, at *21 (citing *Guth*, 5 A.2d at 514).  This factor is to be broadly

19  construed.  *Id.* (citing *Dweck*, 2012 WL 161590, at *13).

20      The Court finds that Chocolate falls within AngioScore's line of business.  Since its

21  founding in 2003, AngioScore has designed, manufactured, and marketed angioplasty balloon

22  catheters surrounded by a nitinol structure that are used for the treatment of cardiovascular disease

23  and sold under the brand name AngioSculpt.  The evidence demonstrates conclusively that

24  AngioSculpt and Chocolate are similar in both purpose and function.  AngioSculpt and Chocolate

25  are both angioplasty balloon catheters consisting of a nitinol cage surrounding a semi-compliant

26  balloon.  Both are used to open occluded or narrowed blood vessels at lesion sites by inflating to

27  compress plaque deposits against the vessel wall and then deflating for removal from the patient's

28  body.  Both devices were cleared by the FDA with overlapping indications for use.  Indeed, there

20

**A000084**

1   are no indications for which the peripheral Chocolate device is cleared that the peripheral

2   AngioScore device is not and the devices make similar marketing claims.  Both specialty balloons

3   and as such, enjoy premium pricing over that of plain old balloon angioplasty (POBA) products.

4   In fact, Chocolate is priced at $25 per unit less than the AngioSculpt.  Moreover, as set forth in

5   more detail below, Chocolate is a competitor to the AngioSculpt with a common customer base.

6        Under Delaware law, the "line of business" element is to be broadly construed.  The Court

7   finds it met here.  The similarities in terms of purpose and function establish that AngioScore had

8   "fundamental knowledge and practical experience" to pursue Chocolate.  That AngioScore has

9   historically focused on products that "scored" plaque is of no moment, for the devices are

10  materially similar and their differences amount to variations on a common theme.  For example,

11  both devices are comprised of nylon balloons encased in nitinol cages.  No other specialty

12  balloons on the market use nitinol cage on a semi-compliant balloon – the Boston Scientific

13  Cutting Balloon uses surgical steel, and the Vascutrak uses stainless steel guide wires.[6]  Further,

14  given the overlapping features and design, AngioScore's manufacturing and distribution process

15  could have easily been modified to accommodate Chocolate.  All of Chocolate's component parts

16  were essentially the same as those of the AngioSculpt.

17       Based on the above findings, the conclusion is inescapable that Chocolate is "logically and

18  naturally . . . adapt[ed] to [AngioScore's] business."  *See In re Mobilactive Media*, 2013 WL

19  297950, at *21 (citation omitted).

20            **3.  *AngioScore had an interest or expectancy in Chocolate.***

21       "[F]or a corporation to have an expectant interest in any specific property, there must be

22  some tie between the property and the nature of the corporate business."  *Grove*, 2013 WL

23  4041495, at *8 (internal quotes omitted).  By requiring "a tie to the 'nature of the corporate

24  business,'" this factor "implicates many of the issues" discussed above concerning AngioScore's

25  line of business.  *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d

26  961, 973 (Del. Ch. 2003) (citing *Broz*, 673 A.2d at 156).  Even if there is a "tie" between the line

27  _____

28       [6] Nonetheless, those devices also compete with AngioSculpt.

21

**A000085**

of a corporation's business and the potential opportunity, however, the Court may decline to find

an interest or expectancy where facts establish that a corporation is shifting away from its

historical line of business, where it disavows such interest, and where it lacks the capacity to

capitalize on the interest.  In *Broz*, for example, the Delaware Supreme Court found that there was

no interest or expectancy where a corporation was divesting in the area of venture from which the

potential opportunity arose, and where its business plan did not contemplate any new acquisitions.

*Broz*, 673 A.2d at 156.  The inquiry requires a court to use its judgment to discern whether, given

the factual context of each particular case, the corporation had an interest, "*actual or in*

*expectancy*," or whether the acquisition of property for a director's own use "may hinder or defeat

the plans and purposes of the corporation in the carrying on or development of the legitimate

business for which it was created." *Johnston*, 121 A.2d at 924 (citations omitted) (emphasis in

original).

　　　　As detailed in the preceding discussion, the Court finds that "some tie" exists between

Chocolate and the nature of AngioScore's business.  The devices are both angioplasty balloon

catheters that serve similar purposes and are constructed from the same materials.  Well beyond

the loose connection that the "some tie" standard evokes, however, the Court finds that in 2009

and early 2010, AngioScore had an actual and expectancy interest in Chocolate by virtue of its

then-existing needs and business purposes, as well as Chocolate's unique features and potential

benefits to AngioScore.  The Court so finds for three main reasons:  (1) Chocolate's design

configuration could have proven helpful, and at a minimum, would have been seriously considered

in solving AngioScore's then-existing problem with creating AngioSculpt devices at 100mm

lengths; (2) Chocolate's potential as a drug-eluting specialty balloon technology was in keeping

with AngioScore's business goal to bring such a device to market; and (3) AngioScore had an

interest in keeping a direct competitor out of the relatively small specialty balloon market.

Collectively, these conclusions compel a finding that AngioScore had an interest and expectancy

in Chocolate as of, at the latest, the date Konstantino resigned from its board.  The Court

elaborates:

A000086

United States District Court
Northern District of California

First, in late 2009, AngioScore needed a balloon design amenable to longer length catheters. AngioScore was facing design challenges with its 100mm AngioSculpt. At the same time, drawings and prototypes of 100mm Chocolate balloons existed. Jeffrey Bleam, AngioScore's Vice President of Research and Development, explained the company's difficulty executing its 100mm AngioSculpt balloon. Part of the engineering challenge had to do with ensuring that the balloon would inflate uniformly while inside the nitinol cage. In the longer lengths, the balloon was less likely to inflate uniformly every time. The concern was that uneven inflation would result in an uneven distribution of force, jeopardizing the safety and effectiveness of the device. The company devoted significant resources to resolving this problem. Although research began in 2009, AngioScore did not release a 100mm balloon until 2011. Even as AngioScore finalized its first generation 100mm AngioSculpt, there remained issues with deployment. The company then devoted further engineering resources to design a second generation balloon. Ultimately, the engineering team discovered that by adding cross-lengths to the metal struts, they were able to ensure more even deployment of the balloon. The second generation 100mm balloon was released in 2013, presenting the critical cross-struts.

Had AngioScore known about the importance of the cross-struts back in 2009 and 2010, it likely never would have released the first generation 100mm AngioSculpt. To that end, the Chocolate's design would have been of considerable help. The cross-lengths added to the AngioSculpt 100mm resemble, at least conceptually, those which present as radial struts on the Chocolate device, and which had been a part of the Chocolate design since its early development in 2009. Bleam testified that had he gained access to the Chocolate, its unique elements could have benefitted the design of the 100mm AngioSculpt. He stated that the radial strut configuration was "pretty interesting, specifically," and its cross-application was relatively obvious. Accordingly, the Court finds it plausible that Chocolate's design would have aided AngioScore's pursuit of a 100mm balloon.

Second, the Court finds that Chocolate's avowed potential as a drug-eluting specialty balloon as of late 2009 accorded with AngioScore's business goal of bringing a drug-eluting balloon to market, and AngioScore would have therefore been interested in such technology. As a

23

United States District Court
Northern District of California

1   member of AngioScore's board, Konstantino knew that AngioScore's strategy included bringing

2   drug-eluting balloon to market.  In fact, the issue was discussed at AngioScore's 2010 board

3   meeting, which Konstantino attended.  (*See* PX 246 (AngioScore February 2010 Board Meeting

4   presentation, giving overview of then-existing cash balance, notably above budget, research and

5   development items, including drug-coated devices).)  The fact that Konstantino was soliciting

6   investments upon representations that Chocolate was an "ideal platform for drug delivery" (*see* PX

7   85) establishes conclusively that Chocolate would have aligned with AngioScore's stated business

8   objectives, long-term research and development plan, and business purpose.  Moreover,

9   Konstantino's attendance at AngioScore's board meetings confirms that he both knew and

10   understood AngioScore's desire to enter this portion of the market.

11          Third, the Court finds that based on the evidence adduced at trial, AngioScore would have

12   been interested in Chocolate because *rejecting* the Chocolate opportunity carried financial

13   implications for the company:  namely, the potential entry of a competitive device into the

14   specialty balloon catheter marketplace and a likely reduction in AngioScore's market share.  In so

15   finding, the Court notes that AngioScore competes in a relatively small, specialty balloon catheter

16   market.  In late 2009 and early 2010, there were only two general types of balloon catheters in the

17   specialty balloon market – those that scored or cut, as in the case of the Boston Scientific Cutting

18   Balloon and the AngioSculpt, and the Vascutrak, which possesses stainless steel guide wires.  The

19   market was thus defined by the nature of the devices then available.  Chocolate presented a

20   paradigm-shifting design:  a cage designed to create pillows and grooves in such a way as to create

21   focal force on the balloon surface as it pushes through the openings in the cage.  The entry of such

22   a device into a small, competitive marketplace previously limited to devices whose purpose was to

23   have metal come into contact with a vessel wall would have significant implications for revenues.

24   As a young company, revenue growth was a primary concern for AngioScore.  (*See* Trial Tr. at

25   488:17-22; 489:15-490:4 (Raffin).)  The business judgment revealed during the course of

26   testimony, in combination with common sense, leads the Court to conclude that AngioScore

27   would not have simply done nothing had Chocolate been offered in a timely fashion.

28

1    Defendants advance primarily three arguments in opposition to the interest and expectancy

2    element.  (*See* DRB at 7-8.)  The Court finds none persuasive based on the evidence in this case.

3    First, defendants argue that AngioScore would have rejected Chocolate because it was focused

4    singularly on developing the AngioSculpt line of scoring balloons.  Second, defendants argue that

5    AngioScore disclaimed any interest in Chocolate when Konstantino's invention assignment

6    agreement terminated at the conclusion of his employment with AngioScore, and relatedly, that

7    the only entities with legally cognizable interests in Chocolate were Konstantino and Feld,

8    Chocolate's inventors.  Third, defendants maintain that AngioScore would have passed on the

9    Chocolate opportunity due to personality conflicts with Konstantino.  The Court addresses, and

10   rejects, each in turn.

11   As to the first argument, for the reasons set forth above, the Court is not convinced that

12   AngioScore would not have been interested in Chocolate.  Put differently, the Court is not

13   persuaded that AngioScore would have refused the opportunity.  The fact that Chocolate does not

14   engage in an identical mechanism of action to that of the AngioSculpt is not enough to overcome

15   the weight of evidence supporting the Court's finding that AngioScore would have been interested

16   in Chocolate.

17   Defendants argue that AngioScore's 2009 rejection of an unnamed scoring device

18   establishes that AngioScore would not have been interested in Chocolate.  AngioScore's mid-2009

19   rejection of a new scoring balloon was based in part on Trotter's belief that there was no strong

20   need to add another scoring device to the market.  (*See* DX 1099.)  The Court is not convinced that

21   this decision bears on whether AngioScore had an interest or expectancy in Chocolate.  The

22   opportunity presented in early 2009 related to another concrete product.  AngioScore was

23   permitted to evaluate the design features.  In light of this concrete opportunity, Trotter explained

24   that AngioScore declined to pursue the proposed technology because "there was nothing

25   particularly impressive about it."  (Trial Tr. at 627:25-628:1 (Trotter direct).)  He further added

26   that he "didn't see that there was any innovation there that would be valuable to AngioScore."  (*Id*.

27   at 628:1-2.)  The fact that Chocolate represented a new concept – focal force through the creation

28   of balloon pillows, rather than scoring – sets it apart from the opportunity AngioScore

United States District Court
Northern District of California

25

**A000089**

1   contemplated and rejected.  Moreover, as set forth above, AngioScore would have been interested

2   in Chocolate for its presentation of longer lengths and for its potential as a drug-eluting device.

3        Defendants further rely on answers board members provided in response to a survey

4   conducted by a consultant, Sarah Lugaric.  Board members were directed to answer the following

5   question: "Do you support acquiring another company, technology, or product line?  (yes/no,

6   timing, description)."  The board's responses fell onto a spectrum – some directors were open to it,

7   others less so.  Three of the seven directors were opposed to acquiring another company,

8   technology, or product line; four indicated that they would be open to it with certain reservations.

9   Defendants seize on these answers to argue that the board never would have been interested in

10  Chocolate.  The Court disagrees.  First, the Lugaric question was hypothetical and abstract.

11  Second, the question related to members' inclination to acquire more than simply a new product –

12  it also concerned whether the members would be interested in the acquisition of another company.

13  The directors were not considering a concrete, potentially paradigm-changing technology.  They

14  did not know that Chocolate existed.  The answers to this survey thus cannot undermine the

15  Court's finding that AngioScore had an interest or expectancy in the Chocolate.

16       Defendants' second argument reduces to this:  AngioScore did not renew Konstantino's

17  invention assignment agreement.  Therefore, AngioScore had no interest in Konstantino's

18  inventions.  Chocolate was one such invention.  Therefore, AngioScore had no interest in

19  Chocolate.  (DRB at 7.)  Under the terms of an invention assignment agreement and as a matter of

20  contract law, this would appear to make sense.  However, the rights and obligations to which

21  parties agree in the context of an employee/employer invention assignment agreement are

22  fundamentally different from the nature of the issue presented here:  whether, in developing

23  Chocolate, and secreting it from the corporation he served for his own personal benefit,

24  Konstantino violated his duty of loyalty to AngioScore.  Simply because AngioScore would no

25  longer automatically have property rights in anything Konstantino invented does not obviate

26  Konstantino's obligation to adhere scrupulously to his duty to place the interests of AngioScore

27  above his own financial gain.  The lack of an invention assignment agreement does not absolve a

28  director of his fiduciary obligations with respect to inventions he may develop that compete with

26

United States District Court
Northern District of California

1    the corporation he serves.  To hold otherwise would undermine the basic fabric upon which the

2    duty is based.

3        Last, defendants maintain that AngioScore would have passed on the Chocolate

4    opportunity due to personality conflicts between Konstantino and members of the AngioScore

5    board.  Throughout the trial in this case, the defense returned to its theory that at some point

6    between 2006 and 2010, members of AngioScore's board had essentially blacklisted Konstantino.

7    While the Court agrees that personality conflicts may have existed, defendants' resort to

8    overstatement undermines their credibility and any relevance the true facts might have had.  With

9    the exception of Ozdil, with whom Konstantino had previously had an altercation, and possibly

10    Tom Trotter, who was less than pleased to hear that in December 2009 Konstantino and TriReme

11    were embarking on building a POBA (the Glider), the Court finds that Konstantino was generally

12    well-regarded and respected by his other fellow board members in the time period leading up to

13    his resignation.  No board members who testified stated that prior to the events giving rise to this

14    litigation, they had anything but amicable and professional interactions with Konstantino.  None

15    witnessed any effort by any other board member to push Konstantino off the board, nor did any

16    board member witness any hostility between AngioScore and Konstantino.  No evidence, besides

17    Konstantino's ruminations, supports any inference that board members possessed anti-Semitic

18    feelings toward Konstantino.  Board members Raffin and Suennen testified credibly that no one

19    harbored such feelings and that they themselves are Jewish.  Konstantino's claim that he was

20    ostracized at AngioScore is further undermined by evidence that AngioScore's CEO, Trotter, was

21    helping Konstantino further his non-AngioScore business pursuits, including fundraising for

22    TriReme, around the same time Konstantino and Feld were developing Chocolate.  Specifically, in

23    August of 2009, Trotter emailed Ivan Pirzada in an attempt to get Konstantino funding.  (PX 234.)

24    In December 2009, Trotter sent Konstantino a tip on potential funders for TriReme.  (PX 241.)

25    The Court thus finds that there is no merit to Konstantino's claim that AngioScore would not have

26    worked with him on Chocolate.  Furthermore, and to state the obvious, personality conflicts

27    between board members do not obviate their fiduciary duties to the companies they serve.  The

28    law expects and demands that board members rise above such concerns.

1    Accordingly, the Court finds that AngioScore had an interest and expectancy in the

2  Chocolate opportunity.

3    **4.  *AngioScore had the financial capacity to exploit the Chocolate***

4    ***opportunity.***

5    The Court finds that AngioScore had the financial ability to exploit Chocolate.  In so

6  finding, the Court is mindful that under Delaware law, this prong implicates broader policy

7  concerns more favorable to the corporation.  Such concerns stem from the inherent conflict

8  between, on the one hand, a director who has control and responsibility for the financial security

9  of the corporation he serves, and on the other hand, the director's potential personal interest in

10  ensuring that the company not have secured financial footing so as to permit usurpation of what

11  otherwise might be a corporate opportunity.  Thus, once the plaintiff has made such a *prima facie*

12  showing of financial ability, a fiduciary "faces a significant burden in establishing that a

13  corporation was financially unable to take advantage of a corporate opportunity."  *Norman v.*

14  *Elkin*, 617 F. Supp. 2d 303, 312 (D. Del. 2009) (citing *Gen. Video Corp. v. Kertesz*, No. 1922-

15  VCL, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (finding financial inability must amount

16  to insolvency such that the company is practically defunct); *but see Yiannatsis v. Stephanis by*

17  *Sterianou*, 653 A.2d 275, 279 (Del. 1995) (declining to adopt "the 'insolvency-in-fact test'";

18  stating instead that courts should consider "a number of options and standards for determining

19  financial inability, including but not limited to, a balancing standard, temporary insolvency

20  standard, or practical insolvency standard")).  Defendants have not established AngioScore's

21  inability to capitalize on the Chocolate opportunity.  To the contrary, AngioScore has established

22  that it could have capitalized on Chocolate had Konstantino offered the opportunity.

23    Evidence regarding what it would have cost to develop Chocolate varies, but in all events,

24  reflects an initial amount that fell *below* the amount of cash AngioScore had on hand at the end of

25  2009 and beginning of 2010.  According to an email from November 17, 2009, Konstantino

26  estimated capital requirement of approximately $3 million. (PX 70.)  By May 2010, Konstantino

27  had secured sufficient capital to pursue the Chocolate "all the way to first commercial sale"; the

28  total raised to that point was $4.5 to 5 million.  (PX 547; Belson dep., discussing Feb 2010

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Chocolate presentation that placed the cost of developing Chocolate at roughly $2 million USD

2   beyond the Singaporean EDB grant, PX 78).)   Finally, with respect to the amount of money

3   required to acquire an assignment of the intellectual property rights to Chocolate, the record places

4   that value in the amount of $370,000 cash and a royalty of 5%.  (Trial Tr. at 237:8-18.)  In the

5   event such right was acquired, however, there is nothing to suggest that AngioScore would have

6   been obligated to develop Chocolate.

7          Based on the above figures, even assuming that Chocolate would have cost $5 million to

8   develop, the Court finds that AngioScore was able to exploit this opportunity through several

9   avenues.  First, AngioScore had approximately $17 million cash on hand in October 2009, and in

10  excess of $15 million cash on hand at the end of 2009.  Second, as a going concern with existing

11  relationships, AngioScore could have obtained funds from external investors, such as Oxford

12  Finance, or other venture capital funds.  In December 2009, for example, Oxford Capital

13  expressed a willingness to lend between $10 and $20 million to AngioScore.  Third, AngioScore

14  could have redirected research and development money it was currently using to fix the design

15  problems for its 100mm AngioSculpt product.  This financial position existed notwithstanding the

16  downsizing and resources expended in response to a Department of Justice investigation.

17         The practicalities of new technology companies further support the Court's conclusion.

18  Konstantino himself admitted that startup companies in Silicon Valley, such as AngioScore and

19  TriReme, are frequently short on cash and face the prospect of running out of money.  He further

20  stated that the fact that such a company is not "profitable" doesn't mean that the company is "not

21  successful."  For example, TriReme was not able to sell its Antares product, a stent, in the United

22  States, and Antares made only negligible sales abroad.  Despite TriReme's limited financial

23  position, TriReme was able to develop Chocolate.

24         Based on the foregoing, the Court finds that AngioScore was able to exploit the Chocolate

25  opportunity.  Despite having been privy to AngioScore's confidential financial documents as a

26  member of AngioScore's board of directors (*see e.g.*, PX 246, February 2010 board meeting

27  presentation including proposed budget, discussion of cash on hand), Konstantino never broached

28  the subject of Chocolate with AngioScore.

### 5.  *By taking the Chocolate for himself, Konstantino placed himself in a position inimical to his fiduciary duties to AngioScore.*

The result of the above findings compels the conclusion that by taking the Chocolate opportunity for himself and companies he preferred, to the exclusion of AngioScore, Konstantino placed himself in a "position inimicable to his duties to the corporation." *Broz*, 673 A.2d at 155. In essence, he became a competitor to AngioScore.  It is axiomatic that as such, absent some knowing waiver by AngioScore, Konstantino could never fulfill his duty of loyalty to AngioScore. Any financial gain Konstantino enjoyed stemmed from Chocolate's success in the limited specialty balloon market, in which AngioScore is a key player.  Indeed, while sitting on AngioScore's board, Konstantino participated in a strategy where, by design, Chocolate would compete with AngioScore.  Chocolate's price was explicitly tied to AngioSculpt pricing, *i.e. exactly* $25 less than AngioScore's products.  That Chocolate was priced just below the AngioSculpt was intended to "drive rapid adoption" and "get faster uptick" in the specialty balloon catheter market.  Moreover, Konstantino himself extolled the advantages of Chocolate compared to scoring balloons, including AngioScore's devices, as he sought to secure funding for Chocolate.

This factor is therefore met, as is each element of AngioScore's breach of fiduciary duty claim.

## II.    The Statute of Limitations does not bar AngioScore's claims.

"A claim for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland v. Sutherland*, No. CIV.A. 2399-VCN, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010); *see Pomeranz v. Museum Partners, L.P.*, No. CIV.A. 20211, 2005 WL 217039, at *8 (Del. Ch. Jan. 24, 2005).  The parties agree as follows:  (i) the relevant statute of limitations for breach of fiduciary duty claims is three years[7];  (ii) the acts giving rise to the instant claim occurred in 2009

---

[7]  Under Delaware law, the doctrine of laches governs the timeliness of claims brought in equity.  Courts sitting in equity will apply by analogy the statute of limitations for substantive claims in order to apply the doctrine of laches.  *Pomeranz*, 2005 WL 217039, at *2.  Here, three years is the relevant limitations period.

30

United States District Court
Northern District of California

1   and 2010;  and (iii) more than three years elapsed between those acts and when plaintiff brought

2   its claim (here, June 27, 2014).  The central issue is whether equitable tolling is available.

3   Plaintiff bears the burden of establishing that such tolling is warranted.  *Pomeranz*, 2005 WL

4   217039, at *2.  Defendants claim the statute has run because AngioScore was on notice by no later

5   than February 5, 2010, the date of Konstantino's resignation.

6          Three bases for tolling exist under Delaware law: (1) the inherently unknowable doctrine

7   (the "Discovery Rule"), (2) equitable tolling, and (3) fraudulent concealment.  As set forth in

8   *Smith v. McGee*, No. CIV.A. 2101-S, 2006 WL 3000363, at *3-*4 (Del. Ch. Oct. 16, 2006), the

9   contours of each of these bases is as follows:

10              A limitations period may be tolled under the inherently unknowable
11          doctrine so long as "the discovery of the existence of a cause of
            action is a practical impossibility."  Specifically, "there must have
12          been no observable or objective factors to put a party on notice of an
            injury, and plaintiffs must show that they were blamelessly ignorant
13          of the act or omission and the injury."  Plaintiffs may establish
            "blameless ignorance" by showing justifiable reliance on a person
14          whom they have "no ostensible reason to suspect of deception."
            Such proof tolls the limitations period until a plaintiff had "reason to
15          know" of a wrong.

16              Equitable tolling is appropriate "where a plaintiff reasonably relies
17          on the competence and good faith of a fiduciary."  Underlying this
            doctrine is the idea that "even an attentive and diligent [investor]
18          relying, in complete propriety, upon the good faith of [fiduciaries]
            may be completely ignorant of transactions that ... constitute self-
19          interested acts injurious to the [Partnership]."  This doctrine also
            tolls the limitations period until an investor knew or had reason to
20          know of the facts constituting the wrong.

