# United States Court of Appeals

*for the*

# Federal Circuit

ANGIOSCORE, INC.,

*Plaintiff-Appellee,*

— v. —

TRIREME MEDICAL, LLC, QUATTRO VASCULAR PTE LTD.,
QT VASCULAR LTD. and EITAN KONSTANTINO,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 4:12-CV-3393
HONORABLE YVONNE GONZALEZ ROGERS

## BRIEF FOR PLAINTIFF-APPELLEE

PETER J. ARMENIO, P.C.
WILLIAM B. ADAMS
CLELAND B. WELTON II
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

ROBERT P. FELDMAN
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
(650) 801-5000

*Attorneys for Plaintiff-Appellee AngioScore, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee AngioScore, Inc. certifies the following:

**1.     The full name of every party or amicus represented by me is:**

AngioScore, Inc.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Not applicable.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

AngioScore, Inc. is a wholly owned subsidiary of The Spectranetics Corporation. No publicly held company owns 10 percent or more of The Spectranetics Corporation's stock.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:**

QUINN EMANUEL URQUHART & SULLIVAN, LLP: Kathleen M. Sullivan, Peter J. Armenio, William B. Adams, Margret M. Caruso, Diane M. Doolittle, Laura L. Fairneny, Robert P. Feldman, Claire D. Hausman, Rachel H. Kassabian, Diem-Suong T. Nguyen, Matthew D. Robson, Meredith M. Shaw, Margaret H. Shyr, Nathan N. Sun, Cleland B. Welton II, Rebecca A. Bers (no longer with the firm), Jennifer J. Matystik (no longer with the firm), Kimball D. Parker (no longer with the firm)

SHEPPARD, MULLIN, RICHTER & HAMILTON LLP: James W. Geriak, Andre De La Cruz (no longer with the firm), Steven M. Hanle (no longer with the firm)

FARBER LLC: Mark Farber

DICKSTEIN SHAPIRO LLP: Allan W. Jansen (no longer with the firm), Charles A. Kertell (no longer with the firm), Ehab M. Samuel (no longer with the firm)

LAW OFFICES OF ROBERT E. WHITE: Robert Edward White

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF AUTHORITIES ........................................................................v

STATEMENT OF RELATED CASES .................................................xiv

PRELIMINARY STATEMENT ..................................................................1

JURISDICTIONAL STATEMENT ............................................................4

COUNTERSTATEMENT OF THE ISSUES............................................4

COUNTERSTATEMENT OF THE CASE.................................................5

      A.     AngioScore's Specialty Angioplasty Balloon-Catheter Business ........5

      B.     Konstantino's Role As A Director Of AngioScore..............................6

      C.     Defendants' Development Of A Competing Specialty Angioplasty Balloon-Catheter Device ........................................................................7

      D.     Konstantino's And TriReme's Concealment Of Chocolate From AngioScore ..........................................................................................9

      E.     AngioScore's Patent-Infringement Suit And Consequent Discovery Of Konstantino's Breach Of Fiduciary Duty....................13

      F.     The Proceedings Below.......................................................................15

            1.     The Pretrial Proceedings .........................................................15

            2.     The District Court's Findings Of Fact And Conclusions Of Law..........................................................................................17

            3.     The Post-Trial Proceedings.....................................................21

SUMMARY OF ARGUMENT .................................................................22

STANDARDS OF REVIEW .....................................................................23

ARGUMENT .............................................................................................24

# TABLE OF CONTENTS
## (continued)

**Page**

I.    THE DISTRICT COURT PROPERLY EXERCISED SUPPLEMENTAL JURISDICTION OVER ANGIOSCORE'S STATE-LAW CLAIMS ..............................................................................24

    A.    AngioScore's Claims Form Part Of A Single "Case" And "Controversy" Over The Chocolate Device.......................................24

        1.    AngioScore's Claims Share A "Common Nucleus Of Operative Fact" .......................................................................25

        2.    Defendants Fail To Disaggregate AngioScore's Claims..........28

    B.    The District Court Was Well Within Its Discretion To Exercise Jurisdiction ...........................................................................31

II.    THE DISTRICT COURT CORRECTLY FOUND THAT ANGIOSCORE'S CLAIMS WERE TIMELY FILED.................................33

III.    THE DISTRICT COURT CORRECTLY FOUND THAT KONSTANTINO BREACHED HIS FIDUCIARY DUTIES ......................39

    A.    Delaware Law Required Konstantino To Disclose And Offer The Competing Chocolate Opportunity To AngioScore...........................40

        1.    Konstantino's Fiduciary Duty Of Loyalty Obligated Him Not To Usurp The Chocolate Opportunity ...............................40

        2.    Konstantino's Fiduciary Duties To AngioScore Were Not Limited To Dealings With Third Parties ...................................42

    B.    Konstantino Could Not "Prepare To Compete" With AngioScore By Usurping The Chocolate Opportunity ............................................47

IV.    THE DISTRICT COURT PROPERLY AWARDED LOST PROFITS AND DISGORGEMENT ..............................................................................48

    A.    The District Court Properly Awarded Lost Profits ............................49

# TABLE OF CONTENTS
## (continued)

**Page**

    1.    The District Court Correctly Found That Feld Would Have Offered To Assign His Rights To AngioScore ......................... 49

    2.    The District Court Correctly Identified The Relevant Market ................................................................................. 52

    3.    The District Court Correctly Determined The Amount Of Lost Profits ......................................................................... 57

  B.  The District Court Properly Required Konstantino To Disgorge All Benefits He Obtained From His Breach ........................................ 61

V.  FEDERAL LAW DOES NOT PREEMPT ANGIOSCORE'S CLAIM FOR BREACH OF FIDUCIARY DUTY ..................................................... 63

  A.  Defendants Waived Preemption By Not Raising It Below ................ 63

  B.  Defendants Identify No Conflict With Federal Law ........................... 64

    1.    Upholding A Fiduciary's Duties Does Not Conflict With Federal Patent Law .................................................................... 65

    2.    The District Court Did Not Confer "Patent Rights" Upon AngioScore ............................................................................. 70

VI.  THE DISTRICT COURT PROPERLY DENIED ATTORNEYS' FEES ON THE PATENT CLAIM ................................................................... 72

  A.  This Court Lacks Jurisdiction To Review The Attorneys' Fees Order Because No Party Timely Appealed ......................................... 72

  B.  The District Court Was Well Within Its Discretion To Deny Attorneys' Fees ............................................................................... 73

CONCLUSION .................................................................................................. 77

PROOF OF SERVICE ....................................................................................... 78

CERTIFICATE OF COMPLIANCE .................................................................. 79

iv

# TABLE OF AUTHORITIES

**Page**

## Cases

*3D Sys. Inc. v. Aarotech Labs., Inc.*,
  160 F.3d 1373 (Fed. Cir. 1998) ..........................................................28

*Acri v. Varian Assoc., Inc.*,
  114 F.3d 999 (9th Cir. 1997) .............................................................31

*Axel Johnson, Inc. v. Carroll Carolina Oil Co.*,
  145 F.3d 660 (4th Cir. 1998) .............................................................31

*BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*,
  1 F.3d 1214 (Fed. Cir. 1993) .............................................................53

*Bartleson v. United States*,
  96 F.3d 1270 (9th Cir. 1996) .............................................................54

*Bean v. Fursa Capital Partners, LP*,
  2013 WL 755792 (Del. Ch. Feb. 28, 2013)......................................36

*Bd. of Trs. v. Roche Molecular Sys., Inc.*,
  131 S. Ct. 2188 (2011)......................................................................67

*Bd. of Trs. v. Roche Molecular Sys., Inc.*,
  583 F.3d 832 (Fed. Cir. 2009) ..........................................................67

*Bomarko, Inc. v. Int'l Telecharge, Inc.*,
  794 A.2d 1161 (Del. Ch. 1999) ........................................................62

*Bowles v. Russell*,
  551 U.S. 205 (2007)..........................................................................72

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
  373 F.3d 296 (2d Cir. 2004) .............................................................28

*Brilliant Instruments, Inc. v. Guidetech, LLC*,
  707 F.3d 1342 (Fed. Cir. 2013) ........................................................76

*Broad v. Sealaska Corp.*,
  85 F.3d 422 (9th Cir. 1996) ...............................................59, 60, 63

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Broz v. Cellular Info. Sys., Inc.*,
    673 A.2d 148 (Del. 1996) ...............................................................31, 41, 42, 45

*CE Distrib., LLC v. New Sensor Corp.*,
    380 F.3d 1107 (9th Cir. 2004) ...........................................................................25

*CMS Inv. Holdings, LLC v. Castle*,
    2015 WL 3894021 (Del. Ch. June 23, 2015).......................................................34

*Cantor Fitzgerald, L.P. v. Cantor*,
    2001 WL 536911 (Del. Ch. May 11, 2001)....................................20, 49, 58, 60

*Carlson v. Hallinan*,
    925 A.2d 506 (Del. Ch. 2006) ...........................................................................44

*Cede & Co. v. Technicolor, Inc.*,
    634 A.2d 345 (Del. 1993) ....................................................................40, 41, 43

*Clark v. B.H. Holland Co.*,
    86 F.3d 1178 (Fed. Cir. 1996) ...........................................................................29

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001) .........................................................................53

*Curet-Velazquez v. ACEMLA de Puerto Rico, Inc.*,
    656 F.3d 47 (1st Cir. 2011)................................................................................64

*Data Gen. Corp. v. Johnson*,
    78 F.3d 1556 (Fed. Cir. 1996) ...........................................................................30

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012) .........................................................................76

*In re Dole Food Co., Inc. Stockholder Litig.*,
    2015 WL 5052214 (Del. Ch. Aug. 27, 2015) ....................................................60

*E.E.O.C. v. Wal-Mart Stores, Inc.*,
    187 F.3d 1241 (10th Cir. 1999) .........................................................................73

# TABLE OF AUTHORITIES
## (continued)

*Equity Corp. v. Milton*,
  221 A.2d 494 (1966) .....................................................................45, 46

*F.T.C. v. BurnLounge, Inc.*,
  753 F.3d 878 (9th Cir. 2014) ................................................................24

*Falana v. Kent State Univ.*,
  669 F.3d 1349 (Fed. Cir. 2012) ....................................................72, 73

*Far W. Fed. Bank, S.B. v. Dir., Office of Thrift Supervision*,
  930 F.2d 883 (Fed. Cir. 1991) ...............................................................26

*Fitzgerald v. Harris*,
  549 F.3d 46 (1st Cir. 2008) ...................................................................69

*Fulgenzi v. PLIVA,  Inc.*,
  711 F.3d 578 (6th Cir. 2013) ................................................................68

*Gantler v. Stephens*,
  965 A.2d 695 (Del. 2009) .....................................................................40

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ...........................................................51

*Grove v. Brown*,
  2013 WL 4041495 (Del. Ch. Aug. 8, 2013) ........................................41

*Guth v. Loft, Inc.*,
  5 A.2d 503 (Del. 1939) .......................................... 40-43, 48, 59, 60, 66

*Halpern v. Barran*,
  313 A.2d 139 (Del. Ch. 1973) ..............................................................38

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) .............................................................54

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  134 S. Ct. 1744 (2014) ...................................................................24, 75

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Highway Equip. Co. v. FECO, Ltd.*,
    469 F.3d 1027 (Fed. Cir. 2006) ....................................................28, 29

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*,
    476 U.S. 380 (1986)............................................................................63

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001) ........................................................58

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
    906 A.2d 766 (Del. 2006) ..................................................................62

*Kenney v. United States*,
    458 F.3d 1025 (9th Cir. 2006) ..........................................................24

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974)............................................................................65

*Lam, Inc. v. Johns-Manville Corp.*,
    718 F.2d 1056 (Fed. Cir. 1983) ........................................................58

*Lentini v. Cal. Ctr. for Arts, Escondido*,
    370 F.3d 837 (9th Cir. 2004) ............................................................57

*Magna Weld Sales Co., Inc. v. Magna Alloys & Research Pty., Ltd.*,
    545 F.2d 668 (9th Cir. 1976) ............................................................57

*Malabed v. N. Slope Borough*,
    335 F.3d 864 (9th Cir. 2003) ............................................................69

*Marandola v. United States*,
    518 F.3d 913 (Fed. Cir. 2008) ..........................................................72

*Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*,
    24 F.3d 1368 (Fed. Cir. 1994) ..........................................................29

*McCollough v. Johnson, Rodenburg & Lauinger, LLC*,
    637 F.3d 939 (9th Cir. 2011) ............................................................54

# TABLE OF AUTHORITIES
## (continued)

**Page**

*MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*,
731 F.3d 1258 (Fed. Cir. 2013) ..........................................................................63

*Metro Commc'ns Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
854 A.2d 121 (Del. Ch. 2004) .....................................................................38, 39

*Microsoft Corp. v. Amphus, Inc.*,
2013 WL 5899003 (Del. Ch. Oct. 31, 2013) ......................................................37

*Miller v. Thane Int'l, Inc.*,
615 F.3d 1095 (9th Cir. 2010) ............................................................................50

*Mills Acquisition Co. v. Macmillan, Inc.*,
559 A.2d 1261 (Del. 1989) .................................................................................40

*Mondaca-Vega v. Lynch*,
808 F.3d 413 (9th Cir. 2015) ..............................................................................51

*Moore U.S.A., Inc. v. Standard Register Co.*,
229 F.3d 1091 (Fed. Cir. 2000) ..........................................................................77

*Needham v. Cruver*,
1993 WL 179336 (Del. Ch. May 12, 1993)........................................................45

*In re Nine Sys. Corp. S'holders Litig.*,
2014 WL 4383127 (Del. Ch. Sept. 4, 2014)........................................................40

*In re Nine Sys. Corp. S'holders Litig.*,
2013 WL 4013306 (Del. Ch. July 31, 2013) ......................................................34

*Norman v. Elkin*,
726 F. Supp. 2d 464 (D. Del. 2010)....................................................................39

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
134 S. Ct. 1749 (2015)........................................................................21, 74, 75

*Oiness v. Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996) ............................................................................58

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Primedia, Inc. S'holders Litig.*,
2013 WL 6797114 (Del. Ch. Dec. 20, 2013)....................................................36

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
324 F.3d 1346 (Fed. Cir. 2003) ...........................................................54

*Russo v. Ballard Med. Prods.*,
550 F.3d 1004 (10th Cir. 2008) ...........................................................71

*Ryan v. Gifford*,
918 A.2d 341 (Del. Ch. 2007) .............................................................34

*S.E.C. v. Rubera*,
350 F.3d 1084 (9th Cir. 2003) ........................................................24, 50

*S.O.S., Inc. v. Payday, Inc.*,
886 F.2d 1081 (9th Cir. 1989) ...........................................................28

*SSL Servs., LLC v. Citrix Sys., Inc.*,
769 F.3d 1073 (Fed. Cir. 2014) ...........................................48, 57, 74

*Satey v. JPMorgan Chase & Co.*,
521 F.3d 1087 (9th Cir. 2008) ...........................................................31

*Science Accessories Corp. v. Summagraphics Corp.*,
425 A.2d 957 (Del. 1980) .................................................................47

*Siga Techs., Inc. v. PharmAthene, Inc.*,
__ A.3d __, 2015 WL 9467037 (Del. Dec. 23, 2015) ........................................58

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ..........................................................62

*Smith v. Whelan*,
2013 WL 3169373 (D. Del. June 21, 2013) ................................................38