21
                Fraudulent concealment, unlike the doctrines of inherently
22          unknowable injuries and equitable tolling, "requires an affirmative
            act of concealment by a defendant-an 'actual artifice' that prevents a
23          plaintiff from gaining knowledge of the facts or some
            misrepresentation that is intended to put a plaintiff off the trail of
24          inquiry."  Nevertheless, "mere ignorance of the facts by a plaintiff,
            where there has been no such concealment, is no obstacle to
25          operation of the statute."  Like the previously mentioned doctrines,
            tolling exists only "until his rights are discovered or until they could
26          have been discovered by the exercise of reasonable diligence."
27

28   *Id.*  (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456 (Del. Ch. July 17, 1998)).  Under

A000095

1  Delaware law, tolling is proper only until a plaintiff is properly put on inquiry notice. "When

2  plaintiffs are on inquiry notice, the statute of limitations begins to run. Inquiry notice does not

3  require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they

4  have sufficient knowledge to raise their suspicions to the point where persons of ordinary

5  intelligence and prudence would commence an investigation that, if pursued, would lead to the

6  discovery of the injury." *Pomeranz*, 2005 WL 217039, at *3 (citation omitted).

7       The Court finds tolling appropriate here based on the third of these theories: namely,

8  Konstantino's purposeful, fraudulent concealment, although much of the analysis would also

9  overlap with the first two approaches. Tolling is warranted because Konstantino "engaged in

10  fraudulent concealment of the facts necessary to put [AngioScore] on notice of the truth." *Albert*

11  *v. Alex. Brown. Mgmt. Servs., Inc.*, No. CIV.A. 762-N, 2005 WL 1594085, *19 (Del. Ch. June 29,

12  2005). Specifically, Konstantino's "affirmative act[s] of concealment" in early 2010, during the

13  time in which AngioScore sought information relating to whether he had developed a specialty

14  balloon, constitutes "an 'actual artifice'" that prevented AngioScore from gaining knowledge of

15  the facts. *In re Dean Witter*, 1998 WL 442456, at *5 (citation omitted). Having reviewed the

16  evidence of record and observed the testimony at trial, the conclusion is inescapable that letters

17  authored by Konstantino's counsel contained intentional misrepresentations that were intended to

18  put AngioScore "off the trail of inquiry." *Id.*

19       In Konstantino's February 3, 2010 meeting with Trotter, Konstantino told Trotter that

20  TriReme was "considering developing a specialty balloon catheter for peripheral indications," and

21  that TriReme had been actively working on "something for the future" in specialty balloon

22  catheters. (Trial Tr. at 574:8-12; 602:22-25 (Trotter); *see* PX 107.) This conversation itself was

23  deceptive in nature, for Konstantino did not in any way indicate that the development of

24  TriReme's specialty balloon, which by that point had been called Chocolate for several months,

25  was well underway. Nor did he disclose his personal role in the development and

26  conceptualization of the device, that a prototype had been created, that animal testing had

27  occurred, or that he had already engaged potential investors and funding sources.

28

United States District Court
Northern District of California

32

**A000096**

1    Even lacking these details, the news of a possible specialty balloon at TriReme resulted in

2    an investigation led by AngioScore's lawyer.  Trotter sent Konstantino an email entitled "Board of

3    Directors Position," copying AngioScore's counsel, John Sellers.  (PX 107.)  In it, Trotter restated

4    his concerns about TriReme moving into the specialty balloon market, and stated that the board

5    members with whom he had spoken saw this as a "clear conflict of interest."

6    Konstantino then engaged in a series of communications intentionally designed to assuage

7    AngioScore's concerns, disavowing that any such device existed or had been developed, much

8    less that he had any personal role in the development of a specialty balloon.  For example, in

9    response to Trotter's email, Konstantino stated that "TriReme has not made any decision to make

10   such a change and I was giving you very early heads up to *something that may take place in the*

11   *future, or may never happen*[.]"  He added, "there is *no reason to be trigger happy*."  (PX 107

12   (emphasis supplied).)

13   Thereafter, Konstantino continued in his misdirection.  The next day, February 5, 2010,

14   Konstantino wrote an email to Sellers, cc'ing Trotter, Suennen, and Raffin.  (*Id.*)  In it, he stated:

15           As we discussed, I'm surprised and disappointed that you and the
             company jumped to the conclusion that I should resign from the
16           board based on assumptions after receiving bits and pieces of
             information.  I am *keenly aware of my obligations* as a board
17           member and this is precisely why I am coming to AngioScore now;
             *before any new project is started*.
18

19   (*Id.* (emphasis supplied).)

20   The board nonetheless continued investigating whether Konstantino or TriReme had in fact

21   developed a competitive device.  At that point, Konstantino himself was the most authoritative

22   source of information regarding what activities, if any, he had actually undertaken with respect to

23   bringing a competitive product to market.  Thus, the board undertook to ask Konstantino whether

24   he had done so.

25   What followed were several letters from Konstantino, through counsel, in which

26   Konstantino unequivocally refuted any notion that he had worked on a specialty balloon catheter,

27   or that any such device had been developed, while he was on AngioScore's board.

28

United States District Court
Northern District of California

33

**A000097**

1    In the first such letter, dated February 23, 2010.  Konstantino's counsel specifically

2    reiterated that prior to Konstantino's resignation on February 5, 2010, he was not "involved in ***any***

3    ***development work*** or licensing of angioplasty balloon technology for the coronary or periphery

4    markets ***that involves specialized features such as scoring, cutting, or drug eluting elements***."

5    (PX 420 (emphasis supplied).)  Likewise, Konstantino represented that he was not involved "in

6    ***any development*** or licensing of angioplasty balloon technology for the coronary or periphery

7    markets that ***makes similar claims*** to that of the AngioSculpt product."  (*Id.* (emphasis supplied).)

8    Konstantino restated that TriReme was "***considering, in the future, the possibility*** of entering the

9    field of specialized balloons for peripheral applications" but that before February 5, 2010,

10    TriReme "***ha[d] not developed*** any products . . . that compete[] with AngioScore's products."  (*Id.*

11    (emphasis supplied).)

12    In response, AngioScore expressed concern that during Konstantino's service as a board

13    member, he:

> obtained proprietary and confidential information about AngioScore,
> the peripheral market, and the role of specialty balloons in that
> market, while at the same time **developing and pursuing plans**
> within TriReme to **pursue those same markets with another
> device**.

18    (PX 421 (emphasis supplied).)  Again, Konstantino unequivocally and unambiguously denied that

19    any such activity had taken place.  (PX 423.)  Characterizing AngioScore's questioning as

20    predicated on "unsubstantiated accusations" against Konstantino, counsel informed AngioScore

21    that should such accusations continue, Konstantino will "have no choice but to consider his legal

22    options."  (*Id.*)

23    At that point, Konstantino's representations had sufficiently assuaged any and all concerns

24    about whether he or TriReme had developed a specialty balloon.  AngioScore was satisfied that

25    nothing of the sort had occurred.  Given the nature and strength of Konstantino's representations, a

26    reasonable person would have come to the same conclusion.

27    "Equitable exceptions to statutes of limitations are narrow and designed to prevent

28    injustice."  *Pomeranz*, 2005 WL 217039, at *13 (citations omitted).  The equitable exception to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the normal rule is warranted here.  AngioScore acted diligently in its 2010 investigation.  That

2    Konstantino now disavows the intent of his obvious affirmative, misleading representations,

3    particularly those cloaked in formality as letters from his attorneys, is self-serving and bears on his

4    credibility for truthfulness.[8]  He cannot now hide behind the "actual artifice" he constructed to

5    prevent AngioScore from gaining knowledge of the facts.  AngioScore undertook an earnest,

6    broad-based inquiry into the nature of Konstantino's activities.  Instead of answering

7    AngioScore's queries in good faith and with candor, Konstantino's answers were designed to put

8    AngioScore "off the trail of inquiry" and disabuse AngioScore of the notion that any fiduciary

9    breach had occurred.  The truth was sharply at odds with Konstantino's representations.

10            Because Konstantino's artifice worked to his desired ends, the three-year statute of

11   limitations cannot now shield him from AngioScore's claim.  AngioScore was not on inquiry

12   notice until it learned, in connection with the discovery in its patent case, that Chocolate had been

13   developed before Konstantino left AngioScore's board.  It filed this claim mere months after that.

14   The claim is timely.

15   **III.    TriReme and Quattro aided and abetted Konstantino's breach of fiduciary duty.**

16          **A.  The standard for aiding and abetting liability is met.**

17           Under California law, "'[l]iability may . . . be imposed on one who aids and abets the

18   commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach

19   of duty and gives substantial assistance or encouragement to the other to so act or (b) gives

20   substantial assistance to the other in accomplishing a tortious result and the person's own conduct,

21   separately considered, constitutes a breach of duty to the third person.'"  *Casey v. U.S. Bank Nat'l*

22

---

23           [8] As a prime example of Konstantino's artifice, in 2009, while he was on AngioScore's

24   board he filed a patent application for Chocolate.  In March 2010, after engaging in
     correspondence with AngioScore's lawyers, he switched patent counsel and filed a second

25   provisional patent application.  The strategy underpinning Konstantino's second patent application
     decision is apparent.  By filing a second provisional patent application in March 2010,

26   Konstantino sacrificed five months of patent priority.  However, by citing the March 2010
     application instead of the earlier 2009 application in his March 2011 patent application,

27   Konstantino was able to ensure that the patent application from 2009, which listed him as a co-
     inventor of Chocolate at a time when he was on AngioScore's board, would not become public.

28

1   *Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005) (citations omitted); *Neilson v. Union Bank of*

2   *California, N.A.*, 290 F. Supp. 2d 1101, 1133 (C.D. Cal. 2003) (noting that California courts cite

3   Restatement (Second) of Torts section 876 to hold that "liability may properly be imposed on one

4   who knows that another's conduct constitutes a breach of duty and substantially assists or

5   encourages the breach.") (citations omitted).  AngioScore must establish that defendant

6   corporations TriReme and Quattro actually knew of Konstantino's fiduciary duty breach.  *Casey*,

7   127 Cal. App. 4th at 1145 ("[E]ven 'ordinary business transactions' . . . can satisfy the substantial

8   assistance element of an aiding and abetting claim if the [defendant] actually knew those

9   transactions were assisting the [fiduciary] in committing a specific tort [breach of fiduciary duty].

10  Knowledge is the crucial element.").  Additionally, "causation is an essential element of an aiding

11  and abetting claim," and AngioScore must show that the aiders and abettors provided assistance

12  that was a substantial factor in causing AngioScore's harm.  *Neilson*, 290 F. Supp. 2d at 1135.

13       For corporations, "[i]t is the general rule that knowledge of an officer or director of a

14  corporation will be imputed to the corporation."  *See Brown v. Brewer*, No. CV 06-3731-GHK

15  (JTLx), 2008 WL 6170885, at *7 (C.D. Cal. July 14, 2008) (quoting *Teachers' Ret. Sys. of La. v.*

16  *Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006)).  California follows the well-established

17  principle that the acts and knowledge of an officer or agent can be attributed to a corporation or

18  principal.  *In re Cal. TD Inv. LLC*, 489 B.R. 124, 129 (Bankr. C.D. Cal. 2013).[9]

19

20

21

22

23

24

25       [9] As was recognized in *In re Cal. TD Inv. LLC*, the attribution or imputation rule is subject
    to the "adverse interest" exception, whereby an officer's acts adverse to a corporation will not
26  generally be imputed to the corporation, which is in turn subject to the "sole actor" exception,
    where courts may impute the actions of officers even where adverse to the corporations if the
27  officer is the "sole person in control of [the corporation]."  489 B.R. at 129-30.  Defendants have
    not argued that any such exception would apply in this case.

28

United States District Court
Northern District of California

A000100

1          **1.** *TriReme knowingly provided substantial assistance.*

2          The Court finds that TriReme knew Konstantino's conduct constituted a breach of duty

3   and gave substantial assistance or encouragement for Konstantino to persist in his breach.

4   Accordingly, TriReme is liable for aiding and abetting Konstantino's breach of fiduciary duty.

5          First, the record is replete with evidence that TriReme employees provided substantial

6   assistance to Konstantino at every step of the design and modeling process for Chocolate.  While

7   Konstantino remained on AngioScore's board of directors, TriReme engineers helped him develop

8   and build the Chocolate device.  Such individuals included Feld[10]; Jayson Delos Santos, a senior

9   engineer; Maria Pizarro, TriReme's Director of Research and Development[11]; and Gary Binyamin,

10  TriReme's technology manager.  These individuals were engaged in creating and fine-tuning the

11  engineering design of Chocolate.  They created prototypes of Chocolate and undertook testing of

12  the devices.  They attended the porcine study of the Chocolate device at Stanford in January 2010.

13  Not only did TriReme employees design and test the Chocolate idea prior to the time Konstantino

14  left AngioScore's board, they did so under his general supervision.  Konstantino, as TriReme's

15

16          [10] The role of Feld with respect to TriReme at this time is unclear.  On TriReme's

17  September 2009 board meeting, Feld is identified as TriReme's Vice President of Research and
    Development.  However, in his testimony, Feld stated that around this time, he was a consultant

18  for TriReme.  (Trial Tr. at 863:17-21.)  The Court is wary of letting the distinction, however, exalt
    form over substance.  Feld was a cofounder of TriReme.  He testified that he speaks to

19  Konstantino at least weekly, if not more.  Even as a consultant, he was paid by TriReme on a
    monthly basis, had access to all the TriReme employees who were working on Chocolate, and

20  used TriReme employees in the pursuit of Chocolate.  (Trial Tr. at 863:17-864:20.)

21
            [11] During trial, Pizarro persisted in her efforts to obfuscate the true nature of TriReme's

22  involvement in the Chocolate opportunity.  During cross-examination, however, this quickly
    became apparent.  For example, after acknowledging that she had been involved in a December

23  2009 presentation to MedTronic regarding the status of TriReme's projects, including Chocolate,
    Pizarro denied that "there was development work performed on Chocolate in 2009," disputing the

24  meaning of the word "development."  (Trial. Tr. at 1069:2-1070:9.)  The evidentiary record,
    however, was starkly to the contrary – as Pizarro well knows.  As early as October 2009, Pizarro

25  was on emails concerning Chocolate prototypes, relaying engineering updates including such
    information as:  "we are building the 100mm balloons over as we speak." (PX 89.)  Despite the

26  obvious connection, Pizarro maintained that only "possibly" did such reference refer to Chocolate.
    (Trial Tr. at 1071:23-25.)  Similar attempts to equivocate and evade continued throughout her

27  testimony, compromising fatally any shred of credibility.

28

CEO, was on emails contributing to the discussion. TriReme's HR and Marketing Manager

provided critical support to Konstantino's efforts by applying for funding for a grant from the

Singaporean government.

Second, the Court finds that based on the evidence of record, TriReme employees and

management knew that Konstantino was on AngioScore's board while such work was undertaken.

The conclusion is all but inescapable that they knew Konstantino's work on Chocolate constituted

a violation of his fiduciary duties as a board member. Throughout the later part of 2009 and early

into 2010, TriReme employees, as well as Konstantino, knew well – indeed, *intended* – that

Chocolate would compete with AngioScore, and that Konstantino remained on AngioScore's

board of directors. As TriReme's CEO, Konstantino knew he owed AngioScore fiduciary duties

solely by virtue of his board seat. (PX 101 (February 2009 letter Konstantino signed confirming

that he remained bound by fiduciary duties as a director).) Pizarro, a former AngioScore engineer,

knew AngioScore's line of business and knew that Konstantino was serving on AngioScore's

board of directors while Chocolate work was done at TriReme. (Trial Tr. at 1028:17-23; 1093:25-

1094:3.) Feld knew not only that Konstantino remained on AngioScore's board of directors and

remained subject to fiduciary duties, and that Chocolate competed with AngioSculpt, but also that

Konstantino had previously obtained a waiver from AngioScore for purposes of working on

bifurcated stents with TriReme. Ong, TriReme's HR Manager, also knew that Konstantino

remained on AngioScore's board while she helped him obtain financing for a product directly

competitive with AngioScore's products.

### 2. *Quattro/Proteus knowingly provided substantial assistance.*

The Court finds that during the development of Chocolate, Quattro existed as "Proteus," an

unincorporated association. In March of 2010, "Proteus" incorporated under the name Quattro.

For the reasons set forth below, the Court finds that Quattro/Proteus is liable for aiding and

abetting Konstantino's breach.

First, Proteus was an "unincorporated association" that predated Quattro and was capable

of being sued. Under California law, an "unincorporated association" is defined in California

Corporations Code section 18035. Subsection (a) of that provision provides that an

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "Unincorporated association" is an unincorporated group of two or more persons joined by mutual

2    consent for a common lawful purpose, whether organized for profit or not.  Cal. Corp. Code §

3    18035 (West).

4         Although case law on this provision generally concerns entities like churches, political

5    parties, professional or trade associations, social clubs, and homeowners associations, the doctrine

6    and the breadth of what qualifies as an "unincorporated association" was explained in *Barr v.*

7    *United States Methodist Church*, 90 Cal. App. 3d 259 (1979).  There, the court of appeals

8    explained that the trend in the state and nation was to "assure legal status where in fairness it is

9    appropriate" and included in such consideration the dictates of fairness where "persons dealing

10   with the association contend their legal rights have been violated."  *Barr*, 90 Cal. App. 3d at 266-

11   67.  An unincorporated association need not have the formalities of quasi-corporate organization.

12   "Courts have even assessed liability against a church association with no officers where there were

13   only nine persons whose sole business transaction (aside from small purchases of printed religious

14   material) was the purchase, by down payment, of a station wagon."  *Id.* at 267 (citation omitted).

15   Likewise, criminal street gangs have been found to qualify as "unincorporated associations"

16   capable of being sued.  *People ex rel. Totten v. Colonia Chiques*, 156 Cal. App. 4th 31, 41

17   (2007).[12]

18        Proteus easily satisfies the criteria under Section 18035.  During the development of

19   Chocolate, Proteus was held out as if a corporation.  It consisted of at least three members, James

20   Dreher, Konstantino, and Feld, and was formed for the lawful purpose of raising money and

21

22   ─────────────────

23        [12]  In *Totten*, a criminal street gang was found to be an unincorporated association capable
     of being sued for injunctive relief.  The court noted that "[s]tatutes must be given a reasonable and
24   common sense construction in accordance with the apparent purpose and intention of the
     lawmakers—one that is practical rather than technical and that will lead to a wise policy rather
25   than mischief or absurdity."  *Id.* (citation omitted).  Upon review of the purpose of California
     Corporations Code 18035, and in view of legislative history, the court of appeal found that "it
26   would border on absurdity to conclude that, by the 2004 addition of Corporations Code section
     18035, subdivision (a) [which included the element of "lawful purpose" in the definition of an
27   unincorporated association], the Legislature intended to shield criminal street gangs from liability
     and injunctive relief by rendering them immune from civil suits.  *Totten*, 156 Cal. App. 4th at 41.

28

39

**A000103**

United States District Court
Northern District of California

1   investor interest in the Chocolate technology.  Investors were informed that "Proteus" was the

2   entity developing Chocolate and seeking funds therefor, and Konstantino represented himself as

3   Chairman of the entity.  As Proteus's chairman, Konstantino signed a contract to raise funds for

4   Chocolate's development.  Fairness would dictate that investors who gave money to Proteus

5   would have been able to seek recourse against Proteus.  *Barr*, 90 Cal. App. 3d at 266-67.

6   Konstantino held himself out as a Chairman of Proteus, signed contracts as such, sought money

7   from individuals under the guise of this entity, and later, to investors, characterized Proteus's

8   transition to "Quattro" as merely a name change.  Not only did Konstantino himself understand

9   that Quattro was "previously Proteus," but by characterizing the transition from Proteus to Quattro

10  as a simple change in name, he was able to retain for Quattro the benefits Proteus had obtained.

11  Indeed, the lack of distinction between Quattro and Proteus is so complete that on the basis that

12  the difference between these entities was merely one of nomenclature, contracts signed between

13  "Proteus" and third parties were amended to substitute the name "Quattro Vascular Pte Ltd" for

14  "Proteus Vascular Systems Pte Ltd."  (PX 7.)  The unfairness of immunizing Quattro is amplified

15  here, where defendants now offer a hypertechnical argument that because Quattro did not formally

16  exist as an incorporated entity at the time of Konstantino's breach, it cannot be liable for acts it

17  undertook when it was known as Proteus.[13]  It is not lost on the Court that almost exactly one

18  month after Konstantino resigned from AngioScore's board, the name change occurred and

19  Quattro officially incorporated, with the agreement of Dreher, Konstantino, and Feld.  Thereafter,

20  Quattro continued in Proteus's efforts.  Defendants cannot hide posthumously behind the name

21  change.

22          Proteus/Quattro was inextricably involved in, and had actual knowledge of, Konstantino's

23  breach.  Indeed, it was formed with the specific purpose of furthering that breach.  Konstantino, as

24

25          [13] Even the term "Proteus" carries a meaning that pointedly undermines defendants'

26  position.  Proteus was a Greek sea god capable of assuming different forms.  MERRIAM-WEBSTER,
    New Collegiate Dictionary (9th ed. 1988).  An entity presenting "protean" qualities has the

27  "ability to assume different forms."  *Id.*  The Court finds that Proteus lived up to its name by later
    assuming the name "Quattro" while retaining its original essence.

28

40

United States District Court
Northern District of California

Proteus's Chairman and Quattro's Director, formed the organization for purposes of raising funds for Chocolate, which included seeking funding from the Singaporean government, and later, used Quattro as the corporate entity to hold intellectual property rights in Chocolate. Dreher implemented a business strategy for seeking early investors and funds. On this basis, the Court finds that Proteus, as an unincorporated association, knowingly aided and abetted Konstantino's breach of fiduciary duty. In March of 2010, when Proteus incorporated as Quattro, it maintained its debts and liabilities. *See Sec.-First Nat. Bank of L.A. v. Cooper*, 145 P.2d 722, 731 (Cal. Ct. App. 1944).

### IV. QT Vascular is liable as a successor in interest to the liabilities of Quattro and TriReme.

The decision whether to impose successor liability involves broad equitable considerations. *See Ray v. Alad Corp.*, 19 Cal.3d 22, 34 (Cal. 1977); *see also Rosales v. Thermex–Thermatron, Inc.,* 67 Cal. App. 4th 187, 196 (Cal. Ct. App. 1998). Each case of successor liability must be assessed on its own unique set of facts. *See CenterPoint Energy, Inc. v. Super. Ct.*, 157 Cal. App. 4th 1101, 1122 (Cal. Ct. App. 2007). Under California law, a corporation that purchases the assets of another does not assume the liabilities of the selling corporation unless: "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray*, 19 Cal.3d at 28.

As a preliminary matter, successor liability under California law requires an asset transfer, not merely the purchase of stock. *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05 0553 MHP, 2007 WL 2462142, at *6 (N.D. Cal. Aug. 29, 2007); *Potlatch Corp. v. Superior Court,* 154 Cal. App. 3d 1144, 1150-51 (Cal. Ct. App. 1984). The evidence on this point is admittedly limited. However, in view of the evidentiary record, including its observation of the critical witness on this issue, the Court finds that an asset transfer occurred. This conclusion is based on testimony from defendants' 30(b)6 corporate designee, Momi Brosh, QT Vascular's Vice President of Business Operations. Brosh was designated by defendants to testify on the relationship between QT

41

1    Vascular, Quattro, and TriReme.  He testified that QT Vascular assumed both the assets and

2    liabilities.  (*See* Brosh Dep. at 277:19-281:15[14].)  Specifically, Brosh testified that the shareholders

3    of Quattro and TriReme agreed to form QT Vascular.  In exchange, the shareholders would

4    receive shares of QT Vascular stock, and QT Vascular would receive "100% of all existing stock,

5    shares, assets, and liabilities in each of Quattro, [and] TriReme."  (*Id*.)