*TBG, Inc. v. Bendis*,
36 F.3d 916 (10th Cir. 1994) ............................................................73

x

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Tavory v. NTP, Inc.*,
  297 F. App'x 976 (Fed. Cir. 2008) .................................................68

*Technicorp Int'l II, Inc. v. Johnston*,
  2000 WL 713750 (Del. Ch. May 31, 2000).........................................37

*Teets v. Chromalloy Gas Turbine Corp.*,
  83 F.3d 403 (Fed. Cir. 1996) .............................................................66

*Telxon Corp. v. Meyerson*,
  802 A.2d 257 (Del. 2002) ..................................................................45

*Thorpe ex rel. Castleman v. CERBCO, Inc.*,
  676 A.2d 436 (Del. 1996) ............................................. 41, 44, 49, 58, 59, 62, 69

*Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*,
  2009 WL 1387115 (Del. Ch. May 18, 2009)....................................61

*In re Tyson Foods, Inc.*,
  919 A.2d 563 (Del. Ch. 2007) ............................................33, 37, 38

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
  411 F.3d 1369 (Fed. Cir. 2005) ..................................................65, 70

*United Mine Workers v. Gibbs*,
  383 U.S. 715 (1966)..................................................16, 25, 26, 31

*United States v. Dubilier Condenser Corp.*,
  289 U.S. 178 (1933)......................................................................66, 67

*United States v. Elias*,
  921 F.2d 870 (9th Cir. 1990) ...........................................................56

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
  342 F.3d 1298 (Fed. Cir. 2003) .......................................................71

*Van Lake v. Sorin CRM USA, Inc.*,
  2013 WL 1087583 (Del. Super. Feb. 15, 2013) ...............................37

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Versata Software, Inc. v. SAP Am., Inc.,* ,
   717 F.3d 1255 (Fed. Cir. 2013) ..........................................................51

*Vichi v. Koninklijke Philips Elecs. N.V.,*
   62 A.3d 26 (Del. Ch. 2012) ...............................................................62

*In re Vigilant Video, Inc.,*
   535 F. App'x 928 (Fed. Cir. 2013) ....................................................74

*Violette v. Smith & Nephew Dyonics, Inc.,*
   62 F.3d 8 (1st Cir. 1995)....................................................................64

*Voda v. Cordis Corp.,*
   476 F.3d 887 (Fed. Cir. 2007) .........................................23, 25, 31, 33

*Water Techs. Corp. v. Calco, Ltd.,*
   850 F.2d 660 (Fed. Cir. 1988) ...........................................................31

*Whitaker v. Garcetti,*
   486 F.3d 572 (9th Cir. 2007) .............................................................73

*Wielgos v. Commonwealth Edison Co.,*
   892 F.2d 509 (7th Cir. 1989) .............................................................73

*Williams v. Gerber Prods. Co.,*
   552 F.3d 934 (9th Cir. 2008) .............................................................64

*Yarway Corp. v. Eur-Control USA, Inc.,*
   775 F.2d 268 (Fed. Cir. 1985) ...........................................................56

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
   259 F.3d 1101 (9th Cir. 2001) .....................................................57, 61

## Constitution, Statutes, and Rules

28 U.S.C. § 1295(a)(1)..............................................................................4

28 U.S.C. § 1331 .......................................................................................4

# TABLE OF AUTHORITIES
### (continued)

**Page**

28 U.S.C. § 1338(a) ....................................................................4

28 U.S.C. § 1338(b) ....................................................................4

28 U.S.C. § 1367 .................................................................24, 32

28 U.S.C. § 1367(a) .........................................................4, 23, 25

28 U.S.C. § 1367(c) ......................................................16, 31, 33

28 U.S.C. § 1367(c)(1)...............................................................31

28 U.S.C. § 1367(c)(2)...............................................................32

28 U.S.C. § 2107(a) ...................................................................72

35 U.S.C. § 262 .........................................................................68

35 U.S.C. § 285.....................................................5, 21, 24, 73, 75

Fed. R. App. P. 4(a)(1)(A) ...................................................72, 73

Fed. R. App. P. 4(a)(4)(A)(iv) ...................................................73

Fed. R. Civ. P. 59(e)      ....................................21, 57, 61, 73

Fed. R. Evid. 103(a)(1) ..............................................................54

U.S. Const. art. VI, cl. 2............................................................68

## Other Authority

13D Wright et al., Federal Practice & Procedure § 3567.1 (3d ed.)......25, 26

## STATEMENT OF RELATED CASES

This Court (Wallach, J., joined by Prost, C.J. and Reyna, J.) previously denied Defendants' petition for a writ of mandamus arising from the same civil action. *In re: TriReme Medical, LLC*, No. 2015-128, ECF 18 (Fed. Cir. April 2, 2015). No case pending in this or any other court will directly affect or be directly affected by this Court's decision in these appeals.

## PRELIMINARY STATEMENT

These appeals arise from a final judgment of the U.S. District Court for the Northern District of California (Gonzalez Rogers, J.), holding after a bench trial that Defendants[1] are liable under well-settled Delaware law for Konstantino's breach of his fiduciary duties as a Director of Plaintiff AngioScore, Inc.  AngioScore manufactures and sells AngioSculpt, a specialty balloon-catheter device.  While serving as a member of AngioScore's Board of Directors, Konstantino co-conceived and worked to develop Chocolate, a competing specialty balloon-catheter device.  But in disregard of his fiduciary duties of loyalty and good faith under Delaware law, Konstantino did not disclose the Chocolate opportunity to AngioScore.  Instead, Konstantino and TriReme (a separate company he had founded) spent months secretly developing Chocolate as a direct competitor to AngioSculpt—*even as Konstantino continued to sit on AngioScore's Board*.

When Konstantino finally resigned from AngioScore's Board in February 2010, Chocolate had been designed and tested, and Konstantino had told prospective investors that the product's design had been "completed."  But when AngioScore asked him, directly and repeatedly, whether he had been developing a competing device, Konstantino responded, falsely and repeatedly, that he had not—eventually

---

[1] "Defendants" are TriReme Medical, LLC ("TriReme"), Quattro Vascular PTE Ltd. ("Quattro"), QT Vascular Ltd ("QT Vascular") (collectively, "Corporate Defendants"), and Eitan Konstantino.

1

threatening legal action in response to AngioScore's "unsubstantiated accusations." After learning of the Chocolate device in the second half of 2011, AngioScore promptly sued for patent infringement—but it was only late in discovery on the patent claim that AngioScore learned that Konstantino had developed Chocolate while serving on AngioScore's Board. AngioScore promptly amended its complaint to assert claims for breach of fiduciary duty and unfair competition.

In a thorough decision following a six-day trial, the district court found the above facts in AngioScore's favor. The court accordingly ruled that by usurping the Chocolate opportunity, rather than offering it to AngioScore, Konstantino breached his fiduciary duties of loyalty and good faith under Delaware law. Exercising its broad equitable authority, the court fashioned remedies designed to restore AngioScore's losses, deprive Konstantino of his ill-gotten gains, and deter future breaches.

None of Defendants' challenges to the district court's judgment has merit—indeed, Defendants improperly raise many of them for the first time on appeal. The district court had supplemental jurisdiction over AngioScore's breach-of-fiduciary-duty claim, which has far more in common with AngioScore's patent claim than is necessary to satisfy the broad and pragmatic "common nucleus of operative fact" test—including most obviously the Chocolate device and Defendants' wrongful

exploitation of it. The district court also correctly found that AngioScore's claim was timely filed, because Konstantino's fraud tolled the limitations period.

On the merits, Defendants *do not contest* the district court's application of the recognized elements of Delaware's corporate-opportunity doctrine, and instead ask this Court to announce a new exception to that State's well-established fiduciary duties of loyalty and good faith. But nothing supports relaxing those "unyielding" obligations where a fiduciary has secretly developed his own product to compete against the corporation whose interests he is duty-bound to place above his own. To the contrary, as the district court found, Konstantino's conduct is all the more offensive for its brazenness.

Defendants' challenges to the district court's selection of remedies are mostly waived and entirely meritless, particularly given the court's broad equitable discretion. And Defendants' preemption defenses rest on illusory allegations of conflict between Delaware law and federal patent law, which—notwithstanding their alarmism on appeal—Defendants did not raise below and thus have waived.

Finally, Defendants failed to timely appeal the district court's order denying attorneys' fees. Even if this Court had jurisdiction to review that order, Defendants' challenge fails, as it rests on an argument not included in their summary-judgment motion, and as to which AngioScore in any event had reasonable rejoinders.

The judgment should be affirmed.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over AngioScore's patent-infringement claims.  28 U.S.C. §§ 1331, 1338(a).  The court had supplemental jurisdiction over AngioScore's state-law claims.  *Id.* §§ 1367(a), 1338(b).

This Court has jurisdiction, *id.* § 1295(a)(1), except to the extent these appeals challenge the district court's order denying attorneys' fees, *see infra* Part VI.A.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the district court properly exercised supplemental jurisdiction over  state-law claims that share numerous factual issues with a patent-infringement claim.

2.      Whether the district court correctly applied the fraudulent-concealment doctrine to find that claims were timely filed.

3.      Whether the district court correctly found that a Director breaches his fiduciary duties under Delaware law by usurping the opportunity to commercially exploit a competing device, rather than offering it to the company on whose Board he sits.

4.      Whether the district court properly exercised its discretion to award equitable remedies of lost profits and disgorgement for breach of fiduciary duty.

5.      Whether Defendants' preemption defenses should be rejected as waived, and/or because neither Delaware law nor the judgment conflicts with federal law.

4

6.      Whether Defendants' appeals of the order denying attorneys' fees under 35 U.S.C. § 285 should be dismissed as untimely, or rejected because the district court properly determined that the patent case was not "exceptional."

## COUNTERSTATEMENT OF THE CASE

### A.    AngioScore's Specialty Angioplasty Balloon-Catheter Business

AngioScore develops and commercializes specialty angioplasty balloon-catheter devices.  A133; A50068.  Generally, a balloon-catheter device consists of a catheter tube with a balloon at one end, used to treat blood vessels blocked by buildups of plaque and other material (called "lesions").  A50069.  A physician inserts the device (with the balloon deflated) percutaneously through the skin and into the vasculature, and then snakes the tube through the circulatory system until the balloon reaches the lesion to be treated.  *Id.*  The balloon is inflated (compressing the plaque and opening the vessel), and then deflated and removed—allowing now-improved blood flow to resume.  *Id.*

AngioScore's flagship product is called AngioSculpt.  It improves upon a standard balloon catheter (in the parlance, a "plain old balloon angioplasty" catheter or "POBA") by adding to the balloon an outer structure made of nitinol, a nickel-titanium alloy.  A44; A66; A133; A61299.  When the AngioSculpt balloon inflates, the outer structure (the "scoring element") presses into ("scores") the blockage, combining with the balloon to clear the vessel more effectively.  A66-67; A61299.

5

When the balloon deflates, the scoring element collapses with it to permit safe removal of the entire device.  A66-67; A50181.

### B.    Konstantino's Role As A Director Of AngioScore

Konstantino co-conceived of the idea for AngioSculpt in 2002, and co-founded AngioScore in 2003.  A50067; A51322.  He served the company in several roles, including as President, Executive Vice President, and Chief Scientific Officer.  *See* A67; A51325.  After Konstantino's employment at AngioScore ceased in April 2007 (A61157), he remained a member of its Board of Directors until February 5, 2010 (A128; A50133; A51334-35).  As a Director, Konstantino attended Board meetings (A50213) and retained access to AngioScore's confidential information and market data (A69; A141; A50174-77; A50213-15; A50562-63).

As Konstantino's role at AngioScore evolved, he devoted more time to a second company, TriReme, which he had co-founded to develop bifurcation stents.  A67-68; *see* A146; A50264; A50557-58; A50561-62; A50699-700; A50874; A61154-56. Because bifurcation stents do not compete with AngioScore's specialty balloon catheter (A67; A50412; A50699-700), AngioScore granted Konstantino permission to pursue the bifurcation-stent opportunity with TriReme while remaining on AngioScore's Board (A146; A50264; A61154-56).  This permission was never extended to other opportunities.  A146; A50561-62; A50699-700; A50731-32; A50874; A61154-56; A80071-72.  In February 2009, Konstantino signed a letter

6

confirming that "[a]s a member of [AngioScore's] Board of Directors," he remained "subject to fiduciary duties to the Company under applicable law, like all directors." A147; A61157-58.

### C.    Defendants' Development Of A Competing Specialty Angioplasty Balloon-Catheter Device

According to Konstantino, he and Dr. Tanhum Feld jointly conceived of a balloon-catheter product that would become the Chocolate device in the second half of 2009. A128; A51336-37. Chocolate (like AngioSculpt) is designed to treat artery disease by using a balloon to open blocked blood vessels, without leaving any part of the device behind. A133-34; A50181. And Chocolate (like AngioSculpt) improves on POBA devices by attaching a nitinol structure to the balloon, making the balloon more effective at compressing and clearing blockages. A50180; A71659-60. The FDA has approved AngioSculpt and Chocolate for treating the same diseases; there is no indication for which the peripheral Chocolate device is approved for which AngioSculpt is not. A134; A50420; A51026-27; A61298-302; A61321-25.

As the district court found (A151), AngioScore and Chocolate "compete[] in the same specialty balloon market." Indeed, AngioSculpt and Chocolate are the only two balloon-catheter devices commercially available in the United States that employ a nitinol structure. A133; A50408-11. Konstantino intended that Chocolate would compete directly with AngioSculpt (A151; A50185-86; A60054), and the two devices are sold to the same customers, on the basis of similar marketing claims (A134;

7

A50181; A50422-28; A50759-60; A61261-65; A61271-73; A71659-60; A71667-72;

A71673-78).  TriReme's sales force compared Chocolate against AngioSculpt, and

named AngioSculpt as Chocolate's "closest competitor."  A151; A172; A50343-44;

A61259-60; *see also* A61228-29; A61232; A61266-68.  The devices are sold at

similar, premium prices:  Whereas POBAs sell for around $150 each (A50412),

AngioSculpt sold for approximately $852 as of 2011 (A116; A61241-56), and

Defendants intentionally undercut AngioSculpt's pricing by $25 (A134; A50336-40;

A61234-36; A61254).

Konstantino, Feld, and TriReme employees developed Chocolate in late 2009

and early 2010, while Konstantino remained on AngioScore's Board.  During this

period, Feld and TriReme employees improved the device's design, prepared

engineering drawings, built prototypes, and performed bench and animal tests.  A129;

A50152-56; A50860-61; A50873-74; A50891; A51081-84; A51089-90; A51192-94;

A61050-51; A61064-66; A61076-79; A61083-84; A61127-28; A61129-31; A61132-

41; A61175; A71786-91.  Konstantino, meanwhile, solicited between 20 and 30

prospective outside investors.  A130; A50239-41; A50888-89; A51338.

Chocolate's initial design was substantially complete by January 2010, when

Konstantino and seven TriReme employees attended an animal-testing session for

Chocolate sponsored by Quattro.  A130; A50172-73; A50248; A60042-49; A60495-

98.  By that time, Konstantino had represented to prospective investors that

Chocolate's "IP, Concept design, Prototypes, business model, Team, [and] partnerships" were all "completed"; that the "initial [Chocolate] design already works well and attracts a lot of attention"; that the "Proof-of-Concept of the [Chocolate] design has been completed"; and that the Chocolate "product design" had been "completed."  A131; A60015; A61080; A61099; A61189; A71713.