6         Persons designated as corporate representatives "[shall] testify as to matters known or

7    reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  A Rule 30(b)(6) deposition

8    notice serves a unique function: it is the sworn corporate admission that is binding on the

9    corporation.  *Hardin v. Wal-Mart Stores, Inc.*, No. 08-CV-0617 AWI BAM, 2011 WL 11563217,

10   at *2 (E.D. Cal. Dec. 2, 2011) (citing *Gales v. Winco Foods*, 2011 WL 3794887 (N.D. Cal. 2011)

11   ("As a 30(b)(6) witness, her testimony is a sworn corporate admission binding on the

12   corporation.").  If the notice of deposition or subpoena served on the entity sufficiently describes

13   the matters on which questions will be asked, the entity is under a duty to designate and produce

14   "one or more officers, directors, or managing agents, or designate other persons who consent to

15   testify on its behalf . . . ."  Rule 30(b)(6); *Mitchell Eng'g v. City & Cnty. of S.F.*, 2010 WL

16   455290, at *1 (N.D. Cal. Feb. 2, 2010) ("A 30(b)(6) witness testifies as a representative of the

17   entity, his answers bind the entity and he is responsible for providing all the relevant information

18   known or reasonably available to the entity.") (quotation marks and citation omitted); *Great Am.*

19   *Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 541 (D. Nev. 2008).  Still, other courts

20   hold that "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other

21   deposition testimony, can be contradicted and used for impeachment purposes[,]" and that such

22   testimony does not "bind" the designating entity "in the sense of [a] judicial admission."  *A.I.*

23   *Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001).  The Ninth Circuit has not yet

24

25

United States District Court
Northern District of California

26       [14] Designated portions of Brosh's two-day video deposition testimony were played during
27   trial (*see* Trial Tr. at 970) and the designated transcript for that testimony appears at the end of
     Day Five of the trial transcript.  (*See* Dkt. No. 637 (Trial Transcript Volume Five) at 205.)
28   Citations to Brosh's deposition include only designated portions played during trial.

A000106

1   decided the issue. *Coalition for a Sustainable Delta v. McCamman*, 725 F. Supp. 2d 1162, 1172

2   (E.D. Cal. 2010).

3        In the absence of specific direction from the Ninth Circuit, the Court joins those courts

4   who have adopted a middle ground and holds that defendants cannot rebut the testimony of their

5   Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony,

6   and defendants have provided no adequate explanation for the rebuttal offered at trial. *See MKB*

7   *Constructors v. Am. Zurich Ins. Co.*, 49 F. Supp. 3d 814, 829 n.11 (W.D. Wash. 2014); *Hyde v.*

8   *Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000), *aff'd* 31 Fed. App'x. 151 (5th Cir. 2001)

9   (per curiam) (unpublished); *State Farm Mut. Auto. Ins. Co. v. New Horizont*, 250 F.R.D. 203 (E.D.

10  Pa. 2008) ("The better rule is that the testimony of a Rule 30(b)(6) representative, although

11  admissible against the party that designates the representative, is not a judicial admission

12  absolutely binding on that party," but the party still may not "retract prior testimony with

13  impunity" and courts can disregard inconsistent testimony when the movant has relied on it); *Tex.*

14  *Technical Inst. v. Silicon Valley, Inc.*, No. H–04–3349, 2006 WL 237027, at *5 (S.D. Tex. Jan. 31,

15  2006) (affidavit did not create an issue of material fact because it conflicted without explanation

16  with Rule 30(b)(6) testimony).

17       With this in mind, the Court expounds on the basis for its finding.  Brosh testified that he

18  prepared for the deposition.  He went over materials, spoke with the defendants' financial team,

19  and with the research and development engineers.  (Brosh Dep. at 33:11-19.)  He provided specific

20  names of individuals with whom he spoke.  (Brosh Dep. at 34:06-35:24; 36:09-14.)  He estimated

21  that he spent approximately twenty hours preparing for the deposition, and that he met with

22  counsel in preparation.  (Brosh Dep. at 34:06-35:24; 62:08-19; 62:23-63:05.)  He also spent time

23  preparing on his own, including reading the QT Vascular IPO documents.  (Brosh Dep. at 72:18-

24  73:06.)  Because Mr. Brosh is not a native English speaker, a translator was present for his

25  deposition, as was his English-speaking counsel, and he was free to ask for translation assistance

26  during the deposition.  (*See* Brosh Dep. at 59:09-12.)

27       In addition, the pattern of questioning by AngioScore's counsel during the critical

28  moments of Brosh's deposition permitted both sufficient review of the relevant documents, and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    was sufficiently clear to provide Brosh an opportunity to understand what was being asked and

2    answer accordingly.  Each question was constructed in the following format:  counsel identified a

3    document and presented it to Brosh.  She then read a brief sentence or phrase from the document

4    supporting a conclusion that certain factual events occurred.  She would then ask if the relevant

5    sentence or phrase accurately set forth what actually happened.  (*See* Brosh Dep. at 272:07-10;

6    273:19-21: 273:24-274:04; 277:19-277:22; 280:03-11; 281:02-15.)  She did this no fewer than

7    four times.  Brosh agreed every time.  (*See id.*)

8         To the extent Brosh's answers were inaccurate or erroneous, he was free to submit errata

9    following the transmittal of his deposition transcript.  He elected to do so.  Indeed, Brosh

10   submitted fairly extensive errata, in two parts, wherein he amended his answers for purposes of

11   accuracy *fifty-five* times.  (Dkt. Nos. 593-7, 593-8.)  Tellingly, Brosh did not seek to amend or

12   correct the answers given with respect to QT Vascular's acquisition of assets from TriReme and

13   Quattro.  To the extent defendants believed that his testimony remained in some way deficient,

14   they were free to offer another person for deposition as to these issues.  They did not do so.

15        Moreover, Brosh's testimony that an asset transfer and liability assumption took place was

16   corroborated by contemporaneous documents reflecting that QT Vascular would be the product of

17   a merger between TriReme and Quattro.  (PX 32; PX 43.)  It is therefore not wholly controverted

18   by the evidence of record.  At trial, defendants offered public statements of the corporate group

19   (comprising QT Vascular, TriReme US, TriReme Singapore, and Quattro), such as their initial

20   public offering documents and their 2013 annual report, to controvert Brosh's statements.  Those

21   documents purport to demonstrate that by virtue of an arms'-length corporate reorganization, QT

22   Vascular acquired all stock in Quattro and TriReme, with only certain liabilities.  In exchange

23   therefor, the shareholders in each of TriReme and Quattro received shares of QT Vascular's stock.

24   The Court is not convinced that these representations, standing alone, overcome the weight of

25   evidence to the contrary –  Brosh's testimony, the manner in which the defendants' key players,

26   including Konstantino, Brosh, Haig, Pizarro, and Feld, conducted business affairs, and the fact that

27   the bulk of the management of these three defendant companies is entrusted to the same people.

28   Although some of these individuals simultaneously occupy different roles in the various defendant

1   corporations, these roles do not appear to be distinct.  It also cannot be overlooked that Brosh, an

2   insider himself, reviewed the IPO document in preparation for his testimony and nonetheless

3   testified that QT Vascular acquired all assets and liabilities of TriReme and Quattro.

4        Based on the foregoing, the Court finds Brosh's answers to the questions most relevant to

5   whether QT Vascular assumed all of TriReme's and Quattro's assets and liabilities and that given

6   the sufficiency of their reliability, AngioScore appropriately relied upon his answers.  To the

7   extent that defendants seek to rely on contradictory testimony provided by Randall Farwell, QT

8   Vascular's CFO, who was never deposed, and was first disclosed as a witness on the eve of trial,

9   long after discovery had closed, they cannot do so.  Rule 30(b)(6) is a powerful and necessary

10  discovery tool, and AngioScore was entitled to rely upon Brosh's representations in developing its

11  case.  To the extent Brosh's testimony on this subject was inaccurate, there were multiple ways for

12  defendants to correct or clarify the evidentiary record and they have failed to provide any adequate

13  reason for why they did not do so, or why Brosh's testimony should be rebutted.  Their failure to

14  do so cannot be the basis for permitting an eleventh-hour witness to offer defendants' preferred

15  version of events.  To hold otherwise would be to permit a trial by ambush, which the federal

16  discovery rules are designed to avoid.

17       Having found that underlying the formation of QT Vascular was a transfer of assets and

18  liabilities from TriReme and Quattro, the Court now turns to whether QT Vascular is a successor

19  in interest to the liabilities of Quattro and TriReme.  Again, a corporation acquiring the assets of

20  another corporation will be found to have succeeded in interest to the acquired corporation's

21  liabilities if any one of the following applies: "(1) there is an express or implied agreement of

22  assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3)

23  the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the

24  purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray*, 19 Cal.3d

25  at 28.

26       AngioScore argues that the first and second of the above theories apply here.  As to the

27  first – express or implied agreement to assume liabilities – as explained above, the Court finds that

28

United States District Court
Northern District of California

45

1    QT Vascular assumed the liabilities of Quattro and TriReme.  Accordingly, imposing successor

2    liability is proper.

3        As to the second –  whether the transaction amounted to a de facto merger – the Court also

4    finds that evidence supports a finding that this occurred.  The *de facto* merger doctrine applies

5    under California law when "one corporation takes all of another's assets without providing any

6    consideration that could be made available to meet claims of the other's creditors" or when "the

7    consideration consists wholly of shares of the purchaser's stock which are promptly distributed to

8    the seller's shareholders in conjunction with the seller's liquidation."  *Ray*, 136 Cal. Rptr. at 578.

9    To determine whether a transaction "cast in the form of an asset sale actually achieves the same

10    practical result" as a merger, the Court considers the following factors: "(1) was the consideration

11    paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the

12    same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the

13    purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to

14    carry on the business of the seller?"  *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 846 (9th Cir. 1992)

15    (citing *Marks v. Minn. Mining and Mfg. Co.*, 187 Cal. App. 3d 1429, 1436 (Ct. Ct. App. 1986)).

16        Here, QT Vascular assumed the assets and liabilities of Quattro and TriReme, and in

17    consideration, gave QT Vascular stock to the former shareholders of Quattro and TriReme.  The

18    purchasing company, QT Vascular, continued in the enterprise of Quattro and TriReme after its

19    formation:  manufacturing and selling the Chocolate device.  The shareholders of Quattro and

20    TriReme became shareholders of QT Vascular, and QT Vascular assumed the liabilities of each.

21    It cannot be said that under these facts, the transaction resulting in QT Vascular did not achieve

22    the same practical result as a merger.  *See Marks*, 187 Cal. App. 3d at 1437-38 (finding a

23    "reorganization" between a parent and a subsidiary constituted a de facto merger).

24        For these reasons, the Court finds that QT Vascular is the successor in interest to the

25    liabilities of Quattro and TriReme.

26

27

28

**V.    By usurping a corporate opportunity, defendants violated California's Unfair Competition Law.**

Under California Business and Professional Code section 17200, *et seq.*, "any unlawful, unfair or fraudulent business act or practice" is prohibited.  Cal. Bus. & Prof. Code § 17200 (West).  "Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent . . . ."  *Aleksick v. 7–Eleven, Inc.*, 205 Cal. App. 4th 1176, 1184 (Cal. Ct. App. 2012).  AngioScore argues that one of these three bases apply here:  that defendants' acts constitute "unlawful" predicate acts to establish liability under California's Unfair Competition Law ("UCL").[15]

A "violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong."  *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 610 (Cal. Ct. App. 2014) (citing *Berryman v. Merit Prop. Mgmt., Inc.*,152 Cal. App. 4th 1544, 1554 (Cal. Ct. App. 2007)).  "By proscribing any unlawful' business practice, [S]ection 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. Virtually any law—federal, state or local—can serve as a predicate for a [UCL] action."  *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 553 (2013) (quotations omitted); *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 195 (Kennard, J., concurring and dissenting)  (explaining that in 1963, the state legislature added "unlawful" business practices to the list of proscribed conduct and thereby "expanded the definition of unfair competition with respect to conduct violating statutory prohibitions, for now any business practice that violated an independent statutory duty was an instance of unfair competition that could be enjoined even if the underlying statute did not specifically authorize injunctive relief") (citation omitted).  Common law violations may suffice as predicate acts under the UCL.  *Yanting Zhang v. Superior Court*, 57 Cal. 4th 364, 380 (Cal. 2013).  Under the statute, "[p]revailing plaintiffs are

---

[15]   Although in prior briefing, AngioScore argued that defendants' actions qualify as "unfair" predicate acts for purposes of establishing UCL liability, the Court understands that AngioScore has essentially withdrawn that argument.  (Dkt. No. 658 ("AngioScore does not request that the Court find that Defendants' conduct also constitutes "unfair" acts and practices under the UCL.")).

47

**A000111**

1   generally limited to injunctive relief and restitution." *Korea Supply Co. v. Lockheed Martin*

2   *Corp.*, 29 Cal.4th 1134, 1144 (Cal. 2003) (quoting *Cel-Tech Commc'ns, Inc.*, 20 Cal.4th at 179).

3   Accordingly, the Court addresses the issue below.

4          AngioScore seeks the extraordinary remedy of injunctive relief and asks that the Court

5   permanently enjoin defendants from continuing to sell Chocolate.  In evaluating this request, the

6   Court has considered whether AngioScore has met its burden to establish that: (1) it has suffered

7   an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to

8   compensate for that injury; (3) considering the balance of hardships between the plaintiff and

9   defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a

10  permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).  Having

11  considered these factors, the Court declines to award AngioScore's requested injunction.

12         The Court possesses broad discretion in imposing equitable remedies upon finding a

13  violation of the UCL.  *Yanting Zhang*, 57 Cal. 4th at 371 (citations omitted).  Even when an unfair

14  business practice has been shown, the UCL does not require the imposition of equitable relief.  *See*

15  *Cortez v. Purolator Air Filtration Prods. Co.,* 23 Cal.4th 163, 180 (Cal. 2000) ("The court's

16  discretion is very broad. Section 17203 does not mandate restitutionary or injunctive relief when

17  an unfair business practice has been shown.").  Here, the Court is satisfied that the remedies set

18  forth below fully and fairly compensate AngioScore for its past and future harms, and adequately

19  addresses defendants' wrongdoing.  AngioScore has conceded that the existence of such relief

20  obviates the need for an injunction.  (Dkt. No. 658 at 5.)  *See E.B.C. Trust Corp. v. JB Oxford*

21  *Holdings, Inc.*, 2005 WL 6214851, at *5 (C.D. Cal. Aug. 26, 2005) (injunctive relief "requires a

22  showing that other adequate relief is not available" and where "the plaintiff pursues other remedies

23  in addition to seeking relief under [UCL] the court may conclude that those other remedies obviate

24  the need for injunctive relief.") (citations omitted).  Furthermore, as discussed more below, an

25  injunction is directly contrary to the public interest.  Accordingly, the Court declines to award

26  AngioScore its requested injunction.

27

28

United States District Court
Northern District of California

48

**A000112**

<div style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

**REMEDY**

### I.    Legal Framework

The law abhors one who betrays his or her fiduciary duty.  Thus, "[i]f an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit."  *Guth*, 5 A.2d at 510.  The bounds of this rule are considerable, for it rests upon the "broader foundation of a wise public policy that, for the purpose of ***removing all temptation***, ***extinguishes all possibility*** of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty."  *Id.* at 270 (emphasis supplied).  Where a plaintiff has proved that its interests have been subverted by a disloyal fiduciary, "the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired."  *Id.* at 273.

While it is true that damages flowing from a breach of fiduciary duty are to be liberally calculated, *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996) (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)), the Delaware Supreme Court has held that where certain claimed damages were not proximately caused by the breach, those damages were not recoverable.  *Id*.  Thus, causation remains a consideration for damages even in the context of fiduciary duty breaches.  *Thorpe*, 676 A.2d at 444;  *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 907 (Del. Ch. 1999) (noting lack of causal relationship; finding authority to award damages where the breach of duty caused economic harm to a corporation) (citing *Thorpe*, 676 A.2d at 445).  So, too, does causation remain at issue in the case of aiding and abetting the commission of a tort.  *See Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 352 (1966) ("It is clear from the evidence . . . that Bender was aware of or ratified Glen's breach of his fiduciary duties in all but a few respects, that he cooperated with Glen in the breach, and that he received the benefits of Glen's infidelity . . . . Under all the circumstances, Bender and

49

**A000113**

1    Bender Co. must be held liable for their part in Glen's breach of his fiduciary duties.  They

2    encouraged the sowing and reaped the benefit.  They cannot now disclaim the burden.").

3    **II.    Defense of Causation**

4          Defendants have argued throughout this case that AngioScore has failed to prove that

5    defendants' behavior caused harm to AngioScore either because (i) the devices do not compete, or

6    (ii) Feld had an independent right to develop Chocolate.  The Court is unpersuaded.

7          First, Chocolate and AngioSculpt compete.  More than sufficient evidence exists in the

8    record to support a finding that Chocolate's presence in the market has harmed AngioScore.  The

9    Court explains:

10          In the angioplasty balloon market, there are two basic categories of products.  First are the

11    plain old balloon catheters, or POBAs, which come in three basic forms:  compliant, semi-

12    compliant, and non-compliant.  Within that field, POBAs come in different types (small, large,

13    standard, and high-pressure).  (PX 294 at 251.)  POBAs are priced between approximately $150 to

14    $200  per unit.  (Trial Tr. at 412:7-9 (Viano direct).)  Specialty balloons comprise a sub-market

15    within the broader angioplasty balloon market, and are priced as high as $1000, depending on

16    length.  (*See id*.)  Within that sub-market, there are relatively few players.  (*Id*. at 249.)  As of

17    2013, the specialty balloon catheter market was primarily occupied by four companies:  Boston

18    Scientific, C.R. Bard, Abbott Laboratories, and AngioScore.  The market share at that time reflects

19    that AngioScore was in close competition with Boston Scientific's flagship product, the Cutting

20    Balloon:  AngioScore occupied 48.1% of the specialty balloon market and Boston Scientific

21    occupied 47.1%.  C.R. Bard held only 3.3% of the market with its specialty balloon, the

22    Vascutrak.  Abbott Laboratories held only 1.3%.  (PX 294 at 249.)

23          The similarities between Chocolate and AngioSculpt from a competitive viewpoint are

24    overwhelming.  Both are specialty balloons.  Both contain balloons made with nylon elements.

25    Both have a nitinol cage surrounding the balloon.  Neither device leaves anything behind in a

26    vessel after it has inflated; no stent remains, for example.  The purposes for the devices are the

27    same: to open occluded blood vessels and enable more blood flow.  The devices share the same

28    target customers, both of which are specialized: interventional cardiologists and vascular surgeons.

United States District Court
Northern District of California

50

**A000114**

1    (Trial Tr. at 407:20-408:3 (Viano).)   The fact that the two products do not use identical

2    mechanisms of action does not mean that they do not compete.

3          The obviousness of the competitive relationship between the devices becomes undeniable

4    upon a review of defendants' own pre-litigation communications regarding their goals for

5    Chocolate, then being developed and marketed.  Konstantino himself made multiple written

6    references that touted the competitive benefits of the Chocolate compared to the AngioSculpt.

7    (*See* PX 66 (November 2009 Chocolate presentation referencing that Chocolate would "reduce

8    dissections"; dissections would occur with a scoring balloon, *i.e.*, AngioSculpt); PX 124 (January

9    2010 email from Konstantino forwarding information memorandum outlining benefits of

10   Chocolate as Proteus's proprietary device; identifying AngioScore as one of "only a couple

11   companies" marketing specialty balloon products); PX 132 (October 2011 email from Vardit

12   Benjamin to Konstantino and Haig attaching "TriReme's Competitor Analysis" spreadsheet;

13   identifying the AngioSculpt as competitor); PX 127 (February 2011 email Konstantino forwarded

14   his wife for purposes of his patent application background discussion, identifying AngioSculpt as

15   an "alternative tool" to Chocolate).)  Chris Haig further confirmed the market similarities between

16   Chocolate and AngioSculpt.  As Chocolate was being developed, TriReme faced the question of

17   where to price its new specialty balloon catheter device.  In October 2011, an email from Steve

18   Dreaden entitled "AngioScore Competitive Information" relayed "competitive field intel on

19   AngioScore" in terms of their pricing.  (PX 130.)  The email itself and responses make clear that

20   TriReme priced Chocolate just $25 under AngioScore's prices. (*See also* PX 135.)

21          Thus, for every size Chocolate was available, it was priced at exactly $25 below its

22   AngioScore counterpart.  Notably, Haig admitted that pricing for the Chocolate was keyed off

23   AngioSculpt, as opposed to Vascutrak, because AngioSculpt was "on the higher side" of the

24   pricing spectrum and had higher clinical value.  However, at that time they were first pricing

25   Chocolate, TriReme *lacked* clinical data on the value of Chocolate, further evidencing that

26   defendants believed AngioSculpt was the "closest competitor" to Chocolate.  (PX 143.)

27   Konstantino himself approved the pricing.

28

United States District Court
Northern District of California

51

**A000115**

1    Ample other evidence of record reveals that TriReme considered Chocolate competitive

2    with AngioSculpt.  On December 30, 2011, following Chocolate's 510K approval, for example,

3    Haig forwarded a powerpoint deck to Konstantino extolling the virtues of Chocolate.  (PX 137.)

4    Included was a slide entitled "Chocolate – pricing strategy" that stated that Chocolate was "price

5    competitive to other "specialty" catheters to drive rapid adoption" and noted specifically that

6    AngioSculpt was priced at $852.  (*Id.*)  Sales discussions at TriReme focused substantially on

7    distinguishing Chocolate from AngioSculpt in order to gain market share over the other

8    competitive specialty balloons.  To that end, in December 2012, high level discussions occurred at

9    TriReme concerning such things as how to describe Chocolate's relative advantages compared to

10    the AngioScore and Vascutrak when communicating with potential customers.  (PX 142.)

11    Although the devices are different in some ways, "all of these balloons fall under the "specialty

12    balloon" category."  (*Id.*)  The differences are finely tuned.  In defendants' parlance, AngioScore

13    was described as a "focal force" balloon; Chocolate was described as a "distributed force" balloon.

14    Defendants maintain that Chocolate is "the opposite of a scoring balloon" because when inflated,

15    the balloon itself protrudes through the nitinol cage, forming crowns or pillows that impress upon

16    the plaque.  This, they claim, contrasts with the AngioSculpt, which is designed such that the

17    nitinol element itself presses into the plaque.  Again, the Court finds that these differences do not

18    do not demonstrate lack of competition.  TriReme acknowledged as much when it was marketing

19    Chocolate.  The differences, to the extent the parties' documents acknowledge them, were focused

20    on helping each side market its own product *as against* the other side's product – indeed, the

21    Court finds that such documents, on the whole, reaffirm that the devices were competing with one

22    another, *not* that they were so different that they did not compete.

23    Defendants' succeeded in their attempt to compete with the AngioSculpt.  Frank Viano,

24    Eastern Area of VP of Sales for Spectranetics (which acquired AngioScore), testified on the

25    competitive relationship between Chocolate and AngioSculpt.  With over 20 years of experience

26    in the area of selling cardiovascular angioplasty devices, including experience working with

27    AngioScore's other competitors such as Boston Scientific, Viano attested that he has personally

28    seen sales of AngioScore products affected by the advent of Chocolate.  According to Viano,

52

United States District Court
Northern District of California

1  Chocolate is the closest competitor to AngioSculpt in the field of specialty balloons.  Viano also

2  confirmed that POBAs and stents are not competitors with AngioSculpt.

3      Loss of AngioSculpt sales have been directly attributed to Chocolate.  (Trial Tr. at 444:20-

4  445:21 (Viano, discussing losing five to ten units a month to Chocolate, including its sales to Dr.

5  Garcia, defendants' industry expert).)  Viano testified that he has been asked to reduce prices for

6  AngioSculpt approximately twenty-five to thirty times.  Corroborating that testimony, in March

7  2013, for example, Viano was asked via email by a sales and service representative in Maryland

8  and Rhode Island to reduce the AngioSculpt price because Chocolate had been offered at a lower

9  price.  (PX 152.)  He estimated that requests to reduce prices for AngioSculpt sales have occurred

10  at approximately ten to fifteen percent of the 200 or 250 hospitals falling under his jurisdiction.  In

11  response to the competition from Chocolate, Viano explained that he has directed his sales

12  representatives to provide more sales focus time on the AngioSculpt, to "sell our features, clinical

13  success, and track record to the hospitals in a much more robust fashion."  (Trial Tr. at 418:18-

14  419:5 (attesting to diversion of resources at AngioScore due to counter market threats by

15  Chocolate and including lowering prices for AngioSculpt).)

16      Defendants place much reliance on the fact that AngioScore initially disclaimed any

17  similarity between the devices when Chocolate was first released.  The Court finds such

18  arguments unpersuasive.  Initial reactions to Chocolate on behalf of AngioScore's marketing team

19  expressing skepticism that Chocolate could compete with AngioSculpt,[16] are not dispositive of the

20  question of whether, in fact, these devices compete.  As explained above, the fact that the devices

21  are different in design does not undermine their competitiveness with one another.  Based on

22  similar reasoning, the fact that in June 2014, Viano created a chart outlining the advantages of

23  AngioSculpt as compared to Chocolate for distribution to the AngioSculpt sales team does not

24  support a finding that the devices are not competing with one another.  If anything, it affirms it.