### D.    Konstantino's And TriReme's Concealment Of Chocolate From AngioScore

At no point in 2009 or 2010 did Konstantino reveal to AngioScore anything about Chocolate, or his secret plan to develop a product to compete with AngioSculpt. A152; A50071-72; A50138-39; A50212-13; A50271-72; A50280; A50282-83; A50486-87; A50523; A50571-73; A50580; A50633-34; A50703; A61164; A61166; A71334; A71366.  Instead, Konstantino *actively concealed* both the device's existence and that it had been developed while he was serving as an AngioScore Director.

Konstantino sat through several AngioScore Board meetings without mentioning Chocolate, including one held February 3, 2010.  A153; A50138-39; A50213.  After that meeting, during a discussion with AngioScore's CEO Tom Trotter, Konstantino stated that he and TriReme were "*considering* pursuing a specialty balloon [product]," hiding the fact that the competing Chocolate product was *already* substantially complete.  A153 (emphasis added); A50574.  The conversation ended when Trotter asked Konstantino to leave the premises (A153; A50574), but resumed via e-mail the next day, when Trotter relayed the Board's opinion that

TriReme's contemplated "change in direction" was such a conflict of interest that Konstantino should resign (A153; A61166). Konstantino replied the same day to protest the supposedly "trigger happy" demand for resignation, falsely stating that "TriReme has not made any decision to [develop a competing specialty balloon] and I was giving you very early heads up to *something that may take place in the future, or may never happen*[.]" A61166 (emphasis added); A97; A153-54. Konstantino carried on the ruse the next day, stating in an e-mail to AngioScore's Board that he was "keenly aware of [his] obligations as a board member and this is precisely why I am coming to AngioScore *at this juncture; before any new project is started*." A61164 (emphasis added); A154-55. Konstantino resigned from the Board effective February 5, 2010. A50133; A51335; A128.[2]

On February 10, 2010, AngioScore sent a letter requesting "confirmation" of Konstantino's representations that he had not begun developing a specialty balloon prior to his resignation. A155; A71329. But as the district court found, Konstantino's response was to "knowingly and intentionally misle[ad] … AngioScore." A155.

In a response letter dated February 23, 2010, Konstantino (through counsel) represented that "TriReme is considering, *in the future*, the possibility of entering the field of specialized balloons" (A71334 (emphasis added); A155-56; *see* A160), when

---

[2] Unbeknownst to AngioScore, a TriReme vice-president met to discuss Chocolate with a German drug-coating-technology company on that same day. A157-58; A50163-64; A50331-33; A61367-69; A71334.

in fact TriReme had already decided to enter that field by developing Chocolate. Konstantino stated that "TriReme has not developed any products … that compete[] with AngioScore's products" (A71334; A156), when in fact he and TriReme had developed Chocolate *specifically* to compete with AngioSculpt. Konstantino represented that he "was not involved in any development work … of angioplasty balloon technology for the … periphery markets that involves specialized features such as scoring, cutting, or drug eluting elements" (A71334; A156), when in fact Chocolate contained a "specialized feature" in the form of the nitinol cage. Konstantino represented that he was "not involved in any development … of angioplasty balloon technology for the … periphery markets that makes similar claims to that of the AngioSculpt product" (A71334; A158), when in fact Chocolate meets that precise description.

On February 25, 2010, TriReme announced its receipt of premarket FDA clearance for a balloon-catheter product called "Glider." A80402. Glider was a POBA device that lacked a scoring component or other specialty elements; it was *not* directly competitive with AngioSculpt, and AngioScore was *not* interested in it. A50138; A50573; A50599; A71362-63. Upon learning of Glider, Trotter surmised that it had "been in the works for many months." A80402. Trotter and AngioScore planned to "keep a close watch on Scoring/Cutting Balloon patent filing activity going forward" (A80400), but understood that Glider was "just a balloon" that lacked

specialty features (A80394). Since there was no immediate "patent issue" (A80401), AngioScore Board member Tom Raffin concluded that there was not "anything more we can do about this" at the time (A80393-94).

AngioScore nevertheless responded to Konstantino's February 23 letter with another letter (dated March 5, 2010) in which it directly inquired whether "Konstantino and/or TriReme evaluated, negotiated, or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" prior to Konstantino's resignation from AngioScore's Board. A71338; A160. In a response letter dated March 21, 2010, Konstantino (through counsel) *again* falsely represented that prior to his resignation, "neither Mr. Konstantino nor TriReme evaluated, negotiated or otherwise pursued the acquisition or licensing of any technology that competes with AngioScore's products" (A71366; A160-61), when in fact Konstantino and TriReme had begun developing Chocolate in 2009 and had continued doing so through the date Konstantino resigned from the Board. And Konstantino threatened to sue—demanding that AngioScore "refrain from making these unsubstantiated accusations" that he had "breached his duties as a Board member of AngioScore," lest he have "no choice but to consider his legal options." A71366; A161.

Konstantino also took other steps that the district court found to "demonstrate an intent to deceive." A163. While still serving on AngioScore's Board, Konstantino

12

secretly filed a provisional patent application for Chocolate in October 2009. A61037-49. After receiving AngioScore's letters of February 10 and March 5, 2010, Konstantino switched patent counsel and filed a second, substantially similar provisional patent application on March 12, 2010—without alerting his patent lawyers to the duplicative filing. A162-63; A50203; A51188; A50679; A61037-49; A71339-60; A71368-79. When Konstantino publicly filed a non-provisional application in March 2011, he claimed priority only to the March 2010 application—giving up five months of priority in order to prevent public disclosure of the October 2009 provisional application (which he had filed while an AngioScore Director). A162-63; A71339-60; A71368-79.

## E.    AngioScore's Patent-Infringement Suit And Consequent Discovery Of Konstantino's Breach Of Fiduciary Duty

AngioScore learned of Chocolate in the second half of 2011, when a sales representative heard about the device from a customer. A76; A50576-77. After Chocolate's launch in December 2011 (A50336; A80561-62), AngioScore promptly investigated, filing this action in June 2012 (A321-28)—alleging infringement of (*inter alia*) U.S. Patent No. 7,691,119 (the "'119 patent"). Even then, however, because of Konstantino's misrepresentations, AngioScore did not know that he had begun developing Chocolate *before* his February 2010 resignation from AngioScore's Board.

13

The truth did not come to light until after a year and a half of litigation. Beginning in September 2012, AngioScore sought discovery of relevant documents concerning (*inter alia*) Chocolate's conception, design, development, production, and specifications (A71506-07; A71528-29), but Konstantino and TriReme refused to produce them. AngioScore brought the dispute to the district court (A71441-44), which in October 2013 compelled compliance with AngioScore's requests (A71445-46).

As the district court found (A99; A76; *see also* A32-33), information uncovered during this late stage of discovery supplied AngioScore with the factual basis for its state-law claims—showing for the first time, and in contradiction to Konstantino's earlier representations, that Chocolate had been developed *before Konstantino left AngioScore's Board*. For instance, one late-produced document, dated November 2009, showed that substantial work had been completed on Chocolate by that time. A61052-63. And the point was not finally confirmed until Konstantino and Feld were forced to admit it at their depositions in late 2013 and early 2014. *See* A50071-72; A50577; *see also* A61050-51 (engineering drawing for Chocolate, produced by Feld, with metadata showing date of October 2009).

Promptly after uncovering this new evidence, AngioScore moved in May 2014 to amend its complaint to assert state-law claims based on unfair competition and

Konstantino's breach of fiduciary duty.  *See* A235.  The district court granted the motion.  A23-25.[3]

### F.    The Proceedings Below

#### 1.    The Pretrial Proceedings

At a March 2015 hearing, the district court ordered that while AngioScore's patent-infringement claim would be tried to a jury, the state-law claims would be tried to the bench because (as both parties agreed) those claims sound "all in equity" and therefore carried no jury-trial right.  A19319; *see* A19214-15.  Although the court noted substantial "similarities between the two [sets of claims]" (A19219), it decided—with the parties' agreement, for scheduling reasons, and to avoid inconvenience to a jury (A19320-21)—to bifurcate trial between the patent claims and the state-law claims (A19331).

Defendants thereafter moved to dismiss AngioScore's state-law claims for lack of subject-matter jurisdiction, reasserting arguments that the court had rejected in permitting AngioScore to amend its complaint.  *See* A282.  The district court denied

---

[3]    After AngioScore amended the complaint, Konstantino sued AngioScore in Delaware state court, seeking advancement of legal fees pursuant to an indemnification agreement dating to his service on AngioScore's Board.  *See Konstantino v. Angioscore Inc*., No. 9681-CB (Del. Ch.).  That agreement does not call for advancement of fees incurred in defending against *patent* claims, but Konstantino nevertheless sought fees charged for certain work relating to AngioScore's patent claim—including attendance at patent depositions and review of patent documents—because of factual and temporal overlaps.  *See* A12417-25.  The Delaware court ruled in Konstantino's favor.  A12407-14; A12427.  AngioScore has paid more than $11 million in Konstantino's fees.

the motion (A30-40), explaining that "the exercise of supplemental jurisdiction is proper" because "AngioScore 'would ordinarily be expected to try … all [such claims] in one judicial proceeding'" (A36-37 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966))). The court elaborated that "the Chocolate specialty balloon catheter" is "[a]t the heart of this case," and that, in addition, "Konstantino's role and relationship to AngioScore will be at issue in both the patent and state law claims." A36-37. The "witnesses and documents used to support the claims substantially overlap," and crucial documents for the state-law claims had been "produced in the context of patent discovery." A37. Both sets of claims also involved similar proof of damages. *Id.* In short, the claims were "fundamentally related," to the point that Defendants' contrary position  "strain[ed] credulity." A36. The court rejected Defendants' argument that bifurcation of trial necessitated dismissal—reaffirming that it had been "prepared to try all the claims in this case together," and that the "decision to bifurcate was influenced by a host of factors" and not by a conclusion that the claims were unrelated. A38.[4]

The court also exercised its discretion not to dismiss the state-law claims under 28 U.S.C. § 1367(c). A39-40. The court found no novel legal issues, noting that settled Delaware case law established a "multi-factor" and "intensely fact-specific"

---

[4] Defendants unsuccessfully petitioned for a writ of mandamus directing dismissal of the state-law claims. *See In re: TriReme Medical, LLC*, No. 15-128, ECF 18 (Fed. Cir. April 2, 2015).

"test to be applied in corporate opportunity cases." A39. The state-law claims did not substantially predominate over the federal claims, and no "exceptional circumstances" could justify dismissal: Defendants' contention that judicial economy favored dismissal was "nonsensical" in light of the resources already expended in federal court. A40.

### 2. The District Court's Findings Of Fact And Conclusions Of Law

In July 2015, following a six-day bench trial and extensive post-trial briefing of the state-law claims, the district court ruled in AngioScore's favor, issuing a 110-page decision, including 63 pages of careful legal analysis and 224 separate findings of fact based on the court's observation of witness testimony and examination of the documentary evidence. A65-174.

*Statute of Limitations.* The district court found that AngioScore's state-law claims were not barred by the applicable three-year statute of limitations. A94-99. The "central issue" was whether the limitations period was tolled until AngioScore learned, through patent discovery, that Konstantino had developed Chocolate while serving on its Board. A95. The court found tolling "warranted" by Konstantino's "'affirmative act[s] of concealment' in early 2010"—specifically, his repeated false insistence that a specialty balloon was potentially "something for [TriReme's] future," his false denials that he had been involved in developing specialty balloons, and his subterfuge in concealing the provisional patent application he filed while on

17

AngioScore's Board.    A96-99 & n.8; *see supra*, at 9-13.    The court rejected Konstantino's attempt at trial to "disavow[] the intent of his obvious affirmative, misleading representations," finding his testimony "self-serving" and damaging to his "credibility for truthfulness."  A99.  The court further found that "AngioScore acted diligently in its 2010 investigation," and ruled that an "equitable exception" to the statute of limitations was appropriate because Konstantino had "put AngioScore 'off the trail of inquiry' and [falsely] disabused AngioScore of the notion that any fiduciary breach had occurred."  A89-99.

**Konstantino's Breach of Fiduciary Duty.**    The court found for AngioScore on the merits of its breach-of-fiduciary-duty claim, ruling that "Konstantino's fiduciary duty demanded … that he offer AngioScore the *opportunity to acquire* the rights to the Chocolate" opportunity (A82), and that he had breached his duties by taking Chocolate for himself (A76-94).

The court rejected Defendants' contention that an actionable "corporate opportunity" must be presented to the fiduciary by a third party, explaining that "[t]he fact of inventorship does not absolve a director of his fiduciary obligations with respect to inventions he may develop that compete with the corporation he serves."  A79.  Indeed, "*[t]o hold otherwise would work an absurdity*":  Allowing fiduciaries to secretly compete with their putative masters would "stand[] in stark opposition to the

foundational principles of corporate governance, which demand that directors exalt the interests of the companies they serve above their own." *Id.* (emphasis added).

The district court held Corporate Defendants liable for aiding and abetting Konstantino's breach of fiduciary duty.  A99-110.

***Remedies.***   The district court concluded that Konstantino's breach injured AngioScore, finding (*inter alia*) that if Konstantino had heeded his duty to offer Chocolate to AngioScore, his collaborator Feld would have done so as well.  A119. The court explained that the evidence established "Feld's undeniable deference to Konstantino's independent business decisions." *Id.* (citing A50872-73).  The court rejected as not credible "Feld's claim he disliked AngioScore and would not have wanted Chocolate to belong to AngioScore," finding the assertion "belied by the objective facts and only raised conveniently in the context of ongoing litigation." *Id.* The court expressed "steadfast[] confiden[ce] that based on Feld's lack of business acumen, allegiance to Konstantino, and fundamental character, he would have followed Konstantino's lead." *Id.*

In order to extinguish Konstantino's benefits from his breach, the district court ordered him to disgorge them.  These included "the $250,000 he received in agreeing to assign his intellectual property rights to Chocolate"; his "2.85% royalty on Chocolate sales"; and monies received from his royalty and "in connection with his monthly consulting retainer relative to Chocolate."  A120.  In addition, given that

Chocolate sales accounted for at least 90% of QT Vascular's 2014 revenue (A51298; *see* A71323), the court found it proper to require Konstantino to turn over "his shares in QT Vascular stock" and "existing stock options," as well as all monies he has received from "any sale of such stock" (A120).

The district court also considered several additional remedies that would run against Corporate Defendants as well as Konstantino—including injunctive relief, disgorgement of all profits on Chocolate, and an award of Chocolate's present value. *See* A121.  But the court concluded that such remedies were not best suited to ameliorating AngioScore's particular harm and discouraging future breaches.  *See* A123-25.  Instead, the court exercised its "'broad discretion to tailor remedies to suit the situation as it exists'" (A121 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, *3 (Del. Ch. May 11, 2001)), and concluded that "equitable considerations counsel in favor of awarding AngioScore a remedy in the form of its past and future lost profits" (A126).  Relying on both fact evidence and the analysis of AngioScore's damages expert Gary Olsen, the court found past lost profits of approximately $2.97 million, and future lost profits of approximately $17.064 million through mid-2019— the end of the conservatively estimated "useful life of the AngioSculpt product with which Chocolate has been shown to compete."  A121-22 & n.19.