25

26      [16] Notwithstanding these assessments, which the Court finds reflected an optimistic
viewpoint designed to motivate AngioScore's sales force, Viano confirmed that even at the
27  beginning he viewed Chocolate as a "competitive threat" to the AngioSculpt and instructed his
sales team to "knock it down right away."  (DX 1581.)
28

53

**A000117**

1    (DX 1770.)  Viano testified that he and a colleague created the chart in response to TriReme's

2    recent acquisition of a 510(k) clearance for their Chocolate PTCA Balloon.  At that point, they

3    understood that the Chocolate device was an "immediate competitive threat."  Accordingly, the

4    chart was designed to identify all the ways in which AngioScore's device was superior.

5         Defendants' criticism that AngioScore's submission of sales documents do not

6    demonstrate a direct corroboration or one-to-one link between decrease in sales, and, in particular,

7    Chocolate as the source of the loss, is not dispositive.  The proffered evidence more than meets the

8    legal standard.  Leaving aside the weight of evidence confirming that AngioScore was forced to

9    lower its prices on its products due to pressure from Chocolate, and that defendants themselves

10   claimed that clinicians were replacing AngioScore devices with Chocolate (PX 164), defendants

11   argue that Chocolate did not impede AngioScore's market share because the two devices are

12   "complementary."  The only practitioner evidence directly supporting this notion is testimony

13   from Dr. Garcia, defendants' industry expert.  Defendants place more weight on this testimony

14   than it can bear.  Dr. Garcia, whose testimony is of marginal weight given his pre-existing

15   relationship with the defendants, testified that Chocolate and AngioSculpt are complementary, and

16   stated that Chocolate and AngioSculpt can be used "in concert, in the same patient."  (Trial Tr. at

17   911:16-25.)  But Dr. Garcia himself could not recall ever having used a Chocolate and

18   AngioSculpt in this manner.  Nor could he recall any medical studies recommending such

19   complementary usage.  Furthermore, he admitted that defendants' promotional materials did not

20   tout Chocolate as "complementary" to another product.  (Trial Tr. at 932:4-933:3.)  Indeed,

21   defendants' goal was to have physicians replace their use of AngioSculpt with Chocolate, and gain

22   market share.  (PX 164 (noting that clinicians are replacing the use of Scoring/Cutting

23   (AngioScore) devices with Chocolate).)

24        Defendants' second argument is that due to Feld's independent right to assign his interest

25   in Chocolate, defendants enjoyed an independent right to develop Chocolate.  Thus, they reason

26   that AngioScore cannot demonstrate that their actions caused AngioScore's harm, and that

27   AngioScore cannot establish that had the opportunity been offered by Konstantino, it would have

28

United States District Court
Northern District of California

1    been able to acquire an exclusive right to Chocolate.  The Court rejects this conclusion as contrary

2    to the facts of record and reasonable inferences therefrom.

3         Defendants' position hinges on the notion that Feld would never have assigned his rights to

4    AngioScore under any circumstances.  The Court finds this argument implausible.  Feld testified

5    that while he was the engineering leader on the device, Konstantino was the one with the business

6    acumen.  Indeed, in deposition, Feld stated that he had no involvement with "the business side."

7    (Trial Tr. at 862:21-863:1.)  He had incomplete knowledge of who Chocolate's first investors

8    were and was not involved in determining who could be a potential partner for Chocolate.  (Trial

9    Tr. at 863:10-14.)  Konstantino was responsible for handling such things.  Based on this and other

10   of Feld's testimony, the Court finds that Feld would have assigned his interest wherever and to

11   whomever Konstantino recommended.  That Feld was subject to Konstantino's business decisions

12   and did not exert any independent control over these decisions is further evidenced by the fact that

13   despite Feld's critical role in designing the device, he was paid only $70,000 for his interest in

14   Chocolate while Konstantino was paid $250,000.  Feld's undeniable deference to Konstantino's

15   independent business decisions is further underscored by the fact that Konstantino received a

16   2.85% royalty in Chocolate where Feld received only 2.15%.  Had Konstantino offered the

17   opportunity to AngioScore, the Court is steadfastly confident that based on Feld's lack of business

18   acumen, allegiance to Konstantino, and fundamental character, he would have followed

19   Konstantino's lead.  For this reason, defendants' insistence that Feld's independent right somehow

20   undermines AngioScore's harm does not persuade.  Feld's claim he disliked AngioScore and

21   would not have wanted Chocolate to belong to AngioScore, is belied by the objective facts and

22   only raised conveniently in the context of ongoing litigation.

23        In sum, the Court finds that plaintiffs have offered sufficient evidence to establish that

24   defendants' conduct – Konstantino's breach and defendants' aiding and abetting that breach –

25   intentionally, and directly caused AngioScore harm.

26

27

28

United States District Court
Northern District of California

55

**A000119**

III.     **Remedy Awarded**

    **A.  Konstantino may retain no benefit he received as a result of his breach.**

      Under *Guth*, the remedies available in a breach of duty case are designed to "den[y] to the betrayer all benefit and profit." *Guth*, 5 A.2d at 510.  AngioScore has proved that its interests have been subverted by a disloyal fiduciary, and may now "elect to claim all of the benefits of the transaction for itself." *Id.* at 273; *see also Thorpe*, 676 A.2d at 445 ("Once disloyalty has been established, the standards . . . require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct.").

      Accordingly, Konstantino may retain no benefit of his breach.  The result, while potentially viewed as harsh, is designed to deter such conduct from occurring in the first place.  It differs from contractual remedies and does more than return AngioScore to the position that it would have been in had the breach never occurred.  It serves to deter future transgressions.  To wit, Konstantino's personal disgorgement shall include the $250,000 he received in agreeing to assign his intellectual property rights to Chocolate, as well as the 2.85% royalty on Chocolate sales.  It also includes his shares in QT Vascular stock, which total roughly 15 million, and his existing stock options.  Furthermore, Konstantino must disgorge any and all monies he collected in any sale of such stock, the monies he has received relative to his royalty share, and any monies he has made in connection with his monthly consulting retainer relative to Chocolate.

    **B.  The Court awards AngioScore its past and future lost profits as the most appropriate equitable remedy.**

      In light of the fact that the underlying claim is equitable in nature, the Court has broad discretion to address inequity.  *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del. 2002) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983) (noting "the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate"); *Int'l Telecharge, Inc. v. Bomarko, Inc*., 766 A.2d 437, 439 (Del. 2000) (noting that this Court "defer[s] substantially to the discretion of the trial court in determining the proper remedy")).  Beyond the disgorgement of benefits Konstantino personally received as a result of his breach, the Court finds it appropriate, given the totality of the circumstances, to fashion a remedy

United States District Court
Northern District of California

56

1    in order that defendants may be deterred from future breaches and to compensate AngioScore, as

2    "the beneficiary must not be harmed by such conduct." *Boyer*, 754 A.2d at 906.

3          As set forth above, AngioScore has proved that Chocolate's market presence has cost it

4    market share and resulted in lower profits; the causation element is satisfied.  But it must be noted

5    that the harms resulting from defendants' wrongdoing are difficult to quantify, especially given the

6    industry and the infancy of Chocolate.  The Court, "fortunately, has broad discretion to tailor

7    remedies to suit the situation as it exists." *Cantor Fitzgerald, L.P. v. Cantor*, No. CIV.A. 16297,

8    2001 WL 536911, at *3 (Del. Ch. May 11, 2001).  Cognizant of this framework, AngioScore has

9    presented myriad alternative remedies that it believes would work to the same equitable ends.  For

10   example, AngioScore has presented measurements of the following alternative remedies:  (i)

11   disgorgement of defendants' past profits from Chocolate;  (ii) an injunction on the sale of

12   Chocolate; (iii) awarding AngioScore its lost profits sustained to date, and a reasonable estimate

13   into the future; and (iv) awarding AngioScore the present value of Chocolate, which represents its

14   value into the future.  The Court first explains why a lost profits award is, in its estimation, the

15   most appropriate for this case, and next explains why the other proposed remedies are wanting.

16         The Court finds that AngioScore's calculated lost profits, reflective of both its harm to this

17   point and into the future, is sufficiently well-established to remedy AngioScore's harm, and

18   represents an appropriate degree of opprobrium for defendants' wrongful behavior.  Thus, the

19   Court awards AngioScore (i) its current lost profits of $2.97 million, representing the profits it

20   would have generated had business not been diverted to defendants, and (ii) its future lost profits

21   where, as here, the Court declines to issue an injunction and permits Chocolate to stay on the

22   market.  That value is $17.064 million, representing AngioScore's lost profits on future sales from

23   2014 through the second quarter of 2019.  (PX 383; Trial Tr. at 759:22-760:2.)

24         Defendants' dispute as to AngioScore's lost profits calculation centers on the definition of

25   the "market" in which AngioSculpt and Chocolate compete, and the corresponding market share

26   used to calculate AngioScore's lost sales.[17]  For reasons explained extensively above and

27

28         [17] As explained extensively above, although defendants maintain that Chocolate has not
     caused AngioScore to suffer lost profits, the Court disagrees.  The evidence demonstrates

57

United States District Court
Northern District of California

1    incorporated by reference, the Court finds the specialty balloon market to be the relevant market

2    for purposes of analysis, not the whole angioplasty balloon catheter market.  Of particular import

3    is that specialty balloons are priced significantly higher than POBAs and are designed to address

4    more complex medical problems where only four devices are employed:  AngioSculpt, Chocolate,

5    Vascutrak, and Cutting Balloon.  Defendants themselves have long recognized that Chocolate

6    would compete with AngioSculpt and priced their device accordingly.  Thus, AngioScore's lost

7    profits model, which limits the relevant market to that of specialty balloons rather than POBAs,

8    provides an accurate estimation of losses AngioScore has suffered due to Chocolate's market

9    presence.[18]  Having addressed this objection, the Court awards AngioScore $2.97 million,

10   representing its lost profits from December 2011, when Chocolate entered the market, to June

11   2014, when AngioScore filed its claim.

12         Next, AngioScore is awarded $17.064 million, which represents one measure to address

13   future harms, namely, AngioScore's calculation of its future lost profits through mid-2019.[19]  In

14   declining to award AngioScore's estimated present values for Chocolate, which total either $46 or

15   $96 million, the Court weighed and balanced myriad considerations.  The Court has endeavored to

16   remain faithful to the purposes of remedies for breach of fiduciary duty: the deprivation to the

17   wrongdoer of benefits borne of the breach, and the goal of ensuring that a plaintiff will not

18   continue to be harmed.  The Court also finds that an award must be commensurate with the

19

20   _____

21   conclusively that the devices do compete, and that defendants in fact intended that AngioScore
     would experience lower profits due to Chocolate.

22         [18] Defendants' expert, Prowse, used an iData report in his competing calculation.
23   Although in their briefing, defendants do not dispute the suitability of the Millennium Research
     Group Reports for the calculation AngioScore's relevant market share 2013 and 2014, and upon
24   which Gary Olsen, AngioScore's expert, relied in formulating his market share lost profits
     analysis, the Court notes that both parties use the Millennium Research Group reports regularly in
25   the course of their business.  Thus, the Court finds it the more reliable of the two for purposes of
     this analysis.
26
27         [19] The end date certain is defined by the useful life of the AngioSculpt product with which
     Chocolate has been shown to compete.  (Trial Tr. at 761:19-762:2.)  Notably, the time period here
28   reflects a conservative approach.  (Trial Tr. at 763:3-8.)

58

**A000122**

1   highest degree of opprobrium for defendants' wrongful conduct, cognizant that here, had

2   Konstantino resigned from AngioScore's board before Chocolate became an opportunity, this

3   dispute would not exist.  AngioScore possessed no right to be offered the Chocolate opportunity

4   absent Konstantino's board membership.  Thus, the appropriate remedy is also one that does not

5   work to the destruction of new innovative technology.  This is critical, as there is a public benefit

6   derived from healthy advancement and competition in the marketplace, particularly in the area of

7   medical devices.  Put differently, the Court finds that equity demands that any remedy be

8   sufficient to repair and deter without being gratuitously extreme.

9        With these principles in mind, AngioScore's alternative remedies are less satisfying.  For

10   example, AngioScore's first proposed remedy – an injunction barring the sale of Chocolate – is

11   not appropriate here, where the parties concede that a monetary award will serve as an adequate

12   remedy.  Moreover, the Court cannot overlook the harm such an injunction would work on the

13   public interest.  That AngioScore asks the Court to remove from the quiver of practicing

14   physicians one arrow with which they might treat a patient is brazen, particularly where they also

15   seek monetary damages, albeit as an alternative.  The Court sees limited benefits in removing from

16   the avowedly limited field of specialty balloon catheters a device that has been approved for

17   medical use in treating complex disease.  An injunction is plainly inappropriate.

18        Next, given the infancy of Chocolate, calculating an award based on defendants' past

19   profits is less satisfying.[20]  Here, AngioScore contends that profits defendants have earned to date

20   due to Chocolate total $5,038,000.  (ARB at 21.)  Unsurprisingly, defendants dispute this amount.

21   The disagreement turns on the fact that Chocolate is a new product being developed in a start-up

22   environment.

23

24        [20] In cases concerning aiding and abetting a breach of fiduciary duty, disgorgement is one
25   available remedy.  *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451,
     1481 (2014), *as modified* (May 27, 2014); *see also Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
26   No. CIV.A. 3290-VCP, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) *aff'd*, 988 A.2d 938
     (Del. 2010) (finding that where defendants aided and abetted the breach of fiduciary duty, they are
27   jointly and severally liable for the damages imposed to remedy those breaches) (citing *Gotham
28   Partners*, 817 A.2d at 173).

United States District Court
Northern District of California

1    AngioScore's calculation centers on the delta between the sales price of the device less the

2    actual cost to manufacture, less a deduction for some marginal costs.  Defendants, by contrast,

3    argue that all their research and development ("R&D") costs should be considered in determining

4    past and future lost profits.  Both positions suffer from want of certainty, and were proffered to the

5    Court without any industry context or a fulsome record,[21] as R&D costs can be treated in various

6    ways from an accounting perspective.[22]  Further, Defendants cannot dispute that the product has

7    been successful enough to generate revenues of approximately $11 million in 2014 and an

8    anticipated $20 million in 2015; and that optimism in the product is great, as evidenced by

9    defendants' ability to raise $40 million in an initial public offering and a market capitalization

10   estimated at $170 million.  On the whole, this approach is not as compelling as a remedy based on

11   AngioScore's established record of profits.

12

13   [21] For example, AngioScore contends that the only evidence the Court should consider
     with respect to defendants' costs should be the testimony of defendants' 30(b)(6) witness.  (Brosh
14   Dep. at 235:04-14.)  The position does not persuade.  Brosh was designated as a witness to answer
     questions relating to annual revenues and annual profits realized in connection with the
15   manufacture and sale of Chocolate devices in the United States and worldwide.  (Dkt. No. 593-3 at
     4, Topic 5.)  The topic, although connected conceptually to the notion of R&D costs, did not
16   expressly state that Brosh's testimony would concern the same.  Importantly, counsel's questions
     of Brosh, which form the substance of his designated testimony, did not seek to elicit testimony
17   concerning the R&D costs associated with Chocolate.  Rather, the designated portions of his
     deposition concern the costs to defendants of manufacturing each unit, the amount TriReme pays
18   Quattro for the manufactured units, and the profit margin realized upon market sale.  (See Brosh
     Dep. at 228:01-05; 228:14-17; 229:06-14.)  Thus, Brosh was not asked, nor did he testify to, costs
19   incurred as part of defendants' development of Chocolate.  AngioScore cannot reasonably be
     heard to argue that it in any way understood Brosh's designated testimony to concern such costs,
20   nor that the testimony of Randall Farwell, QT Vascular's Chief Financial Officer, as to such costs,
     should be barred.  Accordingly, the Court finds the Brosh testimony inconclusive and unhelpful in
21   the Court's endeavor to discern the most appropriate measure for assessing defendants' profits in
     this particular industry for this particular product.  See Restatement Third of Restitution § 51, com.
22   h ("Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net
     gains, results in a punitive sanction that the law of restitution normally attempts to avoid.").
23

24

25   [22] Not only are R&D costs treated differently across industries, but at times they are sunk
     costs.  Further, prior to Chocolate, defendants had never manufactured a specialty balloon.  Thus,
26   they had to invest in some amount of infrastructure in order to develop Chocolate.  It is not clear
     that such costs should not be considered sunk costs as well.  Ultimately, defendants chose not to
27   be fully forthcoming with their financial information, with the result that they cannot now hide
     behind their own lack of disclosures and claim no profit.
28

60

**A000124**

United States District Court
Northern District of California

1   Next, the Court finds both of AngioScore's present value calculations lack adequate

2   foundation.  First, AngioScore relies upon terminal value for purposes of determining Chocolate's

3   present value.  Such calculations formed the basis for Gary Olsen's present value calculation.  (*See*

4   PX 381; PX 383.)  The use of a terminal value is most commonly used to evaluate the value of a

5   firm, rather than the future value of a discrete device or invention.  (Trial Tr. at 1220:1-17.)[23]  The

6   application of a terminal value to a going concern company assumes that the company will

7   continue beyond an explicit forecast period.  Plaintiffs have failed to provide sufficient foundation

8   showing that such a measurement is appropriate in the context of valuing a new device or product.

9   As an alternative to its terminal value calculation for Chocolate's present value,

10  AngioScore contends in its post-trial briefing that the application of a multiple to current revenue

11  in order to calculate Chocolate's present value is appropriate.  Applying that multiple to

12  AngioScore's 2014 revenue results in a total of $35 million, which AngioScore argues represents

13  another measure of Chocolate's present value.  The Court finds that this, too, lacks foundation.

14  Olsen's testimony does not support a finding that this is a satisfactory method of calculating the

15  value of a technology, as opposed to a going concern.  As with the use of a terminal value,

16  AngioScore's proof at trial concerning the appropriateness of using a revenue multiple effectively

17  relied on the fact that this valuation technique was used in valuing QT Vascular as a going concern

18  with a stabilized revenue stream, not the Chocolate as a new technology.  (Trial Tr. at 777:5-13

19  (Olsen, testifying that use of a revenue multiple is a common way to value a company and noting

20  that AngioScore and QT Vascular have been valued using a multiple applied to revenue); Trial Tr.

21  at 780:2-7; *see also* Trial Tr. at 1246:18-1251:25 (Prowse, testifying that such measures are used

22  to value companies).)

23  _____

24  [23] Terminal value calculations play a part in appraisal proceedings which require valuation
    of a company.  *See* Del. L. of Corp. and Bus. Org § 9.45 VALUATION IN A DELAWARE APPRAISAL

25  PROCEEDING, 2006 WL 2454231 (noting that the discounted cash flow analysis utilizing a terminal
    value is a valid methodology for purposes of determining the value of appraised shares; "the value

26  of a company is equal to the present value of its projected future cash flows").  AngioScore's cited
    case in support of applying a terminal value, *In re Orchard Enterprises, Inc*., No. CIV.A. 5713-

27  CS, 2012 WL 2923305 (Del. Ch. July 18, 2012), concerned an appraisal of stock values and did
    not apply a terminal value to a brand new technological device.

28  

61

United States District Court
Northern District of California

1    In sum, the Court finds that equitable considerations counsel in favor of awarding

2    AngioScore a remedy in the form of its past and future lost profits.  Such a remedy repairs and

3    deters without being punitive.

4    **C.  Corporate defendants are liable for damages AngioScore has sustained.**

5    As aiders and abettors of Konstantino's breach of fiduciary duty, defendants are jointly and

6    severally liable.  *See Casey*, 127 Cal. App. 4th at 1144; *Neilson*, 290 F. Supp. 2d at 1133 (noting

7    that California courts cite Restatement (Second) of Torts section 876 to hold that "liability may

8    properly be imposed on one who knows that another's conduct constitutes a breach of duty and

9    substantially assists or encourages the breach.") (citations omitted); *see also Gotham Partners*,

10   817 A.2d at 160.  Based upon the detailed discussion above, this liability should extend to the

11   corporate defendants.  *See Bancroft-Whitney*, 64 Cal.2d at 352 (finding that where defendant

12   aiders and abettors were "aware of or ratified a director's breach of his fiduciary duties in all but a

13   few respects, . . . cooperated with [the director] in the breach, and . . .  received the benefits of [the

14   director's] infidelity . . . . [they] must be held liable for their part in the director's breach of his

15   fiduciary duties.  They encouraged the sowing and reaped the benefit. They cannot now disclaim

16   the burden.").

17   ## CONCLUSION

18   In summary, the Court finds that Konstantino not only breached his fiduciary duties, he

19   actively hid his transgressions to avoid detection.  As a result, he exploited the Chocolate

20   opportunity for his own gain rather than providing the opportunity to AngioScore, as he was duty

21   bound to do.  While such a duty would not have existed had he resigned before Chocolate became

22   an opportunity, Konstantino's breach resulted in measurable harm to AngioScore.

23   A director's duty to the corporation he serves cannot be ignored under the mantra of

24   innovation.  Should a director walk that path, the innovation must be offered, the conduct

25   transparent, and the fidelity to one's duty paramount.  While conflicts between the desire to

26   innovate and the obligations of board membership may arise, a director always has the option to

27   resign.  Here, Konstantino did neither, and thus, a remedy must be awarded to address the breach.

28   The Court further finds that Quattro and TriReme aided and abetted the breach of fiduciary duty,

62

**A000126**

1    and that QT Vascular is liable for the acts of Quattro and TriReme.

2         Accordingly, the Court **ORDERS** the following measures of damages:

3        1.  Konstantino shall disgorge the benefits he obtained by way of his breach; and

4        2.  Defendants are liable for AngioScore's past and future lost profits, totaling $2.97

5            million and $17.064 million, respectively, for a total of $20.034 million.

6         No later than **July 13, 2015**, the parties shall submit a joint statement including language

7    for a form of judgment, approved as to form, to be issued upon conclusion of the patent trial.