### 3.    The Post-Trial Proceedings

The case proceeded to trial of AngioScore's patent claim, at which the jury found for Defendants. On the day of the jury's verdict, Konstantino filed a motion to reopen the bench-trial record, which the district court denied. A175-78. The district court entered final judgment on October 14, 2015. A19-22. Defendants filed notices of appeal on November 9, 2015. *See* A318.

On November 12, 2015, Konstantino filed a Rule 59(e) motion, seeking relief from the remedies awarded against him. The district court denied that motion on January 7, 2016 (A183-85), rejecting Konstantino's challenge to its lost-profits determination and reiterating that the disgorgement remedy "was justified under Delaware law" (A185).

Meanwhile, in October 2015, Defendants moved for an award of attorneys' fees pursuant to 35 U.S.C. § 285. A317. The district court denied Defendants' motion on December 9, 2015. A179-82. Applying the standard set forth in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2015), the court ruled that the case was not "exceptional." A181-82. The court explained that AngioScore's patent case "was not exceptionally weak—as evidenced in part by its survival through summary judgment." A181. Reviewing the "totality of the circumstances," the court found nothing to "suggest the patent suit was brought in bad faith, with an improper purpose, or in the absence of an adequate pre-filing investigation." A182.

21

On January 21, 2016, Defendants filed "amended notices of appeal" purporting for the first time to appeal the December 9, 2015 order denying attorneys' fees. A18734-39. These consolidated and expedited appeals followed.[5]

## SUMMARY OF ARGUMENT

The district court's well-considered and amply-supported judgment should be affirmed in its entirety.

**I.**      The district court had supplemental jurisdiction over AngioScore's state-law claims based on usurpation of the Chocolate opportunity, which are closely related to its patent-infringement claim concerning Chocolate. The claims share issues, witnesses, evidence, requested remedies, and thus a "common nucleus of operative fact." The district court was not required to decline to adjudicate the state-law claims, which involved no unsettled legal issue and which were trial-ready by the time Defendants moved to dismiss.

**II.**      The district court correctly tolled the limitations period because Konstantino fraudulently concealed his development of the Chocolate opportunity while serving on AngioScore's Board, preventing AngioScore from learning the vital facts until late in the patent case.

**III.**      Konstantino breached his fiduciary duties of loyalty and good faith. Defendants do not dispute that every recognized element of Delaware's corporate-

---

[5] This Court (Prost, C.J.) expedited these appeals (ECF 40) at AngioScore's request since its judgment is unsecured (*see* ECF 33).

opportunity doctrine is satisfied. Their attempt to create a new exception to the doctrine has no support in Delaware law, and does not comport with a fiduciary's "unyielding" duty to put his corporation's interests above his own. Konstantino's conduct as Director was not mere "preparation" to compete with AngioScore, and that characterization would provide no defense even if true.

**IV.**      The district court properly selected and quantified its remedies for Konstantino's breach. The court's findings are all well supported, and Defendants' arguments are largely waived and do not show clear error.

**V.**      The Patent Act does not preempt Delaware fiduciary law. Defendants waived their preemption defenses by failing to assert them below, and in any event Defendants do not identify any colorable conflict between federal law and the state-law duties and remedies reflected in the judgment.

**VI.**      Defendants' appeals of the order denying fees are untimely. And the district court was well within its considerable discretion in concluding that AngioScore's patent claim (which survived to trial) was not "exceptionally weak."

## STANDARDS OF REVIEW

This Court reviews *de novo* a district court's determination of supplemental jurisdiction under 28 U.S.C. § 1367(a), and it reviews for abuse of discretion a district court's decision not to decline to exercise that jurisdiction. *See, e.g.*, *Voda v. Cordis Corp.*, 476 F.3d 887, 892, 897-98 (Fed. Cir. 2007).

23

Applying the law of the regional circuit, here the Ninth Circuit, this Court reviews a district court's findings of fact following a bench trial for clear error and its conclusions of law *de novo*. *See, e.g.*, *F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 883 (9th Cir. 2014). The clear-error standard "is significantly deferential, and [the court of appeals] will accept the lower court's findings of fact unless [it is] left with the definite and firm conviction that a mistake has been committed." *Id.* A finding may not be reversed on clear-error review if it was "plausible" in light of the evidence. *S.E.C. v. Rubera*, 350 F.3d 1084, 1093-94 (9th Cir. 2003).

A district court's "choice of equitable remedies is reviewed for an abuse of discretion." *Kenney v. United States*, 458 F.3d 1025, 1032 (9th Cir. 2006).

This Court reviews an order denying attorneys' fees under 35 U.S.C. § 285 for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014).

## ARGUMENT

## I.  THE DISTRICT COURT PROPERLY EXERCISED SUPPLEMENTAL JURISDICTION OVER ANGIOSCORE'S STATE-LAW CLAIMS

### A.  AngioScore's Claims Form Part Of A Single "Case" And "Controversy" Over The Chocolate Device

The district court correctly concluded (A35-40) that it had supplemental jurisdiction over AngioScore's state-law claims under Section 1367, which authorizes federal courts to adjudicate, "in any civil action of which the district courts have original jurisdiction, … *all other claims* that are so related to claims in the action

24

within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a) (emphasis added). AngioScore's state-law claims and its federal patent claim are all addressed to questions concerning the Chocolate device and the technology it embodies. They are part of the same "case" and "controversy," as the district court ruled, and were properly adjudicated together in federal court.

### 1.  AngioScore's Claims Share A "Common Nucleus Of Operative Fact"

The exercise of supplemental jurisdiction requires a "common nucleus of operative fact" between the federal and state-law claims. *Gibbs*, 383 U.S. at 725; *see Voda*, 476 F.3d at 894. The federal courts are thus authorized to decide state-law claims pendent to a federal claim if the "claims are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Gibbs*, 383 U.S. at 725.

Defendants incorrectly contend (Corp. Defs. Br. 21) that this "common nucleus" test requires a "close connection between the issues and facts in the federal and non-federal claims." To the contrary, it is *hornbook law* that the test "requires *only* that the jurisdiction-invoking claim and the supplemental claim have *some loose factual connection*." 13D WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3567.1 (3d ed.) (emphasis added); *see, e.g.*, *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1114 (9th Cir. 2004) (applying "loose factual connection" test). This standard is

"broad and fact-specific," and must "be applied with a pragmatic appreciation of the efficiency promoted by supplemental jurisdiction." WRIGHT ET AL., *supra*, § 3567.1; *see, e.g.*, *Far W. Fed. Bank, S.B. v. Dir., Office of Thrift Supervision*, 930 F.2d 883, 891 (Fed. Cir. 1991) (doctrine "implement[s] the strong policy disfavoring multiplication of litigation").

The district court correctly applied the pragmatic "common nucleus" test in exercising supplemental jurisdiction. As the court found (A36-37), Chocolate is "the heart of this case," and the state-law claims are "fundamentally related" to the federal patent claim: Each claim "turn[ed] on proof concerning exactly what the Chocolate [device] is, how it was developed, and its import relative to AngioScore both in terms of lost profits if found to be infringing, or its value as a potential corporate opportunity." A37. Each claim implicated the issue of "Konstantino's role and relationship to AngioScore." *Id.* And AngioScore only discovered the fiduciary-duty claim as a result of patent discovery. A36. This is far more than a "loose factual connection," and is amply sufficient to support supplemental jurisdiction.

Contrary to Defendants' suggestion (Corp. Defs. Br. 20-21), the district court's decision to bifurcate proceedings just before trial (A38) does not undo its finding that "AngioScore 'would ordinarily be expected to try … all [of its claims] in one judicial proceeding'" (A37 (quoting *Gibbs*, 383 U.S. at 725)). Indeed, all of AngioScore's claims *were* fairly and efficiently adjudicated in "one judicial proceeding." And the

district court's decision not to resolve them in a single *trial* did not depend on dissimilarity in their subject matter—the court confirmed that it "was prepared to try all the claims … together before a jury." A38. Instead, the court bifurcated trial because of "efficiency" and scheduling benefits, and its expressed desire not to unnecessarily inconvenience jurors. *Id.*

The content of the two trials confirms that the claims would have been tried together in a single proceeding if not for the fact that the state-law claims were equitable. Many of the same witnesses testified,[6] and many of the same documents were introduced in evidence.[7] The issues substantially overlapped: for instance, both trials featured proof concerning the Chocolate device's design, specifically whether the device "scores" plaque.[8] Both trials also addressed whether and to what extent Chocolate competes with AngioSculpt,[9] and involved overlapping evidence with respect to remedies—the same damages experts testified in each trial.[10]

---

[6] A50066-67, A90125-26 (Andrews); A50523-24, A090151-52 (Bleam); A50555-56, A91168 (Trotter); A50132-33, A90245-46 (Konstantino); A50846-47, A90232-33 (Feld); A51033-34, A90238 (Pizarro); A50980-81, A90238 (Brosh); A50323-24, A90685-86 (Haig); A50979, A90685 (Dreaden).

[7] *Compare* Dist. Ct. ECF 629-30 *with* Dist. Ct. ECF 804-05.

[8] A50538-39, A51094-96, A51098-99, A51377 (bench trial); A90166-68; A90310-14; A90456-57; A90886-87; A90963-65 (jury trial).

[9] A50333-349, A50355-57, A50408-10, A50520, A71334 (bench trial); A90715 (jury trial).

[10] A50744, A51228 (bench trial); A90693-94, A91171-72 (jury trial).

Courts routinely and correctly uphold supplemental jurisdiction on comparable facts. For instance, in *3D Systems Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373 (Fed. Cir. 1998), this Court found supplemental jurisdiction over state-law trade-libel and unfair-competition claims asserted as pendent to patent-infringement claims. *Id.* at 1377. The district court had supplemental jurisdiction because "[a]ll of the claims arise out of [defendant's] sales activity," such that the state-law claims went "hand-in-hand" with the patent claims. *Id.* The Ninth Circuit similarly found supplemental jurisdiction in *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989), where the plaintiff alleged a state-law contract claim and a federal copyright-infringement claim. *Id.* at 1084. Although the claims were distinct, both "derive[d] from a common nucleus of operative fact" in the software program and business relationship that underlay both claims. *Id.* at 1091; *see, e.g.*, *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (similar). The claims here are likewise related, sharing more than enough of a factual connection to form a single "case" and "controversy."

### 2. Defendants Fail To Disaggregate AngioScore's Claims

Defendants offer (Corp. Defs. Br. 20-26) no basis to overturn the district court's jurisdictional determination.

Defendants' lead cases (*id.* at 21-22) are readily distinguished. In *Highway Equipment Co. v. FECO, Ltd.*, 469 F.3d 1027 (Fed. Cir. 2006), the state contract-law

counterclaim involved a *different* product than was at issue in the federal patent-infringement claim, and arose even before *issuance* of the relevant patent. *Id.* at 1030, 1038-39. In *Clark v. B.H. Holland Co.*, 86 F.3d 1178 (Fed. Cir. 1996) (table), the facts giving rise to the state-law corporate-mismanagement claim were "separate [from] and irrelevant" to the federal correction-of-inventorship claim, as the "asserted contribution to th[e] invention [was] not in any way involved in the corporate mismanagement claims." *Id.* at *3. And in *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368 (Fed. Cir. 1994), the plaintiff asserted claims for infringement of U.S. *method* patents and a claim for infringement of a Japanese *apparatus* patent that did not contain the relevant limitations of the U.S. patents. *Id.* at 1375. The Japanese claim, moreover, was asserted against a far broader class of devices than was the U.S. claim. *Id.*

As the district court found (A37), this case is significantly distinct from *Highway Equipment*, *Clark*, and *Mars*: Whereas the pendent claims in those cases had no substantial connection to the original-jurisdiction claims, *all* of AngioScore's claims are about *wrongful competitive conduct*, with Defendants' wrongful conduct with respect to the Chocolate device at their core. They arise out of and relate to Defendants' usurpation of the Chocolate device and the technology embodied therein, and concern what Chocolate is, how it functions, how it was developed, and whether AngioScore has rights arising from its commercialization.

29

Thus, contrary to Defendants' assertion (Corp. Defs. Br. 25), the district court did not base jurisdiction on a mere "'same device' theory" or a "'but-for' test," untethered to other "factual commonality" between the claims. Rather, the court relied not only on the fact that the Chocolate device itself was the subject of both sets of claims, but also on substantial overlaps in witnesses, evidence, and issues. *See* A37. Defendants' "same device" hypotheticals (Corp. Defs. Br. 25) might be apt if AngioScore's Trotter were suing TriReme for personal injury caused by a faulty Chocolate catheter, but he is not.[11]

Finally, Defendants misplace reliance (Corp. Defs. Br. 23-24) on events in the Delaware state-court fees-advancement proceeding (*see supra*, at 15 n.3). As the district court found (A39), AngioScore's *contractual* arguments regarding fee recovery (*see* A11837-60; A11886-87; A11897-912; A11939-40) have no bearing on the "common nucleus" test. *See, e.g.*, *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (judicial estoppel inapplicable where issues differ). Defendants, moreover, ignore that the Delaware court adopted *Konstantino's* position (*see* A12417-27) and thus granted his request for advancement of certain patent-related fees (A12407-14; A12427). AngioScore cannot be estopped, and jurisdiction cannot be defeated, by what its attorneys said in making a *losing* legal argument in an entirely

---

[11]  Defendants note (Corp. Defs.' Br. 22-23) that the claims accrued at different times, but identify no authority holding that timing is dispositive—particularly where, as here, there is otherwise a common nucleus of fact.

different context. *See, e.g.*, *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 666 (Fed. Cir. 1988) (judicial estoppel applies only to previously-successful litigant).[12]

## B.    The District Court Was Well Within Its Discretion To Exercise Jurisdiction

The Court should reject Defendants' suggestion (Corp. Defs. Br. 26-29) that the district court should be ordered, after trial and judgment, to dismiss the state-law claims under Section 1367(c). The statute is informed by *Gibbs*'s principles "of economy, convenience, fairness, and comity," and the exercise of jurisdiction is entrusted to the district court's discretion. *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1000-01 (9th Cir. 1997) (en banc); *see Voda*, 476 F.3d at 892, 897-98. The district court cannot have abused its discretion through its reasonable conclusion that "[j]udicial economy and convenience to the parties" are better served by retaining jurisdiction than they would be by dismissing the case. *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008).

*First*, the district court correctly found (A39) no "novel or complex issue of State law," 28 U.S.C. § 1367(c)(1). As the district court recognized, "the contours of [the corporate-opportunity] doctrine [have been] well established" for at least twenty years. *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). That doctrine

---

[12]    Defendants cite (Corp. Defs. Br. 24) *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660 (4th Cir. 1998), in passing, but the plaintiff's representations there concerning whether the claims were "factually and legally distinct" were not determinative of the outcome, because the claims would never ordinarily be tried together. *See id.* at 661-62. The same is not true here.

requires an "intensely fact-specific" application of broad but settled principles (A39)—a task the district court carefully performed.  The court did not (*contra* Corp. Defs. Br. 27) purport to announce a "new state-law duty," and was never asked to do so.

*Second*, the district court correctly found (A40; *contra* Corp. Defs. Br. 28) that the state-law claims did not "substantially predominate[]" over the earlier-filed patent-infringement claim, 28 U.S.C. § 1367(c)(2).  Defendants rest on the defense verdict on the patent claim, but the fact that the case went to trial reinforces that (as the district court observed, A40) the patent claim was not insubstantial, but was "litigated fully" all the way through trial.