8         **IT IS SO ORDERED.**

9    Dated: July 1, 2015

10

11                          **YVONNE GONZALEZ ROGERS**

                      **UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

63

FINDINGS OF FACT

| Findings of Fact | Supporting Evidence |
|---|---|
| **1.** Konstantino and Feld began development of Chocolate while Konstantino served on AngioScore's Board.  Konstantino and Feld jointly conceived of the idea for Chocolate no later than the Fall of 2009. | Trial Tr. at 846:20-847:13, 850:3-25 (Feld direct), 1290:25-1293:6 (Konstantino 4/21/2015 direct); DX 1609. |
| **2.** Konstantino was a member of AngioScore's Board of Directors from March 2003 until February 5, 2010. | Trial Tr. at 133:7-11, 1275:21-23, 1288:25-1289:3. |
| **3.** Konstantino knew he owed fiduciary duties to AngioScore as a member of its Board of Directors. | Trial Tr. at 133:7-11; PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company.) |
| **4.** Konstantino and non-party Feld jointly conceived of the idea for Chocolate during a telephone call. While serving on AngioScore's Board, Konstantino conceived of an idea for an angioplasty balloon that had pillow and groove formations when inflated, and had a telephone call with Feld.  The two men then "brainstormed" together.  Konstantino conceived of the notion of a balloon with pillows and grooves; Feld suggested this could be achieved with a nitinol cage.  This was the balloon catheter that later became known as Chocolate. | Trial Tr. at 1290:25-1291:21 (Konstantino 4/21/2015 direct stating that Feld was the first to suggest a nitinol cage to achieve pillows and grooves); 1292:22-1293:6; Trial Tr. at 846:20-847:13 (Feld direct, explaining that Konstantino and Feld were "brainstorming" and Feld was talking about using a frame or cage for what would eventually become Chocolate; later clarifying that he later thought that "it might be a good idea and that I should spend some time trying to create a model for this"); DX 1609; PX 109 at 0004. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **5.** While the precise extent of development of Chocolate as of February 5, 2010 is not certain, it was developed sufficiently to constitute a corporate opportunity as of that date. | Trial Tr. at 139:20-141:21 (Konstantino direct, "In 2009, and before I left the AngioScore board, I had an idea, one of three or four other ideas that I had at the same time. Around mid-January 2010, I made a decision to pursue this idea, and that's pretty much it."); 328:6-15 (Haig direct, noting that as of February 3, 2010, Chocolate was sufficiently developed such that it could be presented as part of the "scope of products that TriReme was working on"); *see also* PX 80. |
| **6.** In October 2009, TriReme's Board was notified of the Chocolate opportunity. | Trial Tr. at 1096:19-1097:11 (Pizarro cross-exam).  *See also* Trial Tr. at 1291:22-1292:3 (Konstantino 4/21/2015 direct) (Konstantino stated that he met with "maybe 20 to 30" different investors in the second half of 2009). |
| **7.** On October 12, 2009, while serving on AngioScore's Board, Konstantino drafted and applied for a provisional patent application on the Chocolate technology, naming himself and Feld as co-inventors. | Trial Tr. at 200:15-201:10; PX 63; PX 64 (October 2009 patent application listing Feld as co-inventor). |
| **8.** While Konstantino was serving on AngioScore's Board, Feld and TriReme employees assisted with the Chocolate design, prepared engineering drawings on TriReme templates, built prototypes, and performed bench tests. | Trial Tr. at 152:5-153:4, 153:11-154:21, 155:3-156:25, 850:18-851:18, 863:17-864:3, 881:5-24, 1070:17-1073:1, 1078:11-1079:8; PX 65; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 109 at 0004; PX 618; PX 619; PX 620; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **9.** While Konstantino was serving on AngioScore's Board, a TriReme employee showed Chocolate to physicians. | PX 76 (January 2010 email between Ong, Pizarro, Haig re physician feedback; confirming Chocolate was shown to at least one physician); Trial Tr. at 364:13-365:15 (Haig direct). |

| Findings of Fact | Supporting Evidence |
|---|---|
| **10.** While Konstantino was serving on AngioScore's Board, he and seven other TriReme employees attended animal testing on Chocolate at Stanford sponsored by Quattro, then known as Proteus, in January 2010. | PX 11 (Report from Stanford study); PX 18 (recording attendees from TriReme at test); Trial Tr. at 172:13-173:6, 248:11-23. |
| **11.** While serving on AngioScore's Board, Konstantino sought to raise funds from third-party investors and the Singapore Economic Development Board in connection with Chocolate, with assistance from several TriReme employees. | Trial Tr. at 239:8-240:24, 243:19-244:3, 1292:1-3 (Konstantino direct); PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 3 (January 2010 engagement letter between Proteus and Maida Vale Associates signed by Konstantino referring to financial advisor arrangement for Proteus); PX 85 (December 2009 email between Konstantino, Ong, and Foo (Maida Vale) re Proteus's executive summary on Chocolate, requesting Foo sign a nondisclosure agreement); Ong Dep. at 16:3-9, 16:11-19, 16:23-17:8, 17:11, 21:4-10, 22:21-23:2, 29:22-30:17, 127:19-22, 128:4-10. |
| **12.** During the second half of 2009, Konstantino offered 20 to 30 investors the opportunity to invest in Chocolate. | Trial Tr. at 1292:1-3 (Konstantino direct); *see also* Trial Tr. at 878:15-21, 879:1-9 (Feld examination by Court, stating that Konstantino met with "dozens of investors" in the 2009 time frame). |
| **13.** In presentations seeking to raise funds for Chocolate, Konstantino described Chocolate as an "Investment Opportunity." | PX 2 at 0013 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 85 at 0014 December 2009 email between Konstantino, Ong, and Foo (Maida Vale) re Proteus's executive summary on Chocolate, requesting Foo sign a nondisclosure agreement). |

United States District Court
Northern District of California

66

A000130

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **14.**   In a November 2009 presentation seeking funding from the Singapore Economic Development Board, Konstantino stated that the Chocolate "IP, Concept design, Prototypes, business model, Team, [and] partnerships" were all "completed." | PX 2 at 0010 (November 2009 presentation); Trial Tr. at 239:8-240:24; *see also* PX 85 at 0011 (email to Kah Foo transmitting November 2009 presentation); Trial Tr. at 162:12-19 (Konstantino direct). |
| **15.**   In December 2009 correspondence with Dr. Kah Foo, with whom Konstantino was working to get financing for Chocolate, Konstantino represented that the "initial [Chocolate] design already works well and attracts a lot of attention." | PX 73 at 0001 (December 2009 email between Konstantino, Foo, and Ong); Trial Tr. at 160:23-25, 1319:17-1320:2 (Konstantino). |
| **16.**   In January 2010, Konstantino sent Dr. Kah Foo, with whom Konstantino was working to get financing for Chocolate, a memorandum stating that the "Proof-of-Concept of the [Chocolate] design has been completed." | PX 124 at 0003 (January 2010 email wherein Konstantino transmits "Proteus Information memorandum" reflecting status of Chocolate development to that point); Trial Tr. at 144:9-13, 160:23-25. |
| **17.**   Other presentations dated before Konstantino left AngioScore's Board stated that the Chocolate "product design" was "completed." | PX 585 at 0015 (October 2009 powerpoint re status of Chocolate, reflecting that "Front-end R&D: product design completed"); *see also* PX 78 at 0014 (February 2010 presentation re Chocolate). |
| **18.**   The first Chocolate 510(k) was submitted on April 8, 2011. | PX 197 (510K notificaton for Chocolate PTA Balloon catheter); PX 201; Trial Tr. at 1009:14-1010:5. |

A000131

| Findings of Fact | Supporting Evidence |
|---|---|
| **19.** The two kinds of testing on which the first Chocolate 510(k) relied to get FDA clearance—mechanical bench testing and pre-clinical animal testing—used samples of Chocolate products with constraining structure designs created before Konstantino left AngioScore's Board. | PX 11 at 0004; PX 197 at 0003, 0011 (510K notificaton for Chocolate PTA Balloon catheter); PX 599 at 0004 (Stanford report RPTA013-2, June 18, 2010, noting device used was RD 18.20); PX 618; PX 619; PX 620; Trial Tr. at 870:17-871:13, 1009:14-1011:7, 1089:20-1091:6, 1331:11-1332:22. |
| **20.** The mechanical bench testing submitted to the FDA with the first Chocolate 510(k) used samples of design version RD_20, which was drawn on January 13, 2010. | PX 197 at 0003 (510K notificaton for Chocolate PTA Balloon catheter); PX 618; PX 619; PX 620; Trial Tr. at 870:17-871:13, 1089:20-1091:6. |
| **21.** The pre-clinical animal testing submitted to the FDA with the first Chocolate 510(k) was performed on samples of design version RD_18.20, the same version used in the January 2010 animal testing. | PX 11 at 0004 (Stanford report reflecting RPTQ013-1); PX 197 at 0011 (510K notificaton for Chocolate PTA Balloon catheter noting in vivo study RPTQ-013-2); PX 599 at 0004 (Stanford report reflecting RPTA013-2, testing on RD 18.20); Trial Tr. at 1331:11-1332:22. |
| **22.** Chocolate was a sufficiently concrete concept in October 2009 for Konstantino to so describe and define in an application to the U.S. Patent and Trademark Office. | Trial Tr. at 200:15-201:10; PX 63 (October 2009 email confirming filing of patent application); PX 64 (October 2009 patent application). |
| **23.** Konstantino's filing of a provisional patent application for Chocolate evidences that Chocolate was a sufficiently concrete opportunity at that time such that an entity or individual could acquire rights. | Trial Tr. at 200:15-201:10, 201:21-23; 202:6-20 (Konstantino discussing his filing of patent applications for Chocolate); PX 64 (October 2009 patent application); PX 422; PX 427 (patent documents; applications). |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Findings of Fact | Supporting Evidence |
|---|---|
| **24.** Konstantino's filing of a provisional patent application was specifically identified in his presentations to investors. | PX 2 at 0007, 0013 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 85 at 0008, 0014; PX 124 at 0003; Trial Tr. at 144:15-145:6, 242:12-17. |
| **25.** Since its founding in 2003, AngioScore has designed, manufactured, and sold specialty angioplasty balloon catheters under the brand name AngioSculpt. | Trial Tr. at 68:12-22. |
| **26.** Konstantino was the principal inventor of AngioSculpt and filed a patent application that described a drug-coated angioplasty balloon before AngioScore was founded and incorporated. | Trial Tr. at 841:1-22 (Feld direct), 1276:15-1277:12, 1277:19-1278:4 (Konstantino 4/21/2015 Direct); DX 1371; DX 1652 at 5; DX 2015 (Konstantino's resume). |
| **27.** AngioSculpt and Chocolate are both specialty angioplasty balloon catheters. | Trial Tr. at 159:7-16, 180:6-8, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 577:25-578:3, 924:5-17. |
| **28.** AngioSculpt and Chocolate both have a nitinol structure surrounding a nylon semi-compliant balloon. | Trial Tr. at 180:22-25, 410:5-21, 411:5-18, 579:13-21; PX 195 at 0002; PX 197 at 0005; PX 501. |
| **29.** No other specialty balloons on the market use nitinol cage on a semi-compliant balloon – the Boston Scientific Cutting Balloon uses surgical steel and the Vascutrak uses stainless steel guide wires. | Trial Tr. at 896: 16-23 (Garcia); 410:12-21 (Viano); Trial Tr. at 411:5-18 (Viano). |
| **30.** AngioSculpt and Chocolate are both used for the treatment of peripheral and coronary artery disease by opening occluded blood vessels | Trial Tr. at 181:1-10, 579:13-21; PX 189; PX 195; PX 201; PX 211. |

*United States District Court*
*Northern District of California*

69

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| | without leaving metal behind. | |
| **31.** AngioSculpt and Chocolate have both been cleared by the FDA with overlapping indications for use. | Trial Tr. at 420:12-20, 1015:12-16, 1016:8-11; PX 195; PX 201. |
| **32.** There are no indications for which the peripheral Chocolate device is cleared that the peripheral AngioScore device is not. | Trial Tr. at 1016:8-11; *see also* PX 195; PX 201. |
| **33.** AngioSculpt and Chocolate are sold to the same customers. | Trial Tr. at 181:11-20, 749:15-751:20; PX 152; PX 164. |
| **34.** AngioSculpt and Chocolate make overlapping marketing claims. | Trial Tr. at 422:11-428:5; PX 501; PX 531; PX 533. |
| **35.** AngioSculpt and Chocolate are both sold at premium pricing over plain old balloon angioplasty ("POBA") products. | Trial Tr. at 158:22-23, 159:2-3, 411:19-412:11, 746:8-749:2; PX 294 at 0219; PX 137 at 0014. |
| **36.** AngioSculpt and Chocolate have approximately the same list price. | Trial Tr. at 336:16-340:7; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); PX 137 at 0014. |
| **37.** While Chocolate is a specialty balloon catheter, it is not a "scoring device." Testing of Chocolate however confirms that the device bears into or impresses upon plaque before the balloon inflates to the point of protrusion beyond the nitinol cage. | Trial Tr. at 538:9-539:9; PX 452 (photograph of molding clay). Based on its classification of the Chocolate PTCA balloon as a Class II device, the FDA does not consider Chocolate to be a scoring balloon. Trial Tr. at 995:2-14, 1002:14-20, 1003:7-13 (Kuehn direct). |

70

**A000134**

| Findings of Fact | Supporting Evidence |
|---|---|
| **38.** To determine whether Chocolate scores, Jeffrey Bleam, an AngioScore engineer with over 20 years of experience in the medical device industry, performed an experiment in which he inflated the Chocolate device within a cylinder of modeling clay. Chocolate's nitinol struts left impressions in the modeling clay. | Trial Tr. at 538:9-539:9, 525:9-526:11; PX 452; PX 610. |
| **39.** There is no evidence of record that rebuts the findings from Bleam's test, nor any reason that the impressions in the modeling clay observed by Mr. Bleam were not reflective of how Chocolate would perform in a vessel. | *See* DX 1985; DX 1986 (noting diameter at various levels of pressure); Trial Tr. at 378:15-381:14-60, 382:5-22 (Haig testifying that Chocolate is not a scoring device). |
| **40.** A 2010 TriReme document states that Chocolate has a "[d]ual mechanism of action" whereby the first stage involves "[p]laque disruption by initial metal to plaque contact." At the second stage, when inflated, the balloon protrudes past the cage. | PX 78 at 0010; Trial Tr. at 1083:21-24, 1084:3-1085:18. |
| **41.** Defendants' FDA submissions state that Chocolate's nitinol constraining structure "provides for focal force transmission up to nominal pressure and multiple balloon pillows expanding beyond the CS at high pressure. Pillow dilatation is regional, providing for strain relief within the vascular wall and a gentle expansion mechanism." | PX 599 at 0003; Trial Tr. at 1331:11-13. |

United States District Court
Northern District of California

71

**A000135**

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **42.** | Defendants' FDA submissions state that "the inflation of the Chocolate Balloon closely resembles the commercially available VascuTrak balloon with the potential for increased focal force at low pressure." | PX 207 at 0004; Trial Tr. at 1087:2-1088:5. |
| **43.** | Even if Chocolate did not score, AngioScore would still have been interested in the opportunity. | Trial Tr. at 91:22-92:6, 490:17-22, 540:9-14, 579:13-581:2; *see also* Trial Tr. at 208:24-209:7, 1295:19-1296:7; PX 2 at 0012; PX 78 at 0018; PX 85 at 0013. |
| **44.** | Konstantino's actions demonstrate that he thought that AngioScore would have been interested in participating in the Chocolate opportunity. | Trial Tr. at 207:22-25, 208:24-209:7, 1295:19-1296:7. |
| **45.** | Konstantino repeatedly referred to AngioScore as a potential partner in the Chocolate opportunity in presentations in 2009 and 2010. | PX 2 at 0012 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 78 at 0018; PX 85 at 0013; Trial Tr. at 207:22-25, 208:24-209:7. |
| **46.** | On February 3, 2010, Konstantino approached Tom Trotter with the intent to present Chocolate as an investment opportunity because he thought AngioScore would be "interested in investing" in it. | Trial Tr. at 1295:19-1296:7; *see also* Trial Tr. at 207:22-25, 208:24-209:7. |
| **47.** | In December 2009, Konstantino pitched Tom Trotter about AngioScore distributing the Glider product. | Trial Tr. at 136:4-138:6, 571:25-572:14; PX 423 at 0002. |
| **48.** | Glider is a POBA, not a specialty balloon. | Trial Tr. at 138:7-21, 158:15-20, 571:25-572:14, 573:3-4; PX 423 at 0002. |

| Findings of Fact | Supporting Evidence |
|---|---|
| **49.** AngioSculpt is more similar to Chocolate than it is to Glider. | Trial Tr. at 138:13-21, 158:15-159:16, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 571:25-572:14, 573:3-4, 577:25-578:3, 924:5-17. |
| **50.** Distributors of medical devices sometimes also invest in the company manufacturing the device. | Trial Tr. at 247:2-10. |
| **51.** AngioScore could have found Chocolate's nitinol cage design useful in the 2009 to 2010 timeframe to address the challenge it faced in designing devices longer than 100mm. | Trial Tr. at 87:23-88:10, 91:1-16, 530:5-16 (Bleam direct), 532:7-536:5 (describing process of adding cross-struts to the AngioSculpt device to ensure even inflation, difficulties with 100mm length balloon)s, 539:15-25 (Bleam direct, explaining that Chocolate's radial struts could have assisted AngioScore's development of a 100mm device), 540:22-541:1 (Bleam direct, stating that he would have considered Chocolate for development despite its not being a "scoring balloon," describing modeling clay experiment, stating that it is "definitely a possibility" that AngioScore could have released a more ideal 100mm balloon sooner had it been aware of Chocolate), 541:12-20 (Bleam direct, stating that had someone shown him the Chocolate design while he was working on developing the 100mm AngioSculpt, that could have affected the money AngioScore spent developing these balloons), 564:1-23 (Trotter direct, discussing July 2009 board meeting presentation referring to AngioScore's difficulty with developing extra long catheters), 579:22-581:2 (Trotter direct, discussing same, stating that Chocolate opportunity could have saved AngioScore cost and development money for its longer length balloons). |

United States District Court
Northern District of California

73

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **52.** While Konstantino served on AngioScore's Board, drawings and prototypes of 100mm Chocolate devices existed. | PX 67 (November 2009 email between Feld and Delos Santos discussing performance of Chocolate prototypes, including a 100mm device); PX 89; PX 620; Trial Tr. at 871:10-13, 1070:17-1071:25, 1090:23-1091:6; Delos Santos Dep. at 76:23-77:7, 77:12-18, 77:21-25, 78:1. |
| **53.** The first Chocolate 510(k) submission sought FDA clearance for devices as long as 120mm. | PX 197 at 0002; Trial Tr. at 1012:4-25. |
| **54.** After the initial generation of its longer length product experienced design challenges, AngioScore introduced a new version of its 100mm AngioSculpt in 2013 with improvements. | Trial Tr. at 532:7-533:8, 534:1-535:24; PX 596; PX 622; DX 1706 at 20. |
| **55.** While Konstantino was on AngioScore's board, AngioScore was having difficulty designing a 100mm AngioSculpt, and Konstantino knew of the same. | Trial Tr. at 87:23-88:10, 91:1-16, 530:5-16; 532:7-536:5, 564:1-23, 579:22-581:2; PX 220 (July 2009 board meeting presentation discussing business challenges). |
| **56.** The Chocolate device possibly could have assisted in AngioScore's work to address the design problems associated with the 100mm AngioSculpt. | Trial Tr. at 91:1-16, 539:15-25, 540:22-541:1, 541:12-20, 579:22-581:2. |
| **57.** The Chocolate opportunity could have aided AngioScore's effort in developing longer-length specialty balloons. | Trial Tr. at 87:23-88:10, 91:1-16 (Andrews direct discussing difficulty designing 100mm AngioSculpt), 530:5-16 (Bleam direct re same), 532:7-536:5 ("the challenge for this particular device . . . [was ensuring] even deployment of the struts around the balloon" . . . "we added cross-links to the metal that goes over the balloon" to "help[] with even deployment"), 539:15-25 (testifying that knowledge of the Chocolate design could |

74

**A000138**

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| | | have been of assistance in developing the 100mm device), 540:22-541:1, 541:12-20, 564:1-23, 579:22-581:2, 871:10-13, 1012:4-25, 1070:17-1071:25, 1090:23-1091:6; PX 67; PX 89; PX 197; PX 620. |
| 58. | AngioScore could have been interested in Chocolate in the 2009 to 2010 timeframe insofar as it presented long-term potential as a drug-eluting specialty balloon. | Trial Tr. at 490:5-16 (Raffin direct), 579:22-581:2, 697:7-698:2; PX 217 (February 2009 email between board members discussing effort to attain drug coated balloon technology; PX 220 (July 2009 board presentation outlining future business strategy including "extra long" devices of 100mm and drug coated device). |
| 59. | While Konstantino was on AngioScore's Board, AngioScore was working on developing drug-eluting specialty balloon technology. | Trial Tr. at 87:23-88:10, 164:14-165:17, 166:9-15, 214:15-215:6, 566:6-568:13, 579:22-581:2; PX 226; PX 246 (AngioScore February 2010 Board Meeting presentation, giving overview of then-existing cash balance, notably above budget (p.6), research and development items, including drug-coated devices (p.13)); DX 1199. |
| 60. | Konstantino did not disclose Chocolate or its potential as a drug-eluting specialty balloon to AngioScore. Instead, in a letter to AngioScore's counsel dated February 23, 2010, he denied involvement in "any development work . . . of angioplasty balloon technology . . . that involves specialized features [. . .]." | PX 420 at 0004. |

75

| Findings of Fact | Supporting Evidence |
|---|---|
| **61.** While serving on AngioScore's Board, Konstantino was promoting Chocolate as an "ideal platform for drug delivery" in his efforts to obtain financing for his undisclosed project. | Trial Tr. at 160:20-162:4; PX 85 (November 2009 Proteus presentation) at 0008; *see also* PX 2 at 0007 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board). |
| **62.** Given the limited specialty balloon catheter market, AngioScore would not have simply done nothing had Chocolate been presented. During the relevant time period, there were only two general types of balloon catheters in the specialty balloon market – those that scored or cut, as in the case of the Boston Scientific Cutting Balloon and the AngioSculpt, and Vascutrak, which had stainless steel guide wires. Chocolate presented a paradigm-shifting design: a cage designed to create pillows and grooves in such a way as to create focal force on the balloon surface as it pushes through the openings in the cage. As a young company, revenue growth was a primary concern for AngioScore. It would have, at a minimum, issued an offer to acquire rights to the technology. | Trial Tr. at 488:17-22; 489:15-490:4 (Raffin direct; 408:18-410:21 (Viano); 438:19-439:21. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A000140

| Findings of Fact | Supporting Evidence |
|---|---|
| **63.**  AngioScore's earlier rejection of an offer of a new scoring balloon does not establish that it had no interest or expectancy in Chocolate.  The opportunity then presented related to another concrete product.  AngioScore was permitted to evaluate the design features.  In light of this concrete opportunity, Trotter explained AngioScore declined to pursue the proposed technology because "there was nothing particularly impressive about it."  He further added that he "didn't see that there was any innovation there that would be valuable to AngioScore."  The fact that Chocolate represented a new concept – focal force through the creation of balloon pillows, rather than scoring – sets it apart from the opportunity AngioScore contemplated and rejected. | *See* DX 1099; Trial Tr. 627:25-628:1 (Trotter direct); 628:1-2. |
| **64.**  Personality conflict issues would not have prevented AngioScore from being interested in the Chocolate, nor would AngioScore have declined to exploit the Chocolate opportunity.  On the whole, Konstantino was well-regarded by members of the board. | FF *supra* 51-61; PX 234 (August 2009 email in which Trotter emailed Ivan Pirzada in an attempt to get Konstantino funding); PX 241 (In December 2009, Trotter sent Konstantino a tip on potential funders for TriReme); Trial Tr. at 483:14-484-1 (Raffin); 692:16-21 (Suennen). |
| **65.**  As a member of AngioScore's Board, Konstantino had long-standing exposure to, and access to, AngioScore's confidential information.  Certain of this information was forwarded to others involved in the development of Chocolate. | PX 246 (February 2010 board meeting presentation); PX 444; PX 445; Trial Tr. at 174:7-15, 175:2-19, 176:4-11, 177:3-24, 213:7-15, 214:15-215:6. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| 66. Konstantino used information obtained by virtue of his role on AngioScore's board when developing Chocolate. | PX 246 (AngioScore February 2010 Board Meeting presentation, giving overview of then-existing cash balance, notably above budget (p.6), research and development items, including drug-coated devices (p.13)); PX 444 (October 2009 email from Konstantino forwarding China Market information sent to AngioScore board); PX 445 (November 2009 email from Konstantino to Dreher forwarding Trotter's analysis of the VascuTrak device); Trial Tr. at 174:7-15, 175:2-19, 176:4-11, 177:3-24, 213:7-15, 214:15-215:6. That Konstantino and Feld jointly developed Chocolate does not undermine the fact that by virtue of his seat on AngioScore' board, Konstantino had access to information on the angioplasty balloon market, AngioScore's competitive standing in that market, and utilized such information in his pursuit of Chocolate. |
| 67. Konstantino attended AngioScore's February 2010 Board meeting. | Trial Tr. at 138:22-139:4, 213:7-15. |
| 68. At the same time Konstantino attended AngioScore's February 2010 Board meeting, TriReme's Vice President of Marketing & Business Development, Christopher Haig, traveled to Germany to meet with a drug coating technology company about Chocolate. | PX 222 (Feb. 5, 2010 email between Konstantino and Haig re meetings to discuss Chocolate); PX 223 (Feb. 9, 2010 emails re same); Trial Tr. at 163:5-164:2, 164:8-16, 331:3-333:6 (Konstantino direct discussing Haig's visit to Germany in February 2010). |
| 69. AngioScore never disavowed an interest in Chocolate. | FF *infra* 70-85. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **70.** The survey of AngioScore Board members and management by Sarah Lugaric was directed to an abstract and hypothetical opportunity—*i.e.*, the acquisition of "another company technology or product line." | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 578:4-15, 696:7-13. |
| **71.** The Lugaric survey did not present either the specific Chocolate opportunity or a product resembling the Chocolate opportunity—*i.e.*, a specialty balloon with a nitinol structure surrounding the balloon that would leverage AngioScore's existing sales force and that had been developed by AngioScore's co-founder and co-creator of the AngioSculpt technology. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 68:14-16, 91:17-21, 131:6-21, 136:8-137:22, 159:7-16, 180:22-25, 181:11-20, 325:18-326:10, 326:20-22, 408:23-409:12, 410:5-21, 526:12-19, 577:25-578:3, 579:13-21; 924:5-17, 1276:15-17. |
| **72.** Several participants in the Lugaric survey testified that they interpreted the question about "acquiring another company, technology or product line" as referring to products outside of AngioScore's core business of specialty balloons. | Trial Tr. at 129:15-25, 578:16-579:21. |
| **73.** A majority of the Board members surveyed by Lugaric were receptive to the possibility of "acquiring another company, technology or product line." | PX 214 at 0002 (Lugaric survey responses summary). |
| **74.** Thomas Raffin responded to the Lugaric survey that he "[w]ould consider" "acquiring another company, technology or product line" and noted that this would "not [be] easy." Dr. Raffin would have considered Chocolate as such a possibility if it had been presented. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 488:7-22, 489:15-490:22. |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **75.** Lisa Suennen responded to the Lugaric survey that she would have been "[p]otentially" interested in "acquiring another company, technology or product line," if that acquisition "is accretive or adds some significant strategic value." Ms. Suennen was open to having AngioScore incorporate new technology into its product lineup and would have considered pursuing Chocolate had that opportunity been presented. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 696:24-698:2. |
| **76.** Jeanette Welsh responded to the Lugaric survey that she would have been interested in "acquiring another company, technology or product line" "only if the acquisition leverages the very expensive Sales force AngioScore has." | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 131:6-21, 181:11-20. |
| **77.** Konstantino responded to the Lugaric survey that he would support "acquiring another company, technology or product line" "to leverage sales force," and that AngioScore "[c]an identify complementary or adjacent vascular technology" "[p]referably for the peripheral market" and "should be looking for product with premium pricing for distribution and[/]or acquisition." | PX 214 at 0002 (Lugaric survey responses summary). |