*Third*, judicial-economy considerations did not (*contra* Corp. Defs. Br. 27-28) require dismissal of the state-law claims.  Although the court held separate trials, it did so for the very reasons of economy, convenience, and fairness that underlie Section 1367.  *See supra*, at 26-27.  And by the time Defendants moved to dismiss, the case was at the eve of trial.  *See* A34.  The district court was not required to abandon years of discovery, motion practice, and trial preparation just to force a different court to familiarize itself with the claims.

*Finally*, comity considerations did not favor dismissal (*contra* Corp. Defs. Br. 28-29).  As shown, the district court had no difficulty identifying or applying state

law, and judicial economy favored keeping the case in federal court. The court acted well within its discretion in retaining jurisdiction.[13]

## II.    THE DISTRICT COURT CORRECTLY FOUND THAT ANGIOSCORE'S CLAIMS WERE TIMELY FILED

Under Delaware law, a limitations period is tolled where "a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth" by committing "an affirmative act of 'actual artifice' … that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth." *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007). The district court correctly applied this standard, finding that "Konstantino's repeated misrepresentations, misdirection, and threats of legal action prevented AngioScore from becoming aware" that he had conceived and developed the Chocolate opportunity while owing fiduciary duties to AngioScore. A162; *see supra*, at 9-13, 17-18. This affirmative conduct amounted to "actual artifice" that prevented AngioScore "from gaining knowledge of material facts" and "led [AngioScore] away from the truth" by preventing it from learning the crucial facts until late in patent discovery. A96; *see Tyson*, 919 A.2d at 585.

---

[13] While in *Voda* this Court directed the district court to decline jurisdiction under Section 1367(c) (*see* Corp. Defs. Br. 26), that case involved the unusual circumstance that the pendent claims alleged infringement of *foreign* patents. This implicated an extraordinary combination of considerations weighing against jurisdiction that are not present here. *See Voda*, 476 F.3d at 898-905. And the issue was resolved in an early interlocutory appeal, *id.* at 889, so this Court's decision did not nullify a trial.

Delaware courts have repeatedly found fraudulent concealment on closely analogous facts.  In *In re Nine Systems Corp. Shareholders Litigation*, 2013 WL 4013306 (Del. Ch. July 31, 2013), for instance, the court tolled the statute where the defendant concealed and falsely represented the date of a crucial merger negotiation, and the plaintiff was able to learn the truth only through litigation discovery.  *See id.* at *8-9.  Similarly, in *CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021 (Del. Ch. June 23, 2015), tolling applied where the defendant had "consistently lied to Plaintiff's representatives" about material facts, which did not come to light until the plaintiff hired an outside firm to investigate.  *Id.* at *10.  And in *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007), tolling applied where the defendant had misrepresented a crucial date in public filings, thereby "affirmatively act[ing] to conceal a fact that prevented plaintiff from gaining material relevant knowledge in an attempt to put plaintiff off the trail of inquiry."  *Id.* at 360.

Konstantino's conduct here had just the same effect:  As the district court found (*see* A96-99; A152-63), he and TriReme were in sole possession of the relevant information, but prevented AngioScore from uncovering it by lying in response to repeated, direct inquiries.  He then discouraged further investigation by threatening legal action (A98), and prevented AngioScore from discovering his wrongdoing through public channels by manipulating the Patent and Trademark Office (A99 n.8).  This was a paradigmatic case for tolling.

34

Defendants show no clear error in the district court's findings. *First*, their recitation of events in early 2010 (Konstantino Br. 34-35) does not show that AngioScore knew then that Konstantino had developed a competing specialty balloon-catheter device before resigning from the Board, as would have been necessary for AngioScore to state its fiduciary-duty claim.[14]  To the contrary, the documents that Defendants cite show that AngioScore was *unaware* of that crucial fact:  On February 4, 2010, AngioScore's Trotter stated in an internal e-mail that he was "sure [TriReme's still-secret device] is not a drug coated version," and could only *hypothesize*, without any factual basis, that it "*could* very well be a Scoring Balloon of some type (which [Konstantino] thinks gets around our IP)."  A61161.  Trotter's e-mail shows that he and AngioScore did *not* know what TriReme's balloon device would be.

TriReme announced Glider three weeks later (*see* A80402), but Glider was "just a balloon" with no nitinol cage (A80394).  AngioScore reasonably believed that there was no "patent issue" (A80401), no direct competition with AngioSculpt (A50138; A50573; A50599; A71362-63), and "[no]thing more we can do about this" at the time (A80393-94).  Glider's introduction did not start the limitations clock running on

---

[14]  Whether Konstantino had an "opportunity to tell" AngioScore about Chocolate on February 3, 2010 (Konstantino Br. 34 n.11) is immaterial.  Whatever happened at that meeting, the fact is that Konstantino *never* made such a disclosure—either then or later.  *See* A96-99; A152.

claims relating to the *separate*, still-concealed *Chocolate* device. *See, e.g.*, *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, *15-16 (Del. Ch. Dec. 20, 2013) (tolling statute for earlier wrongful act even though plaintiff was on notice of subsequent independent wrong); *Bean v. Fursa Capital Partners, LP*, 2013 WL 755792, *5 (Del. Ch. Feb. 28, 2013) (similar).

Defendants' assertion (Konstantino Br. 36-37) that "AngioScore had all of the information it needed to bring the claims" in February 2010 is thus incorrect: AngioScore did not have *any* evidence of the crucial facts regarding *the timing of Chocolate's development* until late in patent discovery—Defendants hid those facts.[15] While Defendants suggest (Konstantino Br. 31, 37) that AngioScore personnel had a subjective "*belief* that Konstantino had undertaken development of Chocolate while on the board of AngioScore" (emphasis added), the district court made no such finding, and Defendants offer no evidence that could compel one. To the contrary, the evidence was that AngioScore personnel thought that TriReme *might* have been "*planning* to add a scoring element *over time*." A80394 (emphasis added). AngioScore had no reason to believe that TriReme had *already* added the nitinol cage,

---

[15]  Defendants refer (Konstantino Br. 35-36) to events in December 2011, but those events did not reveal anything about when Chocolate was developed. And even if they had put AngioScore on notice, AngioScore filed its state-law claims less than three years later, within the limitations period.

a fact that Konstantino had repeatedly denied and intentionally concealed. *See* A50633.

*Second*, even if AngioScore did *suspect* pre-resignation wrongdoing in early 2010, any such suspicion could at most trigger an obligation to exercise "reasonable diligence" by *investigating*. *See Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, *19 (Del. Ch. Oct. 31, 2013); *Tyson*, 919 A.2d at 591. As the district court recognized (A98-99), and as defendants concede (Konstantino Br. 35, 38-39), AngioScore diligently investigated here by sending formal letters seeking information regarding Konstantino's activities while an AngioScore Director. But, as the district court also found, Konstantino rendered AngioScore's investigation futile by responding with misrepresentations and threats in February and March 2010 (A156, A158, A160-61), and then deliberately concealing his October 2009 provisional patent application—the only document outside of Defendants' control that could have revealed Chocolate's pre-resignation origins (A162-63; A99 n.8). AngioScore cannot be faulted for Konstantino's success in thwarting its investigation. *See, e.g.*, *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, *10 (Del. Super. Feb. 15, 2013) (fraudulent concealment could be established where defendant's misrepresentations and false responses threw plaintiff "off the trail of inquiry"); *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, *8 (Del. Ch. May 31, 2000) (same where "defendant

possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion").

*Third*, Defendants' cases (Konstantino Br. 33, 37-38, 40) do not compel a different conclusion.  The court in *Tyson*, 919 A.2d at 590, found "actual artifice" based on a "partial, selective disclosure"—not unlike Konstantino's representations that a specialty balloon was "something for [TriReme's] future" (A50602) when in fact it was something for the present.  And unlike the defendant in *Halpern v. Barran*, 313 A.2d 139 (Del. Ch. 1973), Konstantino cannot plausibly deny that his misrepresentations and misconduct "prevent[ed]" AngioScore "from gaining knowledge of the facts."  *Id.* at 143.

Conversely, whereas the plaintiffs in Defendants' remaining cases all failed to adequately investigate their claims, the district court found here that AngioScore conducted a reasonable and diligent inquiry into Konstantino's conduct.  A99; *see supra*, at 10-12, 17-18.  Indeed, AngioScore did precisely what *Smith v. Whelan*, 2013 WL 3169373, *3 (D. Del. June 21, 2013), recognized as the "exercise of reasonable diligence":  It "ask[ed] Defendant directly" about the alleged wrongdoing, but (unlike the plaintiff in *Smith*) could not obtain a "basis to file suit" because of Konstantino's misrepresentations, reinforced by his threat to sue.[16]

---

[16]  There was no limitations or tolling issue in *Metro Communications Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121 (Del. Ch. 2004), which concerned an affirmative claim based on fraudulent concealment.  And any

*Finally*, Defendants have no basis for their theories (*e.g.*, Konstantino Br. 18, 26, 32, 35-36) that fraudulent concealment is inapplicable because AngioScore did not file its claims in 2010 because of insurance issues, or because it was waiting for QT Vascular to complete an IPO. The allegations in any case make no sense: AngioScore filed its patent-infringement claims promptly after learning of Chocolate, and filed its state-law claims promptly after learning that Konstantino had developed Chocolate while sitting on its Board. AngioScore's claims are timely.

## III. THE DISTRICT COURT CORRECTLY FOUND THAT KONSTANTINO BREACHED HIS FIDUCIARY DUTIES

Settled Delaware law provides a fact-intensive four-part test for determining whether a business opportunity is a "corporate" one triggering fiduciary duties to disclose and offer the opportunity. Applying that test, the district court found every element satisfied, and that Konstantino breached his fiduciary duties as a Director by secretly developing Chocolate and then keeping it for himself, rather than disclosing and offering the opportunity to AngioScore. On appeal, Defendants *do not dispute* that the established corporate-opportunity test is satisfied, but argue only that this Court should adopt *new* exceptions to that doctrine. Their contentions find no support in Delaware law.

---

requirement to establish reasonable reliance, *see id.* at 150, would be satisfied here by AngioScore's inability to uncover the evidence after a reasonable investigation. *See supra*, at 10-12, 17-18. There was also no fraudulent concealment issue in *Norman v. Elkin*, 726 F. Supp. 2d 464 (D. Del. 2010)—the cited "inaccuracies and misinformation … form[ed] the basis of the fraud claim itself." *Id.* at 472.

## A.    Delaware Law Required Konstantino To Disclose And Offer The Competing Chocolate Opportunity To AngioScore

### 1.    Konstantino's Fiduciary Duty Of Loyalty Obligated Him Not To Usurp The Chocolate Opportunity

In serving as a Director, Konstantino owed AngioScore an "unyielding" fiduciary obligation "to protect the interests of the corporation and to act in the best interests of its shareholders." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993). This duty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director … and not shared by the stockholders generally." *Id.* at 361. As the Delaware Supreme Court explained in its seminal decision in *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939), the law requires "scrupulous observance" of a director's fiduciary duty of "undivided and unselfish loyalty to the corporation"—demanding (*inter alia*) that he act "not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything … to deprive it of profit or advantage which his skill and ability might properly bring to it." *Id.* at 510; *accord Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).[17]

---

[17]    Contrary to Corporate Defendants' suggestions (Br. 1, 4, 11, 13), Konstantino's obligations were not affected by his purported status as an "outside" director: All "officers and directors of Delaware corporations" owe the same fiduciary duties, *Gantler v. Stephens*, 965 A.2d 695, 709 n.36 (Del. 2009), including independent board members, *see In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, *36 (Del. Ch. Sept. 4, 2014), *aff'd*, 129 A.3d 882 (Del. 2015). And regardless of the interests he may have represented in the boardroom (*see* Corp. Defs. Br. 11), Konstantino was

A fiduciary's duty to exercise "the utmost good faith in his relation to the corporation which he represents" includes an obligation not to keep for himself a business opportunity in which the corporation may be interested. *Guth*, 5 A.2d at 510; *see Grove v. Brown*, 2013 WL 4041495, *8 (Del. Ch. Aug. 8, 2013) (corporate-opportunity doctrine is "consequence of a fiduciary's duty of loyalty"). From *Guth* and its progeny, the Delaware Supreme Court has distilled what is now a settled four-part test holding that a director or officer *must* present a business opportunity to the company if:

> (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

*Broz*, 673 A.2d at 155. Thus, where a corporation would be interested in a business opportunity, "disclosure to the board of directors [is] required" so that the company may decide whether to pursue the opportunity. *Thorpe ex rel. Castleman v. CERBCO, Inc.*, 676 A.2d 436, 442 n.7 (Del. 1996). While failure to make such a disclosure may later be excused if a court finds that the opportunity was not "one rightfully belonging to the corporation," *Broz*, 673 A.2d at 157, a "director who opts not to inform the board of the opportunity acts at his peril." *Thorpe*, 676 A.2d at 442 n.7.

---

bound by an absolute duty "to protect the interests of the corporation." *Cede*, 634 A.2d at 360.

Delaware law thus provides not a rigid formula, but "guidelines to be considered by a reviewing court in balancing the equities of an individual case." *Broz*, 673 A.2d at 155. Determining whether an opportunity is a corporate one requires a court to take "all factors … into account insofar as they are applicable," and "[n]o one factor is dispositive." *Id.*

The district court found that Chocolate was a corporate opportunity that Konstantino was obligated to offer to AngioScore. A83-94. On appeal, Defendants do not contend that the court erred in finding that AngioScore established *all* of the recognized factors under *Guth* and its progeny. Nor do Corporate Defendants deny that they are jointly and severally liable for Konstantino's conduct.

### 2. Konstantino's Fiduciary Duties To AngioScore Were Not Limited To Dealings With Third Parties

Unable to contest the district court's application of settled law, Defendants posit a novel exception—asserting (Corp. Defs. Br. 34) that "developing an opportunity of one's own making is outside the scope of the corporate opportunity doctrine." The argument has no basis in Delaware law, which is clear in recognizing that corporate-opportunity cases "range over a multitude of factual settings" and that therefore "[h]ard and fast rules" must give way to case-specific factual analysis. *Broz*, 673 A.2d at 155.

Indeed, far from finding support in Delaware law, Defendants' proposed rule *conflicts* with the duties of loyalty and good faith upon which the corporate-

42

opportunity doctrine rests.  The doctrine is *not* (*contra* Corp. Defs. Br. 32) "premised on a business opportunity that is '*presented to* a corporate office or director'" by a third party; it is premised on a director's inflexible fiduciary duty of "undivided and unselfish loyalty to the corporation," *Guth*, 5 A.2d at 510, and follows from the obligation to ensure that "the best interest of the corporation and its shareholders takes precedence over" the director's own interests, *Cede*, 634 A.2d at 361.   Those obligations are "*unyielding*," *id.* at 360 (emphasis added)—the director's obligation to remain loyal does not dissipate because he had a good idea himself rather than receiving it from someone else.  *Guth* itself explains that a fiduciary must "refrain from doing *anything* … to deprive [the company] of profit or advantage which *[the fiduciary's] skill and ability* might properly bring to it."  5 A.2d at 510 (emphasis added).

While Corporate Defendants assert (Br. 16) that settled Delaware law "makes no sense" where the opportunity is of the director's own making, the truly nonsensical supposition is that Delaware law or policy would allow a fiduciary to secretly develop and *then* usurp an opportunity even though the same conduct indisputably would be *forbidden* if the opportunity had been presented by a third party.  Under that absurd rule, a Director would have free rein to use his insider knowledge to identify a problem in the market and then secretly develop a product to compete with *his own company*—and could even commence *selling* a competing product without ever

43

resigning from his Board. This would create an environment in which boards, shareholders, and officers could have no trust in one another.