80

**A000144**

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **78.** Although Tom Trotter responded to the Lugaric survey by stating that he did not think "acquiring another company, technology or product line" was necessary to get AngioScore where it needed to go, he interpreted the question as referring to products outside the area of the balloon angioplasty and would have been interested in Chocolate had it been offered. | PX 214 at 0002 (Lugaric survey responses summary); Trial Tr. at 578:4-581:2. |
| **79.** AngioScore's Board—not its management—would have made the ultimate decision whether to accept or reject the Chocolate opportunity had it been offered. | Trial Tr. at 488:23-489:13. |
| **80.** AngioScore did not consent to Konstantino's pursuit of the Chocolate opportunity, nor did it waive any interest or expectancy in that opportunity. | FF *infra* 81-85. |
| **81.** Konstantino never disclosed Chocolate to AngioScore while serving on AngioScore's Board. | Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 280:1-25, 282:6-283:24, 486:2-487:10, 523:12-16, 571:25-573:4, 580:15-17, 633:7-14, 634:5-7, 693:6-11; PX 107 at 0001, 0003; PX 420 at 0004 (February 23, 2010 letter from Konstantino through counsel); PX 423 at 0006. |

81

| Findings of Fact | Supporting Evidence |
|---|---|
| **82.** AngioScore's Board took Konstantino's request to pursue "endovascular bifurcation stents and delivery systems for bifurcation stents" with TriReme very seriously and adopted a formal resolution that granted Konstantino permission to pursue this limited business opportunity and waived AngioScore's rights solely in that particular opportunity. | PX 98; Trial Tr. at 264:6-22. |
| **83.** AngioScore's original Board resolution dated July 26, 2005 only allowed Konstantino to provide advisory services to TriReme and specified that such services would be without compensation. | PX 98 at 0001. |
| **84.** AngioScore later gave Konstantino permission to pursue additional roles at TriReme but never waived its interest in anything other than bifurcation stents. | DX 1014; Trial Tr. at 561:24-562:4, 689:4-690:13, 721:13-722:2, 864:4-8. |
| **85.** Chocolate is not a bifurcation stent. | Trial Tr. at 1322:2-3, 1322:8-9, 1322:14-16. |
| **86.** Konstantino did not offer testimony that contradicted Lisa Suennen's testimony that he told her TriReme would not compete with AngioScore. | Trial Tr. at 689:4-690:13. |
| **87.** Konstantino's claim that he did not believe he needed AngioScore's consent to develop Chocolate is not credible. | PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company.) |

United States District Court
Northern District of California

82

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| 88. On February 10, 2009, Konstantino signed a letter confirming that "[a]s a member of the Company's Board of Directors," he was "of course also . . . subject to fiduciary duties to the Company under applicable law, like all directors." | PX 101 (letter of February 10, 2009, confirming matters relating to Konstantino's transition from employee and board member, to solely board member; noting that as such, he remained subject to fiduciary duties to the Company). |
| 89. Immediately before his resignation from AngioScore's Board, Konstantino told AngioScore that "precisely" because he was "keenly aware of [his] obligations as a board member," he approached AngioScore supposedly "before any new project is started." | PX 107 at 0001. |
| 90. In late 2006, Feridun Ozdil and Konstantino had an argument and their relationship soured. Despite the conflict of interest, Konstantino remained respected by other members of the board. | Trial Tr. at 1280:14-17; 1281:17- (Konstantino); DX 1993; Trial Tr. at 483:14-484:1 (Raffin); 692:16-21 (Suennen). |
| 91. AngioScore had the financial capacity to exploit the Chocolate opportunity. | DX 1199 (AngioScore's December 2009 Monthly Report noting $15.3 million cash on hand). |
| 92. Konstantino told potential investors that it would cost between $1.5 million and $5 million to commercialize Chocolate. | PX 547; Trial Tr. at 209:17-211:21; PX 258; PX 78 at 0017. |
| 93. Amir Belson, a TriReme Board Member, testified that that $3.5 million to $4 million would be sufficient to commercialize Chocolate and that he had "done things like this for less." | Belson Dep. at 238:12-16, 238:21-23, 239:04-10, 239:13-19; PX 78 at 0017. |

83

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **94.** Bleam, AngioScore's Vice President of R&D, testified it would cost AngioScore $1 million to $2 million to develop a "specialty balloon with nitinol over the balloon," with potentially more money needed for more complex versions. | Trial Tr. at 542:23-543:4. |
| **95.** Given that AngioScore already had the infrastructure to produce a specialty angioplasty balloon using a nitinol exterior structure, the cost to exploit Chocolate would have been incremental. All the Chocolate's component parts were essentially the same as those of the AngioSculpt. | FF *supra* 27-28; *infra* 106. |
| **96.** As of the date of its sale to Spectranetics, AngioScore had spent approximately $100 million developing different varieties of the AngioSculpt. | Trial Tr. at 582:6-15; 593:21-594:14. |
| **97.** AngioScore had approximately $17 million cash on hand in October 2009, when Konstantino filed a provisional patent application on Chocolate. | Trial Tr. at 76:4-9; PX 63; PX 64 (October 2009 patent application). |
| **98.** AngioScore had in excess of $15 million cash on hand at the end of 2009, just over a month before Konstantino resigned from AngioScore's Board. | PX 621; Trial Tr. at 74:4-75:21; *see also* PX 246 at 0016; Trial Tr. at 213:4-215:6; DX 1199. |
| **99.** AngioScore could have exploited the Chocolate opportunity by borrowing the necessary funds. | PX 242 (December 2009 email from Trotter to AngioScore board detailing meeting with Oxford Financial and Oxford's willingness to lend up to $20 million); Trial Tr. at 76:13-79:16. |

84

**A000148**

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **100.** In December 2009, Oxford Finance stated a willingness to lend AngioScore up to $20 million, and even more if necessary. | PX 242 (December 2009 email from Trotter to AngioScore board detailing meeting with Oxford Financial and Oxford's willingness to lend up to $20 million). |
| **101.** AngioScore borrowed $10 million from Oxford in late 2010, and an additional $5 million in 2011. | Trial Tr. at 79:4-16. |
| **102.** AngioScore could have exploited the Chocolate opportunity through equity financing. | Trial Tr. at 79:18-80:3 (Andrews Direct), 696:14-697:11 (Suennen Direct). |
| **103.** AngioScore successfully raised "about $111 million" through six different equity rounds, including in 2011. | Trial Tr. at 79:18-80:3. |
| **104.** Psilos, an AngioScore investor with a Board seat, and others invested more money in AngioScore in 2011. | Trial Tr. at 696:14-697:11 (Suennen direct); PX 320 at 0050-0051. |
| **105.** AngioScore could have redirected R&D money it spent to develop the 100mm AngioSculpt in order to exploit the Chocolate opportunity. | Trial Tr. at 91:1-16, 539:15-25, 540:22-541:1, 541:12-20, 579:22-581:2. |
| **106.** AngioScore would not have needed to incur many of the post-commercialization costs that defendants attribute to Chocolate. | PX 214 at 0002; Trial Tr. at 131:6-21, 136:8-137:22, 1170:21-1172:15, 1174:12-1176:17; PX 388. |
| **107.** Several AngioScore Board members, including Konstantino, specifically called out AngioScore's excess sales capacity in responding to the Sarah Lugaric survey. | PX 214 at 0002; *see also* Trial Tr. at 136:8-137:22. |

85

| Findings of Fact | Supporting Evidence |
|---|---|
| **108.** By taking the Chocolate opportunity for himself, Konstantino placed himself in a position inimical to his duties to AngioScore. | *See e.g.*, FF *infra* 110-162; 200-220. |
| **109.** By taking the Chocolate opportunity for himself, Konstantino did not act in good faith or in the best interest of AngioScore. By taking the Chocolate opportunity for himself, Konstantino placed his own financial interest above AngioScore's. Konstantino did not reasonably believe he was acting in the best interest of AngioScore or in a way that was not adverse to AngioScore. | *See e.g.*, FF *infra* 110-162; 200-220. |
| **110.** Konstantino viewed placing his own interests above AngioScore's interests as acceptable. | Trial Tr. at 133:23-134:1 ("'Q. Did you believe that you had a duty to place AngioScore's commercial interests above your own personal financial interests? A. No, I did not believe that.'"). |
| **111.** While sitting on AngioScore's Board of Directors, Konstantino knew that AngioScore "might be interested" in the Chocolate opportunity. | Trial Tr. at 91:1-16, 161:12-162:4, 164:14-165:17, 166:9-15, 208:24-209:7, 530:5-16, 564:17-565:5, 579:22-581:2, 1012:4-25, 1070:17-1071:25, 1295:19-1296:7; PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board identifying AngioScore as potential partner for Chocolate at p. 12); PX 69; PX 78 at 0018; PX 85; PX 89; PX 197; PX 226; PX 620. |
| **112.** Konstantino profited from taking the Chocolate opportunity for himself. | Trial Tr. 775:5-13; Brosh Dep. At 228:1-5, 14-17, 229:6-14; 235:4-5, 235:21-236:14; 254:25-255:12.; PX 383; PX 388. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Findings of Fact | Supporting Evidence |
|---|---|
| **113.** AngioScore was harmed by Konstantino's decision to develop Chocolate, because it competes in the same specialty balloon market. | Trial Tr. at 139:20-141:23, 149:13-152:17, 159:7-16, 185:1-186:3, 186:7-189:4, 325:21-24; PX 15 at 0005; PX 66; PX 107; PX 419; PX 420. |
| **114.** While sitting on AngioScore's Board of Directors, Konstantino intended that Chocolate would compete with AngioSculpt. | PX 124 at 0007; PX 125 at 0009; Trial Tr. at 185:1-186:3 (Konstantino admitting that a December 13, 2009 presentation described Chocolate as "[a] step up from scoring," which "refer[s] to AngioScore"); *id.* at 186:7-189:4 (Konstantino admitting that a November 2009 TriReme presentation made the identical claim regarding reducing dissections that AngioScore makes). |
| **115.** Konstantino claimed that Chocolate was a "step up from scoring" balloons, such as AngioSculpt. | Trial Tr. at 185:1-186:3; PX 15 at 0005. |
| **116.** TriReme's sales force directly compared Chocolate to the AngioSculpt. | Trial Tr. at 343:19-344:7. |
| **117.** TriReme's sales force named AngioSculpt as Chocolate's "closest competitor." | Trial Tr. at 343:19-344:7; PX 127; PX 132 at 0002; PX 143; PX 154. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

87

**A000151**

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **118.** TriReme used AngioSculpt to set the price of Chocolate, believing it would give Chocolate a competitive advantage. | Trial Tr. 335:9-336:15 (Haig admitting that TriReme targeted "AngioScore accounts" to "get a faster uptick on Chocolate" because these were accounts where "pricing had already been established for specialty balloons"); *id.* at 336:16-340:7 (TriReme setting Chocolate list price at launch in December 2011 to be exactly $25 below the price of AngioSculpt); *id.* at 348:10-349:4 (pricing Chocolate "competitive with other specialty catheters to drive rapid adoption," and listing AngioSculpt and two other balloons); PX 130; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); PX 137 at 0014; PX 143. |
| **119.** Konstantino never disclosed Chocolate to AngioScore, including during his December 2009 conversation with Trotter regarding Glider. | Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 280:1-25, 282:6-283:24, 486:2-487:10, 523:12-16, 571:25-573:4, 633:7-14, 634:5-7, 693:9-11; PX 107 at 0001, 0003; PX 420 at 0004; PX 423 at 0006.<br>Trial Tr. at 136:4-7, 138:7-12, 580:15-17. |
| **120.** While sitting on AngioScore's Board of Directors, Konstantino concealed the Chocolate opportunity from AngioScore. | PX 107 at 0001, 0003; Trial Tr. at 71:25-72:18, 138:7-12, 138:22-139:19, 212:25-213:15, 271:14-272:4, 272:18-19, 486:2-487:10, 575:19-24, 580:15-17, 633:7-14, 634:5-7, 693:6-11. |
| **121.** While serving on AngioScore's Board, Konstantino did not seek funding from any current AngioScore Board member. | Trial Tr. at 212:25-213:3 (Konstantino). |

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **122.** Two days before Konstantino resigned from AngioScore's Board, Konstantino sat through an entire AngioScore Board meeting without disclosing Chocolate to AngioScore. | Trial Tr. at 138:22-139:4, 213:7-15 (Trotter). |
| **123.** After the February 3, 2010 AngioScore Board meeting, Konstantino had a brief discussion with Tom Trotter and told him that he and TriReme were considering pursuing a specialty balloon, and Trotter asked Konstantino to leave. | Trial Tr. at 574:1-19, 602:17-25 (Trotter). |
| **124.** During Konstantino's brief discussion with Trotter on February 3, 2010, Konstantino did not disclose Chocolate or defendants' ongoing development work on a specialty balloon. | Trial Tr. at 138:22-139:19 (Konstantino). |
| **125.** On February 4, 2010, Trotter emailed Konstantino relaying the board's unanimous belief that he should resign.  Konstantino emailed AngioScore's Board on February 4, 2010 stating that AngioScore was being "trigger happy" by asking him to resign from AngioScore's Board of Directors. | PX 107; PX 108 at 0002-0003. |
| **126.** Konstantino's February 4, 2010 email to AngioScore's Board stating that AngioScore was being "trigger happy" by asking him to resign from AngioScore's Board was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21 (Konstantino direct, explaining that "around mid-January 2010, I made a decision to pursue this idea"), 152:5-153:4 (same, "Q. . . . [P]rior to . . . your February 5 resignation, you were involved in development work relative to Chocolate?  A. Yes, I agree with you.", 153:11-154:21 (same, discussing TriReme employee involvement in Chocolate development); 155:3-156:25 (same), 171:5-172:6 (same, discussing Stanford porcine study), 172:13-173:6 (same), |

89

**A000153**

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| | 883:8-23 (Feld cross, discussing development in fall 2009), 1070:17-1073:1 (Pizarro cross, discussing models), 1078:11-1079:8 (same); PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0002-0003; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **127.** Konstantino emailed AngioScore's Board on February 4, 2010 stating that "TriReme has not made any decision to make such a change and I was giving you very early heads up to something that may take place in the future, or may never happen." | PX 108 at 0002-0003. |
| **128.** Konstantino's February 4, 2010 email to AngioScore's Board stating "TriReme has not made any decision to make such a change and I was giving you very early heads up to something that may take place in the future, or may never happen" was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0002-0003; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **129.** Konstantino spoke to John Sellers on February 4, 2010 and did not disclose Chocolate or that defendants were already developing a specialty balloon. | Trial Tr. at 145:8-14, 271:14-272:4, 272:18-19, 318:18-19; PX 108 at 0001. |
| **130.** Konstantino emailed AngioScore's Board on February 5, 2010 stating that he was "keenly aware of my obligations as a board member and this is precisely why I am coming to Angio[S]core at this juncture; before any new project is started." | PX 108 at 0001-0002. |

A000154

| Findings of Fact | Supporting Evidence |
|---|---|
| **131.** Konstantino's February 5, 2010 email to AngioScore's Board stating he was "keenly aware of my obligations as a board member and this is precisely why I am coming to Angio[S]core at this juncture; before any new project is started" was incorrect because defendants began developing Chocolate in 2009. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 108 at 0001-0002; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **132.** After Konstantino's resigned on February 5, 2010, AngioScore investigated whether Konstantino had done competitive work while on AngioScore's Board. | Trial Tr. at 693:12-694:12; DX 1292 (email from Suennen recounting conversations with Heller and Lynn); DX 1295; PX 419; PX 421; *see also*; DX 1329. |
| **133.** On February 10, 2010, AngioScore sent Konstantino a letter requesting "confirmation" that Konstantino and/or TriReme were not developing a specialty balloon prior to Konstantino's resignation from AngioScore's Board on February 5, 2010. | PX 419 at 0002. |
| **134.** Konstantino knowingly and intentionally misled his counsel and AngioScore in emails and letters in which he denied, among other things, that he or TriReme had engaged in any "development work" on balloons with "specialized features" or that "compete[] with" or "make[] similar claims" to AngioSculpt, and insisting that AngioScore was being "trigger happy." | PX 103 at 0001; PX 107 at 0001, 0003; PX 420 at 0004; PX 423 at 0006; Nguyen Dep. at 38:10-14; *see also* Trial Tr. at 150:11-24, 151:5-153:4, 153:11-154:21, 155:3-156:25, 158:6-159:14, 159:19-161:7, 161:14-162:4, 163:5-164:2, 164:8-13, 167:14-22, 168:6-169:2, 169:8-170:24, 171:5-172:6, 172:13-173:6. |
| **135.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that "TriReme is considering, in the future, the possibility of entering the field of specialized | PX 420 at 0004. |

91

A000155

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| balloons." | |
| **136.** Konstantino's February 23, 2010 letter stating that "TriReme is considering, in the future, the possibility of entering the field of specialized balloons" was incorrect because Konstantino and TriReme had made the decision to enter the field of specialized balloons before Konstantino left AngioScore's Board. | Trial Tr. at 141:1-21, 328:6-15; PX 420 at 0004. |
| **137.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that "TriReme has not developed any products . . . that competes with AngioScore's products." | PX 420 at 0004. |
| **138.** Konstantino's February 23, 2010 letter stating that "TriReme has not developed any products . . . that competes with AngioScore's products" was incorrect because TriReme began developing Chocolate in 2009 and considered Chocolate a "[d]irect competitor[]" to AngioSculpt. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 185:1-186:6, 193:21-195:6, 883:3-23, 1070:17-1073:1, 1078:11-1079:8; PX 15 at 0005; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 124 at 0007; PX 125 at 0009;  PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **139.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements." | PX 420 at 0004. |
| **140.** Konstantino's February 23, 2010 | Trial Tr. at 141:1-21, 152:5-15, 153:11- |

92

A000156

| Findings of Fact | Supporting Evidence |
|---|---|
| letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting, or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because Chocolate is a specialty balloon having a nitinol structure surrounding a semi-compliant nylon balloon. | 154:21, 155:3-156:25, 159:7-14, 171:5-172:6, 172:13-173:6, 180:20-25, 325:18-326:10, 326:20-22, 408:23-409:12, 410:5-21, 526:12-19, 575:25-578:3, 579:13-21, 883:8-23, 924:5-17, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **141.** Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because Konstantino was promoting Chocolate in 2009 as an "ideal platform for drug delivery" in his efforts to obtain financing for his undisclosed project. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 160:20-162:4, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 85 at 0008; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **142.** Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because TriReme's Vice President of Marketing & Business Development, | Trial Tr. at 163:5-164:2, 164:8-16, 331:3-333:6; PX 222; PX 223; PX 420 at 0004. |

93

**A000157**

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| Christopher Haig, traveled to Germany and met with a drug coating technology company about Chocolate on February 5, 2010. | |
| **143.** Konstantino's February 23, 2010 letter stating that he "was not involved in any development work . . . of angioplasty balloon technology for the . . . periphery markets that involves specialized features such as scoring, cutting , or drug eluting elements" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because TriReme's contemporaneous documents state that Chocolate has a "[d]ual mechanism of action" whereby the first stage involves "[p]laque disruption by initial metal to plaque contact." | PX 78 at 0010; *see also* Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 883:8-23, 1070:17-1073:1, 1078:11-1079:8, 1083:21-24, 1084:3-1085:18; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **144.** In a letter to AngioScore's counsel dated February 23, 2010, Konstantino stated that he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product." | PX 420 at 0004. |
| **145.** Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 181:1-10, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 189 at 0002; PX 195 at 0001; PX 201 at 0001; PX 211 at 0001; PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |

94

A000158

| Findings of Fact | Supporting Evidence |
|---|---|
| and because both AngioSculpt and Chocolate are used for the treatment of peripheral and coronary artery disease by opening occluded blood vessels without leaving metal behind. | |
| **146.** Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board and because both AngioSculpt and Chocolate have been cleared by the FDA with overlapping indications for use. | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 420:12-20, 883:8-23, 1015:12-16, 1016:8-11, 1070:17-1073:1, 1078:11-1079:8; PX 67 (November 2009 email between Feld and Delos Santos, discussing testing of Chocolate prototypes); PX 72 (December 2009 email discussing coating for Chocolate); PX 74 (December 2009 email between Feld and TriReme employees, including Konstantino, re findings from testing Chocolate prototypes); PX 87 (October 2009 email discussing same); PX 89 (October 2009 email re shorties of Chocolate); PX 90 (November 2009 email re Chocolate prototype production); PX 91 (email re Chocolate development); PX 92 (same); PX 93 (same, referring to "upcoming animal study"); PX 195 at 0001 (AngioScore 510K Summary for AngioSculpt Scoring Balloon Catheter); PX 201 at 0001 (TriReme 510K Summary for Chocolate PTA Balloon Catheter); PX 420 at 0004; Delos Santos Dep. at 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| **147.** Konstantino's February 23, 2010 letter stating he was "not involved in any development . . . of angioplasty balloon technology for the . . . periphery markets that makes similar claims to that of the AngioSculpt product" was incorrect because Konstantino was engaged in the development of Chocolate before he resigned from AngioScore's Board | Trial Tr. at 141:1-21, 152:5-153:4, 153:11-154:21; 155:3-156:25, 171:5-172:6, 172:13-173:6, 422:20-428:5, 883:8-23, 1070:17-1073:1, 1078:11-1079:8; PX 67; PX 72; PX 74; PX 87; PX 89; PX 90; PX 91; PX 92; PX 93; PX 420 at 0004; PX 501 (QT Vascular website describing Chocolate product); PX 531 at 0005-0006 (AngioSculpt marketing materials); PX 533 at 0004 (AngioSculpt XL marketing materials); Delos Santos Dep. at |

United States District Court
Northern District of California

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| and because both AngioSculpt and Chocolate make similar marketing claims. | 48:23-25, 51:4-9, 76:23-77:7, 77:12-18, 77:21-25; 78:1, 90:23-91:11, 96:19-22, 96:23-25, 97:1-2. |
| 148. Konstantino provided the information for, and approved the contents of, the February 23, 2010 letter to AngioScore's counsel. | Trial Tr. at 150:11-24, 151:5-16; Nguyen Dep. at 38:10-14. |
| 149. On March 5, 2010, AngioScore sent Konstantino a second letter inquiring whether "Konstantino and/or TriReme evaluated, negotiated, or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" prior to Konstantino's resignation from AngioScore's Board on February 5, 2010. | PX 421 at 0002. |
| 150. In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products." | PX 423 at 0006. |
| 151. Konstantino's March 21, 2010 letter stating that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" was intentionally misleading because defendants, particularly TriReme, were evaluating Chocolate prior to February 5, 2010. | Trial Tr. at 168:9-18, 169:8-170:13, 171:5-173:6; PX 18; PX 70; PX 93; PX 423 at 0006. |