Defendants identify no case adopting their proffered exception, instead relying primarily (Corp. Defs. Br. 32-33) on isolated phrases ("presented to," "comes to") taken out of context from *Guth*, while failing to explain how an opportunity's *origin* could make a difference to a director's duties of loyalty and good faith. Nor do Defendants' other authorities (Br. 33) support their rule: *Thorpe* noted that corporate-opportunity cases "[g]enerally" involve competition between director and corporation to buy something, 676 A.2d at 443, but did not foreclose application of the doctrine on other fact patterns implicating the duty of loyalty. *See id.* at 442. If *Carlson v. Hallinan*, 925 A.2d 506 (Del. Ch. 2006), is correct that "[i]n the typical corporate opportunity case, only one entity may take advantage of the opportunity," *id.* at 538 (quoted in Corp. Defs. Br. 33), then this case is a prototypical one for applying the doctrine: Konstantino kept Chocolate for himself and his co-defendants, depriving AngioScore of the opportunity. And the fact that Delaware courts have found corporate opportunities in third-party contexts (*see* Corp. Defs. Br. 33-34) does not mean that the doctrine is somehow restricted to such scenarios. Indeed, such a restriction would run counter to the Delaware Supreme Court's explanation that corporate-opportunity claims "range over a multitude of factual settings" and are to be

44

decided by "balancing the equities of an individual case" rather than through application of "[h]ard and fast rules." *Broz*, 673 A.2d at 155.

Moreover, Defendants are wrong to assert (Corp. Defs. Br. at 31, 32) that no court has invoked the corporate-opportunity doctrine in a case involving a development by the fiduciary himself. For instance, in *Telxon Corp. v. Meyerson*, 802 A.2d 257 (Del. 2002), the Delaware Supreme Court applied the doctrine where a fiduciary-defendant desired to develop a new technology, *see id.* at 260, and reversed a grant of summary judgment to the defendant—remanding for consideration not of *who* had developed the technology, but of whether the defendant had adequately offered it to the board. *Id.* at 263-64; *see also Needham v. Cruver*, 1993 WL 179336, *2 (Del. Ch. May 12, 1993) (applying doctrine where defendants "identified the development and manufacture of above-ground petroleum storage tanks as a potential business opportunity" for their corporation, but took it for themselves).

Defendants cite (Corp. Defs. Br. 34) only one case, *Equity Corporation v. Milton*, 221 A.2d 494 (1966), purportedly supporting their rule—but as the district court explained (A80), *Milton* is off-point. The defendant there had, for tax reasons, shuffled ownership of stock options in Equity (the plaintiff corporation) among various corporations under his direct and indirect control. *See* 221 A.2d at 495-96. Equity asserted that instead of causing one of his corporations to acquire the options from another, Milton should have offered Equity the opportunity to acquire them. *Id.*

45

at 497.  In affirming  the lower court's finding that Milton's opportunity was not one that "should belong to the corporation," the Delaware Supreme Court relied on a *combination* of factors:  The opportunity was not shown to be "of practical advantage to the corporation," and did not "fit into the business of the corporation or fit into an established corporate policy."  *Id.* at 497-98.  And crucially, the "opportunity, … if indeed it can be called an opportunity, … was in reality nothing more than the reacquisition directly of property over which he formerly had exercised control indirectly."  *Id.* at 499.  He "was a stockholder dealing with himself," "dealing with what was his own property"—not property in which the corporation had any cognizable business interest—and thus "there was in fact never any new opportunity that came into being."  *Id.*

Contrary to Corporate Defendants' suggestion (Br. 35), it was not determinative in *Milton* that the "opportunity" was "of [Milton's] own making"; what mattered was that he was dealing with his own property, in which Equity had no interest and for which it would have had no practical use.  Here, in contrast, Defendants do not dispute either that AngioScore had an interest in Chocolate or that it could have exploited the opportunity.  The district court correctly ruled that Chocolate was a corporate opportunity and that Konstantino breached his duties to disclose and offer it to AngioScore.

## B.    Konstantino Could Not "Prepare To Compete" With AngioScore By Usurping The Chocolate Opportunity

Defendants cannot evade liability by arguing (Corp. Defs. Br. 36-39) that Konstantino's conduct constituted mere *preparation* to compete.

As the district court explained (A80-81 n.5), the sole Delaware prepare-to-compete case on which Defendants rely, *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957 (Del. 1980) (cited in Corp. Defs. Br. 37), was clear in stating that "[t]he right to make arrangements to compete is by no means absolute"—specifically identifying "usurpation of [an] employer's business opportunity" as an act of misconduct that will override the privilege. *Id.* at 965. The case turned on the fact that the defendants had been conclusively found *not* to have usurped a corporate opportunity. *See id.* at 964-66. That finding "finally determine[d] the right of the [fiduciary] to treat the opportunity as his own," *id.* at 964, which meant that the defendants were permitted to prepare to exploit it. *See id.* at 965-66.

This case is the opposite. As the district court found, "Konstantino *did* usurp (indeed, created and then usurped) a corporate opportunity" while on AngioScore's Board. A81 n.5 (emphasis added). Konstantino had no right to treat the Chocolate opportunity as his own, and no right to engage in preparations for using it to compete with AngioScore while serving as a Director.

Defendants' argument additionally fails because, as the district court found (*id.*), Konstantino's "machinations were not merely preparatory." Defendants' failure

47

to challenge that finding is dispositive of this issue. *See., e.g.*, *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1085 (Fed. Cir. 2014). Nor could Defendants demonstrate clear error, given the extent of the device's development, its "completed" design, the surreptitious patent application, and Konstantino's development of the business (including by soliciting investors). *See* A129-31; A61037-49.[18]

Finally, it is immaterial that Konstantino was under no express *contractual* obligation not to compete with AngioScore (*see* Corp. Defs. Br. 38-39), because he served as a Director subject to well-settled *fiduciary* obligations. While AngioScore "agreed to Konstantino's work at TriReme and … service on TriReme's board" (*id.* at 38), that agreement was strictly limited to TriReme's work on *bifurcation stents* that would not compete with AngioSculpt (A146; A50561-62; A50699-700; A50731-32; A50874; A61154-56; A80071-72). Far from seeking "to impose more restrictions than fiduciary law provides" (Corp. Defs. Br. 38), AngioScore was careful to *preserve* the common-law fiduciary duties that Konstantino breached.

## IV.   THE DISTRICT COURT PROPERLY AWARDED LOST PROFITS AND DISGORGEMENT

Defendants' challenges to the remedies awarded by the district court likewise fail. Whatever standards may apply in other contexts, Delaware law has long held that a fiduciary who breaches his duties by usurping a corporate opportunity must be

---

[18] These unchallenged findings render irrelevant Defendants' out-of-state authorities discussing the purported extent of permissible preparation (Corp. Defs. Br. 37-38).

denied "*all benefit and profit*," in order to protect the "wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." *Guth*, 5 A.2d at 510. Under Delaware law, trial courts have "broad discretion to craft a remedy" to achieve that goal, *Cantor Fitzgerald*, 2001 WL 536911, at *5, and the amount of the remedy is "to be liberally calculated," *Thorpe*, 676 A.2d at 444. Indeed, "breaches of a fiduciary relationship … comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." *Id.* at 445 (citation and internal quotation marks omitted). The district court properly fashioned remedies to achieve these aims of Delaware law.

## A.    The District Court Properly Awarded Lost Profits

### 1.    The District Court Correctly Found That Feld Would Have Offered To Assign His Rights To AngioScore

Defendants identify (Corp. Defs. Br. 44-49) no error in the district court's rejection of their causation defense based on Feld's rights in Chocolate. The court correctly found (A119) "that Feld would have assigned his interest wherever and to whomever Konstantino recommended," and thus would have followed Konstantino had he offered Chocolate to AngioScore.

This factual finding was amply supported by the court's assessment of the trial evidence, including witnesses' credibility. The court observed that Konstantino and Feld were "brother-like friend[s] and colleague[s]" (A68; *see* A50885-86; A50892-93)

and that Feld bore substantial "allegiance to Konstantino" (A119; *see* A50870-73; A51339).   Moreover, Feld had little business acumen—for example, he was not involved with locating partners with which to develop the Chocolate opportunity, and indeed *acknowledged* that he had no role in "the business side" of the project (A119 (citing A50872-73)).   Based on this and other evidence, the court found that "Feld's … deference to Konstantino's independent business decisions" was "undeniable," and that Feld "did not exert any independent control over these decisions"—a conclusion underscored by the discrepancy in the compensation the two collaborators received for assigning their equal interests to Quattro:   Whereas Konstantino received $250,000 and a 2.85% royalty on Chocolate sales, Feld made just $70,000 and a 2.15% royalty. A119; A50237; A50870; A51339; 51388.

The district court's "steadfastly confident" finding that Feld "would have followed Konstantino's lead" by assigning his interest to AngioScore (A119) was far more than "plausible," and therefore cannot be reversed on clear-error review. *Rubera*, 350 F.3d at 1093-94; *see Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1104 (9th Cir. 2010) (district-court causation finding reviewed for clear error).   Indeed, the contrary finding urged by Defendants is affirmatively "implausible," as the district court found (A119):  Defendants offered no evidence that if Konstantino had offered Chocolate to AngioScore, Corporate Defendants (or any other company) would have pursued Chocolate on the basis of Feld's *non-exclusive* rights.

Defendants' arguments against this conclusion fail. The district court did not (*contra* Corp. Defs. Br. 48) "assume[]" that Feld "would blindly follow" Konstantino; instead, it made a factual finding based on the record evidence. The only purportedly contrary evidence Defendants cite (*id.* at 47-48 (citing A50864-65)) is Feld's testimony—but the district court properly rejected that testimony as not credible in light of the "objective facts" described above, and because Feld had offered it "only … conveniently in the context of ongoing litigation" (A119). Defendants identify no evidence requiring the district court to accept Feld's self-serving testimony over the objective facts of his relationship to Konstantino. *See, e.g.*, *Mondaca-Vega v. Lynch*, 808 F.3d 413, 428 (9th Cir. 2015) (clear-error standard does not permit reviewing court "to reweigh the evidence presented at trial in an attempt to assess which items should and which should not have been accorded credibility").

Defendants criticize (Corp. Defs. Br. 47-48) the district court's decision as resting on a "counterfactual" scenario involving a "hypothetical offer," but causation determinations *routinely* rest on the fact-finder's assessment of what would likely have happened in the absence of a defendant's conduct. *See, e.g.*, *Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) (determining causation by assessing effect of infringement on market share is "by definition a hypothetical enterprise"). Just as a fact-finder may infer causation from objective evidence via the "*Panduit* factors," *see, e.g.*, *Versata Software, Inc. v. SAP Am., Inc.*,

717 F.3d 1255, 1264-65 (Fed. Cir. 2013), so the district court here properly inferred causation from the objective evidence of Feld's role and relationship to Konstantino. Defendants' implausible alternative theory is far more speculative.

### 2. The District Court Correctly Identified The Relevant Market

Nor did the district court err in finding (A121-22) that Chocolate and AngioSculpt compete in the market for specialty balloon-catheter devices. As the court found (A122), specialty balloons comprise a market separate from POBAs, which lack specialty elements like nitinol cages: Specialty balloons are "designed to address more complex medical problems" than POBAs, and are "priced significantly higher." *See* A50158-59; A50408-09; A50756. Thus, a doctor planning a procedure must determine whether the benefits of a specialty device are worth the premium price—up to $1000 for a specialty balloon versus $150 to $200 for a POBA, and an *average* differential of 244%. *See id.*; A173; A50758. But once the doctor has decided that a specialty device is necessary, she is left with a narrow marketplace in which AngioScore held a 48.1% share prior to Chocolate's introduction. A122, A171, A50520; A50932-33; 62444. Tellingly, Defendants specifically targeted their Chocolate marketing efforts at doctors who had used *specialty* balloons in the past (A172; A50336; A61230; A61266; A61271-73), and purposefully used AngioSculpt's prices as the benchmark for Chocolate's pricing strategy (A134; A172; A50335-44; A50348-49; A61234-36; A61254; A61230; A61259-60). Defendants'

contemporaneous documents show that they viewed AngioSculpt—*not* the devices in the POBA market—as Chocolate's "closest competitor."  A151; A172; A50343-44; A61259-60; *see also* A61228-29; A61232; A61266-68.

On the basis of this evidence, as well as the testimony of AngioScore's expert Mr. Olsen, the district court reasonably concluded that AngioScore and Chocolate compete in a market that differs from the POBA market.  As this Court has held in the *Panduit* context, products occupy different markets where—as with specialty balloons and POBAs—one has a "disparately higher price than or possess[es] characteristics significantly different" from the other.  *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993); *see, e.g., Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1356 (Fed. Cir. 2001) (similar).

Defendants' arguments against the district court's market finding fail.  *First*, Defendants' challenges to Olsen's testimony are irrelevant and in any event waived. The district court did not directly rely on Olsen's opinions in determining the relevant market, but rested its finding on *fact* evidence relating to price differential and feature distinctions, as well as Defendants' contemporaneous recognition that Chocolate and AngioSculpt directly compete.  *See* A121-22.  That evidence is sufficient to support the court's market-definition finding "even without [expert] testimony."  *Crystal Semiconductor*, 246 F.3d at 1356.

Defendants' objections to Olsen's qualifications and foundations (Konstantino Br. 53-55) are in any event unpreserved. *See* A3354-55 (motion omitting such arguments); A50744-99, A50843-44; Fed. R. Evid. 103(a)(1); *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 954 (9th Cir. 2011).[19] Defendants do not attempt to establish plain error, and could not do so. *See, e.g.*, *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) ("Plain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault…."). And Defendants cannot evade plain-error review by couching their challenge as implicating the sufficiency of the evidence. *See Bartleson v. United States*, 96 F.3d 1270, 1277-78 (9th Cir. 1996) (argument against weight of expert testimony waived by not objecting to admission).

*Second*, Defendants cannot establish error (let alone clear error) by citing evidence purportedly inconsistent with the district court's finding. The Millennium reports do not "expressly state[] that specialty balloons … compete with POBAs," as Defendants assert (Konstantino Br. 55). At most, they suggest that specialty balloons "compete with *high-pressure* balloons" (A62437 (emphasis added)) and that specialty balloons and *high-pressure* balloons may be used for the same primary indications (A61799). But not all POBAs are *high-pressure* balloons (*see id.*), so even

---

[19]    This Court "appl[ies] the law of the regional circuit to the procedural question of waiver." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003).

Defendants' interpretation does not support a market comprising both specialty balloons and *all* POBAs.  And in any event the Millennium reports clearly distinguish the specialty-balloon market both from the POBA market generally and from the high-pressure balloon market in particular.  *See* A62429-38; A61804-06.

Defendants' assertion (Konstantino Br. 56) that specialty balloons compete with POBAs is true only in the immaterial sense that in a given case, a doctor must determine whether an expensive specialty balloon is necessary, or whether a POBA will do.  As the district court correctly found (A171), the relevant market is the small set of devices from which a doctor would choose *after* deciding to use a specialty balloon.  Nor did the district court clearly err in finding AngioScore's evidence of the relevant market more credible than the interested testimony of Defendants' expert Dr. Garcia (*see* Konstantino Br. 57-58)—which the court gave only "marginal weight" (A118), and which was based on his individual experience as a physician, not on any analysis of the market (*see* A50932-33).   Given the obvious and undisputed distinctions in features and price between specialty balloons and POBAs, the district court correctly found that the specialty market is distinct.