96

| Findings of Fact | Supporting Evidence |
|---|---|
| **152.** Konstantino's March 21, 2010 letter stating that before February 5, 2010 "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" was intentionally misleading because defendants thought Chocolate was a "[d]irect competitor[]" to AngioSculpt. | PX 125 at 0009; *see also* Trial Tr. at 185:1-186:6, 193:21-195:6; PX 15 at 0005; PX 124 at 0007; PX 423 at 0006. |
| **153.** In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated AngioScore made "unsubstantiated accusations" that Konstantino "somehow breached his duties as a Board member of AngioScore." | PX 423 at 0006. |
| **154.** In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that "AngioScore has provided no details to support [] an accusation" that Konstantino has "somehow breached his duties as a Board member of AngioScore." | PX 423 at 0006. |
| **155.** In a letter to AngioScore's counsel dated March 21, 2010, Konstantino stated that AngioScore should "refrain from making these unsubstantiated accusations" or "Mr. Konstantino will have no choice but to consider his legal options." | PX 423 at 0006. |
| **156.** AngioScore sent the February 10, 2010 and March 5, 2010 letters to Konstantino to investigate the "specific details" of Konstantino's development activities prior to his resignation from AngioScore's Board | Trial Tr. at 275:19-276:4, 282:6-283:2, 283:10-24; PX 419; PX 421. |

A000161

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| on February 5, 2010. | |
| **157.** Konstantino's repeated misrepresentations, misdirection, and threats of legal action prevented AngioScore from becoming aware of when defendants began developing Chocolate. | Trial Tr. at 280:1-25, 283:21-24, 522:1-523:16, 633:7-14, 634:5-7. |
| **158.** AngioScore did not file a claim in 2010 because AngioScore did not know that "Chocolate existed at that point" and was intentionally led to believe that no specialty balloon existed. | Trial Tr. at 634:5-7; *see also* Trial Tr. at 271:14-272:4, 272:18-19, 486:5-487:10; 693:9-11. |
| **159.** While serving on AngioScore's Board, Konstantino filed a provisional patent application for Chocolate in October 2009. | Trial Tr. at 200:15-201:10; PX 63; PX 64 (October 2009 patent application). |
| **160.** After receiving two letters from AngioScore's counsel, Konstantino switched patent counsel and filed a second provisional patent application sometime in March 2010 without informing either of his patent lawyers of the substantially similar application from five months earlier. | Trial Tr. at 203:19-206:18; Heslin Dep. at 88:9-18; Shay Dep. at 39:14-19; PX 64 (October 2009 patent application); PX 419; PX 421; PX 422. |
| **161.** By filing a second provisional patent application in March 2010, Konstantino lost five months of patent priority. However, by citing to the second provisional patent application from March 2010 instead of the first provisional patent application from October 2009 in his March 2011 utility patent application, Konstantino ensured that the first provisional patent application from October 2009 | Trial Tr. at 201:15-203:13, 205:2-4; PX 64 (October 2009 patent application); PX 422; PX 427. |

A000162

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| would not become public. | |
| **162.** Konstantino's actions with respect to the patent application demonstrate an intent to deceive. | *See* FF *supra* 159-161. |
| **163.** TriReme provided substantial assistance to Konstantino's breach of fiduciary duty. | PFF 146-159. |
| **164.** Before Konstantino left AngioScore's Board of Directors, TriReme engineers helped develop and build the Chocolate device. Tanhum Feld, in his various roles at TriReme, worked with several TriReme employees to develop Chocolate, including Jayson Delos Santos, a TriReme Senior R&D Engineer, Maria Pizarro, TriReme's Director of R&D, and Gary Binyamin, TriReme's Technology Manager. | PX 109 at 0004 (September 2009 TriReme board meeting presentation containing organizational chart); PX 92 (December 2009 email between TriReme employees and Konstantino relating to design and prototype development for Chocolate); PX 87 (October 2009 email between Feld, Delos Santos, and Konstantino re same); PX 90 (November 2009 email between Feld and Delos Santos re same); Trial Tr. at 850:18-851:5, 863:17-864:15. |
| **165.** Konstantino and the TriReme employees who worked on Chocolate referred to themselves as the "Team." | PX 92; Trial Tr. at 156:4-25. |
| **166.** The TriReme Chocolate team created prototypes, solved technical issues such as bonding the nitinol cage to the balloon, and tested the device. | PX 87; PX 92; Trial Tr. at 328:23-329:14; 851:16-852:4. |
| **167.** Eight TriReme employees attended the January 15, 2010 testing of the Chocolate device at Stanford. | PX 18 at 0002 (recorded attendance at Stanford study, Konstantino included). |

A000163

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **168.** In February 2010, Trireme's Vice President of Marketing and Business Development traveled to Germany to meet with a company specializing in drug coating technology about a partnership involving Chocolate. | PX 222; PX 223; Trial Tr. at 331:7-22. |
| **169.** TriReme repeatedly listed Chocolate as a TriReme product in its presentations in late 2009 and early 2010. | PX 15 at 0005; PX 17 at 0004. |
| **170.** By February 3, 2010 TriReme had already decided "that Chocolate was going to be brought into the scope of products that TriReme was working on." | Trial Tr. at 328:6-15; PX 80. |
| **171.** The TriReme Chocolate team worked on Chocolate during TriReme's business hours, via TriReme's email system, using TriReme's engineering templates. | Trial Tr. at 879:17-880:6, 881:5-8, 22-24, 882:14-20; PX 65. |
| **172.** TriReme had the requisite knowledge for aiding and abetting. | FF *infra* 173-176. |
| **173.** Konstantino was TriReme's CEO in 2009 and 2010. | PX 109; Trial Tr. at 134:6-8. |

1  2  3  4  5  6  7  8  9  10  11  12  13  14  15  16  17  18  19  20  21  22  23  24  25  26  27  28

100

**A000164**

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **174.** As a co-creator of AngioSculpt and a co-founder of AngioScore, Feld knew AngioScore's line of business, knew that Konstantino was serving on AngioScore's Board, knew that Konstantino owed AngioScore fiduciary duties, knew AngioScore had only granted Konstantino a waiver to pursue bifurcated stents with TriReme, and knew that Chocolate and AngioScore were alternative tools—all while helping Konstantino develop the Chocolate device. | Trial Tr. at 840:25-843:3, 864:4-8 (Feld direct, confirming Feld's knowledge that Konstantino had been granted a waiver from AngioScore for his work with TriReme on Glider), 882:10-13 (confirming Feld's knowledge that Konstantino was on AngioScore's board while developing Chocolate), 879:13-16 (confirming that Feld knew that in such capacity, Konstantino had fiduciary duties to AngioScore); PX 127. |
| **175.** As a former employee of AngioScore who had worked on AngioSculpt, Maria Pizarro knew AngioScore's line of business, and knew that Konstantino was serving on AngioScore's Board. | Trial Tr. at 1028:12-14, 1028:25-1029:7; 1093:25-1094:3; PX 442. |
| **176.** GimMoey Ong, TriReme's HR and Marketing Manager, knew Konstantino was on AngioScore's Board, and knew that Chocolate would compete with AngioSculpt. | Trial Tr. at 969:10-21; Ong Dep. at 46:1-7; PX 124 at 0001, 0007; PX 125 at 0001, 0009. |
| **177.** Proteus Vascular Systems was an unincorporated association founded in 2009 that sought to develop and market the Chocolate device. | PX 124; PX 2 at 0002-0014; Trial Tr. at 241:7-20. |
| **178.** Proteus consisted of at least three individuals: James Dreher, Konstantino, and Feld. Dreher "led" Proteus, while Konstantino was the Chairman of the Board. | PX 124 at 0002; PX 445. |

101

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **179.** As part of his entrepreneurial practice, Dreher would quickly form a company and raise early money, and sell the company soon thereafter.  He applied this model to Chocolate and helped attract potential acquirers. | Trial Tr. at 175:17-19; 1324:8-22; PX 70 at 0001; PX 124. |
| **180.** Konstantino recruited employees, presented Chocolate to the Economic Development Board of Singapore, and sought funds for Proteus. | PX 70; PX 2 (December 2009 email between Cheng and Ong re Proteus's Chocolate device, attaching powerpoint presentation for Singapore Economic Development Board); PX 124; Trial Tr. at 239:8-241:1; PX 3. |
| **181.** On January 1, 2010, Konstantino signed a contract as Proteus' Chairman to help raise funds for the Chocolate project. | PX 3; Trial Tr. 242:18-244:11. |
| **182.** Konstantino represented that Quattro was "previously Proteus." | PX 6 at 0002; Trial Tr. at 246:3-9; PX 7. |
| **183.** According to an addendum to the January 10, 2010 fundraising contract Konstantino had signed as Chairman of Proteus, a few months later, Konstantino represented that "[t]he name Proteus Vascular Systems Pte Ltd was changed to Quattro Vascular Pte Ltd."  The addendum noted this name change and "Quattro" assumed the role previously held by "Proteus," with its rights and obligations. | PX 7; Trial Tr. at 247:15-248:4. |
| **184.** While still serving on AngioScore's Board, Konstantino held himself out as the Chairman of Proteus and later as a Director at Quattro. | PX 3; Trial Tr. 242:18-244:11; PX 7. |

102

**A000166**

| Findings of Fact | Supporting Evidence |
|---|---|
| **185.** On January 15, 2010, the company (apparently still known as Proteus at that time) sponsored a study at Stanford involving the Chocolate device. Later that year, the report from the study was released reflecting that "Quattro Vascular Pte Ltd" had sponsored the study. | PX 11; Trial Tr. at 248:5-23. |
| **186.** Quattro formally incorporated in March 2010. James Dreher, Konstantino, and others involved in the organization all agreed to the incorporation. | PX 1 at 0004. |
| **187.** Konstantino and Feld assigned their rights to the Chocolate device to Quattro for a 5% royalty and a cash payment. | Trial Tr. at 237:8-13. |
| **188.** Konstantino and Feld were founders and shareholders of Quattro when they transferred their rights to Chocolate. | PX 1 at 0004-0005. |
| **189.** QT Vascular is the product of a merger between TriReme and Quattro. | PX 43; Trial Tr. at 256:7-21 (Konstantino discussing representation he made on behalf of QT Vascular wherein he stated that "QTV is a result of a merger between Quattro Vascular and TriReme Medical"). |
| **190.** QT Vascular assumed the assets and liabilities of TriReme or Quattro wholesale in the final transaction. | PX 32; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15. |

United States District Court
Northern District of California

**A000167**

| Findings of Fact | Supporting Evidence |
|---|---|
| **191.** Momi Brosh, QT Vascular's corporate designee on the relationship among TriReme, Quattro, QT Vascular, stated that QT Vascular took on Quattro's and TriReme's assets and liabilities. | Trial Tr. at 969:22-970:2; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15; PX 32. |
| **192.** While defendants significantly changed the answers of Brosh's 30(b)(6) testimony after the fact, they did not dispute his answers on the above facts, and did not seek to amend his answers on the same. | *See* Dkt. Nos. 593-7; 593-8. Trial Tr. at 1126:6-12, 1127:22-1128:8 (Farwell direct); DX 1746 at 82-83; DX 1652 at 43-45. |
| **193.** Documents describing the terms for the QT Vascular transaction refer to it as a merger. | PX 32 at 0001 (Summary of terms for proposed merger, signed November 5, 2012); Trial Tr. at 252:13-254:23. |
| **194.** The TriReme Board minutes say that TriReme will merge with Quattro. | PX 30 at 0001-0002; Trial Tr. at 251:11-252:12. |
| **195.** Quattro wrote to its shareholders that it will merge with TriReme. | PX 33 (letter to Quattro shareholders dated November 6, 2012, explaining decision to merge, need for merger between TriReme and Quattro, "a merged entity would provide a complete platform for an IPO and a far more compelling story for a potential acquirer"); Trial Tr. 254:24-255:13. |
| **196.** Konstantino described the transaction to form QT Vascular as a merger. | PX 40; Trial Tr. at 255:19-256:6. |
| **197.** QT Vascular presentations state that QT Vascular "is a result of a merger between Quattro Vascular and TriReme Medical." | PX 43 at 0002; Trial Tr. at 256:7-21. |

United States District Court
Northern District of California

104

**A000168**

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **198.** Along with the assets and liabilities of Quattro and TriReme, QT Vascular "acquired 100% of the issued and outstanding capital stock" of Quattro and TriReme and that the "purchase consideration for the acquisition" was "satisfied by the allotment and issuance" of QT Vascular shares, "credited as fully paid." | Trial Tr. at 1328:3-17; PX 45 at 0080; Trial Tr. at 1125:16-23; 1128:5-8; PX 32 at 0001; Brosh Dep. at 277:19-22, 280:3-11, 281:2-15. |
| **199.** The shareholders of TriReme and Quattro became the shareholders of QT Vascular. | Trial Tr. at 1328:3-17; *see also* PX 45 at 0073. |
| **200.** AngioScore has experienced financial losses due to Chocolate's entry into the marketplace. | PX 152; PX 164; PX 130; Trial Tr. at 1235:1-1239:20. |
| **201.** AngioSculpt and Chocolate compete. As a result of defendants' competition and targeted pricing strategy, AngioScore lost share in the specialty balloon market. | PX 15 at 0005; PX 124 at 0007 (Proteus investor document noting AngioScore as potential competitor); PX 127 (February 2011 email between Feld and Konstantino noting AngioSculpt as competitor to Chocolate); PX 130 (October 2011 email between Dreaden, Konstantino, Haig, Benjamin re competitive information on AngioScore's pricing, discussing Chocolate pricing strategy); PX 132 at 0002 (TriReme competitor analysis spreadsheet noting AngioSculpt PTA and PTCA devices compete with Chocolate); PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioScore); PX 137 (December 2011 email re Chocolate noting pricing strategy keyed off of other balloons including AngioSculpt); PX 143 (December 2012 email between Haig and Borrell reflecting Chocolate pricing $25 less per unit than AngioSculpt); PX 154 (March 2013 sales email noting that "the closest |

105

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| | comparable product [to Chocolate] is the AngioSculpt"); PX 164 (June 2013 email between TriReme sales to customer noting that "most clinicians are replacing the use of Scoring/Cutting (AngioScore) devices with Chocolate"); PX 264 at 0163 (Millennium Research Group Report table noting that AngioScore had 12.5% of specialty balloon catheter market share in 2009); PX 294 at 0251 (Millennium Research Group Report table noting that AngioScore had 48.1% of the specialty balloon market share in 2013); Trial Tr. at 159:7-16 (Konstantino direct, noting that "specialty balloon" is a balloon that costs more than an average POBA), 520:3-13 (noting field of competitive specialty balloons consists of AngioSculpt, Chocolate, Vascutrak, and the Cutting Balloon), 185:1-186:3 (Konstantino direct, establishing that Konstantino considered Chocolate competitive ("a step up") with respect to AngioSculpt), 218:6-21 (Konstantino confirming that he utilizes Millennium Research Group reports), 335:9-340:17 (Konstantino direct, re competition between Chocolate and AngioSculpt), 343:19-344:7 (Haig direct, with respect to pricing), 348:10-349:4 (same), 353:18-25 (same, discussing Millennium Research Group report), 355:25-357:1 (Haig, discussing competitive products in specialty balloon market), 571:6-11 (same, discussing metal impressing upon plaque in the case of scoring or cutting balloons), 741:10-17 (Olsen direct, discussing lost profits from the end of 2011 to the end of 2Q14 for AngioScore), 1235:1-1239:20 (Prowse cross, discussing AngioSculpt and Chocolate as competitors occupying the same market). |

United States District Court
Northern District of California

| | Findings of Fact | Supporting Evidence |
|---|---|---|
| **202.** | The parties' damages experts generally agree on the methodology to calculate AngioScore's lost profits, and used the same numerical values for AngioScore's lost revenue, profit margin, and the applicable discount rate. | Trial Tr. at 1228:5-1229:25 (defendants' expert, Prowse, testifying that the material change in his calculation was with respect to market share percentages; revenue, profits, profit margin, gross profit margin remain the same). |
| **203.** | Chocolate and the AngioSculpt products are specialty balloons. | Trial Tr. at 159:7-16, 180:6-8, 325:18-326:10, 326:20-22, 408:23-409:12, 526:12-19, 577:25-578:3, 924:5-17; PX 142. |
| **204.** | The Chocolate and AngioSculpt products compete with each other in the specialty balloon market.  Within the specialty balloon sub-market, there are relatively few players.  As of 2013, the Millennium Research Group found the specialty balloon catheter market was primarily occupied by four companies:  Boston Scientific, C.R. Bard, Abbott Laboratories, and AngioScore.  The market share reflects that AngioScore was in close competition with Boston Scientific and its product, the Cutting Balloon:  AngioScore occupied 48.1% of the specialty balloon market and Boston Scientific occupied 47.1%.  C.R. Bard held 3.3% of the market with its specialty balloon, the Vascutrak.  Abbott Laboratories held only 1.3%. | FF *supra* 200-201; *infra* 205-220. PX 294 at 249-51; PX 142. |
| **205.** | Once a doctor decides "to use a specialty balloon for a particular procedure," the competition narrows to just four devices: "the AngioSculpt, the Chocolate, the Vascutrak, and the Cutting Balloon" and a drug-coated balloon, which recently entered the specialty balloon market. | Trial Tr. at 520:3-13; Trial Tr. at 922:11-19, 923:11-18 (Garcia direct). |

107

**A000171**

| Findings of Fact | Supporting Evidence |
|---|---|
| **206.** AngioScore has lost sales due to Chocolate's entry into the specialty balloon catheter marketplace. | Trial Tr. at 418:18-419:5 (attesting to diversion of resources at AngioScore due to threat from Chocolate); 444:20-445:21 (Viano discussing losing five to ten units a month to Chocolate, including losing sales to Dr. Garcia, defendants' industry expert); PX 152; PX 164 (defendants' email reflecting observation that clinicians were replacing AngioScore devices with Chocolate). |
| **207.** TriReme used specialty balloons to set their initial prices for Chocolate. | PX 137 at 0014; Trial Tr. at 336:11-15, 339:19-340:7, 340:10-17, 341:16-24, 348:10-349:4. |
| **208.** TriReme's sales force targeted doctors who used specialty balloons. | PX 164; PX 124 at 0007; PX 130; PX 132 at 0002; PX 137 at 0014; PX 152; PX 154; Trial Tr. at 336:11-15. |
| **209.** Documents show that TriReme employees stated that AngioScore was Chocolate's "closest competitor." | PX 143; PX 154; PX 132 at 0002; PX 127; Trial Tr. at 343:19-344:7. |
| **210.** TriReme employees gathered pricing information on AngioScore, and strategically priced Chocolate $25 below AngioSculpt to "get faster uptick" in AngioScore accounts. | PX 130; PX 143; PX 137 at 0014; PX 135 (December 2011 email from Dreaden to other TriReme employees regarding Chocolate pricing, attaching tables confirming that at each available size, Chocolate is exactly $25 less per unit than AngioSculpt); Trial Tr. at 335:14-336:15. |
| **211.** TriReme's Vice President of Marketing & Business Development regarded AngioScore accounts as "an opportunity for TriReme" because premium "pricing had already been established for specialty balloons." | Trial Tr. 336:11-15. |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

108

United States District Court
Northern District of California

| Findings of Fact | Supporting Evidence |
|---|---|
| **212.** POBAs are priced around $150 to $200 per unit. Specialty balloons are priced much higher than that, up to $1000 per unit, depending on length. | Trial Tr. at 412:7-9 (Viano direct). |
| **213.** AngioScore and defendants use the Millennium Research Report in the course of their businesses. | Trial Tr. at 218:6-21; 353:18-25; 571:6-18. |
| **214.** No trial evidence established that either party used the iData Research Report, nor did Dr. Prowse offer any reason to use the iData Research Report to determine AngioScore's market share. | Trial Tr. at 571:19-23. |
| **215.** According to the Millennium Research Reports, AngioScore had between a 39% and 48% of the specialty balloon catheter market between 2011 and 2014. | PX 264 at 163; PX 294 at 251; Trial Tr. at 218:6-21; 353:18-25; 571:6-11. |
| **216.** Chocolate made $11,269,00 in revenue from 2011 to 2014. | PX 388; Trial Tr. 742:1-742:7; PX 381 at 0028. |
| **217.** Applying AngioScore's market share to Chocolate's revenue, AngioScore lost $5,335,000 in revenue to Chocolate. | Trial Tr. at 757:9-17; PX 264 at 163; PX 294 at 251; Trial Tr. at 218:6-21; 353:18-25; 571:6-11; PX 381 at 0028. |
| **218.** AngioScore had profit margins between 55% and 58%. | Trial Tr. at 758:5-760:2; PX 351; PX 369-372; PX 381 at 0028. |
| **219.** Applying AngioScore lost revenue shows that AngioScore lost $2.97 million to Chocolate from 2011 to 2014. | Trial Tr. at 741:10-24; PX 381 at 0028. *See also* Trial Tr. at 444:20-445:21 (Viano cross, discussing losing five to ten units a month to Chocolate, including losing sales to Dr. Garcia, defendants' industry expert). |

109

**A000173**

| Findings of Fact | Supporting Evidence |
|---|---|
| **220.** If Chocolate remains on the market through 2019, AngioScore will suffer $17.064 million in lost profits. | Trial Tr. at 759:22-760:2, 772:21-25. |
| **221.** Konstantino received $250,000 by agreeing to an invention assignment agreement of Chocolate. | DX 1435 at 0003. |
| **222.** Konstantino receives a 2.85% royalty on Chocolate sales. | Trial Tr. at 1342:13-22. |
| **223.** Konstantino has 15 million shares of QT Vascular stock. | Trial Tr. at 1336:23-1338:4. |
| **224.** Konstantino has stock options in QT Vascular. | Trial Tr. at 1336:23-25. |

United States District Court
Northern District of California

110

**A000174**

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

**ANGIOSCORE, INC.**,

Plaintiff,

Case No.  12-cv-03393-YGR

8

9

v.

**ORDER DENYING DEFENDANTS' MOTION FOR ATTORNEY'S FEES**

10

**TRIREME MEDICAL, INC., ET AL.**,

Defendants.

Re: Dkt. No. 827

11

12          After prevailing at the patent trial in the above-captioned case, defendants filed the instant

13    motion seeking attorney's fees, pursuant to Federal Rule of Civil Procedure 54(d), under: (1) the

14    "exceptional case" provision of 35 U.S.C. § 285, or (2) the Court's inherent power to impose

15    sanctions.  (Dkt. No. 827.)  Defendants request fees in the amount of $4,786,497.75.  (*Id.* at 25.)

16    Plaintiff opposes the motion.  (Dkt. No. 836.)

17          Having carefully considered the papers submitted and the record in this case,[1] and good

18    cause shown, the Court hereby **DENIES** the motion.

19    **I.    LITIGATION HISTORY**

20          Plaintiff initiated this suit on June 29, 2012, alleging infringement of two patents: U.S.

21    Patent Nos. 7,691,119 (the "'119 Patent") and 7,931,663 (the "'663 Patent").  (Dkt. No. 1.)  On

22    August 16, 2012, plaintiff filed an amended complaint, no longer asserting infringement of the

23    '663 Patent.  (Dkt. No. 12.)  On December 5, 2012, the Court denied as premature defendants'

24    motion for sanctions under Federal Rule of Civil Procedure 11 alleging an inadequate pre-suit

25

26          _____

            [1] The Court has determined that the motion is appropriate for decision without oral

27    argument, as permitted by Civil Local Rule 7-1(b) and Federal Rule of Civil Procedure 78.  *See*
      *also Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th

28    Cir. 1991).  Thus, the hearing on the motion set for December 15, 2015 is **VACATED**.

United States District Court
Northern District of California

1    investigation.  (Dkt. No. 54.)  On June 25, 2014, the Court granted, in part, defendants' motion for

2    summary judgment on the patent claim.  (Dkt. No. 218.)  In the same order, in light of plaintiff's

3    discovery of a potential breach of fiduciary duty by defendant Eitan Konstantino, the Court

4    granted plaintiff leave to amend to assert related state law claims.  (Dkt. No. 219.)