*Finally*, the record does not support Defendants' suggestion (Konstantino Br. 57-58) that drug-coated balloons are the "real" cause of the decline in AngioScore's sales.  To the contrary, drug-coated balloons were not introduced until months *after* the close of the *past* lost profits period (*see* A171; A50751; A50803; A71323), and the

*future* lost profits award incorporated a substantial discount rate (with which Defendants' expert agreed, A51275) to account for future events such as the introduction of new competition like drug-coated balloons (*see, e.g.*, A50781). Defendants cannot possibly show clear error in the court's market definition by citing five lines of opinion testimony (A50933) from a physician unqualified to testify about trends in the market (*see* A50899 (Garcia qualified only "in the field of interventional cardiology and peripheral vascular disease")).

Defendants' assertion (Konstantino Br. 58) that "there can be no dispute" about the effect on the market of drug-coated balloons is supported not by record evidence, but by exhibits to Konstantino's motion to *reopen* the trial record—which was filed in September 2015 (*see* A17070-72), long *after* the district court's July 1, 2015 decision. The district court denied that motion as improper and untimely (A175-78), and Defendants do not challenge that order. Those documents thus are not "proof of anything," *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 272 (Fed. Cir. 1985) (rejecting reliance on document attached to properly-denied motion to reopen), and could not justify reversal in any event: As the district court noted (A177), Defendants chose not to develop the drug-coated-balloon issue at trial, despite having the opportunity to do so. Defendants "must bear the burden of a factual record that is incomplete," and cannot complain about their own failure to develop "sufficient facts … to support a challenge on appeal." *United States v. Elias*, 921 F.2d 870, 874 (9th

56

Cir. 1990).  And even if drug-coated balloons *did* cause AngioScore to lose sales, that would not preclude a finding that Chocolate *also* caused (and *will* cause) *additional* lost sales—particularly given that Chocolate itself may be sold as a drug-eluting device in the future (*see* A139-40).

### 3.     The District Court Correctly Determined The Amount Of Lost Profits

Defendants fare no better in their challenges to the *amount* of the lost-profits award, which were not properly raised below and which are barely developed on appeal.

*First*, Defendants waived any contention (Konstantino Br. 59-60) that the award of future lost profits is too speculative.  They waived it below by waiting to raise the argument until Konstantino's Rule 59(e) motion (which Corporate Defendants did not even join).  *See, e.g.*, *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1110 (9th Cir. 2001) ("By waiting until post-trial motions to raise this argument, [Defendants] waived the right to appeal.").  And they reinforce that waiver by not challenging the district court's order denying the Rule 59(e) motion (A183-85).  *See SSL*, 769 F.3d at 1085.

In any event, Defendants identify no clear error.  *See Lentini v. Cal. Ctr. for Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004) (damages computation reviewed for clear error).  Their cases are inapposite:  *Magna Weld Sales Co., Inc. v. Magna Alloys & Research Pty., Ltd.*, 545 F.2d 668, 672 (9th Cir. 1976), was decided four

decades ago under Washington misrepresentation law, and *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996), was a patent-infringement case. The governing *Delaware fiduciary-duty law* is clear and different: damages are "liberally calculated," and proof requirements are "loosen[ed]," *Thorpe*, 676 A.2d at 444-45, affording the trial court "broad discretion to craft a remedy," *Cantor Fitzgerald*, 2001 WL 536911, at *5. Even in a *contract* case where the rules are *not* so relaxed, Delaware law holds that lost-profit "damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty. The *amount* of damages can be an estimate." *Siga Techs., Inc. v. PharmAthene, Inc.*, __ A.3d __, 2015 WL 9467037, *1 (Del. Dec. 23, 2015).

The *fact* of injury here is certain; Defendants challenge only the *amount*. And they show no clear error in the district court's estimation. They object (Konstantino Br. 59-60) to Olsen's reliance on *Defendants' own sales projections*, but projections are a permissible basis for calculating damages. *See, e.g.*, *Siga*, 2015 WL 9467037, at *11-15, *20-23 (approving lost-profits determination based on, *inter alia*, future earnings model incorporating sales expectations); *see also Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983). Having failed to raise the issue at trial, Defendants cite no evidence that *their own projections* are so wrong as to render a finding based on them clearly erroneous. Defendants also dispute

58

(Konstantino Br. 59) the 5% annual growth rate reflected in the court's judgment, but that is *conservative* compared to Defendants' projections (*see* A50773-77), and Defendants again have no contrary evidence.

*Second*, Defendants waived any argument (Corp. Defs. Br. 52-53) that the lost-profits award should be reduced by the cost of acquiring Chocolate, which was never raised below. *See, e.g.*, *Broad v. Sealaska Corp.*, 85 F.3d 422, 430 (9th Cir. 1996).[20]

Defendants' argument is also wrong. In exercising its discretion to assess an appropriate equitable award, the district court did not assume a hypothetical world in which AngioScore paid to acquire Chocolate. Rather, the court determined the extent to which "Chocolate's market presence has cost [AngioScore] market share and resulted in lower profits." A121. That calculation did not require subtraction of any hypothetical payment to Konstantino.

Moreover, allowing a deduction for the cost of acquiring Chocolate would have violated Delaware law by permitting Defendants to benefit from Konstantino's breach. *See Guth*, 5 A.2d at 510. In light of that rule, and the concomitant principle that "the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly," *Thorpe*, 676 A.2d at 445, Delaware law would permit an award "*exceeding*

---

[20]    Defendants note (Corp. Defs. Br. 53) that the district court did not "venture as to the specifics" of Konstantino's hypothetical offer to AngioScore (A82). But the court made that statement in explaining that Konstantino's fiduciary duties required him to make an *offer* (*id.*). The court did not address the issue in determining remedies (A120-25), because Defendants did not seek a deduction.

the fair value" of what the plaintiff has lost—"particularly where [as here] fraud, misrepresentation, [and] self-dealing … are involved," *In re Dole Food Co., Inc. Stockholder Litig.*, 2015 WL 5052214, *44 (Del. Ch. Aug. 27, 2015) (emphasis added).  The district court did not go so far here, but granted a lost-profits remedy intended to "repair[] and deter[] without being punitive."  A126.  Particularly given Defendants' failure to raise their challenge or present supporting evidence, the district court's award falls comfortably within its "broad discretion."  *Cantor Fitzgerald*, 2001 WL 536911, at *5.

  *Finally*, the district court's lost-profits award cannot be set aside on public-policy grounds (*contra* Corp. Defs. Br. 50-52).  This argument too was not raised below and is waived.  *See Broad*, 85 F.3d at 430.

  It also lacks merit.  The lost-profits award does not "run[] counter to the policy favoring innovation" or limit "the availability of life-saving and life-enhancing medical products" (Corp. Defs. Br. 51):  The district court did not enjoin Chocolate or remove it from the market, and Defendants are entitled to continue manufacturing and profiting from it.  The district court's award is if anything *overprotective of Defendants* under Delaware law—*instead* of "extinguish[ing] all possibility of profit" from the breach by requiring disgorgement of all of Defendants' profits, or of the entire value of Chocolate itself, *see Guth*, 5 A.2d at 510; A123-25, the court adopted a lost-profits remedy that will "repair[] and deter[] without being punitive" (A126)—

permitting Defendants to retain their profits except to the extent of AngioScore's loss. That decision, based on "equitable considerations" (*id.*), was well within the court's discretion.

### B.    The District Court Properly Required Konstantino To Disgorge All Benefits He Obtained From His Breach

Konstantino identifies (Br. 60-62) no error in the district court's order that he disgorge his personal benefits from his knowing breach of fiduciary duty.

*First*, Konstantino's arguments that the disgorgement order effects a double recovery and (conversely) imposes a double remedy (Br. 61-62) are waived. Neither was presented until Konstantino's Rule 59(e) motion, which was too late. *See Yeti*, 259 F.3d at 1110.

Even if not waived, the arguments fail. Delaware law permits a court in a fiduciary-duty case to award *both* a compensatory remedy and one directed to disgorgement of wrongfully-obtained profits. *See, e.g.*, *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, *28 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010). This rule exists to ensure both "that a fiduciary not profit personally from his [wrongful] conduct, and that the beneficiary not be harmed by such conduct." *Id.* Here, the lost-profits award seeks to remedy AngioScore's injury, but disgorgement is still necessary to deprive Konstantino of the benefits of his conduct. For instance, if Konstantino were to keep his shares of QT Vascular stock, he would continue to benefit from Corporate Defendants' profits on Chocolate.

61

*Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161 (Del. Ch. 1999) (cited in Konstantino Br. 61), is not to the contrary: The court declined to order disgorgement there because there was "no evidence" that the defendant "realized a 'windfall' … that [was] not remedied … by [the court's] award of damages." *Id.* at 1190. Here, by contrast, the lost-profits award is distinct from the disgorgement remedy: Compensation for AngioScore's lost profits (which is likely to come at least in substantial part from Corporate Defendants) will not eliminate Konstantino's *personal* benefits from his breach.

*Second*, Konstantino identifies (Br. 62) no clear error in the district court's determination of which benefits he must disgorge. Indeed, the three-sentence argument contains no citations to record evidence that could overcome the district court's conclusion. Such an insufficiently developed argument is waived. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

The argument fails in any event. As discussed, "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe*, 676 A.2d at 445. Thus, the remedy need only be "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).[21]

---

[21] No Delaware fiduciary-duty claim was at issue in *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26 (Del. Ch. 2012) (cited in Konstantino Br. 62). The only similar claim there was asserted under *Dutch* law, *id.* at 52, and it failed, *id.* at 57.

Konstantino fails to show that the benefits to be disgorged are not "logically and reasonably related" to his breach of fiduciary duty—each of them is closely tied to his work on Chocolate for TriReme. For instance, at least 90% of QT Vascular's 2014 revenue came from Chocolate sales (A51298; *see* A71323), so Konstantino's QT Vascular stock is closely intertwined with his usurpation of the Chocolate opportunity. And there is a clear relationship between Konstantino's breach and the monies he received for consulting on Chocolate and from royalties earned on Chocolate's sales.

## V.   FEDERAL LAW DOES NOT PREEMPT ANGIOSCORE'S CLAIM FOR BREACH OF FIDUCIARY DUTY

### A.   Defendants Waived Preemption By Not Raising It Below

This Court need not reach the merits of Defendants' preemption arguments, because they waived them by not raising preemption in the district court. *See Broad*, 85 F.3d at 430; *MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*, 731 F.3d 1258, 1271 (Fed. Cir. 2013).[22]

Defendants' preemption arguments cannot be saved by a contention that they are non-waivable. Preemption is subject to ordinary waiver rules unless the particular challenge addresses the court's *jurisdiction* to adjudicate a claim. *See, e.g.*, *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 389, 391 (1986)

---

[22] Konstantino asserts (Br. 41) that purported conflicts between federal and state law were raised below, but his omission of any record citation is telling. Defendants *never* asserted a preemption defense, and the district court was not obliged to develop and apply one *sua sponte*.

63

(preemption non-waivable only if it would "foreclos[e] the [federal] court's very jurisdiction to adjudicate"); *Violette v. Smith & Nephew Dyonics, Inc.*, 62 F.3d 8, 11-12 (1st Cir. 1995) ("preemption is not jurisdictional and is subject to the ordinary rules of appellate adjudication, including timely presentment and waiver," where it addresses "whether state tort or federal statutory law controls").  The First Circuit thus has found waiver of an argument, analogous to Defendants', that the Copyright Act preempted a state-law claim.  *Curet-Velazquez v. ACEMLA de Puerto Rico, Inc.*, 656 F.3d 47, 52-53 (1st Cir. 2011).  The Ninth Circuit likewise has found waiver of an argument that the Food Drug & Cosmetic Act preempted state-law claims. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008).

Defendants do not contend that their preemption arguments are jurisdictional. Instead, they seek a different "reading of Delaware law" than the one adopted below (Corp. Defs. Br. 39), or assert that AngioScore should be limited to rights and remedies under the Patent Act (*id.* at 42-44; Konstantino Br. 41-52).  Those arguments are waivable, and waived.  Defendants offer no reason to undercut the vital considerations of fairness, finality, and judicial economy underlying the waiver doctrine by considering their new defenses.

### B.    Defendants Identify No Conflict With Federal Law

If the Court considers Defendants' preemption arguments, it should reject them. Because patent law neither "provide[s] explicit preemption" nor "occup[ies]

64

exclusively the field of" fiduciary-duty law, Defendants must show that Delaware law actually *conflicts* with federal law. *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377 (Fed. Cir. 2005). Defendants, however, fail to identify any provision of federal law, nor any Congressional policy, with which Delaware law even arguably conflicts. To the contrary, the Supreme Court has long recognized that even in patent-adjacent contexts such as trade-secrets law, the States have non-preempted authority to regulate and enforce "[t]he necessity of good faith and honest, fair dealing, [which form] the very life and spirit of the commercial world." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481-82 (1974). Delaware's fiduciary standards fall in that category and are wholly consistent with the Patent Act.

### 1. Upholding A Fiduciary's Duties Does Not Conflict With Federal Patent Law

There is no conflict (*contra* Corp. Defs. Br. 39-42; Konstantino Br. 43-49) between Delaware fiduciary law and federal patent law. And Defendants offer no reason to think that Congress intended to make the existence of a fiduciary duty not to usurp a corporate opportunity dependent on whether a particular opportunity is patentable.

*First*, the presumption of patent ownership does not conflict with a voluntary arrangement obliging a fiduciary to offer corporate opportunities (including patent-related opportunities) to the corporation he serves. There can be no dispute, for instance, that an advance-*assignment* agreement is enforceable under the Patent Act.

*See, e.g.*, *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933) ("One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained."); *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 408 (Fed. Cir. 1996) (similar). The advance-*offer* arrangement embodied in the corporate-opportunity doctrine (*see* A82; *Guth*, 5 A.2d  at 511) is *less* restrictive of patent ownership than such an advance-assignment agreement.  The presumption that a fiduciary owns rights in his inventions does not conflict with a voluntarily-incurred obligation to disclose and offer such rights where his corporation has an interest in them.

Defendants' contrary contentions appear (*see* Konstantino Br. 43-44) to rest on the unstated premise that Konstantino's fiduciary duties were imposed involuntarily, but that disregards that he knowingly accepted those duties (*see* A147; A61157-58) as part of a *private, voluntary business arrangement*:  Konstantino *chose* to serve as a Director, and was entitled at any time to end the fiduciary relationship—as evidenced by his February 2010 resignation.  By becoming and then remaining a Director until the date of his resignation, Konstantino *willingly subjected himself* to long-settled Delaware fiduciary obligations to *disclose* and *offer* corporate opportunities to AngioScore (*see* A50133-34).[23]

---

[23]   Konstantino wrongly asserts (Br. 43, 45) that the district court "required [him] to forfeit all his interest in his invention," and "forced the transfer … from Konstantino

66

*Second*, none of Corporate Defendants' cases (Br. 39-41) even remotely supports them.  *Board of Trustees v. Roche Molecular Systems, Inc.*, 131 S. Ct. 2188 (2011), has nothing to do with preemption.  The Court held only that the Bayh-Dole Act could not be interpreted to vest an inventor's rights *automatically* in his federal-contractor employer, *in the absence of a private arrangement*.  *See id.* at 2194-97.  *Roche* in fact gave effect to a contract under which an inventor *prospectively* assigned *future* inventions to another party.  *See Bd. of Trs. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009).