5         On March 3, 2015, the Court bifurcated the state law claims from the patent claim, as the

6    former were subject to a bench trial and the latter to a jury trial.  (Dkt. No. 582.)  Following a six-

7    day bench trial on the state law claims, the Court issued its Findings of Fact and Conclusions of

8    Law on July 1, 2015, detailing the history of this dispute and finding in favor of plaintiff on its

9    state law claims for breach of fiduciary duty.  *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-CV-

10   03393-YGR, 2015 WL 4040388 (N.D. Cal. July 1, 2015).  In September 2015, a jury trial was

11   held on plaintiff's patent infringement claim, resulting in a verdict of non-infringement and

12   invalidity as to all of the asserted claims of the '119 Patent.  (Dkt. No. 790.)  Judgment was

13   entered on October 14, 2015.  (Dkt. No. 812.)

14   **II.    LEGAL STANDARDS**

15       **A.    35 U.S.C. § 285**

16       The Patent Act provides that "[t]he court in exceptional cases may award reasonable

17   attorney fees to the prevailing party."  35 U.S.C. § 285.  An "'exceptional' case . . . is simply one

18   that stands out from others with respect to the substantive strength of a party's litigating position

19   (considering both the governing law and the facts of the case) or the unreasonable manner in

20   which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct.

21   1749, 1756 (2014).  The determination of what is "exceptional" is a made in exercise of the

22   court's discretion taking into account the totality of the circumstances.  *Id.*  The court considers

23   such factors as evidence of bad faith litigation, objectively unreasonable positions, or improper

24   conduct.  *See id.* at 1756-57.  In short, attorneys' fees under 35 U.S.C. § 285 are awarded "in the

25   rare case in which a party's unreasonable conduct—while not necessarily independently

26   sanctionable—is nonetheless so 'exceptional' as to justify an award of fees."  *Id.* at 1757.  A

27   district court's determination under this statute is reviewed for an abuse of discretion.  *Highmark*

28   *Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1747 (2014).

2

**A000180**

United States District Court
Northern District of California

**B.    Sanctions Under the Court's Inherent Power**

The Court "has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct." *Fink v. Gomez*, 239 F.3d 989, 992-94 (9th Cir. 2001) (finding "mere recklessness, without more, does not justify sanctions under a court's inherent power" but that "[s]anctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose").

**III.    DISCUSSION**

Although the patent case was not particularly strong, it was not exceptionally weak—as evidenced in part by its survival through summary judgment.  Notably, this Court's rulings on motions *in limine* decided immediately preceding the patent trial—including, for example, as to a doctrine of equivalents theory regarding the "end" limitation—foreclosed certain stronger arguments and evidence sought to be introduced due to plaintiff's failure to make timely disclosures.  (Dkt. No. 749.)[2]  The ultimate avenue available to plaintiff to prove infringement was, by the time the case was presented to the jury, fairly narrow, but not unreasonably so.  Thus, while defendants ultimately prevailed in the patent case, that outcome alone does not warrant a finding that the case is exceptional, especially given the excluded opinions.

Defendants have also failed to establish the case was unreasonably litigated.[3]  According to defendants, plaintiff filed a frivolous patent case solely in order to "disrupt" defendants' business and as a "pretext" to obtain discovery to support its anticipated state law claims.  (Dkt. No. 827 at 3-4.)  In support of this theory, defendants offer largely speculation.  Defendants do point to a contemporaneous email from plaintiff's CEO wherein he noted that potential investors in

---

[2] Similarly, plaintiff was appropriately sanctioned for its failure to disclose Dr. Levenston's measurements in a timely manner and consequently testimony and other evidence directly relating to those measurements were excluded at trial.

[3] The Court also notes that all parties were particularly litigious.  Given the considerable judicial resources expended for motions brought by both sides, the Court declines to recount the entire case history herein.  However, if mere contentious litigation warranted an award of attorney's fees, the granting of such fees in patent cases would be the rule rather than the exception.

3

1    defendant TriReme Medical, Inc. might be in for a "big surprise" upon discovering the "major

2    lawsuit" plaintiff had filed. (*Id.* at 4.) However, there is nothing inherently suspect about that

3    observation. A CEO might make such a remark regarding a suit brought in good faith. Moreover,

4    unless the patent case was itself meritless, plaintiff's use of the discovery process in connection

5    therewith to learn of the related conduct that ultimately led to its assertion of state law claims is

6    not necessarily improper. A party is free to seek leave to amend its complaint if, in the course of

7    discovery, it learns of alternative bases for relief. The Court finds that the totality of the

8    circumstances at issue here does not suggest the patent suit was brought in bad faith, with an

9    improper purpose, or in the absence of an adequate pre-filing investigation.[4] Defendants have put

10    forth no authority supporting an exceptional case finding in such a context.

11        In light of the foregoing, the Court is not convinced that this was an "exceptional case," or

12    that counsel acted with "subjective bad faith." The Court also declines to award sanctions under

13    its inherent power in light of these findings.

14    **IV.    CONCLUSION**

15        For the foregoing reasons, the Court **DENIES** defendants' motion for attorney's fees.

16        This Order terminates Docket Number 827.

17        **IT IS SO ORDERED.**

18    Dated: December 9, 2015

19

20        **YVONNE GONZALEZ ROGERS**
          **UNITED STATES DISTRICT COURT JUDGE**

21

22

23        _____

          [4] The adequacy of the pre-filing investigation was previously demonstrated by plaintiff's
24    submission of three declarations at Docket Numbers 33-35. In light of subsequent developments
      in the case, the Court finds the pre-filing investigation was reasonable. Moreover, defendants'
25    complaint regarding the number of experts retained by plaintiff (five on infringement and two on
      validity, with three infringement experts testifying at trial) does not justify an exceptional case
26    finding. Defendants raise a number of other concerns regarding quotidian—if less than ideal—
      litigation conduct by plaintiff, such as in regards to the deposition of Mr. Olsen, which was
27    prematurely terminated but which resumed shortly thereafter upon the order of Magistrate Judge
      Corley. (Defendants ignore this Court's sanctions related to their own deposition conduct.)
28    However, none of these issues, either standing alone or together, render this case exceptional.

4



US007691119B2

(12) **United States Patent**
Farnan

(10) **Patent No.: US 7,691,119 B2**
(45) **Date of Patent: Apr. 6, 2010**

(54) **BALLOON CATHETER WITH NON-DEPLOYABLE STENT**

(75) Inventor: **Robert C. Farnan**, Davie, FL (US)

(73) Assignee: **AngioScore, Inc.**, Fremont, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 759 days.

(21) Appl. No.: **10/399,589**

(22) PCT Filed: **Nov. 6, 2002**

(86) PCT No.: **PCT/US02/35547**

§ 371 (c)(1),
(2), (4) Date: **Sep. 2, 2003**

(87) PCT Pub. No.: **WO03/041760**

PCT Pub. Date: **May 22, 2003**

(65) **Prior Publication Data**

US 2005/0049677 A1      Mar. 3, 2005

(51) **Int. Cl.**
*A61B 17/22* (2006.01)
*A61M 29/00* (2006.01)

(52) **U.S. Cl.** ...................... 606/194; 606/191; 606/159

(58) **Field of Classification Search** ............... 606/191, 606/194, 159; 623/1.23; 604/103.07, 103.08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,854,983 | A | 10/1958 | Baskin |
| 4,950,227 | A | 8/1990 | Savin et al. |
| 5,071,407 | A | 12/1991 | Termin et al. |
| 5,102,417 | A | 4/1992 | Palmaz |
| 5,108,416 | A | 4/1992 | Ryan et al. |
| 5,176,693 | A * | 1/1993 | Pannek, Jr. ................. 606/159 |
| 5,190,058 | A | 3/1993 | Jones et al. |

| | | | |
|---|---|---|---|
| 5,449,373 | A | 9/1995 | Pinchasik et al. |
| 5,456,667 | A | 10/1995 | Ham et al. |
| 5,527,282 | A | 6/1996 | Segal |

(Continued)

FOREIGN PATENT DOCUMENTS

EP          1 179 323 A2      2/2002

(Continued)

OTHER PUBLICATIONS

PCT Search Report mailed May 20, 2003 by Jacki Tan-Uyen T. Ho.

(Continued)

*Primary Examiner*—Julian W Woo
*Assistant Examiner*—Melissa Ryckman
(74) *Attorney, Agent, or Firm*—Townsend and Townsend and Crew LLP

(57) **ABSTRACT**

An angioplasty balloon including a non-deployable stent to prevent or reduce the potential for slippage of the inflated balloon with respect to the vessel wall being treated. The balloon includes a non-deployable stent that is adapted to be secured to the balloon or angioplasty balloon catheter. The stent has a proximal end, a distal end, and at least three radially-spaced struts, each strut connecting the proximal end to the distal end and having one or more bends that allow expansion of the strut to accommodate the inflation of the balloon. The stent is made of a material so that the stent collapses upon deflation or the balloon.

**9 Claims, 11 Drawing Sheets**



US 7,691,119 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,571,086 | A | 11/1996 | Kaplan et al. |
| 5,607,442 | A * | 3/1997 | Fischell et al. ............ 623/1.18 |
| 5,730,698 | A | 3/1998 | Fischell et al. |
| 5,755,781 | A | 5/1998 | Jayaraman |
| 5,766,238 | A | 6/1998 | Lau et al. |
| 5,797,935 | A * | 8/1998 | Barath ........................ 606/159 |
| 5,868,779 | A | 2/1999 | Ruiz |
| 5,904,698 | A | 5/1999 | Thomas et al. |
| 5,994,667 | A | 11/1999 | Merdan et al. ......... 219/121.67 |
| 6,036,686 | A | 3/2000 | Griswold |
| 6,036,689 | A | 3/2000 | Tu et al. |
| 6,053,913 | A * | 4/2000 | Tu et al. ......................... 606/41 |
| 6,071,285 | A | 6/2000 | Lashinski et al. |
| 6,071,286 | A | 6/2000 | Mawad |
| 6,077,298 | A | 6/2000 | Tu et al. |
| 6,106,548 | A * | 8/2000 | Roubin et al. ............. 623/1.15 |
| 6,117,104 | A | 9/2000 | Fitz |
| 6,146,323 | A | 11/2000 | Fischell |
| 6,152,944 | A | 11/2000 | Holman et al. |
| 6,190,403 | B1 | 2/2001 | Fischell et al. |
| 6,203,569 | B1 | 3/2001 | Wijay |
| 6,206,910 | B1 * | 3/2001 | Berry et al. ................ 623/1.15 |
| 6,309,414 | B1 | 10/2001 | Rolando et al. |
| 6,312,459 | B1 | 11/2001 | Huang et al. ............... 623/1.15 |
| 6,325,779 | B1 | 12/2001 | Zedler |
| 6,371,961 | B1 | 4/2002 | Osborne et al. |
| 6,416,539 | B1 | 7/2002 | Hassdenteufel |
| 6,475,234 | B1 | 11/2002 | Richter et al. |
| 6,569,180 | B1 | 5/2003 | Sirhan et al. |
| 6,605,107 | B1 | 8/2003 | Klein |
| 6,613,072 | B2 | 9/2003 | Lau et al. |
| 6,648,912 | B2 | 11/2003 | Trout, III et al. |
| 6,663,660 | B2 | 12/2003 | Dusbabek et al. |
| 2001/0001823 | A1 | 5/2001 | Ryan |
| 2001/0007082 | A1 | 7/2001 | Dusbabek et al. |
| 2001/0016753 | A1 | 8/2001 | Caprio et al. |
| 2002/0038144 | A1 | 3/2002 | Trout, III et al. |
| 2002/0045930 | A1 | 4/2002 | Burg et al. |
| 2002/0111633 | A1 | 8/2002 | Stoltze et al. |
| 2002/0165599 | A1 | 11/2002 | Nasralla |
| 2003/0028235 | A1 | 2/2003 | McIntosh et al. |
| 2003/0074046 | A1 | 4/2003 | Richter |
| 2003/0105509 | A1 | 6/2003 | Jang et al. |
| 2003/0149468 | A1 | 8/2003 | Wallsten |
| 2003/0171799 | A1 | 9/2003 | Lee et al. |
| 2003/0187494 | A1 | 10/2003 | Loaldi |
| 2003/0195609 | A1 | 10/2003 | Berenstein et al. |
| 2003/0199970 | A1 | 10/2003 | Shanley |
| 2003/0199988 | A1 | 10/2003 | Devonec et al. |
| 2003/0208255 | A1 | 11/2003 | O'Shaughnessy et al. |
| 2006/0149308 | A1 | 7/2006 | Melsheimer et al. |
| 2006/0184191 | A1 | 8/2006 | O'Brien |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 98/05377 | 2/1998 |
| WO | WO 03/041760 A2 | 5/2003 |

## OTHER PUBLICATIONS

PCT Search Report for International Application No. PCT/US04/27836, mailed Dec. 30, 2004 by Jackie Tan-Uyen T. Ho.

* cited by examiner

A000332



FIG. 1

Case: 16-1126  Document: 53  Page: 229  Filed: 02/16/2016



FIG. 2

A000334



FIG. 3



FIG. 4

Case: 16-1126   Document: 53   Page: 232   Filed: 02/16/2016



FIG. 5



FIG. 6



FIG. 7

Case: 16-1126 Document: 53 Page: 235 Filed: 02/10/2016



FIG. 8

Case: 16-1126   Document: 53   Page: 236   Filed: 02/10/2016



FIG. 9

A000341



FIG. 10



FIG. 11

A000343

US 7,691,119 B2

1

## BALLOON CATHETER WITH NON-DEPLOYABLE STENT

### BACKGROUND OF THE INVENTION

When a balloon used for percutaneous transluminal angioplasty (PTA) or percutaneous transluminal coronary angioplasty (PTCA) is inflated and forced into contact with the plaque, the balloon can have a tendency to move or slip longitudinally in relation to the vessel wall being 10 treated.

Cutting balloons (atherotomy) have recently shown clinical efficacy in preventing the reoccurrence of some types of restenosis (specifically calcified lesions and in-stent restenosis). The cutting balloon is a coronary dilatation catheter with 15 3 to 4 atherotomes (microsurgical blades) bonded longitudinally on the balloon surface. As the cutting balloon is inflated, the atherotomes move radially and open the occluded artery by incising and compressing the arterial plaque in a controlled manner. An additional advantage of the cutting bal- 20 loon is that it maintains its position during inflation by using the metal blades on the external surface of the balloon to penetrate into the tissue and prevent the balloon from moving.

Accordingly, it is the principal objective of the present invention to provide a PTA or PTCA balloon that, like a 25 cutting balloon, has a reduced potential of slippage when inflated in a vessel.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of an inflated angioplasty 30 balloon incorporating a non-deployable stent according to the present invention.

FIG. 2 is a plan view of the inflated angioplasty balloon and non-deployable stent of FIG. 1.

FIG. 3 is a perspective view of the non-deployable stent in 35 its expanded condition, as shown in FIG. 1, with the angioplasty balloon removed so as to more clearly show the stent.

FIG. 4 is a plan view of the non-deployable stent of FIG. 3.

FIG. 5 is a perspective view of an alternate embodiment of 40 the non-deployable stent associated with an angioplasty balloon that has a longer working length than the angioplasty balloon shown in FIGS. 1 and 2.

FIG. 6 is an engineering drawing showing, in plan view, the layout of a non-deployable stent adapted to be used with an 45 angioplasty balloon of 20 mm in length. (All dimensions shown in the drawing are in inches.)

FIG. 7 is a perspective view of an inflated angioplasty balloon incorporating an alternative embodiment of a non-deployable stent which does not include any connecting ele- 50 ments between the struts intermediate the ends of the balloon.

FIG. 8 is a perspective view of the non-deployable stent shown in FIG. 7, with the angioplasty balloon removed so as to more clearly show the stent.

FIGS. 9 and 10 are perspective views similar to FIGS. 1, 5, 55 and 7 showing a further embodiment of the invention.

FIG. 11 is a perspective view of a further embodiment of the present invention showing the balloon and non-deployable stent in conjunction with a catheter.

### DESCRIPTION

The non-deployable stent of the present invention may be used in conjunction with a conventional balloon catheter. A PTA or PTCA catheter (dilatation catheter) may be a coaxial 65 catheter with inner and outer members comprising a guide wire lumen and a balloon inflation lumen, respectively. Each

2

member can have up to 3 layers and can be reinforced with braids. The proximal end of the catheter has a luer hub for connecting an inflation means, and a strain relief tube extends distally a short distance from the luer hub. The distal ends of 5 the outer and inner members may include a taper. The catheter shaft is built using conventional materials and processes. A catheter having multi-durometer tubing with variable stiffness technology is also a possibility. The catheter should be compatible with a 6 F guide catheter. Optionally, the catheter 10 may be a multi-lumen design.

The balloon 1 may be made of either nylon or nylon copolymer (compliant, non-puncture) or PET (high pressure, non-compliant) with a urethane coating to provide tackiness. The balloon may be a multi-layered balloon with a non-15 compliant inner layer to a most compliant outer layer. For example, a inner most layer of PET, which provides a higher pressure balloon, surrounded by an outer layer of nylon, which provides a more puncture-resistant surface. The balloon may be from 1.5-12 mm in diameter (1.5-4 mm for 20 coronary and 4-12 mm for peripheral vessels) and 15-60 mm in length (15-40 mm for coronary and up to 60 mm for peripheral vessels). The balloon inflation pressure will be from 8-20 atmospheres, depending on the wall thickness of the balloon. When inflated, the balloon ends or necks are 25 cone-shaped.

In keeping with the invention, the balloon is provided with a Nitinol (NiTi) structure, generally designated 2, that incorporates bends for both radial and longitudinal expansion of the Nitinol structure 2 in response to longitudinal and radial 30 expansion of the balloon during inflation, so that the Nitinol structure 2 maintains the balloon in its intended position during inflation. This Nitinol structure 2 can be described as a non-deployable or temporary stent that provides for both controlled cracking of vessel occlusion and gripping of vessel 35 wall during an angioplasty procedure. The Nitinol structure 2 comprises a laser cut hypo tube that expands upon inflation of the balloon, but collapses upon deflation of the balloon because of the super-elastic properties of the Nitinol material, rather than remain expanded in the deployed condition, as 40 would stents in general.

The Nitinol structure or non-deployable stent 2 has a proximal end 3, a distal end 4, and, therebetween, anywhere from 3-12 struts or wires 5 (depending on balloon size—but most likely 3-4 struts) with a pattern of radial and longitudinal 45 bends. The use of laser cutting in connection with stent manufacture is well known (See, e.g., Meridan et al. U.S. Pat. No. 5,994,667), as is the use of the super-elastic nickel—titanium alloy Nitinol (see e.g., Huang et al. U.S. Pat. No. 6,312,459).

As seen in FIGS. 1-4, each end of the linear, longitudinally 50 aligned four struts 5 has a sinusoidal bend 6 that allows the laser cut hypo tube to expand longitudinally when the balloon 1 is inflated. The linear length of the sinusoidal bends 6 is sized to accommodate the longitudinal expansion of the balloon 1 due to inflation. The strut or wire 5 cross sectional 55 shape can be round, triangular or rectangular. Preferred diameter of the struts 5 ranges from 0.003 to 0.010 inch.

At the longitudinal center of the hypo tube, a U-shaped circumferential connector 7 joins each strut 5 to its adjacent 60 strut. As best seen in FIGS. 3 and 4, the U-shaped connectors 7 are on opposing sides of the central radial axis. The distal end 4 of the hypo tube is adhered to the distal neck of the balloon or the distal end of the catheter shaft, and the proximal 65 end 3 of the hypo tube is either attached to the proximal neck of the balloon or to the proximal end of the catheter shaft. The struts 5 may be attached to the working region of the balloon 1 to assist the hypo tube in staying with the balloon as it

US 7,691,119 B2

3

inflates and deflates, and an adhesive, such as a cyanoacrylate adhesive, may be used to tack the struts down onto balloon at various points.

Catheter shafts to which the balloon and laser cut hypo tube are attached can have diameters ranging from 2.5 F to 8 F, and the distal end may be tapered and slightly less in diameter than the proximal end.

In FIG. 6, the dimensions of the laser cut hypo tube are for use with a 3 mm (0.118 in) diameter by 20 mm length balloon. The circumference of a 3 mm balloon is $nD=3.14(3$ mm)=9.42 mm or 0.37 in. As can be readily appreciated, the total length of all U-shaped connectors 7 (up and back) must be greater than the circumference of the inflated balloon 1. The length of each U-shaped connector 7 (up and back), may be calculated using the following equation:

$$\frac{\Pi d}{n},$$

where d is the diameter of the inflated balloon and n is the number of struts. The total length of the U-shaped bends (up and back) must exceed this length.

The resulting number is divided by 2 to get the length which each up-and-back side of the U-shaped connector should exceed. For example: for a 3 mm balloon compatible, laser-cut hypo tube with four struts, the length of each U-shaped connector (up and back) is 0.37 inch divided by 4=0.0925 in. Further divide by 2 and to get 0.04625 in. This is the length that each side of the U-shaped connector must exceed.

There is also one or more sets of U-shaped connectors 7 in between the sinusoidal bends 6. The set includes one U-shaped connector for each strut (3 struts—a set of 3 U-shaped connectors; 4 struts—a set of 4 U-shaped connector; and so on). The number of U-shaped connector sets depends on the length of the balloon and thus, the length of the laser cut hypo tube. For a 20 mm length balloon, there is one set of U-shaped connectors spaced 10 mm from the end (at the halfway point along length of balloon). For a 40 mm length balloon, there are three sets of U-shaped connectors spaced in 10 mm increments (the first set is spaced 10 mm from one end; the second set is spaced 10 mm from first set; and the third set is spaced 10 mm from each the second set and the other end). The equation for number of sets of U-shaped connectors.

4

$$\frac{L}{10} - 1.$$

where L=length of balloon in mm. Other embodiments, such as those shown in FIGS. 7 and 8, have linear, longitudinally aligned struts 5 with bends 6 at each end which do not incorporate the intermediate U-shaped connectors.

What is claimed:

1. An angioplasty balloon catheter comprising:
   a catheter shaft carrying an inflatable/deflatable balloon having a proximal end and a distal end; and
   a non-deployable radially expansible stent comprising a hypo tube disposed over the balloon and comprising a proximal end; a distal end; and at least three longitudinally aligned, radially-spaced struts, wherein each strut extends from the proximal end to the distal end and prior to radial expansion has one or more bends that allow longitudinal expansion of the strut to accommodate radial expansion of the stent upon inflation of the balloon; wherein the distal end of the hypo tube is attached to the distal end of the catheter shaft and the proximal end of the tube is attached to the proximal end of the catheter shaft and the stent is made of a material having a memory so that the stent radially collapses and the struts longitudinally shorten upon deflation of the balloon.

2. The angioplasty balloon of claim 1 wherein the stent is made of an alloy of nickel and titanium.

3. The angioplasty balloon of claim 1 wherein the struts of the stent have a diameter of from 0.003" to 0.010".

4. The angioplasty balloon of claim 1 wherein the bends in the struts of the stent are sinusoidal.

5. The angioplasty balloon of claim 1 wherein the hypo tube is laser cut.

6. The angioplasty balloon of claim 1 wherein the stent is secured to the balloon by an adhesive.

7. The angioplasty balloon of claim 6 wherein the adhesive is a cyanoacrylate.

8. The angioplasty balloon of claim 1 wherein the struts of the stent are connected to each other intermediate the proximal end and distal end by connectors that include a bend which allows longitudinal expansion of the connectors to accommodate radial expansion of the balloon.

9. The stent of claim 8 wherein the connectors in the struts comprise sinusoidal bends.

\* \* \* \* \*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2016, I electronically filed the

foregoing document with the United States Court of Appeals for the Federal

Circuit by using the appellate CM/ECF system.  I certify that all participants in the

case are registered CM/ECF users and that service will be accomplished by the

appellate CM/ECF system.


Dated:  February 16, 2016                    /s/  Lisa S. Blatt_____
                                             Lisa S. Blatt

## CERTIFICATE OF COMPLIANCE

1.     The foregoing Brief of Defendants-Appellants Trireme Medical, LLC,

Quattro Vascular PTE Ltd., and QT Vascular Ltd. complies with the type-volume

limitations of Fed. R. App. P. 29(d) because the brief contains 13,340 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     The brief also complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced typeface using

Microsoft Word 2007 in Times New Roman 14-point font.


Dated:  February 16, 2016              /s/  Lisa S. Blatt
                                       Lisa S. Blatt