*Dubilier* likewise has nothing to do with preemption, but held only that the inventors retained rights in their patents because they did not expressly agree to assign them away, and the "circumstances preclude[d] the implication of any [such] agreement."  289 U.S. at 187-88, 193-96.  The Court did not hold or suggest that the Patent Act would bar an implied assignment agreement, or otherwise preclude a voluntarily relinquishment of intellectual-property rights.  The implied agreement embodied in Konstantino's fiduciary duties cannot be understood to conflict with the "basic principle of patent law that inventors own their inventions."  *Roche*, 131 S. Ct. at 2199.

---

to AngioScore[] of all his rights to Chocolate."   The court compelled no such forfeiture, and the rights in any event belong to *Quattro*, not Konstantino (*see* A167).

The only preemption case on which Defendants here rely (Corp. Defs. Br. 41), *Tavory v. NTP, Inc.*, 297 F. App'x 976 (Fed. Cir. 2008), is inapposite. *Tavory* found preemption under 35 U.S.C. § 262 where the asserted unjust-enrichment claim was premised on the plaintiff's purported right to co-ownership of a patent: Such a claim would have directly conflicted with the (actual) co-owner's express right to use the patent "without the consent of the other co-owners and without accounting to the co-owners." *See* 297 F. App'x at 982-83. There is no such conflict here. AngioScore does not claim part-ownership of any relevant patent, and seeks to vindicate rights in a business opportunity arising from *fiduciary* law, not patent law.[24]

*Third*, Defendants' policy arguments (Konstantino Br. 45-49) are unavailing. Preemption cannot proceed on the basis of vague policy preferences such as "promot[ing] innovation and its fruits" (*id.* at 45), which do not make up "the supreme Law of the Land." U.S. CONST. art. VI, cl. 2; *see, e.g.*, *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 586 (6th Cir. 2013) ("vague policy …, untethered from the structure of the [statute], is not enough to support purposes-and-objectives [conflict] preemption");

---

[24] Relying on *Tavory*, Defendants also assert (Corp. Defs. Br. 48-49) that federal law somehow preempted the district court's finding that Feld would have acquiesced if Konstantino had offered Chocolate to AngioScore. But Defendants cite no authority holding that a federal court's *factual* determination can be preempted, and (as shown) this case does not implicate Section 262. The relevant intellectual property currently has only one owner (Quattro), and Feld has no present interest in it that could be disturbed by the court's finding. Nor (*contra* Corp. Defs. Br. 49) do the remedies affect the compensation Feld received for his assignment, or otherwise invade whatever rights he may have had.

*Fitzgerald v. Harris*, 549 F.3d 46, 53 (1st Cir. 2008) ("general tension with broad or abstract goals that may be attributed to ... federal laws" is insufficient for preemption); *Malabed v. N. Slope Borough*, 335 F.3d 864, 872 (9th Cir. 2003) ("general federal policy … is insufficient to preempt state law").

In any event, Defendants do not show that enforcement of Delaware fiduciary law will chill innovation.  There is nothing "uncertain[]" (Konstantino Br. 47) about the settled rule of Delaware law implicated here:  A Delaware fiduciary must disclose and offer an opportunity to his corporation if the corporation might have an interest in it—whether or not that opportunity relates to a patented or patentable invention. *See, e.g., Thorpe*, 676 A.2d at 442 n.7.  Nor does the rule invade "patent ownership and rights" (Konstantino Br. 47), since the fiduciary's obligations are voluntarily accepted and readily terminable.

There can also be no preemption based on a general policy of protecting fiduciaries' ability to serve on multiple corporate boards (*see id.* at 47-49), which is not codified in the Patent Act.  And even assuming *arguendo* that preserving that ability may be valuable, the law *favors* fiduciaries' disclosure of business opportunities, so that corporations can protect themselves—including by acquiring the opportunity or asking the fiduciary to resign.   Konstantino knew this:  He sought permission from AngioScore to serve as a TriReme officer and board member, and received it only on condition that he limit his work to bifurcation stents that do not

compete with AngioSculpt.  A146; A50561-62; A50699-700; A50731-32; A50874;

A61154-56; A80071.  His service on two boards did not put him in an "untenable

position[]" (Br. 48):  He was unambiguously required to disclose and offer Chocolate

to AngioScore (his specialty-balloon company) and not to TriReme (his bifurcation-

stent company).  Any doubts would have been resolved by prompt disclosure.

### 2. The District Court Did Not Confer "Patent Rights" Upon AngioScore

Defendants' alternative preemption theory—that operation of Delaware law

"awarded patent rights and damages to AngioScore" (Konstantino Br. 49-52) or "gave

patent-like protection to AngioScore" (Corp. Defs. Br. 42-44)—is likewise

unfounded.  The district court did not (*contra id.* at 43) "award[] lost profits premised

on AngioScore's ability to *prevent* Defendants from making and selling Chocolate"

(emphasis added), nor did it prohibit Defendants (or anyone else) from selling the

device.  Rather, the court enforced Konstantino's fiduciary duties by compensating

AngioScore for its loss, and ordering disgorgement to deprive Konstantino of his ill-

gotten gains and to discourage future usurpations.  The court assessed these remedies

not on the basis of any patent-like right of exclusion, but by determining the effects of

Konstantino's breach.  Enforcement of Konstantino's duties is not a grant of patent

rights, and does not conflict with federal law.

This case thus is not like *Ultra-Precision*, 411 F.3d 1369 (cited in Corp. Defs.

Br. 43), in which the plaintiff asserted patent-like rights in an unpatented product and

did not claim any confidential or otherwise-protected relationship with the defendant. It is instead far closer to *University of Colorado Foundation, Inc. v. American Cyanamid Co.*, 342 F.3d 1298 (Fed. Cir. 2003). There, the plaintiff scientists conceived of new pharmaceutical formulations, which they disclosed confidentially to Cyanamid. *Id.* at 1301-03. Cyanamid filed a patent application claiming the invention as its own. *Id.* at 1303. This Court held that the plaintiffs' unjust-enrichment claim was *not* preempted, for it sought restitution for Cyanamid's unfair use of confidential information—it did not claim a patent remedy or patent-like protection over an unpatentable or publicly-available technology, but asserted "a legal claim to remedy the breach of a contract implied in law for disclosure of [plaintiffs'] confidential manuscript in exchange for a promise not to disseminate the idea without [their] consent." *Id.* at 1306; *see also Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1014-18 (10th Cir. 2008) (similarly holding claims for trade-secret misappropriation and breach of confidentiality agreement not preempted).

Here, as in *Cyanamid*, "[t]he right involved … and compensated for … is not 'patent-like' at all," 342 F.3d at 1306, but arises from a voluntary state-law arrangement under which Konstantino was obligated not to take a corporate opportunity (whether or not patentable) for his own. The district court did not rule that AngioScore had any exclusive rights over the Chocolate device, or prohibit the device's production and sale. Rather, the court ordered restitution for Defendants'

wrongful usurpation of a *business opportunity* that differs from the specific claims of any patents that Defendants hold or could hold over the Chocolate device. Delaware law required Konstantino to offer that *business opportunity* to AngioScore in his fiduciary capacity as Director, whether or not it was patented or patentable. That requirement does not conflict with federal law.

## VI. THE DISTRICT COURT PROPERLY DENIED ATTORNEYS' FEES ON THE PATENT CLAIM

### A. This Court Lacks Jurisdiction To Review The Attorneys' Fees Order Because No Party Timely Appealed

The appeals of the fees order should be dismissed as untimely. The district court entered its order denying fees on December 9, 2015 (A179-82), and no Defendant filed a notice designating that order as one being appealed until January 21, 2016 (A18734-39)—well after the 30-day appeal period expired on January 8. *See* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). This is fatal, for a timely notice of appeal is "a jurisdictional requirement," *Bowles v. Russell*, 551 U.S. 205, 214 (2007), and accordingly "[a]n untimely appeal must be dismissed for lack of jurisdiction," *Marandola v. United States*, 518 F.3d 913, 914 (Fed. Cir. 2008).

It does not matter that Defendants timely appealed the final *merits* judgment, because that judgment and the fees order are "separate final decisions" that "must be covered by separate notices of appeal." *Falana v. Kent State Univ.*, 669 F.3d 1349, 1360 (Fed. Cir. 2012). Without such a separate, timely notice, "the court of appeals

lacks jurisdiction to review the [fees] order." *Whitaker v. Garcetti*, 486 F.3d 572, 585 (9th Cir. 2007); *see also E.E.O.C. v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1250 (10th Cir. 1999) (same).

Nor did Konstantino's Rule 59(e) motion to amend the *merits* judgment extend the time to appeal the *fees* order. A notice of appeal must be filed "within 30 days after entry of the judgment or order appealed from." Fed. R. App. P. 4(a)(1)(A). While that deadline may be extended by a motion "to alter or amend the judgment" that is to be the subject of the appeal, Fed. R. App. P. 4(a)(4)(A)(iv), where there are two *separately appealable* orders or judgment, a timely notice is required with respect to each. *See Falana*, 669 F.3d at 1360. A "motion to reconsider one [of them] does not extend the time to appeal another … just because they are part of the same litigation." *TBG, Inc. v. Bendis*, 36 F.3d 916, 921 (10th Cir. 1994); *see also Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 511-12 (7th Cir. 1989) (similar). Since no party sought relief from the fees order in the district court, the time to appeal that order expired 30 days after its entry. The appeals of the fees order should accordingly be dismissed for want of jurisdiction.

## B. The District Court Was Well Within Its Discretion To Deny Attorneys' Fees

Were the Court to reach the merits, the district court's order denying attorneys' fees should be affirmed. A district court may award attorneys' fees only in an "exceptional" patent case, 35 U.S.C. § 285, meaning one "that stands out from others

with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated," *Octane Fitness*, 134 S. Ct. at 1756. A district court's determination of whether a case is "exceptional" entails a "case-by-case exercise of [its] discretion, considering the totality of the circumstances." *Id.* Corporate Defendants[25] identify no error, let alone an abuse of discretion, in the district court's determination (A181) that this case was not "exceptional."

Corporate Defendants cannot contend that the case was unreasonably litigated, and so exclusively argue (Br. 54-59) that the district court wrongly relied in part on the fact that AngioScore's patent claims survived a motion for summary judgment— since, in their view, they were entitled to summary judgment based on an argument that claim vitiation defeated application of the doctrine of equivalents. But Corporate Defendants *omitted* that argument from their summary-judgment motion. *See* A1507-42. While they later sought leave to file a *second* summary judgment motion on this theory (*see* A3349.1-.3), the district court properly denied that request as in violation of its Standing Order in Civil Cases (A3353.1). Corporate Defendants have not challenged that ruling on appeal, nor would they have any basis to do so. *See, e.g.*, *In re Vigilant Video, Inc.*, 535 F. App'x 928, 931 (Fed. Cir. 2013) (noting district courts'

---

[25] Konstantino waived any challenge to the fees order by omitting to request relief therefrom (*see* Br. 63) or to incorporate by reference Corporate Defendants' arguments on this point (*see* Br. 29). *See, e.g.*, *SSL*, 769 F.3d at 1085.

"broad discretion" in conducting summary-judgment proceedings).  The district court's failure to grant summary judgment on a basis never properly presented does not undermine its determination that this case was not "exceptional."

Yet even if Corporate Defendants *had* moved for summary judgment on their claim-vitiation theory, and even if summary judgment should have been granted, that still would not show that the district court acted outside its discretion in denying attorneys' fees.  A case is not "exceptional" for Section 285 purposes simply because a patent-infringement claim was or should have been rejected at summary judgment— such a bright-line rule would be inconsistent with *Octane Fitness*'s requirement to conduct a *case-specific* evaluation of the strength of a party's litigating position.  *See* 134 S. Ct. at 1756.[26]

Nor do Corporate Defendants show (Br. 57-59) that AngioScore's position was so "exceptionally meritless" as to "set itself apart from mine-run cases to warrant a fee award."  *Octane Fitness*, 134 S. Ct. at 1757.  Corporate Defendants seek to relitigate their claim-vitiation theory, but disregard AngioScore's reasonable arguments against their underlying position.  Specifically, in opposing their request to file a second summary judgment motion, AngioScore explained (A3350-51) that Defendants'

---

[26]  Corporate Defendants misplace reliance (Corp. Defs. Br. 57) on *Highmark*, 134 S. Ct. at 1748 n.2: the Supreme Court simply noted that a legal error constitutes an abuse of discretion.  Defendants identify no legal error in the district court's exceptional-case ruling.

argument—that AngioScore could not prove infringement under the doctrine of equivalents because the proposed equivalent was the purported opposite of the "end limitation" in AngioScore's '119 patent—did not account for *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349 (Fed. Cir. 2012). In *Deere*, this Court held that the doctrine of equivalents is not inapplicable simply because the proposed equivalent is the "binary" opposite of the patent's limitation, explaining that the doctrine, "by definition, recognizes that an element is missing that must be supplied by the equivalent substitute." *Id*. at 1356-57. Thus, the proper inquiry is "whether an asserted equivalent represents an 'insubstantial difference' from the claimed element, or 'whether the substitute element matches the function, way, and result of the claimed element.'" *Id*. at 1356; *see Brilliant Instruments, Inc. v. Guidetech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013) (similar). AngioScore reasonably argued that, under *Deere*, Defendants' claim-vitiation theory was incorrect. A3350-52.

AngioScore's case at trial was likewise reasonable. AngioScore argued that there was no substantial difference between the '119 patent's "end-to-end" struts and Chocolate's configuration, in which interconnected struts alternatively originated at one end of the stent and then the other with each strut nearly reaching both ends but for the omission of a small end segment. This argument was supported by expert testimony (A90452-55), as well as Defendants' own patent applications, which disclosed that Chocolate could be configured with "*either or both* of the strut ends …

attached to the catheter shaft" (A94024 (emphasis added)), and provided a reasonable basis to distinguish *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) (cited in Corp. Defs. Br. 58-59) (claim required a "majority," but accused device had only a "minority"). While AngioScore did not prevail at trial, the district court was well within its discretion to find AngioScore's position not so meritless as to render the case "exceptional."

## CONCLUSION

The judgment should be affirmed. The order denying attorneys' fees should be affirmed if considered on the merits.

Dated: March 28, 2016

Respectfully submitted,

/s/ Robert P. Feldman

Peter J. Armenio, P.C.
William B. Adams
Cleland B. Welton II
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Robert P. Feldman
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
bobfeldman@quinnemanuel.com

*Attorneys for Plaintiff-Appellee AngioScore, Inc.*

## **PROOF OF SERVICE**

The undersigned hereby certifies that on March 28, 2016, I caused the foregoing Brief For Plaintiff-Appellee to be filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF System. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


<u>/s/ Robert P. Feldman</u>

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing Brief For Plaintiff-Appellee complies with the type-volume limitation of this Court's Order of March 24, 2016 (ECF 65) granting leave to file an extended brief of up to 18,000 words, because exclusive of the exempted portions it contains 17,986 words as counted by the word-processing system used to prepare the brief.

The undersigned further certifies that the Brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared using Microsoft Office Word 2013 in Times New Roman, font size 14.

/s/ Robert P. Feldman